**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>ORION HEALTHCORP, INC. *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 18-71748 (AST) |
| HOWARD M. EHRENBERG, IN HIS CAPACITY AS LIQUIDATING TRUSTEE OF ORION HEALTHCORP, INC., ET AL.,<br><br>Plaintiff,<br>v.<br><br>ARVIND WALIA; NIKNIM MANAGEMENT INC.,<br><br>Defendants. | Adv. Proc. No. 20-08049 (AST) |

**DEFENDANTS' BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, SUMMARY ADJUDICATION AS AGAINST DEFENDANTS ARVIND WALIA AND NIKNIM MANAGEMENT, INC.**

---

[1] The debtors in these chapter 11 cases are: Orion Healthcorp, Inc.; Constellation Healthcare Technologies, Inc.; NEMS Acquisition, LLC; Northeast Medical Solutions, LLC; NEMS West Virginia, LLC; Physicians Practice Plus Holdings, LLC; Physicians Practice Plus, LLC; Medical Billing Services, Inc.; Rand Medical Billing, Inc.; RMI Physician Services Corporation; Western Skies Practice Management, Inc.; Integrated Physician Solutions, Inc.; NYNM Acquisition, LLC; Northstar FHA, LLC; Northstar First Health, LLC; Vachette Business Services, Ltd.; Phoenix Health, LLC; MDRX Medical Billing, LLC; VEGA Medical Professionals, LLC; Allegiance Consulting Associates, LLC; Allegiance Billing & Consulting, LLC; and New York Network Management, LLC.

**TABLE OF CONTENTS**

Summary of Argument………………………………………………………………………………………1, 2

Procedural Statement……………………………………………………………………….…….…2

Statement of Facts………………………………………………………………………………………3

    The Transfers………………………………………………………………………………………………3

    The Two Year Transfer…………………………………………………………………………………3-6

    The One Year Transfers……………………………………………………………………………….6-10

    Claims under the NYDCL…………………………………………………………………………………10

    Judgment against Walia……………………………………………………………………………….10

Argument……………………………………………………………………………………………………11

    Legal Standard………………………………………………………………………………………………11

    Disputed Material Facts…………………………………………………………………………………11-14

Conclusion………………………………………………………………………………………………15

# TABLE OF AUTHORITIES

                                                                                                                        Pages

**Cases**

*Adickes v. S.H. Kress & Co.*
   398 U.S. 144, 167, 90 S.Ct.1598, 26 L. ED. 2d 142 (1970)……………………………………………….2, 11

*Anderson v. Liberty Lobby, Inc.*
 447 U.S. 242, 248, 105 S.Ct.2505, 91 L. Ed 2d 302 (1986)………………………………………….    2, 11

*Damianos Reality Group, LLC v. Francchia*
885 N.Y.S. 2d 270, 274  ( 2d Dept. 2006), N.Y. App. Div. Lexis 14542……………………………….14

*First Bank of Americas v. Motor Funding*
257 A.D. 287, 294, ^90 N.Y.S. 2d 17 (1999)     ………………………………………………………………14

*Jacobs v. D'Allesando (In re Dewey & LeBoeuf, LLP*
2014 Bankr. Lexis 4051, 17……………………………………………………………………………………….  13

*Salomon v. Kaiser (In re Kaiser)*
222 F.2d 1574, 1582-83 (2s Cir. 1983)………………………………………………………………………….12

*Se. Investor Prot. Corp. v. Bernard Madoff Inv. Sec, LLC*
564 B.R. 737, 2017 Bankr. Lexis 245, 63 Bank Ct. Dec. 202 (2017)……………………………………….14

