# FW: various document - marked up

**From:**
Arvind Walia <awalia@porteck.com>

. ul Parmar <paul@constellationhealthgroup.com>
**Date:**
Mon, 19 Jun 2017 08:50:09 -0400
**Attachments:**
Undertaking Agreement - June 2017.docx (22.39 kB); Arvind Walia Employment Agreement 2017.docx (64.76 kB); MIPA - Objecttech Holdings LLC.DOCX (155.4 kB); Niknim Management Inc Consulting Agreement.docx (47.97 kB); Notice to Exercise Option - June 2017.doc (47.62 kB)

---

Paul

Please see the mark up. Please lets finalize today as I will like to close on this asap for one reason which I will talk to you about today.

Regards
Arvind

-----------------------------------
Arvind Walia
CEO, Orion Health Corporation
100 Jericho Quadrangle, Ste 235
Jericho, NY 11753
http://www.orionhealthcorp.com/
516-874-8101 (phone)
646-536-2515 (fax)
516-770-6222 (Mobile)
-----------------------------------------

Original Message-----
г.om: Arvind Walia
Sent: Thursday, June 15, 2017 6:58 PM
To: Paul Parmar (paul@constellationhealthgroup.com)
Subject: FW: various document - marked up

Please see the documents.

Objecttech - 1.52M at closing,  325k for 12% EBITDA anytime upto 6months and 325k for 15% EBTDA anytime upto 12 months.

Employment agreement - stock option participation language, 1 year non compete and state of new York instead of arbitration.

Thanks
Arvind

-----------------------------------
Arvind Walia
CEO, Orion Health Corporation
100 Jericho Quadrangle, Ste 235
Jericho, NY 11753
http://www.orionhealthcorp.com/
516-874-8101 (phone)
646-536-2515 (fax)
516-770-6222 (Mobile)
-----------------------------------------

-----Original Message-----
From: Arvind Walia
        Thursday, June 8, 2017 7:18 AM
. .. Sam Zaharis'
Subject: various document - marked up

Sam

Exhibit
0025

EHREN-WALIA 004519

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------

| | |
|---|---|
| In re: | : Chapter 11 |
| | : |
| ORION HEALTHCORP, INC.[1] | : Case No. 18-71748 (AST) |
| | : |
| Debtors. | : (Jointly Administered) |

---------------------------------------

| | |
|---|---|
| HOWARD M. EHRENBERG IN HIS CAPACITY | : |
| AS LIQUIDATING TRUSTEE OF ORION | : Adv. Pro. No. 20-08049 (AST) |
| HEALTHCORP, INC., ET AL., | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : |
| | : |
| ARVIND WALIA, NIKNIM MANAGEMENT, | : |
| INC. | : |
| Defendant(s) | : |
| | : |
| | : |

---------------------------------------

### AFFIDAVIT OF FRANK A. LAZZARA IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, SUMMARY ADJUDICATION

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Orion Healthcorp, Inc. (7246); Constellation Healthcare Technologies, Inc. (0135); NEMS Acquisition, LLC (7378); Northeast Medical Solutions, LLC (2703); NEMS West Virginia, LLC (unknown); Physicians Practice Plus Holdings, LLC (6100); Physicians Practice Plus, LLC (4122); Medical Billing Services, Inc. (2971); Rand Medical Billing, Inc. (7887); RMI Physician Services Corporation (7239); Western Skies Practice Management, Inc. (1904); Integrated Physician Solutions, Inc. (0543); NYNM Acquisition, LLC (unknown) Northstar FHA, LLC (unknown); Northstar First Health, LLC (unknown); Vachette Business Services, Ltd. (4672); Phoenix Health, LLC (0856); MDRX Medical Billing, LLC (5410); VEGA Medical Professionals, LLC (1055); Allegiance Consulting Associates, LLC (7291); Allegiance Billing & Consulting, LLC (7141); New York Network Management, LLC (7168). The corporate headquarters and the mailing address for the Debtors listed above is 1715 Route 35 North, Suite 303, Middletown, NJ 07748.

DOCS_LA:346960.5 65004/003

I, FRANK A. LAZZARA, being duly sworn, deposes and says: I, Frank A. Lazzara, make this Declaration in support of Plaintiff's Motion for Summary Judgment or, In The Alternative, Summary Adjudication in the above referenced adversary. I make this declaration based on (a) my personal knowledge, (b) my review of relevant documents and information concerning the Debtors' operations, (c) my opinions based upon my experience and knowledge of the Debtors' historically reported financial operations and financial conditions, or (d) information provided to me by management, advisors, employees or other representatives of the Debtors.

1.      I was a Managing Director in the Forensic and Litigation Consulting practice of FTI Consulting, Inc. ("FTI"). I am currently a Managing Director in the Global Investigations practice at J.S. Held LLC.  I am a Certified Public Accountant ("CPA") in the state of New York, a Certified Fraud Examiner ("CFE"), and am Certified in Financial Forensics ("CFF") by the American Institute of Certified Public Accountants ("AICPA"). I have more than 30 years of experience in accounting, auditing, controllership and forensics.

2.      In September 2017, FTI was retained in connection with multiple investigative, advisory, and restructuring tasks regarding Constellation Healthcare Technologies, Inc., Orion Healthcorp., et al. ("CHT"). I led a team of FTI professionals (the "FTI Investigations Team") who, in conjunction with CHT's counsel, began an investigation into the then-current and historically reported financial condition of the Debtor.  Beginning September 29, 2017, computer forensics professionals from the FTI Investigations Team directed the collection of CHT's electronically stored information ("ESI") from servers maintained by CHT and its subsidiaries.

3.     Included within such acquired ESI were the Office 365 mailboxes of CHT's former CEO, Parmjit "Paul" Parmar ("Parmar"), and CHT's former CFO, Sam Zaharis ("Zaharis"), in addition to CHT's financial systems, accounting records, bank statements, accounts payable, receivables, vendor, customer files and financial systems. The FTI Investigations Team searched and reviewed the financial records, e-mails, and accounts payable information with regard to past operations of the Debtors.

4.     FTI also conducted various forensic analyses in an effort to identify and corroborate the payment of certain accounts going forward. As such, I am personally familiar with the Debtors' books and records in hard copy and electronic format, including its general ledger, financial statements and tax returns as well as the historical communications that were committed to e-mail. I continue to assist the plaintiff, Howard M. Ehrenberg, in his capacity as the Liquidating Trustee of Orion Healthcorp, Inc. *et al.* (the "Liquidating Trustee" or "Plaintiff"), in the conduct of investigative tasks.

5.     In its review of the Debtors' books and records, the FTI Investigations Team discovered numerous email communications from Robinson Brog Leinwand Greene Genovese & Gluck P.C. ("Robinson Brog"), to former executives of the Debtors (the "September 27, 2017 E-mail"), along with ledgers of the IOLA activity in the escrow account maintained by Robinson Brog at  Wells Fargo Bank, N.A. (the "IOLA Account" or "IOLA"). A true and correct copy of the covering email and attachment are attached herein as **Exhibit 1**, LAZ.

6.     For the fiscal year ended December 31, 2014, 23.1 million dollars borrowed by Orion through a facility with RCC Commercial, Inc. was deposited into and appears in the IOLA account statement activity[2], dated 4/1/2014. This inflow of cash was reflected in the

---

[2] There are two entries noted in the amounts of $13.1 million and $10 million with entries in the "Name " field reading RCC Commercial Inc. and Whitehorse Fin Warehouse Collection, respectively

467

2014 audited Consolidated Financial Statements of the Debtors Constellation Healthcare Technologies and Subsidiaries as "net proceeds from long term debt" within the "Cash flows from financing activities:" section of the Consolidated Statement of Cash Flows[3]. (See 2014 Audited Consolidated Financial Statements, a true and correct copy of which is attached hereto as **Exhibit 2,** LAZ)

       7.     Robinson Brog received the distribution of over $46 million related to a CHT go-private merger transaction involving the Debtors that closed in January 2017 ("Go-Private Transaction"). These funds raised through the Go-Private Transaction were deposited into the IOLA Account on 2/3/2017. No Debtors other than CHT and Orion deposited monies into the IOLA Account prior to the Transfers based on my review of the IOLA Account as attached hereto as **Exhibit 1,** LAZ.

       8.     On March 2, 2015, the day prior to the March 3, 2015 Disbursement Authorization and Itemization  for the sale of Porteck Corporation assets to Physician Practice Plus, LLC , the IOLA Account records  "wire in" for $9,800,000" and the source of inflow as Constellation Healthcare Technologies. (See **Exhibit 1**, LAZ, pg 3) Thereafter, on March 5, 2015, 9.8 Million was paid from the IOLA Account as reflected on the MS Excel schedule attached hereto as **Exhibit 4, LAZ** which I prepared, comparing the Disbursement Authorization and Itemization form to the IOLA Account.  (See **Exhibit 1 and 3,** attached hereto)  However as reflected in the IOLA Account, of the 9.8MM, $3,000,000 was disbursed to First United Health LLC. (See **Exhibits 1)** [Please see the MS Excel schedule attached hereto as **Exhibit 4,** LAZ].

---

[3] According to Note 11 "Line of Credit And Long-Term Debt" to the 2016 audited financials, (Exhibit 5), the unpaid balance of this facility reported on the Consolidated Balance Sheet was $20,958,879 at 12/31/2016

9.      As part of the forensic analysis of the Debtors' books and records between January 1, 2015 and December 31, 2015, no entry was made recording a 2.5 MM debt owed to any of the Sellers of Porteck. I also reviewed the fiscal year 2016 books and records, and similarly noted no recordation of a 2.5 MM debt owed to Sellers of Porteck.  There was no evidence within the Debtors' books and records of the satisfaction of an antecedent debt as a result of the Debtors' payment of $2,500,000 made to Defendants on April 15, 2016.

10.      As part of the forensic analysis of the Debtors' books and records between January 1, 2017 and December 31, 2017, no entry was made recording a 1.52 MM debt owed to any of Objecttech Holdings, LLC or to Defendants Walia or NIKNIM.  In 2017, the Debtors' books and records do not evidence the satisfaction of any antecedent debt or increase in net assets through the acquisition of an asset such as Objecttech Holdings LLC, AllRad or PHNMS for $1,520,000.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 18th day of January, 2023, at _New York City,  NY ._

_____
Frank Lazzara

SWORN TO AND SUBSCRIBED before me this
18th day of January, 2023

_____

YVETTE TORRES
Notary Public, State of New York
No. 01TO6299989
Qualified in New York County
Commission Expires March 31, 20 26

Exhibit 1

# FW: Constellation

From:
"A. Mitchell Greene" <amg@robinsonbrog.com>
To:
Zaharis <sam.zaharis@constellationhealthgroup.com>
Cc:
"A. Mitchell Greene" <amg@robinsonbrog.com>
Date:
Wed, 27 Sep 2017 16:07:16 -0400
Attachments:
Constellation Billing Memo-1.pdf (3.15 MB); IOLA Quickreport for Constellation Health All Accts.pdf (23.85 kB)

---

**From:** A. Mitchell Greene
**Sent:** Friday, July 28, 2017 1:28 PM
**To:** Paul Parmar; Sam Zaharis
**Subject:** Constellation

Paul and Sam:

Attached are the current escrow runs and our Constellation billing memos. Fees are in the area of $300,000 which I would like to take from escrow to settle up your accounts.

*A. Mitchell Greene, Esq.*

Robinson Brog Leinwand Greene Genovese & Gluck P.C.
875 Third Avenue/9th Floor
New York, NY 10022
( ) 603-6399 (VOICE)
(347) 227-4901 (EFAX)

This message contains information which may be confidential and privileged. Unless you are the addressee (or authorized to receive for the addressee), you may not use, copy or disclose to anyone the message or any information contained in the message. If you have received the message in error, please advise the sender by reply e-mail, and delete or destroy the message. Thank you.

4:29 PM
07/27/17
Accrual Basis

## Wells Fargo - IOLA (Non-Interest)
## Account QuickReport
### All Transactions

**Greene, A. Mitchell**
**Constellation Health LLC**

| Type | Date | Num | Name | Memo | Split | Debit | Credit | Balance |
|------|------|-----|------|------|-------|-------|--------|---------|
| Deposit | 05/14/2013 | CMWire | Abruzzi Investments LLC | wire in | Wells Fargo-IOLA | | 4,000,000.00 | 4,000,000.00 |
| Deposit | 05/14/2013 | CMWire | Constellation Health Group | wire in | Wells Fargo-IOLA | | 11,000,000.00 | 15,000,000.00 |
| Deposit | 05/17/2013 | CMWire | Hercules Funding II, Inc. | wire in | Wells Fargo-IOLA | | 15,620,000.00 | 30,620,000.00 |
| Check | 05/17/2013 | DMWire | Escrow Incoming Wire Account | wire out | Wells Fargo-IOLA | 2,500.00 | | 30,617,500.00 |
| Check | 05/17/2013 | DMWire | Habif, Arogeti & Wynne, LLP | wire out | Wells Fargo-IOLA | 36,000.00 | | 30,581,500.00 |
| Check | 05/17/2013 | DMWire | Wingman Health Corp. | wire out | Wells Fargo-IOLA | 40,000.00 | | 30,541,500.00 |
| Check | 05/17/2013 | DMWire | Sarah Reincich | wire out | Wells Fargo-IOLA | 40,000.00 | | 30,501,500.00 |
| Check | 05/17/2013 | DMWire | Kirkland & Ellis LLP | wire out | Wells Fargo-IOLA | 50,000.00 | | 30,451,500.00 |
| Check | 05/17/2013 | DMWire | Escrow Incoming Wire Account | wire out | Wells Fargo-IOLA | 100,000.00 | | 30,351,500.00 |
| Check | 05/17/2013 | DMWire | Wingman Health Corp. | wire out | Wells Fargo-IOLA | 367,330.00 | | 29,984,170.00 |
| Check | 05/17/2013 | DMWire | Orion Healthcare, Inc. | wire out | Wells Fargo-IOLA | 400,000.00 | | 29,584,170.00 |
| Check | 05/17/2013 | DMWire | Bereschl, Fackelman, Caplan & Arnoff | wire out/JPM as EA for Constellation Health/Orion Exc Fund | Wells Fargo-IOLA | 483,534.00 | | 29,100,636.00 |
| Deposit | 05/17/2013 | CMWire | Escrow Incoming Wire Account | wire out/JPM as EA for Constellation Health/Orion Exp Fund | Wells Fargo-IOLA | 600,000.00 | | 28,489,170.00 |
| Check | 05/17/2013 | DMWire | Triplenet, LLC | wire out/JPM as EA for Constellation Health/Orion Exc Fund | Wells Fargo-IOLA | 224,170.00 | | 28,265,817.00 |
| Check | 05/17/2013 | DMWire | Orion Disbursing Agent, LLC | wire out | Wells Fargo-IOLA | 15,785,837.41 | | 12,565,627.78 |
| Check | 05/17/2013 | DMWire | Wells Fargo Capital Finance | wire out | Wells Fargo-IOLA | 9,113,969.29 | | 2,951,658.47 |
| Check | 05/17/2013 | DMWire | MagireWoods Operating Account | wire out | Wells Fargo-IOLA | 7,000.00 | | 2,944,158.47 |
| Check | 06/17/2013 | DMWire | Dalmore Group LLC | wire out | Wells Fargo-IOLA | 200,000.00 | | 2,744,158.47 |
| Check | 06/18/2013 | DMWire | Moore Colson | wire out | Wells Fargo-IOLA | 31,146.00 | | 2,713,012.47 |
| Check | 06/18/2013 | DMWire | Sage Group Consulting, Inc. | wire out | Wells Fargo-IOLA | 140,000.00 | | 2,573,012.47 |
| Check | 06/21/2013 | DMWire | Sage Group Consulting, Inc. | wire out | Wells Fargo-IOLA | 1,025,000.00 | | 1,548,012.47 |
| Check | 06/21/2013 | DMWire | Brown Brothers Harriman & Co. | wire out | Wells Fargo-IOLA | 43,012.47 | | 1,505,000.00 |
| Deposit | 06/25/2013 | CMWire | Orion Healthcare, Inc. | wire in | Wells Fargo-IOLA | | 75,000.00 | 1,580,000.00 |
| Check | 06/27/2013 | DMWire | Robinson Borg Leinwand | Fax - Cart00869 | Wells Fargo-IOLA | 40,000.00 | | 1,540,000.00 |
| Check | 06/27/2013 | DMWire | Preston Fox-Collaf | wire out | Wells Fargo-IOLA | 5,000.00 | | 1,535,000.00 |
| Check | 06/27/2013 | DMWire | Christian & Smith IOLTA Trust Acct | wire out | Wells Fargo-IOLA | 5,000.00 | | 1,530,000.00 |
| Check | 07/02/2013 | DMWire | Wolf Rifkin Shapiro Schulman Rabkin LLP | wire out | Wells Fargo-IOLA | 25,000.00 | | 1,505,000.00 |
| Deposit | 01/14/2014 | CMWire | Orion Healthcare, Inc. | acct to acct transfer of wire sent into Operating account in error (Paul Parmar) | Wells Fargo-IOLA | | 1,613,278.06 | 1,613,278.06 |
| Check | 01/15/2014 | DMWire | Orion Healthcare, Inc. | wire out | Wells Fargo-IOLA | 1,613,278.06 | | 0.00 |
| Deposit | 01/15/2014 | CMWire | Christian & Smith IOLTA Trust Acct | wire in | Wells Fargo-IOLA | | 45,000.00 | 45,000.00 |
| Check | 01/15/2014 | DMWire | Christian & Smith IOLTA Trust Acct | wire out | Wells Fargo-IOLA | 15,000.00 | | 30,000.00 |
| Check | 01/15/2014 | DMWire | Chamberlain Hrdlicka White etal | wire out | Wells Fargo-IOLA | 15,000.00 | | 15,000.00 |
| Check | 01/15/2014 | CMWire | Chamberlain Hrdlicka White etal | wire out | Wells Fargo-IOLA | 15,000.00 | | 0.00 |
| Deposit | 03/31/2014 | CMWire | Patrick V. Hampson | wire in | Wells Fargo-IOLA | | 265,847.29 | 265,847.29 |
| Check | 04/01/2014 | CMWire | RCC Commercial Inc. | wire in | Wells Fargo-IOLA | | 13,365,367.29 | 13,365,367.29 |
| Deposit | 04/01/2014 | CMWire | Restaurant Capital Group | Fax - Constellation Health/Parmar | Wells Fargo-IOLA | | 13,100,000.00 | 12,751,850.51 |
| Check | 04/01/2014 | DMWire | Bank of the West | wire out | Wells Fargo-IOLA | 600,000.00 | | 12,151,950.51 |
| Check | 04/01/2014 | DMWire | Wells Fargo Commercial Finance | wire out | Wells Fargo-IOLA | 13,198.76 | | 12,704,315.15 |
| Check | 04/01/2014 | DMWire | United Bank - WV | wire out | Wells Fargo-IOLA | 47,477.36 | | 12,702,378.41 |
| Check | 04/01/2014 | DMWire | United Bank - WV | wire out | Wells Fargo-IOLA | 5,083.82 | | 12,699,349.53 |
| Check | 04/01/2014 | DMWire | Orion Healthcare, Inc. | wire out | Wells Fargo-IOLA | 304,111.11 | | 12,374,575.29 |
| Check | 04/01/2014 | DMWire | Sage Group Consulting, Inc. | wire out | Wells Fargo-IOLA | 280,000.00 | | 12,874,575.29 |
| Check | 04/01/2014 | DMWire | Staples Credit Card | wire out | Wells Fargo-IOLA | 25,247.84 | | 12,874,101.79 |
| Check | 04/01/2014 | DMWire | Office Depot | wire out | Wells Fargo-IOLA | 876.52 | | 12,873,225.27 |
| Check | 04/01/2014 | DMWire | New American - Corp. | wire out | Wells Fargo-IOLA | 1,563.82 | | 12,871,061.45 |
| Check | 04/01/2014 | DMWire | Whiteforce Fin Warehouse Collection | wire out | Wells Fargo-IOLA | 3,380.00 | | 12,868,281.45 |
| Deposit | 04/01/2014 | CMWire | Orion Healthcare, Inc. | wire in | Wells Fargo-IOLA | | 10,000,000.00 | 22,668,281.45 |
| Check | 04/01/2014 | DMWire | Orion Healthcare, Inc. | wire out | Wells Fargo-IOLA | 2,232,702.99 | | 20,435,578.55 |
| Check | 04/01/2014 | DMWire | Orion Healthcare, Inc. | wire out | Wells Fargo-IOLA | 1,810,548.83 | | 18,625,029.62 |
| Check | 04/01/2014 | DMWire | Commercial Loan Servicing | wire out | Wells Fargo-IOLA | 1,128,239.10 | | 17,496,989.52 |
| Check | 04/01/2014 | DMWire | Resource Financial Mgmt | wire out | Wells Fargo-IOLA | 300,000.00 | | 17,196,989.52 |
| Check | 04/01/2014 | DMWire | Whiteforce Finance Warehouse LLC | wire out | Wells Fargo-IOLA | 304,111.11 | | 16,792,978.41 |
| Check | 04/01/2014 | DMWire | Sage Group Consulting, Inc. | wire out | Wells Fargo-IOLA | 280,000.00 | | 16,512,978.41 |
| Check | 04/01/2014 | DMWire | Orion Healthcare, Inc. | wire out | Wells Fargo-IOLA | 75,741.98 | | 16,437,236.43 |
| Check | 04/01/2014 | DMWire | Commercial Loan Servicing | wire out | Wells Fargo-IOLA | 233,050.89 | | 16,204,072.52 |
| Check | 04/01/2014 | DMWire | Commercial Loan Servicing | wire out | Wells Fargo-IOLA | 200,584.99 | | 16,004,378.53 |
| Check | 04/01/2014 | DMWire | GSK Management | wire out | Wells Fargo-IOLA | 200,000.00 | | 15,604,277.53 |
| Check | 04/01/2014 | DMWire | Commercial Loan Servicing | wire out | Wells Fargo-IOLA | 180,000.00 | | 15,424,277.53 |
| Check | 04/01/2014 | DMWire | Orion Healthcare, Inc. | wire out | Wells Fargo-IOLA | 150,000.00 | | 15,274,277.53 |
| Check | 04/01/2014 | DMWire | Commercial Loan Servicing | wire out | Wells Fargo-IOLA | 148,133.28 | | 15,126,144.25 |
| Check | 04/02/2014 | DMWire | Orion Healthcare, Inc. | wire out | Wells Fargo-IOLA | 120,000.00 | | 15,006,144.25 |
| Check | 04/02/2014 | DMWire | Orion Healthcare, Inc. | wire out | Wells Fargo-IOLA | 100,000.00 | | 14,906,144.25 |
| Check | 04/02/2014 | DMWire | Constellation Health LLC | wire out | Wells Fargo-IOLA | 100,000.00 | | 14,806,144.25 |
| Deposit | 04/02/2014 | DM | Glenn Cunningham | EFTPS Payment - transmitted by C Henning (M 40) | Wells Fargo-IOLA | 84,000.00 | | 14,722,144.15 |
| Check | 04/04/2014 | ACH DM | ADP | EFTPS Payment - transmitted by C Henning (M 40) | Wells Fargo-IOLA | 78,587.44 | | 14,643,546.70 |
| Check | 04/04/2014 | 3575 | API, Inc. | ACH Payment processed by Christian Henning for Adam Greene, Acct Holder | Wells Fargo-IOLA | 700.00 | | 14,593,546.70 |
| Check | 04/04/2014 | 3576 | All About Massage and Wellness | | Wells Fargo-IOLA | 57.91 | | 14,563,940.70 |
| Check | 04/04/2014 | 3577 | Allscripts | | Wells Fargo-IOLA | 58,348.39 | | 14,505,592.31 |
| Check | 04/04/2014 | 3578 | Anne Tymporowski | | Wells Fargo-IOLA | 57.91 | | -13,338.30 |
| Check | 04/04/2014 | 3579 | Athena Health | | Wells Fargo-IOLA | 20,291.00 | | -2,038.30 |
| Check | 04/04/2014 | 3580 | Business Records Management LLC | | Wells Fargo-IOLA | 4,371.06 | | -85,105.66 |
| Check | 04/04/2014 | 3581 | Centron Data Services | | Wells Fargo-IOLA | 4,317.68 | | -89,424.34 |
| Check | 04/04/2014 | 3583 | Clearfield Technologies LLC | | Wells Fargo-IOLA | 628.95 | | -90,051.30 |

4:29 PM

07/27/17

Accrual Basis

# Wells Fargo - IOLA (Non-Interest)
## Account QuickReport
### All Transactions

| Type | Date | Num | Name | Memo | Split | Debit | Credit | Balance |
|---|---|---|---|---|---|---|---|---|
| Check | 04/04/2014 | 3584 | Community Medical Center | | Wells Fargo-IOLA | 1,023.46 | | -91,374.76 |
| Check | 04/04/2014 | 3585 | Consolidated Communications | | Wells Fargo-IOLA | 1,007.29 | | -92,382.05 |
| Check | 04/04/2014 | 3586 | Decision Health | | Wells Fargo-IOLA | 38.50 | | -92,420.55 |
| Check | 04/04/2014 | 3587 | Dawn Fryer | | Wells Fargo-IOLA | 365.99 | | -92,786.54 |
| Check | 04/04/2014 | 3588 | Elizabeth Small | | Wells Fargo-IOLA | 69.95 | | -92,856.49 |
| Check | 04/04/2014 | 3589 | Fox Collections (Einstein) | | Wells Fargo-IOLA | 5,919.38 | | -93,455.49 |
| Check | 04/04/2014 | 3590 | Namco | | Wells Fargo-IOLA | 2,554.00 | | -89,774.85 |
| Check | 04/04/2014 | 3591 | Houston Harbaugh | | Wells Fargo-IOLA | 12,848.29 | | -102,928.85 |
| Check | 04/04/2014 | 3592 | IP Logic Inc. | | Wells Fargo-IOLA | 1,946.74 | | -114,777.14 |
| Check | 04/04/2014 | 3593 | Jamie Kerestes | | Wells Fargo-IOLA | 1,726.80 | | -115,723.88 |
| Check | 04/04/2014 | 3594 | Katyn Lynn | | Wells Fargo-IOLA | 68.95 | | -117,450.68 |
| Check | 04/04/2014 | 3595 | Konstantin Bilal | | Wells Fargo-IOLA | 58.95 | | -117,509.07 |
| Check | 04/04/2014 | 3596 | Marie Ann Palmer | | Wells Fargo-IOLA | 49.95 | | -117,559.02 |
| Check | 04/04/2014 | 3597 | Meyer, Unkovic and Scott | | Wells Fargo-IOLA | 255.00 | | -118,079.57 |
| Check | 04/04/2014 | 3598 | Michael Robert Advertising | | Wells Fargo-IOLA | 108.61 | | -118,334.57 |
| Check | 04/04/2014 | 3599 | Net Sperts | | Wells Fargo-IOLA | 362.46 | | -118,131.18 |
| Check | 04/04/2014 | 3600 | Peter Dawson | | Wells Fargo-IOLA | 500.00 | | -118,793.64 |
| Check | 04/04/2014 | 3601 | Pitney Bowes Purchase Power | | Wells Fargo-IOLA | 19,923.74 | | -119,293.64 |
| Check | 04/04/2014 | 3625 | Premier Medical Associates | | Wells Fargo-IOLA | 343.59 | | -139,123.38 |
| Check | 04/04/2014 | 3626 | Presort | | Wells Fargo-IOLA | 756.49 | | -139,466.97 |
| Check | 04/04/2014 | 3627 | Staples Business Advantage | | Wells Fargo-IOLA | 1,320.94 | | -140,197.37 |
| Check | 04/04/2014 | 3628 | State Farm Insurance | | Wells Fargo-IOLA | 5,803.05 | | -141,507.31 |
| Check | 04/04/2014 | 3601 | Toshiba Business Solutions | | Wells Fargo-IOLA | 10,490.63 | | -142,787.09 |
| Check | 04/04/2014 | 3602 | United Concordia Dental | | Wells Fargo-IOLA | 5,810.97 | | -143,269.68 |
| Check | 04/04/2014 | 3603 | White Plains Technologies, LLC | | Wells Fargo-IOLA | 164.38 | | -145,052.74 |
| Check | 04/04/2014 | 3604 | American Telephony Inc. | | Wells Fargo-IOLA | 2,073.35 | | -146,052.74 |
| Check | 04/04/2014 | 3605 | Business Systems and Services Inc. | | Wells Fargo-IOLA | 65.40 | | -152,312.74 |
| Check | 04/04/2014 | 3606 | Cetron Data Services Inc. | | Wells Fargo-IOLA | 594.00 | | -153,012.74 |
| Check | 04/04/2014 | 3607 | City of Petersburg - M&O Tax | | Wells Fargo-IOLA | 108.61 | | -153,987.04 |
| Check | 04/04/2014 | 3608 | Comcast Business Services | | Wells Fargo-IOLA | 226.80 | MED-19376 | -159,060.09 |
| Check | 04/04/2014 | 3609 | Priceon | | Wells Fargo-IOLA | 433.03 | | -170,170.92 |
| Check | 04/04/2014 | 3610 | Sir Speedy | | Wells Fargo-IOLA | 888.74 | | -175,981.89 |
| Check | 04/04/2014 | 3611 | Highmark Blue Shield | | Wells Fargo-IOLA | 1,583.49 | | -176,146.27 |
| Check | 04/04/2014 | 3612 | Lamp Postpaid | | Wells Fargo-IOLA | 1,037.13 | | -178,319.62 |
| Check | 04/04/2014 | 3613 | Meyer, Unkovic and Scott | | Wells Fargo-IOLA | 1,095.70 | | -178,315.02 |
| Check | 04/04/2014 | 3614 | Michael Robert Advertising | | Wells Fargo-IOLA | 5,103.60 | | -178,909.02 |
| Check | 04/04/2014 | 3615 | Neopost USA Inc. | | Wells Fargo-IOLA | 7,235.37 | | -179,015.63 |
| Check | 04/14/2014 | 3616 | Noc Office Equipment | ACCT #1510475079 | Wells Fargo-IOLA | | | -179,242.43 |
| Check | 04/04/2014 | 3617 | Office Depot Credit Plan | wire in | Wells Fargo-IOLA | 218.94 | 200,000.00 | 20,920.51 |
| Check | 04/14/2014 | 3618 | Perry & Associates, CPA's A.C. | VOID CK - 4/4/14 | Wells Fargo-IOLA | 12,848.29 | | 2,601.57 |
| Check | 04/14/2014 | 3619 | EZ to Use | STOP PYMT - 4/4/14 | Wells Fargo-IOLA | | 12,848.29 | 15,449.86 |
| Check | 04/21/2014 | 3610 | EZ to Use | replace stopped ck #3580 | Wells Fargo-IOLA | 20,291.00 | | 2,601.57 |
| Deposit | 04/29/2014 | 3554 | Jeffrey Andolino, IOLA Acct | VOID CK - 4/4/14 | Wells Fargo-IOLA | | 20,291.00 | 22,892.57 |
| Deposit | 04/29/2014 | 3511 | New American Trust | STOP PYMT - 4/7/14 (stop effective 4/20) | Wells Fargo-IOLA | 164.38 | | 2,601.57 |
| Check | 08/07/2014 | DMwire | Orion Healthcare, Inc. | move wire of 8/5 mistakingly wired to Operating acct | Wells Fargo-IOLA | 3,380.00 | | 2,765.95 |
| Check | 08/07/2014 | DMwire | Weltman, Riley & Sheppeard Raines LLP | wire out | Wells Fargo-IOLA | 3,380.00 | 20,000.00 | -414.05 |
| Deposit | 08/07/2014 | CMwire | Weltman, Riley & Sheppeard LLP Trust | wire in | Wells Fargo-IOLA | 5,000.00 | | 22,765.95 |
| Check | 09/02/2014 | CMwire | Constellation Health LLC | wire out | Wells Fargo-IOLA | 10,000.00 | | 17,765.95 |
| Check | 09/02/2014 | CMwire | RCC Commercial Inc. | wire out | Wells Fargo-IOLA | | | 7,765.95 |
| Check | 09/02/2014 | DMwire | Prestracer Rose LLP Atty Trust Acct | fbo Weathers Riley & Sheppeard LLP on 10/28/14 | Wells Fargo-IOLA | 123,113.72 | 337,000.00 | 344,765.95 |
| Check | 09/02/2014 | 3556 | Graham Curtin, PA | Fee reimbursement for wire charges | Wells Fargo-IOLA | 1,250,000.00 | 1,200,000.00 | -1,844,765.95 |
| Deposit | 10/28/2014 | CM | Community Health/ABC | Fee for intl wire to Grant Thornton UK LLP on 10/28/14 | Wells Fargo-IOLA | 3,866.05 | | 1,421,652.23 |
| Check | 10/28/2014 | CM | Grant Thornton UK LLP | wire in | Wells Fargo-IOLA | 3,866.05 | | 217,452.23 |
| Check | 10/30/2014 | CMwire | Wells Fargo Bank, NA | wire in (for FUH account) - transferred wire into Operating today to IOLA | Wells Fargo-IOLA | 197,178.49 | | 17,765.95 |
| Check | 11/11/2014 | CMwire | Wells Fargo Bank, NA | wire out | Wells Fargo-IOLA | 212,668.18 | 20.00 | 212,666.18 |
| Check | 11/11/2014 | DMwire | Fitra United Health LLC | wire in | Wells Fargo-IOLA | 20.00 | | 0.00 |
| Check | 12/23/2016 | DMwire | Duff & Phelps LLC | wire out re: Duff & Phelps | Wells Fargo-IOLA | 1,750,000.00 | 1,750,000.00 | -1,750,000.00 |
| Deposit | 12/23/2016 | CMwire | Weltman West Finex Acces Howard | | Wells Fargo-IOLA | | | 0.00 |
| Check | 12/29/2016 | DMwire | Orion Healthcare, Inc. | | Wells Fargo-IOLA | 70,000.00 | 70,000.00 | 140,000.00 |
| | | | | | | 70,000.00 | 70,000.00 | 140,000.00 |

| | | | | | | 57,897,950.02 | 57,897,950.02 | |

**Constellation Health/ABC**

| General Journal | 09/21/2016 | 30 | | move from Ranga Broorn to Constellation Health/ABA per A/GL/P&am Zaharis | Constellation Hth/Rang... | 0.00 | 0.00 | 0.00 |

**Total Constellation Health/ABC**

**Constellation Health/ACA**

| General Journal | 08/21/2016 | 30 | | move from Ranga Broorn to Constellation Health/ACA per A/GL/P&am Zaharis | Constellation Hth/Rang... | 327,600.00 | 327,600.00 | 327,600.00 |

**Total Constellation Health/ACA** | | | | | | 327,600.00 | 327,600.00 |

**Constellation Health/CHT Closing** | | | | | | 140,400.00 | 140,400.00 | 140,400.00 |

Page 2

4:28 PM

**Wells Fargo - IOLA (Non-Interest)**

**Account QuickReport**

Accrual Basis

07/27/17

All Transactions

| Type | Date | Num | Name | Memo | Split | Debit | Credit | Balance |
|---|---|---|---|---|---|---|---|---|
| Deposit | 01/30/2017 | CM/wire | CC Capital CHT Holdco LLC | wire in | Wells Fargo-IOLA | | 661,558.28 | 661,558.28 |
| Deposit | 02/03/2017 | CM/wire | Capita Registrars Ltd re CHT Inc. | wire in | Wells Fargo-IOLA | | 700,123.50 | 1,361,681.78 |
| Deposit | 02/03/2017 | CM/wire | Capita Registrars Ltd re CHT Inc. | wire in | Wells Fargo-IOLA | | 4,598,652.58 | 5,960,334.36 |
| Deposit | 02/03/2017 | CM/wire | Capita Registrars Ltd re CHT Inc. | wire in | Wells Fargo-IOLA | | 8,693,406.86 | 14,653,341.22 |
| Deposit | 02/03/2017 | CM/wire | Capita Registrars Ltd re CHT Inc. | wire in | Wells Fargo-IOLA | | 8,765,997.44 | 23,419,738.76 |
| Deposit | 02/03/2017 | CM/wire | Capita Registrars Ltd re CHT Inc. | wire in | Wells Fargo-IOLA | | 2,051,000.00 | 25,470,738.76 |
| Deposit | 02/03/2017 | CM/wire | Capita Registrars Ltd re CHT Inc. | wire in | Wells Fargo-IOLA | | 138,761.00 | 25,610,499.76 |
| Deposit | 02/03/2017 | CM/wire | Merrill Lynch - Michael/Miriam Fauer | wire in | Wells Fargo-IOLA | | 910,131.25 | 26,520,631.01 |
| Deposit | 02/07/2017 | CM/wire | Range Bloom LLC | wire in | Wells Fargo-IOLA | | 20,100,356.30 | 46,620,987.31 |
| Check | 02/10/2017 | DM/wire | Range Bloom LLC | wire out | Wells Fargo-IOLA | 900,000.00 | | 45,720,987.31 |
| Check | 02/10/2017 | DM/wire | Range Bloom LLC | wire out | Wells Fargo-IOLA | 8,765,997.44 | | 36,954,989.87 |
| General Journal | 02/21/2017 | 40 | Red Life Production PVT LTD | move from Constellation HttH/CHT Clsng to RBLGGGCHT Fees per AMG | Wells Fargo-IOLA | 7,234,002.56 | | 29,720,987.31 |
| General Journal | 02/21/2017 | 40 | | move from Constellation HttH/CHT Clsng to RBLGGGCHT Fees per AMG | RBLGGGCHT Fees | | 7,234,002.56 | 29,720,987.31 |
| Check | 03/15/2017 | 41 | Legal Order Debit - FBI case#228353317 | Funds disbanched per Wells Fargo | Wells Fargo-IOLA | 1,500,000.00 | | 28,220,987.31 |
| Check | 03/15/2017 | DM/wire | Windels Marx Lane & Mittendorf LLP | wire out | Wells Fargo-IOLA | 700,000.00 | | 27,520,987.31 |
| Check | 04/13/2017 | DM/wire | Daman & Vakil LLP, Operating Acct | wire out | Wells Fargo-IOLA | 100,000.00 | | 27,420,987.31 |
| Check | 04/13/2017 | DM/wire | Red Life Production PVT LTD | wire out | Wells Fargo-IOLA | 150,000.00 | | 27,270,987.31 |
| General Journal | 04/27/2017 | 44 | | move from RBLGGGCHT Fees to Constellation HttH/CHT Clsng per AMG | RBLGGGCHT Fees | | 150,000.00 | 27,120,987.31 |
| Check | 05/15/2017 | 6599 | State Street Corporate LLC | Inv #1162/119531/1067 | Wells Fargo-IOLA | 300.00 | | 6,350,531.01 |
| Check | 05/17/2017 | 6501 | Pepper Hamilton LLP | Clnt# 145269.00002-INV# 11038858 | Wells Fargo-IOLA | 4,386.75 | | 6,355,844.26 |
| Check | 05/25/2017 | DM/wire | Abruzzi Investments LLC | wire out | Wells Fargo-IOLA | 250,000.00 | | 8,101,421.55 |
| Check | 06/08/2017 | 6159 | Wilcox & Fetzer | re: Dextra - inv# 40170/40178 | Wells Fargo-IOLA | 4,522.71 | | 8,101,421.55 |
| Check | 06/23/2017 | DM/wire | Nilnon Management Inc. | wire out | Wells Fargo-IOLA | 1,500,000.00 | | 6,601,421.55 |
| Check | 06/27/2017 | 6158 | US Legal Support | Inv ES009808 | Wells Fargo-IOLA | 20,000.00 | | 6,600,988.85 |
| Check | 07/05/2017 | 5852 | Nilnon Management Inc. | wire out | Wells Fargo-IOLA | 20,000.00 | | 6,580,988.85 |
| Check | 07/13/2017 | DM/wire | Precise Court Reporting Services Inc. | INV#33798 Case#1-16-CV-02226-GHW | Wells Fargo-IOLA | 1,613.80 | | 6,570,375.05 |
| Check | 07/13/2017 | 6243 | Robinson Kaufman LLP | Dextra v Parmjit Singh Parmar etal B#3101501020 | Wells Fargo-IOLA | 1,623,600.00 | | 4,956,275.05 |
| Check | 07/25/2017 | 6243 | Days International | | Wells Fargo-IOLA | 3,950.25 | | 4,952,325.50 |
| | | | | | | 43,466,662.21 | 48,420,987.71 | 4,952,325.50 |

**Total Constellation HealthCHT/Krelly**

| Constellation HealthCHT/Krelly | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Deposit | 03/10/2017 | CM/wire | Orion Healthbory, Inc. | wire in | Wells Fargo-IOLA | | 2,000,000.00 | 2,000,000.00 |
| | | | | | | 0.00 | 2,000,000.00 | 2,000,000.00 |

**Total Constellation HealthCHT/Krelly**

| Constellation HealthCHT/NYNM | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Deposit | 03/10/2017 | CM/wire | Orion Healthbory, Inc. | wire in | Wells Fargo-IOLA | | 3,590,000.00 | 3,590,000.00 |
| | | | | | | 0.00 | 3,590,000.00 | 3,590,000.00 |

**Total Constellation HealthCHT/NYNM**

| Constellation HealthCHT/Susan Techs. | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Deposit | 12/16/2014 | CM/wire | Orion Healthbory, Inc. | wire in | Wells Fargo-IOLA | | 7,853,888.40 | 7,853,888.40 |
| Check | 12/29/2014 | DM/wire | Orion Healthbory, Inc. | wire out | Wells Fargo-IOLA | 571,102.00 | | 7,282,786.40 |
| Check | 01/02/2015 | DM/wire | Orion Healthbory, Inc. | wire out | Wells Fargo-IOLA | 2,986,534.00 | | 4,296,252.40 |
| Check | 01/02/2015 | DM/wire | Orion Healthbory, Inc. | wire out | Wells Fargo-IOLA | | 6,224,000.00 | 10,520,252.40 |
| Deposit | 01/07/2015 | CM/wire | Orion Healthbory, Inc. | wire in | Wells Fargo-IOLA | | 1,960,000.00 | 12,480,252.48 |
| Check | 01/07/2015 | 4211 | Robinson Borg Leinwand | Fees - client 100/683.0000 | Wells Fargo-IOLA | 393,013.36 | | 12,480,252.48 |
| Check | 01/09/2015 | DM/wire | Rosenberg Roth Baker Bennson & Co | wire out | Wells Fargo-IOLA | 76,497.00 | | 12,175,339.12 |
| Check | 01/21/2015 | DM/wire | Constellation Healthcare Technologies | wire out | Wells Fargo-IOLA | 12,097,842.12 | | 18,097,917.00 |
| Deposit | 03/02/2015 | CM/wire | Constellation Healthcare Technologies | wire in | Wells Fargo-IOLA | | 2,089,307.15 | 0.00 |
| Check | 03/03/2015 | DM/wire | Orion Healthbory, Inc. | wire out | Wells Fargo-IOLA | 2,089,307.15 | | 2,089,307.15 |
| Check | 03/03/2015 | DM/wire | Constellation Healthcare Technologies | wire in | Wells Fargo-IOLA | | 9,600,000.00 | 9,600,000.00 |
| Check | 03/05/2015 | DM/wire | First United Health LLC | wire out | Wells Fargo-IOLA | 3,000,000.00 | | 6,600,000.00 |
| Check | 03/05/2015 | DM/wire | Silvers Lang & Assocs FPLC Atty Trust | wire out Panteck Corp. | Wells Fargo-IOLA | 4,376,211.94 | | 2,433,788.05 |
| Check | 03/05/2015 | DM/wire | Panteck Corp. | wire out Imla Ventures LLC | Wells Fargo-IOLA | 471,527.74 | | 1,962,260.32 |
| Check | 03/05/2015 | DM/wire | People's United Bank | wire outberet 2441-064 Panteck Corp. | Wells Fargo-IOLA | 300,000.00 | | 1,652,260.32 |
| Check | 03/05/2015 | DM/wire | Atlantic Health, LLC | wire out | Wells Fargo-IOLA | 997,648.59 | | 1,554,611.73 |
| Check | 05/05/2015 | DM/wire | Panteck Corp. | wire outberet Imla Ventures LLC | Wells Fargo-IOLA | 625,000.00 | | 429,611.73 |
| Check | 05/05/2015 | DM/wire | Panteck Corp. | wire outberet Swift Financial Corp. | Wells Fargo-IOLA | 189,555.48 | | 240,056.25 |
| Check | 05/05/2015 | DM/wire | Panteck Corp. | wire out | Wells Fargo-IOLA | 240,056.25 | | 0.00 |
| | | | | | | 27,927,195.63 | 27,927,195.63 | 0.00 |

**Total Constellation Healthcare Techs.**

| Constellation HttH/NAYA Cls Esc | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| General Journal | 36 | | Constellation Healthcare Technologies | move from Constellation HttH/Range Bhoomi to Constellation HttH/NAYA Cls Esc per AMG/Sam Zaharis | Constellation HttH/Rang... | | 1,220,000.00 | 1,220,000.00 |
| General Journal | 02/00/2017 | 38 | | move from Constellation HttH/NAYA Cls Esc to Constellation HttH/Range Bhoomi per AMG/Sam Zaharis | Constellation HttH/Rang... | 1,220,000.00 | | 0.00 |
| | | | | | | 1,220,000.00 | 1,220,000.00 | 0.00 |

**Total Constellation HttH/NAYA Cls Esc**

| Constellation HttH/Range Bhoomi | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Deposit | 08/10/2016 | CM/wire | Constellation Healthcare Technologies | wire in | Wells Fargo-IOLA | | 12,740,000.00 | 12,740,000.00 |
| Check | 08/24/2016 | DM/wire | Allegiance Billing Associates, Inc. | wire out | Wells Fargo-IOLA | 2,293,200.00 | | 10,446,800.00 |
| Check | 09/01/2016 | DM/wire | Allegiance Billing Associates, Inc. | wire out | Wells Fargo-IOLA | 982,800.00 | | 9,464,000.00 |
| Check | 09/21/2016 | 30 | | wire out | -SPLIT- | 327,600.00 | | 9,136,400.00 |
| General Journal | 09/21/2016 | 30 | | | Constellation HttH/Rang... | 140,400.00 | | 8,995,000.00 |
| Check | 10/06/2016 | DM/wire | Orion Healthbory, Inc. | wire out | Wells Fargo-IOLA | 500,000.00 | | 8,495,000.00 |
| Deposit | 10/07/2016 | CM/wire | Township of Colts Neck | Deposit | Wells Fargo-IOLA | | 28,670.97 | 8,346,000.00 |
| Check | 10/17/2016 | 001950 | Shari Tanashey LLP | wire out | Wells Fargo-IOLA | 365,000.00 | | 8,374,670.97 |
| Check | 11/23/2016 | DM/wire | Michele Matney | wire out | Wells Fargo-IOLA | 60,000.00 | | 8,009,670.97 |
| | | | | | | | | 7,949,370.97 |

Page 3

# Wells Fargo - IOLA (Non-Interest)

## Account QuickReport

### All Transactions

| Type | Date | Num | Name | Memo | Split | Debit | Credit | Balance |
|---|---|---|---|---|---|---|---|---|
| Check | 11/23/2016 | DMwire | Mick Rasch | wire out | Wells Fargo-IOLA | 240,000.00 | | 7,709,070.97 |
| General Journal | 12/08/2016 | 36 | | move from Constellation Hbh/Ranga Bhoomi to Constellation HBhNAVA Cls Esc per AMG/Sam Zaharis | Constellation HBhNAVY... | 1,220,000.00 | | 6,489,070.97 |
| Check | 12/22/2016 | 5668 | Robinson Brog Leinwand | Fee- Parmar - C#100415 | Wells Fargo-IOLA | 697,392.29 | | 5,792,378.68 |
| Check | 12/30/2016 | DMwire | Young Conaway Stargatt & Taylor | wire out | Wells Fargo-IOLA | 200,000.00 | | 5,592,278.68 |
| General Journal | 01/18/2017 | 38 | Young Conaway Stargatt & Taylor | wire out | Wells Fargo-IOLA | 100,000.00 | | 5,492,278.68 |
| Check | 02/15/2017 | DMwire | Orion Healthcorp, Inc. | move from Constellation HBhNAVA Cls Esc to Constellation Hbh/Ranga Bhoomi per AMG/Sam Zaharis | Constellation HBhNAVY... | | 1,220,000.00 | 6,712,278.68 |
| Check | 02/16/2017 | DMwire | Orion Healthcorp, Inc. | wire out | Wells Fargo-IOLA | 50,000.00 | | 6,662,278.68 |
| Check | 03/03/2017 | DMwire | Michele Mulaney | wire out | Wells Fargo-IOLA | 720,000.00 | | 5,942,278.68 |
| Check | 03/03/2017 | DMwire | Marko Rasch | wire out | Wells Fargo-IOLA | 100,260.00 | | 5,842,018.68 |
| Check | 04/27/2017 | 6068 | United States Treasury | #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 - notices dated 2/6/14 & 5/19/14 (CIV/PEN) | Wells Fargo-IOLA | 176,240.00 | | 5,663,778.68 |
| | | | | | | 248,391.45 | | 5,417,487.23 |
| **Total Constellation Hbh/Ranga Bhoomi** | | | | | | 8,571,183.74 | 13,986,670.97 | 5,417,487.23 |
| **Total Greene, A. Mitchell** | | | | | | 139,084,110.60 | 155,511,923.33 | 16,427,812.73 |
| **TOTAL** | | | | | | 139,084,110.60 | 155,511,923.33 | 16,427,812.73 |

Exhibit 2

476

**Constellation Healthcare Technologies, Inc.
and Subsidiaries**

Consolidated Financial Statements

For the Years Ended
December 31, 2014 and 2013

# CONSTELLATION HEALTHCARE TECHNOLOGIES, INC. AND SUBSIDIARIES

### Table of Contents

|  | Page |
|---|---|
| Independent Auditors' Report | 1 |
| Consolidated Balance Sheets | 2 |
| Consolidated Statements of Operations | 3 |
| Consolidated Statements of Cash Flows | 4-5 |
| Consolidated Statement of Stockholder's Equity | 6 |
| Notes to Financial Statement | 7-22 |



ACCOUNTANTS + ADVISORS

www.rrbb.com

**ROSENBERG RICH BAKER BERMAN & COMPANY**

265 Davidson Avenue, Suite 210 ∘ Somerset, NJ 08873-4120 ∘ PHONE 908-231-1000 ∘ FAX 908-231-6894
111 Dunnell Road, Suite 100 ∘ Maplewood, NJ 07040 ∘ PHONE 973-763-6363 ∘ FAX 973-763-4430

Independent Auditor's Report

To the Board of Directors and Stockholders of
Constellation Healthcare Technologies, Inc. and Subsidiaries

We have audited the accompanying consolidated balance sheets of Constellation Healthcare Technologies, Inc. and Subsidiaries (the "Company") as of December 31, 2014 and 2013 and the related consolidated statements of operations, stockholder's equity, and cash flows for the year ended December 31, 2014 and the periods from June 15, 2013 through December 31, 2013 (Successor) and January 1, 2013 through June 14, 2013 (Predecessor). These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audit.

**Management's Responsibility for the Financial Statements**

Management is responsible for the preparation and fair presentation of these consolidated financial statements in accordance with accounting principles generally accepted in the United States of America; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error.

**Auditor's Responsibility**

Our responsibility is to express an opinion on these consolidated financial statements based on our audit. We conducted our audit in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the consolidated financial statements. The procedures selected depend on the auditor's judgment, including the assessment of the risks of material misstatement of the consolidated financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the entity's preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. Accordingly, we express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

**Opinion**

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Orion Healthcorp, Inc. as of December 31, 2014 and 2013 and the results of its operations and its cash flows for the year ended December 31, 2014 and the periods from June 15, 2013 through December 31, 2013 (Successor) and January 1, 2013 through June 14, 2013 (Predecessor) in accordance with accounting principles generally accepted in the United States of America.

*Rosenberg Rich Baker Berman & Company*

Somerset, New Jersey
March 9, 2015

1

479

CONSTELLATION HEALTHCARE TECHNOLOGIES, INC. AND SUBSIDIARIES
CONSOLIDATED FINANCIAL STATEMENTS FOR YEARS ENDED DECEMBER 31, 2014
AND 2013

### CONSOLIDATED BALANCE SHEETS

| | December 31 2014 | December 31 2013 (As Restated) |
|---|---|---|
| **Current assets** | | |
| Cash and cash equivalents | $ 18,136,336 | $ 4,020,426 |
| Restrictive cash balance | - | 97,000 |
| Accounts receivable, net | 8,601,001 | 5,288,573 |
| Inventory | 382,745 | 339,989 |
| Prepaid expenses and other current assets | 663,644 | 1,290,224 |
| Deferred finance costs | 329,894 | 296,250 |
| Deferred tax asset | 252,000 | 252,000 |
| Total current assets | 28,365,620 | 11,584,462 |
| **Property and equipment, net** | 4,170,363 | 4,847,449 |
| **Other long-term assets** | | |
| Intangible assets, excluding goodwill | 15,419,629 | 11,631,297 |
| Goodwill | 13,722,379 | 12,316,734 |
| Deferred tax asset | 4,018,178 | 4,334,452 |
| Deferred finance costs | 577,309 | 715,938 |
| Other assets, net | 223,796 | 209,077 |
| Total other long-term assets | 33,961,291 | 29,207,498 |
| Total assets | $ 66,497,274 | $ 45,639,409 |
| **Current liabilities** | | |
| Accounts payable | $ 3,024,678 | $ 2,315,750 |
| Accrued expenses | 2,355,936 | 3,115,513 |
| Other current liabilities | 638,700 | 97,000 |
| Income taxes payable | 1,271,858 | 175,505 |
| Current portion of capital lease obligation | 29,107 | 3,260 |
| Line of credit | - | 500,000 |
| Current portion of long-term debt | 4,631,771 | 1,125,000 |
| Total current liabilities | 11,952,050 | 7,332,028 |
| **Long-term liabilities** | | |
| Long-term debt, net of current portion | 16,327,108 | 14,483,005 |
| Deferred tax liability | 4,156,491 | 4,681,047 |
| Total long-term liabilities | 20,483,599 | 19,164,052 |
| **Commitments and Contingencies** | | |
| **Stockholders' equity** | | |
| Common stock, par value $0.0001; 111,226,912 and 1,000 shares authorized at December 31, 2014 and 2013, respectively; 55,615,056 and 1,000 shares issued and outstanding | 5,562 | 1 |
| Additional paid-in capital | 29,488,953 | 16,214,070 |
| Retained earnings | 4,567,110 | 2,929,257 |
| Total stockholders' equity | 34,061,625 | 19,143,328 |
| Total liabilities and stockholders' equity | $ 66,497,274 | $ 45,639,408 |

The accompanying notes are an integral part of the consolidated financial statements.

2

480

CONSTELLATION HEALTHCARE TECHNOLOGIES, INC. AND SUBSIDIARIES
CONSOLIDATED FINANCIAL STATEMENTS FOR YEARS ENDED DECEMBER 31, 2014
AND 2013

## CONSOLIDATED STATEMENTS OF OPERATIONS

| | Successor 2014 | Successor June 15, 2013 through December 31 2013 (As Restated) | Predecessor January 1, 2013 through June 14 2013 |
|---|---|---|---|
| Revenues | $ 54,605,827 | $ 28,179,611 | $ 23,800,052 |
| Operating expenses: | | | |
| Salaries and benefits | 17,334,464 | 10,558,971 | 10,870,981 |
| Physician compensation | 7,223,111 | 4,116,543 | 2,725,174 |
| Facility rent and related costs | 2,538,546 | 1,379,730 | 1,414,077 |
| Depreciation | 1,363,293 | 672,245 | 281,152 |
| Amortization | 1,887,247 | 964,167 | 1,920,500 |
| Professional and consulting fees | 2,916,509 | 1,034,823 | 2,587,629 |
| Insurance | 651,211 | 256,491 | 199,189 |
| Provision for doubtful accounts | 427,643 | 233,251 | 299,193 |
| Vaccines and medical supplies | 4,371,464 | 2,455,702 | 1,593,164 |
| Office and computer supplies | 288,622 | 134,061 | 152,847 |
| Postage and courier | 1,891,431 | 931,328 | 879,484 |
| Other | 2,728,127 | 1,757,916 | 1,436,347 |
| Total operating expenses | 43,621,668 | 24,495,228 | 24,359,737 |
| Income (loss) from operations | 10,984,159 | 3,684,383 | (559,685) |
| Other income (expenses): | | | |
| Interest expense | (3,035,955) | (1,075,508) | (3,144,520) |
| Gain on disposal of fixed assets | - | - | 664 |
| Fees paid to debt providers | (2,164,089) | (241,448) | - |
| Debt related expenses | (3,213,194) | - | - |
| Other income (expense), net | (44,997) | 1,881,931 | (74,591) |
| Total other income (expenses), net | (8,458,235) | 564,975 | (3,218,447) |
| Income (loss) before provision for income taxes | 2,525,924 | 4,249,358 | (3,778,132) |
| Provision for income taxes | 888,071 | 1,320,101 | - |
| Net income (loss) | $ 1,637,853 | $ 2,929,257 | $ (3,778,132) |

The accompanying notes are an integral part of the consolidated financial statements.

CONSTELLATION HEALTHCARE TECHNOLOGIES, INC. AND SUBSIDIARIES
CONSOLIDATED FINANCIAL STATEMENTS FOR YEARS ENDED DECEMBER 31, 2014 AND
2013

## CONSOLIDATED STATEMENTS OF CASH FLOWS

| | Successor | Successor | Predecessor |
|---|---|---|---|
| | 2014 | June 15, 2013 through December 31 2013 (As Restated) | January 1, 2013 through June 14 2013 |
| **Cash Flow from operating activities:** | | | |
| Net Income (Loss) | $ 1,637,853 | $ 2,929,257 | $ (3,778,132) |
| Adjustments to reconcile net income (loss) to net cash provided by (used in) operating activities: | | | |
| Provision for doubtful accounts | 427,643 | 233,251 | 299,193 |
| Depreciation | 1,363,293 | 672,245 | 281,152 |
| Amortization | 1,887,247 | 964,167 | 1,920,500 |
| Deferred Tax benefit | (208,282) | 184,000 | - |
| Write back of acquisition related earn out payable | - | (1,905,000) | - |
| Non-cash interest | 54,708 | 108,005 | - |
| Amortization of deal related expenses | 1,759,984 | 172,813 | - |
| Debt related expenses | 2,905,000 | - | - |
| *Changes in operating assets and liabilities:* | | | |
| Accounts receivable | 3,346,577 | 652,500 | 449,135 |
| Inventory | (42,755) | (68,056) | 51,242 |
| Prepaid expenses and other assets | 632,530 | 166,410 | (219,472) |
| Other assets | 624 | 119,845 | - |
| Accounts payable and accrued expenses | (12,456) | 1,806,551 | (953,932) |
| Income taxes payable | 1,096,353 | 1,136,101 | - |
| Other liabilities | (97,000) | (303,000) | - |
| Net cash provided by (used in) operating activities | 8,058,165 | 6,869,088 | (1,950,314) |
| | | | |
| **Cash flows from Investing activities:** | | | |
| Cash outlay for property and equipment | (68,662) | (4,559,313) | (226,488) |
| Cash acquired from acquisition | 11,900 | - | - |
| Development of software tool | (4,960,714) | (2,095,464) | - |
| Net deposits to restricted cash | 97,000 | (97,000) | - |
| Capital Paid for Acquisition | - | (27,006,454) | - |
| Net cash used in investing activities | (4,920,476) | (33,758,231) | (226,488) |
| | | | |
| **Cash flows from financing activities:** | | | |
| Payments of capital lease obligations | (21,174) | (23,169) | (20,095) |
| Borrowings on line of credit | - | 500,000 | - |
| Payments on line of credit | (500,000) | - | (8,967,282) |
| Payments on long term loan | (24,072,889) | - | - |
| Net proceeds from long term debt | 23,000,000 | 15,500,000 | 8,992,317 |
| Cash outlay for deferred finance costs | (414,541) | (1,185,000) | - |
| Principal Payments of long term debt held by related parties | - | - | 2,510,371 |
| Distribution to parent | (4,389,756) | - | - |
| Contribution from parent | 3,910,350 | - | - |
| Proceeds from sale of stock, net of related fees | 13,466,231 | 14,997,392 | - |
| Net cash provided by financing activities | 10,978,221 | 29,789,223 | 2,515,311 |
| | | | |
| Net increase in cash and cash equivalents | 14,115,909 | 2,900,080 | 338,509 |
| | | | |
| Cash and cash equivalents, beginning of period | 4,020,426 | 1,120,346 | 781,837 |
| Cash and cash equivalents, end of period | $ 18,136,336 | $ 4,020,426 | $ 1,120,346 |
| | | | |
| **Supplemental Cash Flow Information:** | | | |
| Cash Paid for interest | 2,931,240 | $ 847,841 | $ 389,102 |
| Cash Paid for Income Taxes | - | (51) | (39,910) |

The accompanying notes are an integral part of the consolidated financial statements.

4

482

CONSTELLATION HEALTHCARE TECHNOLOGIES, INC. AND SUBSIDIARIES
CONSOLIDATED FINANCIAL STATEMENTS FOR YEARS ENDED DECEMBER 31, 2014 AND 2013

### CONSOLIDATED STATEMENTS OF CASH FLOWS (CONTINUED)

| | Successor 2014 | | Successor June 15, 2013 through December 31, 2013 | | Predecessor January 1, 2013 through June 14, 2013 | |
|---|---|---|---|---|---|---|
| **Supplemental Schedule of Non-Cash Investing and Financing Activities:** | | | | | | |
| Notes payable issued for accrued interest | $ | 162,716 | $ | 108,005 | $ | - |
| Assets acquired and liabilities assumed through Acquisition of NEMS: | | | | - | | - |
| Accounts Receivable, net | $ | 393,494 | $ | - | $ | - |
| Prepaid Expenses and other current assets | $ | 5,950 | $ | - | $ | - |
| Property and equipment | $ | 617,545 | $ | - | $ | - |
| Intangible assets, excluding goodwill, net | $ | 715,000 | $ | - | $ | - |
| Goodwill | $ | 1,405,646 | $ | - | $ | - |
| Other Assets, net | $ | 15,178 | $ | - | $ | - |
| Accounts payable | $ | 156,001 | $ | - | $ | - |
| Accrued Expenses | $ | 173,688 | $ | - | $ | - |
| Current portion of capital lease obligations | $ | 47,021 | $ | - | $ | - |
| Contingent purchase price liability | $ | 638,700 | $ | - | $ | - |

The accompanying notes are an integral part of the consolidated financial statements.

483

CONSTELLATION HEALTHCARE TECHNOLOGIES, INC. AND SUBSIDIARIES
CONSOLIDATED FINANCIAL STATEMENTS FOR YEARS ENDED DECEMBER 31, 2014
AND 2013

### CONSOLIDATED STATEMENT OF STOCKHOLDER'S EQUITY
### YEAR ENDED DECEMBER 31, 2014

| | Common Stock | | Paid-in Capital | Retained Earnings | Total |
|---|---|---|---|---|---|
| | Shares | Amount | | | |
| Balances, January 1, 2013 | 140,486,445 | $ 140,486 | $ 69,158,983 | $ (83,276,404) | $ (13,976,935) |
| Net loss from January 1, 2013 to June 14, 2013 | - | - | - | (3,778,132) | (3,778,132) |
| Balances, June 14, 2013 | 140,486,445 | $ 140,486 | $ 69,158,983 | $ (87,054,536) | $ (17,755,066) |
| | | | | | |
| Class A – Cancellation | (115,827,490) | $ (115,827) | $ - | $ - | $ (115,827) |
| Class D – Cancellation | (24,658,955) | (24,659) | - | - | (24,659) |
| Changes due to acquisition and push down accounting | 1,000 | 1 | (52,944,913) | 87,054,536 | 34,109,624 |
| Net income from June 15, 2013 to December 31, 2013 | - | - | - | 2,929,257 | 2,929,257 |
| | | | | | |
| Balances, January 1, 2014 | 1,000 | $ 1 | $ 16,214,070 | $ 2,929,257 | $ 19,143,328 |
| | | | | | |
| Proceeds from sale of stock, net of related fees | 55,614,056 | 5,561 | 13,460,670 | - | 13,466,231 |
| Distribution to parent | - | - | (4,389,756) | - | (4,389,756) |
| Contributions from parent | - | - | 3,910,350 | - | 3,910,350 |
| Deal fees and deferred financing fees paid by parent | - | - | 4,623,315 | - | 4,623,315 |
| Effect of push down accounting | - | - | (4,329,696) | - | (4,329,696) |
| Net income for 2014 | - | - | - | 1,637,853 | 1,637,853 |
| | | | | | |
| Balances, December 31, 2014 | 55,615,056 | $ 5,562 | $ 29,488,953 | $ 4,567,110 | $ 34,061,625 |

The accompanying notes are an integral part of the consolidated financial statements.

CONSTELLATION HEALTHCARE TECHNOLOGIES, INC. AND SUBSIDIARIES
CONSOLIDATED FINANCIAL STATEMENTS FOR YEARS ENDED DECEMBER 31, 2014
AND 2013

1.   NATURE OF BUSINESS AND SIGNIFICANT ACCOUNTING POLICIES

### A. Nature of Business

Constellation Healthcare Technologies, Inc., a Delaware Corporation (referred to as the "Company", "we", "us" or "our") is a healthcare services organization providing outsourced business services to physicians, serving the physician market through 3 operating segments - Revenue Cycle Management, Practice Management and Group Purchasing Organization - via seven operating subsidiaries: Medical Billing Services, Inc. ("MBS"), Rand Medical Billing, Inc. ("Rand"), RMI Physician Services Corporation ("RMI"), Western Skies Billing Service ("WSB") and Integrated Physician Solutions, Inc. ("IPS") and North Eastern Medical Services ("NEMS").    Our mission is to provide superior business and financial management services resulting in optimal profitability for our clients and maximized enterprise value for our stakeholders. We believe our core competency is our long-term experience and success in working with and creating value for physicians.

*Revenue Cycle Management ("RCM") Segment*

Our RCM segment includes five business units; MBS, Rand, RMI, WSB and NEMS. Through this segment, we offer expert medical billing and collections, practice management, and other related services to hospital-based and office-based physicians, giving them more time to focus on patient care in specialties such as pathology, anesthesiology, radiology, cardiology, family practice, internal medicine, orthopedics, neurology and emergency medicine.    These services help clients to be financially successful by improving cash flows and reducing administrative costs and burdens. MBS currently provides services to 33 clients. Rand currently provides services to 69 clients. RMI currently provides services to 13 clients. WSB currently provides services to 35 clients. NEMS currently provides services to 45 clients.

We deliver billing and collections services to help physicians receive optimal earnings for the care they provide. We assist our clients by maximizing their reimbursement through:

- Tenacious pursuit of every collectible dollar,
- To-the-letter compliance with ever-changing regulations and coding complexities,
- Thorough tracking and methodical working of correspondence, and
- Superior management of short-term cash flow and long-term income.

We also offer consulting services to assist clients with navigating and interacting with managed care organizations, as well as a wide range of management consulting services to help create a more efficient medical practice.

Our RCM segment comprised 52.06%, 59.60% and 66.59% of our total revenues for the year ended December 31, 2014, Successor 2013 period, the Predecessor 2013 period and respectively.

*Practice Management ("PM") Segment*

Our PM segment, via IPS, is an experienced and innovative provider of business and practice management services exclusively dedicated to supporting the needs of primary care and subspecialty pediatric practices.    Through this segment we provide accounting and bookkeeping, human resource management, group purchasing, accounts receivable management, quality assurance services, physician credentialing, fee schedule review, training and continuing education, and billing and reimbursement analysis.    As of December 31, 2014, our PM segment managed six practice sites, representing three medical groups in Illinois and Ohio.  The physicians, who are all employed by separate corporations, provide all clinical and patient care related services.

There is a standard forty-year management service agreement ("MSA") between IPS and the various affiliated medical groups whereby a management fee is paid to IPS, which owns all of the assets used in the operation of the medical groups.  IPS manages the day- to-day business operations of each medical group and provides the assets for the physicians to use in their practice for a fixed fee or percentage of the net operating income of the medical group.  All revenues are collected by IPS and the fixed fee or percentage payment to IPS is taken from the net operating income of the medical group and the remainder of the net operating income of the medical group is paid to the physicians and treated as an expense on IPS's financial statements as "physician group distribution."

Our PM segment comprised 35.04%, 36.83% and 30.38% of our total revenues for the year ended December 31 2014, Successor 2013 period and the Predecessor 2013 period, respectively.

7

485

CONSTELLATION HEALTHCARE TECHNOLOGIES, INC. AND SUBSIDIARIES
CONSOLIDATED FINANCIAL STATEMENTS FOR YEARS ENDED DECEMBER 31, 2014
AND 2013

**Group Purchasing Organization ("GPO")**

Our GPO segment provides for eligible physicians to participate in discounts for vaccines and flu shots offered by certain pharmaceutical companies. In exchange for this, we receive an administrative fee from the pharmaceutical companies.

**B. Basis of Presentation**

Orion, (Orion HealthCorp, Inc, together with its wholly owned subsidiaries) was acquired on June 14th 2013 by way of stock purchase by Constellation Health LLC.

The Company continued as the same legal entity after the acquisition. The accompanying consolidated statements of operations, changes in shareholders' equity, and cash flows are presented for the period ended June 30, 2013, which is presented in two periods: the Predecessor 2013 period (January 1, 2013 to June 14, 2013) and the Successor 2013 period (June 15, 2013 to June 30, 2013), which relate to the period preceding the Orion Acquisition and the period succeeding the Orion Acquisition, respectively. Although the accounting policies followed by the Company are consistent for the Predecessor and Successor periods, financial information for such periods has been prepared under two different historical-cost bases of accounting and is therefore not comparable. The results of the periods presented are not necessarily indicative of the results that may be achieved for future periods. Certain reclassifications have been made to the 2013 consolidated financial statements to conform to the 2014 presentation. We have also performed an evaluation of subsequent events through the date the financial statements were issued.

After the acquisition of Orion, this was effective June 14, 2013, on June 17, 2013, Orion HealthCorp, Inc., ("Orion") a Delaware corporation amended and restated its Certificate of Incorporation. Pursuant to the amendment, Class A and Class D shares of common stock were consolidated into authorized and issued 1,000 shares of common stock.

On September 3, 2014, Constellation Healthcare Technologies, Inc ("**Constellation**") was incorporated in the state of Delaware, USA. Constellation was incorporated to own Orion Healthcorp, Inc and its Subsidiaries.

Constellation Healthcare Technologies was admitted to the AIM market on December 8, 2014 after placing 7,128,235 shares to the market with gross proceeds of £9,623,117 (approx. $15.08 million). The total shares issued by Constellation, after the IPO placement, are 55,615,056.

As of December 31, 2014 Constellation Healthcare Technologies, Inc ("**Constellation**"), a Delaware company, owned all 1000 shares of Orion common stock.

The Company acquired North East Medical Solution (NEMS), a Pennsylvania corporation effective April 1, 2014. The consolidated financials for year ended December 31, 2014 include the financials of NEMS from April 1, 2014 to December 31, 2014.

**C. Revenue Recognition**

IPS, a Physician Practice Management Company (PPM), assumes all financial risk for the performance of the medical practices. The physicians are employees of the captive professional corporation bound by non-compete agreements and the authority of the IPS management structure in place.

IPS recognizes revenue at the time the services are provided by its affiliated medical groups. Net patient service revenue is impacted by billing rates, changes in current procedural terminology code reimbursement, and collection trends. IPS reviews billing rates at each of its affiliated medical groups, on at least an annual basis, and adjusts those rates based on each insurer's current reimbursement practices. Amounts collected by IPS for treatment by its affiliated medical groups of patients covered by Medicare, Medicaid, and other contractual reimbursement programs, which may be based on cost of services provided or predetermined rates, are generally less than the established billing rates of IPS' affiliated medical groups. IPS estimates the amount of these contractual allowances and records a reserve against accounts receivable based on historical collection percentages for each of the affiliated medical groups, which include various payer categories. When payments are received, the contractual adjustment is written off against the established reserve for contractual allowances. The historical collection percentages are adjusted quarterly based on actual payments received, with any differences charged against net revenue for the quarter. Additionally, IPS tracks cash collection percentages for each medical group on a monthly basis, setting quarterly and annual goals for cash collections, bad debt write-offs and aging of accounts receivable. IPS is not aware of any material claims, disputes or unsettled matters with third party payers and there have been no material settlements with third party payers for the year ended December 31 2014, Successor 2013 period, and the Predecessor 2013 period, respectively.

8

486

CONSTELLATION HEALTHCARE TECHNOLOGIES, INC. AND SUBSIDIARIES
CONSOLIDATED FINANCIAL STATEMENTS FOR YEARS ENDED DECEMBER 31, 2014
AND 2013

The Company also receives administration fees tiered by volume of Vaccines and Flu shots consumed by all participating physicians from pharmaceutical companies where it's participating doctors order the Vaccines and Flu Shots and administer vaccines. Revenue is recognized upon the administration of the vaccine by the doctor based on estimated usage during the year

MBS, Rand, RMI, WSB and NEMS principal source of revenues is fees charged to clients based on a percentage of net collections of the client's accounts receivable. They recognize revenue and bill their clients when the clients receive payment on those accounts receivable. Our RCM business units typically receive payment from the client within 30 days of billing. The fees vary depending on specialty, size of practice, payer mix, and complexity of the billing. In addition to the collection fee revenue, MBS, Rand, On Line, RMI and WSB also earn fees from the various consulting services that they provide, including medical practice management services, managed care contracting, coding and reimbursement services and transcription services. Consulting services are recognized as revenue at the time services are performed.

### D. Business Combinations

The Company accounts for all business combinations using the acquisition method of accounting. Under this method, assets and liabilities, including any remaining non-controlling interests, are recognized at fair value at the date of acquisition. The excess of the purchase price over the fair value of assets acquired, net of liabilities assumed, and non-controlling interests is recognized as goodwill. Certain adjustments to the assessed fair values of the assets, liabilities, or non-controlling interests made subsequent to the acquisition date, but within the measurement period, which is up to one year, are recorded as adjustments to goodwill. Any adjustments subsequent to the measurement period are recorded in income. Any cost or equity method interest that the Company holds in the acquired company prior to the acquisition is re-measured to fair value at acquisition with a resulting gain or loss recognized in income for the difference between fair value and the existing book value. Results of operations of the acquired entity are included in the Company's results from the date of the acquisition onward and include amortization expense arising from acquired tangible and intangible assets.

Identifiable Intangibles assets are valued based on the discounted value of earning potential of contracts pertaining to those business segments.

As part of an acquisition consideration, the Company may include, earn out component to the sellers/ identified management team of the acquired company. This earn out is typically payable based on achieving certain revenue and profit levels. At each level of base, high and low scenario cases, this earn out is discounted to the present value at the time of acquisition and recorded as a liability. This liability is adjusted to fair value at each reporting date.

All expenses relating to the acquisitions are expensed as incurred.

### E. Consolidation Policy

Our results for the year ended December 31, 2014, the Successor 2013 period and the Predecessor 2013 period, include the results of MBS, Rand, RMI, WSB, IPS and NEMS.

All intercompany balances and transactions have been eliminated in consolidation.

### F. Estimates

The preparation of consolidated financial statements in conformity with U.S. generally accepted accounting principles requires us to make estimates and assumptions that affect the reported amounts of assets and liabilities, disclosures of contingent assets and liabilities at the date of the consolidated financial statements and the reported amounts of revenues and expenses during the reporting period. While we believe current estimates are reasonable and appropriate, actual results could differ from those estimates.

### G. Concentrations of Credit Risk

Factors that could adversely impact our operations or consolidated financial results include, but are not limited to, the following: the global credit crisis, further deterioration of the credit markets, loss of large clients, interest rate increases, and changes in healthcare legislation.

We monitor our operations with a view to minimize the impact to our overall business that could arise as a result of the risks and uncertainties inherent in our business.

9

487

CONSTELLATION HEALTHCARE TECHNOLOGIES, INC. AND SUBSIDIARIES
CONSOLIDATED FINANCIAL STATEMENTS FOR YEARS ENDED DECEMBER 31, 2014
AND 2013

## H. Cash and Equivalents

We consider all short-term investments with an original maturity of three months or less to be cash equivalents. As of December 31, 2014 and 2013, the Company had no cash equivalents.

## I. Accounts Receivable and Allowance for Doubtful Accounts

MBS, Rand, RMI, WSB and NEMS evaluate the need for an allowance using historical loss experience and the assessment of other risks. The following table enumerates the allowances made on account of this business

|  | December 31 2014 | December 31, 2013 |
|---|---|---|
| Allowances for doubtful accounts | $    62,395 | $    127,000 |

IPS' affiliated medical groups grant credit without collateral to its patients, most of which are insured under third-party payer arrangements. The allowance for doubtful accounts that relates to patient service revenues is based on an evaluation of potentially uncollectible accounts. The allowance for doubtful accounts includes a reserve for 100% of the accounts receivable older than 150 days. Establishing an allowance for bad debt is subjective in nature. IPS uses historical collection percentages to determine the estimated allowance for bad debts, and adjusts the percentage on a quarterly basis.

|  | December 31 2014 | December 31 2013 |
|---|---|---|
| Allowances for doubtful accounts | $    941,889 | $    809,136 |

We typically do not charge late fees or interest on past due accounts.

## J. Inventory

Inventory consists of vaccines, which are stated at the lower of cost or market. Cost is determined under the first-in, first-out method.

## K. Recent Accounting Pronouncements

From time to time, new accounting pronouncements are issued by the Financial Accounting Standards Board ("FASB") and are adopted by us as of the specified effective date. Unless otherwise discussed, the Company believes that the impact of recently adopted and recently issued accounting pronouncements will not have a material impact on its consolidated financial position, results of operations, and cash flows.

In July 2013, the FASB issued ASU 2013-11, *Income Taxes (Topic 740) — Presentation of an Unrecognized Tax Benefit When a Net Operating Loss Carryforward, a Similar Tax Loss, or a Tax Credit Carryforward Exists.* This amendment clarifies the guidance on the presentation of an unrecognized tax benefit, or a portion of an unrecognized tax benefit, in the financial statements as a reduction to a deferred tax asset for a net operating loss carryforward, a similar tax loss, or a tax credit carryforward. ASU No. 2013-11 is effective for fiscal periods beginning after December 15, 2013. The adoption of this ASU did not have a material impact on the consolidated financial statements.

In May 2014, the FASB issued ASU 2014-09, *Revenue from Contracts with Customers (Topic 606)*. The core principle of the guidance is that an entity should recognize revenue to depict the transfer of promised goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services. ASU No. 2014-09 is effective for fiscal periods beginning after December 15, 2016, including, interim periods within that period. We are currently evaluating the impact of ASU 2014-09 on our consolidated financial statements and disclosures.

CONSTELLATION HEALTHCARE TECHNOLOGIES, INC. AND SUBSIDIARIES
CONSOLIDATED FINANCIAL STATEMENTS FOR YEARS ENDED DECEMBER 31, 2014
AND 2013

In August 2014, the FASB issued ASU 2014-15, *Presentation of Financials Statements – Going Concern (Subtopic 205-40). Disclosure of Uncertainties about and Entity's Ability to continue as a Going Concern.* The core principle of the guidance is that even if an entity's liquidation is not imminent, there may be conditions or events that raise substantial doubt about the entity's ability to continue as a going concern. In those situations, financial statements should continue to be prepared under the going concern basis of accounting, but the amendments in this Update should be followed to determine whether to disclose information about the relevant conditions and events. ASU 2014-15 is effective for fiscal periods beginning after December 15, 2016. We do not expect the adoption of the ASU 2014-15 to have a material effect on our financial statements and disclosures

**L. Deferred Rent**

Deferred rent consists of rent escalation and lease incentive terms related to the Company's operating leases for its facilities. Deferred rent represents the difference between actual operating lease payments due and straight-line rent expense, which is recorded by the Company over the term of the lease, including any construction period. The excess of the difference between actual operating lease payments due and straight-line rent expense is recorded as a deferred credit in the early periods of the lease when cash payments are generally lower than straight-line rent expense, and is reduced in the later periods of the lease when payments begin to exceed the straight-line expense. Deferred rent accrued is $534,755 for the years ended December 31, 2014 and $530,037 for the years ended December 31, 2013

**M. Goodwill and Intangible Assets**

Goodwill represents the excess of cost over the fair value of net assets of companies acquired in business combinations accounted for using the purchase method.

Intangible assets include customer contracts and relationships and covenants not-to-compete acquired in connection with acquisitions, as well as software purchase and development costs. These intangible assets are amortized on a straight-line basis, which reflects the pattern in which economic benefits are expected to be realized. The Company concluded that use of the straight-line method was appropriate as the majority of the cash flows are expected to be recognized ratably over the estimated useful lives, without a significant degradation of the cash flows over time. The customer relationships and associated contracts represent the most significant portion of the value of the purchase price for every acquisition.

Goodwill and Intangibles are reviewed for possible impairment, annually or upon the occurrence of an event or when circumstances indicate that a reporting unit's carrying amount is greater than its fair value.

Identified Intangible assets are amortized using straight-line method over their estimated useful lives as follows:

|  | Estimated useful life |
|---|---|
| Management service agreements | 25 years |
| Client relationships | 5 years |
| Group Purchase agreements | 5 years |
| Trade name | 5 years |
| Non-compete agreement | 5 years |

Amortization is computed at rates considered sufficient to amortize the cost of the assets, using the straight-line method over their estimated useful lives. Intangibles were amortized by $1,887,247 for the year ended December 31, 2014, $964,167 from June 15 to December 31, 2013 (Successor period) and $1,920,500 from January 1 to June 14, 2013 (Predecessor period).

**N. Software Development Costs**

We capitalize software development costs in accordance with ASC 985-20, Costs of Software to be Sold, Leased, or Marketed. Research costs and software development costs, prior to the establishment of technological feasibility, determined based upon the creation of a working model, are expensed as incurred. Our software capitalization policy currently defines technological feasibility as a functioning beta test prototype with a confirmed working model, within a reasonably predictable range of costs. Additionally, technological feasibility is established when the Company has completed all planning, designing, coding, and testing activities that are necessary to establish that the product can be produced to meet its design specifications including functions, features, and technical performance requirements. Our policy is to amortize capitalized costs by the straight-line method over the remaining estimated economic life of the product. Software development costs capitalized in 2014 and 2013 were $4,960,714 for the year ended December 31, 2014, $2,095,464 for the successor period ended December 31, 2013.

11

489

CONSTELLATION HEALTHCARE TECHNOLOGIES, INC. AND SUBSIDIARIES
CONSOLIDATED FINANCIAL STATEMENTS FOR YEARS ENDED DECEMBER 31, 2014
AND 2013

**O. Fair Value of financial instruments**

The carrying amounts for cash, cash equivalents, accounts payable, and accrued expenses approximate fair value because of their short-term nature. At December 31, 2014, the carrying value and accrued interest of the Term Loan is $20.78 million. See note 10 for further discussion of notes payable

**P. *Fair Value Measurements:***

The authoritative guidance for fair value measurements defines fair value as the price that would be received if an asset were to be sold or paid to transfer a liability in an orderly transaction between market participants on the measurement date. Market participants are buyers and sellers in the principal market that are (i) independent, (ii) knowledgeable, (iii) able to transact, and (iv) willing to transact. The guidance describes a fair value hierarchy based on the levels of inputs, of which the first two are considered observable and the last unobservable, that may be used to measure fair value which are the following:

Level 1 — Quoted prices in active markets for identical assets or liabilities

Level 2 — Inputs other than Level 1 that are observable, either directly or indirectly, such as quoted prices for similar assets or liabilities; quoted prices in markets that are not active; or other inputs that are observable or corroborated by observable market data for substantially the full term of the assets or liabilities

Level 3 — Unobservable inputs that are supported by little or no market activity and that are significant to the value of the assets or liabilities

### Quantitative Information about Level 2 Fair Value Measurements

| Nature | Fair value at December 31, 2014 | Valuation Techniques | Unobservable input | Range (weighted average) |
|---|---|---|---|---|
| Measurement of earn out payable | $ 638,700 | Discounted cash flows | Discount rate Revenue growth rate | 10% -15% to +15% (0%) |

**Q. Income Taxes**

Provisions for income taxes are based on taxes payable or refundable for the current year and deferred taxes on temporary differences between the tax basis of assets and liabilities and their reported amounts in the consolidated financial statements. Deferred tax assets and liabilities are included in the consolidated financial statements at currently enacted income tax rates applicable to the period in which the deferred tax assets and liabilities are expected to be realized or settled. As changes in tax laws or rates are enacted, deferred tax assets and liabilities are adjusted through the current period's provision for income taxes. A valuation allowance is provided for deferred tax assets if it is more likely than not that the asset will not be realizable.

The Company records a liability for unrecognized tax benefits resulting from uncertain tax positions taken (or expected to be taken) in a tax return before the uncertain tax positions are finally resolved with the taxing authority. If the Company considers that a tax position is "more-likely-than-not" to be sustained upon an audit by the taxing authority, based solely on the technical merits of the tax position, it recognizes the tax benefit. The Company measures the tax benefit by determining the largest amount that is greater than 50% likely of being realized upon settlement, presuming that the tax position is examined by the appropriate taxing authority that has full knowledge of all relevant information. The Company recognizes estimated future interest and penalties related to unrecognized tax positions, if any, as income tax expense in the consolidated statements of operations.

None of the Company's federal or state income tax returns are currently under examination by the Internal Revenue Service or state authorities. The Company is generally no longer subject to U.S. federal, state, or local income tax examinations by tax authorities for years before 2010.

490

CONSTELLATION HEALTHCARE TECHNOLOGIES, INC. AND SUBSIDIARIES
CONSOLIDATED FINANCIAL STATEMENTS FOR YEARS ENDED DECEMBER 31, 2014
AND 2013

2.    **Restatement**

The Company restated its previously issued consolidated financial statements as of December 31, 2014 and for the successor period, June 15, 2013 through December 31, 2013, to correct an error related to certain amounts previously reported as '*Provision for taxes* ' in its consolidated statement of operations and, ' *Deferred tax Asset, Deferred tax liability and Income tax payable* ,' on its consolidated balance sheet.

Disclosures note 14 has been restated consistent with the consolidated financial statements.

The table below details the impact of the restatement on the Company's consolidated balance sheet as of December 31, 2013:

|  | December 31, 2013 | | |
|  | As reported | Adjustments | Restated |
| --- | --- | --- | --- |
| Deferred tax asset | $  4,838,452 | $     (252,000) | $  4,586,452 |
| Deferred tax liability | $  3,681,047 | $   1,000,000 | $  4,681,047 |
| Income tax payable | $  1,175,505 | $  (1,000,000) | $     175,505 |
| Retained earnings | $  3,181,257 | $     (252,000) | $  2,929,257 |

The table below details the impact of the restatement on the Company's consolidated statement of operations for the successor period, June 15, 2013 through December 31, 2013:

|  | December 31, 2013 | | |
|  | As reported | Adjustments | Restated |
| --- | --- | --- | --- |
| Provision for income taxes | $  1,068,101 | $     252,000 | $ 1,320,101 |
| Net Income | $  3,181,257 | $     (252,000) | $ 2,929,257 |

The table below details the impact of the restatement on the Company's consolidated statement of stockholder's equity as of December 31, 2013:

|  | December 31, 2013 | | |
|  | As reported | Adjustments | Restated |
| --- | --- | --- | --- |
| **Retained earnings** |  |  |  |
| Net Income | $     3,181,257 | $     (252,000) | $     ,929,257 |
| Balance at December 31 2013 | $     3,181,257 | $     (252,000) | $  2,929,257 |
| **Total Stockholder's equity** |  |  |  |
| Net Income | $     3,181,257 | $     (252,000) | $  2,929,257 |
| Balance at December 31 2013 | $   19,395,328 | $     (252,000) | $ 19,143,328 |

The table below details the impact of the restatement on the Company's consolidated statement of cash flows for the year ended December 31, 2013:

|  | December 31, 2013 | | |
|  | As reported | Adjustments | Restated |
| --- | --- | --- | --- |
| Net Income | $     3,181,257 | $     (252,000) | $  2,929,257 |

13

491

CONSTELLATION HEALTHCARE TECHNOLOGIES, INC. AND SUBSIDIARIES
CONSOLIDATED FINANCIAL STATEMENTS FOR YEARS ENDED DECEMBER 31, 2014
AND 2013

3.   **Segment reporting information**

| | Successor period<br>Year ended<br>December 31, 2014 | | Successor period<br>June 15, 2013<br>through<br>December 31, 2013 | | Predecessor period<br>January 1, 2013<br>through<br>June 14, 2013 |
|---|---|---|---|---|---|
| **Revenue Cycle Management** | | | | | |
| Revenues | $ 28,425,915 | $ | 16,793,698 | $ | 15,849,628 |
| Depreciation, Depletion and Amortization | $ 2,249,960 | $ | 1,053,631 | $ | 1,939,769 |
| Operating Income (Loss) | $ 7,549,170 | $ | 4,741,467 | $ | 2,408,193 |
| **GP & Corporate** | | | | | |
| Revenues | $ 7,048,604 | $ | 1,007,229 | $ | 720,424 |
| Depreciation, Depletion and Amortization | $ 991,481 | $ | 577,406 | $ | 248,033 |
| Operating Income (Loss) | $ 5,179,558 | $ | (169,595) | $ | (1,101,345) |
| **Practice Management:** | | | | | |
| Revenues | $ 19,131,308 | $ | 10,378,684 | $ | 7,230,001 |
| Depreciation, Depletion and Amortization | $ 9,099 | $ | 5,375 | $ | 13,850 |
| Operating Income (Loss) | $ 1,505,971 | $ | 748,923 | $ | 335,120 |

Corporate expenses that are incurred for the company's general administration have not been apportioned to other business segments. These costs are grouped under General Purchasing and Corporate segment

The operating segments are identified and reported on the basis of internal reports about components of the group that are regularly reviewed by the Management Board to assess the performance of the segments.

The group's internal management reporting is structured primarily on the basis of the market segments in which the 3 operating segments – Revenue Cycle Management, Practice Management and General Purchasing (GP) & Corporate - operate.

Management assesses the performance of segments based on the measures of revenue and earnings before depreciation, interest and taxes (EBDIT), whereby the EBDIT measure includes allocations of expenses from supporting functions within the group.

Company runs shared services for each of its three segments. All resources, who form part of General management & administration, HR, Finance and accounting, IT, call center are part of shared services that are used by one or more segments and have been included in the reallocation.

Such allocations have been determined by the best management estimates based on number of resources served, volume of transactions processed and or relevant measures that reflect the level of benefits of these functions to each of the operating segments. As the 3 operating segments serve only external customers, there is no inter-segment revenue. Interest income and expenses and tax are not allocated to the segments. There is no measure of segment (non-current) assets and/or liabilities provided to the Management Board.

**Reconciliation of reportable segment revenues and profit or loss to the consolidated totals**

| | Successor period<br>Year ended<br>December 31, 2014 | | Successor period<br>June 15, 2013<br>through<br>December 31 2013 | | Predecessor period<br>January 1, 2013<br>through<br>June 14 2013 |
|---|---|---|---|---|---|
| Total Revenues for reportable segments | $ 54,605,827 | $ | 28,179,611 | $ | 23,800,053 |
| **Total Consolidated revenues** | $ 54,605,827 | $ | 28,179,611 | $ | 23,800,053 |
| | | | | | |
| Operating Profit for reportable segments | $ 14,234,699 | $ | 5,320,795 | $ | 1,641,968 |
| Depreciation & amortization | (3,250,540) | | (1,636,412) | | (2,201,652) |
| Interest expense | (3,035,955) | | (1,075,508) | | (3,144,520) |
| Gain (loss) on disposal of fixed assets | - | | | | 664 |
| Other income (expense), net | (5,422,280) | | 1,640,483 | | (74,591) |
| Provision for income taxes | (888,071) | | (1,320,101) | | - |
| Net income (loss) | $ 1,637,853 | $ | 2,929,257 | $ | (3,778,131) |

14

CONSTELLATION HEALTHCARE TECHNOLOGIES, INC. AND SUBSIDIARIES
CONSOLIDATED FINANCIAL STATEMENTS FOR YEARS ENDED DECEMBER 31, 2014
AND 2013

**4.    Property and Equipment**

Property and equipment are presented at cost. Depreciation is computed at rates considered sufficient to depreciate the cost of the assets, using the straight-line method over their estimated useful lives and capital leases and leasehold improvements being in the nature of operating leases are amortized over the lease term, as follows:

|  | Estimated useful life |
|---|---|
| Computer equipment | 2 - 5 years |
| Office equipment | 5 - 7 years |
| Furniture and fixtures | 5 - 7 years |
| Leasehold improvements | Lease term |
| Capital leases | Lease term |
| Medical and surgical equipment | 5 years |
| Automobiles | 5 years |

Property and equipment, net consists of the following at December 31, 2014 and 2013:

|  | December 31, 2014 | December 31, 2013 |
|---|---|---|
| Computer equipment and software | $    8,818,317 | $    8,348,406 |
| Office equipment | 313,184 | 313,184 |
| Furniture and fixtures | 726,663 | 529,265 |
| Capital leases | 910,866 | 910,866 |
| Leasehold improvements | 126,852 | 107,949 |
| Medical and surgical equipment | 19,529 | 19,529 |
| Total | 10,915,411 | 10,229,199 |
| Less accumulated depreciation | (6,745,048) | (5,381,750) |
| **Property and equipment, net** | $    4,170,363 | $    4,847,449 |

We recorded depreciation expense related to the above assets, $1,363,293 for the year ended December 31, 2014, $672,245 and $281,152 for the successor period June 15 to December 31, 2013 and predecessor period January 1 to June 14, 2013, respectively.

The above asset categories include assets on capital lease:

|  | December 31 2014 | December 31 2013 |
|---|---|---|
| Computer equipment and software | $    598,023 | $    598,023 |
| Office equipment | 235,137 | 235,137 |
| Furniture and fixtures | 77,706 | 77,706 |
| Total | 910,866 | 910,866 |
| Less Accumulated Amortization | (910,866) | (910,866) |
| **Net book value** | $    - | $    - |

**5.    Advertising and Business Promotion Costs**

Advertising and business promotion costs are charged to operations as incurred.

|  | Successor | Successor | Predecessor |
|---|---|---|---|
|  | Year ended December 31, 2014 | June 15, 2013 through December 31, 2013 | January 1, 2013 through June 14, 2013 |
| Advertisement and business promotion costs | $    78,410 | $    84,166 | $    71,218 |

CONSTELLATION HEALTHCARE TECHNOLOGIES, INC. AND SUBSIDIARIES
CONSOLIDATED FINANCIAL STATEMENTS FOR YEARS ENDED DECEMBER 31, 2014
AND 2013

**6.    Deferred finance costs**

The Company incurred $1,185,000 towards debt syndication fees for new debt funding in 2013. This was categorized as deferred finance costs and was being amortized over the term of the debt. On March 31, 2014, this funding arrangement was replaced by a new funding and the unamortized balance of $938,125 was expensed on that date..

On March 31, 2014 as part of the new loan arrangement, $1,655,000 was incurred towards deferred finance costs on new financing arrangement.

On September 3 2014, the company modified terms of the new financing arrangement resulted in a write down of the deferred finance fee. The deferred finance fees at December 31, 2014 and 2013 are $907,203 and $1,012,188, respectively

**7.    Acquisitions**

1)    The Company was acquired on June 14, 2013 (the 'Acquisition Date') by way of stock purchase.

Acquisition related transaction costs include investment banking, legal and accounting fees and other costs directly related to the acquisition. Total transaction's costs paid/ accrued is $5.31 million and include $1.19 million towards debt issuance fees, capitalized as debt issuance costs and deferred to be amortized over the term of the loan.

*Purchase Price Allocation:*

The Acquisition was recorded under the acquisition method of accounting by the Parent and pushed-down to the Company by allocating the purchase consideration of $30.43 million to the cost of the assets acquired, including intangible assets, based on their estimated fair values at the Acquisition Date. The allocation of purchase price is based on management's judgment after evaluating several factors, including, but not limited to, valuation assessments of tangible and intangible assets. The excess of the total purchase price over the fair value of assets acquired and the liabilities assumed of $12.32 million is recorded as goodwill. The goodwill arising from the Acquisition consists largely of the commercial potential of the Company and the value of the assembled workforce.

The following sets forth the Company's purchase price allocation (in thousands):

| | | |
|---|---|---|
| Cash and cash equivalents | $ | 1,120 |
| Accounts receivable, net | | 6,174 |
| Inventory | | 272 |
| Prepaid expenses and other current assets | | 1,457 |
| Property and equipment, net | | 960 |
| Intangible assets | | 10,500 |
| Other assets, net | | 232 |
| Deferred tax asset, net | | 1,050 |
| Accounts payable | | (3,625) |
| Current portion of capital lease obligations | | (26) |
| **Total Purchase price allocation** | **$** | **12,317** |

The Company finalized its evaluation of the fair value of the assets acquired and liabilities assumed and the resulting purchase price allocation subsequent to June 14, 2013. As a result, adjustments were made to the preliminary purchase price allocation that impacted the allocation of certain intangible assets to the Company's reportable segments.

The Company has acquired intangible assets, not including goodwill, totaling approximately $10.50 million in the Acquisition. The amortization of these intangibles is not deductible for tax purposes and hence the Company has recorded a deferred tax liability of approximately $3.01 million to offset the future book amortization related to these intangibles.

During the process of acquisition of Orion, a contingent consideration was set up for identified management team. This earn out is based on a minimum revenue generated for 2013 and 2014. A pool of $1 million and $3 million was allocated for 2013 and 2014 respectively. As a part of Purchase price allocation, on the date of acquisition of Orion, this liability was discounted to the present value based on the base, best and low scenarios of achieving the targeted revenue for 2013 and 2014. The discounted liability on this account was accrued at $1.9 million. These amounts were revalued again as of December 31, 2013 and were considered reduced to zero, as the obligation based on meeting the revenue targets was determined not probable as of that date . This reversal of contingent liability is shown under other income.

CONSTELLATION HEALTHCARE TECHNOLOGIES, INC. AND SUBSIDIARIES
CONSOLIDATED FINANCIAL STATEMENTS FOR YEARS ENDED DECEMBER 31, 2014
AND 2013

*Identifiable Intangible Assets*

In performing the purchase price allocation, the Company considered, among other factors, the intended future use of acquired assets, analyses of historical financial performance and estimates of future performance. The following table sets forth the components of intangible assets as of the date of the Acquisition (in thousands):

| *Identifiable Intangible Assets:* | | |
|---|---|---|
| Customer Relationships | $ | 7,900 |
| Group Purchasing Agreements | | 600 |
| Management Service Agreement | | 2,000 |
| **Total Identifiable Intangible Assets** | **$** | **10,500** |

Customer relationships represent the fair value of the existing customer base.

2) In April 1, 2014, the Company's parent, Constellation Health LLC (Constellation), acquired North East Medical Solutions (NEMS), a Revenue Cycle Management company, based out of Pennsylvania, USA. NEMS was acquired for a total consideration of $2.79 million for a 100% ownership with 100% voting rights. Constellation transferred this acquisition to Orion Healthcare, immediately thereafter on the same day.

*Purchase Price Allocation:*

The allocation of purchase price is based on management's judgment after evaluating several factors, including, but not limited to, valuation assessments of tangible and intangible assets. The excess of the total purchase price over the fair value of assets acquired and the liabilities assumed of $1.82 million is recorded as goodwill. The goodwill arising from the Acquisition consists largely of the commercial potential of the Company and the value of the assembled workforce.

The following sets forth the Company's purchase price allocation:

| Purchase Price | $ | 2,788,003 |
|---|---|---|
| Cash and cash equivalents | $ | 11,900 |
| Accounts receivable, net | | 393,494 |
| Prepaid expenses and other current assets | | 5,950 |
| Property and equipment, net | | 617,545 |
| Intangible assets | | 715,000 |
| Other assets, net | | 15,178 |
| Accounts payable | | (156,001) |
| Accrued Expenses | | (173,688) |
| Current portion of capital lease obligations | | (47,021) |
| **Net assets acquired** | **$** | **1,382,357** |
| **Excess Purchase Price Allocated to Goodwill** | **$** | **1,405,646** |

The Company has acquired intangible assets, not including goodwill, totaling approximately $715 thousands in the acquisition.

| *Identifiable Intangible Assets:* | | |
|---|---|---|
| Trade Name | $ | 220,000 |
| Non-Compete Agreements | | 15,000 |
| Customer Contracts | | 480 |
| **Total Identifiable Intangible Assets** | **$** | **715** |

A contingent consideration was set up for identified management team. This earn out is based on a minimum revenue generated for 2014 and 2015. A pool of $367 thousands and $474 thousands was allocated for 2015 and 2016 respectively. As a part of Purchase price allocation, on the date of acquisition of NEMS, this liability was discounted to the present value based on the base, best and low scenarios of achieving the targeted revenue for 2014 and 2015. The discounted liability on this account was accrued at $639 thousand.

NEMS was acquired to foray into a different geographical area and increase the customer base. Along with organic growth plans, the company also constantly is looking for inorganic growth opportunities.

The revenues from NEMS were consolidated from April 2014, totaling $2.5 million for the year ended December 31, 2014. If NEMS was acquired at the beginning of the year, the additional revenues of $800 thousand would also have been included.

17

CONSTELLATION HEALTHCARE TECHNOLOGIES, INC. AND SUBSIDIARIES
CONSOLIDATED FINANCIAL STATEMENTS FOR YEARS ENDED DECEMBER 31, 2014
AND 2013

8.    **Other Assets**

Other assets consist of the following at December 31, 2014 and 2013:

|  | December 31, 2014 | December 31, 2013 |
|---|---|---|
| Deposits | $    223,796 | $    209,077 |
| Total | $    223,796 | $    209,077 |

9.    **Prepaid and other current assets**

|  | December 31, 2014 | December 31, 2013 |
|---|---|---|
| Prepaid rent and Insurance | $    393,024 | $    418,362 |
| Prepaid maintenance | 270,620 | 176,862 |
| Prepaid legal fees | - | 495,000 |
| Prepaid vendor costs | - | 200,000 |
| Total | $    663,644 | $    1,290,224 |

10.    **Intangible Assets, excluding Goodwill, net**

Intangible assets, excluding goodwill, net consist of the following at December 31, 2014 and 2013:

|  | December 31, 2014 | December 31, 2013 |
|---|---|---|
| Software tool - work in progress | $    7,056,043 | $    2,095,464 |
| Client relationships | 8,380,000 | 7,900,000 |
| Management service agreements | 2,000,000 | 2,000,000 |
| Group Purchasing agreements | 600,000 | 600,000 |
| Trade Name | 220,000 | - |
| Non-Compete | 15,000 | - |
|  | 18,271,043 | 12,595,464 |
| Less accumulated amortization | (2,851,414) | (964,167) |
| Net amount | $    15,419,629 | $    11,631,297 |

Estimated future annual amortization of our identifiable intangible assets is as follows:

Year ending December 31:

| Year ended December 31, 2015 | $    2,628,604 |
|---|---|
| Year ended December 31, 2016 | 3,334,209 |
| Year ended December 31, 2017 | 3,334,209 |
| Year ended December 31, 2018 | 2,413,375 |
| Year ended December 31, 2019 | 1,526,959 |
| Thereafter | 2,182,273 |
| **Total** | $    15,419,629 |

18

496

CONSTELLATION HEALTHCARE TECHNOLOGIES, INC. AND SUBSIDIARIES
CONSOLIDATED FINANCIAL STATEMENTS FOR YEARS ENDED DECEMBER 31, 2014
AND 2013

11.    **Line Of Credit And Long-Term Debt**

The Company had a line of credit facility with a bank dated June 17 2013 that provides for maximum borrowing of $2,000,000 and maturing on May 31, 2017. The bank interest rate was 9.50%. The line of credit is collateralized by substantially all the assets of the Company. At Successor period ending December 31 2013, the outstanding line of credit is $500,000.

The Company also had a Term Loan, Type A, for $9,000,000 at a fixed interest rate 11%, and Term Loan, Type B, for $6,500,000 at a fixed interest rate 12% plus an additional 3% PIK interest. The term loans maturing on May 31, 2017

The Company entered into a new loan agreement dated March 31 2014 to replace the loan facility entered on June 17, 2013. The new loan facility is a $40,000,000 Senior debt facility, bearing fixed interest at 10.00%, interest payable monthly, plus an additional 2% payable in kind interest. Principal payments start from June 30 2015, maturing on March 31, 2018, collateralized by a blanket lien on all assets

This loan agreement was modified and amended in September 2014 reducing our facility to $23,000,000. Interest rate was fixed at higher of (a) 3 month LIBOR (**Base rate**) plus 9% and (b) 11%, without payment of kind interest.

For the successor year ending December 31, 2013 the outstanding line of credit balance totaled $500,000.

Long-term debt consisted of the following at December 31, 2014 and 2013:

|  | December 31, 2014 | December 31, 2013 |
|---|---|---|
| $40,000,000 senior note payable to a financial institution, bearing interest at higher of (a) 3 month LIBOR (**Base rate**) plus 9% and (b) 11%, interest payable monthly, principal payments monthly based on schedule, maturing on September 30, 2017, collateralized by a blanket lien on all assets. | $   20,958,879 | $                - |
| $9,000,000 Term loan A payable to a financial institution, bearing fixed interest at 11.00%, interest payable monthly, principal payments monthly based on schedule after 6 months, maturing May 31, 2017, collateralized by a blanket lien on all assets. | - | 9,000,000 |
| $6,500,500 Term loan B payable to a financial institution, bearing fixed interest at 12.00%, interest payable monthly plus an additional 3% PIK interest, principal payments payable after full repayment of Term loan A, maturing May 31, 2017, collateralized by a blanket lien on all assets. | - | 6,608,005 |
| Total | 20,958,879 | 15,608,005 |
| Less current maturities | (4,631,771) | (1,125,000) |
| **Long term debt** | $   16,327,108 | $   14,483,005 |

Future aggregate annual maturities of the debt are as follows:

| Year ending December 31: | | |
|---|---|---|
| 2015 | $ | 4,631,771 |
| 2016 | | 4,631,771 |
| 2017 | | 11,695,337 |
| **Total debt** | $ | 20,958,879 |

Our credit agreement for our Term loans contains certain financial covenants that require us to maintain a maximum leverage ratio and other customary terms and conditions. Post-acquisition, the Company has met all the financial covenants for the debt.

During the year as a part of acquisition of the Company, old debt was retired and replaced by new debt funds. As a part of purchase price allocation this was push down to the company from the parent.

19

CONSTELLATION HEALTHCARE TECHNOLOGIES, INC. AND SUBSIDIARIES
CONSOLIDATED FINANCIAL STATEMENTS FOR YEARS ENDED DECEMBER 31, 2014
AND 2013

### 12. Accrued Expenses

Accrued expenses consisted of the following at December 31, 2014 and 2013:

|  | December 31, 2014 | December 31, 2013 |
|---|---|---|
| Compensation and related taxes | $ 709,819 | $ 541,615 |
| Interest | 209,496 | 159,488 |
| Deferred acquisition deal fees | - | 1,149,983 |
| Deferred rent | 532,349 | 530,037 |
| Professional Fees Payable | 295,211 | 342,406 |
| Other | 609,061 | 391,984 |
| Total | $ 2,355,936 | $ 3,115,513 |

### 13. Operating Leases

We lease our facilities and corporate office space under operating leases that expire in various years through 2022. The leases provide for annual operating expense increases. Annual rental payments related to our facility leases totaled $1,986,863, $1,219,263 and $869,462 for the year ended December 31, 2014 and June 15 to December 31 2013, and January 1 to June 14, 2013 respectively.

Future annual base rental expenses under these lease agreements are as follows:

| | |
|---|---|
| 2015 | $ 2,001,407 |
| 2016 | 1,620,345 |
| 2017 | 1,248,721 |
| 2018 | 1,104,943 |
| 2019 | 1,084,320 |
| Thereafter | 1,149,243 |
| Total | $ 8,208,978 |

### 14. Income Taxes

The provision for income taxes for the years ended December 31, 2014 and 2013 is summarized as follows:

|  |  | December 31, 2014 | December 31, 2013 |
|---|---|---|---|
| Current: | | | |
| | Federal | $ 934,945 | $ 253,587 |
| | State | 161,408 | 173,920 |
| | Total | 1,096,353 | 427,507 |
| Deferred: | | | |
| | Federal | (177,040) | 1,171,315 |
| | State | (31,242) | (308,953) |
| | Valuation allowance | - | 30,232 |
| | Total | (208,282) | 892,594 |
| | Provision for Income taxes | $ 888,071 | $ 1,320,101 |

For the successor period ended December 31, 2014 , the Company's effective income tax rate was 37% and for successor period ending December 31, 2013, the Company's effective income tax rate was 37%.

CONSTELLATION HEALTHCARE TECHNOLOGIES, INC. AND SUBSIDIARIES
CONSOLIDATED FINANCIAL STATEMENTS FOR YEARS ENDED DECEMBER 31, 2014
AND 2013

Our provision for federal and state taxes is comprised primarily of taxes from states that assess franchise and margin tax. Significant components of net deferred tax assets and liabilities are as follows:

Deferred tax liabilities:

|  | Successor December 31, 2014 | Predecessor December 31, 2013 |
|---|---|---|
| Intangibles, amortization not available for tax deduction | $ (4,156,491) | $ (4,681,047) |
| Total deferred tax liabilities | $ (4,156,491) | $ (4,681,047) |
| | | |
| Deferred tax assets: | | |
| Net operating loss - Federal and State - Current | $ 252,000 | $ 252,000 |
| Net operating loss - Federal and State – Long Term | 4,018,178 | 4,334,452 |
| Total deferred tax assets | $ 4,270,178 | $ 4,586,452 |
| | | |
| Total net deferred tax assets/(liabilities) | 113,687 | (94,595) |
| Valuation allowance | - | - |
| Net deferred tax assets | $ 113,687 | $ (94,595) |

The Company has earned taxable income in the year ended December 31 2014 and successor period ended December 31, 2013, and is expected to earn taxable income in future years to claim the benefit of deferred tax asset; therefore the Company is not making any valuation allowance for the year ended December 31, 2014 and successor period ended December 31 2013.

On the acquisition date in 2013, we have identified a net operating loss carry forwards of approximately $28,000,000, which will begin to expire in 2033 year. As a result of the acquisitions and restructurings, we have undergone an ownership change and the utilization of the tax net operating losses are subject to potential limitations pursuant to Internal Revenue Code Section 382. These limitations could reduce the amount of the net operating loss carry forwards utilized in the future. Furthermore, the ultimate utilization of the carry forwards is dependent upon the timing and extent of our future profitability. The annual limitations combined with the expiration date of the carry forwards may prevent the utilization of the carry forwards.

Constellation Health LLC and the Company have entered into a tax indemnity agreement pursuant to which Constellation Health LLC has agreed to indemnify the Company against certain tax liabilities.

Prior to the Company's acquisition, the Company was a party to several promissory notes pursuant to which it borrowed funds from certain lenders. The lenders agreed to receive proceeds from the Company's acquisition in amounts less than the amounts owed by the Company under the notes, in full satisfaction of the Company's obligations under the notes (the "Cancellation of Debt").

Constellation Health LLC has agreed to indemnify the Company should the Cancellation of Debt cause the Company to be liable for any taxes in excess of the indemnification coverage provided in the Company's merger agreement but subject to a maximum of $12 million plus an amount equivalent to any applicable interest, fines, penalties, costs and charges thereon.

15. **Stock Based Compensation, Warrants and Options**

At December 31, 2013, the Company did not have any stock-based employee compensation.

At December 31, 2014, the Company did not have stock-based employee compensation.

For the Successor period ended December 31, 2014 and December 31 2013, the Company did not have any impact of our stock-based employee compensation plan on our consolidated statements of operations.

# Exhibit 3

## DISBURSEMENT AUTHORIZATION AND ITEMIZATION

Re:    Sale of Porteck Corporation assets to  Physicans Practice Plus LLC

The undersigned hereby directs and authorizes Purchaser to disburse, to order of Porteck Corporation, the sum of $7,000,000.00 by wire transfers or check made payable to the following payees in the following amounts.

*TOTAL PROCEEDS: $7,000,000.00*

1)  **People's United Bank**
    ABA#: 221172186
    Further Credit to: GL 24411-004
    Borrower Name: Porteck Corp
    Account #:
    Loan Type: Small Business LOC
    representing payoff ......................................................................................$ 597,648.59

2)  **Atlantic Health, LLC**
    Wells Fargo Bank, N.A.
    San Francisco, CA
    Wire Routing Number: 121000248
    Account Number:
    Name on Account: Atlantic Health, LLC
    Account Address:1402 W Swann Avenue, Tampa, FL 33606
    (PO Box 1351, Tampa, FL 33609)
    representing payoff ......................................................................................$ 625,000.00

3)  **Itria Ventures LLC**
    Account Name: Porteck Corp
    Beneficiary Bank: Silicon Valley Bank
    Beneficiary Bank Address: 3003 Tasman Drive, Santa Clara, CA 95054
    Routing Transit#: 121140399
    Beneficiary Name: ITRIA Ventures LLC
    Beneficiary Address: 333 7th Avenue, 18th Floor, New York, NY 10001
    Beneficiary Account#:
    representing payoff ......................................................................................$ 471,527.74

4)  **Itria Ventures LLC**
    Account Name: Porteck Corp
    Beneficiary Bank: Silicon Valley Bank
    Beneficiary Bank Address: 3003 Tasman Drive, Santa Clara, CA 95054
    Routing Transit#: 121140399
    Beneficiary Name: ITRIA Ventures LLC
    Beneficiary Address: 333 7th Avenue, 18th Floor, New York, NY 10001
    Beneficiary Account#:
    representing payoff ......................................................................................$ 189,555.48

5)  **Swift Financial Corporation**
    Account Name: Porteck Corporation
    Advance #:
    Beneficiary Bank: Silicon Valley Bank
    Beneficiary Bank Address: 3003 Tasman Drive, Santa Clara, CA 95054
    Routing Transit#: 121140399
    Beneficiary Name: Swift Financial Corporation
    Beneficiary Mailing Address: 501 Carr Road, Suite 301, Wilmington, DE 19809
    representing payoff ......................................................................................$ 240,056.25

EHREN-WALIA 000084

501

6)   **PCA Note**
     Steven Landy & Associates, PLLC, as attorneys,
     ABA Routing No.: 021909300
     Account No.:
     Name on Account: Steven Landy & Associates PLLC, Attorney Trust Account
     Account Address: 270 Madison Avenue, Suite 1400, NY, NY 10016
     Bank Name: Hudson Valley Bank
     Bank Address: Lincoln Building Branch, 60 East 42nd Street, NY, NY 10165
     representing payoff ...........…………………………………………………………………$ 300,000.00

7)   **Steven Landy & Associates, PLLC, as attorneys,**
     ABA Routing No.: 021909300
     Account No.:
     Name on Account: Steven Landy & Associates PLLC, Attorney Trust Account
     Account Address: 270 Madison Avenue, Suite 1400, NY, NY 10016
     Bank Name: Hudson Valley Bank
     Bank Address: Lincoln Building Branch, 60 East 42nd Street, NY, NY 10165
     representing balance of closing proceeds……………………..……………………………..$4,576,211.94

**TOTAL DISBURSEMENT**………………………….………………………………...$7,000,000.00

The foregoing constitutes disbursement of the entire cash proceeds, and such disbursement is hereby approved by the undersigned.

Dated: March 3, 2015

PORTECK CORPORATION

By: _____
     Steven Landy as Authorized Agent

EHREN-WALIA 000085

502

Exhibit 4

**Porteck Asset Sale Debtor Outflow Summary**

| Date | Description | Source | Account Paid From | Amount |
|------|-------------|--------|-------------------|--------|
| 3/2/2015 | Source of inflow into IOLA indicated as Constellation Healthcare Technologies "wire in" | Robinson Brog IOLA Statement | Unconfirmed | 9,800,000.00 |
| 3/5/2015 | Payee indicated as First United Health LLC; no indication of disbursement on Landy Disbursement Authorization Itemization dated 3/3/2015. See Ex 1, pg 3 | Robinson Brog IOLA Statement | Robinson Brog IOLA | (3,000,000.00) |
| 3/5/2015 | Payee indicated as Steve Landy & Assocs PPLC Atty Trust; Landy Disbursement Authorization Itemization dated 3/3/2015 indicates $4,576,211.94 (a $200,000 discrepancy). See Ex 1, pg 3 | Robinson Brog IOLA Statement | Robinson Brog IOLA | (4,376,211.94) |
| 3/5/2015 | Payee indicated as Porteck Corp. benefit Itria Ventures LLC; Landy Disbursement Authorization Itemization dated 3/3/2015 corresponds . See Ex 1, pg 3 | Robinson Brog IOLA Statement | Robinson Brog IOLA | (471,527.74) |
| 3/5/2015 | Payee indicated as Steve Landy & Assocs PPLC Atty Trust; Landy Disbursement Authorization Itemization dated 3/3/2015 corresponds. See Ex 1, pg 3 | Robinson Brog IOLA Statement | Robinson Brog IOLA | (300,000.00) |
| 3/5/2015 | Payee indicated as People's United Bank, benefit Porteck Corp; Landy Disbursement Authorization Itemization dated 3/3/2015 corresponds. See Ex 1, pg 3 | Robinson Brog IOLA Statement | Robinson Brog IOLA | (597,648.59) |
| 3/5/2015 | Payee indicated as Atlantic Health; Landy Disbursement Authorization Itemization dated 3/3/2015 corresponds. See Ex 1, pg 3 | Robinson Brog IOLA Statement | Robinson Brog IOLA | (625,000.00) |
| 3/5/2015 | Payee indicated as Porteck Corp. benefit Itria Ventures LLC; Landy Disbursement Authorization Itemization dated 3/3/2015 corresponds . See Ex 1, pg 3 | Robinson Brog IOLA Statement | Robinson Brog IOLA | (189,555.48) |
| 3/5/2015 | Payee indicated as Porteck Corp. benefit Swift Financial Corporation; Landy Disbursement Authorization Itemization dated 3/3/2015 corresponds . See Ex 1, pg 3 | Robinson Brog IOLA Statement | Robinson Brog IOLA | (240,056.25) |
| | | | **Total Outflows** | **(9,800,000.00)** |

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : |  |
| ORION HEALTHCORP, INC[1]. | : | Case No. 18-71748 (AST) |
|  | : |  |
| Debtors. | : | (Jointly Administered) |
| ------------------------------------ | : |  |
| HOWARD M. EHRENBERG IN HIS CAPACITY | : |  |
| AS LIQUIDATING TRUSTEE OF ORION | : | Adv. Pro. No. 20-08049 (AST) |
| HEALTHCORP, INC., ET AL., | : |  |
|  | : |  |
| Plaintiff, | : |  |
|  | : |  |
| v. | : |  |
|  | : |  |
| ARVIND WALIA; NIKNIM MANAGEMENT, | : |  |
| INC., | : |  |
|  | : |  |
| Defendants. | : |  |
| ------------------------------------ | : |  |

**REQUEST FOR JUDICIAL NOTICE
IN SUPPORT OF PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT, OR IN THE
ALTERNATIVE, SUMMARY ADJUDICATION AS AGAINST
<u>DEFENDANTS ARVIND WALIA AND NIKNIM MANAGEMENT, INC.</u>**

In connection with its *Motion for Summary Judgment or in the Alternative Summary*

*Adjudication*, Plaintiff Howard M. Ehrenberg, Liquidating Trustee of Orion Healthcorp, Inc.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Orion Healthcorp, Inc. (7246); Constellation Healthcare Technologies, Inc. (0135); NEMS Acquisition, LLC (7378); Northeast Medical Solutions, LLC (2703); NEMS West Virginia, LLC (unknown); Physicians Practice Plus Holdings, LLC (6100); Physicians Practice Plus, LLC (4122); Medical Billing Services, Inc. (2971); Rand Medical Billing, Inc. (7887); RMI Physician Services Corporation (7239); Western Skies Practice Management, Inc. (1904); Integrated Physician Solutions, Inc. (0543); NYNM Acquisition, LLC (unknown) Northstar FHA, LLC (unknown); Northstar First Health, LLC (unknown); Vachette Business Services, Ltd. (4672); Phoenix Health, LLC (0856); MDRX Medical Billing, LLC (5410); VEGA Medical Professionals, LLC (1055); Allegiance Consulting Associates, LLC (7291); Allegiance Billing & Consulting, LLC (7141); New York Network Management, LLC (7168). The corporate headquarters and the mailing address for the Debtors listed above is 1715 Route 35 North, Suite 303, Middletown, NJ 07748.

("Plaintiff"), hereby requests this Court take judicial notice of the attached documents pursuant to Rule 201 of the Federal Rules of Evidence.

Fed. R. Evid. 201(b) provides that "the court may judicially notice a fact that is not subject to reasonable dispute because it . . . (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *Garb v. Republic of Poland*, 440 F. 3d 579, fn. 18 (2d Cir. 2006). The court "must take judicial notice if a party requests it and the court is supplied with the necessary information." Fed. R. Evid. 201(c)(2). A court may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue. *U.S. ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992) *Asdar Grp. v. Pillsbury, Madison & Sutro*, 99 F.3d 289, 290 n.1 (9th Cir. 1996) (court may take judicial notice of the pleadings and court orders in earlier related proceedings). A court may also take judicial notice of matters of public record or criminal proceedings. *Hutchins v. Solomon,* 2018 U.S. Dist. LEXIS 169421, *19 (Bankr. S.D.N.Y. 2018)

Plaintiff requests this Court take judicial notice of the following document:

1. Constellation Healthcare Technologies, Inc. Application for Admission to AIM, attached hereto as **Exhibit 1.**

2. Proof of Claim filed by creditor, Arvind Walia, Claim no. 10141, in the amount of $1,150,947.00, based on the Assert Purchase Agreement dated as of March 2015, attached hereto as **Exhibit 2.**

3. Summons and Verified Complaint, Supreme Court of the State of New York; Criterions, LLC v. Visient Corp, Physicians Practice Plus, LLC, Arvind Walia and Constellation Healthcare Technologies, Inc., and Judgment, attached hereto as **Exhibit 3.**

Dated: New York, New York
January 18, 2023

                     */s/ Jeffrey P. Nolan*
                     Ilan D. Scharf, Esq.
                     Jeffrey P. Nolan, Esq. (admitted *pro hac vice*)
                     PACHULSKI STANG ZIEHL & JONES LLP
                     780 Third Avenue, 34th Floor
                     New York, New York 10017
                     Telephone:    (212) 561-7700
                     Facsimile:    (212) 561-7777

                     Counsel for the Plaintiff, Howard M. Ehrenberg in his capacity as Liquidating Trustee of Orion Healthcorp, Inc., *et al*.

3

# EXHIBIT 1

**THIS DOCUMENT IS IMPORTANT AND REQUIRES YOUR IMMEDIATE ATTENTION. If you are in any doubt as to the contents of this document or the action you should take, you should immediately seek your own personal financial advice from your stockbroker, bank manager, solicitor, accountant or other independent professional adviser authorised pursuant to the Financial Services and Markets Act 2000, as amended ("FSMA") if you are resident in the United Kingdom or, if not, another appropriately authorised independent financial adviser.**

The Company and the Directors whose names appear on page 8 of this document accept individual and collective responsibility for the information contained in this document including individual and collective responsibility for compliance with the AIM Rules. To the best of the knowledge and belief of the Company and the Directors (who have taken all reasonable care to ensure that such is the case), the information contained in this document is in accordance with the facts and does not omit anything likely to affect the import of such information.

Application has been made for all of the Common Shares of the Company in issue and to be issued to be admitted to trading on the London Stock Exchange's AIM market. It is expected that trading in the Common Shares will commence on AIM on 8 December 2014. **AIM is a market designed primarily for emerging or smaller companies to which a higher investment risk tends to be attached than to larger or more established companies. AIM securities are not admitted to the Official List of the United Kingdom Listing Authority. A prospective investor should be aware of the risks of investing in such companies and should make the decision to invest only after careful consideration and, if appropriate, consultation with an independent financial adviser. Each AIM company is required pursuant to the AIM Rules for Companies to have a nominated adviser. The nominated adviser is required to make a declaration to the London Stock Exchange on admission in the form set out in Schedule Two to the AIM Rules for Nominated Advisers. The London Stock Exchange has not itself examined or approved the contents of this document.**

A copy of this document, which comprises an admission document drawn up in accordance with the AIM Rules for Companies, has been issued in connection with the application for admission to trading of all of the Common Shares of the Company in issue and to be issued pursuant to the Placing. This document does not comprise a prospectus for the purpose of FSMA and the Prospectus Rules of the Financial Conduct Authority and has not been delivered to the Registrar of Companies in England and Wales for registration.

**The whole of this document should be read. Your attention is particularly drawn to the Risk Factors set out in Part III of this document.**

---

# Constellation Healthcare Technologies, Inc.

*(incorporated in the State of Delaware, USA under the Delaware General Corporation Law with registered number 5596678)*

## Placing of up to 7,128,235 new Common Shares
## at 135 pence per Common Share
## and
## Application for Admission to AIM

*Nominated adviser and broker*



**finnCap Ltd**

*Sub-placing agent under finnCap*



**Chrystal Capital Partners LLP**

---

All of the Common Shares, including the Placing Shares, will, upon Admission, rank equally in all respects, including the right to receive all dividends or other distributions thereafter declared, made or paid.

FinnCap Ltd which is authorised and regulated in the United Kingdom by the Financial Conduct Authority, is acting as nominated adviser and broker to the Company. The responsibilities of finnCap Ltd as the Company's nominated adviser under the AIM Rules for Nominated Advisers are owed solely to the London Stock Exchange and are not owed to the Company or to any Director or to any other person in respect of his decision to acquire shares in the Company in reliance on any part of this document. No representation or warranty, expressed or implied, is made by finnCap Ltd as to any of the contents of this document. FinnCap Ltd will not be offering advice and will not otherwise be responsible for providing customer protections to recipients of this document or for advising them on the contents of this document or any other matter.

The distribution of this document outside the UK may be restricted by law and therefore any persons outside the UK into whose possession this document comes should inform themselves about and observe any such restrictions as to the Placing, the Placing Shares, the Existing Common Shares and the distribution of this document. Any failure to comply with such restrictions may constitute a violation of the securities laws of any jurisdiction outside of the UK. This document does not constitute an offer to sell or an invitation to subscribe for, or the solicitation of an offer to buy or to subscribe for, shares in any jurisdiction in which such an offer or solicitation is unlawful. In particular, this document is not for distribution, directly, or indirectly, in or into Canada, Australia, Japan, the Republic of South Africa or to any national, resident or citizen of Canada, Australia, Japan or the Republic of South Africa.

**Notice to potential investors in the European Economic Area**

Common Shares have not been and will not be offered, sold or publicly promoted or advertised in any Member State of the European Economic Area ("EEA") which has implemented the Prospectus Directive (each, a "Relevant Member State") other than in compliance with the Prospectus Directive or any other laws applicable in the EEA governing the issue, offering and sale of securities.

No action has been taken, or will be taken, in any Relevant Member State to permit an offer to the public of any of the Common Shares in that Relevant Member State. Accordingly, the Common Shares are not being (and will not be) offered and will not be allocated to any person in the EEA other than:

(a)     to legal entities which are authorised or regulated to operate in the financial markets or, if not so authorised or regulated, whose corporate purpose is solely to invest in securities;

(b)     to any legal entities which has two or more of (1) an average of at least 250 employees during the last financial year; (2) a total balance sheet of more than €43,000,000 and (3) an annual net turnover of more than €50,000,000, as shown in its last annual or consolidated accounts;

(c)     to fewer than 150 natural or legal persons (other than qualified investors as defined in the Prospectus Directive) subject to obtaining the prior consent of finnCap for any such offer; or

(d)     in any other circumstances falling within Article 3(2) of the Prospectus Directive, provided that no such offer of the Shares shall result in a requirement for the publication by the Company or finnCap of an offering document pursuant to Article 3 of the Prospectus Directive.

For the purposes of this provision, the expression an "offer of Shares to the public" in relation to any Shares in any Relevant Member State means the communication in any form and by any means, presenting sufficient information on the terms of the offer and the securities to be offered, so as to enable an investor to decide to purchase or subscribe for these securities, as the same may be varied in that Member State by any measure implementing the Prospectus Directive in that Member State.

**Notice to potential investors in Switzerland**

Neither this document nor any documents related to the Common Shares constitute a prospectus within the meaning of Articles 652a and 1156 of the Swiss Code of Obligations. The Common Shares will not be listed on the SIX Swiss Exchange or any other regulated securities market in Switzerland, and consequently, the information presented in this document does not necessarily comply with the information standards set out in the listing rules in SIX Swiss Exchange. Accordingly, the Common Shares have not been and may not be publicly offered or sold in Switzerland, as such term is defined or interpreted under the Swiss Code of Obligations. In addition, the Common Shares do not constitute a participation in a collective investment scheme in the meaning of the Swiss Collective Investment Schemes Act ("CISA") and they are neither subject to approval nor supervision by the Swiss Federal Banking Commission. Therefore, investors in the Common Shares do not benefit from protection under CISA or supervision by the Swiss Federal Banking Commission or any other regulatory authority in Switzerland.

**Restrictions under the US Securities Act**

The Common Shares have not been approved or disapproved by the United States Securities and Exchange Commission (the "SEC"), any US state securities commission or any other regulatory authority nor have any of the foregoing authorities passed upon or endorsed the merits of this offering or the accuracy or adequacy of this document. Any representation to the contrary is a criminal offence in the United States.

THE COMMON SHARES HAVE NOT BEEN AND WILL NOT BE REGISTERED UNDER THE US SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR WITH ANY SECURITIES REGULATORY AUTHORITY OF ANY STATE OR OTHER JURISDICTION OF THE UNITED STATES AND MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT (A)(1) TO A PERSON WHOM THE SELLER AND ANY PERSON ACTING ON ITS BEHALF REASONABLY BELIEVES IS A QUALIFIED INSTITUTIONAL BUYER WITHIN THE MEANING OF RULE 144A UNDER THE SECURITIES ACT PURCHASING FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A QUALIFIED INSTITUTIONAL BUYER IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 144A, (2) IN AN OFFSHORE TRANSACTION COMPLYING WITH RULE 903 OR RULE 904 OF REGULATION S UNDER THE SECURITIES ACT OR (3) PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT PROVIDED BY RULE 144 THEREUNDER (IF AVAILABLE) AND (B) IN ACCORDANCE WITH ANY APPLICABLE

SECURITIES LAWS OF ANY STATE OF THE UNITED STATES OR ANY OTHER JURISDICTION. NO REPRESENTATION CAN BE MADE AS TO THE AVAILABILITY OF THE EXEMPTION PROVIDED BY RULE 144 UNDER THE SECURITIES ACT FOR THE RESALE OF COMMON SHARES.

The Common Shares will be offered and sold in the United States to (i) "qualified institutional buyers" as defined in SEC Rule 144A in a private placement exempt from registration under the US Securities Act and (ii) in accordance with any applicable laws of any US state. The Common Shares will also be contemporaneously offered and sold outside the United States to non-US Persons pursuant to the requirements of Regulation S under the US Securities Act. The Common Shares cannot be offered, resold, pledged or otherwise transferred in the United States or to US Persons except in accordance with the restrictions and procedures set forth in Part VI of this document entitled "Transfer Restrictions".

Copies of this document will be available for collection, free of charge, from finnCap Ltd at 60 New Broad Street, London EC2M 1JJ for one month from the date of this document.

## IMPORTANT INFORMATION

The Company is not subject to the periodic reporting requirements of the US Securities Exchange Act of 1934, as amended (the "US Exchange Act"). In order to permit compliance with Rule 144A in connection with resales of the Placing Shares, the Company agrees to furnish upon request of a shareholder or a prospective purchaser the information required to be delivered under Rule 144A(d)(4) of the US Securities Act if at the time of such request the Company is not a reporting company under Section 13 or Section 15(d) of the US Securities Exchange Act, or is not exempt from reporting pursuant to Rule 12g3-2(b) thereunder.

### Settlement and CREST

The EU Regulation on Central Securities Depositories (CSDR) was published on 28 August 2014. Article 3(2) of CSDR requires that where transactions in transferable securities take place on a trading venue, such as AIM, the relevant securities should be recorded in book entry form in a Central Securities Depository ("CSD"), such as CREST, on or before the intended settlement date (unless already so recorded). This requirement applies irrespective of whether the security is currently eligible for electronic settlement or not and applies to all transactions executed under the Rules of the London Stock Exchange irrespective of whether or not the securities are issued by an EU-incorporated issuer. The London Stock Exchange has announced that it intends to amend its rules so that on Exchange transactions are able to comply with the requirements of Article 3(2). The London Stock Exchange has said that it will update the market in due course with regards to when these new rules will take effect.

This rule change will require the Company (in common with all other companies whose securities are admitted to trading on AIM) to ensure that the Common Shares are eligible for electronic settlement through CREST.

The Overseas Placing Shares offered in the Placing are subject to the conditions listed under section 903(b)(3), or Category 3, of Regulation S. Under Category 3, Offering Restrictions (as defined under Regulation S) must be in place in connection with the Placing and additional restrictions are imposed on re-sales of the Overseas Placing Shares. Further details of these restrictions are set out in Part VI of this document entitled "Transfer Restrictions". All Overseas Placing Shares are subject to these restrictions until the expiry of one year after the later of (i) the time when the Overseas Placing Shares are first offered to persons other than distributors in reliance upon Regulations S and (ii) the date of closing of the Placing, or such longer period as may be required under applicable law (the "Compliance Period").

Due to these restrictions, the Company has determined that all Common Shares will be held in certificated form from Admission until further notice and therefore the Common Shares will not be eligible for settlement through CREST during that time. Accordingly, until further notice, settlement of transactions in both the Existing Common Shares and the Placing Shares following Admission will not take place within the CREST system, although trades can be reported to AIM and the cash consideration can be settled using the CREST residual service.

Before the introduction of the London Stock Exchange's new rules, the Company will apply for the Common Shares to be settled in CREST in the form of Depository Interests ("DIs") which facilitate trading and settlement of shares of shares of non-UK companies in CREST. DIs are uncertificated "mirror image" securities constituted under English law representing the underlying shares. In the event that the Company is required to apply for the Common Shares to be settled in CREST in the form of DIs prior to the expiry of the Compliance Period, and if functionality does not exist within CREST at that time to ensure ongoing compliance with the relevant restrictions referred to above for the remainder of the Compliance Period, the Company will take such steps and implement such procedures as it considers reasonable to satisfy its obligations under applicable US securities laws and in any event will seek to comply with the Rules of the London Stock Exchange. However, there can be no assurance that the Company's application for the Common Shares to be settled in CREST in the form of DIs will be successful, and any failure of such application may lead to disciplinary action being taken against the

4

Company by the London Stock Exchange, which may include a fine, censure, suspension or cancellation of the admission of the Company's securities, nor can there be any assurance that any actions proposed to be taken by the Company will be sufficient to satisfy the requirements of Category 3 of Regulation S or any other exemption from registration with respect to the Placing, any of which could lead to enforcement action by the United States Securities and Exchange Commission and/or civil claims from Shareholders alleging violations of applicable securities laws.

**NOTICE TO NEW HAMPSHIRE RESIDENTS**

NEITHER THE FACT THAT A REGISTRATION STATEMENT OR AN APPLICATION FOR A LICENSE HAS BEEN FILED UNDER CHAPTER 421-B OF THE NEW HAMPSHIRE REVISED STATUTES ANNOTATED 1955, AS AMENDED ("RSA 421-B"), NOR THE FACT THAT A SECURITY IS EFFECTIVELY REGISTERED OR A PERSON IS LICENSED IN THE STATE OF NEW HAMPSHIRE IMPLIES THAT ANY DOCUMENT FILED UNDER RSA 421-B IS TRUE, COMPLETE AND NOT MISLEADING. NEITHER ANY SUCH FACT NOR THE FACT THAT AN EXEMPTION OR EXCEPTION IS AVAILABLE FOR A SECURITY OR TRANSACTION MEANS THAT THE SECRETARY OF STATE OF NEW HAMPSHIRE HAS PASSED IN ANY WAY UPON THE MERITS OR QUALIFICATIONS OF, OR RECOMMENDED OR GIVEN APPROVAL TO, ANY PERSON, SECURITY OR TRANSACTION. IT IS UNLAWFUL TO MAKE, OR CAUSE TO BE MADE, TO ANY PROSPECTIVE PURCHASER, CUSTOMER OR CLIENT ANY REPRESENTATION INCONSISTENT WITH THE PROVISIONS OF THIS PARAGRAPH.

**Forward-looking Statements**

This document contains forward looking statements relating to the Company's future prospects, developments and strategies, which have been made after due and careful enquiry and are based on the Directors' current expectations and assumptions and involve known and unknown risks and uncertainties that could cause actual results, performance or events to differ materially from those expressed or implied in such statements. Forward-looking statements are identified by their use of terms and phrases such as "project", "expect", "potential", "believe", "could", "envisage", "estimate", "intend", "may", "plan", "will" or the negative of those, variations or comparable expressions, including references to assumptions. These forward-looking statements are subject to, *inter alia* the risk factors described in Part III of this document. The Directors believe that the expectations reflected in these statements are reasonable, but may be affected by a number of variables which could cause actual results or trends to differ materially. Each forward-looking statement speaks only as of the date of the particular statement.

**Market and other information**

The data, statistics and information and other statements in this document regarding the markets in which the Group operates, or the Group's position therein, are based on the Group's records or are taken or derived from statistical data and information derived from the sources described in this document. In relation to these sources, such information has been accurately reproduced from the published information, and, so far as the Directors are aware and are able to ascertain from the information provided by the suppliers of these sources, no facts have been omitted which would render such information inaccurate or misleading. Various figures and percentages in tables in this document have been rounded and accordingly may not total. Certain financial data has also been rounded. As a result of this rounding, the totals of data presented in this document may vary slightly from the actual arithmetical totals of such data.

Where relevant in this document, unless otherwise stated, US dollar amounts have been converted into Sterling at US$1.5703 : £1.

All times referred to in this document are, unless otherwise stated, references to London time.

# CONTENTS

*Page*

**PLACING STATISTICS AND EXPECTED TIMETABLE OF PRINCIPAL EVENTS**                    **7**

**DIRECTORS, SECRETARY AND ADVISERS**                    **8**

**DEFINITIONS**                    **9**

**PART I**      **INFORMATION ON THE GROUP AND THE PLACING**                    **14**

**PART II**      **REGULATORY OVERVIEW**                    **37**

**PART III**      **RISK FACTORS**                    **45**

**PART IV**      **HISTORICAL FINANCIAL INFORMATION**                    **58**

**PART V**      **UNAUDITED INTERIM FINANCIAL INFORMATION**                    **85**

**PART VI**      **TRANSFER RESTRICTIONS**                    **107**

**PART VII**      **ADDITIONAL INFORMATION**                    **114**

## PLACING STATISTICS AND EXPECTED TIMETABLE OF PRINCIPAL EVENTS[1]

| | |
|---|---|
| Gross proceeds of the Placing receivable by the Company | £9,623,117 |
| Net proceeds of the Placing receivable by the Company | £8.2 million |
| Number of Existing Common Shares in issue immediately prior to Admission | 47,327,593 |
| Placing Price per Placing Share | 135p |
| Number of Placing Shares to be issued by the Company | 7,128,235 |
| Number of Placing Shares as a percentage of Enlarged Share Capital | 12.8 per cent. |
| Number of Common Shares in the Enlarged Share Capital | 55,615,056 |
| ISIN for Common Shares | USU210051004 |
| Admission effective and commencement of dealings on AIM of the Enlarged Share Capital | 8.00 a.m. on 8 December 2014 |
| Despatch of definitive share certificates | 22 December 2014 |

*Each of the times and dates in the above timetable is indicative only and subject to change. All times are London times unless otherwise stated.*

[1] Assuming that the Placing is fully subscribed

## DIRECTORS, SECRETARY AND ADVISERS

| | |
|---|---|
| **Directors** | John Johnston *(Independent Non-executive Chairman)*<br>Paul Parmar *(Group Chief Executive Officer)*<br>Ravi Chivukula *(Group Chief Financial Officer)*<br>David Clark *(Independent Non-executive Director)*<br>Mark Feuer *(Independent Non-executive Director)* |
| **Company Secretary** | Ravi Chivukula |
| **Registered Office** | Corporation Trust Center<br>1209 Orange Street<br>Wilmington, Delaware 19807 |
| **Principal Place of Business** | 3200 Wilcrest Dr Ste 600<br>Houston<br>Texas, 77042-6000 |
| **Nominated Adviser and Broker<br>to the Company** | finnCap Ltd<br>60 New Broad Street<br>London EC2M 1JJ |
| **Sub-placing agent under finnCap** | Chrystal Capital Partners LLP<br>48 Berkeley Square<br>London W1J 5AX |
| **Reporting Accountants to the Company** | Grant Thornton UK LLP<br>30 Finsbury Square<br>London EC2P 2YU |
| **Legal advisers to the Company<br>as to English law** | Squire Patton Boggs (UK) LLP<br>7 Devonshire Square<br>London EC2M 4YH |
| **Legal advisers to the Company as to<br>US law** | Squire Patton Boggs (US) LLP<br>41 S High St #2000<br>Columbus<br>Ohio 43215 |
| **Legal advisers to the Placing** | Rosenblatt Solicitors<br>9-13 St Andrew Street<br>London EC4A 3AF |
| **Financial PR advisers** | Redleaf Polhill Limited<br>First Floor, 4 London Wall Buildings<br>Blomfield Street<br>London EC2M 5NT |
| **Registrars** | Capita Registrars (Guernsey) Limited<br>Mont Crevelt House<br>Bulwer Avenue<br>St Sampson<br>Guernsey GY2 4LH |
| **Website** | www.constellationhealthgroup.com |

# DEFINITIONS

In this document, where the context permits, the expressions set out below shall bear the following meanings:

| | |
|---|---|
| **"ACA"** or **"Affordable Care Act"** | the US Patient Protection and Affordable Care Act and the Health Care and Education Reconciliation Act |
| **"ACOs"** | Accountable Care Organisations |
| **"Act"** | Delaware General Corporation Law |
| **"Admission"** | admission of the Enlarged Share Capital to trading on AIM and such admission becoming effective in accordance with Rule 6 of the AIM Rules for Companies |
| **"affiliate"** | an affiliate of an issuer is defined in Rule 144 under the US Securities Act as a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such issuer |
| **"AIM"** | the market of that name operated by the London Stock Exchange |
| **"AIM Rules for Companies"** | the AIM Rules for Companies published by the London Stock Exchange from time to time |
| **"AIM Rules for Nominated Advisers"** | the AIM Rules for Nominated Advisers published by the London Stock Exchange from time to time |
| **"Anti-Kickback Statute"** | provisions of the US Social Security Act which prohibit anyone from soliciting, receiving, offering or paying, directly or indirectly, any remuneration in return for either making or arranging a referral or order for a service or item covered by various federally sponsored health benefit programs |
| **"BPO"** | business process outsourcing |
| **"Bylaws"** | the bylaws of the Company, as amended and restated from time to time |
| **"Certificate of Incorporation"** | the certificate of incorporation of the Company, as amended and restated from time to time |
| **"Chrystal Capital"** | Chrystal Capital Partners LLP, sub-placing agent under finnCap |
| **"Client"** | any client to whom services are provided by the Group |
| **"CMS"** | Centers for Medicare and Medicaid Services |
| **"Common Shares"** or **"Shares"** | shares of common stock of the Company with a par value per share of $0.0001 |
| **"Company"** | Constellation Healthcare Technologies, Inc. a corporation organised under the laws of the state of Delaware, USA |

9

| | |
|---|---|
| **"Constellation Health"** | Constellation Health LLC, a limited liability company organised under the laws of the state of Delaware, USA, the controlling Shareholder of the Company at Admission |
| **"Credit Agreement"** | the financing agreement entered into on 31 March 2014 between Orion and its subsidiaries, Constellation Health, RCC Commercial Inc. and Whitehorse Finance Inc. (as lenders) (as amended), further details of which are set out in Part VII of this document |
| **"CREST"** | the electronic systems for the holding and transfer of shares in dematerialised form operated by Euroclear UK & Ireland Limited |
| **"Directors"** or **"Board"** | the directors of the Company whose names appear on page 8 of this document and "Director" shall mean any one of them |
| **"Disclosure and Transparency Rules"** | the Disclosure and Transparency Rules made by the FCA under Part VI of the Financial Services and Markets Act 2000 |
| **"EMR"** | electronic medical records |
| **"Enlarged Share Capital"** | the issued share capital of the Company immediately following Admission as enlarged by the issue of the Placing Shares |
| **"Exchange Agreement"** | the share exchange agreement dated the same date as this document between Constellation Health, the Company, Orion and AAKB Investments Limited pursuant to which Constellation Health has agreed conditional upon and effective immediately prior to Admission to transfer the entire issued share capital of Orion to the Company in consideration for the issue of 37,862,074 Common Shares, further details of which are set out in Part VII of this document |
| **"Executive Directors"** | Paul Parmar and Ravi Chivukula |
| **"Existing Common Shares"** | the 47,327,593 Common Shares in issue immediately prior to Admission |
| **"FCA"** | the Financial Conduct Authority of the United Kingdom |
| **"FCA (US)"** | the US False Claims Act |
| **"FERA"** | the US Fraud Enhancement and Recovery Act of 2009 |
| **"finnCap"** | finnCap Ltd, nominated adviser and broker to the Company |
| **"First United Health"** or **"FUH"** | First United Health, LLC, an investment entity controlled by Paul Parmar |
| **"GeBBS"** | GeBBS Healthcare Solutions |
| **"GP"** | Group purchasing, a division of the Group |

| | |
|---|---|
| **"Group"** or **"Orion Group"** | Orion and its subsidiaries as at the date of this document and, immediately prior to Admission, the Company and its subsidiaries |
| **"GSS Healthcare"** | GSS Healthcare IT Solution Pvt Limited |
| **"GSS Infotech"** | GSS Infotech Inc. |
| **"HIPAA"** | the US Health Insurance Portability and Accountability Act of 1996 |
| **"HITECH Act"** | the US Health Information Technology for Economic and Clinical Health Act |
| **"ICD-9"** or **"ICD-10"** | International Classification of Diseases, Ninth or Tenth Revision |
| **"IFRS"** | International Financial Reporting Standards issued by the International Accounting Standards Board and adopted by the European Union |
| **"IPS"** | Integrated Physician Solutions Inc., a corporation organised under the laws of the State of Delaware, USA, and a wholly owned subsidiary of Orion |
| **"Locked-In Shareholders"** | Constellation Health, First United Health and AAKB Investments Limited |
| **"London Stock Exchange"** | London Stock Exchange plc |
| **"MBS"** | Medical Billing Services Inc., a corporation organised under the laws of the State of Texas, USA, and a wholly owned subsidiary of Orion |
| **"Medicaid"** | a US social health care programme for families and individuals with low income and resources which is funded by the states and federal government |
| **"Medicare"** | a US national health insurance programme administered by the US federal government that gives access to health insurance for Americans aged 65 and over who have worked and paid into the system |
| **"NEMS"** | NEMS Acquisition LLC (together with its subsidiaries North East Medical Solutions LLC and NEMS West Virginia, LLC), a corporation organised under the laws of the State of Delaware, USA, and a wholly owned subsidiary of Orion |
| **"Non-executive Directors"** | the non-executive directors of the Company whose names are set out on page 8 of this document and "Non-executive Director" shall mean any one of them |
| **"Orion"** | Orion HealthCorp, Inc., a corporation organised under the laws of the State of Delaware, USA, and a wholly-owned subsidiary of the Company at Admission |
| **"Overseas Placing Shares"** | those Placing Shares to be issued by the Company in reliance on Regulation S |

| | |
|---|---|
| **"Panel"** | the UK Panel on Takeovers and Mergers |
| **"PFRA"** | the US Program Fraud Civil Remedies Act |
| **"Placing"** | the conditional placing of the Placing Shares at the Placing Price by finnCap as broker to the Company, pursuant to the Placing Agreement |
| **"Placing Agreement"** | the conditional agreement dated the same date as this document between finnCap, the Company and the Directors relating to the Placing of the Placing Shares, further details of which are set out in Part VII of this document |
| **"Placing Price"** | 135 pence per Placing Share |
| **"Placing Shares"** | the up to 7,128,235 new Common Shares to be issued by the Company pursuant to the Placing |
| **"PQRS"** | the Physician Quality Reporting System |
| **"Pegasus"** | a proprietary business intelligence platform developed by Orion to enhance its outsourced RCM services and to provide physician groups with increased transparency relating to payment and operational performance |
| **"PM"** | practice management, a division of the Group |
| **"Prospectus Directive"** | Directive No 2003/71/EC of the European Parliament and of the Council passed on 4 November 2003 and relating to the prospectus to be published when securities are offered to the public or admitted to trading |
| **"Rand"** | Rand Medical Billing Inc., a corporation organised under the laws of the State of California, USA and a wholly owned subsidiary of Orion |
| **"RACs"** | Recovery Audit Contractors |
| **"RBRVS"** | Resource-Based Relative Value Scale |
| **"RCM"** | revenue cycle management |
| **"Regulation D"** | Regulation D promulgated under the US Securities Act |
| **"Regulation S"** | Regulation S promulgated under the US Securities Act |
| **"Regulations"** | the Uncertificated Securities Regulations 2001 (SI 2001 No. 3755) as amended |
| **"RMI"** | RMI Physician Services Corporation, a corporation organised under the laws of the State of Texas, USA and a wholly owned subsidiary of Orion |
| **"Rule 144"** | Rule 144, as amended, promulgated under the US Securities Act |
| **"Rule 144A"** | Rule 144A promulgated under the US Securities Act |
| **"SEC"** | the US Securities and Exchange Commission |

| | |
|---|---|
| **"SGR"** | CMS's Sustainable Growth Rate system |
| **"Shareholder"** | a holder of Common Shares |
| **"Stark Law"** | provisions of the US Social Security Act which prohibit a physician from referring a Medicare or Medicaid patient to an entity with which the physician or his immediate family member has a financial relationship for certain types of health services, including, among others, radiology services and clinical laboratory services |
| **"Subsidiaries"** | those subsidiaries of the Company immediately prior to Admission and listed in paragraph 9.1 of Part VII of this document |
| **"Takeover Code"** | the UK City Code on Takeovers and Mergers (as published by the Panel) |
| **"UK"** | the United Kingdom of Great Britain and Northern Ireland |
| **"UK Act"** | the UK Companies Act 2006, as amended from time to time |
| **"UKLA"** | the United Kingdom Listing Authority, being the Financial Conduct Authority acting in its capacity as the competent authority for the purposes of the Financial Services and Markets Act 2000 |
| **"US Exchange Act"** | the United States Securities Exchange Act of 1934, as amended |
| **"US GAAP"** | generally accepted accounting principles in the US |
| **"US Placing Shares"** | those Placing Shares to be offered and sold within the US or to or for the amount or benefit of US Persons who are "qualified institutional buyers" within the meaning of Rule 144A |
| **"US" "USA"** or **"United States"** | the United States of America, its territories and possessions, any State of the United States, and the District of Columbia |
| **"US Person"** | has the meaning ascribed to such phrase by Regulation S |
| **"US Securities Act"** | the United States Securities Act of 1933, as amended |
| **"WSB"** | Western Skies Practice Management Inc., operating as Orion Western Skies Billing Service, a corporation organised under the laws of the State of Colorado, USA and a wholly owned subsidiary of Orion |
| **"£"** and **"p"** | United Kingdom pounds and pence sterling respectively |
| **"$"** and **"c"** | United States dollars and cents respectively |

# PART I

# INFORMATION ON THE GROUP AND THE PLACING

## 1    INTRODUCTION

The Group is a healthcare services organisation providing outsourced revenue cycle management ("RCM"), practice management ("PM") and group purchasing services to the physician market in the United States.

The Group, which was acquired by Constellation Health, led by Paul Parmar, in June 2013, delivers its services to physician groups across 18 states. Since the acquisition of the Group by the existing management team, EBITDA has increased substantially and operating costs have been reduced significantly, primarily through the increased sub-contracting of primarily back office functions to efficient, low cost providers based in India.

The Group's RCM services span various practice specialties across different regions of the United States, providing services primarily to hospital-based physicians or physicians who are part of a larger group practice, including pathologists, anaesthesiologists and radiologists. The Group allows physicians to avoid the infrastructure investment and costs associated with maintaining their own back office operations, thereby improving their cash flows and reducing administrative costs and burdens.

The Group also operates a proprietary business intelligence solution called "Pegasus", which is designed to provide clients with an industry leading analytics tool providing transparency relating to payment and operational performance.

The Group's PM division provides comprehensive business and practice management services dedicated to supporting the needs of primary care practices. In addition, the Group offers a vaccine group purchasing capability that helps participating physicians nationwide to lower vaccine costs through volume pricing with pharmaceutical suppliers, such as Sanofi Pasteur and Merck.

In the year ended 31 December 2013, the Group generated revenues and EBITDA of approximately $52.0 million and approximately $7.0 million respectively, representing an increase of 0.5 per cent. and 165.4 per cent. respectively on the previous financial year. In the six months ended 30 June 2014, the Group generated revenues and EBITDA of approximately $25.3 million and $7.2 million respectively, representing a decrease of 2.0 per cent. in relation to revenue and a 320.4 per cent. increase in relation to EBITDA on the same period during 2013.

According to US Government statistics, the US healthcare market represented approximately 18 per cent. of the nation's GDP in 2013, compared to 5.1 per cent. in 1960. During the same period there has been an increase in healthcare annual expenditure to approximately $2.6 trillion. The Directors believe that almost every aspect of the US healthcare market involves a billing or RCM process.

The Group benefits from a large market opportunity in physician billing, which is estimated by the Directors to be approximately a $37 billion market across current specialties. The Directors believe that there has been an increasing trend towards physicians outsourcing billing operations, although they also believe that approximately 55 per cent. of physicians still retain their RCM operations in-house. This represents a significant market opportunity for large scale RCM service providers such as the Group.

The Directors believe that there are a number of drivers for physicians to outsource the management of their RCM process arising from external pressures to reduce healthcare costs which are leading to an increase in billing regulations, operating costs and consolidation among service providers. Demographic and regulatory factors, including the Affordable Care Act, are also expected to drive increasing numbers into the US healthcare system, which the Directors believe will accelerate provider demand for efficient RCM solutions. According to CMS, Medicaid expenditures are expected to increase between 2013 and 2018 at annual rates of approximately 6.4 per cent. As the scope of

14

522

healthcare services expand and financial and regulatory pressures mount, hospitals and group practices are increasingly demanding greater effectiveness and improved efficiency in the management of their revenue cycle operations.

The Directors believe that there is a significant opportunity to build, both organically and by acquisition, a large scale, stable and efficient RCM service provider to capitalise on this demand.

The domestic third-party medical billing market is highly fragmented with over 2,000 companies, the vast proportion of which the Directors believe have annual revenues below $20 million and relatively low profitability due to their often inefficient business operations and lack of scale. Whilst pursuing acquisition opportunities presented by these industry factors, the Group will also seek to grow organically through increased investment in sales and client relationship management strategies, a focus on optimising its business processes through its use of proprietary technology and enhancing its operating margins through the transition of certain Group operations to dedicated business process outsourcing facilities in India.

## 2   KEY STRENGTHS

The Directors believe that the Group's key strengths are:

- ***Value proposition*** – the Directors believe that the Group's RCM solutions provide significant value to customers by helping them to improve revenue collection rates and timing for claims owed by various payers. The Group's services allow healthcare providers to avoid the administrative costs of training and maintaining personnel to manage the process of medical coding and billing, the regulation of which continues to increase in complexity. The Group's fee structure creates an incentive-based model ultimately driven by collections. The Directors believe that the Group provides a high degree of competitive differentiation and the stability of a well-diversified platform.

- ***Operates in a growing marketplace and market opportunity*** – the Directors believe that the Group operates in a growing marketplace, with increasing demand for its services driven by regulation and demographics and an increasing desire of physicians to optimise cash flows through outsourcing their back office operations and reducing administrative costs. The Directors believe that approximately 55 per cent. of physicians in the US still retain their RCM operations in-house, presenting a significant market opportunity for large scale RCM service providers such as the Group.

- ***Recurring revenue base*** – the Group's RCM division typically enters into customer contracts which have two to five year terms that auto-renew for additional one year periods thus providing some visibility of future revenues. The Group's RCM division revenues for the year ended 31 December 2013 were approximately $32.6 million (representing approximately 63 per cent. of Group revenue). In addition, the Group's PM division provides business, administrative and practice management services to physicians under a 40 year management agreement. The PM division has provided a base of stable and growing revenues historically. The Group's PM division revenues for the year ended 31 December 2013 were approximately $17.9 million (representing approximately 34 per cent. of Group revenue).

- ***Scale and operational efficiency*** – the Directors believe that the Group has the scale to compete effectively with the largest RCM service providers in the industry whilst meeting the increasingly complex demands of regulators and clients alike. The Group is focused on providing high quality services to its clients through a commitment to achieving excellence in all parts of its business and driving operational efficiencies through initiatives such as the consolidation of corporate locations, investment in billing processes and IT systems and the outsourcing of labour to India. The Directors believe that this focus will give the Group the operational leverage to compete effectively on price with its major competitors in the future.

15

- **Established Indian BPO providers** – the Group currently utilises two third party providers to support certain of its business operations. These providers employ over 500 people working in India, including 255 employees of its dedicated BPO provider in India, GSS Healthcare, which is owned and operated by GSS Infotech through an exclusive services agreement with Orion. The outsourced services are predominantly back office tasks such as explanation of benefits, processing, coding, and customer payment processing. In the financial year ended 31 December 2013, the Directors estimate that the Group achieved savings of approximately $6 million in the United States based on the shifting of predominantly back office services from US based employees to the BPO providers in India.

- **Customer diversification** – the Group's largest customer by revenue in 2013 represented only six per cent. of the Group's consolidated revenue for the year ended 31 December 2013. The Group's 10 largest RCM customers by revenue represented approximately 47 per cent. of the Group's RCM revenue and 29 per cent. of total Group revenue for the same period. Customers in the RCM division include physicians spanning a variety of medical specialties including pathology/laboratory, radiology, office-based and anaesthesiology among others.

- **Strong management team** – the Group's senior management team has a combined 300 years' experience in the healthcare industry. The Group is led by Chief Executive Officer, Paul Parmar, an experienced investor and operator in the RCM industry. In 2008, Mr. Parmar acquired a healthcare billing company similar to Orion and deployed the same strategy of transitioning job functions to India to improve margins. That business was subsequently sold to NextGen.

The Directors' vision is to provide superior billing, collections, practice management, business and financial management services for physicians, resulting in optimal profitability for its clients and increased enterprise value for its stakeholders. The Directors believe that the Group's core competency is its significant experience and success in working with and creating value for physicians.

### 3    HISTORY, BACKGROUND AND CORPORATE STRUCTURE

Orion is the immediate holding company of eight direct and indirect wholly-owned operating subsidiaries that form the Group. Orion was incorporated in Delaware in 1984 under the name Technical Coatings Incorporated. On 10 September 1984 its name was changed to Technical Coatings, Inc. and on 11 July 1999 its name was changed to Surgicare, Inc. and it was registered for trading on US exchanges as Surgicare, Inc. in 1999. In 2004, Surgicare's name was changed to Orion Healthcorp, Inc. which subsequently acquired IPS and MBS. This was followed in 2006 by the acquisition of Rand. In 2007, the Orion Healthcorp delisted from NASDAQ. Following this, RMI and WSB were acquired in 2008.

On 17 June 2013, the entire issued share capital of Orion was acquired by Constellation Health, a company controlled by Paul Parmar, for an aggregate purchase price of approximately $32 million, of which approximately $21.5 million was equity from its founders and the balance was third party debt. Further details of the Orion merger agreement are set out at paragraph 10.4 of Part VII of this document.

On 31 March 2014, NEMS Acquisition LLC (whose sole member is Orion) acquired North East Medical Solutions LLC and NEMS West Virginia, LLC, together, another RCM business, for an initial cash consideration of $2 million. At the time of the NEMS acquisition, a credit facility of up to $40 million was made available to Orion from RCC Commercial Inc. and Whitehorse Finance Inc. through the Credit Agreement in order to refinance the debt incurred by the Group at the time of the Orion acquisition and to help finance both the NEMS acquisition and future acquisitions. As at the date of this document, approximately $17 million remains undrawn under that facility. Further details of the NEMS membership interest purchase agreement and the Credit Agreement are set out respectively in paragraphs 10 of Part VII of this document and paragraph 9 below.

The Group also utilises the services of GSS Healthcare, a captive third party BPO provider in India which is owned and operated by GSS Infotech through an exclusive services agreement with Orion.

With effect from Admission, the Company will have an option to acquire the BPO provider at any time on or before 11 June 2018 for a nominal consideration.

The Company was incorporated on 3 September 2014 and will become the holding company of the Group immediately prior to Admission when it shall acquire the entire issued share capital of Orion from Constellation Health in exchange for the issue of 37,862,074 Common Shares. As a result of this transaction, Constellation Health will become the controlling shareholder of the Company and as at Admission (assuming that the Placing is fully subscribed) will own approximately 68.1 per cent. of the voting rights in the Company.

In June 2014, investment entities managed by Paul Parmar acquired all of the ownership interests of Constellation Health not already owned by them, although approximately 29 per cent. of the ownership interests are subject to an irrevocable voting proxy in favour of their prior owner until such time as the purchase price for such ownership interests is paid in full, which is upon the earlier of the second anniversary of Admission or such time as such ownership interests are sold to a third party that is not an affiliate of Mr. Parmar. Mr. Parmar is the President of Constellation Health and the Chief Executive Officer of the Group. Constellation Health and Mr. Parmar have entered into a relationship agreement with the Company further details of which are set out in paragraph 16 below.

## 4    THE GROUP'S OPERATIONS

The Group's services are classified into three primary divisions:

- the RCM division, which provides outsource revenue cycle management services to hospitals and physicians in the US. This division generated approximately $32.6 million in revenues during 2013 (approximately $13.6 million in the six month period ended 30 June 2014) representing approximately 63 per cent. of revenues in 2013 (53 per cent. in the six month period ended 30 June 2014);

- the PM division, which generated approximately $17.9 million in revenues during 2013 (approximately $8.5 million in the six month period ended 30 June 2014) representing approximately 34 per cent. of revenues in 2013 (34 per cent. in the six month period ended 30 June 2014);

- the group purchasing division, which generated approximately $1.4 million in revenues during 2013 (approximately $3.3 million in the six month period ended 30 June 2014) representing approximately three per cent. of revenues in 2013 (13 per cent in the six month period ended 30 June 2014).

### 4.1    The RCM division

In the RCM division, the Group is one of the largest providers in the United States of outsourced billing and collections services. These include coding, reimbursement services, charge entry, claim submission, collection activities, and financial reporting services, including: Current Procedural Terminology ("CPT") and International Classification of Diseases ("ICD-9" and "ICD-10") utilisation reviews; charge ticket (superbill) evaluations; fee schedule analyses; reimbursement audits; training seminars; and patient refund processing.

The Group services hospital-affiliated physicians, particularly in the specialty areas of radiology, pathology, lab and anaesthesiology and office-based physicians in primary care and select sub-specialities including plastic surgery, family practice, internal medicine, orthopaedics, neurology, emergency medicine and ambulatory surgery centres.

The Group's RCM client contracts typically have initial two to five year terms that auto-renew for additional one year periods thus providing some visibility of future revenues. The Group prices its RCM services on the basis of a percentage of net collections. Fees range from five per cent. to 15 per cent. of net collections, depending on specialty and size of practice. All system set up and implementation fees are included in the base rate.

*Business intelligence*

The Group seeks to optimise its business processes through its use of proprietary technology. It has access to a team of approximately 35 technology specialists based in the US and India, employed by the Group or GSS Healthcare. The Group's proprietary "Pegasus" business intelligence platform enhances its outsourced RCM services. Pegasus is designed to provide an industry leading analytics tool providing transparency relating to payment and operational performance.

Pegasus is a proprietary business intelligence solution consisting of web-based dashboards, interactive reports and data visualisation tools for effective financial and operational decision-making. Pegasus captures data from across the revenue cycle continuum and transforms that data into actionable information.

The Directors believe that Pegasus provides the following benefits for the Group:

i.      It offers a competitive differentiation from a wide range of outsourced RCM vendors;

ii.     an increase in top line growth for clients as a result of analytics identifying 'pockets' of revenue and increasing percentages of collections for its customers;

iii.    an increase in gross margin for clients as a result of analytics driving faster and more efficient collections for its customers;

iv.     it enhances the Group's customer relationships as a strategic partner that can orchestrate a suite of offerings across operations, technology and data management; and

v.      it provides data extraction capabilities that can be leveraged into a position of leadership for evidence-based medicine, Accountable Care Organisations and other favourable healthcare trends.

The Group also uses a number of workflow tools, including:

i.      Charge Data Transfer – an application for charge capture and coding;

ii.     Data Processor – logs and archives source files from various hospitals and medical facilities; and

iii.    Payment Reconciliation – reconciles bank deposits and posted payments in the billing software.

Pegasus "sits on top" of the Group's RCM workflow solutions and is designed to provide seamless payment and operational performance transparency in a user-friendly, real-time format.

The Group's RCM division includes the following five operating business units servicing in aggregate approximately 208 clients in 18 states:

i.      MBS specialises in pathology and is based in Texas. MBS currently provides services to approximately 28 clients;

ii.     Rand specialises in billings of physician specialty practices and is based in California. Rand currently provides services to approximately 76 clients;

iii.    RMI specialises in radiology and is based in Texas. RMI currently provides services to approximately 14 clients;

iv.     WSB specialises in billings of physician specialty practices and is based in Colorado. WSB currently provides services to approximately 39 clients; and

18

v.    NEMS provides services to both specialists and hospital based physicians and hospitals and is based in Pennsylvania. NEMS provides RCM, credentialing and consulting services to surgery, radiology, primary care and multi-discipline practices and has approximately 50 clients.

**4.2    The PM division**

In the PM division, the Group (through its IPS business unit) provides comprehensive business and practice management services dedicated to supporting the needs of primary care practices. Services include financial and medical office management, human resource management, management of accounts receivables, quality assurance services, managed care contracting, physician credentialing, fee schedule review, training and continuing education and billing and reimbursement analysis.

As of 31 December 2013, IPS managed three medical groups in Illinois and Ohio. The physicians, who are all employed by the medical groups, provide all clinical and patient care related services, whilst all other medical staff are employed by IPS.

In relation to each practice, there is a standard forty-year management service agreement, in each case entered into between 1998 and January 1999, between IPS and each of the various affiliated medical groups whereby a management fee is paid to IPS. IPS owns all of the assets used in the operation of the medical groups. IPS manages the day-to-day business operations of each medical group and provides the assets for the physicians to use in their practice for a fixed fee or percentage of the net operating income of the medical group. All revenues are collected by IPS, the fixed fee or percentage payment to IPS is taken from the net operating income of the medical group and the remainder of the net operating income of the medical group is paid to the physicians and treated as an expense on IPS's financial statements as "physician group distribution".

**4.3    Group purchasing division**

The Group also manages a group purchasing organisation business focused on the procurement of vaccines and flu shots. The business helps participating physicians nationwide to lower vaccine costs through volume pricing with pharmaceutical suppliers, such as Sanofi Pasteur and Merck. The Group's revenue is derived from administration fees paid by the relevant pharmaceutical companies to the Group for administering the group purchasing programme, typically being a percentage of net sales achieved.

The group purchasing division experienced an increase in revenues during 2013 and the first half of 2014 due to a number of factors including: an increase in the number of physicians buying vaccines through the Group and high flu rates in late 2013 and early 2014.

**5    POST-ACQUISITION INTEGRATION OF ORION AND NEMS**

In the last full financial year prior to the acquisition by Constellation Health of Orion, being the year ended 31 December 2012, Orion's consolidated revenues were approximately $51.7 million and EBITDA was approximately $2.6 million. Following the acquisition of Orion, the Group implemented a series of changes in line with the Group's current strategy, which have had a fundamental impact on the operational and financial performance of Orion, including:

• the redeployment of approximately 187 jobs to the Group's Indian BPO service providers during the remainder of 2013;

• the redeployment of approximately a further 153 jobs to India during the first half of 2014;

• the implementation of performance management and key performance indicators for the Group's billing operations;

• the establishment of new sales and marketing strategies;

- the consolidation of IT operations and the development of Group-wide processes and metrics; and

- the establishment of a client relationship management team and processes.

As a result of these changes, the Group has significantly reduced costs whilst taking steps to stabilise and grow Orion's customer base. As a consequence the Group generated approximately $52.0 million in revenues and EBITDA of approximately $7.0 million in the financial year ended 31 December 2013. In the six month period ended 30 June 2014, the Group generated approximately $25.3 million in revenues and EBITDA of approximately $7.2 million. The unaudited financial information for the first half of 2014 as compared to the same period in 2013 shows a significant improvement in EBITDA, reflecting the successful implementation by management of the Group's current strategy, and various operational improvements made to the Orion business, following its acquisition by Constellation Health in June 2013. Overall, the Group realised an EBITDA margin of 13.4 per cent. in 2013 (as compared to 5.1 per cent. in 2012) and an EBITDA margin of 28.3 per cent. in the six month period ended 30 June 2014.

Following the acquisition of NEMS in March 2014, the Group is in the process of redeploying further jobs to India.

## 6    BUSINESS PROCESS OUTSOURCING TO INDIA

The staff of a typical medical billing company comprises many low skilled workers performing predominantly linear tasks, such as explanation of benefits, processing, coding, and customer payment processing. In the US, such businesses typically comprise relatively lowly qualified workers and also experience high turnover of staff. This creates high operational costs (associated with the recruitment and extensive training of staff) and material inconsistencies in service delivery to clients. The Directors estimate that the total annual cost of employment of such an employee in the US on average is approximately $50,000. By comparison, the Group adopts a model of seeking to outsource predominantly back office tasks to its Indian BPO service providers which are able to employ graduates to perform the same tasks and who the Directors believe tend to be more motivated than their US counterparts and to stay in their jobs for much longer. This significantly reduces recruitment and training costs. Overall the annual cost of such an India-based employee is on average approximately $15,000, an average annual saving of approximately $35,000 per job, which has a direct impact on the Group's EBITDA margins.

The Group retains all front office jobs in the US, including management, customer service and client relationship management activities.

The Group outsources labour to GeBBS Healthcare Solutions ("GeBBS") and GSS Healthcare ("GSS"). Prior to the acquisition of Orion by Constellation Health, the Group used GeBBs as its single source BPO provider. Following the acquisition, the Group's management began to migrate from GeBBs to GSS. GeBBS is a third party vendor also used by competing healthcare service providers, whereas GSS is the Group's dedicated BPO provider in India, owned and operated by GSS Infotech through an exclusive services agreement with Orion. With effect from Admission, the Company will have an option to acquire GSS at any time on or before 11 June 2018 for a nominal consideration.

GeBBS is remunerated on the basis of a fixed percentage of Group revenue derived from each client serviced by GeBBS, whereas GSS is paid on the basis of a defined margin over fixed cost per employee per month which is reduced if key performance targets are not met. In the second half of 2013, following the Group's acquisition of Orion, the Directors estimate that the Group achieved savings of approximately $6 million in the United States based on the shifting of services from US based employees to the BPO providers in India. During the same period, a total of 187 full-time equivalents were added at GeBBS (39 individuals) and GSS (148 individuals) which resulted in an incremental annual BPO cost of approximately $2.5 million.

20

The following steps will be taken to separate customer facing services from back office operations with each newly acquired business:

- identify the business processes that require contact with clients and patients;

- redefine jobs so that the minimum number of jobs have duties which involve client or patient interaction, retaining those jobs in the US;

- modify business processes so that employees with back office operational duties do not perform client and patient interactions;

- train the India based operational team in performing the relevant back office tasks;

- further develop its relocation strategy so as to ensure a smooth transition of business which is as invisible as possible to the end client; and

- execute the relocation plan by business unit over a 24 month transition period.

## 7    THE RCM MARKET

### *The market opportunity*

According to US Government statistics, the US healthcare market represented approximately 18 per cent. of the nation's GDP in 2013, compared to 5.1 per cent. in 1960. During the same period there has been an increase in healthcare annual expenditure to approximately $2.6 trillion. The Directors believe that almost every aspect of the US healthcare market involves a billing or RCM process.

The RCM industry in the United States includes a variety of companies that provide outsourced business services and information technology systems to physicians seeking payment for healthcare services provided to their patients and assistance with the management of their practices.

The Group benefits from a large market opportunity in physician billing, which is estimated by the Directors to be approximately a $37 billion market across current specialties. The Directors believe that there has been an increasing trend towards physicians outsourcing billing operations, although they also believe that approximately 55 per cent. of physicians still retain their RCM operations in-house. This represents a significant market opportunity for large scale RCM service providers such as the Group.

The Directors believe that there are more than 2,000 companies providing RCM services in the United States, some of which are large organisations but most of which are small independent businesses operating in local or regional markets. The Directors believe that this presents the Group with a significant opportunity as it seeks to implement its acquisition strategy, especially given the increasing complexity and regulation facing RCM businesses in the United States.

The US healthcare sector continues to evolve rapidly, driven by a range of economic, regulatory and technological trends. The Directors believe that many of these trends suggest that the RCM industry will continue to grow as physicians are presented with an increasing number of time consuming and costly challenges in their practices thus increasing the benefits to physicians of outsourcing their RCM functions to third party providers such as the Group.

### *RCM market overview*

Physicians typically have to manage a complex medical billing process in order to seek proper reimbursement for their services. This includes generating and submitting medical claims to insurance companies, managing denials of such claims, and managing accounts receivable associated with their billings.

*Medical billing process*

The revenue cycle has historically consisted of dozens of disjointed processes within the payer and physician environments. Tasks are performed across a multitude of software, systems, and paper-based functions for both healthcare providers (such as hospital and office-based physicians) and healthcare payers (such as insurance companies and Government funding sources). Significant resources are required to not only integrate these systems, but also to enable interoperability with pharmacy benefit managers, third-party administrators, and other third party technologies.

The medical billing process is summarised in the chart below:



While the landscape on both the provider and payer sides of the industry has historically been highly fragmented, the market has experienced a heightened period of consolidation. Consolidation has been and continues to be driven by various factors, including a fundamental demand in both the provider and payer markets for a few leading players to aggregate a comprehensive service or product offering that addresses the challenges that customers face as they struggle with the increasingly complex process of paying for healthcare.

In addition, physicians are increasingly turning to their RCM service providers for support with respect to practice management functions, including a variety of administrative, finance and compliance issues.

*Competition*

There are several larger companies that compete with the Group in the RCM division, including McKesson Corporation, Allscripts Healthcare Solutions, Inc., HMS Holding Corporation, The Advisory Board Company, and Accretive Health Inc. The Group also competes with regional and local billing companies and information technology providers such as athenahealth, Inc. and Greenway Medical. Many of these competitors have greater resources than the Group.

A significant number of physician groups also perform billing and collections services in-house, but the Directors believe that this is both a competitive factor and an opportunity for the Group.

The principal competitive factors that affect the Group's ability to provide such services are the ability to provide proactive practice management consulting services, the efficiency and effectiveness of converting medical services to cash while minimising compliance risk, the relationship with the client or prospective client, pricing of services offered, the experience and expertise of personnel, reputation, and access to capital.

*Industry drivers*

Physicians and other healthcare providers are under increasing pressure from a number of areas. The government continues to introduce new and increasingly burdensome regulation, whilst interfacing

with payers, including government funded schemes, insurers and patients, presents a number of challenges.

There are a number of factors which the Directors believe will continue to drive demand for the Group's RCM services, including:

- **Inefficient administrative processes:** redundant data collection, manual processes, and repetitive claims submissions all contribute to diminishing profitability for healthcare organisations. Inefficiencies are compounded by the complexity of the system. There is little standardisation across operating practices, payer and patient payment methodologies, data management processes, and billing systems. Physician practices often rely on heavily manual processes to bridge the gap between different systems, or simply accept incorrect payments or denials of payment. For example, many patients, especially more elderly patients on Medicare, have supplementary health coverage with multiple carriers which complicates the RCM process and can cause high levels of incorrect or denied payments. Hospitals have reported that as many as 80 per cent. of their claims invoke small ($100-$200) "secondary" claims that frequently go uncollected or result in delays in reimbursement. The sheer volume of these small secondary claims can have a significant impact on an institution's finances.

- **Uninsured patients:** financial pressures on healthcare providers are compounded by the increasing number of uninsured patients seeking treatment. Implementation of the Affordable Care Act requires more than 30 million people who were previously uninsured to carry health insurance, mostly with plans that provide reimbursement at a rate that could be closer to that of Medicaid than that of employer-subsidised commercial insurance.

- **Increase in self-pay patients:** physicians have the burden of collecting payment for services from two separate constituents: healthcare insurance companies and patients. Patients have represented an increasing portion of reimbursement in recent years (in part driven by insurance health plans requiring large co-payments and higher deductibles). This has made revenue collection more difficult and unreliable and practice revenues have declined accordingly. At this stage it is unclear how the Affordable Care Act will impact this dynamic.

- **Regulatory and compliance pressures:** the government heavily regulates the healthcare sector, from patient security standards to mandatory quality measures to certification of physicians. Migration to new medical coding standards (ICD-10) will impose significant costs in the industry in compliance fees and will create a more complex reimbursement environment for the future. The Directors expect that new reimbursement models in Medicare and Medicaid programs will add new layers of complexity. In addition, physician revenues are under scrutiny by Recovery Audit Contractors ("RACs"), third-party auditors hired by the Centers for Medicare and Medicaid Services ("CMS") on a contingency fee basis to identify improper payments under fee-for-service Medicare. Originally formed as a three year regional pilot program under the Medicare Modernization Act of 2003, RACs now operate in all 50 states and on a permanent basis.

- **Complex insurance health plans and processes:** there are many insurers in the market, each with an array of health plans and each with its own individual claims handling process and systems, which are often revised on a regular basis to reflect medical data and advancements that become available. Individual physician practices often do not have the resources or expertise to meet these challenges. In addition, insurers continue to create new insurance products that shift the financial burden to the patient (with high deductible plans) and have invested in systems that monitor appropriateness of care which have created further complexities and delays in adjudicating physician claims.

- **Increase in Pay-for-Performance reimbursement:** the growth of Accountable Care Organisations ("ACOs") provides a healthcare model whereby reimbursements will be based on the value, rather than the volume, of services provided. The emergence of ACOs creates additional complexity and an environment in which the billing and claims systems, in addition to other administrative functions of providers and payers, will have to be unified.

23

- **Demographic and market forces:** an ageing population will continue to generate greater demand for healthcare services and exacerbate a number of the other factors referred to above. Likewise, increasing consolidation among physician practices is likely to lead to an increased demand for more efficient ways to manage RCM and other processes as those practices become larger and more complex. The Directors believe that developments such as these will continue to drive demand for the Group's services.

## 8    STRATEGY

The Directors believe that there is a significant opportunity to build a large scale, stable and efficient RCM service provider to capitalise on market demand. The Group's vision is to provide superior billing, collections, practice management, business and financial management services for physicians, resulting in optimal profitability for its clients and increased enterprise value for its stakeholders. The Directors believe that the Group's core competency is its long-term experience and success in working with and creating value for physicians.

The Directors intend to leverage the Group's key strengths in pursuing the following strategy:

- *Organic growth* – the Group intends to grow organically, building on its expertise to further extend its customer base and service offering in the RCM market, for example through increased investment in sales and client relationship management strategies and a focus on optimising its business processes through its use of proprietary technology.

- *Offshoring* – the Group intends to continue to enhance its operating margins through the redeployment of certain Group operations to dedicated business process outsourcing facilities in India.

- *Acquisitions* – currently the domestic third-party medical billing market in the United States is highly fragmented with over 2,000 companies, the vast proportion of which the Directors believe have annual revenues below $20 million and relatively low profitability due to their inefficient business operations and lack of scale. The Group intends to play a leading role in the consolidation of the highly fragmented RCM market through selective acquisitions of competing businesses.

## 9    CREDIT AGREEMENT

A credit facility of up to $40 million was made available to Orion from RCC Commercial Inc. and Whitehorse Finance Inc. (together the "lenders") through the Credit Agreement in order to refinance the debt incurred by the Group at the time of the Orion acquisition and to help finance both the NEMS acquisition and future acquisitions. As at the date of this document, approximately $17 million remains undrawn under that facility. An amendment to the Credit Agreement was entered into on 3rd September 2014, pursuant to which the Group remains subject to various covenants that will result in the Group needing to obtain the consent of the lenders in order to take certain actions which form part of the Group's strategy following Admission, such as the acquisition of certain businesses, the declaration and payment of dividends, and the issue of equity. The lenders will also retain board observer rights in respect of Group entities other than the Company.

In connection with the amendment to the Credit Agreement referred to above, $1.2 million was paid into escrow by First United Health, a company controlled by Mr. Parmar, and was subsequently paid to the lenders on 31 October 2014 as a prepayment of principal (including a 5 per cent. prepayment premium). This amount reduced the outstanding indebtedness of the Group under the credit facility. A further amount may be required to be paid to the lenders as a prepayment of principal if certain expenses incurred by the Group in connection with Admission exceed $1.2 million. First United Health has agreed to capitalise the amount of $1.2 million owed to it as a result of this arrangement into Common Shares at the Placing Price upon Admission. At the same time, First United Health has agreed to invest a further $800,000, by subscribing for additional Common Shares at the Placing Price upon Admission.

Further details of the Credit Agreement (as amended) and the Company's subscription agreement with First United Health are set out in paragraph 10 of Part VII of this document.

## 10   POTENTIAL ACQUISITIONS – SELECTION AND PIPELINE

As part of its growth strategy, the Group intends to identify and select potential acquisition targets by applying a rigorous vetting process. The Directors anticipate that each acquisition will typically meet the following criteria, although any acquisition will be determined on its merits:

- 75 or more staff, the majority of whom are based in the US;

- annual operating revenues of $5 – 15 million (although larger businesses will also be considered on a case-by-case basis);

- an annual EBITDA margin of between five and 25 per cent;

- a positive cash flow;

- an organisational structure based on skill sets with well documented jobs and procedures; and

- owners willing to accept consideration structured with a significant deferred element contingent on achieving performance targets for periods of at least two years post-completion.

The Group has identified a pipeline of potential acquisitions of companies in the United States. The Group is in active discussions with certain of those companies and intends to pursue a number of potential acquisitions immediately following Admission.

There can be no assurance that the Group will be able to complete any of these acquisitions in a timely manner or at all. In particular, even if the Company is able to identify a sufficient number of suitable potential acquisition targets, the Group may not effect any acquisition without obtaining consent of the lenders under the Credit Agreement.

## 11    SUMMARY FINANCIAL INFORMATION

The following information has been extracted from the audited financial information of Orion for the three years ended 31 December 2013 set out in Part IV of this document and the unaudited financial information of Orion for the six months ended 30 June 2014 set out in Part V of this document and summarises the trading record of the Group. Investors should read the full text of this document and, in particular, Parts IV and V of this document and not rely solely on this summary.

| $ million | Year ended 31 December 2011 | Year ended 31 December 2012 | Year ended 31 December 2013 | 6 months to 30 June 2014 |
|---|---|---|---|---|
| **Revenue** | | | | |
| −   RCM | 37.4 | 32.8 | 32.6 | 13.6 |
| −   PM | 16.7 | 17.6 | 17.9 | 8.5 |
| −   GP/Corporate | 1.2 | 1.4 | 1.4 | 3.3 |
| TOTAL | 55.3 | 51.8 | 51.9 | 25.4 |
| **Operating Income*** | | | | |
| −   RCM | 8.0 | 6.2 | 9.6 | 4.2 |
| −   PM | (0.3) | (0.2) | 0.2 | 0.8 |
| −   GP/Corporate | (3.2) | (3.4) | (2.8) | 2.2 |
| TOTAL | 4.5 | 2.6 | 7.0 | 7.2 |
| **Group (Loss)/Profit before Tax** | (6.4) | (9.6) | 0.5 | 2.9 |
| **Cash from Operations** | 2.3 | 0.3 | 4.9 | 2.1 |
| **Net (debt)/cash** | | | (12.0) | (21.2) |

* Operating income is stated before any interest, taxation, depreciation or amortisation

## 12    CURRENT TRADING AND PROSPECTS

During the first half of 2014 the Group continued in its strategy to reduce costs and stabilise the current client base, whilst also seeking to add new clients and invest in the business.

As at 30 June 2014, RCM revenues, including a minor contribution from NEMS which was acquired in March 2014, were down 21 per cent. year on year. This was primarily caused by client losses during previous periods, which the Directors believe was due to the significant uncertainty surrounding the Group's financial position prior to its acquisition by Constellation Health in June 2013, prior to which a number of clients had given notice to terminate. As the Group's finances have stabilised, so too has RCM client churn during the first half of 2014 as management continued with important initiatives, including the establishment of a US-based client relationship management team and the implementation of certain processes designed to measure and monitor levels of client satisfaction. The Group has now begun to focus on new client development and was successful in winning four new clients during the first half of the year; the Group has only lost one client over the same period.

As at 30 June 2014, Practice Management revenues were up 5.7 per cent. year on year to approximately $8.5 million reflecting a drive to more accurate coding and improved marketing.

During the same period, Group Purchasing revenues were up significantly to approximately $3.2 million (compared to approximately $540,000 for the six month period ended 30 June 2013) as management have undertaken a major drive to promote services to more medical practices and have signed up to a new channel partner sales agreement, giving the Group access to the product ranges of two major pharmaceutical companies.

Overall Group annual costs were approximately $6.0 million lower at 30 June 2014 reflecting the downsizing of US based management undertaken since June 2013, as well as the acceleration of the BPO programme with a further 153 jobs moved to India during the first half.

Investment in the Group's software (in particular the Pegasus platform) continued during the first half of 2014 with a further capitalisation of $2.4 million, bringing the total investment in software to $4.2 million since the Group's acquisition in June 2013.

Trading for the period since 30 June 2014 has been in line with management's expectations, with a further two clients added and no clients lost.

## 13    DIVIDEND POLICY

Following Admission, the Directors intend to adopt a progressive dividend policy that will take into account the profitability of the business and underlying growth in earnings of the Group, as well as its capital requirements, the availability of cash and distributable reserves, industry practice and cash flows, while maintaining an appropriate level of dividend cover. As noted at paragraph 9 above, the Credit Agreement contains covenants that will restrict the ability of the Group to declare and pay dividends without the relevant lenders' consents until such time as the Credit Agreement is renegotiated or the facility refinanced.

All of the Common Shares in issue at Admission will rank pari-passu for the payment of dividends. The Directors may amend the dividend policy of the Group from time to time.

Dividends will be declared by the Company in US Dollars. Unless a Shareholder elects to receive dividends in US Dollars, they will be paid in Sterling with the US Dollar dividend being converted into Sterling at exchange rates prevailing at the time of payment. The Company may only pay dividends from net assets in excess of its stated capital or from net profits from the current or prior fiscal year. As a holding company the Company's ability to pay dividends will principally depend upon dividends or interest paid by its subsidiaries. Please see the risk factor headed ''The structure of the Group means that the Company's ability to pay dividends is dependent on distributions received from its subsidiaries" in Part III of this document for further details.

## 14    DIRECTORS AND SENIOR MANAGEMENT

### 14.1    Board of Directors

On Admission, the Board will comprise the following Directors:

#### John Joseph Johnston: (aged 55) Independent Non-executive Chairman

Mr. Johnston has spent his entire career in investment management, initially in fund management then in equity sales. Mr. Johnston began his career at General Accident as a trainee fund manager, subsequently working at Ivory & Sime, Murray Johnson and Legg Mason. In 2003 he established Revera Asset Management and was its Chief Executive Officer until 2007. In 2008, he joined Seymour Pierce as a managing director in Institutional Sales & Trading where he was involved in various IPOs and secondary fund raisings including the successful IPO of Supergroup plc. In 2011 he left Seymour Pierce to join Nomura Code in a similar role. After leaving Nomura Code he established Johnston Asset Management, which is his own consultancy.

#### Paul Parmjit Parmar: (aged 44) Group Chief Executive Officer

Mr. Parmar has provided consultancy services to a number of the world's largest companies including a major healthcare company, to improve their operational platforms by reducing costs and driving efficiencies.

Mr. Parmar has previously invested in healthcare businesses and technologies. In 2008 a group represented by Mr. Parmar bought a controlling interest in a medical billing company and subsequently sold the business to NextGen. In 2013 he founded Constellation Health to acquire Orion.

Mr. Parmar built a private aviation business through both acquisition and organic growth which was sold to Delta Airlines in 2010.

### Ravi Sankar Chivukula: (aged 41) Group Chief Financial Officer

Ravi Chivukula has over 14 years of experience in finance and accounts. Prior to joining Orion Mr. Chivukula served as CFO of GSS America Infotech Ltd where he was responsible for all of the activities relating to the finance and accounts division. GSS provides BPO service to its clients and has approximately 1500 employees around the world providing BPO services.

Prior to joining GSS America, Mr Chivukula was in charge of the Finance Department of Velagapudi Steels Ltd. where he was responsible for the capital restructuring of the company. During his tenure with Fabmall (India) Pvt Ltd. he was responsible for treasury operations, cost control, inventory control and MIS reporting. Prior to that, he was in charge of the Hyderabad office for Strategic Capital Corporation for their debt market operations. Mr Chivukula is a commerce graduate from Dr. L.B.College, Andhra University, an associate member of the Institute of Chartered Accountants of India and a certified Cost and Works Accountant from Institute Cost and Works Accountant of India.

### David Andrew Clark: (aged 49) Independent Non-executive Director

A fund manager for 25 years, David Clark began his career with six years at Scottish Mutual as an investment analyst before joining Ignis Asset Management (formerly Resolution) where he worked from 1993 until September 2014. At Ignis he was responsible for the UK Smaller Companies quoted investments across all sectors. His universe of potential investment candidates included not only those stocks quoted in FTSE UK Small Cap Index but also the Fledgling Index and companies quoted on AIM. His performance resulted in him being ranked number two Fund Manager in the UK (2009) across all sectors by Citywire. David graduated from Glasgow University with a Bachelor of Accountancy Degree and also holds an MSc in Investment Analysis from Stirling University.

### Moshe Menachem Feuer (known as Mark Feuer): (aged 46) Independent Non-executive Director

Mr. Feuer is the founding partner of Beechwood Capital Group, a private investment firm located in New York, which is focused on investments in the healthcare and insurance industries.

Prior to forming Beechwood, Mr. Feuer most recently was Chief Executive Officer of Marsh USA. In previous roles he was also the Chief Operating Officer of Merrill Lynch Americas, with responsibility for the Trust Company, Retirement Division, Private Bank, and other operations. Mr. Feuer sat on the Product Development committee for the Global Wealth Management organisation.

Mr. Feuer serves on several Boards of Directors, including many non-profit institutions in the New York area. He holds a Juris Doctor from New York Law School and an LLM in Taxation from New York University School of Law.

## 14.2  Senior Management Team

### Dale Brinkman: President and Chief Executive Officer of Orion

Mr. Brinkman founded Western Skies Practice Management, a division of the Group, and has served as president since its inception in 1986. Mr. Brinkman has extensive experience as a physician practice manager. Mr. Brinkman developed a national practice management consulting firm serving physician and hospital group clients in the areas of physician hospital organisational development and process improvement. He achieved his fellow status in the American College of Medical Practice Executives in 1995 and served as the president of the Colorado Medical Group Management Association. Mr. Brinkman received his bachelor's degree from Wright State University and his master of public administration in healthcare from the University of Colorado.

**Joe Seale: Chief Operating Officer**

Mr. Seale, CMA, CFE has been involved with growing and leading physician revenue cycle management companies for over 10 years. Mr. Seale began his career in accounting and finance, and has more than 20 years of experience in financial analysis, project development, M&A management, forecasting and valuation. Mr. Seale is a certified management accountant, as well as a certified fraud examiner. Mr. Seale received his bachelor's of business administration in accounting from Sam Houston State University.

**Jessica Curran: Vice-President, Client Relations**

Ms. Curran manages a team of client relation managers in Houston, Denver, California, Atlanta and Pittsburg. Ms. Curran has worked to build a client relations program to promote client-focused customer service that is customised to fit the needs of each customer and develop a culture that translates the Group's message to clients and new prospects. Ms. Curran has over 13 years of healthcare experience with a focus in client relations, clinical applications, operations, marketing, and business development. She started her career as a radiographer and sonographer and obtained her AAS in radiology, sonography and bachelors in applied technology.

**Lynne Sherman: Director of Physician Practice Operations and Managing Director of IPS Vaccine Group Purchasing Alliance**

Ms. Sherman has been providing direct oversight and management to the Practice Management and Group Purchasing divisions since 2007. Ms. Sherman has over 20 years of medical management and consulting experience in both hospital-owned and independent medical practices as well as rural health clinics. Prior to joining Orion, Ms. Sherman served as Director of Practice Operations for WellStar Health System for nine years. Ms. Sherman has extensive healthcare consulting experience, and served as Senior Healthcare Consultant with Key Solutions Consulting in Atlanta, Georgia. Ms. Sherman holds her degree from Barnard College, Columbia University.

**Julie Britton: Chief of Operations, Office-Based Regional Specialty Center**

Ms. Britton has been employed in the healthcare industry since 1989 and has a bachelor of science degree in business management. Ms. Britton has been with Orion since 2003 and oversees the company's operations. She has extensive knowledge of accounting and revenue cycle management procedures. Her expert knowledge of GE's Centricity practice management software, Centricity analytics, and high-level technical experience in software and hardware products, networks and healthcare information systems underwrite her ability to assist physicians with decision-making and problem solving.

**Sue Brooks: Chief of Operations , Multi-Specialty Regional Center**

Ms. Brooks has been in the medical billing field since 1986. Her expertise is in the hospital based specialties of anaesthesiology, pathology and radiology. Most of her work has been handling the daily operations and fine-tuning processes to ensure consistency and accuracy. She is a member of the Healthcare Billing Management Association.

**Sol Bernardino: Vice President, Pathology Regional Specialty Center**

Ms. Bernardino joined Rand in 1995 as a part-time data entry clerk on the evening shift. She became a full time employee in 1996, and over the years worked in nearly every company position wherein she became an expert in all phases of the billing operation. In 2001, Ms. Bernardino became Director of Billing Operations, and in 2011 Vice President of Billing Operations. This current position entails supervision of a staff of 100 employees, and direct responsibility for all daily billing operations. Ms. Bernardino is a graduate of the University of the Philippines where she earned a BA degree in linguistics.

**Jamie M. Kerestes, CEO, NEMS**

Before creating NEMS, Ms. Kerestes worked for several Fortune 500 companies and their respective healthcare divisions, and healthcare practice management companies throughout her career. Since 1998 Ms. Kerestes has created a successful revenue cycle management company at NEMS utilising over 25 years of experience in providing profitable RCM and denial management services to the healthcare community. Her experience consists of providing strong cash flow management for hospital-based physician practices, multi-specialty groups, independent surgeons and primary care practices. In March of 2013, NEMS merged with Orion where Ms. Kerestes is utilising her considerable experience in the RCM and healthcare Industries to build a strong and successful sales team for the Group.

## 15   CORPORATE GOVERNANCE

The Directors recognise the value and importance of high standards of corporate governance. Whilst the Company is not subject to the UK Corporate Governance Code, the Company intends, in so far as is practicable given the size, nature and state of development of the Company and the fact that it is incorporated in the US and not the UK, to comply with the main provisions of the Quoted Companies Alliance Guidelines and the Policy and Voting Guidelines for AIM Companies issued by the National Association of Pension Funds.

The Company is not subject to any federal or state corporate governance regime in the United States other than the Act.

The Board of the Company comprises three independent Non-executive Directors (including the Chairman) with relevant experience to complement the two Executive Directors and to provide an independent view to the Executive Directors.

The Company has established an Audit Committee and a Compensation Committee with the following roles within the Group. At this stage of the Company's development, the Directors consider it appropriate for the Board to retain responsibility for nominations to the Board.

*Audit Committee*

The initial members of the Audit Committee are Mark Feuer (who will chair the committee), John Johnston and David Clark.

Meetings will be held not less than two times a year. As Chief Financial Officer, Ravi Chivukula will be invited to attend meetings where appropriate and the Company's auditors will be regularly invited to attend meetings including at the planning stage before the audit and after the audit at the reporting stage.

The role of the committee is to consider matters relating to the appointment of the Company's auditors and the independence of the Company's auditors and review the integrity of the Company's financial statements including its annual and half-yearly reports, interim management statements, and any other formal announcement relating to its financial performance. The committee will also review the effectiveness of the Group's internal financial controls and internal control and risk management systems.

*Compensation Committee*

The initial members of the Compensation Committee are John Johnston (who will chair the committee), David Clark and Mark Feuer.

The primary duty of the committee is to determine and agree with the Board the framework or broad policy for the compensation of Executive Directors, the Company Secretary and such other members of the executive management as it is designated to consider. The compensation of the Non-executive Directors is a matter for the Chairman and the Company's Executive Directors. No Director or manager may be involved in any decisions as to their own compensation.

*Share incentive schemes*

Although the Company does not currently have any formal employee share incentive scheme in place, the Board, on the recommendation of the Compensation Committee will, at an appropriate time, seek to adopt share incentive schemes pursuant to which management (excluding Mr. Parmar), employees and consultants may be awarded share options or other share incentives. Such schemes will be limited so that the maximum aggregate number of Common Shares issued or issuable (or transferred or transferable out of treasury) pursuant to rights granted under them after Admission shall not at any time exceed 10 per cent. of the issued share capital of the Company. Whilst the exercise price of any such options will be a matter for the approval of the Board, awards granted to senior management upon adoption of any plan within the short term following Admission may be made at the Placing Price to reflect the ongoing contribution of senior management team members to the performance of the Group during the current financial year and to achieve an appropriate level of incentivisation for the Group's future performance.

## 16    RELATIONSHIP AGREEMENT

Constellation Health is an investment vehicle which was formed by Paul Parmar and Southport Lane Asset Management specifically for the purposes of the Orion acquisition (and to pursue an acquisition strategy in the RCM market). In June 2014, investment entities managed by Mr. Parmar acquired all of the ownership interests of Constellation Health, although 29 per cent. of the ownership interests of Constellation Health are subject to an irrevocable voting proxy in favour of their prior owner until such time as the purchase price for such ownership interests is paid in full, which is upon the earlier of the second anniversary of the Admission or such time as such ownership interests are sold to a third party that is not an affiliate of Mr. Parmar.

Immediately prior to Admission, Constellation Health will own approximately 37,862,074 Common Shares, representing 80 per cent. of the Company's Existing Common Shares. Upon Admission, assuming that the Placing is fully subscribed, Constellation Health will own approximately 68.1 per cent. of the Enlarged Share Capital. In addition, First United Health an investment entity controlled by Mr. Parmar has agreed to subscribe for 943,438 Common Shares at the Placing Price on Admission representing 1.7 per cent. of the Enlarged Share Capital.

The Company, Mr. Parmar and Constellation Health have entered into a relationship agreement governing certain aspects of the continuing relationship between them (the "Relationship Agreement"), pursuant to which the parties have agreed, among other things, that conditional upon Admission:

(a)    Constellation Health and Mr. Parmar will (and Mr. Parmar will procure that Constellation Health will) exercise its/his voting rights to ensure that (i) transactions between the Group and Constellation Health and/or its affiliates are conducted at arm's length and on normal commercial terms and in accordance with the related party rules set out in the AIM Rules for Companies, (ii) at all times the Group is capable of carrying on, and carries on, its business independently of Constellation Health and/or its affiliates having regard to its own interests rather than those of any particular Shareholder, (iii) neither Constellation Health nor its affiliates will take any action that would have the effect of preventing the Company from complying with its obligations under the AIM Rules for Companies, (iv) neither Constellation Health nor its affiliates will propose or procure the proposal of a shareholder resolution of the Company which is intended or appears to be intended to circumvent the proper application of the AIM Rules for Companies, (v) neither Constellation Health nor its affiliates will propose or procure the proposal of any shareholder resolution of the Company or vote in favour of any resolution which is intended or appears to be intended to circumvent the pre-emption rights of Shareholders set out in the Certificate of Incorporation, (vi) neither Constellation Health nor its affiliates will propose or procure the proposal of a shareholder resolution of the Company or vote in favour of any resolution for the cancellation of Admission other than (a) in circumstances where such resolution is being recommended by a majority of the independent Directors or (b) in circumstances where such resolution is being proposed in connection with a listing of the

Common Shares on one of the markets operated by an internationally recognised stock exchange, (vii) to the extent reasonably practicable, at all times independent directors constitute at least 50 per. cent of the Board and (viii) any dealings or disputes between any member of Constellation Health, its affiliates and the Group shall be passed to and dealt with on behalf of the Group by a committee comprising only the independent Directors;

(b) Constellation Health undertakes to the Company that it shall not (and Mr. Parmar will procure that Constellation Health shall not) exercise its voting rights in favour of any proposed amendment or propose any amendment, to the Certificate of Incorporation which would be inconsistent with, or in violation of, any of the provisions of the Relationship Agreement or which has not been approved by a majority of independent Directors;

(c) Constellation Health and Mr. Parmar shall (and Mr. Parmar will procure that any affiliates shall) use all commercially reasonable efforts to attend (whether in person or in proxy) all shareholder meetings of the Company;

(d) For as long as Constellation Health or any of its affiliates hold (directly or indirectly) Common Shares representing not less than 15 per cent. of the voting rights attaching to Common Shares, Constellation Health shall have the right by notice in writing to the Company, to nominate, remove and replace one non-executive director of the Company from time to time (such person being a ''Nominated Director''). Upon Admission, there will be no Nominated Director, although such a director may be appointed at any time following Admission;

(e) Constellation Health will not (and Mr. Parmar will procure that Constellation Health will not) vote in a meeting of the Shareholders in respect of any contract or arrangement or any other proposal whatsoever in which Constellation Health or any of its affiliates has any interest (other than by virtue of its interest in Common Shares);

(f) Mr. Parmar and Constellation Health will not (and Mr. Parmar will procure that any affiliates of Constellation Health will not) engage, invest or be interested, directly or indirectly, in the business of medical billing revenue cycle management or related services in the United States (or any part of it) or in any such business competitive with the Group except that they may invest or otherwise be interested in such businesses provided that the Company's Board of Directors has first declined to invest in any such business and the subsequent investment or interest in such business is on substantially the same terms as those offered to the Company;

(g) Constellation Health and Mr. Parmar will not (and Mr. Parmar will procure that any affiliates of Constellation Health will not) during the term of the Relationship Agreement and for a period of 12 months following termination (i) solicit the services of or entice away from the Company or any member of the Group any person who is a director (other than a Nominated Director), employee or consultant of the Company or any member of the Group (who held such position during the period of 12 months prior to the termination date) and who held a senior managerial or technical position, (ii) in the same area of business in which any member of the Group operates, deal with or seek the custom of any person that is, or who at any time during the period of 12 months prior to the termination date was, a client or customer of the Group and (iii) solicit or endeavour to entice away from the Group any supplier who supplies, or has at any time during the period of 12 months prior to the Termination Date supplied, goods and/or services to the Group if that solicitation or enticement causes or would cause such supplier to cease supplying, or materially reduce its supply of, those goods and/or services to the Group; and

(h) the Relationship Agreement will terminate in certain circumstances including:

(i) with respect to Constellation Health and Mr. Parmar, if Constellation Health ceases to hold or control directly or indirectly Common Shares carrying not less than 15 per cent. of the voting rights of the Company or, with respect to Mr. Parmar, if Mr. Parmar ceases to directly or indirectly control Constellation Health, in each case provided that Mr. Parmar

and/or his affiliates do not hold or control directly or indirectly Common Shares carrying not less than 15 per cent. of the voting rights of the Company (although the agreement will subsequently revive if any affiliate of Constellation Health subsequently increases to 15 per cent. or more or if Mr. Parmar subsequently directly or indirectly controls Constellation Health);

(ii) any single Shareholder other than Mr. Parmar or Constellation Health (or their respective affiliates) directly or indirectly holds 30 per cent. or more of the voting rights in the Company without having entered into an agreement on substantially equivalent terms; and

(iii) the Common Shares cease to be admitted to AIM or the main market of the London Stock Exchange.

## 17  TAKEOVER CODE

The Company is not subject to the Takeover Code because its registered office and its place of central business are outside the UK, the Channel Islands and the Isle of Man. As a result, certain of the protections that are afforded to shareholders under the Takeover Code, for example in relation to a takeover of a company or certain stake holding activities by shareholders, do not apply to the Company. Certain provisions have been inserted into the Certificate of Incorporation which adopts similar procedures to the Takeover Code in the event of any party (or parties acting in concert) obtaining 30 per cent. or more of the voting rights attaching to the issued Common Shares of the Company, but there is no assurance that the courts of the State of Delaware, USA will uphold or allow the enforcement of these provisions. Further details relating to these provisions are set out at paragraph 3.14 of Part VII of this document.

## 18  REASONS FOR ADMISSION AND USE OF PROCEEDS

The Directors consider that Admission will be an important step in the Group's development, will enhance its profile and standing in its markets and will assist with the growth of its business. In addition, broadening the Group's shareholder base through Admission gives the Group the capacity if required to raise further capital to support its strategic objectives as suitable acquisition opportunities arise.

The net proceeds of the Placing receivable by the Company will be approximately £8.2 million, which will be applied towards selective acquisitions in line with the Group's strategy, the integration of such acquisitions and for general working capital purposes.

## 19  LOCK-INS AND ORDERLY MARKET ARRANGEMENTS

The Directors who, on Admission, will be interested in 44,445 Common Shares in aggregate, representing approximately 0.08 per cent. of the Enlarged Share Capital, have undertaken to the Company and to finnCap that subject to certain limited exceptions, they will not sell or otherwise dispose of, or agree to sell or dispose of, any of their respective interests in Common Shares held by them on Admission at any time during the period of 12 months following Admission. Certain orderly market provisions will apply for a further period of 12 months after expiry of the initial lock-in period.

In addition, the Locked In Shareholders who, on Admission, will be the holders of 48,271,031 Common Shares in aggregate representing approximately 86.8 per cent. of the Enlarged Share Capital of the Company, have undertaken to the Company and finnCap that, subject to certain exceptions, they will not sell or otherwise dispose of, or agree to sell or dispose of, any their respective interests in the Common Shares held by them on Admission at any time during the period of 12 months following Admission. Certain orderly market provisions will apply for a further period of 12 months after expiry of the initial lock-in period.

Mr. Parmar has also undertaken to finnCap that during the lock-in and orderly market period referred to above, he will not (and will procure that his affiliates will not) sell or otherwise dispose of, or agree

to sell or dispose of, any of his (or their) direct or indirect interests in Constellation Health held by him (or them) on Admission.

Further details of the lock-in undertakings are set out in paragraph 10.15 of Part VII of this document.

## 20    RESTRICTIONS ON TRANSFER UNDER THE US SECURITIES ACT

The Placing Shares will be not be registered under the US Securities Act, or under the applicable securities laws of any of the states of the US and, thus, may not be offered or sold in the United States or to US Persons or for the account or benefit of US Persons, save where a relevant exemption applies. Accordingly, the Placing Shares are subject to the restrictions on transfer set out in Part VI of this document, including a restriction against hedging transactions involving Common Shares unless conducted in compliance with the US Securities Act.

Certificates representing the Placing Shares will bear legends with respect to such transfer restrictions. Placees and subsequent purchasers of the Placing Shares will be deemed to have agreed to the transfer restrictions set out in Part VI of this document and to have agreed not to effect transfers of the Placing Shares except to transferees who also agree to the restrictions, where the restrictions are still applicable. The Company will refuse to register any transfer of the Placing Shares not made in compliance with Rule 144A, in accordance with the provisions of Regulation S, pursuant to registration under the US Securities Act or pursuant to another available exemption from registration under the US Securities Act.

Notwithstanding the foregoing, the Company will be required to ensure that its Common Shares are eligible for electronic settlement through CREST (in the form of depository interests) when the London Stock Exchange implements new rules to comply with the EU Regulation on Central Securities Depositories. At that time the Company may adopt certain procedures which it considers reasonable to satisfy its obligations under applicable US securities laws. For further details see paragraph 23 below and Part VI of this document.

Further details of the transfer restrictions in respect of the Placing Shares and the Existing Common Shares are set out in Part VI of this document.

## 21    EFFECTS OF US DOMICILE

The Company is a US corporation organised under the laws of the State of Delaware. There are a number of differences between the corporate structure of the Company and that of a public limited company incorporated in the UK. While the Directors consider that it is appropriate to retain the majority of the usual features of a US corporation, the Directors intend to take certain actions to conform to UK standard practice. Set out in paragraph 15 of Part VII of this document is a description of the principal differences and, where appropriate, provisions contained in the Company's organisational documents to incorporate English law principles in relation to pre-emption rights, notifiable interests and takeovers.

## 22    DETAILS OF THE PLACING AND ADMISSION

FinnCap has as agent for the Company pursuant to the Placing Agreement conditionally agreed to use its reasonable endeavours to procure placees for the Placing Shares at the Placing Price. The Placing Shares will be placed with institutional and other investors introduced by finnCap and Chrystal Capital (acting as sub-agent under finnCap).

The Placing Shares will be issued by the Company pursuant to the Placing, representing approximately 12.8 per cent. of the Enlarged Share Capital and raising gross proceeds for the Company of £9,623,117 (before estimated expenses of £1.4 million to the Company). Commentary on the use of net proceeds is provided in paragraph 18 above.

The Placing Shares will on issue rank *pari passu* in all respects with the Existing Common Shares including the right to receive all dividends and other distributions thereafter declared, made or paid on the Enlarged Share Capital.

Application has been made for the Common Shares to be admitted to trading on AIM. The Placing Shares have not been marketed in whole or in part to the public in conjunction with the application for Admission.

The Placing is conditional, *inter alia*, upon:

(a)    the Placing Agreement becoming unconditional (save for Admission) and not having been terminated in accordance with its terms prior to Admission; and

(b)    Admission taking place on 8 December 2014 or such later date as finnCap and the Company may agree, not being later than 22 December 2014.

FinnCap and Chrystal Capital are receiving 186,160 Common Shares in aggregate in satisfaction of part of the commissions payable to them with respect to the Placing. FinnCap and Chrystal Capital have agreed to certain orderly market restrictions with respect to such shares for a period of 12 months following Admission.

## 23    ADMISSION, SETTLEMENT AND CREST

Application has been made to the London Stock Exchange for all of the Existing Common Shares and the Placing Shares to be admitted to trading on AIM. It is expected that Admission will take place, and that dealings on AIM in the Common Shares will commence, on 8 December 2014.

The EU Regulation on Central Securities Depositories (CSDR) was published on 28 August 2014. Article 3(2) of CSDR requires that where transactions in transferable securities take place on a trading venue, such as AIM, the relevant securities should be recorded in book entry form in a Central Securities Depository ("CSD"), such as CREST, on or before the intended settlement date (unless already so recorded). This requirement applies irrespective of whether the security is currently eligible for electronic settlement or not and applies to all transactions executed under the Rules of the London Stock Exchange irrespective of whether or not the securities are issued by an EU-incorporated issuer. The London Stock Exchange has announced that it intends to amend its rules so that on Exchange transactions are able to comply with the requirements of Article 3(2). The London Stock Exchange has said that it will update the market in due course with regards to when these new rules will take effect.

This rule change will require the Company (in common with all other companies whose securities are admitted to trading on AIM) to ensure that the Common Shares are eligible for electronic settlement through CREST.

The Overseas Placing Shares offered in the Placing are subject to the conditions listed under section 903(b)(3), or Category 3, of Regulation S. Under Category 3, Offering Restrictions (as defined under Regulation S) must be in place in connection with the Placing and additional restrictions are imposed on re-sales of the Overseas Placing Shares. Further details of these restrictions are set out in Part VI of this document entitled "Transfer Restrictions". All Overseas Placing Shares are subject to these restrictions until the expiry of one year after the later of (i) the time when the Overseas Placing Shares are first offered to persons other than distributors in reliance upon Regulations S and (ii) the date of closing of the Placing, or such longer period as may be required under applicable law (the "Compliance Period").

Due to these restrictions, the Company has determined that all Common Shares will be held in certificated form from Admission until further notice and therefore the Common Shares will not be eligible for settlement through CREST during that time. Accordingly, until further notice, settlement of transactions in both the Existing Common Shares and the Placing Shares following Admission will not take place within the CREST system, although trades can be reported to AIM and the cash consideration can be settled using the CREST residual service.

Before the introduction of the London Stock Exchange's new rules, the Company will apply for the Common Shares to be settled in CREST in the form of Depository Interests ("DIs") which facilitate trading and settlement of shares of non-UK companies in CREST. DIs are uncertificated "mirror image" securities constituted under English law representing the underlying shares. In the event that the Company is required to apply for the Common Shares to be settled in CREST in the form of DIs prior to the expiry of the Compliance Period, and if functionality does not exist within CREST at that time to ensure ongoing compliance with the relevant restrictions referred to above for the remainder of the Compliance Period, the Company will take such steps and implement such procedures as it considers reasonable to satisfy its obligations under applicable US securities laws and in any event will seek to comply with the Rules of the London Stock Exchange. However, there can be no assurance that the Company's application for the Common Shares to be settled in CREST in the form of DIs will be successful, and any failure of such application may lead to disciplinary action being taken against the Company by the London Stock Exchange, which may include a fine, censure, suspension or cancellation of the admission of the Company's securities, nor can there be any assurance that any actions proposed to be taken by the Company will be sufficient to satisfy the requirements of Category 3 of Regulation S or any other exemption from registration with respect to the Placing, any of which could lead to enforcement action by the United States Securities and Exchange Commission and/or civil claims from Shareholders alleging violations of applicable securities laws.

## 24    TAXATION

Your attention is drawn to paragraph 14 of Part VII of this document. These details are intended only as a general guide to the current tax position under UK and US taxation law. If an investor is in any doubt as to his or her tax position he or she should consult his or her own independent financial adviser immediately.

## 25    ADDITIONAL INFORMATION

Prospective investors should read the whole of this document which provides additional information on the Company and the Placing and not rely on summaries or individual parts only. In particular, the attention of prospective investors is drawn to Part III which contains a summary of the risk factors relating to an investment in the Company.

# PART II

# REGULATORY OVERVIEW

**Introduction**

Regulatory activities affect the business activities of the Company's subsidiaries operating in the RCM division by, among other things, controlling reimbursement to their clients, which affects Group revenues, as well as regulations regarding patient privacy and submission of fraudulent claims.

The customers of IPS, the Group's principal PM subsidiary, must comply with governmental regulations, such as those relating to HIPAA, Medicare and Medicaid, which affect healthcare providers. When providing its customers with healthcare business services and information technology solutions, IPS must consider the healthcare regulatory framework in which its customers operate in order to provide them with services and products that will not compromise their compliance with these regulations.

**Regulatory overview**

The operations of healthcare entities and their service providers are subject to various federal and state regulations, including laws and regulations prohibiting false claims, the practice of medicine by non-physicians, kickbacks, rebates or division of fees, the referral of patients to an entity in which a physician has a beneficial interest, the receipt or offering of remuneration as an inducement to refer patients, and otherwise regulating the manner in which prospective patients may be solicited. Physicians and others who violate certain prohibitions, particularly those concerning the state and Federal anti-kickback statutes or the self-referral prohibitions, may incur criminal as well as civil liability, including monetary penalties and exclusion from certain federal or state programs. There can be no assurance given that the activities of the Group or any entity for which the Group provides billing and management services (each, a "Client") will not be reviewed and challenged by enforcement authorities empowered to do so.

***Healthcare reform and changes in the healthcare regulatory environment***

In March 2010, President Obama signed into law the Patient Protection and Affordable Care Act and the Health Care and Education Reconciliation Act (together, "ACA"). The ACA implements far-reaching reforms to the American health care system. These reforms include, among others, adjustments to Medicare reimbursement, creation of a health insurance exchange, implementation of individual and employer mandates for health care coverage and other health insurance coverage reforms.

The Directors believe that the ACA has and will continue to cause significant changes to the health insurance industry and has caused, and will continue to cause, insurers to modify current health insurance plans. Under the ACA, individuals not currently covered under a health insurance plan are required to purchase health insurance or pay financial penalties for not having coverage. Additionally, plans may no longer include lifetime caps on benefits, and parents are permitted to maintain a child on the parent's plan until the child turns 26. Furthermore, plans are prohibited from imposing any limits on coverage as a result of pre-existing conditions.

The ACA also includes a number of provisions that could have a significant impact on providers, including Clients. The ACA includes a number of changes to Medicare payment and, by 2015, the creation of an Independent Payment Advisory Board will be established to provide legislative proposals to curb Medicare spending. Because the Group is often paid on a percentage-of-net-revenue basis under its billing and management contracts, any decrease in Medicare payments to Clients may have a negative impact on the Group's business.

The ACA also provides for the implementation of various demonstration programs and pilot projects to test, evaluate, encourage and expand new payment structures and methodologies to reduce healthcare expenditures while maintaining or improving quality of care, including bundled payments under Medicare and Medicaid and comparative effectiveness research programs that compare the clinical effectiveness of medical treatments and develop recommendations concerning practice guidelines and coverage determinations. Other provisions encourage the creation of new healthcare delivery programs, such as Accountable Care Organisations or combinations of provider organisations, that voluntarily meet quality thresholds to share in the cost savings they achieve for the Medicare program. Again, to the extent these new payment methodologies impact Client reimbursement, they may have a material impact on the Group's operations and revenue.

### *Federal False Claims Act*

The federal criminal false claims law prohibits anyone from knowingly causing any bill or other information to be submitted to Medicare or Medicaid that is false or misleading. Violators can be imprisoned for up to five years. A similar law prohibits knowing and willful attempts to defraud in connection with any health care benefits (not merely governmental benefits). Violators can be imprisoned for up to 10 years (20 years if serious bodily injury results). Violators of either law can be fined up to $250,000 per violation ($500,000 for corporations) or double the amount of any resulting loss, whichever is greater, and/or excluded from federal programs.

The federal civil US False Claims Act ("FCA (US)") makes it illegal to knowingly or willingly submit or present a false, fictitious or fraudulent claim to the federal government. Violators are liable for a civil penalty ranging from $5,500 to $11,000 per claim, plus three times the amount of damages sustained by the government. A person is deemed to have acted knowingly if he or she acted in "deliberate ignorance" or "reckless disregard" of the falsity of the claim. If an individual or entity becomes aware that it was paid any amount under the Medicare or Medicaid programs to which it was not entitled under program rules, it must disclose and repay the amount within 60 days; failure to do so violates the FCA (US). FCA (US) investigations and cases have become common in the health care field and may cover a range of activity from intentionally inflated billings, to highly technical billing infractions, to allegations of inadequate care, and to potential violations of the Stark Law. Violation or alleged violation of the FCA (US) most often results in settlements that require multi-million dollar payments and mandatory compliance agreements. The FCA (US) also permits individuals to initiate civil actions on behalf of the government in lawsuits called "qui tam" actions. Qui tam plaintiffs, or "whistleblowers," share in the damages recovered by the government or recovered independently if the government does not participate. The qui tam relator's share of the recovery can be between 15 per cent. and 25 per cent. in cases in which the government intervenes, and 25 per cent. to 30 per cent. in cases in which the government does not intervene. The government may use the FCA (US) to prosecute Medicare and other government program fraud in areas such as coding errors, billing for services not provided and submitting false cost reports. The FCA (US) has become one of the government's primary weapons against health care fraud. FCA (US) violations or alleged violations could lead to settlements, fines, exclusions or reputation damage that could have a material adverse impact on a hospital. Recent amendments to the FCA (US) in the Fraud Enhancement and Recovery Act of 2009 ("FERA") and the ACA amend and expand the reach of the FCA (US). FERA expanded the FCA (US)'s reverse false claims provision, imposing liability on any person who "knowingly conceals" or "knowingly and improperly avoids or decreases" an "obligation to pay or transmit money or property to the Government," whether the person uses a false record or statement to do so or not. FERA also clarified that an "obligation" can arise from the retention of an overpayment. Section 6402 of the ACA further addresses the retention of overpayments by defining the term overpayment and the circumstances and timing under which an overpayment need be returned to the government before it becomes an "obligation" under the FCA (US).

The Program Fraud Civil Remedies Act ("PFRCA") allows the Department of Health and Human Services to impose administrative penalties for false claims relating to federal healthcare programs. Under the

PFRCA, "knowingly" filing a false claim triggers fines of up to $5,000 for each claim and an assessment by the United States for up to twice the amount of the False Claim if the Government has made payment. As under the FCA (US), "knowingly" includes actual knowledge, deliberate ignorance, or reckless disregard of the falsity of the claim.

The Federal Civil Money Penalty Law imposes substantial monetary penalties for certain actions, including submitting (or causing someone to submit) bills or other information that the person knows or "should know" may result in payments in violation of the many rules of Medicare and Medicaid programs. A person "should know" something if they acted with reckless disregard of, or in deliberate ignorance of, its truth or falsity. Such penalties can also be imposed for other conduct, such as financial inducement to patients. Examples of prohibited conduct include:

- billing for services not rendered;

- misrepresenting the services actually rendered (such as "upcoding" the level of a service, misrepresenting the qualifications of the person rendering the service or representing that supervision requirements were met when they were not);

- falsely certifying that certain services were medically necessary;

- submitting (or causing someone to submit) a claim for payment which is inconsistent with or contrary to Medicare or Medicaid payment requirements; and

- failing to repay an amount received under Medicare or Medicare programs to which the person is entitled within 60 days of learning of the overpayment.

The Group provide billing services for Clients, and thus may be subject to the FCA (US). The Group have adopted policies to promote compliance with the rules and regulations to which the FCA (US) applies. However, there can be no assurance that any of the Group or any Client will not be found to have violated certain rules and regulations resulting in sanctions under the FCA (US), and, if so, that any sanctions imposed would not result in fines and penalties and restrictions on participation in federal and state healthcare programs that are integral to the Group' business.

### *Physician payment*

Physicians may elect to "participate" or enroll in the Medicare program as a provider. Medicare Part B provides reimbursement for physician services, including employed and provider-based physicians, based upon a national fee schedule called the Resource-Based Relative Value Scale ("RBRVS"). Under the RBRVS system, payments for services are determined by the "resource costs" necessary to provide such services. Payments also are adjusted for geographical differences. The costs have three components: physician work, practice expense and professional liability insurance. Payments are calculated by multiplying the combined costs of a service by a conversion factor. The conversion factor is a monetary amount that currently is determined by CMS's Sustainable Growth Rate ("SGR") system. The SGR system annually takes into account changes in the Medicare fee-for-services enrollment, input prices, spending due to law and regulation and gross domestic product over a 10 year period, effectively changing the RBRVS on an annual basis.

The ACA includes several changes to Medicare and Medicaid payments for physician services, including the following:

- making grants to and contract with interdisciplinary "health teams" that support primary care practices who agree to serve as their patients' "medical home" by being accountable for providing integrated, accessible services that meet a large majority of the patient's health needs through a sustained partnership with patients;

- reporting to physicians their costs of utilisation of resources per episode of care in comparison to their peers;

- integrating reporting requirements concerning the meaningful use of electronic health records into the Physician Quality Reporting System ("PQRS");

- establishing payment penalties for physicians who fail to file PQRS reports, starting in 2015;

- developing a system of "value-based payment modifiers" for physicians as early as 2015;

- requiring state Medicaid programs to pay primary care physicians not less than 100 per cent. of the Medicare payment rate.

In 1997, legislation was passed to decrease the federal spending deficit. This legislation called for a reduction in Medicare payments to physicians by 26.5 per cent. beginning in 2002. Although cuts to the Physician Fee Schedule have been scheduled every year since then, Congress and the President have successfully staved off these cuts in reimbursement to physicians under Medicare. However, there can be no guarantee that Congress and the President will act to stop future reductions in the physician fee schedule.

Physicians who opt not to participate in the Medicare program also may provide care to Medicare beneficiaries, but will be reimbursed at a lower fee schedule. Regardless of physician enrolment status, physicians who furnish health care services to Medicare beneficiaries must meet all applicable federal coding, documentation, and other compliance requirements.

On April 9, 2014, CMS released a list of all physicians who received Medicare payments in 2012, along with the total payments made to such physicians. Physician groups are concerned that this data, without context, may lead to misinterpretations and accusations of fraud. The information contained on this list may result in increased scrutiny during audits.

Because the Group's Clients consist of physician practices, and because the Group is typically reimbursed by Clients based on a percentage of the Clients' net revenue, any adjustment in physician compensation under Medicare may have a material impact on the Group' operations.

### *Managed care*

Client revenue is dependent upon their ability to enter into contracts with third-party payers at competitive rates, which in turn affects the Group's financial performance. However, the current economic climate has resulted in lower rate increases from commercial health care insurers. There is no explicit assurance that Clients will be able to attract third-party payers, and where they do, no assurance can be given that it will be able to contract with such payers on advantageous terms. If the Clients are unable to contract with a sufficient number of such payers on advantageous terms could have a material adverse effect on the Group's financial results.

The ACA imposes, over time, increased regulation of the insurance industry, the use and availability of state-based exchanges in which health insurance can be purchased by certain groups and segments of the population, the extension of subsidies and tax credits for premium payments by some consumers and employers and the imposition upon commercial insurers of certain terms and conditions that must be included in contracts with providers. In addition, the ACA imposes many new obligations on states related to health care insurance. The effects of these changes on the financial condition of any third-party payer that offers health care insurance, the rates paid by third-party payers to Clients and upon the operations and financial condition of the Group cannot be predicted.

In many markets managed care organisations ("MCOs"), such as health maintenance organisations ("HMOs"), preferred provider organisations ("PPOs"), point of service providers ("POS") and consumer-driven care and similar arrangements for health care payment have largely replaced indemnity insurance as the prime source of nongovernmental payment for healthcare services. MCOs generally use discounts, risk-transfer mechanisms and other economic incentives to reduce or limit the cost and utilisation of health care services.

To the extent any Client has entered into contractual arrangements with PPOs and HMOs pursuant to which the Client agrees to perform certain health care services for eligible participants at discounted rates, this may impact the financial performance of the contracting Group company.

### HIPAA

The Health Insurance Portability and Accountability Act of 1996 ("HIPAA") established criminal sanctions for health care fraud and applies to all health care benefit programs, whether public or private. HIPAA also provides for punishment of a health care provider for knowingly and wilfully embezzling, stealing, converting or intentionally misapplying any money, funds, securities, premiums, credits, property or other assets of a health care benefit program. A health care provider convicted of health care fraud could be subject to mandatory exclusion from the Medicare program.

HIPAA also requires the U.S. Department of Health and Human Services ("DHHS") to adopt national standards for electronic health care transactions, including federal privacy standards for the protection of health information kept by health care providers that conduct certain financial and administrative transactions electronically (the "Privacy Rule") and standards relating to the security of such health information maintained or transmitted electronically ("Security Rule"). Compliance with the requirements of the Privacy Rule, the Security Rule and other HIPAA requirements obligates covered entities to develop and use policies and procedures designed to inform patients about their privacy rights and how their protected health information may be used, to keep protected information secure, to train employees so that they understand the privacy procedures and practices of the covered entity and to designate a privacy officer responsible for seeing that privacy procedures are adopted and followed.

### The HITECH Act

Provisions in the Health Information Technology for Economic and Clinical Health Act (the "HITECH Act"), enacted as part of the American Recovery and Reinvestment Act of 2009 (Pul.L. 111-5), increase the maximum civil monetary penalties for violations of HIPAA and grant enforcement authority of HIPAA to state attorneys general. The HITECH Act also (i) extends the reach of HIPAA beyond "covered entities," (ii) imposes a breach notification requirement on HIPAA-covered entities, (iii) limits certain uses and disclosures of individually identifiable health information and (iv) restricts covered entities' marketing communications.

The HITECH Act extends direct liability for compliance to HIPAA beyond covered entities to business associates of HIPAA covered entities ("Business Associate"). A Business Associate is a natural person or organisation that, in the capacity other than as a member of the workforce of a covered entity creates, receives, maintains, or transmits protected health information for a function or activity regulated under the HIPAA, including claims processing or administration, data analysis, processing, or administration, utilisation review, quality assurance, patient safety activities listed at 42 C.F.R. § 3.20, billing, benefit management, practice management, and repricing; or provides legal, actuarial, accounting, consulting, data aggregation, management, administrative, accreditation, or financial services to or for a covered entity where the provision of the service involves the disclosure of protected health information from the covered entity, or from another Business Associate of the covered entity. Because the Group companies provide administrative and billing services for Clients, they constitute Business Associates of the Clients, and thus are subject to the requirements of HIPAA.

Business Associates are directly liable under HIPAA for (i) impermissible uses and disclosures, (ii) for a failure to provide breach notification to the covered entity, (iii) for a failure to provide access to a copy of electronic protected health information to either the covered entity, the individual, or the individual's designee (whichever is specified in the business associate agreement), (iv) for a failure to disclose protected health information where required by the Secretary to investigate or determine the business associate's compliance with the HIPAA Rules, (v) for a failure to provide an accounting of disclosures, and (vi) for a failure to comply with the requirements of the Security Rule. Additionally,

41

Business Associates remain contractually liable for other requirements of the Business Associate agreement.

HIPAA imposes civil monetary penalties for violations and criminal penalties for knowingly obtaining or using individually identifiable health information. The penalties are in four tiers, the highest of which would impose a fine of $50,000 per violation and up to $1,500,000 for all such violations of an identical requirement or prohibition during a calendar year. In addition, under the HITECH Act, state Attorneys General are permitted to bring a civil action in federal district court against individuals who violate the HIPAA privacy and security standards, in order to enjoin further such violation and seek damages of up to $100 per violation, capped at $25,000 for all violations of an identical requirement or prohibition in any calendar year. In the event of a successful action, the court would be permitted to award the costs of the action and reasonable attorneys' fees to the state. The DHSS aggressively enforces the HIPAA rules and continues to investigate and take action against those organisations that disregard their obligations under these rules. Since 2011 the DHSS has imposed multi-million dollar fines for violation of the HIPAA Rules. The Group is in the process of reviewing its practices and written policies and procedures, to ensure they comply with HIPAA and the HITECH Act or otherwise bring them into compliance with HIPAA and the HITECH Act.

Failure of any Group companies to comply with the requirements of HIPAA could subject the relevant Group companies to fines and penalties, which may have a material adverse impact on the relevant companies' operations and the Group's operating results.

### *Security breaches and unauthorised releases of personal information*

Federal, state and local authorities are increasingly focused on the importance of protecting the confidentiality of individuals' personal information, including patient health information. In addition to the data breach disclosure requirements of HIPAA, many states have enacted laws requiring businesses to notify individuals of security breaches that result in the unauthorised release of personal information. In some states, notification requirements may be triggered even where information has not been used or disclosed, but rather has been inappropriately accessed. State consumer protection laws may also provide the basis for legal action for privacy and security breaches and frequently, unlike HIPAA, authorise a private right of action. In particular, the public nature of security breaches exposes organisations that maintain such information to increased risk of individual or class action lawsuits from patients or other affected persons, in addition to government enforcement. Failure to comply with restrictions on patient privacy or to maintain robust information security safeguards, including taking steps to ensure that contractors who have access to sensitive patient information maintain the confidentiality of such information, could consequently damage a health care related company's reputation and materially adversely affect its business operations.

### *United States Food and Drug Administration*

The U.S. Food and Drug Administration ("FDA") has promulgated a draft policy for the regulation of computer software products as medical devices and a proposed rule for reclassification of medical device data systems under the Federal Food, Drug and Cosmetic Act, as amended ("FDCA"). The FDA has stated that health information technology software is a medical device under the FDCA, and the Group expects that the FDA is likely to become increasingly active in regulating computer software intended for use in health care settings regardless of whether the draft policy or proposed rule is finalised or changed. In June 2014, the FDA released, for comment, draft guidance relating to proposed regulation of medical device data systems ("MDDS"), medical image storing devices and medical image communications devices. In this draft guidance, the FDA stated that it does not intend to enforce compliance with the regulatory controls that apply to MDDS devices, medical image storing devices and medical image communications devices due, in part, to the low risk they pose to patients and the importance they play in advancing digital health.

If the Group's computer software functionality is considered a medical device under the FDCA, the Group could be subject to additional regulatory requirements. FDA regulations govern, among other things, product development, testing, manufacture, packaging, labelling, storage, clearance or approval, advertising and promotion, sales and distribution, and import and export. FDA requirements with respect to devices that are determined to pose lesser risk to the public include:

(i)    establishment registration and device listing with the FDA;

(ii)    the Quality System Regulation, or QSR, which requires manufacturers, including third-party or contract manufacturers, to follow stringent design, testing, control, documentation, and other quality assurance procedures during all aspects of manufacturing;

(iii)    labelling regulations and FDA prohibitions against the advertising and promotion of products for uncleared, unapproved off-label uses and other requirements related to advertising and promotional activities;

(iv)    medical device reporting regulations, which require that manufacturers report to the FDA if their device may have caused or contributed to a death or serious injury or malfunctioned in a way that would likely cause or contribute to a death or serious injury if the malfunction were to recur;

(v)    corrections and removal reporting regulations, which require that manufacturers report to the FDA any field corrections and product recalls or removals if undertaken to reduce a risk to health posed by the device or to remedy a violation of the FDCA that may present a risk to health; and

(vi)    post-market surveillance regulations, which apply when necessary to protect the public health or to provide additional safety and effectiveness data for the device.

Non-compliance with applicable FDA requirements can result in, among other things, public warning letters, fines, injunctions, civil penalties, recall or seizure of products, total or partial suspension of production, failure of the FDA to grant marketing approvals, withdrawal of marketing approvals, and criminal prosecutions.

### *International Classification of Diseases, Tenth Revision (ICD-10)*

In the United States, the International Classification of Diseases, Ninth Revision (ICD-9) has become the core classification system used by provider organisations to code claims for public and private health insurance reimbursement. This system is used not only for payment justification, but also disease and illness classification, indexing of patient records, and basic industry research. Over the last several years, however, advances in medicine and the identification of new conditions has extended ICD-9 beyond its intended capacity.

The potential impact of ICD-10 to health care providers includes multiple system upgrades and testing cycles, increased human capital needs, significant training, increased claim denials, delayed payment, lost or reduced reimbursement and impacts to cash flow, and more complex financial reporting.

Hospitals likely will have to upgrade multiple information technology (IT) systems to support the conversion from ICD-9 to ICD-10. Because of ICD-10's complex code structures, implementing associated changes in electronic health records, billing systems, reporting packages and other decision-making and analytical systems will require either major upgrades of multiple systems or outright replacement of older systems. The transition will likely necessitate significant capital cost outlays and increased staffing to map and load codes, revise system interfaces, develop new reports, map dual coding systems, and retrain users.

ICD-10 adoption may require significant technology changes for providers' IT vendors, trading partners, external reporting entities and third-party payers. All systems and external organisations accepting or reporting diagnostic and procedure codes will require modification and the ability to run

dual-processing solutions. Significant testing, crosswalk analysis, report development and data aggregation across time periods will be essential to prepare for the ICD-10 transition.

Increased complexity associated with implementation as well as increased costs from productivity loss could create additional demand for outsourced RCM services.

While the potential benefits of ICD-10 implementation are substantial, achieving them will require healthcare providers to make hard choices around capital investments and operating budgets.

The potential impact of ICD-10 to healthcare providers includes multiple system upgrades and testing cycles, increased human capital needs, significant training, increased claim denials, delayed payment, lost or reduced reimbursement and impacts to cash flow, and more complex financial reporting.

Although ICD-10 implementation was originally scheduled for 2014, its implementation has been postponed until 1 October 2015.

# PART III

# RISK FACTORS

In addition to the other relevant information set out in this document, the Directors believe the following general and specific risk factors should be considered carefully in evaluating whether to make an investment in the Company. There may be additional risks that the Directors currently consider not to be material or of which they are currently unaware.

Investors should note that the value of Common Shares may go down as well as up and there is no certainty that they will get back the full amount they invest. Any person considering an investment in Common Shares is recommended to consult an investment advisor, authorised under the Financial Services and Market Act 2000 (as amended), or an appropriately qualified taxation advisor, prior to making any such investment.

## 1    BUSINESS RISKS

### 1.1    The Group's success substantially depends upon key personnel and its ability to attract and retain key employees.

The Group places substantial reliance upon the efforts and abilities of Paul Parmar, Chief Executive Officer of the Group. Mr. Parmar's strategic guidance, experience and expertise will have a significant bearing on the success of the Group. Whilst Mr. Parmar's services are provided under the terms of a consultancy agreement with the Company, the retention of Mr. Parmar's services cannot be guaranteed.

The Group is substantially dependent on the continued performance of senior management. The loss of senior management could seriously harm its business. The Group also depends on its ability to identify, attract, hire, train, retain and motivate personnel. Given the Company's expansion plans and that the primary drivers of expansion are its personnel and know-how, the ability to attract and retain new staff will be critical to the Company's ability to achieve this expansion plan. Competition for qualified personnel is intense, and the Group may be unable to successfully attract, assimilate or retain sufficiently qualified personnel. The failure to retain and attract necessary technical, managerial, merchandising, marketing, sales and customer service personnel could materially and negatively impact the Group's business, operating results and financial condition.

Orion has obtained a $40 million key man life insurance policy for Paul Parmar but the Group does not maintain key man life insurance on the life of any other individual.

### 1.2    The Group's controlling shareholder, Constellation Health, LLC, will own approximately 68.1 per cent. of the Group's outstanding Common Shares on Admission and will have substantial control over the Group's operations.

Immediately prior to Admission, Constellation Health will own approximately 37,862,074 Common Shares, representing 80 per cent. of the Company's Existing Common Shares. Upon Admission, assuming that the Placing is fully subscribed, Constellation Health will own approximately 68.1 per cent. of the Enlarged Share Capital. In addition, First United Health an investment entity controlled by Mr. Parmar has agreed to subscribe for 943,438 Common Shares at the Placing Price on Admission representing 1.7 per cent. of the Enlarged Share Capital.

Paul Parmar, the Group's Chief Executive Officer, is the President of Constellation Health and, through investment entities where he is the manager, controls Constellation Health. As a result, Mr. Parmar has the ability to exercise significant influence on the Group's business and over actions that require the consent of a majority of the Company's outstanding shares, including the election of directors.

The Company has entered into a relationship agreement with Mr. Parmar and Constellation Health to govern its ongoing relationship with both of them; however, either of them may cause or take actions that are not in, or may conflict with, the best interests of the Group or its Shareholders. Further details of the relationship agreement are set out at paragraph 16 of Part I of this document.

1.3 **Covenants in the Credit Agreement and increased leverage on the Group's balance sheet as a result of the Group's recent acquisition may limit the Group's financial and operational flexibility.**

As at the date of this document, the Group has aggregate borrowings under the Credit Agreement of $23 million and a $17 million acquisition facility commitment under the Credit Agreement for future acquisitions. The Credit Agreement has a maturity date of 30 September 2017.

The Group's ability to make principal and interest payments on the Group's debt and fund the operations of the Group's businesses, and to pay or refinance its debt at maturity, will depend on cash flow from operations and the Group's access to public and private equity and debt markets.

The restrictive covenants on the Group contained in the Credit Agreement generally prevent the Group from incurring additional indebtedness, modifying the terms of indebtedness, creating liens, making capital expenditures, issuing securities, pursuing additional acquisitions or selling assets, subject to consent of the creditors or certain exceptions set forth in the Credit Agreement. The covenant restricting acquisitions may limit the Group's ability to realise an important component of its growth strategy. Also, these debt service obligations may, among other things, limit the Group's ability to borrow money or raise capital, increase the Group's vulnerability to adverse economic and industry conditions and could require the dedication of a substantial portion of the Group's cash flow from operating activities to the payment of principal and interest on the Group's credit facility. In addition, the Company is required to comply with specified financial covenants, including a senior debt leverage ratio, minimum trailing twelve months earnings before interest, taxes, depreciation and amortisation ("EBITDA") targets, and a minimum fixed charge coverage ratio. These covenants could place the Group at a disadvantage compared to some of the Group's competitors, which may have access to cheaper sources of capital and may not be required to operate under covenants as restrictive as those to which the Company is obligated.

1.4 **The Group's assets are subject to pledge agreements which, if enforced, may result in the Group losing control of some or all of its operations.**

The Group's assets are subject to a pledge agreement with the lenders pursuant to the Credit Agreement. In addition, the entire issued share capital of Orion is subject to a pledge as security for a potential contingent payment of up to $4 million which may become payable with respect to the Group's acquisition of Orion in 2013. A payment will only become due if certain revenue targets are met by the Group for the financial year ended 31 December 2014, which the Directors believe is unlikely to occur. This pledge is subordinated to the security granted by the Group pursuant to the Credit Agreement and could only be enforced in the event that a contingent payment became due and was not paid. The pledge is due to expire on 31 March 2015.

In the event that any security is enforced against assets of the Group, the Group may lose control of some or all of its operations which would have a significant effect on the Group's ability to continue to trade.

46

1.5 **The Group's businesses operate in a highly competitive and fragmented market, and an inability to successfully compete for business could adversely affect the Group's operations.**

The RCM division is highly competitive. The Group competes with national, regional and local physician reimbursement organisations as well as physician groups that provide their own billing and collections services in-house. Potential industry and market changes that could adversely affect the Group's ability to compete for RCM outsourcing services include an increase in the number of local, regional or national competitors providing comparable services and integration of physician groups and hospital systems. Consolidation of management and billing services through integrated delivery systems may result in a decrease in demand for the Group's outsourcing services for particular physician practices. Consolidation among the Group's customers in the RCM area may result in those customers having greater leverage, which could adversely affect the rates the Company is able to charge for the Group's outsourcing services.

Additionally, there are several companies who compete with the Group for RCM outsourcing services which cover larger geographic areas and have substantially greater financial, technical, marketing and other resources than the Group. The Group's ability to retain and attract customers for the Group's outsourcing services may be adversely affected by the limits of the Group's resources as compared to those larger competitors.

The Group's paediatric medical groups operated by IPS compete with local hospitals and other local medical groups for patients. Changes in local demographics, managed care contracting, changes in operating hours and technological changes could adversely impact the Group's ability to retain and attract patients, which may result in a decline in revenue for the Group's medical groups.

Although the Company intends to monitor industry trends and respond accordingly, it cannot provide assurances that the Company will be able to anticipate and successfully respond to such trends in a timely manner. The Company cannot be certain that it will be able to compete successfully against current and future competitors, or that competitive pressures will not have a material adverse effect on the Group's businesses, financial condition or results of operations.

1.6 **The Group's RCM revenues are generated from a concentrated number of important clients, the overall number of clients has been in decline and the vast majority of clients could terminate their agreements with the Group during 2014.**

In the three year period ended 31 December 2013, Orion's top 10 RCM clients by revenue have represented between 43 and 45 per cent. of RCM revenue in each year. However, the identity of the customers that have comprised the top 10 have changed year on year. In addition, the total number of Orion's RCM clients has declined during the same period from approximately 230 clients in 2011 to 190 in 2013 as a consequence of which overall RCM revenues have also declined over the period. However, the declines occurred prior to the acquisition of Orion by Constellation Health in June 2013.

Within the RCM division, the Group's services span a variety of medical specialties including pathology, radiology, anaesthesiology and office-based physicians. As of 31 December 2013, the Group provided services to approximately 160 customers in the RCM division. The Group's RCM client contracts typically have two to five year terms that auto-renew for additional one year periods; some contracts allow for termination without cause during the initial term. The vast majority of customers could opt to terminate (or not to renew) their contracts during 2014. Any significant number of client losses would have a detrimental effect on overall Group revenues.

Since the acquisition of Orion by Constellation Health in June 2013, the Group has taken steps to address the churn of key customers and to improve organic growth within the RCM division through the implementation of various sales and marketing initiatives and client relationship programmes. However, these strategies may take time to make a positive impact on the business and may not do so at all. Whilst the Directors intend to reduce further the Group's

dependence on key customers and to generate growth in client numbers (and revenues), there can be no assurance that the Group will not lose important customers in the future (or a significant number of smaller customers) and fail to replace them with new customers capable of generating at least an equal amount of annual revenue. Any loss of key customers (or a significant number of smaller customers), or a failure to generate organic growth in the business, may have a material adverse effect on the Group's prospects and financial performance.

**1.7 In relation to the group purchasing division of the Group, the Group's revenue may be lower than forecast.**

In relation to the group purchasing organisation business managed by the Group, the Group is a party to agreements with pharmaceutical suppliers Sanofi Pasteur Inc. ("Sanofi") and Merck Sharp & Dohme ("Merck"), which, assuming sufficient volumes of vaccines are purchased, allows eligible medical practices to acquire vaccines at a discounted price. Pursuant to such agreements, the Group's revenue is derived from administration fees paid by each of Sanofi and Merck to the Group, each with mechanisms that provide for an increase in such fees if certain performance targets are met over certain periods of time. Pursuant to the Merck agreement, the administration fee is linked to market share, with the Group's administration fee increasing if medical practices purchase the relevant vaccines from Merck in excess of a defined threshold. Pursuant to the Sanofi agreement, the administration fee is linked to the value of purchases by medical practices in excess of a specified amount. The Group has the ability to extend payments terms to (i) 24 months in relation to the Merck agreement and (ii) 18 months in respect of the Sanofi agreement, in order to benefit from the adminstration fee rachet provisions.

Merck and Sanofi accounted for approximately 95 per cent. of the aggregate Group revenue derived from the group purchasing organisation business for the financial period ended 30 June 2014. This highlights the Group's reliance on such agreements with respect to its group purchasing operation.

In light of such extended payment terms, there is an inherent risk that the receivables may not be collected by the Group in full. There is a risk that revenue may be lower than currently anticipated by the Group should the market share or value of purchases by medical practices decrease in the future. In addition, it is possible that the longer such receivables are outstanding, the more challenging collection may become.

Any of these factors may have a material adverse effect on the Group's prospects and financial performance.

**1.8 The Group's businesses are highly dependent on the Group's information systems and the Group's operations could be impaired by a failure of those systems.**

The performance of the Group's information systems and technology is critical to the Group's business operations. The Group's information systems are essential to a number of critical areas of the Group's operations, including accounting and financial reporting, billing and collecting accounts for the Group's medical groups as well as the Group's RCM outsourcing clients, coding and compliance and medical records of the Group's medical group patients.

Any system failure that causes an interruption in service or availability of the Group's systems could adversely affect operations or delay the collection of revenue from payers and patients or for the Group's customers. Although the Group has implemented network security measures, the Group's servers could be vulnerable to computer viruses, break-ins, disruptions from unauthorised tampering or damage caused by fire, tornadoes, hurricanes, earthquakes, lightning and electrical power outages. Although the Group has disaster recovery procedures in place and insurance to protect against such contingencies, the Company cannot be certain that insurance or these services will continue to be available at reasonable prices, cover all of the Group's losses or compensate for the possible loss of customers occurring during any period

that the Group is unable to provide business services. The occurrence of any of these events could result in interruptions, delays, loss or corruption of data, or cessations in the availability of the Group's systems, all of which could have a material adverse effect on the Group's financial position and results of operations and harm the Group's business reputation.

The high volume of customer funds and data processed by the Group's RCM outsourcing business entails risks for which the Company may be held liable if the accuracy or timeliness of the transactions processed are not correct. Through its standard contract terms, the Group typically indemnifies its customers for certain losses which may arise from its acts or omissions, albeit that the Group's liability in such circumstances is subject to limitations of liability. The Company could incur significant legal expense to defend any claims against the Group, even those claims without merit. While the Group carries insurance against such potential liabilities, the Company cannot be certain that circumstances surrounding such an error would be entirely reimbursed through insurance coverage. The Directors believe that the Group has controls and procedures in place to address the Group's fiduciary responsibility and mitigate these risks. If the Company is not successful in managing these risks, it may have a material adverse effect on the Group's businesses, financial condition and results of operations.

1.9 **The ability to protect its intellectual property and confidential information is important to the Group.**

The Group relies on a combination of intellectual property laws, as well as confidentiality procedures and contractual provisions, to protect its proprietary technology, databases and its brand. The Group will file and prosecute applications for patents and trademarks when and where appropriate to protect its right in proprietary technologies and its brand. The Company has not filed a trademark application on 'Constellation Healthcare Technologies', 'Pegasus' or 'Orion', so those brands may be vulnerable to challenge as the Group's business grows.

While the Group's trademarks, copyrights, and trade secrets provide some advantages and protection, the following factors are more essential to establishing and maintaining a competitive advantage:

(a)     the statistical and technological skills of the Group's service operations and research and development teams;

(b)     the health care domain expertise and payer rules of knowledge of the Group's service operations and research and development teams;

(c)     the real-time connectivity of the Group's service offerings;

(d)     a continued focus on the improved financial results of the Group's clients.

The Group's employees are subject to confidentiality obligations set forth in the employee handbook, however these may not be enforceable in all circumstances. The Group's proprietary software (including Pegasus) has primarily been developed by GSS Infotech, the Group's exclusive Indian BPO, pursuant to an agreement that assigns all intellectual property rights in the software to the Group. In addition, the Group usually requires individuals and entities with which the Group discusses potential business relationships to sign non-disclosure agreements. The Group's agreements with clients include confidentiality and non-disclosure provisions.

1.10 **The Group's RCM business is affected by some seasonality.**

There is limited seasonality in the Group's RCM business. Revenue is typically lower in the early months of each year as patients are billed for their annual deductible (or excess), resulting in higher than average bad debts.

1.11 **The Group's RCM outsourcing clients are highly concentrated in Colorado, California and Texas, and the Group's PM clients are concentrated in Illinois and Ohio, which makes the**

49

**Group sensitive to regulatory, economic, environmental and competitive changes in those states.**

The Company owns five RCM subsidiaries through Orion, including Rand in California; MBS and RMI in Texas and WSB in Colorado.

The Company also operates three medical groups through Orion in Ohio and Illinois.

Any material change in the current payment programmes or regulatory, economic, environmental or competitive conditions in these states could have a disproportionate effect on the Group's overall business results. Additionally, Houston, Texas is located in a hurricane-prone area and California is susceptible to earthquakes. Hurricanes and earthquakes could have a disruptive effect on the Group's operations and those of the Group's customers in California and Texas.

1.12 **A reversal of or decline in the current trend of outsourcing business services may have a material adverse effect on the Group's RCM division, financial condition and results of operations.**

The Group's business and growth strategy depends, in large part, on the trend toward outsourcing business services, in particular medical billing and collection services by hospital-based physician groups. The Company can give no assurances that this trend in outsourcing will continue. Current and potential clients may elect to perform such services using their own employees, which may have a material adverse effect on the Group's financial condition and result of operations.

1.13 **The Group may be more sensitive to revenue fluctuations than other companies, which could result in fluctuations in the market price of the Group's Common Shares and have a material adverse effect on financial condition and results of operations.**

A number of the Group's operating expenses, such as salaries and benefits, facility rent and related costs, depreciation and amortisation and insurance expense, are relatively fixed in the short term. As a result, the Company may not be able to quickly reduce costs in response to any decrease in revenue. Any decision by a significant customer to delay or cancel the Group's services may cause significant variations in operating results and could result in losses for the applicable period as well as a decline in the price of the Group's Common Shares.

1.14 **US employees do not have notice periods.**

Except for a limited number of senior employees who have written employment contracts with the Group, each of the US employees of the Group is employed "at will", as is customary in the US. Consequently, the Group has not imposed any contractual terms that require an at-will US employee to give to the Group more than nominal notice when the employee voluntarily terminates their employment with the Group. As all staff currently are located in the US, the Group may be more exposed than other non-US companies to the likelihood of its key staff or a group of employees departing with nominal notice. Given that many of the employees possess a large amount of know-how individually this may result in know-how not being passed on effectively to remaining and incoming employees.

In the US, an executive director can be terminated for cause as an employee by a company, but will remain on the board of such company until he either resigns from such board, fails to be elected annually by the shareholders of such company or is removed from such board by a valid resolution of such company's shareholders or directors, as set forth in the Company's governing documents. Consequently, an Executive Director may be able to remain on the Board and have an influence on Board proceedings for a period of time after he has been terminated for cause by the Company.

1.15 **The Group may incur tax liabilities arising from its merger with Orion which, if not recovered under existing indemnity agreements, may have a material adverse effect on the Group's cash flows and financial condition.**

Prior to the Group's merger with Orion, Orion was a party to several promissory notes (the "**Notes**") pursuant to which certain lenders (the "**Lenders**") agreed to lend, and Orion agreed to borrow, certain funds. In connection with the merger, the Lenders agreed to receive proceeds from the merger in amounts less than the amounts owed by Orion under the Notes in full satisfaction of Orion's obligations under the Notes (the "**Cancellation of Debt**"). Such Cancellation of Debt may result in an income tax charge on Orion to the extent that it is not permissible under applicable tax rules for such amount to be offset against Orion's historic net operating losses. In the event that it is determined that such a set off is not available to any extent, the Directors estimate that the potential maximum tax liability of Orion arising from the Cancellation of Debt could be approximately $12 million (plus applicable interest, fines, penalties, costs and other charges for late payment).

Any such potential tax liability is covered by an indemnity from the sellers of Orion under the terms of the merger agreement, although such indemnity is limited in amount. However, the Company's controlling shareholder, Constellation Health, has agreed to indemnify Orion with respect to any such liability up to a maximum amount of $12 million (plus an amount equal to any applicable interest, fines, penalties, costs and other charges thereon).

In the event that Orion has an obligation to pay any such amount in the future and Constellation Health fails to pay under the terms of the indemnity agreement between it and Orion, any payment by Orion would have a material adverse effect on the Group's cash flows and financial condition and may constitute an event of default under the terms of the Credit Agreement.

Any sale of Shares by Constellation Health to help fund a payment obligation under the terms of the tax indemnity agreement may have an adverse effect on the market price of the Shares.

## 2   RISKS OF GOVERNMENTAL AND REGULATORY ACTIVITY

2.1 **The healthcare industry is highly regulated, which may increase the Group's costs of operations or have a material adverse effect on the Group's businesses.**

The healthcare industry is highly regulated and subject to changing political, economic and regulatory forces. Federal and state legislatures have periodically considered programs to reform or amend the healthcare system and to change healthcare financing and reimbursement systems, such as the ACA. These programs may contain proposals to increase governmental involvement in healthcare, lower reimbursement rates or otherwise change the healthcare industry environment, which may affect the Group's businesses.

The operations of healthcare entities and their service providers are subject to various federal and state regulations, including laws and regulations prohibiting false claims, the practice of medicine by non-physicians, kickbacks, rebates or division of fees, the referral of patients to an entity in which a physician has a beneficial interest, the receipt or offering of remuneration as an inducement to refer patients, and otherwise regulating the manner in which prospective patients may be solicited. Physicians and others who violate certain prohibitions, particularly those concerning the state and Federal anti-kickback statutes or the self-referral prohibitions, may incur criminal as well as civil liability, including monetary penalties and exclusion from certain federal or state programs. The Group's arrangements with its clients do not implicate these statutes or prohibitions, though there can be no assurance given that the activities of the Group or any entity for which the Group provides billing and management services will not be reviewed and challenged by enforcement authorities empowered to do so.

There are numerous federal and state civil and criminal laws governing the collection, use, storage and disclosure of personal information, including health information for the purpose of safeguarding the privacy and security of such information. The Company and many of the

Group's employees have access to personal and health information for the Group's medical group patients as well as the patients of the clients for which the Group provides revenue cycle management outsourcing services. Federal and state governments may impose penalties for noncompliance, both criminal and civil, with these laws. Persons who believe their personal information has been misused or improperly disclosed may bring claims against the Group or the Group's customers, seeking monetary damages.

HIPAA established standards for privacy and security of individually identifiable health information as well as standards for electronic transactions. The HIPAA regulations set new or higher standards for the healthcare industry in handling healthcare transactions and information, with penalties for non-compliance. The Company has incurred and will continue to incur costs to implement these standards and monitor compliance. Although the Directors believe that future compliance costs will not have a material effect on the Group's results of operations, compliance with these rules may be more costly than anticipated. Failure to comply with such rules may have a material adverse effect on the Group's businesses, subject the Group to civil and criminal penalties and cause the Group to lose customers and patients.

The Company expects the federal government as well as state governments to continue to pass laws and issue regulations addressing healthcare issues and reimbursement of healthcare providers. The Company cannot predict whether the government will enact new legislation and regulations, and, if enacted, whether such new developments will affect the Group's businesses.

Payment restrictions by governmental and private payers and the use of such measures as payment bundling, medical necessity edits and payment audits may result in increased payment denials and recoveries by payors, reducing reimbursement to the Group's Clients. Such measures may also increase the administrative burden on the Group in managing Client practices. This combination may consequently decrease the Group's revenue under its management agreements while increasing the cost of providing management services.

Further details on applicable regulation are set out in Part II of this document.

**3    RISK FACTORS RELATING TO THE COMPANY'S STRATEGY**

3.1    **The Group may not be able to identify suitable acquisition targets or finance the acquisition of those targets, which may limit the Group's ability to pursue the Group's business strategy.**
The Group completed the acquisition of NEMS in March 2014. It is the Group's intention to selectively acquire additional RCM companies in the Group's target markets.

There can be no guarantee that the Group will successfully identify a sufficient number of companies or businesses meeting the objectives of the Group and it may therefore be unable to effect acquisitions or execute its growth strategy. As a result, the Group will expend resources on investigative work and due diligence which do not result in completed acquisitions.

The Group has certain provisions under the Credit Agreement that limit the Group's ability to acquire additional businesses, subject to the consent of the creditors or certain exceptions set forth in the Credit Agreement. In the event that the Group is unable to obtain the requisite lender consent or otherwise is not in compliance with the financial covenants under the Credit Agreement, the Company could be restricted from making acquisitions, restricted from borrowing funds under the credit facility governed by the Credit Agreement or be deemed in default and required to pay down outstanding balances on the credit facility governed by the Credit Agreement.

If the Company is unable to find or to finance suitable acquisition targets, an important component to the Group's growth strategy may not be realised.

3.2    **Difficulties integrating acquisitions.**

The Company cannot provide assurances that acquisitions, even if completed, will perform as expected, can be properly integrated or will contribute significant synergies, revenues or profits. In addition, the Company may also face increased competition for acquisition opportunities, which may inhibit the Group's ability to complete transactions on terms that are favourable or at all.

The success of an acquisition will depend upon the ability of the Company and the Group's management to integrate the acquisition in a timely and cost-effective manner. Any difficulties in the integration process may result in increased expense, loss of sales and a decline in profitability. The process of integration may require a disproportionate amount of time and attention of the Group's management, which may distract management's attention from its day-to-day responsibilities. In addition, any interruption or deterioration in service resulting from an acquisition may result in a customer's decision to stop dealing with the Group or an acquired business. Whilst the Board's evaluation of acquisition opportunities will take into account integration risk, there can be no assurance that the Company will realise the anticipated benefits of an acquisition, either at all or in a timely manner. If such benefits are not realised as anticipated and the Company incurs significant costs, it could have a material adverse impact on the profits and the business of the Company.

3.3    **Acceptability of Common Shares as consideration.**

Although it is the Company's intention, where appropriate, to use Common Shares to satisfy a part of any consideration payable for acquisitions, vendors may not be prepared to accept these shares and therefore the Company may be forced to use its cash on hand, borrow or abandon the acquisition.

3.4    **Potential loss on investments.**

The Company's strategy carries inherent risks and there can be no guarantee that any appreciation in the value of an acquired business will occur or that the objectives of the Company will be achieved. For example (i) acquired businesses may experience trading difficulties after acquisition by the Company; or (ii) the Company may not be able to conduct a full investigation of the target prior to acquisition and previously undisclosed underperformance or other adverse matters may only come to light after acquisition and affect the performance of the Group; and (iii) the retention of key staff in the business of any acquisition or future acquisition cannot be guaranteed. Acquisitions and investments also include other risks such as the diversion of financial and managerial resources from existing operations and other potential acquisitions and investments, risks relating to the assumption of known and unknown liabilities, the risk of write-offs and the amortisation of expenses related to purchased intangible assets and delays in client purchases due to uncertainty and the inability to maintain relationships with clients of the acquired businesses.

Whilst the Directors are optimistic about the prospects for the Group, there is no certainty that it will be capable of achieving its strategy or the anticipated revenues or growth or remain profitable. The Group's future operating results will be highly dependent upon how well it manages its planned expansion strategy.

3.5    **The Group may face challenges in executing its BPO strategy in India.**

The Group is in the process of transitioning headcount to BPO providers in India. As part of this initiative, headcount in the United States is being decreased and replaced with service providers in India. The Group intends to implement a similar strategy in respect of each new acquisition made by the Group following Admission.

GSS is the Group's dedicated BPO provider in India, owned and operated by GSS Infotech through an exclusive services agreement with Orion. The Company has an option to acquire GSS at any time on or before 11 June 2018 for nominal consideration.

Currently, most of the BPO services the Group receives from India are provided by GeBBs, a third party BPO service provider. The Company believes the terms of this relationship are beneficial to the Company, but the Group intends to transition services from GeBBs to GSS. The Company believes this transition will benefit the Group because GSS is a dedicated provided to the Group and the Company may seek to exercise its option to acquire GSS in the future if it determines that it would be beneficial to do so. However, although the Company believes GSS's operations are scalable, there can be no guarantees that the transition will be successfully completed without issues, or that GSS will be able to achieve the high service standards required in the Group's industry at higher volumes.

The Group is reliant on the BPO providers, and GSS in particular, providing a high quality of service to its clients. In some instances, the Group has experienced short-term falls in service levels when jobs are first transitioned to India. Any persistent failure to provide services to the Group's clients in a timely manner or at a level of service which the clients have come to expect from the Group, or at all, may have a material adverse effect on the Group's ability to retain its existing customers and/or to attract new business. In the event that the Group determined that it wanted to replace GeBBs or GSS with an alternative BPO provider, the transition of such services in a timely and cost effective manner would be critical to ensuring that there was no disruption to the Group's business or that of its clients.

Any future changes in legislation or regulation in India which impact on the BPO providers' ability to maintain the service which they currently provide at the rates currently charged, such as future increases in social or employment costs or rates of taxation, may result in the Group's BPO strategy achieving lower than expected costs savings which could have a material impact on the Group's financial performance and condition.

If any of the Group's key customers object to the Group outsourcing services provided to them by the Group to the Indian BPO providers (as has occurred on one occasion to date) that may have a material impact on the Group's ability to achieve cost efficiencies with respect to the services provided to those customers and may have an adverse impact on the economies of scale the Group is seeking to achieve in India overall. In those circumstances the Group's financial condition may be adversely affected.

In addition, the Group may be the subject of claims from employees and former employees that are impacted by the Group's BPO strategy causing the Group loss both in terms of any damages awarded to claimants and management time spent in dealing with such claims.

If the Group determines in the future that it would be in its best interests to execute the option agreement with GSS Infotech and to acquire GSS, any failure by GSS Infotech to complete the transfer of ownership of GSS to the Group in accordance with the terms of its option agreement may have a material and adverse effect on the Group's future financial condition and prospects.

## 4    RISK FACTORS ASSOCIATED WITH THE ADMISSION OF THE COMPANY'S SHARES TO AIM

### 4.1    Liquidity.

Prior to Admission, there has been no public market for the Company's Common Shares. Whilst the Company is applying for the admission of the Enlarged Share Capital to trading on AIM, there can be no assurance that an active trading market for the Common Shares will develop, or if developed, that it will be maintained. AIM is a market for emerging or smaller growing companies and may not provide the liquidity normally associated with the Official List and other exchanges.

The future success of AIM and liquidity in the market for the Common Shares cannot be guaranteed. In particular, the market for the Common Shares may be, or may become relatively illiquid (particularly given the lock-in arrangements described in paragraph 10.15 of Part VII of this document and the restrictions on the transfer of the Common Shares described in Part VI of this document) and therefore the Common Shares may be or may become difficult to sell.

**4.2 Less demanding rules for companies admitted to AIM.**

The Common Shares will be admitted to AIM. The AIM Rules for Companies are less demanding than those of the Official List. Further, the London Stock Exchange has not itself examined or approved the contents of this document.

**4.3 Investors should consult an independent financial adviser.**

An investment in the Company may not be suitable for all recipients of this document. Accordingly, investors are strongly advised to consult an independent financial adviser authorised for the purposes of the Financial Services and Markets Act 2000 (as amended) who specialises in the acquisition of shares and other securities in the UK before making any decision to invest.

**4.4 Share price and volatility.**

The market price of the Common Shares could be subject to significant fluctuations due to a change in investor sentiment regarding the Common Shares or other securities related to the RCM industry or in response to various facts and events, including variations in the Group's interim or full year operating results and business developments of the Group and/or competitors.

The market price of the Common Shares may not reflect the underlying value of the Group.

Potential investors should be aware that the value of shares and the income from them (if any) can go down as well as up and that investment in a share which is traded on AIM might be less realisable and might carry a higher risk than a share quoted on the Official List.

**4.5 There is no guarantee that the Company will maintain its listing on AIM.**

The Company cannot assure investors that the Company will always retain a listing on AIM. If it fails to retain such a listing, certain investors may decide to sell their shares, which could have an adverse impact on the price of the Common Shares. Additionally, if in the future the Company decides to obtain a listing on another exchange in addition to AIM, the level of liquidity of the Common Shares traded on AIM could decline.

**4.6 Shares held by the Company's principal Shareholders will be eligible for future sale and may adversely affect the trading price of the Common Shares.**

The Locked-In Shareholders have agreed to certain restrictions on the sale of their Shareholdings for periods of up to two years from the date of Admission. The Company cannot provide assurance that future sales or the perception that sales could occur will not adversely affect the trading price of the Common Shares. In addition, the Company cannot be sure when sales by such holders will occur, how many shares will be sold or the effect that sales may have on the market price of the Common Shares.

**5    RISK FACTORS ASSOCIATED WITH UK AND US LAW AND THE COMPANY'S CONSTITUTION**

**5.1 Application of UK and US legislation.**

The Company is incorporated under the laws of the State of Delaware, United States. Accordingly, a significant amount of the legislation in England and Wales regulating the operation of companies does not apply to the Company. In addition, the laws of the State of

Delaware will apply in respect to the Company and these laws may provide for mechanisms and procedures that would not otherwise apply to companies incorporated in England and Wales. The rights of shareholders are governed by Delaware law and by the Company's Certificate of Incorporation and Bylaws, which may differ from the typical rights of shareholders in the UK and other jurisdictions.

5.2 **Takeover regulations.**

The Company is incorporated in and subject to the laws of the State of Delaware, United States. Accordingly, the Company and transactions in its Common Shares are not subject to the provisions of the Takeover Code. Certain provisions of the Company's Certificate of Incorporation adopts similar procedures to the Takeover Code in the event of any party (or parties acting in concert) obtaining 30 per cent. or more of the issued Common Shares of the Company, but there is no assurance that the courts of the State of Delaware, USA will uphold or allow the enforcement of these provisions. Further details regarding the Company's mandatory bid conditions contained in its Certificate of Incorporation are set out in paragraph 3.14 of Part VII of this document.

5.3 **Restrictions on transfer under the US Securities Act.**

Common Shares will be restricted securities within the meaning of Rule 144 of the US Securities Act. The Common Shares are subject to the transfer restrictions set out in Part VI of this document. None of the Common Shares will be eligible for sale under Rule 144 unless the Company has met certain conditions, which may include registration of the class of equity securities under the US Exchange Act. Furthermore, the Company is not required, and has no current intention, to register any securities under the US Securities Act or the US Exchange Act. Accordingly, the Company does not expect that a liquid trading market for the Common Shares will develop in the United States in the foreseeable future.

**6     OTHER RISKS**

6.1 **Dividends may not be paid.**

The Company is recently formed but has never declared or paid cash dividends on its capital stock. The payment of any future dividends will depend on the future earnings of the Group. The payment of future dividends is, therefore, uncertain.

6.2 **The structure of the Group means that the Company's ability to pay dividends is dependent on distributions received from its subsidiaries.**

Since the Company is a holding company, its operating results and financial condition are entirely dependent on the performance of members of the Group. The Company's ability to pay dividends in the future will depend on the level of distributions, if any, received from the Company's subsidiaries. Such distributions are currently subject to the consent of the lenders under the terms of the Credit Agreement. If such lender consent is not forthcoming, the Group will be unable to pay dividends in the future unless and until the terms of the Credit Agreement are renegotiated or the relevant credit facility made available under the Credit Agreement is refinanced.

The ability of the Company's subsidiaries to make distributions to the Company may, from time to time, be restricted as a result of other factors, including restrictive covenants in future loan agreements, foreign exchange limitations, the requirements of applicable law and regulatory, fiscal or other restrictions.

6.3 **Forward looking statements.**

All statements other than statements of historical fact, contained in this document constitute "forward looking statements". In some cases, forward-looking statements can be identified by

terms such as "may", "intend", "might", "will", "should", "could", "would", "believe", "anticipate", "expect", "estimate", "anticipate", "predict", "project", "potential", or the negative of these terms, and similar expressions. Such forward-looking statements are based on assumptions and estimates and involve risks, uncertainties and other factors which may cause the actual results, financial condition, performance or achievements of the Company, or industry results to be materially different from any future results, performance or achievements expressed or implied by such forward looking statements. Factors that might cause such a difference include, but are not limited to, those discussed in this Part III. New factors may emerge from time to time that could cause the Company's business not to develop as it expects and it is not possible for the Company to predict all such factors. Given these uncertainties, prospective investors are cautioned not to place any undue reliance on such forward-looking statements. Except as required by law, the Company disclaims any obligations to update any such forward-looking statements in this document to reflect future events or developments.

# PART IV

## HISTORICAL FINANCIAL INFORMATION

## SECTION A: ACCOUNTANTS' REPORT ON THE HISTORICAL FINANCIAL INFORMATION OF ORION GROUP



**Grant Thornton UK LLP**
30 Finsbury Square
London EC2P 2YU

T +44 (0)20 7383 5100
F +44 (0)20 7184 4301
www.grant-thornton.co.uk

The Directors
Constellation Healthcare Technologies, Inc.
3200 Wilcrest Drive
Suite 600
Houston, Texas 77042
United States

28 November 2014

Dear Sirs

**Orion HealthCorp, Inc. (the "Company") and its subsidiary undertakings (together the "Orion Group")**

We report on the historical financial information of the Orion Group for the three years ended 31 December 2013 set out in Section B of Part IV of the admission document (the "Orion Group Historical Financial Information"). The Orion Group Historical Financial Information has been prepared for inclusion in the AIM admission document dated 28 November 2014 of Constellation Healthcare Technologies, Inc. on the basis of the accounting policies set out in paragraph 1 of the Orion Group Historical Financial Information.

This report is required by Paragraph (a) of Schedule Two of the AIM Rules for Companies and is given for the purpose of complying with that paragraph and for no other purpose.

**Responsibilities**

Save for any responsibility arising under Paragraph (a) of Schedule Two of the AIM Rules for Companies to any person as and to the extent there provided, to the fullest extent permitted by law we do not assume any responsibility and will not accept any liability to any other person for any loss suffered by any such other person as a result of, arising out of, or in connection with this report or our statement, required by and given solely for the purposes of complying with Paragraph (a) of Schedule Two of the AIM Rules for Companies, consenting to its inclusion in the AIM admission document.

The Directors of Constellation Healthcare Technologies, Inc. are responsible for preparing the Orion Group Historical Financial Information in accordance with United States Generally Accepted Accounting Principles. It is our responsibility to form an opinion on the financial information and to report our opinion to you.

**Basis of opinion**

We conducted our work in accordance with the Standards for Investment Reporting issued by the Auditing Practices Board in the United Kingdom. Our work included an assessment of evidence relevant to the amounts and disclosures in the Orion Group Historical Financial Information. It also

**Chartered Accountants**

Grant Thornton UK LLP is a limited liability partnership registered in England and Wales: No.OC307742. Registered office: Grant Thornton House, Melton Street, Euston Square, London NW1 2EP.
A list of members is available from our registered office. Grant Thornton UK LLP is authorised and regulated by the Financial Conduct Authority.
Grant Thornton UK LLP is a member firm of Grant Thornton International Ltd (GTIL). GTIL and the member firms are not a worldwide partnership. Services are delivered by the member firms. GTIL and its member firms are not agents of, and do not obligate, one another and are not liable for one another's acts or omissions. Please see www.grant-thornton.co.uk for further details.

included an assessment of the significant estimates and judgements made by those responsible for the preparation of the Orion Group Historical Financial Information and whether the accounting policies are appropriate to the Orion Group's circumstances, consistently applied and adequately disclosed.

We planned and performed our work so as to obtain all the information and explanations which we considered necessary in order to provide us with sufficient evidence to give reasonable assurance that the Orion Group Historical Financial Information is free from material misstatement, whether caused by fraud or other irregularity or error.

**Opinion**

In our opinion, the Orion Group Historical Financial Information gives, for the purposes of the AIM admission document dated 28 November 2014, a true and fair view of the state of affairs of the Orion Group as at the dates stated and its results, cash flows and changes in equity for the periods then ended in accordance with United States Generally Accepted Accounting Principles.

**Declaration**

For the purposes of Paragraph (a) of Schedule Two of the AIM Rules for Companies we are responsible for this report as part of the AIM admission document and declare that we have taken all reasonable care to ensure that the information contained in this report is, to the best of our knowledge, in accordance with the facts and contains no omission likely to affect its import. This declaration is included in the AIM admission document in compliance with Schedule Two of the AIM Rules for Companies.

Yours faithfully


GRANT THORNTON UK LLP

## SECTION B: HISTORICAL FINANCIAL INFORMATION OF ORION GROUP

**Consolidated Balance Sheet**

| | Predecessor | | Successor |
|---|---|---|---|
| | December 31 2011 $ | December 31 2012 $ | December 31 2013 $ |
| **Current assets** | | | |
| Cash and cash equivalents | 194,510 | 781,837 | 4,020,426 |
| Restrictive cash balance | — | — | 97,000 |
| Accounts receivable, net | 5,632,556 | 6,922,652 | 5,288,573 |
| Inventory | 336,529 | 323,175 | 339,989 |
| Prepaid expenses and other current assets | 873,311 | 1,237,162 | 1,290,224 |
| Deferred finance costs | — | — | 296,250 |
| Total current assets | 7,036,906 | 9,264,826 | 11,332,462 |
| **Property and equipment, net** | 1,527,025 | 1,015,045 | 4,847,449 |
| **Other long-term assets** | | | |
| Intangible assets, excluding goodwill | 14,091,873 | 10,087,820 | 11,631,297 |
| Goodwill | 19,350,436 | 19,350,436 | 27,932,348 |
| Deferred finance costs | — | — | 715,938 |
| Other assets, net | 656,066 | 328,922 | 209,077 |
| Total other long-term assets | 34,098,375 | 29,767,178 | 40,488,660 |
| Total assets | 42,662,306 | 40,047,049 | 56,668,571 |
| **Current liabilities** | | | |
| Accounts payable | 2,863,112 | 2,295,926 | 2,315,750 |
| Accrued expenses | 3,001,824 | 3,167,670 | 3,115,513 |
| Other current liabilities | — | — | 97,000 |
| Income taxes payable | — | — | 12,658,000 |
| Current portion of capital lease obligation | 87,534 | 43,264 | 3,260 |
| Line of credit | 7,159,809 | 8,967,282 | 500,000 |
| Current portion of long-term debt | 1,176,894 | 2,426,894 | 1,125,000 |
| Current portion of long-term debt held by related parties | 30,500,545 | 37,119,688 | — |
| Total current liabilities | 44,789,718 | 54,020,724 | 19,814,523 |
| **Long-term liabilities** | | | |
| Capital lease obligation, net of current portion | 48,296 | 3,260 | — |
| Long-term debt, net of current portion | 2,240,000 | — | 14,483,005 |
| Deferred tax liability | — | — | 3,195,000 |
| Total long-term liabilities | 2,288,296 | 3,260 | 17,678,005 |
| **Commitments and Contingencies** | | | |
| **Stockholders' equity (deficit)** | | | |
| Common stock, par value $0.001; 1000 shares authorized at December 31, 2013;1000 shares issued and outstanding at December 31 2013 | — | — | 1 |
| Common stock, Class A, par value $0.001; 300,000,000 shares authorized at December 31, 2012;115,827,490 issued and outstanding at December 31, 2012 | 115,827 | 115,827 | — |
| Common Stock, Class D, par value $0.001; 50,000,000 shares authorized at December 31, 2012 ; 24,658,955 shares issued and outstanding at December 31, 2012 | 24,659 | 24,659 | — |
| Additional paid-in capital | 69,084,166 | 69,158,983 | 16,214,070 |
| Retained earnings | (73,640,360) | (83,276,404) | 2,961,972 |
| Total stockholders' equity (deficit) | (4,415,708) | (13,976,935) | 19,176,043 |
| Total liabilities and stockholders' equity (deficit) | 42,662,306 | 40,047,049 | 56,668,571 |

**Consolidated Statements of Operations**

| | Predecessor | | | Successor |
|---|---|---|---|---|
| | *For the year ended December 31 2011* | *For the year ended December 31 2012* | *January 1, 2013 through June 14 2013* | *June 15, 2013 through December 31 2013* |
| | *$* | *$* | *$* | *$* |
| **Revenues** | 55,218,763 | 51,745,311 | 23,800,052 | 28,179,611 |
| **Operating expenses:** | | | | |
| Salaries and benefits | 26,977,385 | 24,121,297 | 10,870,981 | 10,558,971 |
| Physician compensation | 6,365,728 | 6,817,082 | 2,725,174 | 4,116,543 |
| Facility rent and related costs | 2,584,290 | 2,631,281 | 1,414,077 | 1,379,730 |
| Depreciation | 811,167 | 727,221 | 281,152 | 672,245 |
| Amortization | 4,899,507 | 4,292,295 | 1,920,500 | 964,167 |
| Professional and consulting fees | 4,466,039 | 5,581,106 | 2,587,629 | 1,034,823 |
| Insurance | 496,126 | 466,170 | 199,189 | 256,491 |
| Provision for doubtful accounts | 355,839 | 394,283 | 299,193 | 233,251 |
| Vaccines and medical supplies | 3,596,763 | 3,892,770 | 1,593,164 | 2,455,702 |
| Office and computer supplies | 563,721 | 335,369 | 152,847 | 134,061 |
| Postage and courier | 1,945,842 | 1,914,348 | 879,484 | 931,328 |
| Other | 3,398,763 | 2,967,721 | 1,436,347 | 1,757,916 |
| Total operating expenses | 56,461,170 | 54,140,943 | 24,359,737 | 24,495,228 |
| **Income/(loss) from operations** | (1,242,407) | (2,395,632) | (559,685) | 3,684,383 |
| **Other income (expenses):** | | | | |
| Interest expense | (5,138,984) | (7,191,305) | (3,144,520) | (1,075,508) |
| Gain/(loss) on disposal of fixed assets | (30,378) | — | 664 | — |
| Other income (expenses), net | — | — | (74,591) | 1,640,483 |
| Total other income (expenses), net | (5,169,362) | (7,191,305) | (3,218,447) | 564,975 |
| **Income/(loss) before provision for income taxes** | (6,411,769) | (9,586,937) | (3,778,132) | 4,249,358 |
| Provision for income taxes | (249,171) | (49,107) | — | (1,287,386) |
| **Net income/(loss)** | (6,660,940) | (9,636,044) | (3,778,132) | 2,961,972 |
| **Income/(loss) per common shares** | | | | |
| ***Basic*** | | | | |
| Common Stock | — | — | — | 2,961.97 |
| Class A Common Stock | (0.05) | (0.07) | (0.03) | — |
| Class B Common Stock | (0.05) | (0.07) | (0.03) | — |
| ***Diluted*** | (0.05) | (0.07) | (0.03) | 2,961.97 |
| **Weighted average number of shares for basic** | | | | |
| Common Stock | — | — | — | 1,000 |
| Class A common stock | 115,827,493 | 115,827,493 | 115,827,493 | — |
| Class B common stock | 24,658,955 | 24,658,955 | 24,658,955 | — |
| **Weighted average number of shares for Diluted** | | | | |
| Common Stock | — | — | — | 1,000 |
| Class A common stock | 115,827,493 | 115,827,493 | 115,827,493 | — |
| Class B common stock | 24,658,955 | 24,658,955 | 24,658,955 | — |

*Note:*

The Company had outstanding warrants to purchase 13,857,941, 13,323,931 and 13,323,931 of Class A common stock in the predecessor periods ended December 31, 2011, December 31, 2012 and June 14, 2013, respectively.

As the Company reported a loss during these periods, these warrants are considered anti-dilutive and therefore are excluded from the diluted earnings per share calculation. There were no dilutive instruments outstanding at year end December 31, 2013.

## Consolidated Statement of Cash Flows

|  | Predecessor | | | Successor |
|---|---|---|---|---|
|  | For the year ended December 31 2011 $ | For the year ended December 31 2012 $ | January 1, 2013 through June 14 2013 $ | June 15, 2013 through December 31 2013 $ |
| **Cash Flow from operating activities:** |  |  |  |  |
| Net income/(loss | (6,660,940) | (9,636,044) | (3,778,132) | 2,961,972 |
| Adjustments to reconcile net loss to net cash provided by (used in) operating activities: |  |  |  |  |
| Provision for doubtful accounts | 355,839 | 394,283 | 299,193 | 233,251 |
| Depreciation | 811,167 | 727,221 | 281,152 | 672,245 |
| Amortization | 4,899,507 | 4,292,295 | 1,920,500 | 964,167 |
| Deferred taxes | — | — | — | 184,000 |
| Provision for taxes | — | — | — | 1,103,386 |
| Write back of acquisition related earn out payable | — | — | — | (1,905,000) |
| Stock issued for acquisitions | 217,022 | 74,817 |  |  |
| Conversion of PIK interest to principal | 1,794,953 | 6,434,493 | — | 108,005 |
| Amortization of deferred finance costs | — | — | — | 172,813 |
| Discount on subordinated notes payable | 184,650 | 184,650 | — | — |
| Loss on disposal of property and equipment | 30,378 | — | — | — |
| Changes in operating assets and liabilities: |  |  |  |  |
| Accounts receivable | 732,080 | (1,684,379) | 449,135 | 652,500 |
| Inventory | 85,832 | 13,354 | 51,242 | (68,056) |
| Prepaid expenses and other assets | (33,220) | (171,609) | (219,472) | 166,410 |
| Other assets | (35,515) | 38,904 | — | 119,845 |
| Accounts payable and accrued expenses | (129,816) | (401,340) | (953,932) | 1,806,551 |
| Other liabilities | — | — | — | (303,000) |
| Net cash provided by operating activities | 2,251,937 | 266,645 | (1,950,314) | 6,869,088 |
| **Cash flows from Investing activities** |  |  |  |  |
| Cash outlay for property and equipment | (809,669) | (215,243) | (226,488) | (4,559,313) |
| Development of software tool | — | — | — | (2,095,464) |
| Net deposits to restricted cash | — | — | — | (97,000) |
| Capital Paid for Acquisition | — | — | — | (27,006,454) |
| Net cash used in investing activities | (809,669) | (215,243) | (226,488) | (33,758,231) |
| **Cash flows from financing activities** |  |  |  |  |
| Payments of capital lease obligations | (124,616) | (89,306) | (20,095) | (23,169) |
| Borrowings on line of credit | 16,183,798 | 5,077,473 | — | 500,000 |
| Payments on line of credit | (14,605,000) | (3,270,000) | (8,967,282) | — |
| Borrowing on long term debt | — | — | 8,992,317 | 15,500,000 |
| Payments on long term debt | (1,005,110) | (990,000) | — | — |
| Cash outlay for deferred finance costs | — | — | — | (1,185,000) |
| Principal Payments of long term debt held by related parties | (1,804,542) | — | 2,510,371 | — |
| Payments related to refinancing | (80,817) | (192,242) | — | — |
| Proceeds from equity transaction | — | — | — | 14,997,392 |
| Net cash provided by (used in) financing activities | (1,436,287) | 535,925 | 2,515,311 | 29,789,223 |
| Net increase in cash and cash equivalents | 5,981 | 587,327 | 338,509 | 2,900,080 |
| **Cash and cash equivalents, beginning of period** | 188,529 | 194,510 | 781,837 | 1,120,346 |
| **Cash and cash equivalents, end of period** | 194,510 | 781,837 | 1,120,346 | 4,020,426 |
| **Supplemental Cash Flow Information** |  |  |  |  |
| Cash Paid for interest | 2,991,279 | 781,923 | 389,102 | 847,841 |
| Cash Paid for Income Taxes | 422,890 | 45,717 | (39,910) | (51) |
| **Supplemental Schedule of Non-Cash Investing and Financing Activities** |  |  |  |  |
| Notes payable issued for accrued interest | 1,794,953 | 6,434,493 | — | 108,005 |

**Consolidated Statement of Stockholder's Equity (Deficit)**
**January 1 2011 to December 31 2013**

| | Common Stock | | Paid-in Capital $ | Retained Earnings $ | Total $ |
|---|---|---|---|---|---|
| | Shares | Amount $ | | | |
| Balances, January 1, 2011 | — | — | 68,867,144 | (66,979,420) | 1,887,724 |
| Class A | 115,827,490 | 115,827 | — | — | 115,827 |
| Class D | 24,658,955 | 24,659 | — | — | 24,659 |
| Addition for the year 2011 | — | — | 217,022 | — | 217,022 |
| Conversion of Debt to Equity by parent | — | — | — | — | — |
| Net loss for 2011 | — | — | — | (6,660,940) | (6,660,940) |
| Balances, December 31, 2011 | 140,486,445 | 140,486 | 69,084,166 | (73,640,360) | (4,415,708) |
| Addition for the year 2012 | — | — | 74,817 | — | 74,817 |
| Conversion of Debt to Equity by parent | — | — | — | — | — |
| Net loss for 2012 | — | — | — | (9,636,044) | (9,636,044) |
| Balances, December 31, 2012 | 140,486,445 | 140,486 | 69,158,983 | (83,276,404) | (13,976,935) |
| Net loss from January 1 2013 to June 14, 2013 | — | — | — | (3,778,132) | (3,778,132) |
| Balances, June 14, 2013 | 140,486,445 | 140,486 | 69,158,983 | (87,054,536) | (17,755,066) |
| Class A – Cancellation | (115,827,490) | (115,827) | — | — | (115,827) |
| Class D – Cancellation | (24,658,955) | (24,659) | — | — | (24,659) |
| Changes due to acquisition and push down accounting | 1,000 | 1 | (52,944,913) | 87,054,536 | 34,109,624 |
| Net income from June 15 2013 to December 31, 2013 | — | — | — | 2,961,972 | 2,961,972 |
| Balances, December 31, 2013 | 1,000 | 1 | 16,214,070 | 2,961,972 | 19,176,043 |

63

## 1.    NATURE OF BUSINESS AND SIGNIFICANT ACCOUNTING POLICIES

### A.    Nature of Business

Orion HealthCorp, Inc., a Delaware Corporation (referred to as the "Company", "we", "us" or "our") is a healthcare services organization providing outsourced business services to physicians, serving the physician market through 3 operating segments – Revenue Cycle Management, Practice Management and Group Purchasing Organization – via six operating subsidiaries: Medical Billing Services, Inc. ("MBS"), Rand Medical Billing, Inc. ("Rand"), On Line Alternatives, Inc. ("OLA"), RMI Physician Services Corporation ("RMI'), Western Skies Billing Service ("WSB") and Integrated Physician Solutions, Inc. ("IPS"). Our mission is to provide superior business and financial management services resulting in optimal profitability for our clients and maximized enterprise value for our stakeholders. We believe our core competency is our long-term experience and success in working with and creating value for physicians.

### *Revenue Cycle Management ("RCM") Segment*

Our RCM segment includes four business units; MBS, Rand, RMI, WSB and OLA. Through this segment, we offer expert medical billing and collections, practice management, and other related services to hospital-based and office-based physicians, giving them more time to focus on patient care in specialties such as pathology, anesthesiology, radiology, cardiology, family practice, internal medicine, orthopedics, neurology and emergency medicine. These services help clients to be financially successful by improving cash flows and reducing administrative costs and burdens. MBS currently provides services to 29 clients. Rand currently provides services to 73 clients. RMI currently provides services to 14 clients. WSB currently provides services to 42 clients.

We deliver billing and collections services to help physicians receive optimal earnings for the care they provide. We assist our clients by maximizing their reimbursement through:

- Tenacious pursuit of every collectible dollar,

- To-the-letter compliance with ever-changing regulations and coding complexities,

- Thorough tracking and methodical working of correspondence, and

- Superior management of short-term cash flow and long-term income.

We also offer consulting services to assist clients with navigating and interacting with managed care organizations, as well as a wide range of management consulting services to help create a more efficient medical practice.

Our RCM segment comprised 62.89%, 69.05%, 66.10% and 67.70% of our total revenues for the Successor 2013 period, the Predecessor 2013 period, the fiscal year ended December 31 2012 and 2011, respectively.

### *Practice Management ("PM") Segment*

Our PM segment, via IPS, is an experienced and innovative provider of business and practice management services exclusively dedicated to supporting the needs of primary care and subspecialty pediatric practices. Through this segment we provide accounting and bookkeeping, human resource management, group purchasing, accounts receivable management, quality assurance services, physician credentialing, fee schedule review, training and continuing education, and billing and reimbursement analysis. As of December 31, 2013, our PM segment managed six practice sites, representing three medical groups in Illinois and Ohio. The physicians, who are all employed by separate corporations, provide all clinical and patient care related services.

There is a standard forty-year management service agreement ("MSA") between IPS and the various affiliated medical groups whereby a management fee is paid to IPS, which owns all of the assets used in the operation of the medical groups. IPS manages the day-to-day business operations of each

medical group and provides the assets for the physicians to use in their practice for a fixed fee or percentage of the net operating income of the medical group. All revenues are collected by IPS and the fixed fee or percentage payment to IPS is taken from the net operating income of the medical group and the remainder of the net operating income of the medical group is paid to the physicians and treated as an expense on IPS's financial statements as "physician group distribution."

Our PM segment comprised 37.11%, 30.95%, 33.90% and 32.30% of our total revenues for the Successor 2013 period, the Predecessor 2013 period, the fiscal year ended December 31 2012 and 2011, respectively.

**Group Purchasing Organization ("GPO")**

Our GPO segment provides for eligible physicians to participate in discounts for vaccines and flu shots offered by certain pharmaceutical companies. In exchange for the Company providing the pharmaceutical companies with eligible physicians, we receive an administrative fee.

**B.    Basis of Presentation**

The Company (Orion HealthCorp, Inc, together with its wholly owned subsidiaries) was acquired on June 14, 2013 by way of stock purchase by Constellation Health LLC.

The Company continued as the same legal entity after the acquisition. The accompanying consolidated statements of operations, changes in shareholders' equity, and cash flows are presented for the year ended December 31, 2013, which is presented in two periods: the Predecessor 2013 period (January 1, 2013 to June 14, 2013) and the Successor 2013 period (June 15, 2013 to December 31, 2013), which relate to the period preceding the Orion Acquisition and the period succeeding the Orion Acquisition, respectively. Although the accounting policies followed by the Company are consistent for the Predecessor and Successor periods, financial information for such periods has been prepared under two different historical-cost bases of accounting and is therefore not comparable. The results of the periods presented are not necessarily indicative of the results that may be achieved for future periods. Certain reclassifications have been made to the fiscal 2012 consolidated financial statements to conform to the 2013 presentation. We have also performed an evaluation of subsequent events through the date the financial statements were issued.

After the acquisition of Orion which was effective June 14, 2014, on June 17, 2013, Orion HealthCorp, Inc., ("**Orion**") a Delaware corporation amended and restated its Certificate of Incorporation. Pursuant to the amendment, Class A and Class D shares of common stock were consolidated into authorized and issued 1,000 shares of common stock. As of December 31, 2013 Constellation Health, LLC, a Delaware limited liability company, owned all 1000 shares of Orion common stock. Constellation Health LLC has three members, all of which are Delaware limited liability companies. The three members of Constellation Health, LLC are: ( 1.) Constellation Health Group, LLC, with an address at, 200 East Randolph Drive, Chicago, Illinois 60601, (2.) Constellation Health Investment LLC with an address at, c/o A. Mitchell Greene, Robinson Brog 875 Third Avenue New York, New York 10022; and (3.) First United Health, LLC, with an address at, c/o A. Mitchell Greene, Robinson Brog 875 Third Avenue New York, New York 10022.

**C.    Revenue Recognition**

IPS, a Physician Practice Management Company (PPM), assumes all financial risk for the performance of the medical practices. The physicians are employees of the captive professional corporation bound by non-compete agreements and the authority of the IPS management structure in place.

IPS recognizes revenue at the time the services are provided by its affiliated medical groups. Net patient service revenue is impacted by billing rates, changes in current procedural terminology code reimbursement, and collection trends. IPS reviews billing rates at each of its affiliated medical groups, on at least an annual basis, and adjusts those rates based on each insurer's current reimbursement practices. Amounts collected by IPS for treatment by its affiliated medical groups of patients covered by Medicare, Medicaid, and other contractual reimbursement programs, which may be based on cost

65

of services provided or predetermined rates, are generally less than the established billing rates of IPS' affiliated medical groups. IPS estimates the amount of these contractual allowances and records a reserve against accounts receivable based on historical collection percentages for each of the affiliated medical groups, which include various payer categories. When payments are received, the contractual adjustment is written off against the established reserve for contractual allowances. The historical collection percentages are adjusted quarterly based on actual payments received, with any differences charged against net revenue for the quarter. Additionally, IPS tracks cash collection percentages for each medical group on a monthly basis, setting quarterly and annual goals for cash collections, bad debt write-offs and aging of accounts receivable. IPS is not aware of any material claims, disputes or unsettled matters with third party payers and there have been no material settlements with third party payers for the Successor 2013 period, the Predecessor 2013 period, the fiscal year ended December 31 2012 and 2011, respectively.

The Company also receives administration fees tiered by volume of Vaccines and Flu shots consumed by all participating physicians from pharmaceutical companies where it's participating doctors order the Vaccines and Flu Shots and administer vaccines. Revenue is recognized upon the administration of the vaccine by the doctor based on estimated usage during the year

MBS, Rand, RMI and WSB's principal source of revenues is fees charged to clients based on a percentage of net collections of the client's accounts receivable. They recognize revenue and bill their clients when the clients receive payment on those accounts receivable. Our RCM business units typically receive payment from the client within 30 days of billing. The fees vary depending on specialty, size of practice, payer mix, and complexity of the billing. In addition to the collection fee revenue, MBS, Rand, On Line, RMI and WSB also earn fees from the various consulting services that they provide, including medical practice management services, managed care contracting, coding and reimbursement services and transcription services. Consulting services are recognized as revenue at the time services are performed.

### D.    Business Combinations

The Company accounts for all business combinations using the acquisition method of accounting. Under this method, assets and liabilities, including any remaining non-controlling interests, are recognized at fair value at the date of acquisition. The excess of the purchase price over the fair value of assets acquired, net of liabilities assumed, and non-controlling interests is recognized as goodwill. Certain adjustments to the assessed fair values of the assets, liabilities, or non-controlling interests made subsequent to the acquisition date, but within the measurement period, which is up to one year, are recorded as adjustments to goodwill. Any adjustments subsequent to the measurement period are recorded in income. Any cost or equity method interest that the Company holds in the acquired company prior to the acquisition is re-measured to fair value at acquisition with a resulting gain or loss recognized in income for the difference between fair value and the existing book value. Results of operations of the acquired entity are included in the Company's results from the date of the acquisition onward and include amortization expense arising from acquired tangible and intangible assets.

Identifiable intangibles assets are valued based on the discounted value of earning potential of contacts pertaining to those business segments.

As part of an acquisition consideration, the Company may include, earn out component to the sellers/identified management team of the acquired company. This earn out is typically payable based on achieving certain revenue and profit levels. At each level of base, high and low scenario cases, this earn out is discounted to the present value at the time of acquisition and recorded as a liability. This liability is adjusted to fair value at each reporting date.

All expenses relating to the acquisitions are expensed as incurred.

### E.    Consolidation Policy

Our results for the fiscal year ended December 31 2011 and 2012, the Predecessor 2013 period, the Successor 2013 period, include the results of MBS, Rand, On Line, RMI, WSB and IPS, respectively.

All intercompany balances and transactions have been eliminated in consolidation.

### F.    Estimates

The preparation of consolidated financial statements in conformity with U.S. generally accepted accounting principles requires us to make estimates and assumptions that affect the reported amounts of assets and liabilities, disclosures of contingent assets and liabilities at the date of the consolidated financial statements and the reported amounts of revenues and expenses during the reporting period. While we believe current estimates are reasonable and appropriate, actual results could differ from those estimates.

### G.    Concentrations of Credit Risk

Factors that could adversely impact our operations or consolidated financial results include, but are not limited to, the following: the global credit crisis, further deterioration of the credit markets, loss of large clients, interest rate increases, and changes in healthcare legislation.

We monitor our operations with a view to minimize the impact to our overall business that could arise as a result of the risks and uncertainties inherent in our business.

### H.    Cash and Equivalents

We consider all short-term investments with an original maturity of three months or less to be cash equivalents. As of December 31, 2011, 2012 and 2013, the Company had no cash equivalents.

### I.    Accounts Receivable and Allowance for Doubtful Accounts

MBS, Rand, On Line, RMI and WSB evaluate the need for an allowance using historical loss experience and the assessment of other risks. The allowance for doubtful accounts at December 31, 2011, 2012 and 2013 for MBS, RAND, On Line, RMI and WSB was:

|  | Predecessor | | Successor |
|---|---|---|---|
|  | *For the year ended Dec 31 2011* | *For the year ended Dec 31 2012* | *For the year ended Dec 31 2013* |
|  | *$* | *$* | *$* |
| Allowances for doubtful accounts | — | — | 127,000 |

IPS' affiliated medical groups grant credit without collateral to its patients, most of which are insured under third-party payer arrangements. The allowance for doubtful accounts that relates to patient service revenues is based on an evaluation of potentially uncollectible accounts. The allowance for doubtful accounts includes a reserve for 100% of the accounts receivable older than 150 days. Establishing an allowance for bad debt is subjective in nature. IPS uses historical collection percentages to determine the estimated allowance for bad debts, and adjusts the percentage on a quarterly basis. The allowance for doubtful accounts for IPS at December 31, 2011, 2012 and 2013 was:

|  | Predecessor | | Successor |
|---|---|---|---|
|  | *For the year ended Dec 31 2011* | *For the year ended Dec 31 2012* | *For the year ended Dec 31 2013* |
|  | *$* | *$* | *$* |
| Allowances for doubtful accounts | 1,103,450 | 616,386 | 809,136 |

67

**Age Analysis of Past Due Financing Receivables**
**as of December 31 2011, 2012, 2013**

| | 30-59 days Past due $ | 60-89 days past due $ | Greater than 90 days $ | Total Past due $ | Current $ | Total financing receivables $ |
|---|---|---|---|---|---|---|
| 2011 | | | | | | |
| Total | 1,211,540 | 491,274 | 769,590 | 2,472,404 | 4,263,602 | 6,736,006 |
| 2012 | | | | | | |
| Total | 1,621,085 | 392,753 | 557,921 | 2,571,759 | 4,967,280 | 7,539,038 |
| 2013 | | | | | | |
| Total | 1,448,290 | 395,848 | 531,102 | 2,375,241 | 3,849,468 | 6,224,709 |

**Roll Forward of Provision for doubtful debts**
**Year ended December 31, 2011 2012 and 2013**

| | $ |
|---|---|
| **Opening Allowance – January 01 2011** | **(538,490)** |
| Additions to Allowances | (897,777) |
| Bad debts adjusted | 332,817 |
| **Closing Balance – December 31 2011** | **(1,103,450)** |
| Reduction in Allowances | 105,233 |
| Bad debts adjusted | 381,831 |
| **Closing Balance – December 31 2012** | **(616,386)** |
| Additions to Allowances | (723,148) |
| Bad debts adjusted | 403,398 |
| **Closing Balance – December 31 2013** | **(936,136)** |

We do not typically charge late fees or interest on past due accounts.

**J.      Inventory**

Inventory consists of vaccines, which are stated at the lower of cost or market. Cost is determined under the first-in, first-out method.

**K.      Recent Accounting Pronouncements**

From time to time, new accounting pronouncements are issued by the Financial Accounting Standards Board ("FASB") and are adopted by us as of the specified effective date. Unless otherwise discussed, the Company believes that the impact of recently adopted and recently issued accounting pronouncements will not have a material impact on its consolidated financial position, results of operations, and cash flows.

In February 2013, the FASB issued amended guidance on the disclosure of accumulated other comprehensive income. The amendments to the previous guidance require an entity to provide information about the amounts reclassified from accumulated other comprehensive income by component. In addition, an entity is required to present, either on the face of the statements of operations or in the notes, significant amounts reclassified from accumulated other comprehensive income to the statement of operations. The Company adopted this guidance in 2013 on a prospective basis, which did not impact its consolidated financial statements.

In July 2013, the FASB issued ASU No. 2013-11, *Income Taxes (Topic 740) — Presentation of an Unrecognized Tax Benefit When a Net Operating Loss Carryforward, a Similar Tax Loss, or a Tax Credit Carryforward Exists*. This amendment clarifies the guidance on the presentation of an unrecognized tax benefit, or a portion of an unrecognized tax benefit, in the financial statements as a reduction to a

deferred tax asset for a net operating loss carryforward, a similar tax loss, or a tax credit carryforward. ASU No. 2013-11 is effective for fiscal periods beginning after December 15, 2013. The Company does not expect the adoption of this guidance to have a material impact on the consolidated financial statements.

### L.     Deferred Rent

Deferred rent consists of rent escalation and lease incentive terms related to the Company's operating leases for its facilities. Deferred rent represents the difference between actual operating lease payments due and straight-line rent expense, which is recorded by the Company over the term of the lease, including any construction period. The excess of the difference between actual operating lease payments due and straight-line rent expense is recorded as a deferred credit in the early periods of the lease when cash payments are generally lower than straight-line rent expense, and is reduced in the later periods of the lease when payments begin to exceed the straight-line expense. Deferred rent accrued is $462,147 for the successor period ended December 31, 2013 and $142,713 for the predecessor year ended December 31, 2012.

### M.     Goodwill and Intangible Assets

Goodwill represents the excess of cost over the fair value of net assets of companies acquired in business combinations accounted for using the purchase method.

Intangible assets include customer contracts and relationships and covenants not-to-compete acquired in connection with acquisitions, as well as software purchase and development costs. These intangible assets are amortized on a straight-line basis, which reflects the pattern in which economic benefits are expected to be realized. The Company concluded that use of the straight-line method was appropriate as the majority of the cash flows are expected to be recognized ratably over the estimated useful lives, without a significant degradation of the cash flows over time. The customer relationships and associated contracts represent the most significant portion of the value of the purchase price for every acquisition.

Goodwill and Intangibles are reviewed for possible impairment, annually or upon the occurrence of an event or when circumstances indicate that a reporting unit's carrying amount is greater than its fair value.

Identified Intangible assets are amortized using straight-line method over their estimated useful lives as follows:

|                                | Estimated useful life |
|--------------------------------|-----------------------|
| Management service agreements  | 25 years              |
| Client relationships           | 5 years               |
| Group Purchase agreements      | 5 years               |

Amortization is computed at rates considered sufficient to amortize the cost of the assets, using the straight-line method over their estimated useful lives. Amortization expense for the year ended December 31, 2011 and December 31, 2012 was $4,899,507 and $4,292,295, respectively. Amortization of Intangibles for 2013 was $1,920,500 from January 1 to June 14, 2013 (Predecessor period) and $964,167 from June 15 to December 31, 2013 (Successor period).

### N.     Software Development Costs

We capitalize software development costs in accordance with ASC 985-20, Costs of Software to be Sold, Leased, or Marketed. Research costs and software development costs, prior to the establishment of technological feasibility, determined based upon the creation of a working model, are expensed as incurred. Our software capitalization policy currently defines technological feasibility as a functioning beta test prototype with a confirmed working model, within a reasonably predictable range of costs. Additionally, technological feasibility is established when the Company has completed all planning, designing, coding, and testing activities that are necessary to establish that the product can be

produced to meet its design specifications including functions, features, and technical performance requirements. Our policy is to amortize capitalized costs by the straight-line method over the remaining estimated economic life of the product. Software development costs capitalized was $0 for year ended December 31, 2011 and December 31, 2012 and for predecessor period ended June 14, 2013, respectively and $2,095,464 for the successor period ended December 31, 2013.

**O.    Fair Value of financial instruments**

The carrying amounts for cash, cash equivalents, accounts payable, and accrued expenses approximate fair value because of their short-term nature. At December 31, 2013, the carrying value and accrued interest of Term Loan A is $9 million, Term loan B is $6.6 million and $0.50 million of revolver loan. See note 10 for further discussion of notes payable.

**P.    Fair Value Measurements:**

The authoritative guidance for fair value measurements defines fair value as the price that would be received if an asset were to be sold or paid to transfer a liability in an orderly transaction between market participants on the measurement date. Market participants are buyers and sellers in the principal market that are (i) independent, (ii) knowledgeable, (iii) able to transact, and (iv) willing to transact. The guidance describes a fair value hierarchy based on the levels of inputs, of which the first two are considered observable and the last unobservable, that may be used to measure fair value which are the following:

Level 1 — Quoted prices in active markets for identical assets or liabilities

Level 2 — Inputs other than Level 1 that are observable, either directly or indirectly, such as quoted prices for similar assets or liabilities; quoted prices in markets that are not active; or other inputs that are observable or corroborated by observable market data for substantially the full term of the assets or liabilities

Level 3 — Unobservable inputs that are supported by little or no market activity and that are significant to the value of the assets or liabilities

**Q.    Income Taxes**

Provisions for income taxes are based on taxes payable or refundable for the current year and deferred taxes on temporary differences between the tax basis of assets and liabilities and their reported amounts in the consolidated financial statements. Deferred tax assets and liabilities are included in the consolidated financial statements at currently enacted income tax rates applicable to the period in which the deferred tax assets and liabilities are expected to be realized or settled. As changes in tax laws or rates are enacted, deferred tax assets and liabilities are adjusted through the current period's provision for income taxes. A valuation allowance is provided for deferred tax assets if it is more likely than not that the asset will not be realizable.

The Company records a liability for unrecognized tax benefits resulting from uncertain tax positions taken (or expected to be taken) in a tax return before the uncertain tax positions are finally resolved with the taxing authority. If the Company considers that a tax position is "more-likely-than-not" to be sustained upon an audit by the taxing authority, based solely on the technical merits of the tax position, it recognizes the tax benefit. The Company measures the tax benefit by determining the largest amount that is greater than 50% likely of being realized upon settlement, presuming that the tax position is examined by the appropriate taxing authority that has full knowledge of all relevant information. The Company recognizes estimated future interest and penalties related to unrecognized tax positions, if any, as income tax expense in the consolidated statements of operations.

None of the Company's federal or state income tax returns are currently under examination by the Internal Revenue Service or state authorities. The Company is generally no longer subject to U.S. federal, state, or local income tax examinations by tax authorities for years before 2010.

70

## 2.    Segment reporting information

| | Predecessor period | | | Successor period |
|---|---|---|---|---|
| | For the year ended December 31 2011 $ | For the year ended December 31 2012 $ | January 1, 2013 through June 14 2013 $ | June 15, 2013 through December 31 2013 $ |
| **Revenue Cycle Management:** | | | | |
| Revenues | 37,366,558 | 32,799,554 | 15,849,628 | 16,793,698 |
| Depreciation, Depletion and Amortization | 4,968,124 | 4,383,722 | 1,970,704 | 2,100,759 |
| Operating Income (Loss) | 8,000,102 | 6,159,861 | 3,271,423 | 6,299,040 |
| **GP & Corporate:** | | | | |
| Revenues | 1,158,553 | 1,385,717 | 628,421 | 776,703 |
| Depreciation, Depletion and Amortization | 685,102 | 586,845 | 217,097 | (469,721) |
| Operating Income (Loss) | (3,190,935) | (3,374,939) | (1,525,127) | (1,295,097) |
| **Practice Management:** | | | | |
| Revenues | 16,693,651 | 17,560,040 | 7,322,004 | 10,609,210 |
| Depreciation, Depletion and Amortization | 57,453 | 48,950 | 13,850 | 5,375 |
| Operating Income (Loss) | (340,900) | (161,038) | (104,328) | 316,852 |

Corporate expenses that are incurred for the company's general administration have not been apportioned to other business segments. These costs are grouped under General Purchasing and Corporate segment.

The operating segments are identified and reported on the basis of internal reports about components of the group that are regularly reviewed by the Management Board to assess the performance of the segments.

The group's internal management reporting is structured primarily on the basis of the market segments in which the 3 operating segments – Revenue Cycle Management, Practice Management and General Purchasing (GP) & Corporate – operate.

Management assesses the performance of segments based on the measures of revenue and earnings before depreciation, interest and taxes (EBDIT), whereby the EBDIT measure includes allocations of expenses from supporting functions within the group.

Company runs shared services for each of its three segments. All resources, who form part of General management & administration, HR, Finance and accounting, IT, call center are part of shared services that are used by one or more segments and have been included in the reallocation.

Such allocations have been determined by the best management estimates based on number of resources served, volume of transactions processed and or relevant measures that reflect the level of benefits of these functions to each of the operating segments. As the 3 operating segments serve only external customers, there is no inter-segment revenue. Interest income and expenses and tax are not allocated to the segments. There is no measure of segment (non-current) assets and/or liabilities provided to the Management Board.

*Reconciliation of reportable segment revenues and profit or loss to the consolidated totals:*

| | Predecessor period | | | Successor period |
|---|---|---|---|---|
| | *For the year ended December 31 2011* | *For the year ended December 31 2012* | *January 1, 2013 through June 14 2013* | *June 15, 2013 through December 31 2013* |
| | *$* | *$* | *$* | *$* |
| Total Revenues for reportable segments | 55,218,763 | 51,745,311 | 23,800,052 | 28,179,611 |
| **Total Consolidated revenues** | **55,218,763** | **51,745,311** | **23,800,052** | **28,179,611** |
| | | | | |
| Operating Profit for reportable segments | 4,468,267 | 2,623,884 | 1,641,968 | 5,320,795 |
| Depreciation & amortization | (5,710,674) | (5,019,516) | (2,201,651) | (1,636,413) |
| Interest expense | (5,138,984) | (7,191,305) | (3,144,520) | (1,075,508) |
| Gain (loss) on disposal of fixed assets | (30,378) | — | 664 | — |
| Other income (expense), net | — | — | (74,591) | 1,640,483 |
| Provision for income taxes | (249,171) | (49,107) | — | (1,287,386) |
| **Net income/(loss)** | **(6,660,940)** | **(9,636,044)** | **(3,778,130)** | **2,961,971** |

## 3.    Property and Equipment

Property and equipment are presented at cost. Depreciation is computed at rates considered sufficient to depreciate the cost of the assets, using the straight-line method over their estimated useful lives and capital leases and leasehold improvements being in the nature of operating leases are amortized over the lease term, as follows:

| | Estimated useful life |
|---|---|
| Computer equipment | 2 – 5 years |
| Office equipment | 5 – 7 years |
| Furniture and fixtures | 5 – 7 years |
| Leasehold improvements | Lease term |
| Medical and surgical equipment | 5 years |
| Automobiles | 5 years |

Property and equipment, net consists of the following at December 31, 2011, 2012 and 2013:

| | Predecessor | | Successor |
|---|---|---|---|
| | *December 31 2011* | *December 31 2012* | *December 31 2013* |
| | *$* | *$* | *$* |
| Computer equipment and software | 3,131,552 | 3,336,503 | 8,946,429 |
| Office equipment | 541,421 | 548,321 | 548,321 |
| Furniture and fixtures | 502,772 | 502,772 | 606,971 |
| Leasehold improvements | 46,363 | 46,363 | 107,949 |
| Medical and surgical equipment | 19,529 | 19,529 | 19,529 |
| Automobiles | 14,461 | — | — |
| Total | 4,256,098 | 4,453,488 | 10,229,199 |
| Less accumulated depreciation | (2,729,073) | (3,438,443) | (5,381,750) |
| **Property and equipment, net** | **1,527,025** | **1,015,045** | **4,847,449** |

We recorded depreciation expense related to the above assets, $672,245 and $281,152 for the successor period June 15 to December 31, 2013 and predecessor period January 1 to June 14, 2013, respectively. Depreciation of $727,223 and $811,167 was recorded for the year ended December 31, 2012 and 2011 respectively.

72

The above asset categories include assets on capital lease:

|  | Predecessor | | Successor |
|---|---|---|---|
|  | December 31 2011 $ | December 31 2012 $ | December 31 2013 $ |
| Computer equipment and software | 598,023 | 598,023 | 598,023 |
| Office equipment | 235,137 | 235,137 | 235,137 |
| Furniture and fixtures | 77,706 | 77,706 | 77,706 |
| Total | 910,866 | 910,866 | 910,866 |
| Less accumulated depreciation | (808,647) | (895,850) | (910,866) |
| **Net book value** | **102,219** | **15,016** | **—** |

## 4.    Advertising and Business Promotion Costs

Advertising and business promotion costs are charged to operations as incurred.

|  | Predecessor | | | Successor |
|---|---|---|---|---|
|  | Year ended December 31 2011 $ | Year ended December 31 2012 $ | January 1, 2013 through June 14 2013 $ | June 15, 2013 through December 31 2013 $ |
| Advertisement and business promotion costs | 196,258 | 156,274 | 71,218 | 84,166 |

## 5.    Deferred finance costs

The Company incurred $1,185,000 towards debt syndication fees for new debt funding in 2013. This was categorized as deferred finance costs and is being amortized over the term of the debt. $172,813 was amortized using straight line method in the successor period ending December 31 2013.

Subsequent to the year ended December 31, 2013, the debt associated with the deferred finance costs was paid off and the deferred finance costs were expensed in 2014. Refer to Subsequent Events disclosure note 17.1.

## 6.    Acquisitions

The Company was acquired on June 14, 2013 (the 'Acquisition Date') by way of 100% stock purchase.

Acquisition related transaction costs include investment banking, legal and accounting fees and other costs directly related to the acquisition. Total transaction costs paid or accrued are $5.31 million and include $1.19 million towards debt issuance fees, capitalized as debt issuance costs and deferred to be amortized over the term of the loan.

### *Purchase Price Allocation:*

The Acquisition was recorded under the acquisition method of accounting by the Parent and pushed-down to the Company by allocating the purchase consideration of $30.43 million to the cost of the assets acquired, including intangible assets, based on their estimated fair values at the Acquisition Date. The allocation of purchase price is based on management's judgment after evaluating several factors, including, but not limited to, valuation assessments of tangible and intangible assets. The excess of the total purchase price over the fair value of assets acquired and the liabilities assumed of $27.93 million is recorded as goodwill. The goodwill arising from the Acquisition consists largely of the commercial potential of the Company and the value of the assembled workforce.

The Company finalized its evaluation of the fair value of the assets acquired and liabilities assumed and the resulting purchase price allocation subsequent to June 14, 2013. As a result, adjustments were

made to the preliminary purchase price allocation that impacted the allocation of certain intangible assets to the Company's reportable segments.

The following sets forth the Company's purchase price allocation (in thousands):

|  | $'000 |
|---|---|
| Cash and cash equivalents | 1,120 |
| Accounts receivable, net | 6,174 |
| Inventory | 272 |
| Prepaid expenses and other current assets | 1,457 |
| Property and equipment, net | 960 |
| Intangible assets | 10,500 |
| Other assets, net | 232 |
| Accounts payable | (3,625) |
| Current portion of capital lease obligations | (26) |
| Income tax payable – current | (5,517) |
| Income tax liability for uncertain tax positions | (6,038) |
| Deferred tax liability | (3,011) |
| **Total Purchase price allocation** | **2,499** |

The Company has acquired intangible assets, not including goodwill, totaling approximately $10.50 million in the Acquisition. The amortization of these intangibles is not deductible for tax purposes and hence the Company has recorded a deferred tax liability of approximately $3.01 million to offset the future book amortization related to these intangibles.

During the process of acquisition of Orion, a contingent consideration was set up for identified management team. This earn out is based on a minimum revenue generated for 2013 and 2014. A pool of $1 million and $3 million was allocated for 2013 and 2014 respectively. As a part of Purchase price allocation, on the date of acquisition of Orion, this liability was discounted to the present value of future expected cash flows based on the base, best and low scenarios of achieving the targeted revenue for 2013 and 2014. The discounted liability on this account was accrued at $1.9 million. These amounts were revalued again as of December 31, 2013 and were considered reduced to zero, as the obligation based on meeting the revenue targets was determined not probable as of that date. This reversal of contingent liability is shown under other income.

***Identifiable Intangible Assets***

In performing the purchase price allocation, the Company considered, among other factors, the intended future use of acquired assets, analyses of historical financial performance and estimates of future performance. The following table sets forth the components of intangible assets as of the date of the Acquisition (in thousands):

|  | $'000 |
|---|---|
| ***Identifiable Intangible Assets:*** | |
| Customer Relationships | 7,900 |
| Group Purchasing Agreements | 600 |
| Management Service Agreement | 2,000 |
| **Total Identifiable Intangible Assets** | **10,500** |

Customer relationships represent the fair value of the existing customer base.

## 7. Other Assets

Other assets consist of the following at December 31, 2011, 2012 and 2013:

|  | Predecessor | | Successor |
|---|---|---|---|
|  | December 31 2011 $ | December 31 2012 $ | December 31 2013 $ |
| Deposits | 247,979 | 209,075 | 209,075 |
| Financing costs | 3,463,248 | 3,463,248 | — |
| Accumulated amortization | (3,055,161) | (3,343,401) | — |
| **Total** | **656,066** | **328,922** | **209,075** |

## 8. Prepaid and other current assets

|  | Predecessor | | Successor |
|---|---|---|---|
|  | December 31 2011 $ | December 31 2012 $ | December 31 2013 $ |
| Prepaid expenses | 311,861 | 329,403 | 418,362 |
| Other prepaid expenses | 190,160 | 223,075 | 176,862 |
| Compensation related expenses | 371,290 | 411,625 | — |
| Acquisition deal advances | — | 273,059 | 495,000 |
| Customer advances | — | — | 200,000 |
| **Total** | **873,311** | **1,237,162** | **1,290,224** |

## 9. Intangible Assets, Excluding Goodwill, net

Intangible assets, excluding goodwill, net consist of the following at December 31, 2011, 2012 and 2013:

|  | Predecessor | | Successor |
|---|---|---|---|
|  | December 31 2011 $ | December 31 2012 $ | December 31 2013 $ |
| Software tool – work in progress | — | — | 2,095,464 |
| Client relationships | 28,755,798 | 28,755,798 | 7,900,000 |
| Management service agreements | 9,216,911 | 9,216,911 | 2,000,000 |
| Group Purchasing agreements | 3,058,087 | 3,058,087 | 600,000 |
|  | 41,030,796 | 41,030,796 | 12,595,464 |
| Less accumulated amortization | (26,938,923) | (30,942,976) | (964,167) |
| **Net amount** | **14,091,873** | **10,087,820** | **11,631,297** |

Estimated future annual amortization of our identifiable intangible assets is as follows:

Year ending December 31:

| | $ |
|---|---:|
| 2014 | 1,780,000 |
| 2015 | 2,199,093 |
| 2016 | 2,199,093 |
| 2017 | 2,199,093 |
| 2018 | 1,278,260 |
| Thereafter | 1,975,758 |
| Total | 11,631,297 |

## 10.    Line Of Credit And Long-Term Debt

The Company has a line of credit facility with a bank dated June 17 2013 that provides for maximum borrowing of $2,000,000 and maturing on May 31, 2017. The bank interest rate is 9.50%. The line of credit is collateralized by substantially all the assets of the Company. At Successor period ending December 31 2013, the outstanding line of credit is $500,000.

For the predecessor year ending December 31, 2012 and December 31, 2011, the outstanding line of credit balance totaled $8,967,282 and $7,159,809, respectively. The Company had a line of credit facility with a bank dated December 2006 that provided for maximum borrowing of $10,000,000 and matured on June 30, 2012. On July 1, 2012, the bank increased the interest rate from 7.75% to 10.25% until the Company had refinanced its obligation. The line of credit was collateralized by substantially all the assets of the Company.

Our existing credit agreement for our line of credit contains certain financial covenants that require us to maintain minimum levels of monthly EBITDA, a minimum fixed charge coverage ratio, a maximum senior debt leverage ratio, and other customary terms and conditions.

Long-term debt consisted of the following at December 31, 2011, 2012 and 2013:

| | Predecessor | | Successor |
|---|---:|---:|---:|
| | December 31 2011 $ | December 31 2012 $ | December 31 2013 $ |
| $9,000,000 Term loan A payable to a financial institution, bearing fixed interest at 11.00%, interest payable monthly, principal payments monthly based on schedule after 6 months, maturing May 31, 2017, collateralized by a blanket lien on all assets. | — | — | 9,000,000 |
| $6,500,000 Term loan B payable to a financial institution, bearing fixed interest at 12.00%, interest payable monthly plus an additional 3% PIK interest, principal payments payable after full repayment of Term loan A, maturing May 31, 2017, collateralized by a blanket lien on all assets. | — | — | 6,608,005 |
| $4,500,000 senior note payable to a financial institution, bearing fixed interest at 10.25%, interest payable monthly, principal payments monthly based on schedule, matured June 30, 2012, collateralized by a blanket lien on all assets. | 1,086,894 | 186,894 | — |
| Term loan payable to a financial institution, non-interest bearing, matures October 1, 2013. | 2,330,000 | 2,240,000 | — |
| Total | 3,416,894 | 2,426,894 | 15,608,005 |
| Less current maturities | (1,176,894) | (2,426,894) | (1,125,000) |
| **Long term debt** | **2,240,000** | **—** | **14,483,005** |

Future aggregate annual maturities of debt are as follows:

Year ending December 31:

|  | $ |
|---|---|
| 2014 | 1,125,000 |
| 2015 | 1,575,000 |
| 2016 | 2,025,000 |
| 2017 | 10,883,005 |
| Total debt | 15,608,005 |

| | Predecessor | | Successor |
|---|---|---|---|
| | December 31 2011 $ | December 31 2012 $ | December 31 2013 $ |
| Promissory note payable to sellers of RMI, bearing fixed interest at 14.53%, principal and interest payments monthly, matured August 2, 2012. | 1,737,978 | 1,737,978 | — |
| Promissory note payable to sellers of WSB, bearing fixed interest at 14.53%, principal and interest payments monthly, matured August 2, 2012. | 459,667 | 459,667 | — |
| Promissory note payable to seller of Rand, bearing fixed interest at 14.53%, principal and interest payments monthly, matured August 2, 2012. | 856,733 | 856,733 | — |
| $22,300,000 senior subordinated promissory notes payable to related parties, plus 16.75% PIK (6.75% PIK plus 7% cash prior to October 1, 2011) plus $184,650 annual amortized discount ($92,325 remains unamortized at December 31, 2012), principal due on June 30, 2013 | 27,446,167 | 34,065,310 | — |
| Total | 30,500,545 | 37,119,688 | — |
| Less current maturities | (30,500,545) | (37,119,688) | — |
| **Long-term notes payable held by related parties** | — | — | — |

Our credit agreement for our Term loans contains certain financial covenants that require us to maintain a maximum leverage ratio and other customary terms and conditions. Post-acquisition, the company has met all the financial covenants for the debt.

During the year as a part of acquisition of the Company, old debt was retired and replaced by new debt funds. As a part of purchase price allocation this was push down to the company from the parent.

## 11.   Accrued Expenses

Accrued expenses consisted of the following at December 31, 2011, 2012 and 2013:

|  | Predecessor | | Successor |
|---|---|---|---|
|  | December 31 2011 $ | December 31 2012 $ | December 31 2013 $ |
| Compensation and related taxes | 948,445 | 1,083,506 | 541,615 |
| Interest | 1,208,417 | 752,428 | 159,488 |
| Deferred acquisition deal fees | — | — | 1,149,983 |
| Deferred rent | 273,093 | 142,713 | 462,137 |
| Professional Fees Payable | — | 424,028 | 342,406 |
| Other | 571,869 | 764,995 | 459,884 |
| **Total** | **3,001,824** | **3,167,670** | **3,115,513** |

## 12.   Operating Leases

We lease our facilities and corporate office space under operating leases that expire in various years through 2022. The leases provide for annual operating expense increases. Annual rental expenses related to our facility leases totalled $1,916,527, $1,972,297, and $2,088,725 for the years ended December 31, 2011, 2012 and 2013, respectively.

Future annual base rental expenses under these lease agreements are as follows:

Year Ending December 31:

|  | $ |
|---|---|
| 2014 | 1,922,621 |
| 2015 | 1,868,190 |
| 2016 | 1,548,699 |
| 2017 | 1,230,810 |
| 2018 | 1,104,943 |
| Thereafter | 1,257,682 |
| Total | 8,932,945 |

## 13.   Income Taxes

The provision for income taxes for the years ended December 31, 2011, 2012 and 2013 is summarized as follows:

|  | Predecessor | | Successor |
|---|---|---|---|
|  | December 31 2011 $ | December 31 2012 $ | December 31 2013 $ |
| Current: |  |  |  |
| Federal | (4,095) | — | $ 940,866 |
| State | 253,266 | 49,107 | 162,520 |
| Total | 249,171 | 49,107 | 1,103,386 |
| Deferred: |  |  |  |
| Federal | (4,027,305) | (2,745,533) | 184,000 |
| State | (1,142,759) | (701,677) | — |
| Valuation allowance | 5,170,064 | 3,447,210 | — |
| Total | — | — | 184,000 |
| **PROVISION (BENEFIT) FOR INCOME TAXES** | **249,171** | **49,107** | **1,287,386** |

Income tax payable as of December 31 2013 is $12,658,000 and has the following components:

1) Tax liability on uncertain tax positions – $6,038,000. The Company recorded a liability for unrecognized tax benefits resulting from uncertain tax positions taken (or expected to be taken) in a tax return before the uncertain tax positions are finally resolved. This is based on the assumption that the net operating loss (NOL's) as on the date of acquisition, are not available to the successor to set off against the forgiveness of debt taken by the predecessor.

2) Balance of tax payable as of December 31 2013, is the total of predecessor and successor period, segregated as summarized below,

|  | Predecessor | Successor |
|---|---|---|
|  | January 1 2013 to June 14 2013 $ | June 15 2013 to December 31 2013 $ |
| Current tax | 5,516,614 | 1,103,386 |

The tax liability in the predecessor is due to the forgiveness of debt after the adjustment of available NOL's. Since this forgiveness forms part of the acquisition settlement, this has been recognized only through the purchase price allocation.

For predecessor period ending December 31, 2011 and 2012, the Company's effective income tax rate varied from the statutory federal income tax rate principally due to changes in the valuation allowance applied to the net deferred tax asset and for the successor period ended December 31, 2013, the Company's effective income tax rate was 37%.

Our provision for federal and state taxes is comprised primarily of taxes from states that assess franchise and margin tax. Significant components of net deferred tax assets and liabilities are as follows:

|  | Predecessor | | Successor |
|---|---|---|---|
|  | December 31 2011 $ | December 31 2012 $ | December 31 2013 $ |
| Depreciation | (567,971) | (373,624) | (1,122,000) |
| Intangibles, amortization not available for tax deduction | — | — | (2,073,000) |
| Total deferred tax liabilities | (567,971) | (373,624) | (3,195,000) |
| Deferred tax assets: |  |  |  |
| Net operating loss – Federal and State – current | — | — | — |
| Net operating loss – Federal and State – long term | 12,997,046 | 15,222,771 | — |
| Amortization of intangibles | 5,031,984 | 6,233,087 | — |
| Allowance for bad debts | 418,870 | 233,980 | — |
| Stock options | 225,890 | 315,286 | — |
| Other | 94,068 | 15,597 | — |
| Total deferred tax assets | 18,767,858 | 22,020,721 | — |
| Total net deferred tax assets | 18,199,887 | 21,647,097 | — |
| Valuation allowance | (18,199,887) | (21,647,097) | — |
| **Net deferred tax assets/(liability)** | **—** | **—** | **(3,195,000)** |

Based on uncertainties associated with the future realization of the deferred tax assets, the valuation allowance established for the net deferred tax asset is $21,647,097 and $18,199,887 for predecessor period of December 31, 2012 and 2011 respectively.

Constellation Health LLC and the Company have entered into a tax indemnity agreement pursuant to which Constellation Health LLC has agreed to indemnify the Company against certain tax liabilities.

Prior to the Company's acquisition, the Company was a party to several promissory notes pursuant to which it borrowed funds from certain lenders. The lenders agreed to receive proceeds from the Company's acquisition on amounts less than the amounts owed by the Company under the notes, in full satisfaction of the Company's obligations under the notes (the "Cancellation of Debt").

Constellation Health LLC has agreed to indemnify the Company should the Cancellation of Debt cause the Company to be liable for any taxes in excess of the indemnification coverage provided in the Company's merger agreement but subject to a maximum of $12 million plus an amount equivalent to any applicable interest, fines, penalties, costs and charges thereon.

**14.    Stock Based Compensation, Warrants And Options**

*Stock Based Compensation*

At December 31, 2012 and 2011, the Company had stock-based employee compensation. The Company recognized share-based payments to employees in the consolidated financial statements based on their fair values at the date of grant. The calculated fair value is recognized as expense over the requisite service period, net of estimated forfeitures, using the straight-line method. The Company considered many factors when estimating expected forfeitures, including types of awards, employee class and historical experience. The cost was based on the fair value at the grant date. The Company used the Black-Scholes model to determine the fair value of options.

At December 31, 2013, the Company does not have stock-based employee compensation.

For the Successor period ended December 31, 2013 and Predecessor period ended June 14 2013, the Company did not have any impact of our stock-based employee compensation plan on our consolidated statements of operations. For the predecessor year ended December 31, 2012 and 2011, the impact of our stock-based employee compensation plan on our consolidated statements of operations was an increase in salaries and benefits expense of $74,817 and $217,022 respectively, with a corresponding increase in our net loss, resulting from the recognition of compensation expense associated with employee stock options.

***Warrants and Options***

Transactions with other than Employees

The company has cancelled all outstanding options upon acquisition and does not have any outstanding warrants or options as of Dec 31, 2013. The Company also did not issue any warrants in 2013.

The following table summarizes the Company's outstanding warrants for the predecessor's period ended December 31, 2011, 2012 and successor's period ended December 31, 2013:

|  | *Predecessor* | | | | *Successor* | |
|  | *December 31 2011* | | *December 31 2012* | | *December 31 2013* | |
|  | *Warrants* | *Price $* | *Warrants* | *Price $* | *Warrants* | *Price $* |
|---|---|---|---|---|---|---|
| Outstanding at beginning of period | 15,298,737 | 0.001-19.00 | 13,857,941 | 0.001-19.00 | 13,323,931 | — |
| Issued | — | — | — | — | | |
| Exercised | — | — | — | — | | |
| Cancelled | (1,440,796) | 0.001-19.00 | (534,010) | 3.20 | (13,323,931) | — |
| Outstanding at end of the year | 13,857,941 | 0.001-19.00 | 13,323,931 | 0.001 | — | — |
| Weighted average exercise price | 0.12 | | 0.001 | | — | |
| Weighted average remaining life of warrants at end of year | 1.47 years | | 0.50 years | | — | |

There are also no outstanding restricted stock units and options as at the Successor period ended December 31, 2013:

| | Predecessor | | | | | | Successor | | |
|---|---|---|---|---|---|---|---|---|---|
| | December 31 2011 | | | December 31 2012 | | | December 31 2013 | | |
| | Options and Restricted Stock Units | Price per Share $ | Weighted Average Exercise Price $ | Options and Restricted Stock Units | Price per Share $ | Weighted Average Exercise Price $ | Options and Restricted Stock Units | Price per Share $ | Weighted Average Exercise Price $ |
| Outstanding at beginning of period | 8,842,000 | 0.01-0.84 | 0.25 | 8,391,000 | 0.01-0.84 | 0.24 | 7,866,000 | | |
| Issued | — | — | | — | — | | — | — | — |
| Exercised | — | — | | — | — | | — | — | — |
| Forfeited | (451,000) | 0.19-0.47 | 0.21 | (525,000) | 0.18-0.19 | 0.19 | (7,866,000) | — | |
| Outstanding at end of the year | 8,391,000 | 0.01-0.84 | 0.23 | 7,866,000 | 0.01-0.84 | 0.23 | — | | |
| Exercisable at end of year | 6,984,750 | 0.01-0.84 | 0.24 | 7,866,000 | 0.01-0.84 | 0.23 | — | | |
| Weighted average remaining life at end of year | | | | | | | | | |
| Outstanding | 5.65 years | | | 4.62 years | | | — | | |
| Exercisable | 5.54 years | | | 4.62 years | | | — | | |

## 15. 401(K) Plan

We have an employee retirement savings plan under Section 401(k) of the Internal Revenue Code for all eligible employees of Orion HealthCorp, Inc. Participants are permitted to defer compensation up to the dollar limitation as defined by the IRS for the taxable year. On a discretionary basis, we may match up to 50% of the first 6% of the non-highly compensated employee's deferrals. Orion's contributions vest beginning in the second year in equal installments over three years, and are 100% vested after four years. For the Successor period and predecessor period for 2013, the Company did not contribute any sums to match the contributions. For the Predecessor period ended Dec 31 2012 and 2011, the Company contributed approximately $234 and 396,103 respectively. There were no forfeitures during 2012 that were applied as a credit to 401(k) match expense. During the year ended December 31, 2011, forfeitures in the aggregate amount of $74,255 were applied as a credit to 401(k) match expense.

## 16. Commitments and Contingencies

As of December 31, 2013, our combined based annual salary commitments related to all employment agreements totaled $2,144,450 through 2013.

We are involved in various legal proceedings and claims arising in the ordinary course of business. Our management believes that the disposition of these additional matters, individually or in the aggregate, is not expected to have a materially adverse effect on our consolidated financial condition. However, depending on the amount and timing of such disposition, an unfavorable resolution of some or all of these matters could materially affect our future results of operations or cash flows in a particular period.

## 17. Subsequent Events

1. In April 2014, the Company entered into a new loan agreement to replace the existing loan facility. The new loan facility is a $40,000,000 Senior debt facility, bearing fixed interest at 10.00%, interest payable monthly, plus an additional 2% payable in kind interest. Principal

payments start from June 30 2015, maturing on March 31, 2018, collateralized by a blanket lien on all assets.

2.  The final accounting treatment has not been completed for the above transaction in the period ended December 31 2013.

3.  The Company, on April 1, 2014, acquired North East Medical Systems (NEMS), which handles the revenue cycle management for medical practice. Purchase consideration paid for this acquisition is $2.79 million.

## 18.    Related party transactions

During the successor period ended December 31 2013, $180,944 amounts were paid by Orion's parent company, Constellation Health, LLC (Constellation) toward expenses accrued in the Company from June 15, 2013 to December 31, 2013. Balance payable to Constellation as of December 31, 2013 is $180,944.

## SECTION C: CONSTELLATION HEALTHCARE TECHNOLOGIES, INC.

Constellation Healthcare Technologies, Inc. was incorporated on 3 September 2014 under the Delaware General Corporation Law with a financial year end of 31 December.

Since the date of incorporation, Constellation Healthcare Technologies, Inc. has not yet commenced operations and it has no material assets or liabilities, and therefore no financial statements have been prepared as at the date of this document, and no separate historical financial information on Constellation Healthcare Technologies, Inc. is presented in this document.

Refer to paragraph 10.7 of Part VII of this document for details of the Exchange Agreement pursuant to which Constellation Healthcare Technologies, Inc. has agreed, conditional upon but effective immediately prior to Admission to acquire the entire issued share capital of Orion.

# PART V

## UNAUDITED INTERIM FINANCIAL INFORMATION OF ORION GROUP

**Consolidated Balance Sheets**

| | Successor | Successor |
|---|---|---|
| | *June 30 2013* | *June 30 2014* |
| | *$* | *$* |
| **Current assets** | | |
| Cash and cash equivalents | 1,893,054 | 1,830,413 |
| Restrictive cash balance | 400,000 | — |
| Accounts receivable, net | 5,634,338 | 8,961,188 |
| Inventory | 288,565 | 267,809 |
| Prepaid expenses and other current assets | 1,153,342 | 1,434,805 |
| Deferred Finance cost | — | 294,894 |
| Total current assets | 9,369,299 | 12,789,109 |
| **Property and equipment, net** | 5,405,696 | 4,790,080 |
| **Other long-term assets** | | |
| Intangible assets, excluding goodwill | 10,725,184 | 13,812,513 |
| Goodwill | 27,932,348 | 29,753,661 |
| Deferred finance costs | 1,160,313 | 810,957 |
| Other assets, net | 209,077 | 224,254 |
| Total other long-term assets | 40,026,922 | 44,601,385 |
| Total assets | 54,801,917 | 62,180,574 |
| **Current liabilities** | | |
| Accounts payable | 1,641,632 | 2,949,135 |
| Accrued expenses | 4,048,165 | 2,085,182 |
| Other current liabilities | 2,305,000 | 638,700 |
| Income taxes payable | 11,554,614 | 17,357,703 |
| Current portion of capital lease obligation | 160,934 | 41,924 |
| Line of credit | 500,000 | — |
| Total current liabilities | 20,210,345 | 23,072,644 |
| **Long-term liabilities** | | |
| Long-term debt, net of current portion | 15,500,000 | 23,000,000 |
| Deferred tax liability | 3,011,000 | 3,266,332 |
| Total long-term liabilities | 18,511,000 | 26,266,332 |
| **Commitments and Contingencies** | | |
| **Stockholders' equity (deficit)** | | |
| Common stock, par value $0.001; 1000 shares authorized at June 30, 2014 and at June 30, 2013;1000 shares issued and outstanding at June 30, 2014 and at June 30, 2013 | 1 | 1 |
| Additional paid-in capital | 16,214,070 | 11,788,950 |
| Retained earnings | (133,499) | 1,052,647 |
| Total stockholders' equity (deficit) | 16,080,572 | 12,841,598 |
| Total liabilities and stockholders' equity (deficit) | 54,801,917 | 62,180,574 |

**Consolidated Statements of Operations**

| | Predecessor | Successor | |
| --- | --- | --- | --- |
| | January 1, 2013 through June 14 2013 $ | June 15, 2013 through June 30 2013 $ | January 1, 2014 through June 30 2014 $ |
| **Revenues** | 23,800,052 | 2,044,737 | 25,325,218 |
| **Operating expenses:** | | | |
| Salaries and benefits | 10,870,981 | 927,160 | 8,660,418 |
| Physician compensation | 2,725,174 | 170,364 | 2,961,231 |
| Facility rent and related costs | 1,414,077 | 105,022 | 1,234,105 |
| Depreciation | 281,152 | 62,644 | 694,452 |
| Amortization | 1,920,500 | 97,580 | 925,748 |
| Professional and consulting fees | 2,587,629 | (16,753) | 509,100 |
| Insurance | 199,189 | 16,358 | 314,708 |
| Provision for doubtful accounts | 299,193 | 14,785 | 193,513 |
| Vaccines and medical supplies | 1,593,164 | 165,389 | 1,878,052 |
| Office and computer supplies | 152,847 | 15,880 | 151,878 |
| Postage and courier | 879,484 | 76,384 | 978,164 |
| Other | 1,436,347 | 481,341 | 1,266,480 |
| Total operating expenses | 24,359,737 | 2,116,152 | 19,767,848 |
| **Income/(loss) from operations** | (559,685) | (71,415) | 5,557,371 |
| **Other income/(expenses):** | | | |
| Interest expense | (3,144,520) | (30,119) | (1,496,112) |
| Gain/(loss) on disposal of fixed assets | 664 | — | — |
| Other income/(expense), net | (74,591) | (31,965) | (1,199,549) |
| Total other expenses, net | (3,218,447) | (62,084) | (2,695,661) |
| **Net income/(loss) before provision for income taxes** | (3,778,132) | (133,499) | 2,861,710 |
| Provision for income taxes | — | — | (4,771,036) |
| **Net income/(loss)** | **(3,778,132)** | **(133,499)** | **(1,909,326)** |
| **Income/(loss) per common shares** | | | |
| **Basic** | | | |
| Common Stock | — | (133.50) | (1,909.33) |
| Class A Common Stock | (0.03) | — | — |
| Class D Common Stock | (0.03) | — | — |
| **Diluted** | **(0.03)** | **(133.50)** | **(1909.33)** |
| **Weighted average number of shares for basic** | | | |
| Common Stock | — | 1,000 | 1,000 |
| Class A Common Stock | 115,827,493 | — | — |
| Class D Common Stock | 24,658,955 | — | — |
| **Weighted average number of shares for Diluted** | | | |
| Common Stock | — | 1,000 | 1,000 |
| Class A Common Stock | 115,827,493 | — | — |
| Class D Common Stock | 24,658,955 | — | — |

*Note:*

The Company had outstanding warrants to purchase 13,323,931 of Class A common stock in the predecessor period ended June 14, 2013.

As the Company reported a loss during these periods, these warrants are considered anti-dilutive and therefore are excluded from the diluted earnings per share calculation. There were no dilutive instruments outstanding at June 30, 2014.

**Consolidated Statement of Cash Flows**

|  | Predecessor | Successor | |
| --- | --- | --- | --- |
|  | January 1, 2013 through June 14 2013 $ | June 15, 2013 through June 30 2013 $ | January 1, 2014 through June 30 2014 $ |
| **Cash Flow from operating activities:** |  |  |  |
| Net Income/(loss) | (3,778,132) | (133,499) | (1,909,326) |
| Adjustments to reconcile net loss to net cash provided by (used in) operating activities: |  |  |  |
| Provision for doubtful accounts | 299,193 | 14,785 | 193,513 |
| Depreciation | 281,152 | 62,644 | 694,452 |
| Amortization | 1,920,500 | 97,580 | 925,748 |
| Deferred Taxes | — | — | 71,332 |
| Provision for taxes | — | — | 4,699,704 |
| Conversion of PIK interest to principal | — | — | (108,005) |
| Amortization of deferred finance costs | — | 24,687 | 1,061,340 |
| Gain on disposal of property and equipment | (664) | — | — |
| Changes in operating assets and liabilities: |  |  |  |
| Accounts receivable | 449,135 | 525,201 | (3,472,634) |
| Inventory | 51,242 | (16,632) | 72,180 |
| Prepaid expenses and other assets | (219,368) | 303,292 | (138,631) |
| Other assets | — | 23,413 | — |
| Accounts payable and accrued expenses | (954,037) | 233,105 | 7,680 |
| Other liabilities | — | 1,905,000 | — |
| Net cash provided by (used in) operating activities | (1,950,979) | 3,039,576 | 2,097,354 |
| **Cash flows from Investing activities** |  |  |  |
| Cash outlay for property and equipment | (225,824) | (4,507,959) | (19,538) |
| Development of software tool | — | (299,352) | (2,391,966) |
| Net deposits to restricted cash | — | (400,000) | — |
| Deferred acquisition fees paid | — | — | (1,149,983) |
| Capital Paid for Acquisition | — | (27,006,454) | (2,137,402) |
| Net cash used in investing activities | (225,824) | (32,213,765) | (5,698,889) |
| **Cash flows from financing activities** |  |  |  |
| Payments of capital lease obligations | (20,095) | 134,505 | (8,358) |
| Borrowings on line of credit | — | 500,000 | — |
| Payments on line of credit | — | — | (500,000) |
| Payments on line of credit | — | — | (15,500,000) |
| Net proceeds from long term debt | 2,535,406 | 15,500,000 | 23,000,000 |
| Cash outlay for deferred finance costs | — | (1,185,000) | (1,155,000) |
| Dividend distributions | — | — | (3,225,120) |
| Equity financing costs | — | — | (1,200,000) |
| Proceeds from equity | — | 14,997,392 | — |
| Net cash provided by (used in) financing activities | 2,515,311 | 29,946,898 | 1,411,522 |
| Net increase in cash and cash equivalents | 338,509 | 772,708 | (2,190,013) |
| **Cash and cash equivalents, beginning of period** | 781,837 | 1,120,346 | 4,020,426 |
| **Cash and cash equivalents, end of period** | 1,120,346 | 1,893,054 | 1,830,413 |

## Consolidated Statement of Stockholder's Equity (deficit)

### January 1, 2013 To June 14, 2013 – Predecessor Period

| | Common Stock | | | | |
| --- | --- | --- | --- | --- | --- |
| | Shares | Amount $ | Paid-in Capital $ | Retained Earnings $ | Total $ |
| Balances, January 1, 2013 | — | — | 69,158,983 | (83,276,404) | (14,117,421) |
| Class A | 115,827,490 | 115,827 | — | — | 115,827 |
| Class D | 24,658,955 | 24,659 | — | — | 24,659 |
| Net income/(loss) | — | — | — | (3,778,132) | (3,778,132) |
| **Balances, June 14, 2013** | **140,486,445** | **140,486** | **69,158,983** | **(87,054,536)** | **(17,755,066)** |
| Class A – Cancellation | (115,827,490) | (115,827) | — | — | (115,827) |
| Class D – Cancellation | (24,658,955) | (24,659) | — | — | (24,659) |
| Effect of acquisition and push down accounting | 1,000 | 1 | (52,944,913) | 87,054,536 | 34,109,624 |
| Net income/(loss) | — | — | — | (133,499) | (133,499) |
| **Balances, June 30, 2013** | **1,000** | **1** | **16,214,070** | **(133,499)** | **16,080,572** |

## Consolidated Statement of Stockholder's Equity (deficit)

### January 1, 2014 To June 30, 2014 – Successor Period

| | Common Stock | | | | |
| --- | --- | --- | --- | --- | --- |
| | Shares $ | Amount $ | Paid-in Capital $ | Retained Earnings $ | Total $ |
| Balances, January 1, 2014 | — | — | 16,214,070 | 2,961,972 | 19,176,042 |
| Common Stock | 1,000 | 1 | — | — | 1 |
| Adjustment in the period due to push down accounting | — | — | (4,425,120) | — | (4,425,120) |
| Net income/(loss) | — | — | — | (1,909,326) | (1,909,326) |
| **Balances, June 30, 2014** | **1,000** | **1** | **11,788,950** | **1,052,646** | **12,841,597** |

1. **Nature of Business and Significant Accounting Policies**

A. **Nature of Business**

Orion HealthCorp, Inc., a Delaware Corporation (referred to as the "Company", "we", "us" or "our") is a healthcare services organization providing outsourced business services to physicians, serving the physician market through 3 operating segments – Revenue Cycle Management, Practice Management and Group Purchasing Organization – via seven operating subsidiaries: Medical Billing Services, Inc. ("MBS"), Rand Medical Billing, Inc. ("Rand"), On Line Alternatives, Inc. ("OLA"), RMI Physician Services Corporation ("RMI'), Western Skies Billing Service ("WSB") and Integrated Physician Solutions, Inc. ("IPS') and North Eastern Medical Services ("NEMS'). Our mission is to provide superior business and financial management services resulting in optimal profitability for our clients and maximized enterprise value for our stakeholders. We believe our core competency is our long-term experience and success in working with and creating value for physicians.

*Revenue Cycle Management ("RCM") Segment*

Our RCM segment includes four business units; MBS, Rand, RMI, WSB, OLA and NEMS. Through this segment, we offer expert medical billing and collections, practice management, and other related services to hospital-based and office-based physicians, giving them more time to focus on patient care in specialties such as pathology, anesthesiology, radiology, cardiology, family practice, internal medicine, orthopedics, neurology and emergency medicine. These services help clients to be financially successful by improving cash flows and reducing administrative costs and burdens. MBS currently provides services to 28 clients. Rand currently provides services to 77 clients. RMI currently provides services to 13 clients. WSB currently provides services to 36 clients. NEMS currently provides services to 20 clients.

We deliver billing and collections services to help physicians receive optimal earnings for the care they provide. We assist our clients by maximizing their reimbursement through:

• Tenacious pursuit of every collectible dollar,

• To-the-letter compliance with ever-changing regulations and coding complexities,

• Thorough tracking and methodical working of correspondence, and

• Superior management of short-term cash flow and long-term income.

We also offer consulting services to assist clients with navigating and interacting with managed care organizations, as well as a wide range of management consulting services to help create a more efficient medical practice.

Our RCM segment comprised 60.86%, 59.33% and 52.02% of our total revenues for the Successor 2013 period, the Predecessor 2013 period and six months ended June 30 2014, respectively.

*Practice Management ("PM") Segment*

Our PM segment, via IPS, is an experienced and innovative provider of business and practice management services exclusively dedicated to supporting the needs of primary care and subspecialty pediatric practices. Through this segment we provide accounting and bookkeeping, human resource management, group purchasing, accounts receivable management, quality assurance services, physician credentialing, fee schedule review, training and continuing education, and billing and reimbursement analysis. As of June 30 2014, our PM segment managed six practice sites, representing three medical groups in Illinois and Ohio. The physicians, who are all employed by separate corporations, provide all clinical and patient care related services.

There is a standard forty-year management service agreement ("MSA") between IPS and the various affiliated medical groups whereby a management fee is paid to IPS, which owns all of the assets used in the operation of the medical groups. IPS manages the day- to-day business operations of each

medical group and provides the assets for the physicians to use in their practice for a fixed fee or percentage of the net operating income of the medical group. All revenues are collected by IPS and the fixed fee or percentage payment to IPS is taken from the net operating income of the medical group and the remainder of the net operating income of the medical group is paid to the physicians and treated as an expense on IPS's financial statements as "physician group distribution."

Our PM segment comprised 28.52%, 37.11% and 34.68% of our total revenues for the Successor 2013 period, the Predecessor 2013 period and six months ended June 30 2014.

### Group Purchasing Organization ("GPO")

Our GPO segment provides the participating physicians an attractive pricing for the Vaccines and Flu Shots and we get an administrative fee for volume of vaccines and flu shots ordered through our GPO.

### B.    Basis of Presentation

The Company (Orion HealthCorp, Inc, together with its wholly owned subsidiaries) was acquired on June 14th 2013 by way of stock purchase by Constellation Health LLC.

The Company continued as the same legal entity after the acquisition. The accompanying consolidated statements of operations, changes in shareholders' equity, and cash flows are presented for the period ended June 30, 2013, which is presented in two periods: the Predecessor 2013 period (January 1, 2013 to June 14, 2013) and the Successor 2013 period (June 15, 2013 to June 30, 2013) which relate to the period preceding the Orion Acquisition and the period succeeding the Orion Acquisition, respectively. Although the accounting policies followed by the Company are consistent for the Predecessor and Successor periods, financial information for such periods has been prepared under two different historical-cost bases of accounting and is therefore not comparable. The results of the periods presented are not necessarily indicative of the results that may be achieved for future periods. Certain reclassifications have been made to the 2013 consolidated financial statements to conform to the 2014 presentation. We have also performed an evaluation of subsequent events through the date the financial statements were issued.

After the acquisition of Orion which was effective June 14, 2014, on June 17, 2013, Orion HealthCorp, Inc., ("Orion") a Delaware corporation amended and restated its Certificate of Incorporation. Pursuant to the amendment, Class A and Class D shares of common stock were consolidated into authorized and issued 1,000 shares of common stock. As of December 31, 2013 Constellation Health, LLC, a Delaware limited liability company, owned all 1000 shares of Orion common stock. Constellation Health LLC has three members, all of which are Delaware limited liability companies. The three members of Constellation Health, LLC are: ( 1.) Constellation Health Group, LLC, with an address at, 200 East Randoph Drive, Chicago, Illinois 60601, (2.) Constellation Health Investment LLC with an address at, c/o A. Mitchell Greene, Robinson Brog 875 Third Avenue New York, New York 10022; and (3.) First United Health, LLC, with an address at, c/o A. Mitchell Greene, Robinson Brog 875 Third Avenue New York, New York 10022.

The Company acquired North East Medical Solution (NEMS), a Pennsylvania corporation effective April 1, 2014. The consolidated financials for six months ended June 30, 2014 include the financials of NEMS from April 1 2014 to June 30 2014.

### C.    Revenue Recognition

IPS, a Physician Practice Management Company (PPM), assumes all financial risk for the performance of the medical practices. The physicians are employees of the captive professional corporation bound by non-compete agreements and the authority of the IPS management structure in place.

IPS recognizes revenue at the time the services are provided by its affiliated medical groups. Net patient service revenue is impacted by billing rates, changes in current procedural terminology code reimbursement, and collection trends. IPS reviews billing rates at each of its affiliated medical groups, on at least an annual basis, and adjusts those rates based on each insurer's current reimbursement

90

practices. Amounts collected by IPS for treatment by its affiliated medical groups of patients covered by Medicare, Medicaid, and other contractual reimbursement programs, which may be based on cost of services provided or predetermined rates, are generally less than the established billing rates of IPS' affiliated medical groups. IPS estimates the amount of these contractual allowances and records a reserve against accounts receivable based on historical collection percentages for each of the affiliated medical groups, which include various payer categories. When payments are received, the contractual adjustment is written off against the established reserve for contractual allowances. The historical collection percentages are adjusted quarterly based on actual payments received, with any differences charged against net revenue for the quarter. Additionally, IPS tracks cash collection percentages for each medical group on a monthly basis, setting quarterly and annual goals for cash collections, bad debt write-offs and aging of accounts receivable. IPS is not aware of any material claims, disputes or unsettled matters with third party payers and there have been no material settlements with third party payers for the six months ended June 30 2014, Successor 2013 period, and the Predecessor 2013 period, respectively.

The Company also receives administration fees tiered by volume of Vaccines and Flu shots consumed by all participating physicians from pharmaceutical companies where it's participating doctors order the Vaccines and Flu Shots and administer vaccines. Revenue is recognized upon the administration of the vaccine by the doctor based on estimated usage during the year.

MBS, Rand, RMI and WSB's principal source of revenues is fees charged to clients based on a percentage of net collections of the client's accounts receivable. They recognize revenue and bill their clients when the clients receive payment on those accounts receivable. Our RCM business units typically receive payment from the client within 30 days of billing. The fees vary depending on specialty, size of practice, payer mix, and complexity of the billing. In addition to the collection fee revenue, MBS, Rand, On Line, RMI and WSB also earn fees from the various consulting services that they provide, including medical practice management services, managed care contracting, coding and reimbursement services and transcription services. Consulting services are recognized as revenue at the time services are performed.

### D.    Business Combinations

The Company accounts for all business combinations using the acquisition method of accounting. Under this method, assets and liabilities, including any remaining non-controlling interests, are recognized at fair value at the date of acquisition. The excess of the purchase price over the fair value of assets acquired, net of liabilities assumed, and non-controlling interests is recognized as goodwill. Certain adjustments to the assessed fair values of the assets, liabilities, or non-controlling interests made subsequent to the acquisition date, but within the measurement period, which is up to one year, are recorded as adjustments to goodwill. Any adjustments subsequent to the measurement period are recorded in income. Any cost or equity method interest that the Company holds in the acquired company prior to the acquisition is re-measured to fair value at acquisition with a resulting gain or loss recognized in income for the difference between fair value and the existing book value. Results of operations of the acquired entity are included in the Company's results from the date of the acquisition onward and include amortization expense arising from acquired tangible and intangible assets.

Identifiable Intangibles assets are valued based on the discounted value of earning potential of contacts pertaining to those business segments.

As part of an acquisition consideration, the Company may include, earn out component to the sellers/identified management team of the acquired company. This earn out is typically payable based on achieving certain revenue and profit levels. At each level of base, high and low scenario cases, this earn out is discounted to the present value at the time of acquisition and recorded as a liability. This liability is adjusted to fair value at each reporting date.

All expenses relating to the acquisitions are expensed as incurred.

91

### E.    Consolidation Policy

Our results for the Successor 2013 period, the Predecessor 2013 period and the six months ended June 30 2014, include the results of MBS, Rand, On Line, RMI, WSB, IPS and NEMS for the Successor 2013 period, the Predecessor 2013 period and the six months ended June 30 2014, respectively.

All intercompany balances and transactions have been eliminated in consolidation.

### F.    Estimates

The preparation of consolidated financial statements in conformity with U.S. generally accepted accounting principles requires us to make estimates and assumptions that affect the reported amounts of assets and liabilities, disclosures of contingent assets and liabilities at the date of the consolidated financial statements and the reported amounts of revenues and expenses during the reporting period. While we believe current estimates are reasonable and appropriate, actual results could differ from those estimates.

### G.    Concentrations of Credit Risk

Factors that could adversely impact our operations or consolidated financial results include, but are not limited to, the following: the global credit crisis, further deterioration of the credit markets, loss of large clients, interest rate increases, and changes in healthcare legislation.

We monitor our operations with a view to minimize the impact to our overall business that could arise as a result of the risks and uncertainties inherent in our business.

### H.    Cash and Equivalents

We consider all short-term investments with an original maturity of three months or less to be cash equivalents. As of June 30, 2014 and 2013, the Company had no cash equivalents.

### I.    Accounts Receivable and Allowance for Doubtful Accounts

MBS, Rand, On Line, RMI, WSB and NEMS evaluate the need for an allowance using historical loss experience and the assessment of other risks. The following table enumerates the allowances made on account of this business.

|  | Successor | |
| --- | --- | --- |
|  | June 30 2013 | June 30, 2014 |
|  | $ | $ |
| Allowances for doubtful accounts | 127,000 | 127,000 |

IPS' affiliated medical groups grant credit without collateral to its patients, most of which are insured under third-party payer arrangements. The allowance for doubtful accounts that relates to patient service revenues is based on an evaluation of potentially uncollectible accounts. The allowance for doubtful accounts includes a reserve for 100% of the accounts receivable older than 150 days. Establishing an allowance for bad debt is subjective in nature. IPS uses historical collection percentages to determine the estimated allowance for bad debts, and adjusts the percentage on a quarterly basis.

|  | Successor | |
| --- | --- | --- |
|  | June 30 2013 | June 30, 2014 |
|  | $ | $ |
| Allowances for doubtful accounts | 822,474 | 1,025,378 |

**Age Analysis of Past Due Financing Receivables**
**as of June 30, 2014**

|  | 30-59 days Past due $ | 60-89 days past due $ | Greater than 90 days $ | Total Past due $ | Current $ | Total financing receivables $ |
|---|---|---|---|---|---|---|
| 2014 |  |  |  |  |  |  |
| Commercial | 2,007,468 | 1,414,380 | 1,701,267 | 5,123,115 | 4,990,452 | 10,113,566 |

**Roll Forward Analysis of Contractual allowances and Provision for doubtful debts**
**Six months ended June 30, 2014**

|  | $ |
|---|---|
| **Closing Balance – December 31 2013** | **(936,136)** |
| Additions to Allowances | (416,946) |
| Bad debts adjusted | 200,704 |
| **Closing Balance – June 30 2014** | **(1,152,378)** |

We do not typically charge late fees or interest on past due accounts.

### J.      Inventory

Inventory consists of vaccines, which are stated at the lower of cost or market. Cost is determined under the first-in, first-out method.

### K.      Recent Accounting Pronouncements

From time to time, new accounting pronouncements are issued by the Financial Accounting Standards Board ("FASB") and are adopted by us as of the specified effective date. Unless otherwise discussed, the Company believes that the impact of recently adopted and recently issued accounting pronouncements will not have a material impact on its consolidated financial position, results of operations, and cash flows.

In February 2013, the FASB issued amended guidance on the disclosure of accumulated other comprehensive income. The amendments to the previous guidance require an entity to provide information about the amounts reclassified from accumulated other comprehensive income by component. In addition, an entity is required to present, either on the face of the statements of operations or in the notes, significant amounts reclassified from accumulated other comprehensive income to the statement of operations. The Company adopted this guidance in 2013 on a prospective basis, which did not impact its consolidated financial statements.

In July 2013, the FASB issued ASU No. 2013-11, *Income Taxes (Topic 740) — Presentation of an Unrecognized Tax Benefit When a Net Operating Loss Carryforward, a Similar Tax Loss, or a Tax Credit Carryforward Exists*. This amendment clarifies the guidance on the presentation of an unrecognized tax benefit, or a portion of an unrecognized tax benefit, in the financial statements as a reduction to a deferred tax asset for a net operating loss carryforward, a similar tax loss, or a tax credit carryforward. ASU No. 2013-11 is effective for fiscal periods beginning after December 15, 2013. The Company does not expect the adoption of this guidance to have a material impact on the consolidated financial statements.

93

**L.    Deferred Rent**

Deferred rent consists of rent escalation and lease incentive terms related to the Company's operating leases for its facilities. Deferred rent represents the difference between actual operating lease payments due and straight-line rent expense, which is recorded by the Company over the term of the lease, including any construction period. The excess of the difference between actual operating lease payments due and straight-line rent expense is recorded as a deferred credit in the early periods of the lease when cash payments are generally lower than straight-line rent expense, and is reduced in the later periods of the lease when payments begin to exceed the straight-line expense. Deferred rent accrued is $572,484 for the successor period ended June 30, 2014 and $471,375 for the successor year ended June 30, 2013.

**M.    Goodwill and Intangible Assets**

Goodwill represents the excess of cost over the fair value of net assets of companies acquired in business combinations accounted for using the purchase method.

Intangible assets include customer contracts and relationships and covenants not-to-compete acquired in connection with acquisitions, as well as software purchase and development costs. These intangible assets are amortized on a straight-line basis, which reflects the pattern in which economic benefits are expected to be realized. The Company concluded that use of the straight-line method was appropriate as the majority of the cash flows are expected to be recognized ratably over the estimated useful lives, without a significant degradation of the cash flows over time. The customer relationships and associated contracts represent the most significant portion of the value of the purchase price for every acquisition.

Goodwill and Intangibles are reviewed for possible impairment, annually or upon the occurrence of an event or when circumstances indicate that a reporting unit's carrying amount is greater than its fair value.

Identified Intangible assets are amortized using straight-line method over their estimated useful lives as follows:

|  | Estimated useful life |
| --- | --- |
| Management service agreements | 25 years |
| Client relationships | 5 years |
| Group Purchase agreements | 5 years |
| Trade name | 5 years |
| Non-compete agreement | 5 years |

Amortization is computed at rates considered sufficient to amortize the cost of the assets, using the straight-line method over their estimated useful lives. Intangibles were amortized by $925,748 for the six months ended June 30, 2014, $97,580 from June 15 to June 30, 2013 (Successor period) and $1,920,500 from January 1 to June 14, 2013 (Predecessor period).

**N.    Software Development Costs**

We capitalize software development costs in accordance with ASC 985-20, Costs of Software to be Sold, Leased, or Marketed. Research costs and software development costs, prior to the establishment of technological feasibility, determined based upon the creation of a working model, are expensed as incurred. Our software capitalization policy currently defines technological feasibility as a functioning beta test prototype with a confirmed working model, within a reasonably predictable range of costs. Additionally, technological feasibility is established when the Company has completed all planning, designing, coding, and testing activities that are necessary to establish that the product can be produced to meet its design specifications including functions, features, and technical performance requirements. Our policy is to amortize capitalized costs by the straight-line method over the remaining estimated economic life of the product. Software development costs capitalized in 2014 and

94

2013 were $2,391,966 for the successor six month ended June 30, 2014, $299,352 for the period June 15, 2013 to June 30, 2013 and $0 for predecessor period ended June 14, 2013, respectively.

**O.    Fair Value of financial instruments**

The carrying amounts for cash, cash equivalents, accounts payable, and accrued expenses approximate fair value because of their short-term nature. At June 30, 2014, the carrying value and accrued interest of the Term Loan is $23 million. See note 10 for further discussion of notes payable.

**P.    Fair Value Measurements**

The authoritative guidance for fair value measurements defines fair value as the price that would be received if an asset were to be sold or paid to transfer a liability in an orderly transaction between market participants on the measurement date. Market participants are buyers and sellers in the principal market that are (i) independent, (ii) knowledgeable, (iii) able to transact, and (iv) willing to transact. The guidance describes a fair value hierarchy based on the levels of inputs, of which the first two are considered observable and the last unobservable, that may be used to measure fair value which are the following:

Level 1 — Quoted prices in active markets for identical assets or liabilities

Level 2 — Inputs other than Level 1 that are observable, either directly or indirectly, such as quoted prices for similar assets or liabilities; quoted prices in markets that are not active; or other inputs that are observable or corroborated by observable market data for substantially the full term of the assets or liabilities

Level 3 — Unobservable inputs that are supported by little or no market activity and that are significant to the value of the assets or liabilities

**Quantitative Information about Level 2 Fair Value Measurements**

| Nature | Fair value at June 30, 2014 $ | Valuation Techniques | Unobservable input | Range (weighted average) |
|---|---|---|---|---|
| Measurement of earn out payable | 638,700 | Discounted cash flows | Discount rate Revenue growth rate | 10% -15% to +15% (0%) |

**Q.    Income Taxes**

Provisions for income taxes are based on taxes payable or refundable for the current year and deferred taxes on temporary differences between the tax basis of assets and liabilities and their reported amounts in the consolidated financial statements. Deferred tax assets and liabilities are included in the consolidated financial statements at currently enacted income tax rates applicable to the period in which the deferred tax assets and liabilities are expected to be realized or settled. As changes in tax laws or rates are enacted, deferred tax assets and liabilities are adjusted through the current period's provision for income taxes. A valuation allowance is provided for deferred tax assets if it is more likely than not that the asset will not be realizable.

The Company records a liability for unrecognized tax benefits resulting from uncertain tax positions taken (or expected to be taken) in a tax return before the uncertain tax positions are finally resolved with the taxing authority. If the Company considers that a tax position is "more-likely-than-not" to be sustained upon an audit by the taxing authority, based solely on the technical merits of the tax position, it recognizes the tax benefit. The Company measures the tax benefit by determining the largest amount that is greater than 50% likely of being realized upon settlement, presuming that the tax position is examined by the appropriate taxing authority that has full knowledge of all relevant information. The Company recognizes estimated future interest and penalties related to unrecognized tax positions, if any, as income tax expense in the consolidated statements of operations.

None of the Company's federal or state income tax returns are currently under examination by the Internal Revenue Service or state authorities. The Company is generally no longer subject to U.S. federal, state, or local income tax examinations by tax authorities for years before 2009.

**2.    Segment reporting information**

| | *Predecessor Period* | *Successor Period* | |
| --- | --- | --- | --- |
| | *January 1, 2013 through June 14, 2013* | *June 15, 2013 through June 30, 2013* | *January 1, 2014 through June 30, 2014* |
| | *$* | *$* | *$* |
| **Revenue Cycle Management** | | | |
| Revenues | 15,849,628 | 1,283,577 | 13,550,828 |
| Depreciation, Depletion and Amortization | 1,970,704 | 145,925 | 1,763,836 |
| Operating Income | 3,237,951 | 717,726 | 4,166,468 |
| **GP & Corporate** | | | |
| Revenues | 579,353 | 87,322 | 3,263,699 |
| Depreciation, Depletion and Amortization | 217,098 | (9,559) | (148,186) |
| Operating Income/(Loss) | (1,491,656) | (651,793) | 2,231,361 |
| **Practice Management:** | | | |
| Revenues | 7,371,072 | 673,838 | 8,510,691 |
| Depreciation, Depletion and Amortization | 13,850 | 445 | 4,550 |
| Operating Income | (104,328) | (537) | 779,742 |

Corporate expenses that are incurred for the company's general administration have not been apportioned to other business segments. These costs are grouped under General Purchasing and Corporate segment.

The operating segments are identified and reported on the basis of internal reports about components of the group that are regularly reviewed by the Management Board to assess the performance of the segments.

The group's internal management reporting is structured primarily on the basis of the market segments in which the 3 operating segments – Revenue Cycle Management, Practice Management and General Purchasing (GP) & Corporate – operate.

Management assesses the performance of segments based on the measures of revenue and earnings before depreciation, interest and taxes (EBDIT), whereby the EBDIT measure includes allocations of expenses from supporting functions within the group.

Company runs shared services for each of its three segments. All resources, who form part of General management & administration, HR, Finance and accounting, IT, call center are part of shared services that are used by one or more segments and have been included in the reallocation.

Such allocations have been determined by the best management estimates based on number of resources served, volume of transactions processed and or relevant measures that reflect the level of benefits of these functions to each of the operating segments. As the 3 operating segments serve only external customers, there is no inter-segment revenue. Interest income and expenses and tax are not allocated to the segments. There is no measure of segment (non-current) assets and/or liabilities provided to the Management Board.

*Reconciliation of reportable segment revenues and profit or loss to the consolidated totals:*

| | Predecessor Period | Successor Period | |
| --- | --- | --- | --- |
| | January 1, 2013 through June 14, 2013 $ | June 15, 2013 through June 30, 2013 $ | January 1, 2014 through June 30, 2014 $ |
| Total Revenues for reportable segments | 23,800,052 | 2,044,737 | 25,325,218 |
| **Total Consolidated revenues** | **23,800,052** | **2,044,737** | **25,325,218** |
| | | | |
| Operating Profit for reportable segments | 1,641,967 | 65,396 | 7,177,571 |
| Depreciation & amortization | (2,201,652) | (136,811) | (1,620,200) |
| Interest expense | (3,144,520) | (30,119) | (1,496,112) |
| Gain (loss) on disposal of fixed assets | 664 | — | — |
| Other income (expense), net | (74,591) | (31,965) | (1,199,549) |
| Provision for income taxes | — | — | (1,436,878) |
| **Net income (loss)** | **(3,778,132)** | **(133,499)** | **1,424,832** |

### 3.    Property and Equipment

Property and equipment are presented at cost. Depreciation is computed at rates considered sufficient to depreciate the cost of the assets, using the straight-line method over their estimated useful lives and capital leases and leasehold improvements being in the nature of operating leases are amortized over the lease term, as follows:

| | *Estimated useful life* |
| --- | --- |
| Computer equipment | 2 – 5 years |
| Office equipment | 5 – 7 years |
| Furniture and fixtures | 5 – 7 years |
| Leasehold improvements | Lease term |
| Capital leases | Lease term |
| Medical and surgical equipment | 5 years |
| Automobiles | 5 years |

Property and equipment, net consists of the following at June 30, 2013 and 2014:

| | *Successor* | Successor |
| --- | --- | --- |
| | *June 30 2013* $ | *June 30, 2014* $ |
| Computer equipment and software | 8,895,076 | 9,568,795 |
| Office equipment | 548,321 | 563,038 |
| Furniture and fixtures | 606,970 | 606,971 |
| Leasehold improvements | 107,948 | 107,949 |
| Medical and surgical equipment | 19,529 | 19,529 |
| Total | 10,177,844 | 10,866,282 |
| Less accumulated depreciation | (4,772,148) | (6,076,202) |
| **Property and equipment, net** | **5,405,696** | **4,790,080** |

We recorded depreciation expense related to the above assets, $694,452 for the six month ended June 30, 2014, $62,644 and $281,152 for the successor period June 14 to June 30, 2013 and predecessor period January 1 to June 14, 2013, respectively.

The above asset categories include assets on capital lease:

|  | *Successor* | Successor |
|---|---|---|
|  | *June 30 2013* | *June 30, 2014* |
|  | *$* | *$* |
| Computer equipment and software | 598,023 | 598,023 |
| Office equipment | 235,137 | 235,137 |
| Furniture and fixtures | 77,706 | 77,706 |
| Total | 910,866 | 910,866 |
| Less Accum Amortization | (910,866) | (910,866) |
| **Net book value** | — | — |

### 4.    Advertising and Business Promotion Costs

Advertising and business promotion costs are charged to operations as incurred.

|  | *Predecessor* | *Successor* | |
|---|---|---|---|
|  | *January 1, 2013 through June 14, 2013* | *June 15, 2013 through June 30, 2013* | *January 1, 2014 through June 30, 2014* |
|  | *$* | *$* | *$* |
| Advertisement and business promotion costs | 11,642 | 13,305 | 102,595 |

### 5.    Deferred finance costs

The Company incurred $1,185,000 towards debt syndication fees for new debt funding in 2013. This was categorized as deferred finance costs and was being amortized over the term of the debt. In 2014, this funding arrangement was replaced by a new funding arrangement, hence the balances of unamortized amounts are charged to expenses in six months ended June 30, 2014.

In April 2014 as part of the new loan arrangement, $1,155,000 was incurred towards deferred finance costs. For the six months ended June 30, 2014 $49,149 was amortized using straight line method and balance of unamortized amounts will be amortized over the term of the loan. Refer note # 10 for more details on the new debt arrangement.

**6.    Acquisitions**

1)      The Company was acquired on June 14, 2013 (the 'Acquisition Date') by way of stock purchase.

Acquisition related transaction costs include investment banking, legal and accounting fees and other costs directly related to the acquisition. Total transaction's costs paid/accrued is $5.31 million and include $1.19 million towards debt issuance fees, capitalized as debt issuance costs and deferred to be amortized over the term of the loan.

***Purchase Price Allocation:***

The Acquisition was recorded under the acquisition method of accounting by the Parent and pushed-down to the Company by allocating the purchase consideration of $30.43 million to the cost of the assets acquired, including intangible assets, based on their estimated fair values at the Acquisition Date. The allocation of purchase price is based on management's judgment after evaluating several factors, including, but not limited to, valuation assessments of tangible and intangible assets. The excess of the total purchase price over the fair value of assets acquired and the liabilities assumed of $27.93 million is recorded as goodwill. The goodwill arising from the Acquisition consists largely of the commercial potential of the Company and the value of the assembled workforce.

The following sets forth the Company's purchase price allocation (in thousands):

|  | $'000 |
|---|---|
| Cash and cash equivalents | 1,120 |
| Accounts receivable, net | 6,174 |
| Inventory | 272 |
| Prepaid expenses and other current assets | 1,457 |
| Property and equipment, net | 960 |
| Intangible assets | 10,500 |
| Other assets, net | 232 |
| Accounts payable | (3,625) |
| Current portion of capital lease obligations | (26) |
| Income tax payable – current | (5,517) |
| Liability for uncertain tax positions | (6,038) |
| Deferred tax liability | (3,011) |
| **Total Purchase price allocation** | **2,499** |

The Company finalized its evaluation of the fair value of the assets acquired and liabilities assumed and the resulting purchase price allocation subsequent to June 14, 2013. As a result, adjustments were made to the preliminary purchase price allocation that impacted the allocation of certain intangible assets to the Company's reportable segments.

The Company has acquired intangible assets, not including goodwill, totaling approximately $10.50 million in the Acquisition. The amortization of these intangibles is not deductible for tax purposes and hence the Company has recorded a deferred tax liability of approximately $3.01 million to offset the future book amortization related to these intangibles.

During the process of acquisition of Orion, a contingent consideration was set up for identified management team. This earn out is based on a minimum revenue generated for 2013 and 2014. A pool of $1 million and $3 million was allocated for 2013 and 2014 respectively. As a part of Purchase price allocation, on the date of acquisition of Orion, this liability was discounted to the present value based on the base, best and low scenarios of achieving the targeted revenue for 2013 and 2014. The discounted liability on this account was accrued at $1.9 million. These amounts were revalued again as of December 31, 2013 and were considered reduced to zero, as the obligation based on meeting the revenue targets was determined not probable as of that date . This reversal of contingent liability is shown under other income.

### Identifiable Intangible Assets

In performing the purchase price allocation, the Company considered, among other factors, the intended future use of acquired assets, analyses of historical financial performance and estimates of future performance. The following table sets forth the components of intangible assets as of the date of the Acquisition (in thousands):

|  | $'000 |
|---|---|
| **Identifiable Intangible Assets:** | |
| Customer Relationships | 7,900 |
| Group Purchasing Agreements | 600 |
| Management Service Agreement | 2,000 |
| **Total Identifiable Intangible Assets** | **10,500** |

Customer relationships represent the fair value of the existing customer base.

2)    In April 1, 2014, the Company's parent, Constellation Health LLC (Constellation), acquired North East Medical Solutions (NEMS), a Revenue Cycle Management company, based out of Pennsylvania, USA. NEMS was acquired for a total consideration of $2.79 million for a 100% ownership with 100% voting rights. Constellation transferred this acquisition to Orion Healthcare, immediately thereafter on the same day.

### Purchase Price Allocation:

The allocation of purchase price is based on management's judgment after evaluating several factors, including, but not limited to, valuation assessments of tangible and intangible assets. The excess of the total purchase price over the fair value of assets acquired and the liabilities assumed of $1.82 million is recorded as goodwill. The goodwill arising from the Acquisition consists largely of the commercial potential of the Company and the value of the assembled workforce.

The following sets forth the Company's purchase price allocation (in thousands):

|  | $'000 |
|---|---|
| Cash and cash equivalents | 11.90 |
| Accounts receivable, net | 393.49 |
| Prepaid expenses and other current assets | 5.95 |
| Property and equipment, net | 617.55 |
| Intangible assets | 715.00 |
| Other assets, net | 15.18 |
| Accounts payable | (571.67) |
| Accrued Expenses | (173.69) |
| Current portion of capital lease obligations | (47.02) |
| **Total Purchase price allocation** | **966.69** |

The Company has acquired intangible assets, not including goodwill, totaling approximately $715 thousands in the acquisition.

|  | $ in thousands |
|---|---|
| **Identifiable Intangible Assets:** | |
| Trade Name | 220 |
| Group Purchasing Agreements | 15 |
| Management Service Agreement | 480 |
| **Total Identifiable Intangible Assets** | **715** |

A contingent consideration was set up for identified management team. This earn out is based on a minimum revenue generated for 2014 and 2015. A pool of $367,000 and $474,000 was allocated for 2015 and 2016 respectively. As a part of Purchase price allocation, on the date of acquisition of NEMS, this liability was discounted to the present value based on the base, best and low scenarios of achieving the targeted revenue for 2014 and 2015. The discounted liability on this account was accrued at $638.70 thousands.

NEMS was acquired to foray into a different geographical area and increase the customer base. Along with organic growth plans, the company also constantly is looking for inorganic growth opportunities.

The revenues from NEMS were consolidated from April 2014, totaling $783,000 for the quarter ended June 30, 2014. If NEMS was acquired at the beginning of the year, the additional revenues of $800,000 would also have been included.

### 7.    Other Assets

Other assets consist of the following at June 30, 2013 and 2014:

|  | *June 30 2013* | *June 30, 2014* |
|---|---|---|
|  | *$* | *$* |
| Deposits | 209,007 | 224,254 |
| **Total** | **209,007** | **224,254** |

### 8.    Prepaid and other current assets

|  | *Successor* | Successor |
|---|---|---|
|  | *June 30 2013* | *June 30, 2014* |
|  | *$* | *$* |
| Prepaid rent and Insurance | 468,601 | 253,280 |
| Other prepaid expenses | 182,451 | 41,567 |
| Compensation related expenses | 442,290 | — |
| Prepaid legal fees | 60,000 | — |
| IPO related advances | — | 539,958 |
| Prepaid vendor costs | — | 600,000 |
| **Total** | **1,153,342** | **1,434,805** |

### 9.    Intangible Assets, excluding Goodwill, net

Intangible assets, excluding goodwill, net consist of the following at June 30, 2013 and 2014:

|  | *Successor* | Successor |
|---|---|---|
|  | *June 30 2013* | *June 30, 2014* |
|  | *$* | *$* |
| Software tool – work in progress | 299,351 | 4,487,430 |
| Client relationships | 7,900,000 | 8,380,000 |
| Management service agreements | 2,000,000 | 2,000,000 |
| Group Purchasing agreements | 600,000 | 600,000 |
| Trade name | — | 220,000 |
| Non-compete agreement | — | 15,000 |
|  | 10,799,351 | 15,702,430 |
| Less accumulated amortization | (74,167) | (1,889,917) |
| **Net amount** | **10,725,184** | **13,812,513** |

Estimated future annual amortization of our identifiable intangible assets is as follows:

|  | $ |
|---|---|
| Year ending December 31: |  |
|    6 month ended December 31, 2014 | 959,500 |
|    Year ended December 31, 2015 | 2,816,486 |
|    Year ended December 31, 2016 | 2,816,486 |
|    Year ended December 31, 2017 | 2,816,486 |
|    Year ended December 31, 2018 | 1,895,653 |
| Thereafter | 2,488,903 |
| **Total** | **13,793,513** |

### 10.   Line Of Credit And Long-Term Debt

The Company entered into a new loan agreement dated March 31 2014 to replace the loan facility entered on June 17, 2013. The new loan facility is a $40,000,000 Senior debt facility, bearing fixed interest at 10.00%, interest payable monthly, plus an additional 2% payable in kind interest. Principal payments start from June 30 2015, maturing on March 31, 2018, collateralized by a blanket lien on all assets.

For the successor year ending June 30, 2013 the outstanding line of credit balance totaled $500,000.

Our existing credit agreement for our line of credit contains certain financial covenants that require us to maintain minimum levels of monthly EBITDA, a minimum fixed charge coverage ratio, a maximum senior debt leverage ratio, and other customary terms and conditions.

Long-term debt consisted of the following at June 30, 2013 and 2014:

|  | Successor | Successor |
|---|---|---|
|  | June 30 2013 | June 30, 2014 |
|  | $ | $ |
| $40,000,000 senior note payable to a financial institution, bearing fixed interest at 10.00%, interest payable monthly plus 2% payable in kind interest, principal payments monthly based onschedule, maturing on March 31, 2018, collateralized by a blanket lien on all assets. | — | 23,000,000 |
| $9,000,000 Term loan A payable to a financial institution, bearing fixed interest at 11.00%, interest payable monthly, principal payments monthly based on schedule after 6 months, maturing May 31, 2017, collateralized by a blanket lien on all assets. | 9,000,000 | — |
| $6,500,000 Term loan B payable to a financial institution, bearing fixed interest at 12.00%, interest payable monthly plus an additional 3% PIK interest, principal payments payable after full repayment of Term loan A, maturing May 31, 2017, collateralized by a blanket lien on all assets. | 6,500,000 | — |
| Total | 15,500,000 | 23,000,000 |
| Less current maturities | — | (1,150,000) |
| **Long term debt** | **15,500,000** | **21,850,000** |

Future aggregate annual maturities of the debt are as follows:

| | $ |
|---|---|
| **Year ending December 31:** | |
| 2015 | 3,450,000 |
| 2016 | 4,600,000 |
| 2017 | 4,600,000 |
| 2018 | 10,350,000 |
| **Total debt** | **23,000,000** |

Our credit agreement for our Term loans contains certain financial covenants that require us to maintain a maximum leverage ratio and other customary terms and conditions. Post-acquisition, the company has met all the financial covenants for the debt.

During the year as a part of acquisition of the Company, old debt was retired and replaced by new debt funds. As a part of purchase price allocation this was push down to the company from the parent.

### 11.    Accrued Expenses

Accrued expenses consisted of the following at June 30, 2014 and 2013:

| | Successor | Successor |
|---|---|---|
| | *June 30 2013* | *June 30, 2014* |
| | *$* | *$* |
| Compensation and related taxes | 1,032,135 | 626,055 |
| Interest | 70,847 | 199,411 |
| Deferred rent | 471,375 | 572,484 |
| Deferred acquisition deal fees | 1,850,000 | — |
| Professional Fees Payable | 265,226 | 305,437 |
| Other | 358,582 | 381,795 |
| **Total** | **4,048,165** | **2,085,182** |

### 12.    Operating Leases

We lease our facilities and corporate office space under operating leases that expire in various years through 2022. The leases provide for annual operating expense increases. Annual rental payments related to our facility leases totaled $962,922, $155,213 and $869,462 for the six month period ended June 30, 2014 and June 15 to June 30 2013, and January 1 to June 14, 2013 respectively.

Future annual base rental expenses under these lease agreements are as follows:

| | $ |
|---|---|
| **for the year ended** | |
| 2014 | 985,647 |
| 2015 | 1,867,619 |
| 2016 | 1,548,699 |
| 2017 | 1,230,810 |
| 2018 | 1,104,943 |
| Thereafter | 2,233,562 |
| **Total** | **8,971,280** |

### 13.    Income Taxes

The provision for income taxes for 6 months ended June 30, 2013 and 2014 is summarized as follows:

|  | *Successor* | Successor |
|---|---|---|
|  | *June 30 2013* | *June 30, 2014* |
|  | *$* | *$* |
| Current: |  |  |
| Federal | — | 1,161,588 |
| State | — | 203,958 |
| Interest | — | 802,558 |
| Penalties | — | 2,531,600 |
| Total | — | 4,699,704 |
| Deferred: |  |  |
| Federal | — | 71,332 |
| State | — | — |
| Valuation allowance | — | — |
| Total | — | — |
| **Provision for Income taxes** | **—** | **4,771,036** |

Income tax payable as of June 30 2013 and 2014 is $11,554,614 and $14,023,545 respectively. The following are components of the income tax payable:

1)    Tax liability on uncertain tax positions – $ 6,038,000 is included as of June 30 2013 and June 30, 2014 respectively. The Company recorded a liability for unrecognized tax benefits resulting from uncertain tax positions taken (or expected to be taken) in a tax return before the uncertain tax positions are finally resolved. This is based on the assumption that the net operating loss (NOL's) as on the date of acquisition, are not available to the successor to set off against the forgiveness of debt taken by the predecessor.

2)    Potential interest and penalties arising on the potential tax payable on the cancellation of debt (including the tax liability on uncertain tax positions) up to June 30, 2014 have been provided amounting to $712,000 and $2,311,000 respectively.

Interest on other tax payable (excluding the cancellation of debt) has been provided amounting to $90,558. Also potential penalties for late payments of $220,600 have been provided.

3)    Balance of tax payable as of June 30 2013 and June 30 2014 is $5,516,614 and $7,985,545, respectively and is segregated as summarized below:

|  | *Predecessor* | *Successor* | |
|---|---|---|---|
|  | *January 1, 2013 to June 14, 2013* | *June 15, 2013 to December 31, 2014* | *January 1, 2014 to June 30, 2014* |
|  | *$* | *$* | *$* |
| Current tax | 5,516,614 | 1,103,386 | 1,365,545 |

The tax liability in the predecessor is due to the forgiveness of debt after the adjustment of available NOL's. Since this forgiveness forms part of the acquisition settlement, this has been recognized only through the purchase price allocation.

For the period ended June 30, 2014, the Company's effective income tax rate was 37% and for the period ending June 30, 2013, the Company's effective income tax rate varied from the statutory federal income tax rate principally due to changes in the valuation allowance applied to the net deferred tax asset.

Our provision for federal and state taxes is comprised primarily of taxes from states that assess franchise and margin tax. Significant components of net deferred tax assets and liabilities are as follows:

Deferred tax liabilities:

| | *Successor* | Successor |
|---|---|---|
| | *June 30 2013*<br>*$* | June 30, 2014<br>$ |
| Depreciation | 1,079,000 | 1,052,332 |
| Intangibles, amortization not available for tax deduction | 1,932,000 | 2,214,000 |
| Total deferred tax liabilities | 3,011,000 | 3,266,332 |
| Deferred tax assets | — | — |
| Total deferred tax assets | — | — |
| **Total net deferred tax liability** | **3,011,000** | **3,266,332** |
| Valuation allowance | — | — |
| **Net deferred tax liability** | **3,011,000** | **3,266,332** |

4) Constellation Health LLC and the Company have entered into a tax indemnity agreement pursuant to which Constellation Health LLC has agreed to indemnify the Company against certain tax liabilities.

   Prior to the Company's acquisition, the Company was a party to several promissory notes pursuant to which it borrowed funds from certain lenders. The lenders agreed to receive proceeds from the Company's acquisition on amounts less than the amounts owed by the Company under the notes, in full satisfaction of the Company's obligations under the notes (the "Cancellation of Debt").

   Constellation Health LLC has agreed to indemnify the Company should the Cancellation of Debt cause the Company to be liable for any taxes in excess of the indemnification coverage provided in the Company's merger agreement but subject to a maximum of $12 million plus an amount equivalent to any applicable interest, fines, penalties, costs and charges thereon.

## 14.    Stock Based Compensation, Warrants and Options

At December 31, 2012, the Company had stock-based employee compensation. The Company recognized share-based payments to employees in the consolidated financial statements based on their fair values at the date of grant. The calculated fair value is recognized as expense over the requisite service period, net of estimated forfeitures, using the straight- line method. The Company considered many factors when estimating expected forfeitures, including types of awards, employee class and historical experience. The cost was based on the fair value at the grant date. The Company used the Black-Scholes model to determine the fair value of options.

At June 30, 2014, the Company does not have stock-based employee compensation.

For the Successor period ended June 30, 2014 and period ended June 30 2013, the Company did not have any impact of our stock-based employee compensation plan on our consolidated statements of operations.

*Transactions with Other than Employees*

The company has cancelled all outstanding options upon acquisition and does not have any outstanding warrants or options as of June 30, 2014 and June 30, 2013. The Company also did not issue any warrants in 2013 and 2014.

There are also no outstanding restricted stock units and options as at the Successor period ended June 30, 2014 and June 30, 2013.

### 15.    401(K) Plan

We have an employee retirement savings plan under Section 401(k) of the Internal Revenue Code for all eligible employees of Orion HealthCorp, Inc. Participants are permitted to defer compensation up to the dollar limitation as defined by the IRS for the taxable year. On a discretionary basis, we may match up to 50% of the first 6% of the non-highly compensated employee's deferrals. Orion's contributions vest beginning in the second year in equal installments over three years, and are 100% vested after four years. For the Successor period ending June 30, 2014 and June 30, 2013 and predecessor period ending June 14, 2013, the Company did not contribute any sums to match the contributions.

### 16.    Commitments and Contingencies

As of June 30, 2014, our combined based annual salary commitments related to all employment agreements totaled $2,144,450 through 2014.

We are involved in various legal proceedings and claims arising in the ordinary course of business. Our management believes that the disposition of these additional matters, individually or in the aggregate, is not expected to have a materially adverse effect on our consolidated financial condition. However, depending on the amount and timing of such disposition, an unfavorable resolution of some or all of these matters could materially affect our future results of operations or cash flows in a particular period.

### 17.    Related party transactions

During the successor period ended June 30, 2014, there were no related party transactions relating to sales and purchases. Balance payable to Constellation Health (Parent) as at June 30, 2014 is $180,944.

Since the Acquisition Date, Paul Parmar has not received any remuneration or fees from the Company. On Admission, the Company's consulting agreement with First United Health LLC and Paul Parmar will become effective as disclosed in 6.1(a) of Part VII.

# PART VI

# TRANSFER RESTRICTIONS

This document has been prepared by the Company in connection with the placing of the Placing Shares (i) outside the United States to non-US Persons in transactions exempt from registration with the SEC in reliance on Regulation S and (ii) in the United States to "qualified institutional buyers" within the meaning of Rule 144A in a private placement exempt from registration in reliance on Regulation D under the US Securities Act. Defined terms used in this Part VI shall bear the meanings set out in Regulation S, Rule 144A and Regulation D.

Save where a relevant exemption applies as described below, the Placing is not being made, directly or indirectly, to, or for the account or benefit of, any US Person or in or into the United States, Australia, the Republic of South Africa, the Republic of Ireland, Japan or Canada or in any other country outside the United Kingdom where such distribution may lead to a breach of any legal or regulatory requirement. Accordingly, unless an exemption under relevant securities law is available, the Common Shares may not be offered, sold, transferred, or delivered, directly or indirectly, to, or for the account or benefit of, any US Person or in or into the United States, Australia, the Republic of South Africa, the Republic of Ireland, Japan or Canada or any other country outside the United Kingdom where such offer, sale, transfer or delivery would breach applicable laws or regulations.

The Common Shares have not been and will not be registered under the US Securities Act. The Common Shares may not be offered or sold within the United States or to US Persons, except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the US Securities Act.

A purchaser of Common Shares may not offer, sell, pledge or otherwise transfer such securities in the United States or to, or for the account or benefit of, any US Person, except (a) pursuant to an effective registration statement under the US Securities Act, (b) to a person whom the seller reasonably believes is a "qualified institutional buyer" within the meaning of, and in a transaction meeting the requirements of, Rule 144A, (c) in certain transactions specified in Regulation S, or (d) pursuant to another exemption from the registration requirements of the US Securities Act.

## Regulation S Offering

### Category 3 Compliance Period

The Overseas Placing Shares offered in the Placing are subject to the conditions listed under section 903(b)(3), or Category 3, of Regulation S. Under Category 3, Offering Restrictions (as defined under Regulation S) must be in place in connection with the Placing and additional restrictions are imposed on re-sales of the Overseas Placing Shares, as described below. All Overseas Placing Shares are subject to these restrictions.

Subject to the procedures that the Company may need to implement in order to facilitate the settlement of its securities in CREST in compliance with new rules to be implemented by the London Stock Exchange in accordance with the EU Regulation on Central Securities Depositories (see "Settlement in CREST" below), prior to one year after the later of (i) the time when the Overseas Placing Shares are first offered to persons other than distributors in reliance upon Regulations S and (ii) the date of closing of the Placing, or such longer period as may be required under applicable law (the "Compliance Period"):

(a)    every purchaser of Overseas Placing Shares, other than a distributor, will be required to certify that it is not a US person and is not acquiring the securities for the account or benefit of any US person or is a US person who purchased the securities in a transaction that did not require registration under the US Securities Act;

(b)    every purchaser of the Overseas Placing Shares will be required to agree to resell such Placing Shares only in accordance with the provisions of Rule 144A, Rule 144 (if available) or Regulation S, or pursuant to an effective registration statement under the Securities Act, and will be required to agree to not engage in hedging transactions with regard to the securities unless in compliance with the US Securities Act;

(c)    the Overseas Placing Shares will contain a legend to the effect that transfer is prohibited except in accordance with the restrictions set forth in (a) and (b) above during the Compliance Period;

(d)    each distributor selling securities to a distributor, a dealer (as defined in Section 2(a)(12) of the US Securities Act), or a person receiving a selling concession, fee or other remuneration prior to the expiration of a one-year distribution compliance period will be required to send a confirmation or other notice to the purchaser stating that the purchase is subject to the same restrictions on offers and sales that apply to a distributor; and

(e)    pursuant to the Certificate of Incorporation and the Bylaws, the Company will be required to refuse to register any transfer of its securities not made in accordance with the provisions of Regulation S or pursuant to registration under the US Securities Act or an exemption from registration under the US Securities Act.

*Additional Representations*

In addition to the applicable representations set forth above, each purchaser of Overseas Placing Shares will, pursuant to the terms and conditions of the Placing, warrant and represent to and agree with the Company as follows:

(a)    the purchaser understands that until such time as the restrictions on transfer set forth herein are no longer applicable or otherwise until determined by the Company, the Overseas Placing Shares may remain in certificated form and carry a restrictive legend in substantially the following form:

"THE COMMON SHARES EVIDENCED HEREBY HAVE NOT BEEN AND WILL NOT BE REGISTERED UNDER THE US SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR WITH ANY SECURITIES REGULATORY AUTHORITY OF ANY STATE OR OTHER JURISDICTION OF THE UNITED STATES AND MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT (A)(1) TO A PERSON WHOM THE SELLER AND ANY PERSON ACTING ON ITS BEHALF REASONABLY BELIEVES IS A QUALIFIED INSTITUTIONAL BUYER WITHIN THE MEANING OF RULE 144A UNDER THE SECURITIES ACT PURCHASING FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A QUALIFIED INSTITUTIONAL BUYER IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 144A, (2) IN AN OFFSHORE TRANSACTION COMPLYING WITH RULE 903 OR RULE 904 OF REGULATION S UNDER THE SECURITIES ACT OR (3) PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT PROVIDED BY RULE 144 THEREUNDER (IF AVAILABLE) AND (B) IN ACCORDANCE WITH ANY APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES OR ANY OTHER JURISDICTION. NO REPRESENTATION CAN BE MADE AS TO THE AVAILABILITY OF THE EXEMPTION PROVIDED BY RULE 144 UNDER THE SECURITIES ACT FOR THE RESALE OF COMMON SHARES";

(b)    the purchaser understands that Overseas Placing Shares will remain in certificated form and will not be capable of settlement through CREST until expiration of the transfer restrictions set forth herein, or otherwise until determined by the Company, and then only upon (i) the Company having made appropriate arrangements through CREST for the issue of depository interests in respect thereof; and (ii) delivery of the certificated security certificate to the principal registrar, branch registrar or UK transfer agent (as applicable) together with such evidence as the Company may require (in its sole discretion) to demonstrate that the transfer restrictions set forth in this document have been complied with; and

(c)     the purchaser acknowledges that the Company, finnCap and others will rely upon the truth and accuracy of the foregoing acknowledgements, representations and warranties and agrees that if any such acknowledgement, representation or warranty deemed to have been made by virtue of its purchase of Overseas Placing Shares is no longer accurate, it shall promptly notify the Company and finnCap and, if it is acquiring any Overseas Placing Shares as a fiduciary or agent for one or more accounts it represents, that it has sole investment discretion with respect to each such account and that it has full power to make the foregoing acknowledgements, representations and agreements on behalf of each such account.

**Regulation D Private Placement**

**Due to the following restrictions, purchasers of US Placing Shares in the United States are advised to consult legal counsel prior to making any offer for, resale, pledge or other transfer of the US Placing Shares.**

*Purchaser Representations*

Each purchaser of the US Placing Shares who is located in the United States will be deemed to have warranted and represented and agreed that it has received a copy of this document and such other information as it deems necessary to make an investment decision and that:

(a)     it is: (i) a "qualified institutional buyer" within the meaning of Rule 144A; (ii) acquiring such US Placing Shares for investment and for its own account; (iii) not acquiring the US Placing Shares with a view to further distribution or resale of such US Placing Shares or any part thereof in any transaction that would be in violation of the US Securities Act or any state securities or "blue sky" laws; and (iv) aware and each beneficial owner of such US Placing Shares has been advised that the sale of US Placing Shares to it is being made in reliance on Regulation D;

(b)     it understands that the US Placing Shares have not been, and will not be, registered for sale under the US Securities Act or any state securities or "blue sky" laws in reliance on exemptions from the US Securities Act or with any securities regulatory authority of any state or other jurisdiction of the United States and may not be offered, sold, pledged or otherwise transferred except: (i) pursuant to an effective registration statement under the US Securities Act; (ii) to a person whom it and any person acting on its behalf reasonably believes is a "qualified institutional buyer" within the meaning of Rule 144A under the US Securities Act purchasing for its own account or for the account of a qualified institutional buyer in a transaction meeting the requirements of Rule 144A; (iii) in an "offshore transaction" complying with Rule 903 or Rule 904 of Regulation S; (iv) as provided by Rule 144 under the US Securities Act (if available), or (v) any other applicable exemption from registration under the US Securities Act, in each case in accordance with any applicable securities laws of any state of the US;

(c)     it acknowledges that the US Placing Shares offered and sold pursuant to the Placing are "restricted securities" within the meaning of Rule 144(a)(3) under the US Securities Act, are being offered and sold in a transaction not involving any public offering in the United States within the meaning of the US Securities Act, and that no representation is made as to the availability of the exemption provided by Rule 144 for resales of the US Placing Shares;

(d)     it has been furnished with and/or had access to, and has read and reviewed, all documents and information that the purchaser deemed necessary to evaluate the merits and risks of the purchaser's investment, including, without limitation, this document, and has had the opportunity to ask questions of and has received satisfactory answers from the officers of the Company concerning the Company, and is aware of the Company's business affairs and financial condition and has acquired sufficient information about the Company to reach an informed and knowledgeable decision to acquire the US Placing Shares;

(e)     it has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of acquiring and holding the US Placing Shares;

(f)     it understands that the US Placing Shares (to the extent they are in certificated form), unless otherwise determined by the Company in accordance with applicable law, will bear a legend substantially in the form set out above;

(g)     it will furnish to the Company or its designee, if the Company so requests, an opinion, in form and substance acceptable to the Company, of counsel experienced in securities law matters, regarding any disposition of the US Placing Shares to the effect set forth above, and such other documents as the Company may require (including a letter from the person purchasing from the holder of US Placing Shares providing representations in the manner set out above); and

(h)     it acknowledges that the Company, finnCap and others will rely upon the truth and accuracy of the foregoing acknowledgements, representations and warranties and agrees that if any such acknowledgements, representations or warranties deemed to have been made by virtue of its purchase of US Placing Shares are no longer accurate, it shall promptly notify the Company.

**Resales of Regulation D Common Shares**

The restrictions described above will generally not prohibit a resale on AIM of the US Placing Shares following the Placing, provided it is done in a valid transaction under Regulation S. However, due to the restrictions described above, subscribers for and subsequent purchasers of the US Placing Shares and their brokers may be required to execute representation letters prior to resales of such shares and provide legal opinions. Among other things, prior to any resale during such period, and in addition to certain other representations, a reseller of US Placing Shares and such reseller's broker may each be required to represent that neither such reseller, nor any person acting on such reseller's behalf, knows that the resale transaction has been pre-arranged with a buyer in the United States. The Company reserves the right to modify this process as may be deemed necessary or appropriate and may require such other documentation evidencing a valid exemption from registration to comply with applicable US securities law requirements and the AIM Rules for Companies.

**Additional Matters**

Common Shares will be restricted securities under Rule 144 of the US Securities Act. Except as set forth below, none of the Common Shares will be eligible for sale under Rule 144 unless the Company has met certain conditions, which may include registration of the class of equity securities under the US Exchange Act. Furthermore, the Company is not required, and has no current intention, to register any securities under the US Securities Act or the US Exchange Act.

As a result, it is unlikely that sales of Common Shares will be eligible for sale by non-affiliates (as defined under US federal securities laws) under Rule 144 until the date which is one year after the issue date for such securities when the Common Shares will become eligible for sale under Rule 144. Accordingly, the Company does not expect that a liquid trading market for the Common Shares will develop in the United States in the foreseeable future.

Pursuant to the Certificate of Incorporation and the Bylaws, the Company will be required to refuse to register any transfer of the Placing Shares not made in accordance with the provisions of Regulation S pursuant to registration under the US Securities Act, or pursuant to another available exemption from registration. The Company may determine to modify the transfer restrictions set forth above or to require additional certifications and/or related documentation to evidence an exemption from registration, in each case in accordance with applicable law.

**Settlement in CREST**

As a result of the EU Regulation on Central Securities Depositories, the London Stock Exchange intends to amend its rules such that the Company (in common with all other companies whose securities are admitted to trading on AIM) will be required to ensure that the Common Shares are eligible for electronic settlement through CREST. The London Stock Exchange has said that it will update the market in due course with regard to when these new rules will take effect.

Due to the transfer restrictions described above, the Company has determined that all Common Shares will be held in certificated form from Admission until further notice and therefore the Common Shares will not be eligible for settlement through CREST during that time. Accordingly, until further notice, settlement of transactions in Common Shares following Admission will not take place within the CREST system, although trades can be reported to AIM and the cash consideration can be settled using the CREST residual service.

Before the introduction of the London Stock Exchange's new rules, the Company intends to apply for the Common Shares to be settled in CREST in the form of Depository Interests ("DIs") which facilitate trading and settlement of shares of non-UK companies in CREST. DIs are uncertificated "mirror image" securities constituted under English law representing the underlying shares. DIs are freely tradable within the CREST system. Currently, the functionality does not exist within CREST to ensure ongoing compliance with the relevant restrictions referred to above. In the event that the Company is required to apply for the Common Shares to be settled in CREST in the form of DIs prior to the expiry of the Compliance Period, and if functionality does not exist within CREST at that time to ensure compliance with the relevant restrictions for the remainder of the Compliance Period, the Company intends to take such steps and implement such procedures outside of CREST as it considers reasonable to satisfy its obligations under applicable US securities laws and in any event it will seek to comply with the Rules of the London Stock Exchange.

If necessary the Company currently anticipates that the procedures that it will implement (unless and until there are any changes implemented to the CREST system which will ensure ongoing compliance with the relevant restrictions) during the Compliance Period will include:

- requesting a "-RegS" marker with respect to the Company's name in the systems of the London Stock Exchange;

- maintaining the legend referred to above on any physical certificates in issue, whether held by the depositary or otherwise;

- prominent disclosure of the relevant restrictions, placed on the Company's website and on market announcements;

- a letter of representation from each Shareholder at the point that certificates representing Common Shares are submitted to the Company's depositary with a request for the issue of DIs acknowledging, and undertaking to continue to comply with, the relevant restrictions;

- reliance on provisions in the Company's certificate of incorporation which constitute representations from any purchaser as to their eligibility to acquire shares pursuant to an exemption from registration under the Securities Act, in addition to an obligation on such purchaser to deliver a letter of representation to the Company upon request. Any failure to comply with such a request may result, at the discretion of the Board, in disenfranchisement of the voting and economic rights attaching to the relevant underlying Common Shares or a forced sale to the Company of such securities; and

- the grant of powers to the depositary to rematerialise any DI holder's securities into a physical securities certificate with an appropriate legend in the event of a breach of securities laws. Any subsequent dematerialisation of such securities would require a letter of representation from the relevant Shareholder to the Company in a form satisfactory to the Company.

If the London Stock Exchange issues new rules (or amends its existing rules) requiring different or additional steps or procedures to be adhered to by issuers whose securities are admitted to trading on AIM, then the Company would seek to amend its procedures described above so as to comply with such requirements.

**United States securities disclosures regarding transfers of Shares**

The Company's certificate of incorporation includes the following provisions with respect to any transfer of its Common Shares or interests in such Shares. With respect to each transfer of shares (or any interest in shares) of the Company, at the time of such transfer and by virtue of giving effect to such transfer, the transferee shall have, and shall be deemed to have, acknowledged, represented, warranted and agreed with the Company as follows (and upon request from the Company the transferee shall, and the transferor shall procure that such transferee shall, deliver to the Company a letter of confirmation to the following effect):

(a)     The shares have not been and will not be registered under the Securities Act. Terms not otherwise defined below have the meanings given to them in Regulation S, Rule 144A and Rule 144 under the Securities Act.

(b)     The transferee of the shares or the relevant interest therein (or, if the transferee is acting on behalf of others, each beneficial owner of such shares or interest) is either:

    (i)     a non-U.S. Person that purchased the shares or the relevant interest therein outside the United States in an offshore transaction that qualifies for the exemption pursuant to Regulation S; or

    (ii)     a U.S. Person that is a "qualified institutional buyer" within the meaning of Rule 144A under the Securities Act.

(c)     The purchase or transfer of the shares or the relevant interest therein is not a part of a plan or scheme to evade the registration requirements of the Securities Act.

(d)     The transferee understands that any subsequent offer, resale, pledge or transfer of any of the shares or the relevant interest therein may only take place in accordance with the legend set forth below and will notify any subsequent holder of such resale restrictions except, in the case of a transfer of the shares or the relevant interest therein in uncertificated form only, if such notification is not possible:

THE COMMON SHARES EVIDENCED HEREBY HAVE NOT BEEN AND WILL NOT BE REGISTERED UNDER THE US SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR WITH ANY SECURITIES REGULATORY AUTHORITY OF ANY STATE OR OTHER JURISDICTION OF THE UNITED STATES AND MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT (A)(1) TO A PERSON WHOM THE SELLER AND ANY PERSON ACTING ON ITS BEHALF REASONABLY BELIEVES IS A QUALIFIED INSTITUTIONAL BUYER WITHIN THE MEANING OF RULE 144A UNDER THE SECURITIES ACT PURCHASING FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A QUALIFIED INSTITUTIONAL BUYER IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 144A, (2) IN AN OFFSHORE TRANSACTION COMPLYING WITH RULE 903 OR RULE 904 OF REGULATION S UNDER THE SECURITIES ACT OR (3) PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT PROVIDED BY RULE 144 THEREUNDER (IF AVAILABLE) AND (B) IN ACCORDANCE WITH ANY APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES OR ANY OTHER JURISDICTION. NO REPRESENTATION CAN BE MADE AS TO THE AVAILABILITY OF THE EXEMPTION PROVIDED BY RULE 144 UNDER THE SECURITIES ACT FOR THE RESALE OF COMMON SHARES.

(e)     The transferee acknowledges that the Company, its registrar, their agents and affiliates, and others will rely on the truth and accuracy of the foregoing acknowledgements, agreements, representations and warranties, consents to such reliance and agrees that if any such acknowledgements, agreement, representation or warranties made or deemed to have been made by virtue of its purchase or the transfer of the shares or interests therein is no longer accurate, it shall promptly notify the Company and that in such circumstances the Company shall refuse to register such transfer or revoke the registration of such transfer of shares or interests therein if it is permissible to do so within the rules of the electronic settlement system to which the Company's shares or interests therein are subject at that time as required under

applicable law, and in any event may, if the Board so determines in its sole discretion, immediately purchase such shares or interests at a price equal to the lesser of the then current market price of or the price paid by such person for such shares or interests.

(f)    The transferee acknowledges that the Company, its registrar or its/their agents reserve the right to make inquiries of any holder of the shares (or interests therein) at any time as to such person's status under U.S. securities laws and if any such person does not satisfy the Company that such person acquired the shares or interests therein in accordance with applicable U.S. securities laws, the Company shall refuse to register such transfer or revoke the registration of such transfer of shares or interests therein if it is permissible to do so within the rules of the electronic settlement system to which the Company's shares or interests therein are subject at that time as required under applicable law, and in any event may, if the Board so determines in its sole discretion, immediately purchase such shares or interests at a price equal to the lesser of the then current market price of or the price paid by such person for such shares or interests.

(g)    The Board may determine in its absolute discretion that as an alternative to the repurchase of any shares or interests therein by the Company pursuant to provisions (e) and (f) above, or pending any such repurchase, the holder and owner of such shares or interests therein shall be disenfranchised such that he shall not be entitled to exercise (or to direct the exercise of) any voting rights with respect to such shares or interests therein or to exercise or enjoy any other right or privilege with respect to such shares or interests (including any dividends or other distributions otherwise payable) unless and until, in the opinion of the Board, the above provisions have been complied with or such repurchase has been effected.

# PART VII

# ADDITIONAL INFORMATION

## 1    THE COMPANY

1.1    The Company was incorporated in the United States under the Delaware General Corporation Law as Constellation Healthcare Technologies, Inc. on 3 September 2014 and with registration number 5596678.

1.2    The governing documents of the Company (which correspond in general terms to the articles of association of a company incorporated in England and Wales) are its Certificate of Incorporation and Bylaws. The Company's registered office is located at Corporation Trust Centre, 1209 Orange Street, Wilmington, Delaware 19807 (telephone number: +1 302 658 7581). The Company's principal place of business is located at 3200 Wilcrest Dr., Suite 600, Houston, Texas 77042, United States of America (telephone number: +1 800 523 1966).

1.3    The Company's legal and commercial name at the date of this document is Constellation Healthcare Technologies, Inc. The Company is domiciled in the State of Delaware, USA. The primary legislation under which the Company operates is the Act and the Common Shares have been created by the Company pursuant to the Act.

1.4    The liability of the Shareholders is limited.

## 2    SHARE CAPITAL OF THE COMPANY

2.1    The authorised and issued share capital of the Company as at the date of this document and Admission is as set out below. All the issued share capital of the Company has been fully paid up.

**At the date of this document**

| Authorised | | Issued and fully paid |
|---|---|---|
| 10,000 | Common Shares of $0.0001 par value | 100 |

**At Admission**

| Authorised | | Issued and fully paid* |
|---|---|---|
| 111,226,912 | Common Shares of $0.0001 par value | 55,615,056 |

* Assuming the Placing is fully subscribed

2.2    The following is a summary of the changes in the Company's authorised and issued share capital during the three years preceding the date of this document:

(a)    100 common shares of no par value were issued to AAKB Investments Limited on incorporation of the Company on 3 September 2014;

(b)    on 28 November 2014, AAKB Investments Limited, as sole shareholder of the Company, resolved that:

(i)    conditional upon and effective immediately prior to Admission the 100 common shares in issue be split into Common Shares in the ratio 94,655.19 for 1 to create 9,465,519 Common Shares all held by AAKB Investments Limited;

(ii)    conditional upon and effective immediately prior to Admission 37,862,074 Common Shares be issued to Constellation Health pursuant to the terms of the Exchange Agreement, further details of which are set out at paragraph 10.7 below; and

114

       (iii)    upon Admission 566,063 Common Shares be issued to First United Health by way of capitalisation of a $1.2 million loan owed to it by the Group in connection with a prepayment under the Credit Agreement and a further 377,375 Common Shares be issued to First United Health pursuant to a subscription agreement with the Company.

2.3    The Placing Shares in issue following Admission will rank *pari passu* in all respects with the Existing Common Shares, including the right to receive all dividends and other distributions declared, made or paid after Admission on the Common Shares.

2.4    No Common Shares are currently in issue with a fixed date on which entitlement to a dividend arises and there are no arrangements in force whereby future dividends are waived or agreed to be waived.

2.5    No Common Shares are currently held in treasury by the Company or held by any other person on its behalf and no Common Shares are currently held by any subsidiary of the Company.

2.6    The Company does not have in issue any shares that do not represent capital.

2.7    The Placing Shares the subject of the Placing were issued (conditional upon Admission) pursuant to a resolution passed at a meeting of the Board held on 27 November 2014.

2.8    The Company has not issued any partly paid Common Shares, convertible securities, exchangeable securities or securities with warrants and, save as disclosed in this document, on Admission no share or loan capital of the Company or any other member of the Group will be under option or has been conditionally or unconditionally agreed to be put under option.

2.9    The holders of Existing Common Shares will be diluted by the issue of the Placing Shares and other Common Shares upon Admission. The effect of the issue of Placing Shares will be that the holders of Existing Common Shares at the date of this document will own 85.1 per cent. of the Enlarged Share Capital.

2.10  The Registrar is in charge of maintaining the Company's register of members.

2.11  The Common Shares are in registered form.

## 3     CERTIFICATE OF INCORPORATION AND BYLAWS

The following is a summary of certain provisions of the Company's Certificate of Incorporation, Bylaws and provisions of the Delaware General Corporation Law that apply to the Company with effect from Admission.

3.1    *Objects:*

    The Company may, and is authorised by its Certificate of Incorporation to, engage in any lawful act or activity for which corporations may be engaged in under the Act.

3.2    *Common Shares:*

    (a)    *Voting rights*

    Each holder of the Company's Common Shares is entitled to one vote for each Common Share held by such holder. The Bylaws provide that the holders of one-third in interest of all shares entitled to vote on a matter, represented by Shareholders of record in person or by proxy, shall constitute a quorum. If a quorum is present at a meeting of the Shareholders, then the affirmative vote of a majority of the shares represented and voting shall be the act of the Shareholders, unless the vote of a greater number of shareholders of voting classes is required by the Company's Certificate of Incorporation or the Act. The Certificate of Incorporation provides that the Shareholders may not cumulate their vote for the election of directors.

115

(b)    *Issue of Common Shares*

The Directors have the authority to allot unissued Common Shares on such terms as they deem appropriate (subject to the pre-emption rights noted below and the other terms of the Certificate of Incorporation) provided that the number of such Shares during any 12 month period does not exceed in aggregate, one third of the outstanding Common Shares from time to time (or two thirds of such outstanding Common Shares in connection with a rights issue).

(c)    *Dividends*

Subject to any restrictions contained in either the Act or the Certificate of Incorporation, holders of Common Shares are entitled to receive dividends, when, as and if declared by the Board out of assets lawfully available for such purposes. The Board may set apart out of any funds of the Company available for dividends a reserve or reserves for any proper purpose and may abolish any such reserve.

(d)    *Rights upon liquidation, dissolution or winding-up*

In the event of any distribution of assets upon liquidation, dissolution or winding up of the Company, Shareholders will be entitled to share rateably and equally in all of the Company's remaining assets after payment or provision for payment of the debts and other liabilities of the Company.

(e)    *Other rights*

Shareholders have no subscription, redemption or conversion rights, nor do they have any pre-emptive or other rights to acquire or subscribe for additional, unissued shares, except as expressly provided for in an agreement with the Company and as described in paragraph 3.3 below.

3.3    *Pre-emption rights*

The Certificate of Incorporation expressly provides that no Shareholder of the Company will have by reason of its holding shares of any class of capital stock of the Company any statutory pre-emptive rights to acquire or subscribe for any additional equity securities of the Company in any form.

The Certificate of Incorporation provides that, unless otherwise determined in a general meeting by Shareholders of the Company holding 75 per cent. of the outstanding Common Shares represented at such meeting, each Shareholder shall have a pre-emption right to purchase its *pro rata* share of any shares of any kind, class or series of the Company (with certain exceptions) that the Company may, from time to time, propose to sell and issue wholly for cash, but subject to such exclusions or other arrangements as the Board may deem necessary or expedient in its exclusive discretion to deal with fractional entitlements or legal or practical problems under the laws of any country, territory or political subdivision thereof, or the requirements of any regulatory authority or stock exchange in any jurisdiction. The Company may, at any time and from time to time upon approval by the Board, disapply the pre-emption provisions, provided that such disapplication is limited to (i) the allotment for cash of shares where the nominal amount of such shares during any 12 month period does not exceed in the aggregate, ten per cent. of the outstanding Common Shares from time to time, or (ii) the allotment is in connection with a rights issue or (iii) the grant of options or other rights to subscribe for Common Shares (and the subsequent issue of Common Shares upon the exercise or vesting of such options or rights) pursuant to a plan approved by the Board for the incentivisation of management of the Company provided that the amount of such Common Shares (taken together with any Common Shares which are the subject of outstanding options or rights to subscribe or have been issued pursuant to the exercise or vesting of such options or rights in the 10 years prior to such grant) does not exceed in the aggregate, ten per cent. of the

outstanding Common Shares from time to time. These pre-emption rights will cease to apply if the Company becomes a reporting company under the US Exchange Act.

3.4   *Method of transfer of Shares*

The Bylaws provide that shares represented by certificate may be transferred by delivery of the certificate accompanied by either an assignment in writing on the back of the certificate or by a written power of attorney to assign and transfer the same on the books of the Company, signed by the record holder of the certificate. The shares may be issued in uncertificated or book entry form in connection with new share issuances, the transfer of shares and the replacement of shares represented by lost, destroyed or mutilated certificates. The Board may implement and/or approve arrangements evidencing title to and transfer of interest in shares in the capital of the Company in the form of depositary interests or similar interests, instruments or securities.

3.5   *United States securities disclosures regarding transfers of Shares*

The Company's certificate of incorporation includes the following provisions with respect to any transfer of its Common Shares or interests in such Shares. With respect to each transfer of shares (or any interest in shares) of the Company, at the time of such transfer and by virtue of giving effect to such transfer, the transferee shall have, and shall be deemed to have, acknowledged, represented, warranted and agreed with the Company as follows (and upon request from the Company the transferee shall, and the transferor shall procure that such transferee shall, deliver to the Company a letter of confirmation to the following effect):

(a)   The shares have not been and will not be registered under the Securities Act. Terms not otherwise defined below have the meanings given to them in Regulation S, Rule 144A and Rule 144 under the Securities Act.

(b)   The transferee of the shares or the relevant interest therein (or, if the transferee is acting on behalf of others, each beneficial owner of such shares or interest) is either:

(i)   a non-U.S. Person that purchased the shares or the relevant interest therein outside the United States in an offshore transaction that qualifies for the exemption pursuant to Regulation S; or

(ii)   a U.S. Person that is a "qualified institutional buyer" within the meaning of Rule 144A under the Securities Act.

(c)   The purchase or transfer of the shares or the relevant interest therein is not a part of a plan or scheme to evade the registration requirements of the Securities Act.

(d)   The transferee understands that any subsequent offer, resale, pledge or transfer of any of the shares or the relevant interest therein may only take place in accordance with the legend set forth below and will notify any subsequent holder of such resale restrictions except, in the case of a transfer of the shares or the relevant interest therein in uncertificated form only, if such notification is not possible:

THE COMMON SHARES EVIDENCED HEREBY HAVE NOT BEEN AND WILL NOT BE REGISTERED UNDER THE US SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR WITH ANY SECURITIES REGULATORY AUTHORITY OF ANY STATE OR OTHER JURISDICTION OF THE UNITED STATES AND MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT (A)(1) TO A PERSON WHOM THE SELLER AND ANY PERSON ACTING ON ITS BEHALF REASONABLY BELIEVES IS A QUALIFIED INSTITUTIONAL BUYER WITHIN THE MEANING OF RULE 144A UNDER THE SECURITIES ACT PURCHASING FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A QUALIFIED INSTITUTIONAL BUYER IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 144A, (2) IN AN OFFSHORE TRANSACTION COMPLYING WITH RULE 903 OR RULE 904 OF REGULATION S UNDER THE SECURITIES ACT OR (3) PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE

SECURITIES ACT PROVIDED BY RULE 144 THEREUNDER (IF AVAILABLE) AND (B) IN ACCORDANCE WITH ANY APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES OR ANY OTHER JURISDICTION. NO REPRESENTATION CAN BE MADE AS TO THE AVAILABILITY OF THE EXEMPTION PROVIDED BY RULE 144 UNDER THE SECURITIES ACT FOR THE RESALE OF COMMON SHARES.

(e)     The transferee acknowledges that the Company, its registrar, their agents and affiliates, and others will rely on the truth and accuracy of the foregoing acknowledgements, agreements, representations and warranties, consents to such reliance and agrees that if any such acknowledgements, agreement, representation or warranties made or deemed to have been made by virtue of its purchase or the transfer of the shares or interests therein is no longer accurate, it shall promptly notify the Company and that in such circumstances the Company shall refuse to register such transfer or revoke the registration of such transfer of shares or interests therein if it is permissible to do so within the rules of the electronic settlement system to which the Company's shares or interests therein are subject at that time as required under applicable law, and in any event may, if the Board so determines in its sole discretion, immediately purchase such shares or interests at a price equal to the lesser of the then current market price of or the price paid by such person for such shares or interests.

(f)     The transferee acknowledges that the Company, its registrar or its/their agents reserve the right to make inquiries of any holder of the shares (or interests therein) at any time as to such person's status under U.S. securities laws and if any such person does not satisfy the Company that such person acquired the shares or interests therein in accordance with applicable U.S. securities laws, the Company shall refuse to register such transfer or revoke the registration of such transfer of shares or interests therein if it is permissible to do so within the rules of the electronic settlement system to which the Company's shares or interests therein are subject at that time as required under applicable law, and in any event may, if the Board so determines in its sole discretion, immediately purchase such shares or interests at a price equal to the lesser of the then current market price of or the price paid by such person for such shares or interests.

(g)     The Board may determine in its absolute discretion that as an alternative to the repurchase of any shares or interests therein by the Company pursuant to provisions (e) and (f) above, or pending any such repurchase, the holder and owner of such shares or interests therein shall be disenfranchised such that he shall not be entitled to exercise (or to direct the exercise of) any voting rights with respect to such shares or interests therein or to exercise or enjoy any other right or privilege with respect to such shares or interests (including any dividends or other distributions otherwise payable) unless and until, in the opinion of the Board, the above provisions have been complied with or such repurchase has been effected.

3.6     *Meetings of Shareholders*

The Bylaws provide that no action shall be taken by the Shareholders except at an annual or special meeting of Shareholders called in accordance with the Bylaws and no action shall be taken by the Shareholders by written consent.

The Bylaws provide that the Company shall hold an annual meeting of the Shareholders. A special meeting of the Shareholders may be called at any time by the Chairman of the Board or the President, and shall be called by the President or Secretary upon the written request of one or more Shareholders who hold at least 10 per cent. of all Common Shares entitled to vote on any issue proposed to be considered at the meeting.

To determine the Shareholders entitled to vote in a Shareholder meeting, the Board may fix, in advance, a record date, which is not more than 60 days nor less than 10 days before the date of

any such meeting. If the Board does not fix a record date, then the record date will be the day notice is given of the meeting to the Shareholders.

3.7   *Method of appointing proxy*

Shareholders of record may vote at any meeting by proxy executed in writing. A proxy is effective when received by the person authorised to tabulate votes for the Corporation. No such proxy shall be voted or acted upon after three years from its date, unless the proxy provides for a longer period.

3.8   *Directors*

(a)   *Powers of Directors*

Subject to the provisions of the Act and the Certificate of Incorporation, the business and property of the Company shall be managed by the Board.

(b)   *Number of Directors*

The Bylaws provide that the number of Directors constituting the Board will be not less than one nor more than ten Directors, but that the number of Directors constituting the Board may be increased or decreased from time to time by the Board at any regular or special meeting.

(c)   *Resignation and Removal*

The Bylaws provide that a Director may resign at any time by giving notice to the Board. A Director may be removed before the expiration of such Director's term of office for cause or without cause by the Shareholders at a special meeting called for the purpose of removing the Director only if one or more Shareholders holding a majority of the outstanding stock of the Company entitled to vote thereon vote in favour of such removal.

(d)   *Vacancies*

In the case of any vacancy on the Board, including a vacancy resulting from an increase in the number of Directors authorised to serve on the Board, such vacancy may be filled by the remaining Directors (whether constituting a quorum or not) or the Shareholders.

(e)   *Appointment*

The Directors are elected by the Shareholders at each annual Shareholders' meeting to hold office until the next annual meeting of the Shareholders and until their respective successors are elected and qualified. If, for any reason, the Directors shall not have been elected at any annual meeting, they may be elected at a special meeting of Shareholders called for that purpose.

(f)   *Action without a Meeting*

The Bylaws provide that, unless otherwise restricted by the Certificate of Incorporation or the Bylaws, any action required or permitted to be taken at any meeting of the Board or of any committee thereof may be taken without a meeting by the consent in writing of all the directors or members of the committee as the case may be (such written consents to be filed with the minutes of proceedings of the Board). Such consent may be provided before or after the action.

(g)   *Meetings of Directors*

The Bylaws provide that regular meetings of the Board may be held at any place or time that the Board determines by a vote and may be held without notice upon such vote. Special meetings of the Board may be called by the Chair of the Board, the Chief Executive Officer or the President (in the absence of the Chief Executive Officer) or by any two or more Directors with at least two days' notice to each director. A majority of the Directors shall constitute a quorum for the transaction of business. Every act or decision done or made by a majority of the Directors at a

119

meeting of the Board where a quorum is present is regarded as an act of the Board unless a greater number is required by law or the Certificate of Incorporation.

3.9    *Officers*

The officers of the Company required by the Act are the President, Secretary and Treasurer. The Company may also appoint any number of Vice Presidents and Assistant Secretaries. The officers of the Company are appointed by the Board and may be removed by the Board by a majority vote with or without cause. The Company may also have a Chief Executive Officer, Chief Technology Officer and Chief Financial Officer, or such other officers and assistant officers as may be necessary, and any of such offices may be occupied by any of the individuals serving in any other officer position.

3.10   *Exculpation and Indemnification of officers, Directors, employees and other agents*

The Certificate of Incorporation provides that, to the fullest extent permitted by the Act, a Director will not be personally liable to the Company or its Shareholders for monetary damages for breach of fiduciary duty as a director or other liability.

The Bylaws and Certificate of Incorporation provide that the Company, to the fullest extent permitted by the Act, will indemnify any officer, employee or agent of the Company or Director made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative to which the indemnified individual was made a party because such individual is an officer, employee or agent of the Company or Director, against any obligation to pay a judgment, settlement, penalty, fine, including an excise tax with respect to any employee benefit plan, or reasonable expenses incurred with respect to a proceeding, provided that the Company will not be obligated to indemnify any officer, employee or agent of the Company or Director on account of (i) acts or omissions adjudged to be intentional misconduct or a knowing violation of law, (ii) acts, suits or proceedings with respect to which the Act or other applicable law does not permit indemnification, (iii) any transaction with respect to which it was finally adjudged that such officer, employee or agent of the Company or Director received a benefit in money, property or services to which such person was not legally entitled, (iv) claims initiated by the purported indemnitee, except to enforce such individual's indemnification rights unless not brought in good faith and (v) claims with respect to which the individual has been fully paid through insurance.

In addition to the indemnification provided for in the Certificate of Incorporation and Bylaws, the Company has entered into indemnification agreements with each of its current Directors. These agreements provide for the indemnification of Directors for all reasonable actions.

3.11   *Notices*

The Bylaws provide for notice in written form or, if a Shareholder consents to receive electronically transmitted notices and designates the address, location or system to which these notices may be electronically transmitted, in electronic form. Written notice may be transmitted by United States or United Kingdom mail, postage prepaid, in which case notice is effective when deposited. In the case of electronic notice consented to by a Shareholder, notice may be given by facsimile telecommunication to the number designated by the Shareholder, electronic mail to the address designated by the Shareholder, posting on an electronic network together with separate notice to the Shareholder, or by any other form of electronic transmission. Electronic notice is effective when the notice is directed to the Shareholder.

A Shareholder who has consented to receipt of electronically transmitted notices will be deemed to have revoked this consent if: (a) the Company is unable to electronically transmit two consecutive notices given by the Company in accordance with the consent; and (b) this inability becomes known to the secretary, the transfer agent, or any other person responsible for giving

the notice. The inadvertent failure by the Company to treat this inability as a revocation does not invalidate any meeting or other action.

### 3.12   *Disclosure of significant stockholdings*

The Certificate of Incorporation requires a Shareholder to provide notification in writing to the Company where the Shareholder either:

(i)     to such Shareholder's knowledge acquires an aggregate nominal value of a class or series of the Company's shares of stock in which such Shareholder's interest is equal to or more than three per cent. of the aggregate outstanding shares of that class of shares (a "Notifiable Interest");

(ii)    ceases to have a Notifiable Interest; or

(iii)   becomes aware that such Shareholder has acquired a Notifiable Interest, or that such Shareholder has ceased to have a Notifiable Interest in which such Shareholder was previously interested,

Shareholders shall also notify the Company promptly following any increase or decrease in the percentage level of such shareholder's Notifiable Interest. Only percentage level changes equal to at least a whole number are required to be notified to the Company.

In addition, the Board may serve a disclosure notice ("Disclosure Notice") in writing on any Shareholder whom the Board knows, or has reasonable cause to believe, to be interested in shares of the Corporation, requiring such person to indicate whether or not it is the case and, where such person holds any interest in any such shares, to give such further information as may be required by the Board. If a Disclosure Notice has been served on a Shareholder and the Company has not received the information required in respect of the specified shares in writing within a period of fourteen days after the service of the Disclosure Notice, then the Board may apply certain restrictions on the specified shares.

### 3.13   *Amendments to Certificate of Incorporation and Bylaws*

The Certificate of Incorporation may be amended in a manner permitted by statute. For certain provisions of the Certificate of Incorporation, a vote of 65 per cent. of voting power of all then outstanding capital stock is required for amendment. The Bylaws provide that the Bylaws may be amended or repealed either: by the Shareholders at any regular or special meeting if such action is approved by Shareholders holding a majority of the outstanding stock of the Corporation entitled to vote thereon and if notice of the proposed action is contained in the notice of the meeting; or by the affirmative vote of a majority of the Board at any regular or special meeting. In addition, until the date of occurrence of the earliest date that (i) the Common Shares are no longer admitted to trading on AIM, or (ii) the Company has a class of securities registered under the US Securities Act or (iii) the Company does not have any Shareholder that directly or indirectly is the beneficial owner (as defined in Rule 13d-3 under the US Securities Act) of 30 per cent. or more of the outstanding voting securities of the Company, any action by the Shareholders or the Board shall require the approval of Shareholders holding 75 per cent. or more of the outstanding stock of the Company in order to effect any amendment, repeal, alteration or recession of any of the following provisions of the Bylaws: Sections 2 (Special Meetings), 4 (Notice), 6 (Quorum of Shareholders) and 8 (Voting) of Article I – Shareholders; Section 1 (Action By Written Consent) of Article III – Special Measures Applying to Meetings of Both the Shareholders and Directors; Section 7 (Dividends) of Article V – Shares of Capital Stock, Certificates and Their Transfer; Section 3 (Inspections by Shareholders) of Article VI – Books and Records; and this provision itself.

3.14 *Takeovers*

The Certificate of Incorporation provides that if a person (i) acquires shares which (taken together with securities held or acquired by persons acting in concert with such person) represent 30 per cent. or more of the voting rights attaching to the issued Common Shares, or (ii) (together with persons acting in concert with such person) holds not less than 30 per cent. but not more than 50 per cent. of the voting rights attaching to the issued Common Shares and such person, or any person acting in concert with such person, acquires additional securities, which will increase such person's percentage holding of such voting rights, then any such person (and any persons acting in concert with such person) must make a written cash offer to the holders of all of the Common Shares to acquire the outstanding Common Shares. These takeover provisions will cease to apply if the Common Shares cease to be admitted to trading on AIM or the Company becomes a reporting company under the US Exchange Act.

3.15 *Squeeze-out rules*

Section 267 of the Act outlines the procedures by which a controlling shareholder or parent corporation that has obtained 90 per cent. or more of the Company's shares may consummate a short-form merger to squeeze out the remaining shareholders. Generally, Section 267 allows for a short-form merger between a parent and a subsidiary, whereby a parent corporation that owns at least 90 per cent. of the outstanding shares of each class of a subsidiary corporation's stock may merge the subsidiary corporation into itself, or, alternatively, may merge both itself and the subsidiary corporation into a third corporation. A short-form merger is effected unilaterally by a board resolution of the parent company. A shareholder would be entitled to certain appraisal rights under Section 262 of the Act (as discussed below) in connection with the squeeze-out merger if the merger consideration was considered by such shareholder to be below "fair value". However, no resolution of the Board or the Shareholders would be required to effect the squeeze-out merger.

Under Section 262 of the Act, a holder of shares of a company that is the target of a merger, sale or consolidation who does not wish to accept the consideration being offered may elect to have the company pay in cash to him or her the "fair value" of his or her shares, plus accrued interest (excluding any appreciation or depreciation in anticipation of the corporate action unless exclusion would be inequitable), provided that the shareholder comply with the conditions set forth in Section 262 of the Act. If there is a dispute between the shareholder and the company as to the fair value of the shares, Section 262 of the Act provides that the fair value may be judicially determined.

## 4  DIRECTORS' INTERESTS IN THE COMPANY

4.1 The interests of the Directors, their immediate families and the persons connected with them, all of which unless otherwise disclosed are beneficial, in the issued Common Shares of the Company as at the date of this document and at Admission are and will be as follows:

**As at the date of this document**

| Director | Number of Common Shares | Percentage of issued Common Share Capital |
|---|---|---|
| John Johnston | Nil | Nil |
| Paul Parmar* | Nil | Nil |
| Ravi Chivukula | Nil | Nil |
| David Clark | Nil | Nil |
| Mark Feuer | Nil | Nil |

122

**At Admission**

| Director | Number of Common Shares | Percentage of issued Common Share Capital |
|---|---|---|
| John Johnston | 29,630 | 0.05 |
| Paul Parmar* | Nil | Nil |
| Ravi Chivukula | Nil | Nil |
| David Clark | 14,815 | 0.03 |
| Mark Feuer | Nil | Nil |

\* Immediately prior to Admission Constellation Health will be the legal and beneficial owner of 37,862,074 Common Shares. Constellation Health is an investment vehicle which was formed by Mr. Parmar and Southport Lane Asset Management specifically for the purposes of the acquisition of Orion in June 2013 (and to pursue an acquisition strategy in the RCM market). Mr. Parmar, through investment entities where he is the manager, has voting control of over approximately 70 per cent. of the ownership interests in Constellation Health and, through its operating agreement, has the right to control the appointment and dismissal of the board of that company. The economic interests in the relevant investment entities are ultimately owned by trusts of which neither Mr. Parmar (nor any spouse or children of Mr. Parmar) is a potential beneficiary save that Mr. Parmar has an effective economic interest, through one of those entities, of 0.45 per cent. of Constellation Health.

In addition, upon Admission, First United Health will be the legal and beneficial owner of 943,438 Common Shares. First United Health is an investment entity which is controlled by Mr. Parmar and in relation to which he has an effective indirect economic interest of one per cent.

4.2 Save as disclosed in this paragraph 4, none of the Directors, nor any member of their respective immediate families, nor any person connected with them, is or, immediately following Admission, will be interested in any share capital of the Company.

4.3 There are no outstanding loans granted or guarantees provided by the Company to or for the benefit of any of the Directors.

4.4 Save as disclosed in this document, no Director has any interest, whether direct or indirect, in any transaction which is or was unusual in its nature or conditions or significant to the business of the Company taken as a whole and which was effected by the Company during the current or immediately preceding financial year, or during any earlier financial year and which remains in any respect outstanding or unperformed.

## 5 MAJOR SHAREHOLDERS

5.1 Save as disclosed in this paragraph 5, the Directors are not aware of any person (other than the Directors, as set out in paragraph 4 above) who, directly or indirectly, jointly or severally at the date of this document and at Admission is or will be interested in three per cent. or more of the issued Existing Common Shares or the Enlarged Share Capital of the Company.

**As at the date of this document**

| Shareholder | Number of Common Shares | Percentage of issued Common Share Capital |
|---|---|---|
| Constellation Health | 0 | 0% |
| AAKB Investments Limited | 100 | 100% |

**At Admission**

| Shareholder | Number of Common Shares | Percentage of Enlarged Share Capital |
|---|---|---|
| Constellation Health | 37,862,074 | 68.08 |
| AAKB Investments Limited | 9,465,519 | 17.02 |
| Legal & General Investment Management Limited | 2,962,963 | 5.33 |

5.2 As at Admission, no Shareholder will have any different voting rights to the other holders of Common Shares.

## 6    DIRECTORS' TERMS

6.1    *Executive Directors*

(a)    The services of Paul Parmar as Group Chief Executive Officer are provided under the terms of a consulting agreement between (1) the Company, (2) First United Health and (3) Paul Parmar which is conditional in all respects, and will take effect, only on Admission. The consulting agreement is terminable upon 12 months' written notice being given by either party. The consulting agreement provides for an annual fee of $675,000 (plus sales tax, if applicable) payable in equal monthly instalments and the reimbursement of all travelling, hotel and other expenses properly and reasonably incurred. An additional annual bonus of up to $175,000 is payable at the discretion of the Board. The consulting agreement contains restrictive covenants relating to employment activity, suppliers, customers, employees and competition which last for a period of 12 months following termination of the consulting agreement.

(b)    Ravi Chivukula entered into an employment agreement with Orion dated 13 June 2014, subject to termination upon six months' written notice by either party. The agreement contains provisions for termination without notice in a number of circumstances including gross neglect, a material act of fraud or a breach of the material terms of the agreement. The agreement provides for (i) a base yearly salary of $125,000, (ii) a relocation fee of $15,000, and (iii) a bonus of $7,500 per quarter conditional on the delivery of specified financial statements and ensuring that financial reporting, client invoicing and financial auditing is duly completed. The employment agreement provides for the entitlement to any benefit plans of the Company including those regarding life insurance, hospitalisation, medical and disability. The employment agreement contains restrictive covenants relating to (i) employment activity, suppliers, customers and employees which last for a period of six months following termination and (ii) competition which last for a period of six months following termination save that the Company may waive such restriction if Mr. Chivukula has been employed for three years or more or the Company may shorten such restriction to four months if Mr. Chivukula has been employed for two years but less than three years.

6.2    *Non-executive Directors*

Each Non-executive Director has entered into a letter of appointment dated 27 October 2014 which is conditional upon Admission, the appointment being for an initial period of three years but terminable by either party on one month's notice, at an annual fee of £50,000 (in relation to each Non-executive Director save for an annual fee of £100,000 in relation to John Johnston). The Company has agreed to issue 29,630 Common Shares to Johnston Asset Management Limited upon Admission in consideration for consultancy services provided by it prior to Admission.

6.3    There are no arrangements under which any Director has agreed to waive or vary future emoluments nor have there been any waivers or variations of such emoluments during the financial year immediately preceding the date of this document.

6.4    The aggregate remuneration and benefits in kind paid to the Directors (excluding Paul Parmar whose remuneration was paid by Constellation Health) for the financial period ending 31 December 2013 was approximately $nil. It is estimated that under the agreements currently in force, the aggregate remuneration and benefits in kind to be paid to the Directors (including First United Health) for the financial period ended 31 December 2014 will be $113,750.

## 7    ADDITIONAL INFORMATION ON THE BOARD

7.1    Aside from directorships held within the Group the Directors hold or have held the following directorships or been a partner in the following partnerships within the five years prior to the date of this document:

| Name of Director | Current Directorships | Past Directorships |
|---|---|---|
| John Johnston | Action Hotels plc<br>Flowgroup PLC<br>Johnston Asset<br>Management Limited | Tenebris Realisations Limited |
| Paul Parmar | Constellation Health LLC<br>Constellation Health<br>Investment LLC<br>First United Health, LLC<br>NAYA Constellation LLC<br>Pegasus Blue Star Group<br>Taira No Kiyomori LLC | Online Alternatives, Inc. |
| Ravi Chivukula | None | None |
| David Clark | Clark Management Solutions Ltd | None |
| Mark Feuer | Allpath, LLC<br>Beechwood Capital<br>Beechwood Re<br>DNS Auto Glass Shop, LLC<br>NOA Diagnostics of N.Y., LLC | None |

7.2    Save as disclosed in this document, none of the Directors has:

(a)    any unspent convictions in relation to indictable offences;

(b)    had any bankruptcy order made against him or entered into any voluntary arrangements;

(c)    been a director of a company which has been placed in receivership, compulsory liquidation, creditors' voluntary liquidation, administration, been subject to a voluntary arrangement or any composition or arrangement with its creditors generally or any class of its creditors whilst he was a director of that company or within the 12 months after he ceased to be a director of that company;

(d)    been a partner in any partnership which has been placed in compulsory liquidation, administration or been the subject of a partnership voluntary arrangement whilst he was a partner in that partnership or within the 12 months after he ceased to be a partner in that partnership;

(e)    been the owner of any assets or a partner in any partnership which has been placed in receivership whilst he as a partner in that partnership or within the 12 months after he ceased to be a partner in that partnership;

(f)    been publicly criticised by any statutory or regulatory authority (including designated professional bodies);

(g)    been disqualified by a court from acting as a director of any company or from acting in the management or conduct of the affairs of a Company; or

(h)    had a name other than his/her existing name.

7.3    Paul Parmar was appointed as a director of a company called Online Alternatives, Inc, which was a subsidiary of Orion, at the time that Constellation Health acquired Orion in 2013. Following that acquisition, the Group determined that Online Alternatives' business was not core to Orion's operations and that Online Alternatives, Inc's business should be wound down and voluntarily liquidated. The dissolution took effect in March 2014.

In April 2011, Deutsche Bank AG obtained judgment against Mr. Parmar in the sum of $1,650,700 with respect to foreclosure proceedings against real estate owned by Mr. Parmar. Although a receiver was appointed in connection with those proceedings, no bankruptcy or voluntary arrangements were entered into. During his tenure, the receiver took steps to terminate the contracts of various suppliers of services at the property, leading to a series of judgments against Mr. Parmar representing in aggregate approximately $30,000. The parties subsequently entered into a confidential settlement agreement that was approved by the Court.

As a result of litigation arising from a commercial dispute relating to agreements to lease certain airplanes unconnected with the Group, a civil judgment in favour of Red Line Air, LLC was filed against Mr. Parmar in 2010 in the sum of approximately $16.7 million. In 2011 Mr. Parmar entered into a standstill agreement with the holder of the judgment, which bars any collection or enforcement efforts until 2023. To date, Mr. Parmar has fully complied with the terms of that agreement.

Mr. Parmar is also the subject of two ongoing litigations brought by David Bergstein ("Bergstein"), an individual to whom Mr. Parmar lent significant sums of money. None of these litigations are connected with the Group. Both cases have been resolved and documents are in the process of being finalised and filed to dismiss both cases. Both cases sought an unspecified amount of monetary damages and involved allegations that Mr. Parmar improperly recorded and publicised telephone conversations with Bergstein and alleged civil extortion on Mr. Parmar's part in relation to his use of such recorded materials. In order to succeed on his claims, Bergstein would have needed to establish not only that Mr. Parmar's actions were improper, but also that Bergstein has suffered damages to his reputation, business interests or otherwise. Mr. Parmar denied that he made or publicised the recordings for any improper purpose and has asserted that the lawsuits have been filed in an effort to dissuade Mr. Parmar from making further efforts to collect money owed to him by Bergstein. Mr. Parmar received clear and robust advice that Bergstein's claims were wholly without merit and that in the event that Bergstein were to be successful (the likelihood of which Mr. Parmar is advised is remote) the sums involved would be immaterial and have no bearing whatsoever on the appropriateness of Mr. Parmar's role with the Company.

## 8    EMPLOYEES

8.1    The number of permanent employees of the Group at the end of each of the last three financial years, the last of which ended on 31 December 2013 and as at 30 June 2014, is as follows:

|  | 30 June 2014 | 31 December 2013 | 31 December 2012 | 31 December 2011 |
|---|---|---|---|---|
| Total employees | 387 | 364 | 440 | 452 |

**9      DETAILS OF SUBSIDIARIES**

9.1    Immediately prior to Admission, the Company, which will be the parent company of the Group, will have the following directly or indirectly held wholly owned subsidiary undertakings:

| Name | Country of registration or incorporation | Principal activity | Proportion of common shares and voting rights held |
|---|---|---|---|
| Orion Healthcorp, Inc. | United States | Intermediate holding company | 100 per cent by the Company |
| Integrated Physician Solutions Inc. | United States | Operating company | 100 per cent by Orion |
| Medical Billing Services Inc. | United States | Operating company | 100 per cent by Orion |
| Western Skies Practice Management Inc. | United States | Operating company | 100 per cent by Orion |
| RMI Physician Services Corporation | United States | Operating company | 100 per cent by Orion |
| Rand Medical Billing Inc. | United States | Operating company | 100 per cent by Orion |
| NEMS Acquisition LLC | United States | Intermediate holding company | 100 per cent by Orion |
| NEMS West Virginia | United States | Operating company | 100 per cent by NEMS Acquisition LLC |
| Northeast Medical Solutions, LLC | United States | Operating company | 100 per cent by NEMS Acquisition LLC |

9.2    Save for the subsidiaries disclosed in paragraph 9.1 above, the Company does not hold capital in any other undertakings that have a significant effect on the assessment of the Company's assets and liabilities, financial position or profits and losses.

**10      MATERIAL CONTRACTS**

The following section contains summaries of the principal terms of material contracts (not being contracts entered into in the ordinary course of business) entered into by any member of the Group within the two years immediately preceding the date of this document and any other contracts (not being contracts entered in to the ordinary course of business) entered into by any member of the Group which contains any provision under which any member of the Group has any obligation or entitlement which is material to the Group as at the date of this document:

10.1    *Option agreement over Indian BPO*

On 11 June 2013 First United Health, a Delaware limited liability company ("FUH") entered into an Option Agreement with GSS America Infotech, a company organised under the laws of India ("GSS America"), GSS America's American subsidiary, GSS Infotech Inc., a company organised under the laws of the State of Illinois ("GSS InfoTech") and GSS Infotech's 100 per cent. owned subsidiary GSS Healthcare IT Solutions Pvt Ltd, a company organised under the laws of India ("Healthcare", who together with GSS America and GSS Infotech are referred to as the "GSS Companies") (the "Option Agreement"). Under the terms of the Option Agreement, FUH was granted the option to acquire all of the stock and interest of Healthcare including its assets for a period of five years from the execution date of the Option Agreement for a nominal consideration.

Under the Option Agreement the parties agree to enter into a transfer agreement that includes typical representations and warranties in the event that FUH exercises such option. Following exercise of such option GSS Infotech has an obligation to continue providing certain management services for a period of three years.

On 12 June 2014 FUH assigned all of its rights under the Option Agreement to Constellation Health. On or about the date of this document Constellation Health agreed to assign to the Company, (i) all of its rights under the Option Agreement, (ii) all of its rights under a master services agreement and related work order with GSS Infotech; and (iii) certain IP rights vested under the master services agreement, all of which are conditional upon Admission.

10.2   *Credit Agreement/security documents*

The Group has a credit facility dated 31 March 2014, for up to $40,000,000, on which all members of the Group are borrowers, and Constellation Health is a guarantor (the "Credit Facility"). An amendment to the Credit Agreement was entered into on 3rd September 2014.

The Credit Agreement has the following material terms:

o   The Credit Facility is secured by substantially all of the assets of each entity in the Group and Constellation Health;

o   The outstanding balance accrues interest payable in cash at the greater of (A) LIBOR plus eight per cent. or (B) 11 per cent.;

o   The Group must pay prepayment premiums of five per cent. three per cent. and two per cent. on any prepayments made before March 31, 2015, 2016 and 2017, respectively;

o   Current principal amount outstanding is approximately $23,000,000;

o   The Group must make mandatory repayments in the event the Group receives payments outside the ordinary course of business, subject to certain exceptions;

o   The Group must repay five per cent. of the principal balance quarterly, commencing 31 December 2014, with the outstanding balance due on 30 September 2017.

The Group makes customary representations and warranties in the Credit Agreement, and associated disclosures, including with respect to Organisation and Qualification, Authorization; Enforcement; Validity, No Conflicts, Consents, Subsidiary Rights, Equity Capitalization, Indebtedness and Other Contracts, Off Balance Sheet Arrangements, Ranking of Notes, Title to Assets, Intellectual Property Rights, Creation, Perfection, and Priority of Liens, Absence of Certain Changes, Absence of Litigation, No Undisclosed Events, Liabilities, Developments or Circumstances, No Disagreements with Accountants and Lawyers, No General Solicitation; Placement Agent's Fees, No Integrated Offering, Tax Status, Transfer Taxes, Conduct of Business; Compliance with Laws; Regulatory Permits, Foreign Corrupt Practices, Sarbanes-Oxley Act, Environmental Laws, Margin Stock, ERISA/Employee Benefits Plans, Investment Company, U.S. Real Property Holding Corporation, Internal Accounting and Disclosure Controls, Financial Statements, Transactions With Affiliates, Acknowledgment Regarding Lenders' Purchase of Notes, Health Care Laws, Insurance, Subsidiary Acquisition Documents, Employee Relations, Disclosure, Patriot Act, and Material Contracts.

The Group also agrees to customary financial and affirmative and negative covenants in the Credit Agreement, including with respect to Financial Covenants (including various ratios), Notices, Maintaining Senior Rank of Notes, No Incurrence of Indebtedness, Liens, Restricted Payments, Limitations on Mergers, Acquisitions and Asset Sales, No Further Negative Pledges, Affiliate Transactions, Insurance, Corporate Existence and Maintenance of Properties, Non-

circumvention, Conduct of Business, U.S. Real Property Holding Corporation, Compliance with Laws, Additional Collateral, Audit Rights; Field Exams; Appraisals; Meetings, Pledge of Notes, Additional Issuances of Debt or Equity, Use of Proceeds, Costs, Expenses and Other Amounts, Modification of Organisational Documents and Certain Documents, Joinder, Investments, Further Assurances, Board Observation Rights, Compliance With Health Care Laws, and Corporate Compliance Program.

The lenders currently hold warrants exercisable for 2.3 per cent. of the membership interests of Constellation Health, and they will become exercisable for up to four per cent. of the membership interests in proportion to increased borrowings under the Credit Facility.

10.3   *FUH consulting agreement*

Please refer to paragraph 6.1(a) of Part VII of this document for further details.

10.4   *Orion merger agreement and pledge agreement*

On 17 June 2013 Constellation Health, Constellation Health Merger Sub, Inc., Orion and Orion Disbursing Agent, LLC entered into an Agreement and Plan of Merger whereby Constellation Health acquired one hundred per cent. of the common stock of Orion for an aggregate purchase price of $32,000,000.

The purchase price included an initial cash payment of $27,300,000 made at closing and $700,000 paid into an escrow account. In addition to the base purchase price, the merger agreement contemplates two contingent payments of up to $4,000,000 in aggregate based on Orion's revenues for the 12 month period ended 30 June 2014 and the 12 month period ending 31 December 2014. The minimum revenue required for payment of any earnout for the period ended 30 June 2014 was not achieved. Similarly, the Directors believe that the minimum revenue target for the 12 month period ending 31 December 2014 is unlikely to be met.

In connection with the contingent payments, Constellation and Orion issued a promissory note in favour of Orion Disbursing Agent LLC on the same date for up to $4,000,000 to secure such contingent payments. This promissory note is secured by a pledge agreement with one hundred per cent. (100 per cent.) of Orion being pledged as security, although this is subordinated to the security granted by the Group pursuant to the Credit Agreement.

The agreement contains typical representations and warranties and is governed by the laws of the State of New York.

10.5   *NEMS acquisition documents*

On 31 March 2014 NEMS Acquisition LLC, North East Medical Solutions, LLC, NEMS West Virginia, LLC and Jamie M. Kenestes entered into a Membership Interest Purchase Agreement (the "Purchase Agreement") whereby Orion as the sole member of NEMS Acquisition LLC acquired all of the interest in NEMS West Virginia, LLC and Northeast Medical Solutions, LLC.

The price for the interest acquired under the Purchase Agreement was $1,900,000 paid in cash at closing and certain earnout payments based on revenue targets of the business activities and operations of NEMS West Virginia, LLC and NEMS Acquisition LLC. The Directors estimate that the amount of the earnout payments in connection with the Purchase Agreement will be approximately $640,000.

The Purchase Agreement contains typical representations and warranties and is governed by the laws of the State of New York.

10.6   *NEMS acquisition of MFC Corporation assets*

On 28 November 2013 NEMS entered into an Asset Purchase Agreement with MFC Corporation, an Ohio corporation, Robert S. Boone, Lori Boone and the MCF Corporation 401(k) Plan

pursuant to which NEMS purchase all of the assets of MCF Corporation (the "Asset Purchase Agreement"). The assets purchased included but were not limited to all equipment, inventory, patents and accounts receivables.

The price for the assets acquired under the Asset Purchase Agreement was $1,575,000 paid in immediately available funds at closing and subject to a working capital adjustment as determined by the calculation provided for in the Asset Purchase Agreement.

The Asset Purchase Agreement contains typical representations and warranties and is governed by the laws of the Commonwealth of Pennsylvania.

10.7  *Exchange Agreement*

On 28 November 2014 the Company entered into the Exchange Agreement with Constellation, Orion and AAKB Investments Limited pursuant to which Constellation Health has agreed conditional upon and effective immediately prior to Admission to transfer the entire issued common stock of Orion to the Company in consideration of the issue of 37,862,074 Common Shares to Constellation Health. After the exchange but prior to Admission, the Company will own the entire issued common stock of Orion.

10.8  *Relationship agreement*

Please refer to paragraph 16 of Part I of this document for further details.

10.9  *Placing Agreement*

On 28 November 2014 the Company entered into the Placing Agreement with finnCap and the Directors pursuant to which finnCap has agreed to use its reasonable endeavours to procure subscribers for the Placing Shares at the Placing Price. The Placing Agreement is conditional, *inter alia*, on the issued and to be issued Common Shares being admitted to AIM by no later than 8 December 2014 (or such other date as may be agreed between the parties not being later than 22 December 2014).

In consideration of its services in connection with Admission under the Placing, the Company will pay finnCap, on Admission a corporate finance fee of £200,000 and a commission of £304,124.68 in part satisfaction of which 186,160 Common Shares are being issued upon Admission. FinnCap has agreed that, out of its commission, it will pay commission to Chrystal Capital.

The Placing Agreement contains warranties given by the Company and the Directors as to the accuracy of the information contained in this document and other matters relating to the Company and its business. The liability of the Directors under these warranties is limited in time and amount. In addition, the Company has given indemnities to finnCap, in respect of certain matters. FinnCap is entitled to terminate the Placing Agreement prior to Admission, principally in the event of a material breach of the Placing Agreement or of any of the warranties contained in it or if an event of force majeure or other adverse market event arises.

10.10  *Nominated Adviser and Broker Agreement*

On 28 November 2014 the Company entered into an agreement with finnCap, pursuant to which the Company appointed finnCap to act as nominated adviser and broker to the Company until such time as the agreement is terminated by the giving of 3 months' notice by either party. In consideration of its services, the Company will pay finnCap an annual retainer of £60,000.

10.11  *Chrystal Capital engagement terms*

The Group entered into an agreement with Chrystal Capital on 11 June 2014 pursuant to which the Company agreed to pay four per cent. commission on the aggregate subscription price of the Placing Shares subscribed by investors introduced by Chrystal Capital at the Placing Price

(with up to an additional one per cent. commission to be paid at the discretion of the Company). This agreement was superseded by the terms of the Placing Agreement as regards the commissions payable with respect to the Placing.

10.12  *SunTrust Robinson Humphrey Engagement Letter*

Orion entered into an agreement with SunTrust Robinson Humphrey ("STRH") on 3 October 2014 pursuant to which STRH has agreed to act as the Group's placement agent in connection with the private placement of Common Shares in the US pursuant to the Placing. Orion has agreed to pay a fee of $400,000 to STRH for its services and will reimburse STRH for out of pocket expenses up to a limit of $20,000.

Orion also entered into an agreement with STRH on 3 October 2014 pursuant to which STRH has agreed to act as the Group's financial adviser in connection with Orion's acquisition program. Orion has agreed to pay to STRH a fee equal to 1.5 per cent. of the consideration involved in each acquisition, subject to a minimum fee of $250,000, and will reimburse STRH for all reasonable out of pocket expenses.

10.13  *Tax indemnity agreement*

Constellation Health and Orion have entered into a tax indemnity agreement pursuant to which Consetellation Health has agreed to indemnify Orion against certain tax liabilities.

Prior to the Orion acquisition, Orion was a party to several promissory notes pursuant to which it borrowed funds from certain lenders. The lenders agreed to receive proceeds from the Orion acquisition in amounts less than the amounts owed by Orion under the notes, in full satisfaction of Orion's obligations under the notes (the "Cancellation of Debt").

Constellation has agreed to indemnify Orion should the Cancellation of Debt cause Orion to be liable for any taxes in excess of the indemnification coverage provided in the Orion merger agreement but subject to a maximum of $12 million plus an amount equivalent to any applicable interest, fines, penalties, costs and charges thereon.

10.14  *Subscription agreement*

The Company has agreed to issue 566,063 Common Shares to FUH as consideration for a payment made on behalf of Orion of $1.2 million by FUH towards the repayment of certain debts owed by Orion and for the value for the Company resulting from such repayment.

The Company has also agreed to issue 377,375 Common Shares to FUH as consideration for a payment of $800,000 by FUH to the Company.

10.15  *Lock-in Agreements*

(a)      *Directors Lock-Ins*

Pursuant to the Placing Agreement, the Directors (save for Paul Parmar) have undertaken that, subject to certain limited circumstances described below, not to sell or otherwise dispose of any of their interests in the Common Shares held on Admission for a period of 12 months. The Directors have also given certain undertakings with a view to maintaining an orderly market with respect to any disposal of Common Shares for a further 12 months following this initial 12 month period.

Certain disposals are permitted including, *inter alia*: (i) the acceptance of a general offer for the share capital of the Company, or the execution of an irrevocable undertaking to accept such an offer; (ii) a transfer to a family member or a trustee of a trust the beneficiaries of which are the relevant Director and/or a member of his family; and (iii) a disposal on death.

(b)    *Locked-In Shareholders' Lock-Ins*

Pursuant to an agreement dated 28 November 2014 made between (1) the Company, (2) finnCap, (3) Constellation Health (4) First United Health and (5) Paul Parmar, each of Constellation Health and First United Health has undertaken, subject to certain limited circumstances described below, not to sell or otherwise dispose of any of its interests in the Common Shares held on Admission for a period of 12 months. Each of Constellation Health and First United Health has also given certain undertakings with a view to maintaining an orderly market with respect to any disposal of Common Shares for a further 12 months following this initial 12 month period. Mr. Parmar has also undertaken to finnCap that during the lock-in and orderly market period referred to above, he will not (and will procure that his affiliates will not) sell or otherwise dispose of, or agree to sell or dispose of, any of his (or their) direct or indirect interests in Constellation Health held by him (or them) on Admission.

Pursuant to an agreement dated 28 November 2014 made between (1) the Company, (2) finncap, and (3) AAKB Investments Limited, AAKB Investments Limited has undertaken, subject to certain limited circumstances described below, not to sell or otherwise dispose of any of its interests in the Common Shares held on Admission for a period of 12 months. AAKB Investments Limited has also given certain undertakings with a view to maintaining an orderly market with respect to any disposal of Common Shares for a further 12 months following this initial 12 month period.

Certain disposals are permitted including, *inter alia*: (i) the acceptance of a general offer for the share capital of the Company or the execution of an irrevocable undertaking to accept such an offer; or (ii) a disposal to the Locked-In Shareholder's holding company or a subsidiary or a subsidiary of such holding company.

(c)    *Broker Lock-Ins*

FinnCap and Chrystal Capital have agreed to certain orderly market restrictions for a period of 12 months following Admission with respect to an aggregate of 186,160 Common Shares being issued to them upon Admission in connection with the Placing.

10.16 On 28 November 2014 the Company entered into a consultancy agreement with Sir Rodney Aldridge which is conditional upon Admission and pursuant to which Sir Rodney will provide certain consultancy services to the Company for an annual fee of £75,000.

## 11    LITIGATION

The Company is not involved in any governmental, legal or arbitration proceedings which may have or have had in the 12 months preceding the date of this document a significant effect on the Company's financial position or profitability or the financial position or profitability of the Group as a whole and, so far as the Directors are aware, there are no such proceedings pending or threatened against the Company or any other member of the Group.

## 12    WORKING CAPITAL

The Directors are of the opinion, having made due and careful enquiry, that the working capital available to the Company and the Group will be sufficient for their present requirements, that is for at least 12 months from the date of Admission.

## 13    RELATED PARTY TRANSACTIONS

Save as disclosed in paragraph 10 above, the Company has not entered into any related party transactions (being those set out in the Standards adopted according to Regulation (EC) No. 1606/2002) in the last three financial years preceding the date of this document and up to the date of this document.

**14    TAXATION**

14.1  **UK Taxation**

The following statements are intended only as a general guide to current UK tax legislation and to the current practice of HM Revenue & Customs ("HMRC") and may not apply to certain classes of Shareholders, such as dealers in securities, insurance companies and collective investment schemes. They relate only to persons who are the absolute beneficial owners of Common Shares, are resident and (if individuals) ordinarily resident in the UK for tax purposes (except where stated otherwise) and who hold Common Shares as investments. The tax position of any UK resident tax exempt entity, or an individual who is not UK domiciled, is not dealt with below and specific advice should be sought.

This summary relates only to certain limited aspects of the taxation treatment of owners of Common Shares and should not be relied upon as constituting legal or tax advice. Any person who is in any doubt as to his tax position, or who is subject to tax in any jurisdiction other than the UK, should consult his professional advisers immediately. In addition, the tax position of any Shareholder who together with connected persons holds at least 10 per cent. of the Common Shares of the Company is not dealt with below and specific advice should be sought.

(a)    *Tax on chargeable gains*

A disposal of Common Shares by any Shareholder who is (at any time in the relevant UK tax year) resident or, in the case of an individual, ordinarily resident in the UK may give rise to a chargeable gain or allowable loss for the purposes of UK taxation of chargeable gains (subject to any available exemptions or reliefs). Special rules may apply to tax gains on disposals made by individuals at a time when they are temporarily neither resident nor ordinarily resident in the UK.

Any chargeable gain (or allowable loss) will be calculated by reference to the consideration received for the disposal of the Common Shares less the allowable cost to the Shareholder of acquiring such Common Shares. For a Shareholder within the charge to UK corporation tax, an indexation allowance (calculated by reference to the UK retail prices index) in respect of the acquisition cost of the Common Shares should be available to reduce the amount of any chargeable gain realised on a subsequent disposal.

(b)    *Dividends*

Dividends received on the Common Shares by a Shareholder subject to UK corporation tax will generally be exempt from UK corporation tax, subject to certain specific anti-avoidance rules.

Dividends received on the Common Shares by an individual Shareholder who is resident or ordinarily resident in the UK carry an associated tax credit of one-ninth of the cash dividend (as grossed up for any United States withholding tax). Such individuals will be liable to UK income tax on the aggregate of the dividend (as grossed up for any United States withholding tax) and the associated tax credit at either the ordinary rate of 10 per cent., the higher rate of 32.5 per cent. or the additional rate of 37.5 per cent. Effectively those liable to tax at the basic rate will have no further liability to income tax in respect of the dividend. Those who are liable to tax at the higher or additional rates will have an additional tax liability (after taking into account the tax credit) of 25 per cent. and 30.55 per cent. respectively.

If any dividend has been subject to United States withholding tax, discussed in paragraph 14.2(c) below ("Withholding Tax"), the amount received plus the Withholding Tax will be included in the assessable income of UK resident individual Shareholders. In these circumstances, such Shareholders may be entitled to a credit for the foreign tax paid. UK resident corporate shareholders who are exempt from corporation tax on such dividends will not be able to utilise a credit for Withholding Tax.

(c)    *Stamp duty and stamp duty reserve tax ("SDRT")*

The statements below are intended as a general guide to the current position. They do not apply to certain intermediaries who are not liable to stamp duty or SDRT, or (except where stated otherwise) to persons connected with depositary arrangements or clearance services who may be liable at a higher rate.

*Common Shares held in Certificated Form*

No stamp duty or SDRT should be payable on the issue of Placing Shares.

No charge to stamp duty will arise on relation to the transfer of Common Shares held in certificated form provided that all instruments relating to the transfer are executed and retained outside the UK and no do not relate to matters or actions performed in the UK. However any instrument effecting a transfer of Common Shares held in certificated form whether executed in the UK or offshore may not (except in criminal proceedings) be given in evidence or be available for any purpose whatsoever in the UK unless duly stamped. The rate of stamp duty is 0.5 per cent. on the value of the consideration for the relevant transfer, rounded up to the next multiple of £5. Interest on the stamp duty will accrue from 30 days after the date the instrument was executed.

No charge to SDRT will arise in respect of an agreement to transfer Common Shares held in certificated form, provided such shares are not registered in any register kept in the UK by or on behalf of the Company.

*Common Shares held in uncertificated form*

It is not currently envisaged that Common Shares of the Company will be held in uncertified form as depositary interests although as described in paragraph 23 of Part I of this document the Company intends to apply for the Common Shares to be held in CREST in uncertificated form. Therefore the discussion below has been included for information purposes.

Due to the restrictions of the CREST system, shares of companies incorporated outside the UK, such as the Company, may not be settled directly on the CREST system. Accordingly, should Common Shares be held within the CREST system in uncertificated form, they will be held in the form of depositary interests issued by the depositary.

Subject to the exemption discussed below, agreements to transfer depositary interests in shares of companies listed on AIM are liable to SDRT at the rate of 0.5 per cent. of the value of the consideration for the transfer. Interest on the SDRT will accrue from 30 days after the date of the agreement.

The Finance Act 2014 abolished stamp duty and SDRT in shares which are admitted to trading on AIM so long as such shares are not listed on a recognised stock exchange. In order to claim the exemption the Company must complete a self certification.

14.2   **United States Taxation**

United States Taxation – Material United States Federal Income and Estate Tax Consequences to Non-US Holders

(a)    *General Summary*

The following is a general summary of the material US federal income and estate tax consequences that may be relevant to the purchase, ownership and disposition of the Common Shares as of the date of this document. Except where noted, this summary deals only with Common Shares that are held as a capital asset by a non-US holder.

A "non-US holder" means a person (other than a partnership) that is not for United States federal income tax purposes any of the following:

(i)    an individual citizen of the United States or resident of the United States for US federal income tax purposes (generally, the latter includes a non-US individual who (i) is a lawful permanent resident of the United States, (ii) is present in the United States for or in excess of certain periods of time, or (iii) makes a valid election to be treated as a US person);

(ii)    a corporation (or any other entity treated as a corporation for United States federal income tax purposes) created or organised in or under the laws of the United States, any state thereof or the District of Columbia;

(iii)    an estate the income of which is subject to US federal income taxation regardless of its source; or

(iv)    a trust if it (1) is subject to the primary supervision of a court within the United States and one or more US persons have the authority to control all substantial decisions of the trust or (2) has a valid election in effect under applicable US Treasury Regulations promulgated under the US Internal Revenue Code ("IRS Code") ("Treasury Regulations") to be treated as a United States person.

If a partnership holds the Common Shares, the tax treatment of a partner will generally depend upon the status of the partner and the activities of the partnership. If you are a partner of a partnership holding the Common Shares, you should consult your tax advisers.

This summary is based upon provisions of the IRS Code and Treasury Regulations, rulings and judicial decisions as of the date of this document. Those authorities may be changed, perhaps retroactively, so as to result in US federal income and estate tax consequences different from those summarised below. This summary does not address all aspects of US federal income and estate taxes and does not deal with foreign, state, local or other tax considerations that may be relevant to non-US holders in light of their personal circumstances. In addition, it does not represent a detailed description of the US federal income and estate tax consequences applicable to a Shareholder if it is subject to special treatment under the US federal income tax laws, including, for example, if the Shareholder: (i) is a US expatriate, a life insurance company, a tax-exempt organisation, a regulated investment company, a dealer in securities or currency, a bank or other financial institution, a pension plan, an owner (directly, indirectly or constructively) of five per cent. or more of the Company's Common Shares, or an investor whose functional currency is other than the US dollar, (ii) has elected mark-to-market accounting (iii) has acquired Common Shares as compensation, (iv) holds Common Shares as part of a hedge, straddle, constructive sale, conversion or other transaction, (v) is a special status corporation such as a "controlled foreign corporation" a "passive foreign investment company" or a corporation that accumulates earnings to avoid US federal income tax or (vi) is an investor in a pass-through entity. A change in law could alter significantly the tax considerations that are described in this summary.

**A potential investor considering the purchase of the Company's Common Shares, should consult its tax advisers concerning the particular US federal income and estate tax consequences of the ownership of the Common Shares, as well as the consequences to such investor arising under the laws of any other taxing jurisdiction.**

(b)    *Dividends*

Distributions (if any) on Common Shares by the Company will constitute dividends for US federal income tax purposes to the extent they are paid from current or accumulated earnings and profits, as determined under US federal income tax principles. If a distribution exceeds the Company's current and accumulated earnings and profits, the excess will be treated as a return of the non-US holder's investment up to such holder's

tax basis in the Company's Common Shares. Any excess will be treated as capital gain, subject to the tax treatment described below in "Gain on Disposition of Common Shares".

Any dividend (out of earnings and profits) paid to a non-US holder of the Common Shares generally will be subject to withholding of US federal income tax at a 30 per cent. rate or such lower rate as may be specified by an applicable income tax treaty. A non-US holder of the Company's Common Shares who wishes to claim the benefit of an applicable treaty rate for dividends will be required to complete IRS Form W-8BEN (or other applicable form), certify under penalty of perjury that such holder is eligible for benefits under the applicable treaty, and provide other additional information as required. The non-US holder of Common Shares must periodically update the information on such forms. Special certification and other requirements apply to certain non-US holders that are pass-through entities rather than corporations or individuals. In addition, Treasury Regulations provide special procedures for payments of dividends through certain intermediaries.

Dividends that are effectively connected with the conduct of a trade or business by the non-US holder within the United States (and, where a tax treaty applies, are attributable to a US permanent establishment of the non-US holder) are not subject to the withholding tax, provided certain certification and disclosure requirements are satisfied, including providing the Company with an IRS Form W-8ECI (or other applicable form). Instead, such dividends are subject to US federal income tax on a net income basis in the same manner as if the non-US holder were a United States person as defined under the IRS Code. Any such effectively connected dividends received by a foreign corporation may be subject to an additional "branch profits tax" at a 30 per cent. rate or such lower rate as may be specified by an applicable income tax treaty.

A non-US holder of the Common Shares eligible for a reduced rate of US withholding tax pursuant to an income tax treaty may obtain a refund of any excess amounts withheld by filing an appropriate claim for refund with the IRS.

For additional potential US withholding tax please see paragraph 14.2(f) of this Part VII.

(c)   *Gain on Disposition of Common Shares*

Any gain realised on the sale or other disposition of the Common Shares generally will not be subject to US federal income tax unless:

(i)    the gain is effectively connected with a trade or business of the non-US holder in the United States (and, if required by an applicable income tax treaty, is attributable to a US permanent establishment of the non-US holder);

(ii)   the non-US holder is an individual who is present in the United States for 183 days or more in the taxable year of that disposition, and certain other conditions are met; or

(iii)  the Company is or has been a "United States real property holding corporation" for US federal income tax purposes and certain other conditions are met.

An individual non-US holder described in the first bullet point immediately above will be subject to tax on his or her net gain derived from the sale or other taxable disposition of his or her Common Shares in the same manner as if he or she were a US person, as defined in the IRS Code. If a non-US holder that is a foreign corporation falls under the first bullet point immediately above, it will be subject to tax on its net gain in the same manner as if it were a United States person, as defined in the IRS Code, and, in addition, may be subject to the branch profits tax equal to 30 per cent. of its effectively connected earnings and profits (including such gain) or at such lower rate as may be specified by an applicable income tax treaty.

An individual non-US holder described in the second bullet point immediately above will be subject to a flat 30 per cent. tax on the gain derived from the sale, which may be offset by US source capital losses, even though the individual is not considered a resident of the United States.

Although there can be no assurance, the Company does not believe it is, or has been, and does not anticipate becoming a "United States real property holding corporation" for US federal income tax purposes.

For additional potential US withholding tax please see paragraph 14.2(f) of this Part VII.

(d)    *Federal Estate Tax*

Common Shares held by an individual non-US holder at the time of death will be included in such holder's gross estate for US federal estate tax purposes, unless an applicable estate tax treaty provides otherwise.

(e)    *Information Reporting and Backup Withholding*

The Company must report annually to the IRS and to each non-US holder the amount of dividends paid to such holder and the tax withheld with respect to such dividends, regardless of whether withholding was required. Copies of the information returns reporting such dividends and withholding may also be made available to the tax authorities in the country in which the non-US holder resides under the provisions of an applicable income tax treaty.

A non-US holder will be subject to backup withholding for dividends paid to such holder unless such holder certifies under penalty of perjury that it is a non-US holder (and the payer does not have actual knowledge or reason to know that such holder is a United States person as defined under the IRS Code), or such holder otherwise establishes an exemption.

Information reporting and, depending on the circumstances, backup withholding will apply to the proceeds of a sale of the Common Shares within the United States or conducted through certain US-related financial intermediaries, unless the beneficial owner certifies under penalty of perjury that it is a non-US holder (and the payer does not have actual knowledge or reason to know that the beneficial owner is a United States person as defined under the IRS Code) or such owner otherwise establishes an exemption. Certain shareholders, including all corporations, are exempt from the backup withholding rules.

Backup withholding is not an additional tax. Any amounts withheld under the backup withholding rules may be allowed as a refund or a credit against a non-US holder's United States federal income tax liability provided the required information is furnished to the Internal Revenue Service.

(f)    *Withholding under the Foreign Account Tax Compliance Act*

Under the Foreign Account Tax Compliance Act provisions of the IRS Code and related Treasury guidance ("FATCA"), a withholding tax of 30 per cent. will be imposed in certain circumstances on payments of (a) dividends on Common Shares on or after 1 July 2014, and (b) gross proceeds from the sale or other disposition of Common Shares on or after 1 January 2017. In the case of payments made to a "foreign financial institution" (generally including an investment fund), as a beneficial owner or as an intermediary, the tax generally will be imposed, subject to certain exceptions, unless such institution (i) enters into (or is otherwise subject to) and complies with an agreement with the U.S. government (a "FATCA Agreement") or (ii) is required by and complies with applicable foreign law enacted in connection with an intergovernmental agreement between the

137

United States and a foreign jurisdiction (an "IGA"), in either case to, among other things, collect and provide to the U.S. or other relevant tax authorities certain information regarding U.S. account holders of such institution. In the case of payments made to a foreign entity that is not a financial institution (as a beneficial owner), the tax generally will be imposed, subject to certain exceptions, unless such entity provides the withholding agent with a certification that it does not have any "substantial" U.S. owner (generally, any specified U.S. person that directly or indirectly owns more than a specified percentage of such entity) or that identifies its "substantial" U.S. owners. If Common Shares are held through a foreign financial institution that enters into (or is otherwise subject to) a FATCA Agreement, such foreign financial institution (or, in certain cases, a person paying amounts to such foreign financial institution) generally will be required, subject to certain exceptions, to withhold such tax on payments of dividends and proceeds described above made to (x) a person (including an individual) that fails to comply with certain information requests or (y) a foreign financial institution that has not entered into (and is not otherwise subject to) a FATCA Agreement and is not required to comply with FATCA pursuant to applicable foreign law enacted in connection with an IGA. Each Non-U.S. Holder should consult its own tax advisor regarding the application of FATCA to the ownership and disposition of our Common Shares.

## 15    EFFECTS OF US DOMICILE

The Company is incorporated in the State of Delaware, United States. There are a number of differences between the corporate structure of the Company and that of a public limited company incorporated in England under the Companies Act 2006. Whilst the Directors consider that it is appropriate to retain the majority of the usual features of a US corporation, they intend to take certain actions whenever practicable to meet UK standard practice adopted by companies under English law and admitted to AIM. Set out below is a description of the principal differences and, where appropriate, the actions the Board intends to take.

(a)    *Pre-emption rights*

Shareholders do not have pre-emption rights under the Act over further issues of shares of the Company and the Company shall have no obligation to provide any pre-emptive rights to its shareholders.

However, the Certificate of Incorporation provides that, unless otherwise determined in a general meeting by Shareholders of the Company holding 75 per cent. of the outstanding Common Shares represented at such meeting, each Shareholder shall have a pre-emption right to purchase its *pro rata* share of any shares of any kind, class or series of the Company (with certain exceptions) that the Company may, from time to time, propose to sell and issue wholly for cash, but subject to such exclusions or other arrangements as the Board may deem necessary or expedient in its exclusive discretion to deal with fractional entitlements or legal or practical problems under the laws of any country, territory or political subdivision thereof, or the requirements of any regulatory authority or stock exchange in any jurisdiction. The Company may, at any time and from time to time upon approval by the Board, disapply the pre-emption provisions, provided that such disapplication is limited to (i) the allotment for cash of shares where the nominal amount of such shares during any 12 month period does not exceed in the aggregate, ten per cent. of the outstanding Common Shares from time to time, or (ii) the allotment is in connection with a rights issue or (iii) the grant of options or other rights to subscribe for Common Shares (and the subsequent issue of Common Shares upon the exercise or vesting of such options or rights) pursuant to a plan approved by the Board for the incentivisation of management of the Company provided that the amount of such Common Shares (taken together with any Common Shares which are the subject of outstanding options or rights to subscribe or have been issued pursuant to the exercise or vesting of such options or rights in the 10 years prior to such grant) does not exceed in the aggregate, ten per cent. of the

outstanding Common Shares from time to time. These pre-emption rights will cease to apply if the Company becomes a reporting company under the US Exchange Act.

(b) *Inapplicability of the Takeover Code and anti-takeover effects of the Certificate of Incorporation and Bylaws and other relevant law*

The Company is not subject to the Takeover Code because its registered office and its place of central management are outside the UK, the Channel Islands and the Isle of Man. As a result, certain of the protections which are afforded to Shareholders under the Takeover Code, for example in relation to a takeover of a company or certain shareholding activities by shareholders, do not apply to the Company. However, the Certificate of Incorporation contains similar procedures to the Takeover Code in the event of any party (or parties acting in concert) obtaining 30 per cent. or more of the voting rights attaching to the issued Common Shares of the Company. See paragraph 3.14 of this Part VII above for more details.

(c) *Disclosure of interests in Common Shares*

The Company's Article of Incorporation provide that where a shareholder either (i) to his knowledge acquires an aggregate nominal value of a class, or series, of shares in which his interest is equal to or more than three per cent of the aggregate outstanding shares of that class of shares (a "Notifiable Interest"); (ii) ceases to have a Notifiable Interest; or (iii) becomes aware that he has acquired a Notifiable Interest, or that he has ceased to have a Notifiable Interest in which he was previously interested, he shall notify the Company of his interest. This obligation also arises where there is an increase or decrease in the level of a shareholder's Notifiable Interest through any single percentage.

It should be noted that the provisions regarding notification of interests in shares contained in the Disclosure and Transparency Rules of the FCA do not apply to the Company, therefore, the Company is not able to rely on such rules for the purpose of satisfying its obligations to publish notifications of relevant changes to its significant shareholders in accordance with Rule 17 of the AIM Rules. In addition, compliance with any disclosure requirement under Delaware General Corporation Law or other applicable laws and regulations from time to time may not always ensure compliance with the requirements set out in the Certificate of Incorporation which may vary in a number of respects.

## 16    CONSENTS

16.1  Grant Thornton UK LLP has given and not withdrawn its consent to the inclusion herein of its report set out in Section A of Part IV in the form and context in which it is included and has accepted responsibility for such report.

16.2  FinnCap Ltd has given and not withdrawn its consent to the issue of this document with inclusion herein of references to its name in the form and context in which they are included.

16.3  Chrystal Capital Partners LLP have given and not withdrawn their consent to the issue of this document with inclusion herein of references to its name in the form and context in which they are included.

## 17    NO SIGNIFICANT CHANGE

There has been no significant change in the trading or financial position of the Group since 30 June 2014 (being the date to which the unaudited interim financial information of the Orion Group set out in Part V of this document were prepared).

## 18    OTHER INFORMATION

18.1  There are no specific dates on which entitlement to dividends or interest thereon on Common Shares arises and there are no arrangements in force for the waiver of future dividends.

18.2 The total gross proceeds of the Placing receivable by the Company are expected to be £9,623,117.25. The estimated amount of expenses of the Placing and Admission which are payable by the Company is approximately £1.4 million. The net proceeds of the Placing receivable by the Company will be approximately £8.2 million.

18.3 The accounting reference date of the Company is currently 31 December.

18.4 The accounts of Orion for the financial years ended 31 December 2011 and 31 December 2012 were audited by Moore Colson & Company PC (a member firm of PrimeGlobal) of 1640 Powers Ferry Road, Governor's Ridge, Building 11, Suite 300, Marietta, GA 30067, United States and the accounts of the Company for the financial year ended 31 December 2013 were audited by RRBB Accountants & Advisors (a member firm of PrimeGlobal) of 265 Davidson Avenue, Suite 210, Somerset, NJ 08873-4120, United States.

18.5 Save as disclosed in this document, as far as the Directors are aware:

(a) there are no known trends, uncertainties, demands or events that are reasonably likely to have a material adverse effect on the Group's prospects for at least the current financial year; and

(b) there are no exceptional factors that have influenced the Group's activities.

18.6 Save as disclosed at paragraph 6.2 above, no person (excluding professional advisers as stated in this document and trade suppliers) has received directly or indirectly from the Group within the 12 months preceding the Company's application for Admission and no persons have entered into contractual arrangements to receive:

(a) fees totalling £10,000 or more;

(b) securities in the Company with a value of £10,000 or more;

(c) any other benefit with a value of £10,000 or more at the date of Admission.

18.7 Save as disclosed in this document, the Company has no principal investments for the period covered by the historic financial information contained in this document and has no principal investments in progress and no principal future investments in relation to which it has made a firm financial commitment.

18.8 Save as disclosed in this document, there are no patents or licences, industrial, commercial or financial contracts or manufacturing processes which are material to the Group's business or profitability.

18.9 There are no environmental issues that may affect the Group's utilisation of its tangible fixed assets.

18.10 Save as disclosed in this document, as far as the Directors are aware, there are no known trends, uncertainties, demands, commitments or events that are reasonably likely to have a material effect on the Group's prospects for the next 12 months.

18.11 Save as disclosed in this document, the Company does not hold a proportion of capital of any undertaking likely to have a significant effect on the assessment of the Company's assets and liabilities, financial position or profits and losses.

18.12 The Company is not aware of any arrangements, the operation of which may at a subsequent date result in a change of control of the Company.

18.13 Where information in this document has been sourced from a third party, it has been accurately reproduced and, as far as the Company is aware and is able to ascertain from the information published by the third party, no facts have been omitted which would render the reproduced information inaccurate or misleading.

**19    COPIES OF THIS DOCUMENT**

Copies of this document will be available, free of charge, at the offices of finnCap Ltd at 60 New Broad Street, London EC2M 1JJ, from the date of this document during normal business of any weekday (except Saturdays, Sundays and public holidays) for one month from the date of Admission.

Dated: 28 November 2014

# EXHIBIT 2