**Statutes**

11 U.S.C. §548 (a)(1)(A)……………………………………………………………………………………………..11

11 U.S.C. §550(b)(1)…………………………………………………………………………………………………14

**Other Authorities**

New York Debt. & Cred. Law §273 (a)……………………………………………………………………..10, 13

New York Debt. & Cred. Law §276………………………………………………………………………………12

**Rules**

Fed. R. Civ. Proc. 56……………………………………………………………………………………………………….11

Fed. R. Bankr. P. 2056…………………………………………………………………………………………………….11

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>ORION HEALTHCORP, INC. *et al.*,[1]<br>HOWARD M. EHRENBERG, IN HIS CAPACITY AS LIQUIDATING TRUSTEE OF ORION HEALTHCORP, INC., ET AL.,<br><br>Plaintiff,<br><br>v.<br><br><br>ARVIND WALIA; NIKNIM MANAGEMENT INC.,<br><br><br>Defendants. | Chapter 11<br><br><br><br>Case No. 18-71748 (AST)<br><br><br><br><br><br>Adv. Proc. No. 20-08049 (AST) |

**BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARYJUUDGMENT OR IN THE ALTERNATIVE SUMMARY ADJUDICATION**

**SUMMARY OF ARGUMENT**

---

[1] The debtors in these chapter 11 cases are: Orion Healthcorp, Inc.; Constellation Healthcare Technologies, Inc.; NEMS Acquisition, LLC; Northeast Medical Solutions, LLC; NEMS West Virginia, LLC; Physicians Practice Plus Holdings, LLC; Physicians Practice Plus, LLC; Medical Billing Services, Inc.; Rand Medical Billing, Inc.; RMI Physician Services Corporation; Western Skies Practice Management, Inc.; Integrated Physician Solutions, Inc.; NYNM Acquisition, LLC; Northstar FHA, LLC; Northstar First Health, LLC; Vachette Business Services, Ltd.; Phoenix Health, LLC; MDRX Medical Billing, LLC; VEGA Medical Professionals, LLC; Allegiance Consulting Associates, LLC; Allegiance Billing & Consulting, LLC; and New York Network Management, LLC.

1. The Plaintiff has failed to show an absence of material facts with respect to each substantive argument of his motion for summary judgment or in the alternative summary adjudication. The Affidavit of Defendant Arvind Wallia submitted herewith (**Walia Aff.**) shows that there are either controverted material facts or a lack of evidence supporting Plaintiff's with respect to each ground of Plaintiff's motion. Indeed, the first case cited by the Plaintiff, *Adickes v. S.H. Kress & Co,* 398 U.S.144, 157, 90 S.Ct, 1598, 26 L. Ed 2d 342 (1970) sets the standard which must be, but has not been, met by Plaintiff with respect to the motion. "The moving party has the burden of demonstrating the absence of any genuine issue of material fact, and all     favorable to the party opposing the motion." Here, Defendants have met their burden of

    showing by specific evidence that genuine issues of material fact exist or that the Plaintiff failed to provide material evidence sufficient to shift the burden of coming forward  to Defendant. The affidavit of Walia submitted herewith provides sufficient evidence to meet Defendants' burden of showing that "a reasonable jury could return a verdict for [Defendants]" and to require that the motion be denied. *Anderson v. Liberty Lobby, Inc,* 447 U.S. 242, 248, 105 S .Ct. 2505,  (1986).

## Procedural Background

2. The procedural background is contained in the affidavit of defendant Walia filed herewith. (**Walia Aff. 2-20**).

## Statement of Facts

3. In or about 2015 and earlier  Defendant Walia was the sole officer, director, and shareholder of  his co-defendant, Niknim Management Inc. (collectively, "**Defendants**").

4. In or about 2015 and earlier, Walia was the majority owner and Chief Executive Officer of Porteck Corporation ("**Porteck**").

5. In or about March 2015, the Debtor, Physicians Practice Plus, LLC ("**Physicians Practice**"), acquired the assets of Porteck pursuant to an asset purchase agreement made and entered into as of March 2015 (the "**Porteck Asset Purchase Agreement**"). A copy of the Porteck Asset Purchase Agreement is annexed to the **Walia Aff.** as Exhibit A.

6. In or about June 2017, Physicians Healthcare Network Management Solutions LLC ("**Physicians Healthcare**"), a non-debtor, acquired Walia's membership interests in Objectech Holdings, LLC pursuant to a Membership Interests Purchase Agreement made and entered into as of June 2017 (the "**Objectech Membership Purchase Agreement**"). A copy of the Objectech Membership Purchase Agreement is annexed to the **Walia Aff.** as Exhibit B.

The Transfers

7. On or about June 23, 2017, within one (1) year prior to the commencement of the bankruptcy, Constellation Healthcare made two payments to Niknim; one for $1,500,000 and another for $20,000 (collectively, the "**One-Year Transfers**"), representing the Closing Payment pursuant to the terms of the Objectech Membership Purchase Agreement. **(Walia Aff. 24)**

8. On or about April 15, 2016, within two (2) years prior to the commencement of the bankruptcy cases, Constellation Healthcare and/or Orion paid Niknim $2,500,000 (the "**Two-Year Transfer**") (collectively, the One-Year Transfers and the Two-Year Transfer are referred to as the "**Transfers**"). **(Walia Aff. 25)**

9. Plaintiff has produced no evidence as to the identity of the transferor of the Two-Year Transfer; he merely alleges funds were transferred from the Debtors' counsel's IOLA account, into which Constellation Healthcare and/or Orion made deposits. (**Walia Aff. 26**)

The Two-Year Transfer

10. Plaintiff challenges the value of Porteck's assets and makes much of the fact that Parmar characterized Porteck as a "joke". Plaintiff has taken the statement out of context and distorts its meaning without any evidentiary support.

11. Parmar's comment was made to the broker Walia obtained to represent Porteck. It was made as part of Parmar's attempt to negotiate with the broker a lesser price for Porteck's assets than Walia was asking. Walia testified in this litigation that Parmar misstated the purchase price to the broker because Parmar thought "he could get a better deal for us." Parmar made the comment on December 1, 2014, three months prior to the March 2015 execution of the Porteck Asset Purchase Agreement and almost one and one-half years before the Two-Year Transfer of April 15, 2016. (**Walia Aff. 26**) Only Parmar, whose testimonial evidence Plaintiff has not obtained, knows exactly what he meant. In any case, as explained in the Walia Affidavit (**Walia Aff. 35**), the statement is irrelevant.

12. Parmar and Walia ultimately agreed that the value of Porteck's assets was approximately five times its 2014 EBITDA of $2.2 million, or $11 million. (The stated purchase price was $10.8 million.) Based on his experience Walia knew that was a reasonable valuation. (**Walia Aff. 37**)

13. While Porteck, as seller under the Porteck Asset Purchase Agreement, received $10.8 million, the Porteck Asset Purchase Agreement provided for a purchase price of $12.8 million based on a request by Parmar that the purchase price be increased by $2 million to fund related deal fees. Palmar stated he wanted to pay the fees out of the proceeds of sale

-4-

instead of paying them as a separate expense. Palmar stated that he wanted the purchase price to reflect the total cost of the transaction. Walia did not believe there was anything unusual about this. (**Walia Aff. 38**)

14. Although plaintiff notes that according to the IOLA Account, $3 million of the purchase price was paid to First United Health ("**FUH**"), a Parmar controlled entity, Plaintiff assumes that the payment was nefarious without furnishing any evidence. Walia had no knowledge the payment may have been inappropriate. Walia was never privy to information concerning the IOLA account and had no knowledge of any disbursements other than to Porteck. Indeed, Walia did not learn of any payment to FUH until this litigation. (**Walia Aff. 39**)

15. Plaintiff does not directly challenge the value of the Porteck Asset Purchase agreement.

16. Pursuant to Article 3 of the Porteck Asset Purchase Agreement, Porteck, as seller, made certain representations and warranties. Pursuant to Article 4, the selling shareholders also made certain representations and warranties. Pursuant to Article 7, Porteck and the selling shareholders jointly and severally agreed to indemnify and hold harmless Physicians Practice and certain of its affiliates against claims arising from breaches of, among other things, such representations and warranties, **(Walia Aff. 41)**

17. Section 1.6(c) of the Porteck Asset Purchase Agreement, which incorporated a funding mechanism to secure the performance by selling shareholders of their indemnification obligations, provides:

> For the purpose of partially securing Seller's obligations pursuant, and without limiting Seller's obligations thereunder, the amount of two million five hundred thousand Dollars ($2,500,000) in cash (the "**Escrow Amount**") shall be delivered by Buyers [sic] at the closing to the Escrow Agent by wire transfer of immediately available funds' to an account (the "**Escrow Account**") to be designated and administered by the Escrow Agent pursuant to an escrow agreement substantially in the form of Exhibit A ("the **Escrow Agreement**"), which Escrow Agrement shall provide, among other things, that any

> amounts remaining in the Escrow Account shall be released to Seller twelve (12) months after the Closing, to the extent not subject to any clams made prior to that time. Seller and Buyer agree that for all Tax purposes, any amounts in the Escrow Account released to the Seller pursuant to this Section 2.7 [sic] shall be treated as additional purchase price, unless otherwise required by applicable Law. The Escrow Payment Working Capital Deficiency [sic].

18. The stated purpose of the escrow arrangement was to protect the rights of Physicians Practice, as purchaser under the Agreement, to receive $2.5 million, to the extent such funds were required to indemnify Physicians Practice. No indemnity claims arose entitling the purchaser to any such funds [and Walia that the sellers be paid the entire amount of its purchase price?]. Either Cosnstellation Healthcare or Orion paid Niknim $2,500,000 (the "Two-Year" transfer.) (**Walia Aff. 43**)

19. Walia did not learn until this litigation that the escrow was not created. Nor did he ever claim that the funds were otherwise set aside to fund the deferred payment. (**Walia Aff.44**)

20. Walia did not maintain or control the Debtors' books and records. The fact that the Debtors' books did not reflect a debt nor payment of such debt is not attributable to Walia. Plaintiff has submitted no evidence that such entries on the books of the Debtors would have been appropriate under the circumstances. (**Walia Aff. 45**)

21. The email to Walia from Parmar stating "I am willing to give you 3.5MM in return for you to allow me to structure it properly internally which requires I close the file with a [@m?] payment" related to the $2,500,000. owed as payment under the Porteck Asset Purchase Agreement, and $1,000,000 that Porteck collected for accounts receivable that were not sold under that Agreement. (**Walia 46**)

22. Despite his status as an officer of Orion, Walia was not involved in the alleged purchase of MDRX Medical Billing, LLC on February 2016. (**Walia 47**)

The One Year Transfers

23. Payment of $1,520,000 to Niknim under the Objectech Membership Purchase Agreement represented the One Year Transfers.

24. Section 1.1 of the Objectech Membership Purchase Agreement provides that:

> "On the Closing Date and subject to the terms and conditions set forth in this Agreement, [Walia] will sell, assign, and transfer to [Physicians Healthcare], and [Physicians Healthcare ] will purchase and acquire, all of the Interests, free and clear of all Liens, for and in consideration of (A) (1) the sum of those amounts actually paid to one or more of the Selling Parties and Selling Member Representative (i) as Closing Payment, (ii) any Earn-Out payments, and (iii) in respect of the adjustment of the Company's working capital in accordance with Section 1.5, less (B) any Required Repayments paid in accordance with Section 1.6 (collectively, the "Purchase Price")."

25. Section 1.2 of the Objectech Membership Purchase Agreement provides that the Closing Payment of $1,520,000 (the "**Closing Payment**") shall be paid at the closing.

26. Objectech owned AllRad Direct, LLC ("**AllRad**"). AllRad's property consisted of certain software that was advantageous to the Debtors. It provides state of the art technology to ensure that patients, providers, and payers have complete access and insight into every aspect of the diagnosis, treatment, and follow-up for each patient. The data base was designed to facilitate population wellness management solutions by consolidating and storing clinical assessments, diagnostic laboratory and imaging results, prescribed treatment regimens and care plans and their clinical outcomes for each patient. More detailed descriptions of the software are annexed as Exhibits C and D to the **Walia Aff.**.

27. Constellation Healthcare was a medical billing company that had acquired New York Network Management, LLC ("**NYNM")** an IPA company. NYNM needed a major technology overhaul by replacing its existing network management system from Evicore ($1M per year recurring cost) and building custom automation including integration with PARCS (Constellation Healthcare's billing system). (**Walia Aff. 52)**

28. AllRad software is a network management system that has the following advantages.

- It had most of the network management features needed for NYNM.
- The technology was the same as the PARCS system.
- The AllRad team was very familiar with PARCS system as they were from the same company.
- The operational efficiency and cost saving for replacing existing software with AllRad software once adapted by NYNM would be over $3M a year.
- The enhancement and cost to the adaption of AllRad software for NYNM was considerably low since the existing Constellation Healthcare technology team was familiar with the software and it had the same technology as PARCS. (**Walia Aff. 53)**

29. Constellation Healthcare paid Niknim $1,520,000 representing the Closing Payment pursuant to the terms of the Objectech Membership Purchase Agreement. **(Walia Aff. 54)**

30. The amount of the consideration paid under the Objectech Membership Purchase Agreement was the result of a bilateral negotiation and represented the exercise of the parties' respective business judgment, in good faith. No evidence has been produced that the Debtors received less than reasonably equivalent value. (**Walia Aff. 55)**

31. The Debtors' counsel prepared the draft of the Objectech Membership Purchase Agreement. At the time they prepared it they were not familiar with Objectech or its assets and both Parmar and Walia treated the draft as a working template to memorialize the transaction. **(Walia Aff. 56)**

32. As a company, Objectech did nothing, had no revenue, and had no assets other than very valuable software that Objectech had developed through a substantial capital investment. Consequently, various schedules, projections, and other financial information had no relevance to the transaction. Throughout the negotiations, Walia responded to all requests for information relating to the software, its value, and its utility to the Debtors and believed the Debtors were fully satisfied with such information at the time the transaction closed, Walia was unaware that the Orion Board had not approved the transaction. (**Walia Aff. 57)**

33. Plaintiff' has alleged no evidence to support the conclusion that Parmar was acting with fraudulent intent with respect to this transaction sufficient to sustain Plaintiff's burden for obtaining summary judgment.

34. Plaintiff statements that the Debtors' books and records do not evidence an antecedent debt owed under the Objectech Membership Purchase Agreement and that after the One-Year Transfer, the Debtors' books and records do not evidence the satisfaction of such debt or an increase in net assets through the acquisition is another red herring. No such entry would have been made by the Debtors because Physicians Healthcare, a non-debtor, was the counterparty to the Objectech Membership Purchase Agreement. Any such entry would have been recordable in its books and records. In any event, Plaintiff has not submitted any evidence that there actually was an antecedent debt (of Physicians Healthcare) created under the Objectech Membership Purchase Agreement. In fact, there was none because the execution and closing under the Objectech Membership Purchase Agreement occurred simultaneously.

35. The Debtors received reasonably equivalent value even though the buyer under the Objectech Membership Purchase Agreement was Physicians Healthcare, a non-debtor entity and Constellation Healthcare, a debtor, paid the purchase price. (**Walia Aff. 60**)

36. Walia did not know the identity of the members of Physicians Healthcare. Physicians Healthcare purported to be a Delaware limited liability company in the Objectech Membership Purchase Agreement. It was typical in the ordinary course of the Debtors' businesses to create (and own the equity of) an entity for the special purpose of making an acquisition, and Walia believed that such was the case with respect to the Objectech Membership Purchase Agreement. **(Walia Aff. 61)**

37. The assets of Objectech were delivered to Orion, one of the Debtors, at the closing and Walia, presided over the development and integration of the software for the exclusive benefit of the Debtors. The value of this benefit was reasonably equivalent to the amount paid in exchange for it under the Objectech Membership Purchase Agreement. Plaintiff has not submitted any evidence to the contrary. (**Walia Aff. 62**)

38. Plaintiff has presented no competent evidence that either of the Transfers was made with actual intent to hinder, delay, or defraud a creditor. Neither the Porteck Asset Purchase Agreement nor the Objectech Membership Purchase Agreement manifests any false statement, misrepresentation, or backdating.

39. Plaintiff requested copies of certain tax returns filed by Objectech. Such returns were not produced because they do not exist. Objectech did nothing, had no revenue, and had no assets other than valuable software. Having no revenue to report, it filed no tax return. (**Walia Aff. 64**)

Claims Under NYDCL 273-a

40. Constellation Healthcare Debtor paid fair equivalent value under the Objectech purchase and Plaintiff has not submitted evidence to the contrary.

Judgment Against Walia

41. Plaintiff has produced no evidence to show that Walia was in complete domination of Niknim with respect to the Transfers, nor that Walia used such domination to commit a fraud or wrong against Plaintiff which resulted in Plaintiff's injury.

42. Walia took any payments from Niknim, for value, in good faith, and without knowledge of the voidability of the Transfers. (**Walia Aff. 70**)

## **Argument**

**Legal Standard**

43. The Standard for summary judgement, pursuant to Rule 7056 of the Federal Rules of Bankruptcy Procedure is stated in Rule 56 of the Federal Rules of Civil Procedure. As noted in the summary of argument above that standard may be articulated as requiring movant to show that "there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. The moving party bears the burden of demonstrating the absence of any genuine issue of material fact, and all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion." *Adickes v S.H. Kress & Co.,* 398 U.S.144, 157, 90 S. Ct, 1598, 26 L.Ed. 2d (1970). Summary judgment may not be granted if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party" *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 343, 348, 106 S. Ct. 2505, 91 L. Ed 2d 302 (1986).

44. Here, Plaintiff has failed to show lack of such dispute as to each branch of its motion.

**Disputed Material Facts**

45. While Plaintiff states that it is "not disputed that the Debtors' property was involved in both transfers" (Plaintiff's Brief para 47), that is incorrect. See Paragraph 9 above noting that Plaintiff has failed specify the source of the IOLA disbursement with particularity, thereby creating a material dispute fact.

The Two Year Transfer

46. 11 U.S.C. 548(a)(1)(A) requires that for a transfer to be avoidable it must have been made with an "actual intent to hinder, delay or defraud" present or future creditors of the debtor. So too does New York Debtor and Creditor Law ("NYDCL") 276.

47. Plaintiff refers to the "fake acquisition of MDRX" to prove the Debtors' intent to defraud, but even if that transaction was indeed "fake" it does not indicate that transfers made to Niknim or Walia for the purchase of Porteck were also intended to hinder, delay of defraud the creditors of the debtors. That is simply conjecture, not relevant fact.

48. Likewise, Plaintiff's attempts to characterize the documentation of the Porteck Asset Purchase Agreement is no more than conjecture and is specifically refuted by Walia in his affidavit filed herewith. (See paragraphs 10-14 above.)

49. The $2,500,000 transfer was explained by Walia as a withheld payment to protect the rights of the Porteck purchaser and was withheld as part of a contemporaneous transaction to secure the sellers' performance of their representations and warranties. When those representations and warranties were fulfilled, the withheld amount was transferred. (See paragraph 18 above.)

50. The cases cited by Plaintiff with respect to intentional fraud or attempts to hinder or delay payment to creditors are simply in apposite as Defendant Walia has fulling explained and controverted the facts used by Plaintiff to support his argument, The alleged "badges of fraud" allowing an inference of fraudulent intent (See for example *Salomon v Kaiser (In re Kaiser),* 722 F.2d 1574, 1582-83 (2d Cir. 1983) are simply either not present, or are in dispute as noted above.

The One Year Transfer

51. Plaintiff's statement that Walia's claim that the One Year Transfer was for value "is baseless" is, in itself baseless. As explained above (paragraphs 23-39) and in the affidavit of Walia filed herewith, each and every alleged badge of fraud was explained and refuted by Walia as facts in context rather than conclusions built on inference after inference. A

-12-

clear reading of the facts stated above, based on the Walia affidavit, create a series of disputed material facts precluding summary judgement with respect to the claims of intentional fraud.

52. Much is made of the fact that Walia was an insider and thus the transfer violates NYDCL 273-A regardless of intent, as a constructive fraud. However, the question of whether Walia was an insider for purposes of the statute is not a simple exercise based on title. Rather an analysis of insider status is "fact specific" and "can turn on a case-by case basis from the totality of the circumstances." *Jacobs v. D'allessandro (in re Dewey & Leboeuf LLP),* 2014Bankr.Lexis 4051, 17. "Although the definition of insider is to be flexibly construed, courts generally require evidence of 'actual management' or 'extensive control." Id. The purported ***insider*** must have 'a controlling interest in the ***debtor*** or…exercise sufficient authority over the ***debtor*** so as to unqualifiedly dictate corporate policy and the disposition of corporate assets." Id at 18. The cases cited by Plaintiff do not negate the fundamental principles noted in *Jacobs.* Here there has been no evidence proffered that Walia was engaged in actual management of or had sufficient authority over the Debtor to be able to dictate corporate policy or the disposition of corporate assets. Indeed, the opposite is true. Walia has stated in his affidavit that the purchase of Objectech was the result of a bilateral negotiation between the parties and was in good faith. Throughout the transaction Walia reported to Parmar, did not control the books and records of the Debtors, and had no knowledge of the Orion Board's action with respect to the transaction. (See above paragraphs 30-37.)

53. Based on the facts contained herein, and the lack of evidence to the contrary, Walia's sale of Objectech was not lacking in fair value as a matter of law, and a *per se* holding that the

purchase of Objectech was not for fair value or was in bad faith is unwarranted at this stage of the proceedings.

Personal Liability

54. Plaintiff has failed to meet its burden with respect to Walia's personal liability for Transfers to Niknim. "Generally, piercing the corporate veil requires a showing that the individual (1) had complete domination and control over the corporation, and (2) used such domination and control to commit a fraud against the plaintiff which results in injury to plaintiff. *Damianos Realty Group, LLC v. Fracchia,* 885 N.Y.S 2d 270,274 (2d Dept. 2006), NY App. Div. Lexis 14542. Further, the court noted that "Veil piercing is a fact-laden claim that is not well suited for summary judgment resolution (*First Bank of Americas v. Motor Car Funding,* 257 AD 2d,287, 294, 690 N.Y.S.2d 17.)" Plaintiff has failed to show Niknim was used by Walia to commit a fraud against the Debtor and Walia cannot be held personally liable for the Transfers. (Niknim denies it committed any fraud based on the facts elucidated above.)

55. As the transferee of Niknim, Walia is not liable as any monies he received from Niknim were for value, in good faith, and without knowledge of the voidability of the transfer to Niknim. He is thus shielded under section 550(b)(1). *Sec. Investor Prot. Corp v. Bernard Madoff Inv. Sec, LLC,* 564 B.R. 737, 2017 Bankr.Lexis 245, 63 Bank CT. Dec.202. (2017) "550(b)(1) provides a complete defense to a subsequent transferee to the extent he 'takes for value…in good faith, without knowledge of the voidability of the tranfer. Here Walia has stated in his affidavit that he "took for value, in good faith, and without knowledge of the voidability of the Transfers." (**Walia Aff. 70)**

## **Conclusion**

**Wherefore,** Defendants respectfully pray that the Court enter an order denying Plaintiff's motion in its entirety and awarding costs and/or fees by motion and according to proof.

Dated: February 23, 2023

                                            Respectfully submitted,

                                            The Law Office of Eugene R. Scheiman, PLLC
                                            Co-counsel for Defendants

                                            By: <u>/s/ Eugene R. Scheiman</u>
                                                   Eugene R. Scheiman

                                            570 Lexington Avenue.
                                            Suite 1600
                                            New York, NY 10022
                                            Tel: (646) 280-9000

                                            And

                                            Rosen & Associates, P.C.
                                            Co-counsel for Defendants
                                            747 Third Avenue
                                            New York, NY 10017
                                            Tel: (2120 223-1100