provide that the issuer thereof will not redeem or repurchase any such Equity Interests pursuant to such provisions prior to the Facility Termination Date.

"Disqualified Institution" means (a) any bank, financial institution or institutional lender that, in each case, has been identified by legal name in writing to the Administrative Agent prior to November 24, 2016, (b) any Competitor that has been identified by legal name in writing to the Administrative Agent (i) prior to November 24, 2016 or (ii) following the date that is ninety (90) days after the Closing Date, or (c) any Affiliate of any Competitor identified pursuant to clause (b) that is obviously (based solely on the similarity of the legal name of such Affiliate to the name of such Competitor) an Affiliate of such Competitor; provided, that, the foregoing shall not apply to (x) retroactively disqualify any Person that has previously acquired an assignment or participation in the Loans or Commitments under this Agreement to the extent that any such Person was not a Disqualified Institution at the time of the applicable assignment or participation, as the case may be, or (y) any Fund whose managers are not involved with the equity investment decisions of any other Person described in clauses (a), (b) or (c).

"Dollar" and "$" mean lawful money of the United States.

"Domestic Subsidiary" means any Subsidiary that is organized under the laws of any political subdivision of the United States.

"Dutch Auction" means a Dutch auction in accordance with the following procedures:

  (a)  Notice Procedures.  In connection with a Dutch Auction, the Auction Party will provide notification to the Auction Manager (for distribution to the Term Lenders of Initial Term Loans (the "Eligible Auction Lenders") and the Administrative Agent) of the principal amount of Initial Term Loans that will be the subject of the Dutch Auction (an "Auction Notice").  Each Auction Notice shall contain (i) the total cash value of the bid (the "Auction Amount"), in a minimum amount of $1,000,000 with minimum increments of $500,000, (ii) the discount to par, which shall be a range (the "Discount Range") of percentages of the par principal amount of Initial Term Loans (i.e., a five percent (5%) to ten percent (10%) Discount Range would represent $50,000 to $100,000 per $1,000,000 principal amount of Initial Term Loans, with a ten percent (10%) discount being deemed a "higher" discount than five percent (5%) for purposes of a Dutch Auction) at issue that represents the discounts applied to calculate the range of purchase prices that could be paid in the Dutch Auction (provided, that, the Discount Range may, at the option of the Auction Party, be a single percentage), (iii) the date on which the Dutch Auction will conclude, on which date Return Bids will be due at the time provided in the Auction Notice (such time, the "Auction Expiration Time"), as such date and time may be extended upon notice by the Auction Party to the Auction Manager before any prior Auction Expiration Time, and (iv) the identity of the Auction Manager, and shall indicate if such Auction Manager is an Affiliate of Holdings.  Each offer to purchase Initial Term Loans in a Dutch Auction shall be offered on a *pro rata* basis to all the Eligible Auction Lenders.

  (b)  Reply Procedures.  In connection with any Dutch Auction, each Eligible Auction Lender may, in its sole discretion, participate in such Dutch Auction and, if it elects to do so (any such participating Eligible Auction Lender, a "Participating Lender"), shall provide, prior to the Auction Expiration Time, the Auction Manager with a notice of participation (the "Return Bid") which shall be in a form and substance prepared by the Borrower and shall specify (i) a discount to par that must be expressed as a percentage of par principal amount of Initial Term Loans expressed in percentages (the "Reply Discount"), which must be within the Discount Range, and (ii) a principal amount of the Initial Term Loans, which must be in increments of $500,000, that such Eligible Auction Lender is willing to offer for sale at its Reply Discount (the "Reply Amount").

15

CHAR1\1498335\12

EHREN-WALIA 003524

An Eligible Auction Lender may avoid the minimum increment amount condition solely when submitting a Reply Amount equal to such Eligible Auction Lender's entire remaining amount of such Initial Term Loans. Eligible Auction Lenders may only submit one (1) Return Bid per Dutch Auction but each Return Bid may contain up to three (3) bids, only one of which can result in a Qualifying Bid (as defined below). In addition to the Return Bid, each Participating Lender must execute and deliver, to be irrevocable during the pendency of the Dutch Auction and held in escrow by the Auction Manager, an assignment agreement pursuant to which such Participating Lender shall make the representations and agreements substantially consistent with the terms of Section 2.16(a)(i)(F). Any Eligible Auction Lender that fails to submit a Return Bid at or prior to the Auction Expiration Time shall be deemed to have declined to participate in the Dutch Auction.

(c)    Acceptance Procedures. Based on the Reply Discounts and Reply Amounts received by the Auction Manager, the Auction Manager, with the consent of the Auction Party, will, within ten (10) Business Days of the Auction Notice (or such other time agreed by the Borrower), determine the applicable discount (the "Applicable Discount") for the Dutch Auction, which will be the highest Reply Discount at which the Auction Party can complete the Dutch Auction at the Auction Amount; provided, that, in the event that the Reply Amounts are insufficient to allow the Auction Party to complete a purchase of the entire Auction Amount, the Auction Party shall either, at its election, (i) withdraw the Dutch Auction or (ii) complete the Dutch Auction as set forth below. Unless withdrawn, the Auction Party shall notify the Participating Lenders of the Applicable Discount no later than one (1) Business Day after it is determined (the "Applicable Discount Notice"). The Auction Party shall, within three (3) Business Days of the Applicable Discount Notice, purchase Initial Term Loans from each Participating Lender with a Reply Discount that is equal to or higher than the Applicable Discount ("Qualifying Bids") at a discount to par equal to the Reply Discount of such Participating Lender, with the applicable Initial Term Loans of the Participating Lender(s) with the highest Reply Discount being purchased first and then in descending order from such highest Reply Discount to and including the applicable Initial Term Loans of the Participating Lenders with a Reply Discount equal to the Applicable Discount (the "Applicable Order of Purchase"); provided, that, if the aggregate proceeds required to purchase all Initial Term Loans subject to Qualifying Bids would exceed the Auction Amount for such Dutch Auction, the Auction Party shall purchase such Initial Term Loans of the Participating Lenders in the Applicable Order of Purchase, but with the Initial Term Loans of Participating Lenders with Reply Discounts equal to the Applicable Discount being purchased pro rata until the Auction Amount has been so expended on such purchases. If a Participating Lender has submitted a Return Bid containing multiple bids at different Reply Discounts, only the bid with the highest Reply Discount that is equal to or more than the Applicable Discount will be deemed the Qualifying Bid of such Participating Lender. In no event shall any purchase of Initial Term Loans in a Dutch Auction be made at a Reply Discount lower than the Applicable Discount for such Dutch Auction.

(d)    Additional Procedures. Once initiated by an Auction Notice, the Auction Party may withdraw or modify a Dutch Auction only prior to the delivery of the Applicable Discount Notice (and if any Dutch Auction is withdrawn or modified, notice thereof shall be delivered to the Administrative Agent and the Eligible Auction Lenders no later than the first (1st) Business Day after such withdrawal). Furthermore, in connection with any Dutch Auction, upon submission by a Participating Lender of a Qualifying Bid, such Participating Lender will be obligated to sell the entirety or its allocable portion of the Reply Amount, as the case may be, at the Applicable Discount.

"Earn Out Obligations" means, with respect to an Acquisition, all obligations of the Borrower or any Restricted Subsidiary to make earn out or other contingency payments (including purchase price adjustments, non-competition and consulting agreements, or other indemnity obligations) pursuant to the

16

EHREN-WALIA 003525

documentation relating to such Acquisition. For purposes of determining the aggregate consideration paid for an Acquisition at the time of such Acquisition, the amount of any Earn Out Obligations shall be deemed to be the maximum amount of the earn-out payments in respect thereof as specified in the documents relating to such Acquisition. For purposes of determining the amount of any Earn Out Obligations to be included in the definition of Funded Indebtedness, the amount of Earn Out Obligations shall be deemed to be the aggregate liability to be paid in cash in respect thereof to the extent stated on the balance sheet of the acquiring Person, as determined in accordance with GAAP.

"EEA Financial Institution" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a Subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" means any public administrative authority or any Person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Eligible Assets" means property (other than current assets) that is used or useful in the same or a related line of business as the Borrower and its Restricted Subsidiaries were engaged in on the Closing Date (or any reasonable extensions or expansions thereof).

"Eligible Assignee" means any Person that meets the requirements to be an assignee under Section 11.06 (subject to such consents, if any, as may be required under Section 11.06(b)(iii)).

"Eligible Auction Lenders" has the meaning specified in the definition "Dutch Auction".

"Employment and Consulting Agreements" means each of (a) that certain Consulting Agreement, dated as of November 24, 2016, by and among CHT Holdco, LLC, a Delaware limited liability company, Holdings and Alpha Cepheus, LLC, a Delaware limited liability company and (b) that certain Agreement, dated as of November 24, 2016, by and between Holdings and Paul Parmjit Parmar.

"Environmental Laws" means any and all federal, state, local, and foreign statutes, laws, regulations, ordinances, rules, judgments, orders, decrees, Environmental Permits, or governmental restrictions relating to pollution and the protection of the environment or the release of Hazardous Materials or pollutants into the environment, including those related to air emissions and wastewater discharges.

"Environmental Liability" means any actual liability (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of Holdings or any of its Subsidiaries directly or indirectly resulting from or based upon (a) violation of any Environmental Law or any Environmental Permit, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing

"Environmental Permit" means any permit, approval, identification number, license or other authorization required under any Environmental Law.

17

EHREN-WALIA 003526

"Equity Interests" means, with respect to any Person, all of the shares of capital stock of (or other ownership or profit interests in) such Person, all of the warrants, options or other rights for the purchase or acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person, all of the securities convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in) such Person or warrants, rights or options for the purchase or acquisition from such Person of such shares (or such other interests), and all of the other ownership or profit interests in such Person (including partnership, member or trust interests therein), whether voting or nonvoting, and whether or not such shares, warrants, options, rights or other interests are outstanding on any date of determination.

"ERISA" means the Employee Retirement Income Security Act of 1974.

"ERISA Affiliate" means any trade or business (whether or not incorporated) under common control with the Borrower within the meaning of Section 414(b) or (c) of the Code (and Sections 414(m) and (o) of the Code for purposes of provisions relating to Section 412 of the Code).

"ERISA Event" means (a) a Reportable Event with respect to a Pension Plan, (b) the withdrawal of the Borrower or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which such entity was a "substantial employer" as defined in Section 4001(a)(2) of ERISA or a cessation of operations that is treated as such withdrawal under Section 4062(e) of ERISA, (c) a complete or partial withdrawal by the Borrower or any ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is in reorganization, (d) the filing of a notice of intent to terminate a Pension Plan or the treatment of a Pension Plan amendment as a termination of a Pension Plan under Section 4041 or 4041A of ERISA, (e) the institution by the PBGC of proceedings to terminate a Pension Plan, (f) any event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan, (g) the determination that any Pension Plan is considered a plan in endangered or critical status within the meaning of Section 432 of the Code or Section 305 of ERISA, (h) the imposition of any material liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon the Borrower or any ERISA Affiliate or (i) a material failure by the Borrower or any ERISA Affiliate to meet all applicable requirements under the Pension Funding Rules in respect of a Pension Plan, whether or not waived, or the failure by the Borrower or any ERISA Affiliate to make any material required contribution to a Multiemployer Plan.

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"Eurodollar Rate" means:

(a)    for any Interest Period, with respect to a Eurodollar Rate Loan, the rate per annum equal to the London Interbank Offered Rate ("LIBOR"), or a comparable or successor rate which rate is approved by the Administrative Agent, as published on the applicable Bloomberg screen page (or such other commercially available source providing such quotations as may be designated by the Administrative Agent from time to time) (in each case, the "LIBO Rate") at or about 11:00 a.m. (London time), two (2) Business Days prior to the commencement of such Interest Period, for Dollar deposits (for delivery on the first day of such Interest Period) with a term equivalent to such Interest Period;

(b)    for any interest rate calculation with respect to a Base Rate Loan on any date, the rate per annum equal to the LIBO Rate, at or about 11:00 a.m. (London time) determined two (2) Business Days prior to such date for Dollar deposits being delivered in the London interbank market for deposits in Dollars with a term of one (1) month commencing that day;

CHAR1\1498335v12

EHREN-WALIA 003527

*provided*, *that*, (i) to the extent a comparable or successor rate is approved by the Administrative Agent in connection with any rate set forth in this definition, the approved rate shall be applied in a manner consistent with market practice; *provided*, *further*, that to the extent such market practice is not administratively feasible for the Administrative Agent, such approved rate shall be applied in a manner as otherwise reasonably determined by the Administrative Agent and (ii) if the Eurodollar Rate shall be less than zero, such rate shall be deemed zero for purposes of this Agreement.

"Eurodollar Rate Loan" means a Loan that bears interest at a rate based on clause (a) of the definition of "Eurodollar Rate".

"Event of Default" has the meaning specified in Section 8.01.

"Excess Cash Flow" means, with respect to the Borrower and its Restricted Subsidiaries, an amount equal to the sum of (a) Consolidated EBITDA for such Excess Cash Flow Period *minus* (b) the unfinanced portion of Consolidated Capital Expenditures for such Excess Cash Flow Period *minus* (c) Consolidated Interest Charges actually paid in cash by the Borrower and its Subsidiaries for such Excess Cash Flow Period *minus* (d) cash taxes paid for such Excess Cash Flow Period *minus* (e) Consolidated Scheduled Funded Debt Payments for such Excess Cash Flow Period *minus* (f) the portion of the purchase price paid in cash during such Excess Cash Flow Period with respect to any Permitted Acquisitions *minus* (g) one-time transaction costs paid in cash for any Permitted Acquisition or Permitted Transfer during such Excess Cash Flow Period *minus* (h) amounts paid in cash during such Excess Cash Flow Period described in clauses (b)(iv), (b)(vi), (b)(vii) of the definition of Consolidated EBITDA.

"Excess Cash Flow Period" means, each fiscal year of the Borrower, commencing with the fiscal year ending on December 31, 2017.

"Exchange Act" means the Securities Exchange Act of 1934, including all amendments thereto and regulations promulgated thereunder.

"Excluded Property" means, with respect to any Loan Party, (a)(i) any owned or leased real or personal property which is located outside of the United States, (ii) any fee-owned real property with a fair market value of less than $5,000,000; *provided*, that the fair market value of all fee-owned real property constituting "Excluded Property" shall not exceed $15,000,000 in the aggregate, and (iii) any leasehold interest in real property; (b) unless requested by the Administrative Agent or the Required Lenders, any personal property (including motor vehicles, airplanes and other assets subject to certificates of title) in respect of which perfection of a Lien is not either (i) governed by the Uniform Commercial Code or (ii) effected by appropriate evidence of the Lien being filed in either the United States Copyright Office or the United States Patent and Trademark Office; (c) the Equity Interests of any Foreign Subsidiary or any CFC Holdco to the extent not required to be pledged to secure the Secured Obligations pursuant to Section 6.13; (d) any property which, subject to the terms of Section 7.02(c), is subject to a Lien of the type described in Section 7.01(i) pursuant to documents that prohibit such Loan Party from granting any other Liens in such property; (e) any general intangible, permit, lease, license, contract or other instrument of a Loan Party to the extent the grant of a security interest in such general intangible, permit, lease, license, contract or other instrument in the manner contemplated by the Collateral Documents, under the terms thereof or under applicable Law, is prohibited and would result in the termination thereof or give the other parties thereto the right to terminate, accelerate or otherwise alter such Loan Party's rights, titles and interests thereunder (including upon the giving of notice or the lapse of time or both); *provided*, *that*, (i) any such limitation described in the foregoing clause (e) on the security interests granted pursuant to the Collateral Documents shall only apply to the extent that any such prohibition could not be rendered ineffective pursuant to the UCC or any other applicable Law (including Debtor Relief Laws) or principles of equity and (ii) in the

19

EHREN-WALIA 003528

event of the termination or elimination of any such prohibition or the requirement for any consent contained in any applicable Law, general intangible, permit, lease, license, contract or other instrument, to the extent sufficient to permit any such item to become Collateral, or upon the granting of any such consent, or waiving or terminating any requirement for such consent, a security interest in such general intangible, permit, lease, license, contract or other instrument shall be automatically and simultaneously granted under the Collateral Documents and shall be included as Collateral; (f) pledges of, and security interests in, assets, which are prohibited by applicable Law; provided, that, (i) any such limitation described in this clause (f) on the security interests granted pursuant to the Collateral Documents shall only apply to the extent that any such prohibition could not be rendered ineffective pursuant to the UCC or any other applicable Law (including Debtor Relief Laws) or principles of equity and (ii) in the event of the termination or elimination of any such prohibition contained in any applicable Law, a security interest in such assets shall be automatically and simultaneously granted under the Collateral Documents and shall be included as Collateral; (g) any "intent-to-use" application for registration of a Trademark (as defined in the Security Agreement) of such Loan Party filed in the United States Patent and Trademark Office pursuant to Section 1(b) of the Lanham Act, 15 U.S.C. §1051, prior to the filing of a "Statement of Use" pursuant to Section 1(d) of the Lanham Act or an "Amendment to Allege Use" pursuant to Section 1(c) of the Lanham Act with respect thereto, solely to the extent, if any, that, and solely during the period, if any, in which the grant of a security interest therein would impair the validity or enforceability of any registration that issues from such intent-to-use application under applicable federal law; and (h) any real or personal property as to which the Administrative Agent and the Borrower agree in writing that the costs or other consequences of obtaining a security interest or perfection thereof are excessive in view of the benefits to be obtained by the Secured Parties therefrom.

"Excluded Subsidiary" means any Subsidiary of Holdings (other than, for the avoidance of doubt, the Borrower) that is: (a) an Unrestricted Subsidiary; (b) an Immaterial Subsidiary; (c) prohibited or materially restricted by applicable Law or by a binding Contractual Obligation (including if the provision by such Subsidiary of a Guaranty would require governmental (including regulatory) consent, approval, license or authorization and such consent, approval, license or authorization has not been received); provided, that, such Contractual Obligation is permitted hereunder and is in existence on the Closing Date or at the time such Subsidiary is acquired and is not entered into by Holdings or any Subsidiary for the purpose of qualifying as an "Excluded Subsidiary" under this Agreement; provided, further, that, such exception shall only apply until such time as such prohibition or material restriction no longer exists; (d) to the extent that the provision by such Subsidiary of a Guaranty would result in material adverse tax consequences for the Borrower and its Restricted Subsidiaries, as reasonably determined by the Borrower in consultation with the Administrative Agent; (e) a CFC Holdco; (f) a special purpose entity; (g) a not-for-profit Subsidiary; (h) a Captive Insurance Subsidiary; or (i) a Subsidiary for which the Borrower and the Administrative Agent agree in writing that the cost or other consequences of obtaining a Guaranty from such Subsidiary would be excessive in view of the benefits to be obtained by the Secured Parties therefrom.

"Excluded Swap Obligation" means, with respect to any Guarantor, any Swap Obligation if, and to the extent that, all or a portion of the Guaranty of such Guarantor of, or the grant by such Guarantor of a Lien to secure, such Swap Obligation (or any Guarantee thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation thereof) by virtue of such Guarantor's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act (determined after giving effect to Section 10.11 and any other "keepwell", support or other agreement for the benefit of such Guarantor and any and all guarantees of such Guarantor's Swap Obligations by other Loan Parties) at the time the Guaranty of such Guarantor, or grant by such Guarantor of a Lien, becomes effective with respect to such Swap Obligation. If a Swap Obligation arises under a Master Agreement governing more than one Swap Contract, such exclusion shall apply only to the portion of such Swap Obligation that is attributable

CHAR1\1498335v12

EHREN-WALIA 003529

758

to Swap Contracts for which such Guaranty or Lien is or becomes excluded in accordance with the first sentence of this definition.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to any Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its Lending Office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan or Commitment (other than pursuant to an assignment request by the Borrower under Section 11.13) or (ii) such Lender changes its Lending Office, except in each case to the extent that, pursuant to Section 3.01(a)(ii), (a)(iii) or (c), amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its Lending Office, (c) Taxes attributable to such Recipient's failure to comply with Section 3.01(e) and (d) any U.S. federal withholding Taxes imposed pursuant to FATCA.

"Extraordinary Receipt" means any cash received by or paid to or for the account of any Person not in the ordinary course of business, including tax refunds, pension plan reversions, proceeds of insurance (other than proceeds of business interruption insurance to the extent such proceeds constitute compensation for lost earnings and proceeds of Involuntary Dispositions), indemnity payments and any purchase price adjustments; provided, that, an Extraordinary Receipt shall not include cash receipts from proceeds of insurance or indemnity payments to the extent that such proceeds, awards or payments are received by any Person in respect of any third party claim against such Person and applied to pay (or to reimburse such Person for its prior payment of) such claim and the costs and expenses of such Person with respect thereto.

"Facility" means the Initial Term Facility, the Revolving Facility, or any Incremental Term Facility, as the context may require.

"Facility Termination Date" means the date as of which all of the following shall have occurred: (a) the Aggregate Commitments have terminated, (b) all Obligations have been paid in full in cash or immediately available funds (other than contingent indemnification obligations for which no claim has been asserted), and (c) all Letters of Credit have terminated or expired (other than Letters of Credit as to which other arrangements with respect thereto satisfactory to the Administrative Agent and the L/C Issuer shall have been made).

"FASB ASC" means the Accounting Standards Codification of the Financial Accounting Standards Board.

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1) of the Code and any applicable intergovernmental agreements with respect thereto.

"Federal Funds Rate" means, for any day, the rate per annum equal to the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; provided, that, (a) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (b) if no

CHAR1\1498335v12

EHREN-WALIA 003530

such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate (rounded upward, if necessary, to a whole multiple of 1/100 of 1%) charged to Bank of America on such day on such transactions as determined by the Administrative Agent.

"Fee Letter" means the fee letter agreement, dated January 20, 2017, among Bank of America, MLPFS and the Sponsor.

"Fixed Charges" means, for any period, the sum of (a) Consolidated Scheduled Funded Debt Payments for such period plus (b) Consolidated Cash Interest Charges for such period; provided that that for purposes of calculating Fixed Charges: (1) Consolidated Scheduled Funded Debt Payments with respect to the Initial Term Loan for the period ending March 31, 2017 shall be the actual amount thereof for the period of one fiscal quarter then ended multiplied by four (4); (2) Consolidated Scheduled Funded Debt Payments with respect to the Initial Term Loan for the period ending June 30, 2017 shall be the actual amount thereof for the period of two fiscal quarters then ended multiplied by two (2); and (3) Consolidated Scheduled Funded Debt Payments with respect to the Initial Term Loan for the period ending September 30, 2017 shall be the actual amount thereof for the period of three fiscal quarters then ended multiplied by four-thirds (4/3); provided, further, for purposes of calculating Fixed Charges: (1) Consolidated Interest Charges for the period ending March 31, 2017 shall be the actual amount thereof for the period of one fiscal quarter then ended multiplied by four (4); (2) Consolidated Interest Charges for the period ending June 30, 2017 shall be the actual amount thereof for the period of two fiscal quarters then ended multiplied by two (2); and (3) Consolidated Interest Charges for the period ending September 30, 2017 shall be the actual amount thereof for the period of three fiscal quarters then ended multiplied by four-thirds (4/3).

"Flood Hazard Property" means any Mortgaged Property that is in an area designated by the Federal Emergency Management Agency as having special flood or mudslide hazards.

"Foreign Lender" means (a) if the Borrower is a U.S. Person, a Lender that is not a U.S. Person, and (b) if the Borrower is not a U.S. Person, a Lender that is resident or organized under the laws of a jurisdiction other than that in which the Borrower is resident for tax purposes. For purposes of this definition, the United States, each State thereof and the District of Columbia shall be deemed to constitute a single jurisdiction.

"Foreign Subsidiary" means any Subsidiary that is not a Domestic Subsidiary.

"FRB" means the Board of Governors of the Federal Reserve System of the United States.

"Fronting Exposure" means, at any time there is a Defaulting Lender that is a Revolving Lender, (a) with respect to the L/C Issuer, such Defaulting Lender's Applicable Percentage of the outstanding L/C Obligations, other than L/C Obligations as to which such Defaulting Lender's participation obligation has been reallocated to other Revolving Lenders or Cash Collateralized in accordance with the terms hereof, and (b) with respect to the Swingline Lender, such Defaulting Lender's Applicable Percentage of Swingline Loans other than Swingline Loans as to which such Defaulting Lender's participation obligation has been reallocated to other Revolving Lenders or Cash Collateralized in accordance with the terms hereof.

"Fund" means any Person (other than a natural Person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its activities.

"Funded Indebtedness" means as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP: (a) all obligations, whether current or long-term, for borrowed money (including the Obligations) and all

22

EHREN-WALIA 003531

obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments, (b) all purchase money Indebtedness, (c) the principal portion of all obligations under conditional sale or other title retention agreements relating to property purchased by such Person or any Subsidiary thereof (other than customary reservations or retentions of title under agreements with suppliers entered into in the ordinary course of business), (d) all obligations arising under letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, surety bonds and similar instruments, (e) all obligations in respect of the deferred purchase price of property or services, including, without limitation, any Earn Out Obligations (other than trade accounts payable in the ordinary course of business and, in each case, not past due for more than ninety (90) days after the due date thereof), (f) all Attributable Indebtedness, (g) all obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any Equity Interests in such Person or any other Person, valued, in the case of a redeemable preferred interest, at the greater of its voluntary or involuntary liquidation preference plus accrued and unpaid dividends, (h) all Funded Indebtedness of others secured by (or for which the holder of such Funded Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on, or payable out of the proceeds of production from, property owned or acquired by such Person, whether or not the obligations secured thereby have been assumed, (i) all Guarantees with respect to Funded Indebtedness of the types specified in clauses (a) through (h) above of another Person, and (j) all Funded Indebtedness of the types referred to in clauses (a) through (i) above of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or joint venturer, except to the extent that such Funded Indebtedness is expressly made non-recourse to such Person. For purposes hereof, the amount of any direct obligation arising under letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, surety bonds and similar instruments shall be the maximum amount available to be drawn thereunder.

"Funding Indemnity Letter" means a funding indemnity letter, in form and substance satisfactory to the Administrative Agent.

"GAAP" means generally accepted accounting principles in the United States set forth from time to time in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board (or agencies with similar functions of comparable stature and authority within the accounting profession) including the FASB Accounting Standards Codification that are applicable to the circumstances as of the date of determination, consistently applied and subject to Section 1.03.

"Governmental Authority" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"Guarantee" means, as to any Person, (a) any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation payable or performable by another Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness or other obligation of the payment or performance of such Indebtedness or other obligation, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation, or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness or other obligation of the payment or performance thereof or to protect such obligee

23

EHREN-WALIA 003532

against loss in respect thereof (in whole or in part), or (b) any Lien on any assets of such Person securing any Indebtedness or other obligation of any other Person, whether or not such Indebtedness or other obligation is assumed by such Person (or any right, contingent or otherwise, of any holder of such Indebtedness to obtain any such Lien). The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith. The term "Guarantee" as a verb has a corresponding meaning.

"Guaranteed Obligations" has the meaning specified in Section 10.01.

"Guarantors" means, collectively, (a) Holdings, (b) with respect to (i) Additional Secured Obligations owing by any Loan Party or any Domestic Subsidiary and (ii) any Swap Obligation of a Specified Loan Party (determined before giving effect to Sections 10.01 and 10.11) under the Guaranty, in each case, the Borrower, (c) each Domestic Subsidiary of Holdings (other than any CFC Holdco) as is party to this Agreement on the Closing Date or may from time to time become party to this Agreement pursuant to Section 6.12, and (d) the successors and permitted assigns of the foregoing.

"Guaranty" means, collectively, (a) the Guarantee made by the Guarantors under Article X in favor of the Secured Parties, and (b) each other guaranty delivered pursuant to Section 6.12.

"Hazardous Materials" means all explosive or radioactive substances (other than naturally occurring radon) or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, natural gas, natural gas liquids, asbestos or asbestos-containing materials, polychlorinated biphenyls, toxic mold, infectious or medical wastes, and all other substances, wastes, chemicals, pollutants, contaminants or compounds of any nature in any form regulated pursuant to any Environmental Law.

"Health Care Laws" means all requirements of Law relating to (a) healthcare fraud and abuse (including the following statutes, as amended, modified or supplemented from time to time and any successor statutes thereto and regulations promulgated from time to time thereunder: the federal Anti-Kickback Statute (42 U.S.C. § 1320a-7b(b)) other than the regulations at 42 C.F.R. § 1001.952; the Stark Law (42 U.S.C. § 1395nn and §1395(q)); the civil False Claims Act (31 U.S.C. § 3729 et seq.); Sections 1320a-7 and 1320a-7a and 1320a-7b of Title 42 of the United States Code; (b) Medicare Regulations, Medicaid Regulations, Laws regarding the Civilian Health and Medical Program of the Department of Veterans Affairs known as "CHAMPVA", the health program for certain active and retired members of the uniformed services and National Guard members and their families known as "TRICARE" or other Third Party Payor Programs; (c) the provision of, or payment for, health care services, items or supplies; (d) the billing, coding or submission of claims or collection of accounts receivable or refund of overpayments; (e) HIPAA; (f) fee-splitting prohibitions; (g) certificates of operations and authority; and (h) any and all other applicable federal or state health care laws, rules, codes, regulations and manuals.

"Health Care Permits" has the meaning specified in Section 5.21(b).

"Hedge Bank" means any Person in its capacity as a party to a Swap Contract that, (a) at the time it enters into a Swap Contract not prohibited under Article VI or VII, is a Lender or an Affiliate of a Lender, or (b) at the time it (or its Affiliate) becomes a Lender, is a party to a Swap Contract not prohibited under Article VI or VII, in each case, in its capacity as a party to such Swap Contract (even if such Person ceases to be a Lender or such Person's Affiliate ceased to be a Lender); provided, that, in the case of a Secured Hedge Agreement with a Person who is no longer a Lender (or Affiliate of a Lender), such Person shall be considered a Hedge Bank only through the stated termination date (without extension or renewal) of such

24

EHREN-WALIA 003533

Secured Hedge Agreement; provided, further, that for any of the foregoing to be included as a "Secured Hedge Agreement" on any date of determination by the Administrative Agent, the applicable Hedge Bank (other than the Administrative Agent or an Affiliate of the Administrative Agent) must have delivered a Secured Party Designation Notice to the Administrative Agent prior to such date of determination.

"HHS" means the United States Department of Health and Human Services and any successor thereof.

"HIPAA" means the Health Insurance Portability and Accountability Act of 1996, Pub. L. 104-191, Aug. 21, 1996, 110 Stat. 1936, and any successor statute thereto, and any and all rules or regulations promulgated from time to time thereunder.

"HMT" has the meaning specified in the definition of "Sanction(s)".

"Holdings" has the meaning specified in the Recitals.

"Honor Date" has the meaning specified in Section 2.03(c)(i).

"Immaterial Subsidiary" means, as of any date of determination, any Restricted Subsidiary (other than the Borrower) that (a) as of the last day of the Measurement Period most recently ended for which financial statements have been delivered pursuant to Section 6.01(a) or Section 6.01(b), did not have, together with the total assets as of such date of all other Immaterial Subsidiaries in the aggregate, total assets in excess of five percent (5%) of Consolidated Total Assets as of such date, or (b) for the Measurement Period most recently ended for which financial statements have been delivered pursuant to Section 6.01(a) or Section 6.01(b), did not represent, together with the Consolidated EBITDA for such Measurement Period attributable to all Immaterial Subsidiaries in the aggregate, Consolidated EBITDA in excess of five percent (5%) of Consolidated EBITDA of the Borrower and its Restricted Subsidiaries for such Measurement Period; provided, that, if, as of the date financial statements are delivered or required to be delivered pursuant to Section 6.01(a) or Section 6.01(b), (i) the total assets of any or all Immaterial Subsidiaries shall have, as of the last day of the Measurement Period most recently ended, exceeded the limit set forth in clause (a) above, or (ii) the Consolidated EBITDA attributable to any or all Immaterial Subsidiaries shall have, as of the Measurement Period most recently ended, exceeded the limit set forth in clause (b) above, then, in each case, within ten (10) Business Days (or such later date as agreed by the Administrative Agent in its reasonable discretion) after the date such financial statements are delivered or required to be delivered, the Borrower shall re-designate one or more Immaterial Subsidiaries, such that, as a result thereof, the total assets of, and Consolidated EBITDA attributable to, such Immaterial Subsidiary or all Immaterial Subsidiaries in the aggregate, as applicable, do not exceed such limits. Upon any such Restricted Subsidiary ceasing to be an Immaterial Subsidiary pursuant to the preceding sentence, such Restricted Subsidiary, to the extent not otherwise qualifying as an Excluded Subsidiary, shall comply with Sections 6.12 and 6.13, to the extent applicable.

"Impacted Loans" has the meaning specified in Section 3.03.

"Incremental Amount" has the meaning specified in Section 2.02(g)(i).

"Incremental Facility" has the meaning specified in Section 2.02(g)(i).

"Incremental Financing Commitments" has the meaning specified in Section 1.03(e)(ii).

"Incremental Revolving Facility" has the meaning specified in Section 2.02(g)(i).

25

CHAR1\1498335v12

EHREN-WALIA 003534

"Incremental Term Borrowing" means a borrowing consisting of simultaneous Incremental Term Loans of the same Type and, in the case of Eurodollar Rate Loans, having the same Interest Period made by Incremental Term Lenders pursuant to Section 2.01(c).

"Incremental Term Commitment" means, as to each Incremental Term Lender, its obligation to make an Incremental Term Loan hereunder pursuant to an Incremental Term Loan Lender Joinder Agreement; provided, that, at any time after the funding of an Incremental Term Loan, determination of "Required Lenders" shall include the Outstanding Amount of all Incremental Term Loans.

"Incremental Term Facility" means, at any time, with respect to any Incremental Term Loan Lender Joinder Agreement, the aggregate principal amount of all Incremental Term Loans made by Incremental Term Lenders pursuant to such Incremental Term Loan Lender Joinder Agreement that are outstanding at such time.

"Incremental Term Increase" has the meaning specified in Section 2.02(g)(i).

"Incremental Term Lender" means each of the Persons identified as an "Incremental Term Lender" in an Incremental Term Loan Lender Joinder Agreement, together with their respective successors and assigns.

"Incremental Term Loan" means an advance made by any Incremental Term Lender under an Incremental Term Facility.

"Incremental Term Loan Lender Joinder Agreement" means a joinder agreement, substantially in the form of Exhibit C, executed and delivered in connection with the incurrence of any Incremental Term Facility in accordance with the provisions of Section 2.02(g)(iv).

"Incremental Term Loan Maturity Date" with respect to any Incremental Term Facility, shall be as set forth in the applicable Incremental Term Loan Lender Joinder Agreement for such Incremental Term Facility.

"Indebtedness" means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP: (a) all Funded Indebtedness; (b) the Swap Termination Value of any Swap Contract; (c) all Guarantees with respect to outstanding Indebtedness of the types specified in clauses (a) and (b) above of any other Person; and (d) all Indebtedness of the types referred to in clauses (a) through (c) above of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person or a Subsidiary thereof is a general partner or joint venturer, unless such Indebtedness is expressly made non-recourse to such Person or such Subsidiary.

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and (b) to the extent not otherwise described in clause (a), Other Taxes.

"Indemnitee" has the meaning specified in Section 11.04(b).

"Information" has the meaning specified in Section 11.07(a).

"Initial Term Commitment" means, with respect to any Term Lender, its obligation to make an Initial Term Loan to the Borrower pursuant to Section 2.01(a) in an aggregate principal amount at any one time outstanding not to exceed the amount set forth opposite such Term Lender's name on Schedule 1.01(b)

26

EHREN-WALIA 003535

under the caption "Initial Term Commitment" or opposite such caption in the Assignment and Assumption or such other document pursuant to which such Term Lender becomes a party hereto, as applicable, as such amount may be adjusted from time to time in accordance with this Agreement. The Initial Term Commitment of all of the Term Lenders on the Closing Date shall be $130,000,000.

"Initial Term Facility" means, (a) on the Closing Date, the aggregate amount of the Initial Term Commitments at such time, and (b) at any time thereafter, the aggregate principal amount of the Initial Term Loans of all Term Lenders outstanding at such time.

"Initial Term Facility Maturity Date" means January 30, 2022; provided, that, if such date is not a Business Day, the Initial Term Facility Maturity Date shall be the next preceding Business Day.

"Initial Term Loan" means a Term Loan made by a Term Lender to the Borrower on the Closing Date pursuant to Section 2.01(b).

"Insolvency Proceeding" means (a) any insolvency or bankruptcy case or proceeding or any receivership, liquidation, reorganization, readjustment, composition or other similar case or proceeding relating to any Person or its property, (b) any liquidation, dissolution, reorganization or winding up of any Person, whether voluntary or involuntary and whether or not involving insolvency or bankruptcy proceedings or (c) any assignment for the benefit or creditors or any other marshalling of any Person's property.

"Intellectual Property" means all trademarks, trademark applications, service marks, trade names, copyrights, copyright applications, patents, patent applications, patent rights, franchises, licenses and other intellectual property rights.

"Intercompany Debt" has the meaning specified in Section 7.02(d).

"Interest Payment Date" means, (a) as to any Eurodollar Rate Loan, the last day of each Interest Period applicable to such Loan and the Maturity Date of the Facility under which such Loan was made; provided, however, that if any Interest Period for a Eurodollar Rate Loan exceeds three (3) months, the respective dates that fall every three (3) months after the beginning of such Interest Period shall also be Interest Payment Dates, and (b) as to any Base Rate Loan or Swingline Loan, the last Business Day of each March, June, September and December and the Maturity Date of the Facility under which such Loan was made (with Swingline Loans being deemed made under the Revolving Facility for purposes of this definition).

"Interest Period" means, as to each Eurodollar Rate Loan, the period commencing on the date such Eurodollar Rate Loan is disbursed or converted to or continued as a Eurodollar Rate Loan and ending on the date one (1), two (2), three (3) or six (6) months thereafter (in each case, subject to availability), as selected by the Borrower in its Loan Notice, or such other period that is twelve (12) months or less requested by the Borrower and consented to by all of the Appropriate Lenders; provided, that:

(a)       any Interest Period that would otherwise end on a day that is not a Business Day shall be extended to the next succeeding Business Day unless such Business Day falls in another calendar month, in which case such Interest Period shall end on the next preceding Business Day;

(b)       any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of the calendar month at the end of such Interest Period; and

CHAR1\1498335v12

EHREN-WALIA 003536

(c)    no Interest Period shall extend beyond the Maturity Date of the Facility under which such Loan was made.

"Interim Financial Statements" has the meaning specified in Section 4.01(d)(ii).

"Investment" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of Equity Interests of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of debt of, or purchase or other acquisition of any other debt or interest in, another Person (including any partnership or joint venture interest in such other Person and any arrangement pursuant to which the investor guaranties Indebtedness of such other Person), or (c) an Acquisition. For purposes of covenant compliance, the amount of any Investment shall be the amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investment.

"Involuntary Disposition" means any loss of, damage to or destruction of, or any condemnation or other taking for public use of, any property of any Loan Party or any Restricted Subsidiary.

"IRS" means the United States Internal Revenue Service.

"ISP" means, with respect to any Letter of Credit, the "International Standby Practices 1998" published by the Institute of International Banking Law & Practice, Inc. (or such later version thereof as may be in effect at the time of issuance).

"Issuer Documents" means with respect to any Letter of Credit, the Letter of Credit Application, and any other document, agreement and instrument entered into by the L/C Issuer and the Borrower (or any Restricted Subsidiary) or in favor of the L/C Issuer and relating to such Letter of Credit.

"Joinder Agreement" means a joinder agreement substantially in the form of Exhibit D executed and delivered in accordance with the provisions of Section 6.12.

"Junior Debt" has the meaning specified in Section 7.14.

"Latest Maturity Date" means, at any date of determination, the latest of the Revolving Facility Maturity Date, the Initial Term Facility Maturity Date, and the then latest Incremental Term Loan Maturity Date.

"Laws" means, collectively, all international, foreign, federal, state and local statutes, treaties, rules, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the binding interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, licenses, authorizations and permits of, and agreements with, any Governmental Authority.

"L/C Advance" means, with respect to each Revolving Lender, such Lender's funding of its participation in any L/C Borrowing in accordance with its Applicable Revolving Percentage.

"L/C Borrowing" means an extension of credit resulting from a drawing under any Letter of Credit which has not been reimbursed on the date when made or refinanced as a Revolving Borrowing.

"L/C Credit Extension" means, with respect to any Letter of Credit, the issuance thereof or extension of the expiry date thereof, or the increase of the amount thereof.

CHAR1\1498335v12

EHREN-WALIA 003537

"L/C Issuer" means Bank of America, in its capacity as issuer of Letters of Credit hereunder, or any successor issuer of Letters of Credit hereunder.

"L/C Obligations" means, as at any date of determination, the aggregate amount available to be drawn under all outstanding Letters of Credit plus the aggregate of all Unreimbursed Amounts (including all L/C Borrowings). For purposes of computing the amount available to be drawn under any Letter of Credit, the amount of such Letter of Credit shall be determined in accordance with Section 1.06. For all purposes of this Agreement, if on any date of determination a Letter of Credit has expired by its terms but any amount may still be drawn thereunder by reason of the operation of Rule 3.14 of the ISP, such Letter of Credit shall be deemed to be "outstanding" in the amount so remaining available to be drawn.

"LCA Election" has the meaning specified in Section 1.03(e)(iii).

"LCA Test Date" has the meaning specified in Section 1.03(e)(iii).

"Lender" means each of the Persons identified as a "Lender" on the signature pages hereto, each other Person that becomes a "Lender" in accordance with this Agreement, and their respective successors and assigns and, unless the context requires otherwise, includes the Swingline Lender.

"Lending Office" means, as to the Administrative Agent, the L/C Issuer or any Lender, the office or offices of such Person described as such in such Person's Administrative Questionnaire, or such other office or offices as such Person may from time to time notify the Borrower and the Administrative Agent; which office may include any Affiliate of such Person or any domestic or foreign branch of such Person or such Affiliate.

"Letter of Credit" means any standby letter of credit issued hereunder.

"Letter of Credit Application" means an application and agreement for the issuance or amendment of a Letter of Credit in the form from time to time in use by the L/C Issuer.

"Letter of Credit Expiration Date" means the day that is seven (7) days prior to the Revolving Facility Maturity Date (or, if such day is not a Business Day, the next preceding Business Day).

"Letter of Credit Fee" has the meaning specified in Section 2.03(h).

"Letter of Credit Sublimit" means an amount equal to the lesser of (a) $5,000,000 and (b) the Revolving Facility. The Letter of Credit Sublimit is part of, and not in addition to, the Revolving Facility.

"LIBO Rate" has the meaning specified in the definition of "Eurodollar Rate".

"LIBOR" has the meaning specified in the definition of "Eurodollar Rate".

"Lien" means any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or otherwise), charge, or preference, priority or other security interest or preferential arrangement in the nature of a security interest of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to real property and any financing lease having substantially the same economic effect as any of the foregoing).

"Limited Condition Acquisition" means any Permitted Acquisition whose consummation is not conditioned on the availability of, or on obtaining, third-party financing.

CHAR1\1498335v12

EHREN-WALIA 003538

"Loan" means an extension of credit by a Lender to the Borrower in the form of a Revolving Loan, a Term Loan, or a Swingline Loan.

"Loan Documents" means, this Agreement, the Notes, the Guaranty, the Collateral Documents, the Fee Letter, the Borrower Assignment, Assumption and Release, each Issuer Document, each Incremental Term Loan Lender Joinder Agreement, each Joinder Agreement, any intercreditor or subordination agreement entered into for the benefit of, or by, the Administrative Agent in connection with any Indebtedness permitted hereunder, any other agreement, instrument or document designated by its terms as a "Loan Document", and any agreement creating or perfecting rights in Cash Collateral pursuant to the provisions of Section 2.14 (but specifically excluding any Secured Hedge Agreement and any Secured Cash Management Agreement).

"Loan Notice" means a notice of (a) a Borrowing, (b) a conversion of Loans from one Type to the other, or (c) a continuation of Eurodollar Rate Loans, pursuant to Section 2.02(a), which shall be substantially in the form of Exhibit E or such other form as may be approved by the Administrative Agent (including any form on an electronic platform or electronic transmission system as shall be approved by the Administrative Agent), appropriately completed and signed by a Responsible Officer of the Borrower.

"Loan Parties" means, collectively, the Borrower and each Guarantor.

"London Banking Day" means any day on which dealings in Dollar deposits are conducted by and between banks in the London interbank market.

"Master Agreement" has the meaning specified in the definition of "Swap Contract."

"Material Adverse Effect" means any event, change or condition that, individually or in the aggregate, has had (a) a material adverse effect on the business, assets, results of operations, liabilities (actual or contingent) or financial condition of the Loan Parties and their respective Restricted Subsidiaries, taken as a whole, (b) a material adverse effect on the ability of the Loan Parties (taken as a whole) to fully and timely perform any of their payment obligations under any Loan Document to which the Borrower or any of the other Loan Parties is a party, or (c) a material adverse effect on the material rights and remedies (taken as a whole) of the Administrative Agent or any Lender under the Loan Documents (taken as a whole), including the legality, validity, binding effect or enforceability of the Loan Documents.

"Maturity Date" means the Revolving Facility Maturity Date, the Initial Term Facility Maturity Date, or the applicable Incremental Term Loan Maturity Date, as the context may require.

"Maximum Rate" has the meaning specified in Section 11.09.

"Measurement Period" means, at any date of determination, the four (4) fiscal quarters of the Borrower most recently completed on or prior to such date of determination.

"Medicaid" means that government-sponsored entitlement program under Title XIX, P.L. 89-97 of the Social Security Act, which provides federal grants to states for medical assistance based on specific eligibility criteria, as set forth on Section 1396, et seq. of Title 42 of the United States Code.

"Medicaid Regulations" means, collectively, (a) all federal statutes (whether set forth in Title XIX of the Social Security Act or elsewhere) affecting Medicaid and any statutes succeeding thereto; (b) all applicable provisions of all federal rules, regulations and manuals promulgated pursuant to or in connection with the statutes described in clause (a); (c) all state statutes for medical assistance enacted in connection with the statutes and provisions described in clauses (a) and (b); and (d) all applicable provisions of all

30

EHREN-WALIA 003539

rules, regulations and manuals of all Governmental Authorities promulgated pursuant to or in connection with the statutes described in clause (c).

"Medicare" means that government-sponsored insurance program under Title XVIII, P.L. 89-97, of the Social Security Act, which provides for a health insurance system for individuals 65 and older, certain disabled individuals and certain individuals with end-stage renal disease, as set forth at Section 1395, et seq. of Title 42 of the United States Code.

"Medicare Regulations" means, collectively, all federal statutes (whether set forth in Title XVIII of the Social Security Act or elsewhere) affecting Medicare and any statutes succeeding thereto; together with all applicable provisions of all rules, regulations and manuals of all Governmental Authorities (including, without limitation, CMS, the OIG, HHS, or any person succeeding to the functions of any of the foregoing) promulgated pursuant to or in connection with any of the foregoing.

"Mergersub" has the meaning specified in the introductory paragraph hereto.

"Minimum Collateral Amount" means, at any time, (a) with respect to Cash Collateral consisting of cash or deposit account balances provided to reduce or eliminate Fronting Exposure during any period when a Lender constitutes a Defaulting Lender, an amount equal to one hundred three percent (103%) of the Fronting Exposure of the L/C Issuer with respect to Letters of Credit issued and outstanding at such time, (b) with respect to Cash Collateral consisting of cash or deposit account balances provided in accordance with the provisions of Section 2.14(a)(i), (a)(ii) or (a)(iii), an amount equal to one hundred three percent (103%) of the Outstanding Amount of all L/C Obligations, and (c) otherwise, an amount determined by the Administrative Agent and the L/C Issuer in their sole discretion.

"MLPFS" means Merrill Lynch, Pierce, Fenner & Smith Incorporated.

"Moody's" means Moody's Investors Service, Inc. and any successor thereto.

"Mortgage" or "Mortgages" means, individually and collectively, as the context requires, each of the fee mortgages, deeds of trust and deeds executed by a Loan Party that purport to grant a Lien to the Administrative Agent (or a trustee for the benefit of the Administrative Agent) for the benefit of the Secured Parties in any Mortgaged Properties, in form and substance satisfactory to the Administrative Agent.

"Mortgaged Property" means any owned real property of a Loan Party listed on Schedule 5.19(c) (other than Excluded Property) and identified thereon as a "Mortgaged Property" and any other owned real property of a Loan Party that is or will become encumbered by a Mortgage in accordance with the terms of this Agreement.

"Mortgaged Property Support Documents" means with respect to any real property subject to a Mortgage:

    (a)    a fully executed and notarized Mortgage encumbering the fee interest of a Loan Party in such real property;

    (b)    if requested by the Administrative Agent in its sole discretion, maps or plats of an as-built survey of the sites of such real property certified to the Administrative Agent and the title insurance company issuing the policies referred to in clause (c) of this definition in a manner satisfactory to each of the Administrative Agent and such title insurance company, dated a date satisfactory to each of the Administrative Agent and such title insurance company by an independent professional licensed land surveyor, which maps or plats and the surveys on which

31

EHREN-WALIA 003540

they are based shall be sufficient to delete any standard printed survey exception contained in the applicable title policy and be made in accordance with the Minimum Standard Detail Requirements for Land Title Surveys jointly established and adopted by the American Land Title Association and the National Society of Professional Surveyors in 2016 with items 2, 3, 4, 6(a), 6(b), 7(a), 7(b)(1), 7(c), 8, 9, 13, 14, 16, 17, and 19 on Table A thereof completed;

(c)     ALTA mortgagee title insurance policies issued by a title insurance company acceptable to the Administrative Agent with respect to such real property, assuring the Administrative Agent that the Mortgage covering such real property creates a valid and enforceable first priority mortgage lien on such real property, free and clear of all defects and encumbrances except Permitted Liens, which title insurance policies shall otherwise be in form and substance satisfactory to the Administrative Agent and shall include such endorsements as are reasonably requested by the Administrative Agent;

(d)     evidence as to (i) whether such real property is a Flood Hazard Property and (ii) if such real property is a Flood Hazard Property, (A) whether the community in which such real property is located is participating in the National Flood Insurance Program, (B) the applicable Loan Party's written acknowledgment of receipt of written notification from the Administrative Agent (1) as to the fact that such real property is a Flood Hazard Property and (2) as to whether the community in which each such Flood Hazard Property is located is participating in the National Flood Insurance Program and (C) copies of insurance policies or certificates of insurance of the Loan Parties and each Restricted Subsidiary evidencing flood insurance satisfactory to the Administrative Agent and naming the Administrative Agent and its successors and/or assigns as sole loss payee on behalf of the Secured Parties;

(e)     such environmental questionnaires, environmental site assessments and other environmental due diligence as the Administrative Agent requires with respect to such real property; and

(f)     if requested by the Administrative Agent in its sole discretion, an opinion of legal counsel to the Loan Party granting the Mortgage on such real property, addressed to the Administrative Agent and each Lender, in form and substance reasonably acceptable to the Administrative Agent.

"Multiemployer Plan" means any employee benefit plan of the type described in Section 4001(a)(3) of ERISA, to which the Borrower or any ERISA Affiliate makes or is obligated to make contributions, or during the preceding five (5) plan years, has made or been obligated to make contributions.

"Multiple Employer Plan" means a Plan which has two or more contributing sponsors (including the Borrower or any ERISA Affiliate) at least two of whom are not under common control, as such a plan is described in Section 4064 of ERISA.

"Net Cash Proceeds" means the aggregate cash or Cash Equivalents proceeds received by any Loan Party or any Subsidiary in respect of any Disposition, Debt Issuance or Involuntary Disposition, net of (a) direct costs incurred in connection therewith (including, without limitation, legal, accounting and investment banking fees and sales commissions), (b) taxes paid or payable as a result thereof, and (c) in the case of any Disposition or any Involuntary Disposition, the amount necessary to retire any Indebtedness secured by a Permitted Lien (ranking senior to any Lien of the Administrative Agent) on the related property; it being understood that "Net Cash Proceeds" shall include, without limitation, any cash or Cash Equivalents received upon the sale or other disposition of any non-cash consideration received by any Loan Party or any Subsidiary in any Disposition, Debt Issuance or Involuntary Disposition.

32

EHREN-WALIA 003541

"Non-Consenting Lender" means any Lender that does not approve any consent, waiver or amendment that (a) requires the approval of all Lenders or all affected Lenders in accordance with the terms of Section 11.01 and (b) has been approved by the Required Lenders.

"Non-Debt Fund Affiliate" means any Affiliate of the Sponsor, other than (a) Holdings, the Borrower or any of their respective Subsidiaries, (b) any Debt Fund Affiliate, and (c) any natural Person.

"Non-Defaulting Lender" means, at any time, each Lender that is not a Defaulting Lender at such time.

"Non-Extension Notice Date" has the meaning specified in Section 2.03(b)(iv).

"Non-Reinstatement Deadline" has the meaning specified in Section 2.03(b)(v).

"Note" means a Term Note or a Revolving Note, as the context may require.

"Notice of Intent to Cure" has the meaning specified in Section 7.11(c).

"Notice of Loan Prepayment" means a notice of prepayment with respect to a Loan, which shall be substantially in the form of Exhibit F or such other form as may be approved by the Administrative Agent (including any form on an electronic platform or electronic transmission system as shall be approved by the Administrative Agent), appropriately completed and signed by a Responsible Officer of the Borrower.

"NPL" means the National Priorities List under CERCLA.

"Obligations" means (a) all advances to, and debts, liabilities, obligations, covenants and duties of, any Loan Party arising under any Loan Document or otherwise with respect to any Loan or Letter of Credit and (b) all costs and expenses incurred in connection with enforcement and collection of the foregoing, including the fees, charges and disbursements of counsel, in each case whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest, expenses and fees that accrue after the commencement by or against any Loan Party or any Affiliate thereof pursuant to any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest, expenses and fees are allowed claims in such proceeding; provided, that, Obligations of a Guarantor shall exclude any Excluded Swap Obligations with respect to such Guarantor.

"OFAC" means the Office of Foreign Assets Control of the United States Department of the Treasury.

"OIG" means the Office of Inspector General of HHS and any successor thereof.

"Open Market Purchase" has the meaning specified in Section 2.16(b)(i).

"Open Market Purchase Party" has the meaning specified in Section 2.16(b)(i).

"Organization Documents" means, (a)(i) with respect to any corporation, the certificate or articles of incorporation and the bylaws, (ii) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement or limited liability company agreement, and (iii) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization, and (b) with respect to all entities, any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or

33

EHREN-WALIA 003542

organization with the applicable Governmental Authority in the jurisdiction of its formation or organization (or equivalent or comparable documents with respect to any non-U.S. jurisdiction).

"Orion" has the meaning specified in the introductory paragraph hereto.

"Other Connection Taxes" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"Other Financing Commitments" has the meaning specified in Section 1.03(e)(ii).

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 3.06).

"Outstanding Amount" means (a) with respect to any Term Loans, any Revolving Loans and any Swingline Loans on any date, the aggregate outstanding principal amount thereof after giving effect to any borrowings and prepayments or repayments of such Term Loans, such Revolving Loans and such Swingline Loans, as the case may be, occurring on such date, and (b) with respect to any L/C Obligations on any date, the aggregate outstanding amount of such L/C Obligations on such date after giving effect to any L/C Credit Extension occurring on such date and any other changes in the aggregate amount of the L/C Obligations as of such date, including as a result of any reimbursements by the Borrower of Unreimbursed Amounts.

"Parent" means any Person controlled by the Sponsor that, directly or indirectly, controls Holdings.

"Participant" has the meaning specified in Section 11.06(d).

"Participant Register" has the meaning specified in Section 11.06(d).

"Participating Lender" has the meaning specified in the definition "Dutch Auction".

"PATRIOT Act" has the meaning specified in Section 11.19.

"PBGC" means the Pension Benefit Guaranty Corporation.

"Pension Act" means the Pension Protection Act of 2006.

"Pension Funding Rules" means the rules of the Code and ERISA regarding minimum required contributions (including any installment payment thereof) to Pension Plans and set forth in, with respect to plan years ending prior to the effective date of the Pension Act, Section 412 of the Code and Section 302 of ERISA, each as in effect prior to the Pension Act and, thereafter, Section 412, 430, 431, 432 and 436 of the Code and Sections 302, 303, 304 and 305 of ERISA.

"Pension Plan" means any employee pension benefit plan (including a Multiple Employer Plan or a Multiemployer Plan) that is maintained or is contributed to by the Borrower and any ERISA Affiliate and

CHAR1\1498335v12

EHREN-WALIA 003543

is either covered by Title IV of ERISA or is subject to the minimum funding standards under Section 412 of the Code.

"Permitted Acquisition" means Investments consisting of an Acquisition by the Borrower or any Restricted Subsidiary; provided, that, (a) no Event of Default shall have occurred and be continuing or would result from such Acquisition; (b) the property acquired (or the property of the Person acquired) is used or useful in the same or a related line of business as the Borrower and its Restricted Subsidiaries were engaged in on the Closing Date (or any reasonable extensions or expansions thereof); (c) the Administrative Agent, on behalf of the Secured Parties, shall have received (or shall receive in connection with the closing of such Acquisition) a first priority perfected security interest in all property (including Equity Interests) acquired in connection with such Acquisition in accordance with and to the extent required by the terms of Section 6.13 and, in the case of an Acquisition of a Person, such Person shall have executed a Joinder Agreement in accordance with and to the extent required by the terms of Section 6.12; (d) such Acquisition shall not be a "hostile" acquisition and shall have been approved by the Board of Directors and/or the shareholders (or equivalent) of the Borrower or applicable Restricted Subsidiary and the Person to be acquired; (e) the Borrower shall have delivered to the Administrative Agent a Pro Forma Compliance Certificate demonstrating that, upon giving Pro Forma Effect to such Acquisition, the Consolidated Leverage Ratio is less than 3.50 to 1.0 (or, if the ratio required to be maintained at such time by Section 7.11(a) is lower than 3.50 to 1.0, demonstrating compliance with the ratio required to be maintained at such time by Section 7.11(a)); and (f) the aggregate consideration (including cash and non-cash consideration, any assumption of Indebtedness, deferred purchase price, and any Earn Out Obligations) for all such Acquisitions of Persons that do not become Guarantors and assets that do not become subject to the security interests created by the Collateral Documents shall not exceed an amount equal to the total of (i) $25,000,000 during the term of this Agreement, minus (ii) the amount of all Investments made in reliance on Section 7.03(c)(iv).

"Permitted Liens" has the meaning specified in Section 7.01.

"Permitted Transfer" means any Disposition by the Borrower or any Restricted Subsidiary; provided, that, (a) the consideration paid in cash or Cash Equivalents in connection therewith shall constitute not less than seventy five percent (75%) of the consideration to be received in connection therewith, and the total consideration paid in connection therewith shall be paid contemporaneous with consummation of the transaction and shall be in an amount not less than the fair market value of the property disposed of; (b) if such transaction is a Sale and Leaseback Transaction, such transaction is not prohibited by the terms of Section 7.13; (c) such transaction does not involve the sale or other disposition of a minority equity interest in any Subsidiary; (d) no Default or Event of Default has occurred and is continuing both immediately prior to and after giving effect to such Disposition; (e) such transaction does not involve a sale or other disposition of receivables other than receivables owned by or attributable to other property concurrently being disposed of in connection with such Permitted Transfer; and (f) the aggregate net book value of all of the assets sold or otherwise disposed of by the Borrower and its Restricted Subsidiaries in all such transactions during the term of this Agreement shall not exceed $25,000,000.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Plan" means any employee benefit plan within the meaning of Section 3(3) of ERISA (including a Pension Plan), maintained for employees of the Borrower or any ERISA Affiliate or any such Plan to which the Borrower or any ERISA Affiliate is required to contribute on behalf of any of its employees.

"Plan of Reorganization" has the meaning specified in Section 11.06(i).

CHAR1\1498335v12

EHREN-WALIA 003544

"Platform" has the meaning specified in Section 6.02.

"Pledge Agreement" means the pledge agreement, dated as of the Closing Date, executed in favor of the Administrative Agent by each of the Loan Parties party thereto.

"Prior Acquisitions" means the Acquisition of each of the following Persons prior to the Closing Date: (a) Physicians Practice Plus Holdings LLC, (b) Phoenix Health, LLC, (c) Northstar FHA, LLC, (d) MDRX Medical Billing, LLC and (e) Vega Medical Professionals, LLC.

"Pro Forma Basis", "Pro Forma Compliance" and "Pro Forma Effect" means, in respect of a Specified Transaction, that such Specified Transaction and the following transactions in connection therewith (to the extent applicable) shall be deemed to have occurred as of the first day of the applicable Measurement Period for the applicable covenant or requirement: (a)(i) with respect to any Disposition, Involuntary Disposition or sale, transfer or other disposition that results in a Person ceasing to be a Subsidiary or any designation of a Restricted Subsidiary as an Unrestricted Subsidiary, income statement and cash flow statement items (whether positive or negative) attributable to the Person or property disposed of shall be excluded, and (ii) with respect to any Acquisition or Investment, income statement and cash flow statement items (whether positive or negative) attributable to the Person or property acquired shall be included to the extent relating to any period applicable in such calculations to the extent (A) such items are not otherwise included in such income statement items for the Borrower and its Restricted Subsidiaries in accordance with GAAP or in accordance with any defined terms set forth in Section 1.01, and (B) such items are supported by financial statements or other information reasonably satisfactory to the Administrative Agent, (b) any retirement of Indebtedness, and (c) any incurrence or assumption of Indebtedness by the Borrower or any of its Restricted Subsidiaries (and if such Indebtedness has a floating or formula rate, such Indebtedness shall have an implied rate of interest for the applicable period for purposes of this definition determined by utilizing the rate which is or would be in effect with respect to such Indebtedness as at the relevant date of determination); provided, that, (x) Pro Forma Basis, Pro Forma Compliance and Pro Forma Effect in respect of any Specified Transaction shall be calculated in a reasonable and factually supportable manner and certified by a Responsible Officer of the Borrower, (y) any such calculation shall be subject to the applicable limitations set forth in the definition of Consolidated EBITDA and (z) the calculation of Pro Forma Basis, Pro Forma Compliance and Pro Forma Effect (other than for purposes of clause (viii) of the definition of "Consolidated EBITDA") shall not include items attributable to an Acquisition unless the Administrative Agent has received audited financial statements for the property acquired (with such audit being unqualified) or a quality of earnings report with respect to the property acquired that is reasonably acceptable to the Administrative Agent, in the case of an Acquisition where the aggregate consideration paid is greater than $15,000,000.

"Pro Forma Compliance Certificate" means a certificate of a Responsible Officer of the Borrower containing reasonably detailed calculations of the Consolidated Leverage Ratio and/or the Consolidated Fixed Charge Coverage Ratio as of the most recent fiscal quarter end for which the Borrower was required to deliver financial statements pursuant to Section 6.01(a) or Section 6.01(b) after giving Pro Forma Effect to the applicable Specified Transaction.

"Pro Forma Financial Statements" has the meaning specified in Section 4.01(d)(v).

"Protected Health Information" has the meaning ascribed thereto in 42 C.F.R. §160.103.

"Public Lender" has the meaning specified in Section 6.02.

"Qualified ECP Guarantor" means, at any time, each Loan Party with total assets exceeding $10,000,000 or that qualifies at such time as an "eligible contract participant" under the Commodity

CHAR1\1498335v12

EHREN-WALIA 003545

Exchange Act and can cause another Person to qualify as an "eligible contract participant" at such time under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

"Qualified Equity Interests" means any Equity Interests other than Disqualified Equity Interests.

"Qualifying Bids" has the meaning specified in the definition "Dutch Auction".

"Recipient" means the Administrative Agent, any Lender, the L/C Issuer or any other recipient of any payment to be made by or on account of any obligation of any Loan Party hereunder.

"Reference Date" has the meaning specified in the definition of "Available Amount".

"Register" has the meaning specified in Section 11.06(c).

"Related Parties" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, trustees, administrators, managers, advisors and representatives of such Person and of such Person's Affiliates.

"Removal Effective Date" has the meaning specified in Section 9.06(b).

"Reply Amount" has the meaning specified in the definition "Dutch Auction".

"Reply Discount" has the meaning specified in the definition "Dutch Auction".

"Reportable Event" means any of the events set forth in Section 4043(c) of ERISA, other than events for which the thirty (30) day notice period has been waived.

"Request for Credit Extension" means (a) with respect to a Borrowing, conversion or continuation of Term Loans or Revolving Loans, a Loan Notice, (b) with respect to an L/C Credit Extension, a Letter of Credit Application, and (c) with respect to a Swingline Loan, a Swingline Loan Notice.

"Required Lenders" means, at any time, Lenders having Total Credit Exposures representing more than fifty percent (50%) of the Total Credit Exposures of all Lenders. The Total Credit Exposure of any Defaulting Lender shall be disregarded in determining Required Lenders at any time; provided, that, the amount of any participation in any Swingline Loan and Unreimbursed Amounts that such Defaulting Lender has failed to fund that have not been reallocated to and funded by another Lender shall be deemed to be held by the Lender that is the Swingline Lender or the L/C Issuer, as the case may be, in making such determination.

"Required Revolving Lenders" means, at any time, Lenders having Total Revolving Credit Exposures representing more than fifty percent (50%) of the Total Revolving Credit Exposures of all Lenders. The Total Revolving Credit Exposure of any Defaulting Lender shall be disregarded in determining Required Revolving Lenders at any time; provided, that, the amount of any participation in any Swingline Loan and Unreimbursed Amounts that such Defaulting Lender has failed to fund that have not been reallocated to and funded by another Lender shall be deemed to be held by the Lender that is the Swingline Lender or the L/C Issuer, as the case may be, in making such determination.

"Resignation Effective Date" has the meaning specified in Section 9.06(a).

"Responsible Officer" means the chief executive officer, president, chief financial officer, treasurer, assistant treasurer, or controller of a Loan Party, and, solely for purposes of the delivery of

EHREN-WALIA 003546

incumbency certificates pursuant to Section 4.01, the secretary or any assistant secretary of a Loan Party, and, solely for purposes of notices given pursuant to Article II, any other officer or employee of the applicable Loan Party so designated by any of the foregoing officers in a notice to the Administrative Agent or any other officer or employee of the applicable Loan Party designated in or pursuant to an agreement between the applicable Loan Party and the Administrative Agent. Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party. To the extent requested by the Administrative Agent, each Responsible Officer will provide an incumbency certificate and to the extent requested by the Administrative Agent, appropriate authorization documentation, in form and substance satisfactory to the Administrative Agent.

"Restricted Payment" means (a) any dividend or other distribution, direct or indirect, on account of any shares (or equivalent) of any class of Equity Interests of any Loan Party or any of its Restricted Subsidiaries, now or hereafter outstanding, (b) any redemption, retirement, sinking fund or similar payment, purchase or other acquisition for value, direct or indirect, of any shares (or equivalent) of any class of Equity Interests of any Loan Party or any of its Restricted Subsidiaries, now or hereafter outstanding, (c) any payment made to retire, or to obtain the surrender of, any outstanding warrants, options or other rights to acquire shares of any class of Equity Interests of any Loan Party or any of its Restricted Subsidiaries, now or hereafter outstanding, and (d) any payment of management fees, indemnification obligations, or any other similar fees pursuant to any management, consulting, advisory, services or other agreement to any holder of the Equity Interests of any Loan Party or any of its Restricted Subsidiaries or other Affiliates.

"Restricted Subsidiary" means any Subsidiary of the Borrower other than an Unrestricted Subsidiary. Each Loan Party (other than, for the avoidance of doubt, Holdings and the Borrower) shall be a Restricted Subsidiary.

"Return Bid" has the meaning assigned to such term in the definition "Dutch Auction".

"Revolving Borrowing" means a borrowing consisting of simultaneous Revolving Loans of the same Type and, in the case of Eurodollar Rate Loans, having the same Interest Period made by each of the Revolving Lenders pursuant to this Agreement.

"Revolving Commitment" means, as to each Revolving Lender, its obligation to (a) make Revolving Loans to the Borrower pursuant to Section 2.01(b), (b) purchase participations in L/C Obligations, and (c) purchase participations in Swingline Loans, in an aggregate principal amount at any one time outstanding not to exceed the amount set forth opposite such Lender's name on Schedule 1.01(b) under the caption "Revolving Commitment" or opposite such caption in the Assignment and Assumption or other document pursuant to which such Lender becomes a party hereto, as applicable, as such amount may be adjusted from time to time in accordance with this Agreement. The Revolving Commitments of all of the Revolving Lenders as of the Closing Date shall be $15,000,000.

"Revolving Exposure" means, as to any Lender at any time, the aggregate principal amount at such time of such Lender's outstanding Revolving Loans and such Lender's participation in L/C Obligations and Swingline Loans at such time.

"Revolving Facility" means, at any time, the aggregate amount of the Revolving Lenders' Revolving Commitments at such time.

"Revolving Facility Maturity Date" means January 30, 2022; provided, that, if such date is not a Business Day, the Revolving Facility Maturity Date shall be the next preceding Business Day.

EHREN-WALIA 003547

"Revolving Lender" means, at any time, (a) so long as any Revolving Commitment is in effect, any Lender that has a Revolving Commitment at such time, or (b) if the Revolving Commitments have terminated or expired, any Lender that has a Revolving Loan or a participation in L/C Obligations or Swingline Loans at such time.

"Revolving Loan" means a loan made by a Lender to the Borrower in respect of a Revolving Commitment pursuant to <u>Section 2.01(b)</u>.

"Revolving Note" means a promissory note made by the Borrower in favor of a Revolving Lender evidencing Revolving Loans or Swingline Loans, as the case may be, made by such Revolving Lender, substantially in the form of <u>Exhibit G</u>.

"S&P" means Standard & Poor's Financial Services LLC, a subsidiary of McGraw-Hill Financial, Inc., and any successor thereto.

"Sale and Leaseback Transaction" means, with respect to any Loan Party or any Restricted Subsidiary, any arrangement, directly or indirectly, with any Person whereby such Loan Party or such Restricted Subsidiary shall sell or transfer any property used or useful in its business, whether now owned or hereafter acquired, and thereafter rent or lease such property or other property that it intends to use for substantially the same purpose or purposes as the property being sold or transferred.

"Sanction(s)" means any sanction administered or enforced by the United States government (including OFAC), the United Nations Security Council, the European Union, Her Majesty's Treasury ("HMT") or other relevant sanctions authority.

"SEC" means the Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

"Secured Cash Management Agreement" means any Cash Management Agreement between any Loan Party or any of its Subsidiaries and any Cash Management Bank.

"Secured Hedge Agreement" means any interest rate, currency, foreign exchange, or commodity Swap Contract permitted under <u>Article VI</u> and <u>VII</u> between any Loan Party or any of its Subsidiaries and any Hedge Bank.

"Secured Obligations" means all Obligations and all Additional Secured Obligations.

"Secured Parties" means, collectively, the Administrative Agent, the Lenders, the L/C Issuer, the Hedge Banks, the Cash Management Banks, the Indemnitees and the co-agents or sub-agents appointed by the Administrative Agent from time to time pursuant to <u>Section 9.05</u>.

"Secured Party Designation Notice" means a notice from any Lender or an Affiliate of a Lender substantially in the form of <u>Exhibit H</u>.

"Securities Act" means the Securities Act of 1933, including all amendments thereto and regulations promulgated thereunder.

"Securitization Transaction" means, with respect to any Person, any financing transaction or series of financing transactions (including factoring arrangements) pursuant to which such Person or any Subsidiary of such Person may sell, convey or otherwise transfer, or grant a security interest in, accounts,

CHAR1\1498335\12

EHREN-WALIA 003548

777

payments, receivables, rights to future lease payments or residuals or similar rights to payment to a special purpose subsidiary or affiliate of such Person.

"Security Agreement" means the security agreement, dated as of the Closing Date, executed in favor of the Administrative Agent by each of the Loan Parties party thereto.

"Seller Notes" means, collectively, (a) that certain unsecured, subordinated series A promissory note, dated as of the Closing Date, issued by CHT Mergersub, Inc. (which will be merged into Holdings) payable to Capita Registrars Limited, as administrative agent for the account of each holder set forth on Annex A thereto, (b) that certain unsecured, subordinated series B promissory note, dated as of the Closing Date, issued by CHT Mergersub, Inc. (which will be merged into Holdings) payable to Capita Registrars Limited, as administrative agent for the account of each holder set forth on Annex A thereto, and (c) that certain unsecured, subordinated promissory note, dated as of January 27, 2017, issued by CHT Mergersub, Inc. (which will be merged into Holdings) payable to CHT Holdco, LLC.  The aggregate amount of Indebtedness outstanding under the Seller Notes shall not exceed $39,594,901.76.

"Seller Notes Documents" means the Seller Notes and any other agreements, documents or instruments entered into in connection with any of the foregoing.

"Social Security Act" means the Social Security Act of 1965.

"Solvency Certificate" means a solvency certificate in substantially in the form of Exhibit I.

"Solvent" and "Solvency" mean, with respect to any Person on any date of determination, that on such date (a) the fair value of the property of such Person is greater than the total amount of liabilities, including contingent liabilities, of such Person, (b) the present fair saleable value of the assets of such Person is not less than the amount that will be required to pay the probable liability of such Person on its debts as they become absolute and matured, (c) such Person does not intend to, and does not believe that it will, incur debts or liabilities beyond such Person's ability to pay such debts and liabilities as they mature, (d) such Person is not engaged in business or a transaction, and is not about to engage in business or a transaction, for which such Person's property would constitute an unreasonably small capital, and (e) such Person is able to pay its debts and liabilities, contingent obligations and other commitments as they mature in the ordinary course of business.  The amount of contingent liabilities at any time shall be computed as the amount that, in the light of all the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability.

"Specified Acquisition Agreement Representations" means such of the representations and warranties made by Holdings with respect to Holdings and its Subsidiaries and/or assets in the Acquisition Agreement that are material to the interests of the Lenders, but only to the extent that Holdings, Mergersub, the Sponsor or any of their respective Affiliates have the right to terminate the obligations of Holdings, Mergersub, the Sponsor or any of their respective Affiliates under the Acquisition Agreement or to decline to consummate the Closing Date Acquisition as a result of a breach of such representations and warranties in the Acquisition Agreement.

"Specified Event of Default" means any Event of Default pursuant to Section 8.01(a), Section 8.01(f) or Section 8.01(g).

"Specified Loan Party" means any Loan Party that is not then an "eligible contract participant" under the Commodity Exchange Act (determined prior to giving effect to Section 10.11).

EHREN-WALIA 003549

"Specified Representations" means the representations and warranties made in Section 5.01(a) (as to valid existence), Section 5.01(b)(ii), the first clause of Section 5.02, Section 5.02(a), Section 5.02(c), Section 5.04, Section 5.13, Section 5.16 (after giving effect to the Transaction), and Section 5.17.

"Specified Transaction" means (a) any Acquisition, any Disposition, any sale, transfer or other disposition that results in a Person ceasing to be a Subsidiary, any Involuntary Disposition, any Investment that results in a Person becoming a Subsidiary, any designation of a Subsidiary as a Restricted Subsidiary or as an Unrestricted Subsidiary, in each case, whether by merger, consolidation or otherwise, or any incurrence or repayment of Indebtedness or (b) any other event that by the terms of the Loan Documents requires Pro Forma Compliance with a test or covenant or requires such test or covenant to be calculated on a Pro Forma Basis.

"Sponsor" means CC Capital CHT Holdco LLC, a Delaware limited liability company, and any of its Controlled Investment Affiliates (specifically excluding portfolio companies).

"Subordinating Loan Party" has the meaning specified in Section 11.16.

"Subsequent Transaction" has the meaning specified in Section 1.03(e)(i).

"Subsidiary" of a Person means a corporation, partnership, joint venture, limited liability company or other business entity of which a majority of the shares of Voting Stock is at the time beneficially owned, or the management of which is otherwise controlled, directly, or indirectly through one or more intermediaries, or both, by such Person. Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of Holdings.

"Swap Contract" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "Master Agreement"), including any such obligations or liabilities under any Master Agreement.

"Swap Obligations" means with respect to any Guarantor any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of Section 1a(47) of the Commodity Exchange Act.

"Swap Termination Value" means, in respect of any one or more Swap Contracts, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Contracts, (a) for any date on or after the date such Swap Contracts have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Swap Contracts, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Swap Contracts (which may include a Lender or any Affiliate of a Lender).

41

EHREN-WALIA 003550

779

"Swingline Borrowing" means a borrowing of a Swingline Loan pursuant to Section 2.04.

"Swingline Lender" means Bank of America, in its capacity as provider of Swingline Loans, or any successor swingline lender hereunder.

"Swingline Loan" has the meaning specified in Section 2.04(a).

"Swingline Loan Notice" means a notice of a Swingline Borrowing pursuant to Section 2.04(b), which shall be substantially in the form of Exhibit J or such other form as approved by the Administrative Agent (including any form on an electronic platform or electronic transmission system as shall be approved by the Administrative Agent), appropriately completed and signed by a Responsible Officer of the Borrower.

"Swingline Sublimit" means an amount equal to the lesser of (a) $5,000,000, and (b) the Revolving Facility. The Swingline Sublimit is part of, and not in addition to, the Revolving Facility.

"Synthetic Lease Obligation" means the monetary obligation of a Person under (a) a so-called synthetic, off-balance sheet or tax retention lease, or (b) an agreement for the use or possession of property (including Sale and Leaseback Transactions), in each case, creating obligations that do not appear on the balance sheet of such Person but which, upon the application of any Debtor Relief Laws to such Person, would be characterized as the indebtedness of such Person (without regard to accounting treatment).

"Target" has the meaning specified in the Recitals.

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Term Borrowing" means a borrowing consisting of simultaneous Term Loans of the same Type and, in the case of Eurodollar Rate Loans, having the same Interest Period made by Term Lenders pursuant to this Agreement.

"Term Commitment" means, as to each Term Lender, such Term Lender's Initial Term Commitment or Incremental Term Commitment, as applicable.

"Term Facility" means the Initial Term Facility or any Incremental Term Facility, as the context may require.

"Term Lender" means (a) on the Closing Date, any Lender that has an Initial Term Commitment at such time, and (b) at any time after thereafter, any Lender that holds Term Loans at such time.

"Term Loan" means an Initial Term Loan or an Incremental Term Loan, as the context may require.

"Term Note" means a promissory note made by the Borrower in favor of a Term Lender evidencing Term Loans made by such Term Lender, substantially in the form of Exhibit K.

"Third Party Payor" means any Medicare, Medicaid, Blue Cross and/or Blue Shield, private insurers, managed care plans, and any other person or entity which presently or in the future maintains Third Party Payor Programs, including any Governmental Authority or agency or contractor thereof.

CHAR1\1498335v12

EHREN-WALIA 003551

780

"Third Party Payor Programs" means all payment or reimbursement programs, sponsored or maintained by any Third Party Payor.

"Threshold Amount" means $5,000,000.

"Total Credit Exposure" means, as to any Lender at any time, the unused Commitments, Revolving Exposure, and Outstanding Amount of the Term Loans of such Lender at such time.

"Total Revolving Credit Exposure" means, as to any Revolving Lender at any time, the unused Commitments and Revolving Exposure of such Revolving Lender at such time.

"Total Revolving Outstandings" means the aggregate Outstanding Amount of all Revolving Loans, Swingline Loans and L/C Obligations.

"Trade Date" has the meaning specified in Section 11.06(i).

"Transaction" means, collectively, (a) the entering into of the Loan Documents and the incurrence of the Initial Term Loans and any Revolving Loans on the Closing Date, (b) the making of the Closing Date Equity Contribution, (c) the consummation of the Closing Date Acquisition pursuant to the Acquisition Agreement, (d) the issuance of the Seller Notes, and (e) the payment of all fees, costs and expenses in connection with any of the foregoing.

"Type" means, with respect to a Loan, its character as a Base Rate Loan or a Eurodollar Rate Loan.

"UCC" means the Uniform Commercial Code as in effect in the State of New York; provided, that, if perfection or the effect of perfection or non-perfection or the priority of any security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, "UCC" means the Uniform Commercial Code as in effect from time to time in such other jurisdiction for purposes of the provisions hereof relating to such perfection, effect of perfection or non-perfection or priority.

"United States" and "U.S." mean the United States of America.

"Unreimbursed Amount" has the meaning specified in Section 2.03(c)(i).

"Unrestricted Subsidiary" means, at any date of determination, any Subsidiary of the Borrower (other than any Subsidiary that (a) owns any Equity Interests in Holdings, the Borrower or any Restricted Subsidiary, or (b) holds a Lien on any assets or property of Holdings, the Borrower or any Restricted Subsidiary) that has been designated as an Unrestricted Subsidiary by the Borrower (in a written notice by the Borrower to the Administrative Agent); provided, that, (i) no Default or Event of Default has occurred and is continuing or would result therefrom, (ii) the Borrower shall have delivered to the Administrative Agent a Pro Forma Compliance Certificate demonstrating that, upon giving Pro Forma Effect to such designation, the Loan Parties would be in compliance with the financial covenants set forth in Section 7.11 as of the most recent fiscal quarter end for which the Borrower was required to deliver financial statements pursuant to Section 6.01(a) or Section 6.01(b), and (iii) such Subsidiary shall have been or will substantially simultaneously be designated an "unrestricted subsidiary" (or otherwise not be subject to the covenants) under any Indebtedness with an outstanding principal amount in excess of the Threshold Amount. The designation of any Restricted Subsidiary as an Unrestricted Subsidiary after the Closing Date shall constitute an Investment by the Borrower therein at the date of designation in an amount equal to the fair market value (as determined in good faith by the Borrower) of the Investments held by the Borrower in such Unrestricted Subsidiary immediately prior to such designation. The designation of any Unrestricted

43

EHREN-WALIA 003552

Subsidiary as a Restricted Subsidiary shall constitute the incurrence by such Restricted Subsidiary at the time of designation of any Indebtedness or Liens of such Restricted Subsidiary outstanding at such time. Once an Unrestricted Subsidiary has been re-designated as a Restricted Subsidiary, a Subsidiary may not be designated or redesignated again. As of the Closing Date, there are no Unrestricted Subsidiaries.

"U.S. Person" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"U.S. Tax Compliance Certificate" has the meaning specified in Section 3.01(e)(ii)(B)(3).

"Voting Stock" means, with respect to any Person, Equity Interests issued by such Person the holders of which are ordinarily, in the absence of contingencies, entitled to vote for the election of directors (or persons performing similar functions) of such Person, even though the right to so vote has been suspended by the happening of such contingency.

"Weighted Average Life to Maturity" means, when applied to any Indebtedness at any date of determination, the number of years obtained by dividing: (a) the sum of the products obtained by multiplying (i) the amount of each then remaining installment, sinking fund, serial maturity or other required payments of principal, including payment at final maturity, in respect thereof, by (ii) the number of years (calculated to the nearest one twelfth) that will elapse between such date of determination and the making of such payment by (b) the then outstanding principal amount of such Indebtedness as of such date of determination.

"Wholly Owned Restricted Subsidiary" means any Wholly Owned Subsidiary of the Borrower that is a Restricted Subsidiary.

"Wholly Owned Subsidiary" means, as to any Person, (a) any corporation one hundred percent (100%) of whose Equity Interests (other than directors' qualifying shares or Equity Interests that are required to be held by another person in order to satisfy a foreign requirement of Law prescribing an equity owner resident in the local jurisdiction) is at the time owned by such Person and/or one or more Wholly Owned Subsidiaries of such Person, and (b) any partnership, association, joint venture, limited liability company or other entity in which such Person and/or one or more Wholly Owned Subsidiaries of such Person have a one hundred percent (100%) equity interest at such time.

"Write-Down and Conversion Powers" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

Section 1.02    **Other Interpretive Provisions.**

With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)    The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document (including the Loan Documents and any Organization Document) shall be construed as

44

EHREN-WALIA 003553

referring to such agreement, instrument or other document as from time to time amended, amended and restated, modified, extended, restated, replaced or supplemented from time to time (subject to any restrictions on such amendments, supplements or modifications set forth herein or in any other Loan Document), (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, (iii) the words "hereto," "herein," "hereof" and "hereunder," and words of similar import when used in any Loan Document, shall be construed to refer to such Loan Document in its entirety and not to any particular provision thereof, (iv) all references in a Loan Document to Articles, Sections, Preliminary Statements, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Preliminary Statements, Exhibits and Schedules to, the Loan Document in which such references appear, (v) any reference to any law shall include all statutory and regulatory rules, regulations, orders and provisions consolidating, amending, replacing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified, extended, restated, replaced or supplemented from time to time, and (vi) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

(b)    In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including;" the words "to" and "until" each mean "to but excluding;" and the word "through" means "to and including."

(c)    Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

Section 1.03    **Accounting Terms.**

(a)    <u>Generally</u>. All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP applied on a consistent basis, as in effect from time to time, applied in a manner consistent with that used in preparing the Audited Financial Statements, except as otherwise specifically prescribed herein. Notwithstanding the foregoing, for purposes of determining compliance with any covenant (including the computation of any financial covenant) contained herein, Indebtedness of the Borrower and its Subsidiaries shall be deemed to be carried at one hundred percent (100%) of the outstanding principal amount thereof, and the effects of FASB ASC 825 and FASB ASC 470-20 on financial liabilities shall be disregarded.

(b)    <u>Changes in GAAP</u>. If at any time any change in GAAP affect the computation of any financial ratio or requirement set forth in any Loan Document, and either the Borrower or the Required Lenders shall so request, the Administrative Agent, the Lenders and the Borrower shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of the Required Lenders); <u>provided</u>, <u>that</u>, until so amended, (i) such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein and (ii) the Borrower shall provide to the Administrative Agent and the Lenders financial statements and other documents required under this Agreement or as reasonably requested hereunder setting forth a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP. Without limiting the foregoing, leases shall continue to be classified and accounted for on a basis consistent with that reflected in the Audited Financial Statements for all purposes of this Agreement, notwithstanding

45

EHREN-WALIA 003554

any change in GAAP relating thereto, unless the parties hereto shall enter into a mutually acceptable amendment addressing such changes, as provided for above.

(c)     <u>Consolidation of Variable Interest Entities</u>.  All references herein to Consolidated financial statements of the Borrower and its Subsidiaries or to the determination of any amount for the Borrower and its Subsidiaries on a Consolidated basis or any similar reference shall, in each case, be deemed to include each variable interest entity that the Borrower is required to consolidate pursuant to FASB ASC 810 as if such variable interest entity were a Subsidiary as defined herein.

(d)     <u>Pro Forma Calculations</u>.  Notwithstanding anything to the contrary contained herein, all calculations of the Consolidated Leverage Ratio (including for purposes of determining the Applicable Rate) and the Consolidated Fixed Charge Coverage Ratio shall be made on a Pro Forma Basis with respect to all Specified Transactions occurring during the applicable Measurement Period to which such calculation relates, and/or subsequent to the end of such Measurement Period but not later than the date of such calculation; <u>provided</u>, <u>that</u>, notwithstanding the foregoing, when calculating the Consolidated Leverage Ratio and/or the Consolidated Fixed Charge Coverage Ratio for purposes of determining (i) compliance with <u>Section 7.11</u>, and/or (ii) the Applicable Rate, any Specified Transaction and any related adjustment contemplated in the definition of Pro Forma Basis that occurred subsequent to the end of the applicable Measurement Period shall not be given Pro Forma Effect.  For purposes of determining compliance with any provision of this Agreement which requires Pro Forma Compliance with any financial covenant set forth in <u>Section 7.11</u>, (A) in the case of any such compliance required after delivery of financial statements for the fiscal quarter ending March 31, 2017, such Pro Forma Compliance shall be determined by reference to the maximum Consolidated Leverage Ratio and/or minimum Consolidated Fixed Charge Coverage Ratio, as applicable, permitted for the fiscal quarter most recently then ended for which financial statements have been delivered (or were required to have been delivered) in accordance with <u>Section 6.01(a)</u> or <u>(b)</u>, or (B) in the case of any such compliance required prior to the delivery referred to in <u>clause (A)</u> above, such Pro Forma Compliance shall be determined by reference to (x) the Pro Forma Financial Statements, and (y) the maximum Consolidated Leverage Ratio and/or minimum Consolidated Fixed Charge Coverage Ratio, as applicable, permitted for the fiscal quarter ending March 31, 2017.

(e)     <u>Limited Condition Acquisitions</u>.

(i)     Notwithstanding anything herein to the contrary, in connection with any action being taken in connection with a Limited Condition Acquisition, for purposes of (A) determining compliance with any provision of this Agreement which requires the calculation of any financial ratio or test, including the Consolidated Leverage Ratio or the Consolidated Fixed Charge Coverage Ratio, (B) determining other compliance with this Agreement (including the determination that no Default and/or Event of Default has occurred, is continuing or would result therefrom), or (C) testing availability under baskets set forth in this Agreement, in each case, at the option of the Borrower (the Borrower's election to exercise such option in connection with any Limited Condition Acquisition, an "<u>LCA Election</u>"), the date of determination of whether any such action is permitted hereunder shall be deemed to be the date the definitive agreement for such Limited Condition Acquisition is executed (the "<u>LCA Test Date</u>"), and if, for the Limited Condition Acquisition and the other transactions to be entered into in connection therewith, the Borrower or the applicable Restricted Subsidiary would have been permitted to take such action on the relevant LCA Test Date in compliance with such ratio, test or basket, such ratio, test or basket shall be deemed to have been complied with.  If the Borrower has made an LCA Election for any Limited Condition Acquisition, then in connection with any

EHREN-WALIA 003555

calculation of any ratio, test or basket availability with respect to any Specified Transaction (each, a "Subsequent Transaction") following the relevant LCA Test Date and prior to the earlier of the date on which such Limited Condition Acquisition is consummated or the date that the definitive agreement for such Limited Condition Acquisition is terminated or expires without consummation of such Limited Condition Acquisition, for purposes of determining whether such Subsequent Transaction is permitted under this Agreement, any such ratio, test or basket shall be calculated and tested both on (x) a Pro Forma Basis assuming such Limited Condition Acquisition and the other transactions in connection therewith have been consummated until such time as the applicable Limited Condition Acquisition has actually closed or the definitive agreement for such Limited Condition Acquisition has been terminated or expires without consummation of such Limited Condition Acquisition, and (y) a standalone without giving effect to such Limited Condition Acquisition and the other transactions in connection therewith.

(ii)    It is understood and agreed that, notwithstanding anything to the contrary in this Agreement, (A) if the proceeds of any Incremental Facility are being used to finance a Limited Condition Acquisition, and the Borrower has obtained binding commitments of Lenders to fund such Incremental Facility ("Incremental Financing Commitments"), then the conditions set forth in Section 2.02(g)(i)(C), Section 2.02(g)(i)(E), Section 4.02(a), Section 4.02(b), and clause (a) in the definition of "Permitted Acquisition" shall be limited as follows, if and to the extent such Lenders so agree in their Incremental Financing Commitments: (1) the conditions set forth in Section 2.02(g)(i)(E) and Section 4.02(a) shall be limited such that the only representations and warranties the accuracy of which shall be a condition to the availability of such Incremental Facility shall be (x) customary "specified representations" and (y) such representations and warranties under the definitive agreement as entitle the Borrower (or the applicable Restricted Subsidiary) to terminate its obligations under such definitive agreement or decline to consummate the applicable Limited Condition Acquisition, in each case, without paying any penalty or compensation to the other party or incurring liability for breach if such representations and warranties fail to be true and correct, (2) the reference in Section 2.02(g)(i)(C) and Section 4.02(b) to no Default or Event of Default, as applicable, shall mean (x) no Default or Event of Default, as applicable, shall exist at the date of execution of the definitive agreement by the Borrower or the applicable Restricted Subsidiary and (y) no Specified Event of Default shall exist at the time of the initial funding of such Incremental Facility, and (3) the reference in clause (a) in the definition of "Permitted Acquisition" to no Event of Default shall mean (x) no Event of Default shall exist at the date of execution of the definitive agreement by the Borrower or the applicable Restricted Subsidiary and (y) no Specified Event of Default shall exist at the time of the initial funding of such Incremental Facility, and (B) if the proceeds of any Indebtedness not incurred hereunder (but, for the avoidance of doubt, permitted pursuant hereto) are being used to finance a Limited Condition Acquisition, and the Borrower has obtained binding commitments of lenders to fund such Indebtedness ("Other Financing Commitments"), then, if and to the extent such lenders so agree in their Other Financing Commitments, the reference set forth in clause (a) in the definition of "Permitted Acquisition" to no Event of Default shall mean (1) no Event of Default shall exist at the date of execution of the definitive agreement by the Borrower or the applicable Restricted Subsidiary and (2) no Specified Event of Default shall exist at the time of the initial funding of such Indebtedness. It is understood and agreed that this clause (ii) shall not limit the conditions set forth in Section 4.02 with respect to any proposed Revolving Borrowing, any proposed Term Borrowing (other than any Incremental Term Borrowing made under the Incremental Financing Commitments), or the issuance of Letters of Credit in connection with such Limited Condition Acquisition.

CHAR1\1498335v12

EHREN-WALIA 003556

785

Section 1.04     **Rounding.**

Any financial ratios required to be maintained by the Loan Parties pursuant to this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

Section 1.05     **Times of Day.**

Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).

Section 1.06     **Letter of Credit Amounts.**

Unless otherwise specified herein, the amount of a Letter of Credit at any time shall be deemed to be the stated amount of such Letter of Credit in effect at such time; provided, however, that with respect to any Letter of Credit that, by its terms or the terms of any Issuer Document related thereto, provides for one or more automatic increases in the stated amount thereof, the amount of such Letter of Credit shall be deemed to be the maximum stated amount of such Letter of Credit after giving effect to all such increases, whether or not such maximum stated amount is in effect at such time.

Section 1.07     **UCC Terms.**

Terms defined in the UCC in effect on the Closing Date and not otherwise defined herein shall, unless the context otherwise indicates, have the meanings provided by those definitions. Subject to the foregoing, the term "UCC" refers, as of any date of determination, to the UCC then in effect.

Section 1.08     **Rates.**

The Administrative Agent does not warrant, nor accept responsibility, nor shall the Administrative Agent have any liability with respect to the administration, submission or any other matter related to the rates in the definition of "Eurodollar Rate" or with respect to any comparable or successor rate thereto.

## ARTICLE II

## COMMITMENTS AND CREDIT EXTENSIONS

Section 2.01     **Initial Term Loans; Revolving Loans; Incremental Term Loans.**

(a)     Initial Term Loans. Subject to the terms and conditions set forth herein, each Term Lender severally agrees to make a single loan to the Borrower in Dollars on the Closing Date in an amount not to exceed such Term Lender's Applicable Percentage of the Initial Term Facility. The Term Borrowing shall consist of Initial Term Loans made simultaneously by the Term Lenders in accordance with their respective Applicable Percentage of the Initial Term Facility. Term Borrowings repaid or prepaid may not be reborrowed. Initial Term Loans may be Base Rate Loans or Eurodollar Rate Loans, as further provided herein; provided, that, the Term Borrowing to be made on the Closing Date shall be made as Base Rate Loans unless the Borrower delivers a Funding Indemnity Letter not less than three (3) Business Days prior to the date of the Term Borrowing.

(b)     Revolving Loans. Subject to the terms and conditions set forth herein, each Revolving Lender severally agrees to make Revolving Loans to the Borrower in Dollars from time

48

EHREN-WALIA 003557

to time on any Business Day during the Availability Period, in an aggregate amount not to exceed at any time outstanding the amount of such Lender's Revolving Commitment; provided, that, after giving effect to any Revolving Borrowing, (i) the Outstanding Amount of all Revolving Loans shall not exceed the Revolving Facility, and (B) the Revolving Exposure of any Lender shall not exceed such Revolving Lender's Revolving Commitment. Within the limits of each Revolving Lender's Revolving Commitment, and subject to the other terms and conditions hereof, the Borrower may borrow Revolving Loans, prepay under Section 2.05, and reborrow under this Section 2.01(b). Revolving Loans may be Base Rate Loans or Eurodollar Rate Loans, as further provided herein; provided, however, that any Revolving Borrowings made on the Closing Date or any of the three (3) Business Days following the Closing Date shall be made as Base Rate Loans unless the Borrower delivers a Funding Indemnity Letter not less than three (3) Business Days prior to the date of such Revolving Borrowing.

(c)     Incremental Term Loans.  Subject to Section 2.02(g), on the effective date of any Incremental Term Loan Lender Joinder Agreement, each Incremental Term Lender party to such Incremental Term Loan Lender Joinder Agreement severally agrees to make a term loan in a single advance to the Borrower in the amount of its respective Incremental Term Commitment with respect to such Incremental Term Loan Facility as set forth in the applicable Incremental Term Loan Lender Joinder Agreement; provided, that, after giving effect to such advances, the Outstanding Amount of such Incremental Term Loans shall not exceed the aggregate amount of the Incremental Term Commitments set forth in the applicable Incremental Term Loan Lender Joinder Agreement of the applicable Incremental Term Lenders. Each Incremental Term Borrowing shall consist of Incremental Term Loans made simultaneously by the Incremental Term Lenders in accordance with their respective Applicable Percentage of the applicable Incremental Term Facility. Incremental Term Borrowings prepaid or repaid may not be reborrowed. Incremental Term Loans may be Base Rate Loans or Eurodollar Rate Loans, as further provided herein.

Section 2.02     **Borrowings, Conversions and Continuations of Loans.**

(a)     Notice of Borrowing.  Each Borrowing, each conversion of Loans from one Type to the other, and each continuation of Eurodollar Rate Loans shall be made upon the Borrower's irrevocable notice to the Administrative Agent, which may be given by: (i) telephone or (ii) a Loan Notice; provided, that, any telephonic notice must be confirmed immediately by delivery to the Administrative Agent of a Loan Notice.  Each such Loan Notice must be received by the Administrative Agent not later than 11:00 a.m. (A) three (3) Business Days prior to the requested date of any Borrowing of, conversion to or continuation of Eurodollar Rate Loans or of any conversion of Eurodollar Rate Loans to Base Rate Loans, and (B) on the requested date of any Borrowing of Base Rate Loans; provided, however, that if the Borrower wishes to request Eurodollar Rate Loans having an Interest Period other than one (1), two (2), three (3) or six (6) months in duration as provided in the definition of "Interest Period", the applicable notice must be received by the Administrative Agent not later than 11:00 a.m. four (4) Business Days prior to the requested date of such Borrowing, conversion or continuation of Eurodollar Rate Loans, whereupon the Administrative Agent shall give prompt notice to the Appropriate Lenders of such request and determine whether the requested Interest Period is acceptable to all of them.  Not later than 11:00 a.m. three (3) Business Days before the requested date of such Borrowing, conversion or continuation of Eurodollar Rate Loans, the Administrative Agent shall notify the Borrower (which notice may be by telephone) whether or not the requested Interest Period has been consented to by all the Lenders.  Each Borrowing of, conversion to or continuation of Eurodollar Rate Loans shall be in a principal amount of $2,500,000 or a whole multiple of $1,000,000 in excess thereof (or, in connection with any conversion or continuation of Term Loans, if less, the entire principal thereof then outstanding).  Except as provided in Sections 2.03(c) and 2.04(c), each Borrowing of

49

EHREN-WALIA 003558

or conversion to Base Rate Loans shall be in a principal amount of $500,000 or a whole multiple of $100,000 in excess thereof (or, in connection with any conversion or continuation of Term Loans, if less, the entire principal thereof then outstanding). Each Loan Notice and each telephonic notice shall specify (I) the applicable Facility and whether the Borrower is requesting a Borrowing, a conversion of Loans from one Type to the other, or a continuation of Loans, as the case may be, under such Facility, (II) the requested date of the Borrowing, conversion or continuation, as the case may be (which shall be a Business Day), (III) the principal amount of Loans to be borrowed, converted or continued, (IV) the Type of Loans to be borrowed or to which existing Loans are to be converted, and (V) if applicable, the duration of the Interest Period with respect thereto. If the Borrower fails to specify a Type of Loan in a Loan Notice or if the Borrower fails to give a timely notice requesting a conversion or continuation, then the applicable Loans shall be made as, or converted to, Base Rate Loans. Any such automatic conversion to Base Rate Loans shall be effective as of the last day of the Interest Period then in effect with respect to the applicable Eurodollar Rate Loans. If the Borrower requests a Borrowing of, conversion to, or continuation of Eurodollar Rate Loans in any such Loan Notice, but fails to specify an Interest Period, it will be deemed to have specified an Interest Period of one (1) month. Notwithstanding anything to the contrary herein, a Swingline Loan may not be converted to a Eurodollar Rate Loan.

(b)    Advances.  Following receipt of a Loan Notice for a Facility, the Administrative Agent shall promptly notify each Appropriate Lender of the amount of its Applicable Percentage under such Facility of the applicable Loans, and if no timely notice of a conversion or continuation is provided by the Borrower, the Administrative Agent shall notify each Appropriate Lender of the details of any automatic conversion to Base Rate Loans as described in Section 2.02(a). In the case of a Borrowing, each Appropriate Lender shall make the amount of its Loan available to the Administrative Agent in immediately available funds at the Administrative Agent's Office not later than 1:00 p.m. on the Business Day specified in the applicable Loan Notice. Upon satisfaction of the applicable conditions set forth in Section 4.02 (and, if such Borrowing is the initial Credit Extension, Section 4.01), the Administrative Agent shall make all funds so received available to the Borrower in like funds as received by the Administrative Agent either by (i) crediting the account of the Borrower on the books of Bank of America with the amount of such funds or (ii) wire transfer of such funds, in each case in accordance with instructions provided to (and reasonably acceptable to) the Administrative Agent by the Borrower; provided, however, that if, on the date a Loan Notice with respect to a Revolving Borrowing is given by the Borrower, there are L/C Borrowings outstanding, then the proceeds of such Revolving Borrowing, first, shall be applied to the payment in full of any such L/C Borrowings, and second, shall be made available to the Borrower as provided above.

(c)    Eurodollar Rate Loans.  Except as otherwise provided herein, a Eurodollar Rate Loan may be continued or converted only on the last day of an Interest Period for such Eurodollar Rate Loan. During the existence of an Event of Default, no Loans may be requested as, converted to or continued as Eurodollar Rate Loans without the consent of the Required Lenders, and the Required Lenders may demand that any or all of the outstanding Eurodollar Rate Loans be converted immediately to Base Rate Loans.

(d)    Interest Rates. Each determination of an interest rate by the Administrative Agent pursuant to any provision of this Agreement shall be conclusive and binding on the Borrower and the Lenders in the absence of manifest error.

(e)    Interest Periods.  After giving effect to the Term Borrowing of Initial Term Loans, all conversions of Initial Term Loans from one Type to the other, and all continuations of Initial Term Loans as the same Type, there shall not be more than five (5) Interest Periods in effect in

50

EHREN-WALIA 003559

respect of the Initial Term Facility. After giving effect to all Revolving Borrowings of Revolving Loans, all conversions of Revolving Loans from one Type to the other, and all continuations of Revolving Loans as the same Type, there shall not be more than five (5) Interest Periods in effect in respect of the Revolving Facility. With respect to any Incremental Term Loans under each Incremental Term Loan Lender Joinder Agreement, after giving effect to the Incremental Term Borrowing of such Incremental Term Loans, all conversions of such Incremental Term Loans from one Type to the other, and all continuations of such Incremental Term Loans as the same Type, there shall not be more than five (5) Interest Periods in effect in respect of such Incremental Term Loans.

(f)     Cashless Settlement Mechanism. Notwithstanding anything to the contrary in this Agreement, any Lender may exchange, continue or rollover all or the portion of its Loans in connection with any refinancing, extension, loan modification or similar transaction permitted by the terms of this Agreement, pursuant to a cashless settlement mechanism approved by the Borrower, the Administrative Agent and such Lender.

(g)     Incremental Facilities.

(i)     At any time and from time to time prior to the Latest Maturity Date, subject to the terms and express conditions set forth herein, the Borrower may, no more than three (3) times during the term of this Agreement, upon no fewer than three (3) Business Days' prior notice to the Administrative Agent (or such fewer number of days as permitted by the Administrative Agent in its sole discretion), request to increase the Revolving Facility (but not the Letter of Credit Sublimit or the Swingline Sublimit) (any such increase, an "Incremental Revolving Facility"), to increase the Initial Term Facility (any such increase, an "Incremental Term Increase"), and/or to establish one or more Incremental Term Facilities (each such Incremental Term Facility, Incremental Revolving Facility or Incremental Term Increase, an "Incremental Facility"); provided, that, (A) the maximum aggregate principal amount of all Incremental Facilities shall not exceed $100,000,000 (the "Incremental Amount"); (B) any request for an Incremental Facility shall be in a minimum principal amount of $5,000,000 and in integral multiples of $5,000,000 in excess thereof (or, if less, the entire remaining unused Incremental Amount); (C) a Responsible Officer of the Borrower shall have delivered to the Administrative Agent a Pro Forma Compliance Certificate demonstrating that, upon giving Pro Forma Effect to any such Incremental Facility (and assuming for such calculation that such Incremental Facility is fully drawn), (1) the Loan Parties would be in compliance with the financial covenants set forth in Sections 7.11(a) and (b) as of the most recent fiscal quarter for which the Borrower was required to deliver financial statements pursuant to Section 6.01(a) or Section 6.01(b) and (2) the Consolidated Leverage Ratio shall be less than or equal to 3.25 to 1.0; (D) no Default or Event of Default shall exist and be continuing at the time of incurrence of any such Incremental Facility or would result therefrom; (E)(1) any such Incremental Facility shall rank *pari passu* in right of payment and in respect of the Collateral with the existing Facilities, and (2) no Restricted Subsidiary shall be a guarantor with respect to such Incremental Facility unless such Restricted Subsidiary is a Loan Party that has previously or substantially concurrently with the incurrence of such Incremental Facility become a Guarantor hereunder; (F) as a condition precedent to the institution of any such Incremental Facility, the Borrower shall deliver to the Administrative Agent a certificate of each Loan Party dated as of the date of such institution signed by a Responsible Officer of each such Loan Party, (1) certifying and attaching the resolutions adopted by such Loan Party approving or consenting to such institution (to the extent not previously delivered), and (2) in the case of the Borrower, certifying to the Lenders providing the Incremental Facility

CHAR1\1498335v12

EHREN-WALIA 003560

that, before and after giving effect to such institution, the representations and warranties contained in this Agreement and the other Loan Documents are true and correct in all material respects (and in all respects if any such representation or warranty is already qualified by materiality or reference to Material Adverse Effect) on and as of the date of such institution, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they are true and correct in all material respects (and in all respects if any such representation or warranty is already qualified by materiality or reference to Material Adverse Effect) as of such earlier date, and except that for purposes of this Section 2.02(g)(i)(F), the representations and warranties contained in Sections 5.05(a), (b) and (d)(ii) shall be deemed to refer to the most recent statements furnished pursuant to Section 6.01(a), Section 6.01(b) or Section 6.01(c) (and, with respect to Sections 5.05(a) and (b), to the statements of the Borrower rather than Holdings); (G) the Lenders shall have received (1)(x) evidence as to whether each real property that constitutes Collateral is a Flood Hazard Property and (y) if such real property is a Flood Hazard Property, (I) evidence as to whether the community in which such real property is located is participating in the National Flood Insurance Program, (II) the applicable Loan Party's written acknowledgment of receipt of written notification from the Administrative Agent (x) as to the fact that such real property is a Flood Hazard Property and (y) as to whether the community in which each such Flood Hazard Property is located is participating in the National Flood Insurance Program and (III) copies of insurance policies or certificates of insurance of the Loan Parties and their respective Restricted Subsidiaries evidencing flood insurance satisfactory to the Administrative Agent and naming the Administrative Agent and its successors and/or assigns as sole loss payee on behalf of the Secured Parties, and (2) with respect to any new real property that will be added as Collateral on the effective date of such Incremental Facility, or will be required to be added as Collateral following the effective date of such Incremental Facility, written notice thereof at least thirty (30) days prior to the effective date of such Incremental Facility, or such shorter time as the Administrative Agent may agree; (H) as a condition precedent to the institution of any such Incremental Facility, the Lenders providing such Incremental Facility shall have received such other deliverables as shall be required by such Lenders; (I) Schedule 1.01(b) shall be deemed revised to include any Incremental Facility pursuant to this Section 2.02(g) and to include thereon any Person that becomes a Lender pursuant to this Section 2.02(g); and (J) the Administrative Agent shall have received such amendments to the Collateral Documents, if any, as the Administrative Agent reasonably requests to cause the Collateral Documents to secure the Secured Obligations after giving effect to such Incremental Facility.

(ii)    With respect to each Incremental Revolving Facility, (A) such Incremental Revolving Facility shall be on the same terms and pursuant to the same documentation applicable to the Revolving Facility; (B) no existing Lender shall be under any obligation to increase its Revolving Commitment and any decision whether to increase its Revolving Commitment shall be in such Lender's sole and absolute discretion; (C)(1) any new Lender providing a portion of such Incremental Revolving Facility shall (x) be reasonably acceptable to the Administrative Agent, the L/C Issuer, the Swingline Lender and the Borrower, and (y) join this Agreement by executing such joinder documents as are required by the Administrative Agent and/or (2) any existing Lender providing a portion of such Incremental Revolving Facility shall have executed a commitment agreement satisfactory to the Administrative Agent; and (D) the Borrower shall prepay any Loans owing by them and outstanding on the date of any incurrence of any such Incremental Revolving Facility (and pay any additional amounts required pursuant to Section 3.05) to the extent necessary

EHREN-WALIA 003561

to keep the outstanding Loans ratable with any revised Revolving Commitments arising from any non-ratable increase in the Revolving Commitments under this Section 2.02(g).

(iii)　　　With respect to each Incremental Term Increase, (A) except as set forth in clause (iv) below, such Incremental Term Increase shall be on the same terms and pursuant to the same documentation applicable to the Initial Term Facility; (B) no existing Lender shall be under any obligation to increase its Initial Term Commitment and any decision whether to increase its Initial Term Commitment shall be in such Lender's sole and absolute discretion; (C)(1) any new Lender providing a portion of such Incremental Term Increase shall (x) be reasonably acceptable to the Administrative Agent, the L/C Issuer, the Swingline Lender and the Borrower, and (y) join this Agreement by executing such joinder documents as are required by the Administrative Agent and/or (2) any existing Lender providing a portion of such Incremental Term Increase shall have executed a commitment agreement satisfactory to the Administrative Agent; and (D) the Borrowers shall prepay any Loans owing by them and outstanding on the date of any incurrence of any such Incremental Term Increase (and pay any additional amounts required pursuant to Section 3.05) to the extent necessary to keep the outstanding Loans ratable with any revised Initial Term Commitments arising from any non-ratable increase in the Initial Term Commitments under this Section 2.02(g).

(iv)　　　With respect to each Incremental Term Facility, (A) the Incremental Term Loan Maturity Date for such Incremental Term Facility shall be as set forth in the Incremental Term Loan Lender Joinder Agreement relating to such Incremental Term Facility; provided, that, such date shall not be earlier than the Initial Term Facility Maturity Date; (B) the scheduled principal amortization payments under such Incremental Term Facility shall be as set forth in the Incremental Term Loan Lender Joinder Agreement relating to such Incremental Term Facility; provided, that, the Weighted Average Life to Maturity of the Incremental Term Loans made under such Incremental Term Facility shall not be shorter than the then-remaining Weighted Average Life to Maturity of the Initial Term Loans; (C) the Applicable Rate of the Incremental Term Loans for such Incremental Term Facility shall be as set forth in the Incremental Term Loan Lender Joinder Agreement relating to such Incremental Term Facility; provided, that, if the All-In-Yield on such Incremental Term Loans made under such Incremental Term Facility exceeds the All-In-Yield on the Initial Term Loans or any other Incremental Term Loans under any existing Incremental Term Facility by more than fifty basis points (0.50%) per annum, then the Applicable Rate or fees payable with respect to the Initial Term Loans and/or such other existing Incremental Term Loans shall on the effective date of such Incremental Term Facility be increased to the extent necessary to cause the All-In-Yield on the Initial Term Loans and such other existing Incremental Term Loans to be fifty basis points (0.50%) less than the All-In-Yield on such Incremental Term Loans made under such Incremental Term Facility (such increase to be allocated as reasonably determined by the Administrative Agent); and (D) to the extent any of the terms of any such Incremental Term Facility (other than as set forth in this Section 2.02(g)) are not substantially consistent with the Initial Term Facility, such terms shall be reasonably satisfactory to the Administrative Agent.

Section 2.03　　**Letters of Credit.**

(a)　　　The Letter of Credit Commitment.

(i)　　　Subject to the terms and conditions set forth herein, (A) the L/C Issuer agrees, in reliance upon the agreements of the Revolving Lenders set forth in this Section

CHAR1\1498335v12

EHREN-WALIA 003562

2.03, (1) from time to time on any Business Day during the period from the Closing Date until the Letter of Credit Expiration Date, to issue Letters of Credit denominated in Dollars for the account of the Borrower or any Restricted Subsidiary, and to amend or extend Letters of Credit previously issued by it, in accordance with Section 2.03(b), and (2) to honor drawings under the Letters of Credit; and (B) the Revolving Lenders severally agree to participate in Letters of Credit issued for the account of the Borrower or any Restricted Subsidiary and any drawings thereunder; provided, that, after giving effect to any L/C Credit Extension with respect to any Letter of Credit, (x) the Total Revolving Outstandings shall not exceed the Revolving Facility, (y) the Revolving Exposure of any Revolving Lender shall not exceed such Lender's Revolving Commitment, and (z) the Outstanding Amount of the L/C Obligations shall not exceed the Letter of Credit Sublimit. Each request by the Borrower for the issuance or amendment of a Letter of Credit shall be deemed to be a representation by the Borrower that the L/C Credit Extension so requested complies with the conditions set forth in the proviso to the preceding sentence. Within the foregoing limits, and subject to the terms and conditions hereof, the Borrower's ability to obtain Letters of Credit shall be fully revolving, and accordingly the Borrower may, during the foregoing period, obtain Letters of Credit to replace Letters of Credit that have expired or that have been drawn upon and reimbursed.

(ii)    The L/C Issuer shall not issue any Letter of Credit if:

(A)    subject to Section 2.03(b)(iv), the expiry date of the requested Letter of Credit would occur more than twelve (12) months after the date of issuance or last extension, unless the Required Revolving Lenders have approved such expiry date; or

(B)    the expiry date of the requested Letter of Credit would occur after the Letter of Credit Expiration Date, unless all the Revolving Lenders have approved such expiry date.

(iii)    The L/C Issuer shall not be under any obligation to issue any Letter of Credit if:

(A)    any order, judgment or decree of any Governmental Authority or arbitrator shall by its terms purport to enjoin or restrain the L/C Issuer from issuing the Letter of Credit, or any Law applicable to the L/C Issuer or any request or directive (whether or not having the force of law) from any Governmental Authority with jurisdiction over the L/C Issuer shall prohibit, or request that the L/C Issuer refrain from, the issuance of letters of credit generally or the Letter of Credit in particular or shall impose upon the L/C Issuer with respect to the Letter of Credit any restriction, reserve or capital requirement (for which the L/C Issuer is not otherwise compensated hereunder) not in effect on the Closing Date, or shall impose upon the L/C Issuer any unreimbursed loss, cost or expense which was not applicable on the Closing Date and which the L/C Issuer in good faith deems material to it;

(B)    the issuance of the Letter of Credit would violate one or more policies of the L/C Issuer applicable to letters of credit generally;

(C)    except as otherwise agreed by the Administrative Agent and the L/C Issuer, the Letter of Credit is in an initial stated amount less than $500,000;

54

EHREN-WALIA 003563

(D)     the Letter of Credit is to be denominated in a currency other than Dollars; or

(E)     any Revolving Lender is at that time a Defaulting Lender, unless the L/C Issuer has entered into arrangements, including the delivery of Cash Collateral, satisfactory to the L/C Issuer (in its sole discretion) with the Borrower or such Revolving Lender to eliminate the L/C Issuer's actual or potential Fronting Exposure (after giving effect to <u>Section 2.15(a)(iv)</u>) with respect to the Defaulting Lender arising from either the Letter of Credit then proposed to be issued or that Letter of Credit and all other L/C Obligations as to which the L/C Issuer has actual or potential Fronting Exposure, as it may elect in its sole discretion.

(iv)     The L/C Issuer shall not amend any Letter of Credit if the L/C Issuer would not be permitted at such time to issue the Letter of Credit in its amended form under the terms hereof.

(v)     The L/C Issuer shall not be under any obligation to amend any Letter of Credit if (A) the L/C Issuer would have no obligation at such time to issue such Letter of Credit in its amended form under the terms hereof, or (B) the beneficiary of such Letter of Credit does not accept the proposed amendment to the Letter of Credit.

(vi)     The L/C Issuer shall act on behalf of the Revolving Lenders with respect to any Letters of Credit issued by it and the documents associated therewith, and the L/C Issuer shall have all of the benefits and immunities (A) provided to the Administrative Agent in <u>Article IX</u> with respect to any acts taken or omissions suffered by the L/C Issuer in connection with Letters of Credit issued by it or proposed to be issued by it and Issuer Documents pertaining to such Letters of Credit as fully as if the term "Administrative Agent" as used in <u>Article IX</u> included the L/C Issuer with respect to such acts or omissions, and (B) as additionally provided herein with respect to the L/C Issuer.

(b)     <u>Procedures for Issuance and Amendment of Letters of Credit; Auto-Extension Letters of Credit</u>.

(i)     Each Letter of Credit shall be issued or amended, as the case may be, upon the request of the Borrower delivered to the L/C Issuer (with a copy to the Administrative Agent) in the form of a Letter of Credit Application, appropriately completed and signed by a Responsible Officer of the Borrower. Such Letter of Credit Application may be sent by fax transmission, by United States mail, by overnight courier, by electronic transmission using the system provided by the L/C Issuer, by personal delivery or by any other means acceptable to the L/C Issuer. Such Letter of Credit Application must be received by the L/C Issuer and the Administrative Agent not later than 11:00 a.m. at least two (2) Business Days (or such later date and time as the Administrative Agent and the L/C Issuer may agree in a particular instance in their sole discretion) prior to the proposed issuance date or date of amendment, as the case may be. In the case of a request for an initial issuance of a Letter of Credit, such Letter of Credit Application shall specify in form and detail satisfactory to the L/C Issuer: (A) the proposed issuance date of the requested Letter of Credit (which shall be a Business Day), (B) the amount thereof, (C) the expiry date thereof, (D) the name and address of the beneficiary thereof, (E) the documents to be presented by such beneficiary in case of any drawing thereunder, (F) the full text of any certificate to be presented by such beneficiary in case of any drawing thereunder, (G) the purpose and nature of the requested Letter of Credit, and (H) such other matters as the L/C Issuer may

55

EHREN-WALIA 003564

793

require. In the case of a request for an amendment of any outstanding Letter of Credit, such Letter of Credit Application shall specify in form and detail satisfactory to the L/C Issuer: (1) the Letter of Credit to be amended, (2) the proposed date of amendment thereof (which shall be a Business Day), (3) the nature of the proposed amendment, and (4) such other matters as the L/C Issuer may require. Additionally, the Borrower shall furnish to the L/C Issuer and the Administrative Agent such other documents and information pertaining to such requested Letter of Credit issuance or amendment, including any Issuer Documents, as the L/C Issuer or the Administrative Agent may require.

(ii)     Promptly after receipt of any Letter of Credit Application, the L/C Issuer will confirm with the Administrative Agent (by telephone or in writing) that the Administrative Agent has received a copy of such Letter of Credit Application from the Borrower and, if not, the L/C Issuer will provide the Administrative Agent with a copy thereof. Unless the L/C Issuer has received written notice from any Revolving Lender, the Administrative Agent or any Loan Party, at least one (1) Business Day prior to the requested date of issuance or amendment of the applicable Letter of Credit, that one or more applicable conditions contained in Article IV shall not then be satisfied, then, subject to the terms and conditions hereof, the L/C Issuer shall, on the requested date, issue a Letter of Credit for the account of the Borrower (or applicable Restricted Subsidiary) or enter into the applicable amendment, as the case may be, in each case in accordance with the L/C Issuer's usual and customary business practices. Immediately upon the issuance of each Letter of Credit, each Revolving Lender shall be deemed to, and hereby irrevocably and unconditionally agrees to, purchase from the L/C Issuer a risk participation in such Letter of Credit in an amount equal to the product of such Revolving Lender's Applicable Revolving Percentage times the amount of such Letter of Credit.

(iii)     Promptly after its delivery of any Letter of Credit or any amendment to a Letter of Credit to an advising bank with respect thereto or to the beneficiary thereof, the L/C Issuer will also deliver to the Borrower and the Administrative Agent a true and complete copy of such Letter of Credit or amendment.

(iv)     If the Borrower so requests in any applicable Letter of Credit Application, the L/C Issuer may, in its sole discretion, agree to issue a Letter of Credit that has automatic extension provisions (each, an "Auto-Extension Letter of Credit"); provided, that, any such Auto-Extension Letter of Credit must permit the L/C Issuer to prevent any such extension at least once in each twelve (12) month period (commencing with the date of issuance of such Letter of Credit) by giving prior notice to the beneficiary thereof not later than a day (the "Non-Extension Notice Date") in each such twelve (12) month period to be agreed upon at the time such Letter of Credit is issued. Unless otherwise directed by the L/C Issuer, the Borrower shall not be required to make a specific request to the L/C Issuer for any such extension. Once an Auto-Extension Letter of Credit has been issued, the Revolving Lenders shall be deemed to have authorized (but may not require) the L/C Issuer to permit the extension of such Letter of Credit at any time to an expiry date not later than the Letter of Credit Expiration Date; provided, however, that the L/C Issuer shall not permit any such extension if (A) the L/C Issuer has determined that it would not be permitted, or would have no obligation at such time to issue such Letter of Credit in its revised form (as extended) under the terms hereof (by reason of the provisions of clause (ii) or (iii) of Section 2.03(a) or otherwise), or (B) it has received notice (which may be by telephone or in writing) on or before the day that is seven (7) Business Days before the Non-Extension Notice Date (1) from the Administrative Agent that the Required Revolving Lenders have elected not to permit such extension or (2) from the Administrative Agent, any Revolving

56

EHREN-WALIA 003565

Lender or the Borrower that one or more of the applicable conditions specified in <u>Section 4.02</u> is not then satisfied, and in each such case directing the L/C Issuer not to permit such extension.

(v)     If the Borrower so requests in any applicable Letter of Credit Application, the L/C Issuer may, in its sole discretion, agree to issue a Letter of Credit that permits the automatic reinstatement of all or a portion of the stated amount thereof after any drawing thereunder (each, an "<u>Auto-Reinstatement Letter of Credit</u>"). Unless otherwise directed by the L/C Issuer, the Borrower shall not be required to make a specific request to the L/C Issuer to permit such reinstatement. Once an Auto-Reinstatement Letter of Credit has been issued, except as provided in the following sentence, the Revolving Lenders shall be deemed to have authorized (but may not require) the L/C Issuer to reinstate all or a portion of the stated amount thereof in accordance with the provisions of such Letter of Credit. Notwithstanding the foregoing, if such Auto-Reinstatement Letter of Credit permits the L/C Issuer to decline to reinstate all or any portion of the stated amount thereof after a drawing thereunder by giving notice of such non-reinstatement within a specified number of days after such drawing (the "<u>Non-Reinstatement Deadline</u>"), the L/C Issuer shall not permit such reinstatement if it has received a notice (which may be by telephone or in writing) on or before the day that is seven (7) Business Days before the Non-Reinstatement Deadline (A) from the Administrative Agent that the Required Revolving Lenders have elected not to permit such reinstatement or (B) from the Administrative Agent, any Lender or the Borrower that one or more of the applicable conditions specified in <u>Section 4.02</u> is not then satisfied (treating such reinstatement as a L/C Credit Extension for purposes of this clause) and, in each case, directing the L/C Issuer not to permit such reinstatement.

(c)     <u>Drawings and Reimbursements; Funding of Participations</u>.

(i)     Upon receipt from the beneficiary of any Letter of Credit of any notice of a drawing under such Letter of Credit, the L/C Issuer shall notify the Borrower and the Administrative Agent thereof. Not later than 11:00 a.m. on the Business Day that is one (1) Business Day after any payment by the L/C Issuer under a Letter of Credit (each such date, an "<u>Honor Date</u>"), the Borrower shall reimburse the L/C Issuer through the Administrative Agent in an amount equal to the amount of such drawing. If the Borrower fails to so reimburse the L/C Issuer by such time, the Administrative Agent shall promptly notify each Revolving Lender of the Honor Date, the amount of the unreimbursed drawing (the "<u>Unreimbursed Amount</u>"), and the amount of such Revolving Lender's Applicable Revolving Percentage thereof. In such event, the Borrower shall be deemed to have requested a Revolving Borrowing of Revolving Loans that are Base Rate Loans to be disbursed on the Honor Date in an amount equal to the Unreimbursed Amount, without regard to the minimum and multiples specified in <u>Section 2.02</u> for the principal amount of Base Rate Loans, but subject to the amount of the unutilized portion of the Revolving Commitments and the conditions set forth in <u>Section 4.02</u> (other than the delivery of a Loan Notice). Any notice given by the L/C Issuer or the Administrative Agent pursuant to this <u>Section 2.03(c)(i)</u> may be given by telephone if immediately confirmed in writing; <u>provided, that</u>, the lack of such an immediate confirmation shall not affect the conclusiveness or binding effect of such notice.

(ii)     Each Revolving Lender shall upon any notice pursuant to <u>Section 2.03(c)(i)</u> make funds available (and the Administrative Agent may apply Cash Collateral provided for this purpose) for the account of the L/C Issuer, at the Administrative Agent's Office in an amount equal to its Applicable Revolving Percentage of the Unreimbursed

CHAR1\1498335v12

EHREN-WALIA 003566

Amount not later than 1:00 p.m. on the Business Day specified in such notice by the Administrative Agent, whereupon, subject to the provisions of <u>Section 2.03(c)(iii)</u>, each Revolving Lender that so makes funds available shall be deemed to have made a Revolving Loan that is a Base Rate Loan that is to the Borrower in such amount. The Administrative Agent shall remit the funds so received to the L/C Issuer.

(iii)    With respect to any Unreimbursed Amount that is not fully refinanced by a Revolving Borrowing of Revolving Loans that are Base Rate Loans because the conditions set forth in <u>Section 4.02</u> cannot be satisfied or for any other reason, the Borrower shall be deemed to have incurred from the L/C Issuer a L/C Borrowing in the amount of the Unreimbursed Amount that is not so refinanced, which L/C Borrowing shall be due and payable on demand (together with interest) and shall bear interest at the Default Rate. In such event, each Revolving Lender's payment to the Administrative Agent for the account of the L/C Issuer pursuant to <u>Section 2.03(c)(ii)</u> shall be deemed payment in respect of its participation in such L/C Borrowing and shall constitute a L/C Advance from such Lender in satisfaction of its participation obligation under this Section.

(iv)    Until each Revolving Lender funds its Revolving Loan or L/C Advance pursuant to this <u>Section 2.03(c)</u> to reimburse the L/C Issuer for any amount drawn under any Letter of Credit, interest in respect of such Lender's Applicable Revolving Percentage of such amount shall be solely for the account of the L/C Issuer.

(v)    Each Revolving Lender's obligation to make Revolving Loans or L/C Advances to reimburse the L/C Issuer for amounts drawn under Letters of Credit, as contemplated by this <u>Section 2.03(c)</u>, shall be absolute and unconditional and shall not be affected by any circumstance, including (A) any setoff, counterclaim, recoupment, defense or other right which such Lender may have against the L/C Issuer, the Borrower, any Restricted Subsidiary or any other Person for any reason whatsoever, (B) the occurrence or continuance of a Default, or (C) any other occurrence, event or condition, whether or not similar to any of the foregoing; <u>provided</u>, <u>however</u>, <u>that</u>, each Revolving Lender's obligation to make Revolving Loans pursuant to this <u>Section 2.03(c)</u> is subject to the conditions set forth in <u>Section 4.02</u> (other than delivery of a Loan Notice). No such making of a L/C Advance shall relieve or otherwise impair the obligation of the Borrower to reimburse the L/C Issuer for the amount of any payment made by the L/C Issuer under any Letter of Credit, together with interest as provided herein.

(vi)    If any Revolving Lender fails to make available to the Administrative Agent for the account of the L/C Issuer any amount required to be paid by such Lender pursuant to the foregoing provisions of this <u>Section 2.03(c)</u> by the time specified in <u>Section 2.03(c)(ii)</u>, then, without limiting the other provisions of this Agreement, the L/C Issuer shall be entitled to recover from such Lender (acting through the Administrative Agent), on demand, such amount with interest thereon for the period from the date such payment is required to the date on which such payment is immediately available to the L/C Issuer at a rate per annum equal to the greater of the Federal Funds Rate and a rate determined by the L/C Issuer in accordance with banking industry rules on interbank compensation, <u>plus</u> any administrative, processing or similar fees customarily charged by the L/C Issuer in connection with the foregoing. If such Lender pays such amount (with interest and fees as aforesaid), the amount so paid shall constitute such Lender's Revolving Loan included in the relevant Revolving Borrowing or L/C Advance in respect of the relevant L/C Borrowing, as the case may be. A certificate of the L/C Issuer submitted to any Revolving

CHAR1\1498335v12

EHREN-WALIA 003567

Lender (through the Administrative Agent) with respect to any amounts owing under this Section 2.03(c)(vi) shall be conclusive absent manifest error.

(d)    Repayment of Participations.

(i)    At any time after the L/C Issuer has made a payment under any Letter of Credit and has received from any Revolving Lender such Lender's L/C Advance in respect of such payment in accordance with Section 2.03(c), if the Administrative Agent receives for the account of the L/C Issuer any payment in respect of the related Unreimbursed Amount or interest thereon (whether directly from the Borrower or otherwise, including proceeds of Cash Collateral applied thereto by the Administrative Agent), the Administrative Agent will distribute to such Lender its Applicable Revolving Percentage thereof in the same funds as those received by the Administrative Agent.

(ii)    If any payment received by the Administrative Agent for the account of the L/C Issuer pursuant to Section 2.03(c)(i) is required to be returned under any of the circumstances described in Section 11.05 (including pursuant to any settlement entered into by the L/C Issuer in its discretion), each Revolving Lender shall pay to the Administrative Agent for the account of the L/C Issuer its Applicable Revolving Percentage thereof on demand of the Administrative Agent, plus interest thereon from the date of such demand to the date such amount is returned by such Lender, at a rate per annum equal to the greater of the Federal Funds Rate and a rate determined by the L/C Issuer in accordance with banking industry rules on interbank compensation. The obligations of the Lenders under this clause shall survive the payment in full of the Obligations and the termination of this Agreement.

(e)    Obligations Absolute. The obligation of the Borrower to reimburse the L/C Issuer for each drawing under each Letter of Credit and to repay each L/C Borrowing shall be absolute, unconditional and irrevocable, and shall be paid strictly in accordance with the terms of this Agreement under all circumstances, including the following:

(i)    any lack of validity or enforceability of such Letter of Credit, this Agreement, or any other Loan Document;

(ii)    the existence of any claim, counterclaim, setoff, defense or other right that the Borrower or any Restricted Subsidiary may have at any time against any beneficiary or any transferee of such Letter of Credit (or any Person for whom any such beneficiary or any such transferee may be acting), the L/C Issuer or any other Person, whether in connection with this Agreement or by such Letter of Credit, the transactions contemplated hereby or any agreement or instrument relating thereto, or any unrelated transaction;

(iii)    any draft, demand, endorsement, certificate or other document presented under or in connection with such Letter of Credit proving to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect; or any loss or delay in the transmission or otherwise of any document required in order to make a drawing under such Letter of Credit;

(iv)    waiver by the L/C Issuer of any requirement that exists for the L/C Issuer's protection and not the protection of the Borrower or any waiver by the L/C Issuer which does not in fact materially prejudice the Borrower;

59

EHREN-WALIA 003568

(v)     honor of a demand for payment presented electronically even if such Letter of Credit requires that demand be in the form of a draft;

(vi)     any payment made by the L/C Issuer in respect of an otherwise complying item presented after the date specified as the expiration date of, or the date by which documents must be received under, such Letter of Credit if presentation after such date is authorized by the UCC or the ISP, as applicable;

(vii)     any payment by the L/C Issuer under such Letter of Credit against presentation of a draft or certificate that does not strictly comply with the terms of such Letter of Credit; or any payment made by the L/C Issuer under such Letter of Credit to any Person purporting to be a trustee in bankruptcy, debtor-in-possession, assignee for the benefit of creditors, liquidator, receiver or other representative of or successor to any beneficiary or any transferee of such Letter of Credit, including any arising in connection with any proceeding under any Debtor Relief Law; or

(viii)     any other circumstance or happening whatsoever, whether or not similar to any of the foregoing, including any other circumstance that might otherwise constitute a defense available to, or a discharge of, the Borrower, Holdings or any Restricted Subsidiary.

The Borrower shall promptly examine a copy of each Letter of Credit and each amendment thereto that is delivered pursuant hereto and, in the event of any claim of noncompliance with the Borrower's instructions or other irregularity, the Borrower will immediately notify the L/C Issuer. The Borrower shall be conclusively deemed to have waived any such claim against the L/C Issuer and its correspondents unless such notice is given as aforesaid.

(f)     Role of L/C Issuer. Each Lender and the Borrower agree that, in paying any drawing under a Letter of Credit, the L/C Issuer shall not have any responsibility to obtain any document (other than any sight or time draft, certificates and documents expressly required by the Letter of Credit) or to ascertain or inquire as to the validity or accuracy of any such document or the authority of the Person executing or delivering any such document. None of the L/C Issuer, the Administrative Agent, any of their respective Related Parties nor any correspondent, participant or assignee of the L/C Issuer shall be liable to any Lender for (i) any action taken or omitted in connection herewith at the request or with the approval of the Revolving Lenders or the Required Revolving Lenders, as applicable, (ii) any action taken or omitted in the absence of gross negligence or willful misconduct, or (iii) the due execution, effectiveness, validity or enforceability of any document or instrument related to any Letter of Credit or Issuer Document. The Borrower hereby assumes all risks of the acts or omissions of any beneficiary or transferee with respect to its use of any Letter of Credit; provided, however, that, this assumption is not intended to, and shall not, preclude the Borrower's pursuing such rights and remedies as it may have against the beneficiary or transferee at law or under any other agreement. None of the L/C Issuer, the Administrative Agent, any of their respective Related Parties nor any correspondent, participant or assignee of the L/C Issuer shall be liable or responsible for any of the matters described in Section 2.03(e); provided, however, that, anything in such clauses to the contrary notwithstanding, the Borrower may have a claim against the L/C Issuer, and the L/C Issuer may be liable to the Borrower, to the extent, but only to the extent, of any direct, as opposed to consequential or exemplary, damages suffered by the Borrower which the Borrower proves, as determined by a final nonappealable judgment of a court of competent jurisdiction, were caused by the L/C Issuer's willful misconduct or gross negligence or the L/C Issuer's willful failure to pay under any Letter of Credit after the presentation to it by the beneficiary of a sight or time draft and certificate(s) strictly complying

CHAR1\1498335v12

EHREN-WALIA 003569

798

with the terms and conditions of a Letter of Credit. In furtherance and not in limitation of the foregoing, the L/C Issuer may accept documents that appear on their face to be in order, without responsibility for further investigation, regardless of any notice or information to the contrary, and the L/C Issuer shall not be responsible for the validity or sufficiency of any instrument transferring, endorsing or assigning or purporting to transfer, endorse or assign a Letter of Credit or the rights or benefits thereunder or proceeds thereof, in whole or in part, which may prove to be invalid or ineffective for any reason. The L/C Issuer may send a Letter of Credit or conduct any communication to or from the beneficiary via the Society for Worldwide Interbank Financial Telecommunication ("SWIFT") message or overnight courier, or any other commercially reasonable means of communicating with a beneficiary.

(g)    Applicability of ISP; Limitation of Liability. Unless otherwise expressly agreed by the L/C Issuer and the Borrower when a Letter of Credit is issued, the rules of the ISP shall apply to each Letter of Credit. Notwithstanding the foregoing, the L/C Issuer shall not be responsible to the Borrower for, and the L/C Issuer's rights and remedies against the Borrower shall not be impaired by, any action or inaction of the L/C Issuer required or permitted under any law, order, or practice that is required or permitted to be applied to any Letter of Credit or this Agreement, including the Law or any order of a jurisdiction where the L/C Issuer or the beneficiary is located, the practice stated in the ISP, or in the decisions, opinions, practice statements, or official commentary of the ICC Banking Commission, the Bankers Association for Finance and Trade – International Financial Services Association (BAFT-IFSA), or the Institute of International Banking Law & Practice, whether or not any Letter of Credit chooses such law or practice.

(h)    Letter of Credit Fees. The Borrower shall pay to the Administrative Agent for the account of each Revolving Lender in accordance, subject to Section 2.15, with its Applicable Revolving Percentage a Letter of Credit fee (the "Letter of Credit Fee") for each Letter of Credit equal to the Applicable Rate times the daily amount available to be drawn under such Letter of Credit. Letter of Credit Fees shall be (i) due and payable on the first Business Day of each March, June, September and December, commencing with the first such date to occur after the issuance of such Letter of Credit, on the Letter of Credit Expiration Date and thereafter on demand and (ii) computed on a quarterly basis in arrears. If there is any change in the Applicable Rate during any quarter, the daily amount available to be drawn under each Letter of Credit shall be computed and multiplied by the Applicable Rate separately for each period during such quarter that such Applicable Rate was in effect.

(i)    Fronting Fee and Documentary and Processing Charges Payable to L/C Issuer. The Borrower shall pay directly to the L/C Issuer, for its own account, a fronting fee with respect to each Letter of Credit issued by the L/C Issuer, at the rate per annum specified in the Fee Letter, computed on the daily amount available to be drawn under such Letter of Credit on a quarterly basis in arrears, and due and payable on or prior to the date that is ten (10) Business Days following each fiscal quarter end, commencing with the first such date to occur after the issuance of such Letter of Credit, on the Letter of Credit Expiration Date and thereafter on demand. For purposes of computing the daily amount available to be drawn under any Letter of Credit, the amount of such Letter of Credit shall be determined in accordance with Section 1.06. In addition, the Borrower shall pay directly to the L/C Issuer for its own account, the customary issuance, presentation, amendment and other processing fees, and other standard costs and charges, of the L/C Issuer relating to Letters of Credit issued by the L/C Issuer as from time to time in effect. Such customary fees and standard costs and charges are due and payable on demand and are nonrefundable.

(j)    Conflict with Issuer Documents. In the event of any conflict between the terms hereof and the terms of any Issuer Document, the terms hereof shall control.

61

EHREN-WALIA 003570

(k)     Letters of Credit Issued for Restricted Subsidiaries. Notwithstanding that a Letter of Credit issued or outstanding hereunder is in support of any obligations of, or is for the account of a Restricted Subsidiary, the Borrower shall be obligated to reimburse the L/C Issuer hereunder for any and all drawings under such Letter of Credit. The Borrower hereby acknowledges that the issuance of Letters of Credit for the account of a Restricted Subsidiary inures to the benefit of the Borrower, and that the Borrower's business derives substantial benefits from the businesses of such Restricted Subsidiary.

Section 2.04     **Swingline Loans.**

(a)     The Swingline. Subject to the terms and conditions set forth herein, the Swingline Lender, in reliance upon the agreements of the other Lenders set forth in this Section 2.04, may in its sole discretion make loans to the Borrower (each such loan, a "Swingline Loan"). Each such Swingline Loan may be made, subject to the terms and conditions set forth herein, to the Borrower, in Dollars, from time to time on any Business Day during the Availability Period in an aggregate amount not to exceed at any time outstanding the amount of the Swingline Sublimit, notwithstanding the fact that such Swingline Loans, when aggregated with the Applicable Revolving Percentage of the Outstanding Amount of Revolving Loans and L/C Obligations of the Lender acting as Swingline Lender, may exceed the amount of such Lender's Revolving Commitment; provided, that, (i) after giving effect to any Swingline Loan, (A) the Total Revolving Outstandings shall not exceed the Revolving Facility at such time, and (B) the Revolving Exposure of any Revolving Lender shall not exceed such Lender's Revolving Commitment, (ii) the Borrower shall not use the proceeds of any Swingline Loan to refinance any outstanding Swingline Loan, and (iii) the Swingline Lender shall not be under any obligation to make any Swingline Loan if it shall determine (which determination shall be conclusive and binding absent manifest error) that it has, or by such Credit Extension may have, Fronting Exposure. Within the foregoing limits, and subject to the other terms and conditions hereof, the Borrower may borrow under this Section 2.04, prepay under Section 2.05, and reborrow under this Section 2.04. Each Swingline Loan shall bear interest only at a rate based on the Base Rate plus the Applicable Rate. Immediately upon the making of a Swingline Loan, each Revolving Lender shall be deemed to, and hereby irrevocably and unconditionally agrees to, purchase from the Swingline Lender a risk participation in such Swingline Loan in an amount equal to the product of such Revolving Lender's Applicable Revolving Percentage times the amount of such Swingline Loan.

(b)     Borrowing Procedures. Each Swingline Borrowing shall be made upon the Borrower's irrevocable notice to the Swingline Lender and the Administrative Agent, which may be given by: (i) telephone or (ii) a Swingline Loan Notice; provided, that, any telephonic notice must be confirmed immediately by delivery to the Swingline Lender and the Administrative Agent of a Swingline Loan Notice. Each such Swingline Loan Notice must be received by the Swingline Lender and the Administrative Agent not later than 1:00 p.m. on the requested borrowing date, and shall specify (A) the amount to be borrowed, which shall be a minimum of $100,000, and (B) the requested date of the Swingline Borrowing (which shall be a Business Day). Promptly after receipt by the Swingline Lender of any Swingline Loan Notice, the Swingline Lender will confirm with the Administrative Agent (by telephone or in writing) that the Administrative Agent has also received such Swingline Loan Notice and, if not, the Swingline Lender will notify the Administrative Agent (by telephone or in writing) of the contents thereof. Unless the Swingline Lender has received notice (by telephone or in writing) from the Administrative Agent (including at the request of any Revolving Lender) prior to 2:00 p.m. on the date of the proposed Swingline Borrowing (1) directing the Swingline Lender not to make such Swingline Loan as a result of the limitations set forth in the first proviso to the second sentence of Section 2.04(a), or (2) that one or more of the applicable conditions specified in Article IV is not then satisfied, then, subject to the

62

EHREN-WALIA 003571

terms and conditions hereof, the Swingline Lender will, not later than 3:00 p.m. on the borrowing date specified in such Swingline Loan Notice, make the amount of its Swingline Loan available to the Borrower at its office by crediting the account of the Borrower on the books of the Swingline Lender in immediately available funds.

(c)    Refinancing of Swingline Loans.

(i)    The Swingline Lender at any time in its sole discretion may request, on behalf of the Borrower (which hereby irrevocably authorizes the Swingline Lender to so request on its behalf), that each Revolving Lender make a Base Rate Loan in an amount equal to such Lender's Applicable Revolving Percentage of the amount of Swingline Loans then outstanding. Such request shall be made in writing (which written request shall be deemed to be a Loan Notice for purposes hereof) and in accordance with the requirements of Section 2.02, without regard to the minimum and multiples specified therein for the principal amount of Base Rate Loans, but subject to the unutilized portion of the Revolving Facility and the conditions set forth in Section 4.02. The Swingline Lender shall furnish the Borrower with a copy of the applicable Loan Notice promptly after delivering such notice to the Administrative Agent. Each Revolving Lender shall make an amount equal to its Applicable Revolving Percentage of the amount specified in such Loan Notice available to the Administrative Agent in immediately available funds (and the Administrative Agent may apply Cash Collateral available with respect to the applicable Swingline Loan) for the account of the Swingline Lender at the Administrative Agent's Office not later than 1:00 p.m. on the day specified in such Loan Notice, whereupon, subject to Section 2.04(c)(ii), each Revolving Lender that so makes funds available shall be deemed to have made a Base Rate Loan to the Borrower in such amount. The Administrative Agent shall remit the funds so received to the Swingline Lender.

(ii)    If for any reason any Swingline Loan cannot be refinanced by such a Revolving Borrowing in accordance with Section 2.04(c)(i), the request for Base Rate Loans submitted by the Swingline Lender as set forth herein shall be deemed to be a request by the Swingline Lender that each of the Revolving Lenders fund its risk participation in the relevant Swingline Loan and each Revolving Lender's payment to the Administrative Agent for the account of the Swingline Lender pursuant to Section 2.04(c)(i) shall be deemed payment in respect of such participation.

(iii)    If any Revolving Lender fails to make available to the Administrative Agent for the account of the Swingline Lender any amount required to be paid by such Lender pursuant to the foregoing provisions of this Section 2.04(c) by the time specified in Section 2.04(c)(i), the Swingline Lender shall be entitled to recover from such Lender (acting through the Administrative Agent), on demand, such amount with interest thereon for the period from the date such payment is required to the date on which such payment is immediately available to the Swingline Lender at a rate per annum equal to the greater of the Federal Funds Rate and a rate determined by the Swingline Lender in accordance with banking industry rules on interbank compensation, plus any administrative, processing or similar fees customarily charged by the Swingline Lender in connection with the foregoing. If such Lender pays such amount (with interest and fees as aforesaid), the amount so paid shall constitute such Lender's Revolving Loan included in the relevant Revolving Borrowing or funded participation in the relevant Swingline Loan, as the case may be. A certificate of the Swingline Lender submitted to any Lender (through the Administrative Agent) with respect to any amounts owing under this clause (iii) shall be conclusive absent manifest error.

63

EHREN-WALIA 003572

(iv)     Each Revolving Lender's obligation to make Revolving Loans or to purchase and fund risk participations in Swingline Loans pursuant to this <u>Section 2.04(c)</u> shall be absolute and unconditional and shall not be affected by any circumstance, including (A) any setoff, counterclaim, recoupment, defense or other right which such Lender may have against the Swingline Lender, the Borrower or any other Person for any reason whatsoever, (B) the occurrence or continuance of a Default or (C) any other occurrence, event or condition, whether or not similar to any of the foregoing; <u>provided, however,</u> that each Revolving Lender's obligation to make Revolving Loans pursuant to this <u>Section 2.04(c)</u> is subject to the conditions set forth in <u>Section 4.02</u> (other than delivery of a Loan Notice). No such funding of risk participations shall relieve or otherwise impair the obligation of the Borrower to repay Swingline Loans, together with interest as provided herein.

(d)     <u>Repayment of Participations</u>.

(i)     At any time after any Revolving Lender has purchased and funded a risk participation in a Swingline Loan, if the Swingline Lender receives any payment on account of such Swingline Loan, the Swingline Lender will distribute to such Revolving Lender its Applicable Revolving Percentage thereof in the same funds as those received by the Swingline Lender.

(ii)     If any payment received by the Swingline Lender in respect of principal or interest on any Swingline Loan is required to be returned by the Swingline Lender under any of the circumstances described in <u>Section 11.05</u> (including pursuant to any settlement entered into by the Swingline Lender in its discretion), each Revolving Lender shall pay to the Swingline Lender its Applicable Revolving Percentage thereof on demand of the Administrative Agent, <u>plus</u> interest thereon from the date of such demand to the date such amount is returned, at a rate per annum equal to the Federal Funds Rate. The Administrative Agent will make such demand upon the request of the Swingline Lender. The obligations of the Lenders under this clause shall survive the payment in full of the Obligations and the termination of this Agreement.

(e)     <u>Interest for Account of Swingline Lender</u>.  The Swingline Lender shall be responsible for invoicing the Borrower for interest on the Swingline Loans. Until each Revolving Lender funds its Base Rate Loan or risk participation pursuant to this <u>Section 2.04</u> to refinance such Revolving Lender's Applicable Revolving Percentage of any Swingline Loan, interest in respect of such Applicable Revolving Percentage shall be solely for the account of the Swingline Lender.

(f)     <u>Payments Directly to Swingline Lender</u>.  The Borrower shall make all payments of principal and interest in respect of the Swingline Loans directly to the Swingline Lender.

Section 2.05     <u>Prepayments</u>.

(a)     <u>Optional</u>.

(i)     <u>Loans</u>.  The Borrower may, upon notice to the Administrative Agent pursuant to delivery to the Administrative Agent of a Notice of Loan Prepayment, at any time or from time to time voluntarily prepay any Term Loans and/or any Revolving Loans in whole or in part without premium or penalty subject to <u>Section 3.05</u>; <u>provided, that,</u> unless otherwise agreed by the Administrative Agent, (A) such notice must be received by the Administrative Agent not later than 11:00 a.m. (1) three (3) Business Days prior to any

64

EHREN-WALIA 003573

date of prepayment of Eurodollar Rate Loans, and (2) on the date of prepayment of Base Rate Loans, (B) any prepayment of Eurodollar Rate Loans shall be in a principal amount of $2,500,000 or a whole multiple of $1,000,000 in excess thereof (or, if less, the entire principal amount thereof then outstanding), and (C) any prepayment of Base Rate Loans shall be in a principal amount of $500,000 or a whole multiple of $100,000 in excess thereof (or, if less, the entire principal amount thereof then outstanding). Each such notice shall specify the date and amount of such prepayment and the Type(s) of Loans to be prepaid and, if Eurodollar Rate Loans are to be prepaid, the Interest Period(s) of such Loans. The Administrative Agent will promptly notify each Lender of its receipt of each such notice, and of the amount of such Lender's ratable portion of such prepayment (based on such Lender's Applicable Percentage in respect of the relevant Facility). If such notice is given by the Borrower, the Borrower shall make such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein. Any prepayment of principal shall be accompanied by all accrued interest on the amount prepaid, together with any additional amounts required pursuant to Section 3.05. Each prepayment of Term Loans pursuant to this Section 2.05(a)(i) shall be applied as directed by the Borrower; provided, that, (x) if the Borrower fails to specify application of any such voluntary prepayment, such prepayment shall be applied to the Term Loans on a *pro rata basis* to the principal repayment installments of the Term Loans on a *pro rata* basis. Subject to Section 2.15, such prepayments shall be paid to the Lenders in accordance with their respective Applicable Percentages in respect of each of the relevant Facilities.

(ii)     Swingline Loans.  The Borrower may, upon notice to the Swingline Lender pursuant to delivery to the Swingline Lender of a Notice of Loan Prepayment (with a copy to the Administrative Agent), at any time or from time to time, voluntarily prepay Swingline Loans in whole or in part without premium or penalty; provided, that, unless otherwise agreed by the Swingline Lender, (A) such notice must be received by the Swingline Lender and the Administrative Agent not later than 1:00 p.m. on the date of the prepayment, and (B) any such prepayment shall be in a minimum principal amount of $100,000 or a whole multiple of $100,000 in excess thereof (or, if less, the entire principal thereof then outstanding). Each such notice shall specify the date and amount of such prepayment. If such notice is given by the Borrower, the Borrower shall make such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein. Any prepayment of principal shall be accompanied by all accrued interest on the amount prepaid, together with any additional amounts required pursuant to Section 3.05.

(b)     Mandatory.

(i)     Revolving Outstandings.   If for any reason the Total Revolving Outstandings at any time exceed the Revolving Facility at such time, the Borrower shall immediately prepay Revolving Loans, Swingline Loans and L/C Borrowings (together with all accrued but unpaid interest thereon) and/or Cash Collateralize the L/C Obligations in an aggregate amount equal to such excess; provided, however, that the Borrower shall not be required to Cash Collateralize the L/C Obligations pursuant to this Section 2.05(b)(i) unless, after the prepayment of Revolving Loans and Swingline Loans, the Total Revolving Outstandings exceed the Revolving Facility at such time.

(ii)     Dispositions and Involuntary Dispositions. The Borrower shall prepay the Loans and/or Cash Collateralize the L/C Obligations as hereinafter provided in an aggregate amount equal to one hundred percent (100%) of the Net Cash Proceeds received

65

EHREN-WALIA 003574

by any Loan Party or any Restricted Subsidiary from all Dispositions and Involuntary Dispositions within ten (10) days of the date of such Disposition or Involuntary Disposition; provided, that, so long as no Default shall have occurred and be continuing, such Net Cash Proceeds shall not be required to be so applied (A) until the aggregate amount of the Net Cash Proceeds derived from all such Dispositions or Involuntary Dispositions in any fiscal year of the Borrower is equal to or greater than $500,000 and (B) if, at the election of the Borrower (as notified by the Borrower to the Administrative Agent on or prior to the date of such Disposition or Involuntary Disposition), such Loan Party or such Restricted Subsidiary reinvests all or any portion of such Net Cash Proceeds in Eligible Assets within three hundred sixty-five (365) days of the date of such Disposition or Involuntary Disposition (or commits to such reinvestment within such three hundred sixty-five (365) day period and actually consummates such reinvestment within one hundred eighty (180) days after such three hundred sixty-five (365) day period); provided, further, that, for purposes of the foregoing clause (B), if such Net Cash Proceeds shall have not been so reinvested, such Net Cash Proceeds shall be immediately applied to prepay the Loans and/or Cash Collateralize the L/C Obligations. Any prepayment pursuant to this clause (ii) shall be applied as set forth in, and subject to, clause (v) below.

(iii)    Debt Issuance. Immediately upon the receipt by any Loan Party or any Restricted Subsidiary of the Net Cash Proceeds of any Debt Issuance, the Borrower shall prepay the Loans and/or Cash Collateralize the L/C Obligations as hereinafter provided in an aggregate amount equal to one hundred percent (100%) of such Net Cash Proceeds. Any prepayment pursuant to this clause (iii) shall be applied as set forth in, and subject to, clause (v) below.

(iv)    Extraordinary Receipts. To the extent the Consolidated Leverage Ratio as of the most recent fiscal quarter end for which the Borrower was required to deliver financial statements pursuant to Section 6.01(a) or Section 6.01(b) was greater than or equal to 2.75 to 1.0, during the immediately following fiscal quarter, within five (5) Business Days of receipt by the Borrower or any Restricted Subsidiary of any Extraordinary Receipt in excess of $250,000 received by or paid to or for the account of the Borrower or such Restricted Subsidiary during such fiscal quarter, the Borrower shall prepay the Loans and/or Cash Collateralize the L/C Obligations as hereinafter provided in an aggregate principal amount equal to one hundred percent (100%) of such Extraordinary Receipts. Any prepayment pursuant to this clause (iv) shall be applied as set forth in, and subject to, clause (v) below.

(v)    Application of Payments. Each prepayment required pursuant to Section 2.05(b)(ii), (iii) or (iv) shall be applied, first, to the Term Loans on a *pro rata basis* (to the next four scheduled principal amortization payments in direct order of maturity and thereafter ratably to the remaining scheduled principal amortization payments), second, to the outstanding Revolving Loans (without a corresponding permanent reduction of the Revolving Facility), and third, after the outstanding Revolving Loans have been paid in full, to Cash Collateralize the remaining L/C Obligations.

Within the parameters of the applications set forth above, prepayments pursuant to this Section 2.05(b) shall be applied first to Base Rate Loans and then to Eurodollar Rate Loans in direct order of Interest Period maturities. All prepayments under this Section 2.05(b) shall be subject to Section 3.05, but otherwise without premium or penalty, and shall be accompanied by interest on the principal amount prepaid through the date of prepayment.

CHAR1\1498335v12

EHREN-WALIA 003575

**Section 2.06**     **Termination or Reduction of Commitments.**

(a)     Optional.  The Borrower may, upon notice to the Administrative Agent, terminate the Revolving Facility, the Letter of Credit Sublimit or the Swingline Sublimit, or from time to time permanently reduce the Revolving Facility, the Letter of Credit Sublimit or the Swingline Sublimit; provided, that: (i) any such notice shall be received by the Administrative Agent not later than 11:00 a.m. five (5) Business Days prior to the date of termination or reduction, (ii) any such partial reduction shall be in an aggregate amount of $5,000,000 or any whole multiple of $1,000,000 in excess thereof and (iii) the Borrower shall not terminate or reduce (A) the Revolving Facility if, after giving effect thereto and to any concurrent prepayments hereunder, the Total Revolving Outstandings would exceed the Revolving Facility, (B) the Letter of Credit Sublimit if, after giving effect thereto, the Outstanding Amount of L/C Obligations not fully Cash Collateralized hereunder would exceed the Letter of Credit Sublimit, or (C) the Swingline Sublimit if, after giving effect thereto and to any concurrent prepayments hereunder, the Outstanding Amount of Swingline Loans would exceed the Swingline Sublimit.  Each notice delivered by the Borrower pursuant to this Section 2.06(a) shall be irrevocable.

(b)     Mandatory.

(i)     The aggregate Term Commitments under any Term Facility shall be automatically and permanently reduced to zero on the date of the Term Borrowing under such Term Facility.

(ii)     If after giving effect to any reduction or termination of the Revolving Facility under this Section 2.06, the Letter of Credit Sublimit or the Swingline Sublimit exceeds the Revolving Facility at such time, the Letter of Credit Sublimit or the Swingline Sublimit, as the case may be, shall be automatically reduced by the amount of such excess.

(c)     Application of Commitment Reductions; Payment of Fees.  The Administrative Agent will promptly notify the Lenders of any termination or reduction of the Letter of Credit Sublimit, Swingline Sublimit or the Revolving Commitments under this Section 2.06.  Upon any reduction of the Revolving Commitments, the Revolving Commitment of each Revolving Lender shall be reduced by such Lender's Applicable Revolving Percentage.  All fees in respect of the Revolving Facility accrued until the effective date of any termination of the Revolving Facility shall be paid on the effective date of such termination.

**Section 2.07**     **Repayment of Loans.**

(a)     Initial Term Loans.  The Borrower shall repay the outstanding principal amount of the Initial Term Loans in installments on the last Business Day of each March, June, September and December and on the Initial Term Facility Maturity Date, in each case, in the respective amounts set forth in the table below (which amounts shall be reduced as a result of the application of prepayments in accordance with the order of priority set forth in Section 2.05), unless accelerated sooner pursuant to Section 8.02:

| Payment Dates | Principal Amortization Payment (% of Outstanding Amount of Initial Term Loans on the Closing Date (plus the Outstanding Amount of Initial Term Loans issued pursuant to Section |
|---|---|

CHAR1\1498335v12

EHREN-WALIA 003576

805

| | 2.02(g)(i) on the issuance date thereof)) |
|---|---|
| June, 2017 | 1.250% |
| September, 2017 | 1.250% |
| December, 2017 | 1.250% |
| March, 2018 | 1.250% |
| June, 2018 | 1.250% |
| September, 2018 | 1.250% |
| December, 2018 | 1.250% |
| March, 2019 | 1.250% |
| June, 2019 | 1.875% |
| September, 2019 | 1.875% |
| December, 2019 | 1.875% |
| March, 2020 | 1.875% |
| June, 2020 | 1.875% |
| September, 2020 | 1.875% |
| December, 2020 | 1.875% |
| March, 2021 | 1.875% |
| June, 2021 | 2.500% |
| September, 2021 | 2.500% |
| December, 2021 | 2.500% |
| Initial Term Facility Maturity Date | Outstanding Amount of Initial Term Loans |

provided, that, the final principal repayment installment of the Initial Term Loans shall be repaid on the Initial Term Facility Maturity Date and in any event shall be in an amount equal to the aggregate principal amount of all Initial Term Loans outstanding on such date.

(b)    Revolving Loans.  The Borrower shall repay to the Revolving Lenders on the Revolving Facility Maturity Date the aggregate principal amount of all Revolving Loans that are outstanding on such date.

(c)    Incremental Term Loans.  The Borrower shall repay the outstanding principal amount of all Incremental Term Loans in the installments, on the dates and in the amounts set forth in the applicable Incremental Term Loan Lender Joinder Agreement for such Incremental Term Loans (as such installments may hereafter be adjusted as a result of the application of prepayments in accordance with the order of priority set forth in Section 2.05), unless accelerated sooner pursuant to Section 8.02; provided, that, the final principal repayment installment of all Incremental Term Loans made hereunder pursuant to any Incremental Term Loan Lender Joinder Agreement shall be repaid on the Incremental Term Loan Maturity Date set forth in such Incremental Term Loan Lender Joinder Agreement and in any event shall be in an amount equal to the aggregate principal amount of all Incremental Term Loans made pursuant to such Incremental Term Loan Lender Joinder Agreement on such date.

(d)    Swingline Loans.  The Borrower shall repay each Swingline Loan on the earlier to occur of (i) the date ten (10) Business Days after such Swingline Loan is made and (ii) the Revolving Facility Maturity Date.

68

EHREN-WALIA 003577

806

Section 2.08    <u>Interest and Default Rate.</u>

(a)    <u>Interest</u>.  Subject to the provisions of <u>Section 2.08(b)</u>, (i) each Eurodollar Rate Loan under a Facility shall bear interest on the outstanding principal amount thereof for each Interest Period from the applicable borrowing date at a rate per annum equal to the Eurodollar Rate for such Interest Period <u>plus</u> the Applicable Rate, (ii) each Base Rate Loan under a Facility shall bear interest on the outstanding principal amount thereof from the applicable borrowing date at a rate per annum equal to the Base Rate <u>plus</u> the Applicable Rate, and (iii) each Swingline Loan shall bear interest on the outstanding principal amount thereof from the applicable borrowing date at a rate per annum equal to the Base Rate <u>plus</u> the Applicable Rate.

(b)    <u>Default Rate</u>.  Upon the occurrence and during the continuance of a Specified Event of Default, all overdue amounts hereunder shall thereafter bear interest at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Law.  Accrued and unpaid interest on past due amounts (including interest on past due interest) shall be due and payable upon demand.

(c)    <u>Interest Payments</u>.  Interest on each Loan shall be due and payable in arrears on each Interest Payment Date applicable thereto and at such other times as may be specified herein.  Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment, and before and after the commencement of any proceeding under any Debtor Relief Law.

Section 2.09    <u>Fees.</u>

In addition to certain fees described in <u>subsections (h)</u> and <u>(i)</u> of <u>Section 2.03</u>:

(a)    <u>Commitment Fee</u>.  The Borrower shall pay to the Administrative Agent for the account of each Revolving Lender in accordance with its Applicable Revolving Percentage, a commitment fee (the "<u>Commitment Fee</u>") at a rate per annum equal to the product of the Applicable Rate <u>times</u> the actual daily amount by which the Revolving Facility exceeds the sum of (i) the Outstanding Amount of Revolving Loans and (ii) the Outstanding Amount of L/C Obligations, subject to adjustment as provided in <u>Section 2.15</u>.  For the avoidance of doubt, the Outstanding Amount of Swingline Loans shall not be counted towards or considered usage of the Revolving Facility.  The Commitment Fee shall accrue at all times during the Availability Period, including at any time during which one or more of the conditions in <u>Article IV</u> is not met, and shall be due and payable quarterly in arrears on the last Business Day of each March, June, September and December, commencing with the first such date to occur after the Closing Date, and on the last day of the Availability Period.  The Commitment Fee shall be calculated quarterly in arrears, and if there is any change in the Applicable Rate during any quarter, the actual daily amount shall be computed and multiplied by the Applicable Rate separately for each period during such quarter that such Applicable Rate was in effect.

(b)    <u>Other Fees</u>.

(i)    The Borrower shall pay to the Administrative Agent and the L/C Issuer, for their own respective accounts, fees in the amounts and at the times specified in the Fee Letter.  Such fees shall be fully earned when paid and shall not be refundable for any reason whatsoever.

(ii)    The Borrower shall pay to the Lenders and the Arrangers such fees as shall have been separately agreed upon in writing in the amounts and at the times so specified.

CHAR1\1498335v12

EHREN-WALIA 003578

Such fees shall be fully earned when paid and shall not be refundable for any reason whatsoever.

Section 2.10    **Computation of Interest and Fees; Retroactive Adjustments of Applicable Rate.**

(a)    Computation of Interest and Fees.  All computations of interest for Base Rate Loans (including Base Rate Loans determined by reference to the Eurodollar Rate) shall be made on the basis of a year of 365 or 366 days, as the case may be, and actual days elapsed.  All other computations of fees and interest shall be made on the basis of a 360-day year and actual days elapsed (which results in more fees or interest, as applicable, being paid than if computed on the basis of a 365 day year).  Interest shall accrue on each Loan for the day on which the Loan is made, and shall not accrue on a Loan, or any portion thereof, for the day on which the Loan or such portion is paid, provided that any Loan that is repaid on the same day on which it is made shall, subject to Section 2.12(a), bear interest for one (1) day.  Each determination by the Administrative Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

(b)    Financial Statement Adjustments or Restatements.  If, as a result of any restatement of or other adjustment to the financial statements of the Borrower and its Subsidiaries or for any other reason, the Borrower or the Lenders determine that (i) the Consolidated Leverage Ratio as calculated by the Borrower as of any applicable date was inaccurate and (ii) a proper calculation of the Consolidated Leverage Ratio would have resulted in higher pricing for such period, the Borrower shall immediately and retroactively be obligated to pay to the Administrative Agent for the account of the applicable Lenders or the L/C Issuer, as the case may be, promptly on demand by the Administrative Agent (or, after the occurrence of an actual or deemed entry of an order for relief with respect to the Borrower under the Bankruptcy Code of the United States or any other Debtor Relief Laws, automatically and without further action by the Administrative Agent, any Lender or the L/C Issuer), an amount equal to the excess of the amount of interest and fees that should have been paid for such period over the amount of interest and fees actually paid for such period.  This paragraph shall not limit the rights of the Administrative Agent, any Lender or the L/C Issuer, as the case may be, under any provision of this Agreement to payment of any Obligations hereunder at the Default Rate or under Article VIII.  The Borrower's obligations under this paragraph shall survive termination of the Aggregate Commitments and the repayment of all other Obligations hereunder.

Section 2.11    **Evidence of Debt.**

(a)    Maintenance of Accounts.  The Credit Extensions made by each Lender shall be evidenced by one or more accounts or records maintained by such Lender and by the Administrative Agent in the ordinary course of business.  The accounts or records maintained by the Administrative Agent and each Lender shall be conclusive absent manifest error of the amount of the Credit Extensions made by the Lenders to the Borrower and the interest and payments thereon.  Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrower hereunder to pay any amount owing with respect to the Obligations.  In the event of any conflict between the accounts and records maintained by any Lender and the accounts and records of the Administrative Agent in respect of such matters, the accounts and records of the Administrative Agent shall control in the absence of manifest error.  Upon the request of any Lender made through the Administrative Agent, the Borrower shall execute and deliver to such Lender (through the Administrative Agent) a Note, which shall evidence such Lender's Loans in addition to such accounts or records.  Each Lender may attach schedules to its Note and endorse

CHAR1\1498335v12

EHREN-WALIA 003579

thereon the date, Type (if applicable), amount, and maturity of its Loans and payments with respect thereto.

(b)    Maintenance of Records.  In addition to the accounts and records referred to in Section 2.11(a), each Lender and the Administrative Agent shall maintain in accordance with its usual practice accounts or records evidencing the purchases and sales by such Lender of participations in Letters of Credit and Swingline Loans.  In the event of any conflict between the accounts and records maintained by the Administrative Agent and the accounts and records of any Lender in respect of such matters, the accounts and records of the Administrative Agent shall control in the absence of manifest error.

Section 2.12    **Payments Generally; Administrative Agent's Clawback.**

(a)    General.  All payments to be made by the Borrower shall be made free and clear of and without condition or deduction for any counterclaim, defense, recoupment or setoff.  Except as otherwise expressly provided herein, all payments by the Borrower hereunder shall be made to the Administrative Agent, for the account of the respective Lenders to which such payment is owed, at the Administrative Agent's Office in Dollars and in immediately available funds not later than 2:00 p.m. on the date specified herein.  The Administrative Agent will promptly distribute to each Lender its Applicable Percentage in respect of the relevant Facility (or other applicable share as provided herein) of such payment in like funds as received by wire transfer to such Lender's Lending Office.  All payments received by the Administrative Agent after 2:00 p.m. shall be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue.  Subject to definition of "Interest Period" and as otherwise specifically provided for in this Agreement, if any payment to be made by the Borrower shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be.

(b)    (i)    Funding by Lenders; Presumption by Administrative Agent.  Unless the Administrative Agent shall have received notice from a Lender prior to the proposed date of any Borrowing of Eurodollar Rate Loans (or, in the case of any Borrowing of Base Rate Loans, prior to 12:00 noon on the date of such Borrowing) that such Lender will not make available to the Administrative Agent such Lender's share of such Borrowing, the Administrative Agent may assume that such Lender has made such share available on such date in accordance with Section 2.02 (or, in the case of a Borrowing of Base Rate Loans, that such Lender has made such share available in accordance with and at the time required by Section 2.02) and may, in reliance upon such assumption, make available to the Borrower a corresponding amount.  In such event, if a Lender has not in fact made its share of the applicable Borrowing available to the Administrative Agent, then the applicable Lender and the Borrower severally agree to pay to the Administrative Agent forthwith on demand such corresponding amount in immediately available funds with interest thereon, for each day from and including the date such amount is made available to the Borrower to but excluding the date of payment to the Administrative Agent, at (A) in the case of a payment to be made by such Lender, the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation, plus any administrative, processing or similar fees customarily charged by the Administrative Agent in connection with the foregoing, and (B) in the case of a payment to be made by the Borrower, the interest rate applicable to Base Rate Loans. If the Borrower and such Lender shall pay such interest to the Administrative Agent for the same or an overlapping period, the Administrative Agent shall promptly remit to the Borrower the amount of such interest paid by the Borrower for such period.  If such Lender

71

CHAR1\1498335v12

EHREN-WALIA 003580

pays its share of the applicable Borrowing to the Administrative Agent, then the amount so paid shall constitute such Lender's Loan included in such Borrowing. Any payment by the Borrower shall be without prejudice to any claim the Borrower may have against a Lender that shall have failed to make such payment to the Administrative Agent.

(i)     Payments by Borrower; Presumptions by Administrative Agent.  Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders or the L/C Issuer hereunder that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Appropriate Lenders or the L/C Issuer, as the case may be, the amount due.  In such event, if the Borrower has not in fact made such payment, then each of the Appropriate Lenders or the L/C Issuer, as the case may be, severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender or the L/C Issuer, in immediately available funds with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

A notice of the Administrative Agent to any Lender or the Borrower with respect to any amount owing under this subsection (b) shall be conclusive, absent manifest error.

(c)     Failure to Satisfy Conditions Precedent.  If any Lender makes available to the Administrative Agent funds for any Loan to be made by such Lender as provided in the foregoing provisions of this Article II, and such funds are not made available to the Borrower by the Administrative Agent because the conditions to the applicable Credit Extension set forth in Article IV are not satisfied or waived in accordance with the terms hereof, the Administrative Agent shall return such funds (in like funds as received from such Lender) to such Lender, without interest.

(d)     Obligations of Lenders Several.  The obligations of the Lenders hereunder to make Loans, to fund participations in Letters of Credit and Swingline Loans and to make payments pursuant to Section 11.04(c) are several and not joint.  The failure of any Lender to make any Loan, to fund any such participation or to make any payment under Section 11.04(c) on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so make its Loan, to purchase its participation or to make its payment under Section 11.04(c).

(e)     Funding Source.  Nothing herein shall be deemed to obligate any Lender to obtain the funds for any Loan in any particular place or manner or to constitute a representation by any Lender that it has obtained or will obtain the funds for any Loan in any particular place or manner.

Section 2.13     **Sharing of Payments by Lenders.**

If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of (a) Obligations in respect of any of the Facilities due and payable to such Lender hereunder and under the other Loan Documents at such time in excess of its ratable share (according to the proportion of (i) the amount of such Obligations due and payable to such Lender at such time to (ii) the aggregate amount of the Obligations in respect of the Facilities due and payable to all Lenders hereunder and under the other Loan Documents at such time) of payments on account of the Obligations in respect of the Facilities due and payable to all Lenders hereunder and under the other Loan Documents at such time

CHAR1\1498335v12

EHREN-WALIA 003581

obtained by all the Lenders at such time or (b) Obligations in respect of any of the Facilities owing (but not due and payable) to such Lender hereunder and under the other Loan Documents at such time in excess of its ratable share (according to the proportion of (i) the amount of such Obligations owing (but not due and payable) to such Lender at such time to (ii) the aggregate amount of the Obligations in respect of the Facilities owing (but not due and payable) to all Lenders hereunder and under the other Loan Documents at such time) of payments on account of the Obligations in respect of the Facilities owing (but not due and payable) to all Lenders hereunder and under the other Loan Documents at such time obtained by all of the Lenders at such time, then, in each case under clauses (a) and (b) above, the Lender receiving such greater proportion shall (A) notify the Administrative Agent of such fact, and (B) purchase (for cash at face value) participations in the Loans and subparticipations in L/C Obligations and Swingline Loans of the other Lenders, or make such other adjustments as shall be equitable, so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of Obligations in respect of the Facilities then due and payable to the Lenders or owing (but not due and payable) to the Lenders, as the case may be; provided, that, (1) if any such participations or subparticipations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations or subparticipations shall be rescinded and the purchase price restored to the extent of such recovery, without interest; and (2) the provisions of this Section 2.13 shall not be construed to apply to (x) any payment made by or on behalf of the Borrower pursuant to and in accordance with the express terms of this Agreement (including the application of funds arising from the existence of a Defaulting Lender), (y) the application of Cash Collateral provided for in Section 2.14, or (z) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans or subparticipations in L/C Obligations or Swingline Loans to any assignee or participant, other than an assignment to any Loan Party or any Affiliate thereof (as to which the provisions of this Section 2.13 shall apply). Each Loan Party consents to the foregoing and agrees, to the extent it may effectively do so under applicable Law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against such Loan Party rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of such Loan Party in the amount of such participation.

Section 2.14    **Cash Collateral.**

(a)    Certain Credit Support Events. If (i) the L/C Issuer has honored any full or partial drawing request under any Letter of Credit and such drawing has resulted in a L/C Borrowing, (ii) as of the Letter of Credit Expiration Date, any L/C Obligation for any reason remains outstanding, (iii) the Borrower shall be required to provide Cash Collateral pursuant to Section 2.05 or 8.02(c), or (iv) there shall exist a Defaulting Lender, the Borrower shall immediately (in the case of clause (iii) above) or within one (1) Business Day (in all other cases) following any request by the Administrative Agent or the L/C Issuer, provide Cash Collateral in an amount not less than the applicable Minimum Collateral Amount (determined in the case of Cash Collateral provided pursuant to clause (iv) above, after giving effect to Section 2.15(a)(iv) and any Cash Collateral provided by the Defaulting Lender).

(b)    Grant of Security Interest. The Borrower, and to the extent provided by any Defaulting Lender, such Defaulting Lender, hereby grants to (and subjects to the control of) the Administrative Agent, for the benefit of the Administrative Agent, the L/C Issuer and the Lenders, and agrees to maintain, a first priority security interest in all such cash, deposit accounts and all balances therein, and all other property so provided as collateral pursuant hereto, and in all proceeds of the foregoing, all as security for the obligations to which such Cash Collateral may be applied pursuant to Section 2.14(c). If at any time the Administrative Agent determines that Cash Collateral is subject to any right or claim of any Person other than the Administrative Agent or the L/C Issuer as herein provided, or that the total amount of such Cash Collateral is less than the Minimum Collateral Amount, the Borrower will, promptly upon demand by the Administrative Agent, pay or

73

EHREN-WALIA 003582

811

provide to the Administrative Agent additional Cash Collateral in an amount sufficient to eliminate such deficiency. All Cash Collateral (other than credit support not constituting funds subject to deposit) shall be maintained in one or more blocked, non-interest bearing deposit accounts at Bank of America. The Borrower shall pay on demand therefor from time to time all customary account opening, activity and other administrative fees and charges in connection with the maintenance and disbursement of Cash Collateral.

(c)    Application.    Notwithstanding anything to the contrary contained in this Agreement, Cash Collateral provided under any of this Section 2.14 or Sections 2.03, 2.05, 2.15 or 8.02 in respect of Letters of Credit shall be held and applied to the satisfaction of the specific L/C Obligations, obligations to fund participations therein (including, as to Cash Collateral provided by a Revolving Lender that is a Defaulting Lender, any interest accrued on such obligation) and other obligations for which the Cash Collateral was so provided, prior to any other application of such property as may be provided for herein.

(d)    Release.    Cash Collateral (or the appropriate portion thereof) provided to reduce Fronting Exposure or to secure other obligations shall be released promptly following (i) the elimination of the applicable Fronting Exposure or other obligations giving rise thereto (including by the termination of Defaulting Lender status of the applicable Revolving Lender (or, as appropriate, its assignee following compliance with Section 11.06(b)(vi))) or (ii) the determination by the Administrative Agent and the L/C Issuer that there exists excess Cash Collateral; provided, however, (A) any such release shall be without prejudice to, and any disbursement or other transfer of Cash Collateral shall be and remain subject to, any other Lien conferred under the Loan Documents and the other applicable provisions of the Loan Documents, and (B) the Person providing Cash Collateral and the L/C Issuer may agree that Cash Collateral shall not be released but instead held to support future anticipated Fronting Exposure or other obligations.

Section 2.15    **Defaulting Lenders.**

(a)    Adjustments.    Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as that Lender is no longer a Defaulting Lender, to the extent permitted by applicable Law:

(i)    Waivers and Amendments.    Such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in the definition of "Required Lenders", "Required Revolving Lenders" and Section 11.01.

(ii)    Defaulting Lender Waterfall.    Any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of such Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Article VIII or otherwise) or received by the Administrative Agent from a Defaulting Lender pursuant to Section 11.08 shall be applied at such time or times as may be determined by the Administrative Agent as follows: first, to the payment of any amounts owing by such Defaulting Lender to the Administrative Agent hereunder; second, to the payment on a pro rata basis of any amounts owing by such Defaulting Lender to the L/C Issuer or Swingline Lender hereunder; third, to Cash Collateralize the L/C Issuer's Fronting Exposure with respect to such Defaulting Lender in accordance with Section 2.14; fourth, as the Borrower may request (so long as no Default or Event of Default exists), to the funding of any Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent; fifth, if so determined by

EHREN-WALIA 003583

the Administrative Agent and the Borrower, to be held in a deposit account and released *pro rata* in order to (A) satisfy such Defaulting Lender's potential future funding obligations with respect to Loans under this Agreement and (B) Cash Collateralize the L/C Issuer's future Fronting Exposure with respect to such Defaulting Lender with respect to future Letters of Credit issued under this Agreement, in accordance with Section 2.14; sixth, to the payment of any amounts owing to the Lenders, the L/C Issuer or Swingline Lender as a result of any judgment of a court of competent jurisdiction obtained by any Lender, the L/C Issuer or the Swingline Lender against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; seventh, so long as no Default or Event of Default exists, to the payment of any amounts owing to the Borrower as a result of any judgment of a court of competent jurisdiction obtained by the Borrower against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; and eighth, to such Defaulting Lender or as otherwise as may be required under the Loan Documents in connection with any Lien conferred thereunder or directed by a court of competent jurisdiction; provided, that, if (1) such payment is a payment of the principal amount of any Loans or L/C Borrowings in respect of which such Defaulting Lender has not fully funded its appropriate share, and (2) such Loans were made or the related Letters of Credit were issued at a time when the conditions set forth in Section 4.02 were satisfied or waived, such payment shall be applied solely to pay the Loans of, and L/C Obligations owed to, all Non-Defaulting Lenders on a *pro rata* basis prior to being applied to the payment of any Loans of, or L/C Obligations owed to, such Defaulting Lender until such time as all Loans and funded and unfunded participations in L/C Obligations and Swingline Loans are held by the Lenders *pro rata* in accordance with the Commitments hereunder without giving effect to Section 2.15(a)(v). Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender or to post Cash Collateral pursuant to this Section 2.15(a)(ii) shall be deemed paid to and redirected by such Defaulting Lender, and each Lender irrevocably consents hereto.

(iii)     Certain Fees.

(A)     Fees.  No Defaulting Lender shall be entitled to receive any fee payable under Section 2.09(a) for any period during which that Lender is a Defaulting Lender (and the Borrower shall not be required to pay any such fee that otherwise would have been required to have been paid to that Defaulting Lender).

(B)     Letter of Credit Fees.  Each Defaulting Lender shall be entitled to receive Letter of Credit Fees for any period during which that Lender is a Defaulting Lender only to the extent allocable to its Applicable Revolving Percentage of the stated amount of Letters of Credit for which it has provided Cash Collateral pursuant to Section 2.14.

(C)     Defaulting Lender Fees.  With respect to any Letter of Credit Fee not required to be paid to any Defaulting Lender pursuant to clause (B) above, the Borrower shall (1) pay to each Non-Defaulting Lender that portion of any such fee otherwise payable to such Defaulting Lender with respect to such Defaulting Lender's participation in L/C Obligations or Swingline Loans that has been reallocated to such Non-Defaulting Lender pursuant to clause (iv) below, (2) pay to the L/C Issuer and Swingline Lender, as applicable, the amount of any such fee otherwise payable to such Defaulting Lender to the extent allocable to the L/C

CHAR1\1498335v12

EHREN-WALIA 003584

813

Issuer's or Swingline Lender's Fronting Exposure to such Defaulting Lender, and (3) not be required to pay the remaining amount of any such fee.

(iv)    <u>Reallocation of Applicable Revolving Percentages to Reduce Fronting Exposure</u>.  All or any part of such Defaulting Lender's participation in L/C Obligations and Swingline Loans shall be reallocated among the Non-Defaulting Lenders in accordance with their respective Applicable Revolving Percentages (calculated without regard to such Defaulting Lender's Commitment) but only to the extent that such reallocation does not cause the aggregate Revolving Exposure of any Non-Defaulting Lender to exceed such Non-Defaulting Lender's Commitment.    Subject to <u>Section 11.21</u>, no reallocation hereunder shall constitute a waiver or release of any claim of any party hereunder against a Defaulting Lender arising from that Lender having become a Defaulting Lender, including any claim of a Non-Defaulting Lender as a result of such Non-Defaulting Lender's increased exposure following such reallocation.

(v)    <u>Cash Collateral, Repayment of Swingline Loans</u>.  If the reallocation described in <u>clause (iv)</u> above cannot, or can only partially, be effected, the Borrower shall, without prejudice to any right or remedy available to it hereunder or under applicable Law, (A) <u>first</u>, prepay Swingline Loans in an amount equal to the Swingline Lender's Fronting Exposure and (B) <u>second</u>, Cash Collateralize the L/C Issuer's Fronting Exposure in accordance with the procedures set forth in <u>Section 2.14</u>.

(b)    <u>Defaulting Lender Cure</u>.  If the Borrower, the Administrative Agent, Swingline Lender and the L/C Issuer agree in writing that a Lender is no longer a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein (which may include arrangements with respect to any Cash Collateral), that Lender will, to the extent applicable, purchase at par that portion of outstanding Loans of the other Lenders or take such other actions as the Administrative Agent may determine to be necessary to cause the Loans and funded and unfunded participations in Letters of Credit and Swingline Loans to be held on a *pro rata* basis by the Lenders in accordance with their Applicable Revolving Percentages (without giving effect to <u>Section 2.15(a)(iv)</u>), whereupon such Lender will cease to be a Defaulting Lender; <u>provided, that</u>, no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrower while that Lender was a Defaulting Lender; <u>provided, further</u>, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.

Section 2.16    <u>**Dutch Auctions; Open Market Purchases**</u>.

(a)    <u>Dutch Auctions</u>.

(i)    Notwithstanding anything to the contrary contained in this Agreement or any other Loan Document, the Borrower or any Restricted Subsidiary (each, in such capacity, an "<u>Auction Party</u>") may, at any time and from time to time, conduct Dutch Auctions in order to purchase Initial Term Loans (each such Dutch Auction to be managed exclusively by the Administrative Agent (or an Affiliate of the Administrative Agent) or another investment bank of recognized standing selected by the Borrower following consultation with the Administrative Agent (in such capacity, the "<u>Auction Manager</u>"); <u>provided, that</u>, the Administrative Agent shall have no obligation to act as the Auction Manager), so long as the following conditions are satisfied: (A) each Dutch Auction shall

CHAR1\1498335v12

EHREN-WALIA 003585

be conducted in accordance with the procedures, terms and conditions set forth in this Section 2.16(a) and in the definition of "Dutch Auction"; (B) no Default or Event of Default shall have occurred and be continuing on the date of the delivery of each Auction Notice and at the time of purchase of Initial Term Loans in connection with any Dutch Auction; (C) the aggregate principal amount (calculated on the face amount thereof) of all Initial Term Loans purchased by any Auction Party in connection with any Dutch Auction shall be automatically and permanently cancelled and retired on the settlement date of the relevant purchase (and may not be resold); (D) no proceeds of any Revolving Borrowing shall be used by any Auction Party to finance any such repurchase; (E) no more than one Dutch Auction may be ongoing at any one time; (F) at the time of each purchase of Initial Term Loans through a Dutch Auction, each Auction Party participating in such Dutch Auction shall have delivered to the Auction Manager a certificate from a Responsible Officer of such Auction Party certifying compliance with clauses (B) and (D); and (G) if the Sponsor or any Non-Debt Fund Affiliate has purchased any Initial Term Loans pursuant to Section 2.17 and, at the time of such Dutch Auction, holds such Initial Term Loans, the Sponsor or any such Non-Debt Fund Affiliate shall participate in such Dutch Auction to the extent necessary to ensure that the Initial Term Loans held by the Sponsor or any such Non-Debt Fund Affiliate do not, in the aggregate, exceed twenty percent (20%) of the aggregate principal amount of all Initial Term Loans then outstanding.

(ii)      Any Auction Party participating in any Dutch Auction must terminate such Dutch Auction if it fails to satisfy one or more of the conditions set forth above which are required to be met at the time which otherwise would have been the time of purchase of Initial Term Loans pursuant to such Dutch Auction.  If an Auction Party commences any Dutch Auction (and all relevant requirements set forth above which are required to be satisfied at the time of the commencement of such Dutch Auction have in fact been satisfied), and if at such time of commencement such Auction Party believes in good faith that all required conditions set forth above which are required to be satisfied at the time of the purchase of Initial Term Loans pursuant to such Dutch Auction shall be satisfied, then such Auction Party shall have no liability to any Lender for any termination of such Dutch Auction as a result of its failure to satisfy one or more of the conditions set forth above which are required to be met at the time which otherwise would have been the time of purchase of Initial Term Loans pursuant to the such Dutch Auction, and any such failure shall not result in any Default or Event of Default hereunder.  With respect to all purchases of Initial Term Loans made by an Auction Party pursuant to this Section 2.16(a), (A) the Borrower shall pay on the settlement date of each such purchase all accrued and unpaid interest (except to the extent otherwise set forth in the relevant offering documents), if any, on the purchased Initial Term Loans up to the settlement date of such purchase, and (B) such purchases (and the payments made by the Borrower and the cancellation of the purchased Initial Term Loans, in each case, in connection therewith) shall not constitute voluntary or mandatory payments or prepayments for purposes of this Agreement.  At the time of purchases of Initial Term Loans pursuant to a Dutch Auction, the then remaining payments to be made pursuant to Section 2.07(a) shall be reduced by the aggregate principal amount (taking the face amount thereof) of Initial Term Loans repurchased pursuant to such Dutch Auction, with such reduction to be applied to the principal repayment installments thereof on a *pro rata* basis.

(iii)      The Administrative Agent and the Lenders hereby consent to the Dutch Auctions and the other transactions contemplated by this Section 2.16(a) (provided, that, no Lender shall have an obligation to participate in any such Dutch Auctions) and hereby waive the requirements of any provision of this Agreement or any other Loan Document

CHAR1\1498335v12

EHREN-WALIA 003586

that may otherwise prohibit any Dutch Auction or any other transaction contemplated by this Section 2.16(a). The Auction Manager acting in its capacity as such hereunder shall be entitled to the benefits and immunities provided to the Administrative Agent in Article IX with respect to any acts taken or omissions suffered by such Auction Manager in connection with any Dutch Auction as if the term "Administrative Agent" as used in Article IX included such Auction Manager with respect to such acts or omissions, and the Administrative Agent shall cooperate with the Auction Manager as reasonably requested by the Auction Manager in order to enable it to perform its responsibilities and duties in connection with each Dutch Auction.

(b)     Open Market Purchases.

(i)     Notwithstanding anything to the contrary contained in this Agreement or any other Loan Document, the Borrower or any Restricted Subsidiary (each, in such capacity, an "Open Market Purchase Party") may, at any time and from time to time, make open market purchases of Initial Term Loans (each, an "Open Market Purchase"), so long as the following conditions are satisfied: (A) such Open Market Purchase shall be conducted in accordance with the procedures, terms and conditions set forth in this Section 2.16(b); (B) no Default or Event of Default shall have occurred and be continuing on the date of such Open Market Purchase; (C) the aggregate principal amount (calculated on the face amount thereof) of all Initial Term Loans purchased by any Open Market Purchase Party in connection with any Open Market Purchase shall be automatically and permanently cancelled and retired on the settlement date of the relevant purchase (and may not be resold); (D) the aggregate principal amount of all Initial Term Loans purchased pursuant to this Section 2.16(b) shall not exceed ten percent (10%) of the aggregate principal amount of all Initial Term Loans then outstanding; (E) no proceeds of any Revolving Borrowing shall be used by any Open Market Purchase Party to finance any such repurchase; (F) at the time of each Open Market Purchase, each Open Market Purchase Party making an Open Market Purchase shall have delivered to the Administrative Agent a certificate from a Responsible Officer of such Open Market Purchase Party certifying compliance with clauses (B) and (E); and (G) if the Sponsor or any Non-Debt Fund Affiliate has purchased any Initial Term Loans pursuant to Section 2.17 and, at the time of such Open Market Purchase, holds such Initial Term Loans, the Sponsor or any such Non-Debt Fund Affiliate shall participate in such Open Market Purchase to the extent necessary to ensure that the Initial Term Loans held by the Sponsor or any such Non-Debt Fund Affiliate do not, in the aggregate, exceed twenty percent (20%) of the aggregate principal amount of all Initial Term Loans then outstanding.

(ii)     With respect to all purchases of Initial Term Loans made pursuant to this Section 2.16(b), (A) the Borrower shall pay on the settlement date of each such purchase all accrued and unpaid interest, if any, on the purchased Initial Term Loans up to the settlement date of such purchase (except to the extent otherwise set forth in the relevant purchase documents as agreed by the respective selling Lender) and (B) such purchases (and the payments made by the Borrower and the cancellation of the purchased Initial Term Loans, in each case, in connection therewith) shall not constitute voluntary or mandatory payments or prepayments for purposes of this Agreement. At the time of purchases of Initial Term Loans pursuant to any Open Market Purchase, the then remaining payments to be made pursuant to Section 2.07(a) shall be reduced by the aggregate principal amount (taking the face amount thereof) of Initial Term Loans repurchased pursuant to such Open Market Purchase, with such reduction to be applied to the principal repayment installments thereof on a *pro rata* basis.

78

EHREN-WALIA 003587

(iii)    The Administrative Agent and the Lenders hereby consent to the Open Market Purchases contemplated by this <u>Section 2.16(b)</u> and hereby waive the requirements of any provision of this Agreement or any other Loan Document that may otherwise prohibit any Open Market Purchase by this <u>Section 2.16(b)</u>.

Section 2.17    <u>Sponsor, Debt Fund Affiliate and Non-Debt Fund Affiliate Term Loan Purchases.</u>

Notwithstanding anything to the contrary in this Agreement, the Sponsor, any Debt Fund Affiliate and any Non-Debt Fund Affiliate may be an assignee in respect of Initial Term Loans (and to such extent shall constitute an Eligible Assignee), including through Dutch Auctions or open market purchases; <u>provided, that</u>, (a)(i) the aggregate principal amount of Initial Term Loans owned or held by the Sponsor or any Non-Debt Fund Affiliates at any time shall not exceed, in the aggregate, twenty percent (20%) of the aggregate principal amount of all Initial Term Loans then outstanding, and (ii) the number of Non-Debt Fund Affiliates (together with the Sponsor) that hold the Initial Term Loans shall at no time exceed three (3) such Lenders; (b) notwithstanding anything to the contrary in the definition of "Required Lenders" or in <u>Section 11.01</u>, the holder of any Initial Term Loans acquired pursuant to this <u>Section 2.17</u> (other than Debt Fund Affiliates) shall not be entitled to vote such Initial Term Loans in any vote requiring the consent of the Required Lenders pursuant to the terms of this Agreement or any other Loan Document (it being understood that the holder of such Initial Term Loans shall have the right to consent to votes requiring the consent of all Lenders or all Lenders directly affected thereby pursuant to <u>Section 11.01</u> or otherwise, or any other amendment which treats such Lenders differently from other Lenders), and for purposes of any such vote such Initial Term Loans shall be deemed not to be outstanding; (c) no Default or Event of Default shall have occurred and be continuing on the date of such purchase or would occur as a result of such assignment; (d) no proceeds of any Revolving Borrowing shall be used to finance any such purchase pursuant to this <u>Section 2.17</u>; (e) by acquiring an Initial Term Loan hereunder, each of the Sponsor and each Non-Debt Fund Affiliate shall be deemed to have (i) waived its right to receive information prepared by the Administrative Agent or any Lender (or any advisor, agent or counsel thereof) under or in connection with this Agreement or any other Loan Document and attend any meeting or conference call with the Administrative Agent or any Lender, (ii) agreed that it is prohibited from making or bringing any claim, in its capacity as a Lender, against the Administrative Agent or any Lender with respect to the duties and obligations of such Persons under the Loan Documents, and (iii) agreed that it will have no right whatsoever to require the Administrative Agent or any Lender to undertake any action (or refrain from taking any action) with respect to this Agreement or any other Loan Document; (f) in connection with the purchase of Initial Term Loans pursuant to this <u>Section 2.17</u>, the Sponsor and each Non-Debt Fund Affiliate acquiring Initial Term Loans pursuant to this <u>Section 2.17</u> shall execute and deliver an Affiliated Lender Assignment and Assumption pursuant to which it identifies itself as an Affiliate of the Loan Parties; (g) Initial Term Loans acquired by the Sponsor or any Non-Debt Fund Affiliate shall be subject to the voting limitations set forth in <u>Section 11.06(h)</u>; and (h) notwithstanding anything in <u>Section 11.01</u> or the definition of "Required Lenders" to the contrary, for purposes of determining whether the Required Lenders have (i) consented (or not consented) to any amendment, modification, waiver, consent or other action with respect to any of the terms of any Loan Document or any departure by any Loan Party therefrom, (ii) otherwise acted on any matter related to any Loan Document, or (iii) directed or required the Administrative Agent or any Lender to undertake any action (or refrain from taking any action) with respect to or under any Loan Document, all Initial Term Loans held by the Sponsor, Debt Fund Affiliates and Non-Debt Fund Affiliates may not account for, in the aggregate, more than forty nine and nine-tenths percent (49.9%) of the Initial Term Loans of consenting Lenders included in determining whether the Required Lenders have consented to any action pursuant to <u>Section 11.01</u>.

CHAR1\1498335v12

EHREN-WALIA 003588

817

# ARTICLE III

## TAXES, YIELD PROTECTION AND ILLEGALITY

Section 3.01    **Taxes.**

(a)    Payments Free of Taxes; Obligation to Withhold; Payments on Account of Taxes.

(i)    Any and all payments by or on account of any obligation of any Loan Party under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable Laws. If any applicable Laws (as determined in the good faith discretion of the Administrative Agent) require the deduction or withholding of any Tax from any such payment by the Administrative Agent or a Loan Party, then the Administrative Agent or such Loan Party shall be entitled to make such deduction or withholding, upon the basis of the information and documentation to be delivered pursuant to subsection (e) below.

(ii)    If any Loan Party or the Administrative Agent shall be required by the Code to withhold or deduct any Taxes, including both United States federal backup withholding and withholding taxes, from any payment, then (A) the Administrative Agent shall withhold or make such deductions as are determined by the Administrative Agent to be required based upon the information and documentation it has received pursuant to subsection (e) below, (B) the Administrative Agent shall timely pay the full amount withheld or deducted to the relevant Governmental Authority in accordance with the Code, and (C) to the extent that the withholding or deduction is made on account of Indemnified Taxes, the sum payable by the applicable Loan Party shall be increased as necessary so that after any required withholding or the making of all required deductions (including deductions applicable to additional sums payable under this Section 3.01) the applicable Recipient receives an amount equal to the sum it would have received had no such withholding or deduction been made.

(iii)    If any Loan Party or the Administrative Agent shall be required by any applicable Laws other than the Code to withhold or deduct any Taxes from any payment, then (A) such Loan Party or the Administrative Agent, as required by such Laws, shall withhold or make such deductions as are determined by it to be required based upon the information and documentation it has received pursuant to subsection (e) below, (B) such Loan Party or the Administrative Agent, to the extent required by such Laws, shall timely pay the full amount withheld or deducted to the relevant Governmental Authority in accordance with such Laws, and (C) to the extent that the withholding or deduction is made on account of Indemnified Taxes, the sum payable by the applicable Loan Party shall be increased as necessary so that after any required withholding or the making of all required deductions (including deductions applicable to additional sums payable under this Section 3.01) the applicable Recipient receives an amount equal to the sum it would have received had no such withholding or deduction been made.

(b)    Payment of Other Taxes by the Loan Parties. Without limiting the provisions of subsection (a) above, the Loan Parties shall timely pay to the relevant Governmental Authority in accordance with applicable law, or at the option of the Administrative Agent timely reimburse it for the payment of, any Other Taxes.

(c)    Tax Indemnifications.

CHAR1\1498335v12

EHREN-WALIA 003589

818

(i)     Each of the Loan Parties shall, and does hereby, jointly and severally indemnify each Recipient, and shall make payment in respect thereof within ten (10) days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 3.01) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient, and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate setting forth in reasonable detail a calculation of the amount of such payment or liability delivered to the Borrower by a Lender or the L/C Issuer (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender or the L/C Issuer, shall be conclusive absent manifest error. Each of the Loan Parties shall also, and does hereby, jointly and severally indemnify the Administrative Agent, and shall make payment in respect thereof within ten (10) days after demand therefor, for any amount which a Lender or the L/C Issuer for any reason fails to pay indefeasibly to the Administrative Agent as required pursuant to Section 3.01(c)(ii) below; provided, however, that to the extent that a Loan Party pays an amount to the Administrative Agent pursuant to the preceding sentence, then upon request of the Borrower, the Administrative Agent shall use commercially reasonable efforts to exercise its set-off rights described in the last sentence of Section 3.01(c)(ii) below to collect the applicable amount from the applicable Lender and shall pay the amount so collected to the Borrower net of any expenses incurred by the Administrative Agent in its efforts to collect from such Lender.

(ii)     Each Lender and the L/C Issuer shall, and does hereby, severally indemnify and shall make payment in respect thereof within ten (10) days after demand therefor, (A) the Administrative Agent against any Indemnified Taxes attributable to such Lender or the L/C Issuer (but only to the extent that any Loan Party has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Loan Parties to do so), (B) the Administrative Agent and the Loan Parties, as applicable, against any Taxes attributable to such Lender's failure to comply with the provisions of Section 11.06(d) relating to the maintenance of a Participant Register and (C) the Administrative Agent and the Loan Parties, as applicable, against any Excluded Taxes attributable to such Lender or the L/C Issuer, in each case, that are payable or paid by the Administrative Agent or a Loan Party in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate setting forth in reasonable detail a calculation of the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender and the L/C Issuer hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender or the L/C Issuer, as the case may be, under this Agreement or any other Loan Document against any amount due to the Administrative Agent under this clause (ii).

(d)     Evidence of Payments. As soon as practicable after any payment of Taxes by any Loan Party to a Governmental Authority, as provided in this Section 3.01, the Borrower shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of any return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(e)     Status of Lenders; Tax Documentation.

CHAR1\1498335v12

EHREN-WALIA 003590

(i)        Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrower and the Administrative Agent, at the time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrower or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, any Lender, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable Law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.   Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Sections 3.01(e)(ii)(A), (ii)(B) and (ii)(D) below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)        Without limiting the generality of the foregoing, in the event that the Borrower is a U.S. Person,

(A)        any Lender that is a U.S. Person shall deliver to the Borrower and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B)        any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), whichever of the following is applicable:

(1)        in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed copies of IRS Form W-8BEN-E (or W-8BEN, as applicable) establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN-E (or W-8BEN, as applicable) establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2)        executed copies of IRS Form W-8ECI;

(3)        in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit L-1 to the effect that such

CHAR1\1498335v12

EHREN-WALIA 003591

Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code (a "U.S. Tax Compliance Certificate") and (y) executed copies of IRS Form W-8BEN-E (or W-8BEN, as applicable); or

(4)    to the extent a Foreign Lender is not the beneficial owner, executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN-E (or W-8BEN, as applicable), a U.S. Tax Compliance Certificate substantially in the form of Exhibit L-2 or Exhibit L-3, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided, that, if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit L-4 on behalf of each such direct and indirect partner;

(C)    any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies (or originals, as required) of any other form prescribed by applicable Law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable Law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made; and

(D)    if a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable Law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(iii)    Each Lender agrees that if any form or certification it previously delivered pursuant to this Section 3.01 expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so.

83

EHREN-WALIA 003592

(f)     <u>Treatment of Certain Refunds</u>.  Unless required by applicable Laws, at no time shall the Administrative Agent have any obligation to file for or otherwise pursue on behalf of a Lender or the L/C Issuer, or have any obligation to pay to any Lender or the L/C Issuer, any refund of Taxes withheld or deducted from funds paid for the account of such Lender or the L/C Issuer, as the case may be.  If any Recipient determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified by any Loan Party or with respect to which any Loan Party has paid additional amounts pursuant to this <u>Section 3.01</u>, it shall pay to such Loan Party an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by such Loan Party under this <u>Section 3.01</u> with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) incurred by such Recipient, as the case may be, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), <u>provided</u>, <u>that</u>, each Loan Party, upon the request of the Recipient, agrees to repay the amount paid over to such Loan Party (<u>plus</u> any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Recipient in the event the Recipient is required to repay such refund to such Governmental Authority.  Notwithstanding anything to the contrary in this <u>subsection (f)</u>, in no event will the applicable Recipient be required to pay any amount to such Loan Party pursuant to this <u>subsection (f)</u> the payment of which would place the Recipient in a less favorable net after-Tax position than such Recipient would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.  This <u>subsection (f)</u> shall not be construed to require any Recipient to make available its tax returns (or any other information relating to its taxes that it deems confidential) to any Loan Party or any other Person.

(g)     <u>Survival</u>.  Each party's obligations under this <u>Section 3.01</u> shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender or the L/C Issuer, and the termination of the Commitments and the repayment, satisfaction or discharge of all other Obligations.

Section 3.02    <u>**Illegality and Designated Lenders.**</u>

If any Lender determines that any Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for any Lender or its Lending Office to perform any of its obligations hereunder or to make, maintain or fund or charge interest with respect to any Credit Extension or to determine or charge interest rates based upon the Eurodollar Rate, or any Governmental Authority has imposed material restrictions on the authority of such Lender to purchase or sell, or to take deposits of, Dollars in the London interbank market, then, on notice thereof by such Lender to the Borrower through the Administrative Agent, (i) any obligation of such Lender to issue, make, maintain, fund or charge interest with respect to any such Credit Extension or continue Eurodollar Rate Loans or to convert Base Rate Loans to Eurodollar Rate Loans shall be suspended, and (ii) if such notice asserts the illegality of such Lender making or maintaining Base Rate Loans the interest rate on which is determined by reference to the Eurodollar Rate component of the Base Rate, the interest rate on which Base Rate Loans of such Lender shall, if necessary to avoid such illegality, be determined by the Administrative Agent without reference to the Eurodollar Rate component of the Base Rate, in each case until such Lender notifies the Administrative Agent and the Borrower that the circumstances giving rise to such determination no longer exist.  Upon receipt of such notice, (A) the Borrower shall, upon demand from such Lender (with a copy to the Administrative Agent), prepay or convert all Eurodollar Rate Loans of such Lender to Base Rate Loans (the interest rate on which Base Rate Loans of such Lender shall, if necessary to avoid such illegality, be determined by the Administrative Agent without reference to the Eurodollar Rate component of the Base Rate), either on the last day of the Interest Period therefor, if such Lender may lawfully continue to maintain such Eurodollar Rate Loans to such day, or immediately, if such Lender may not lawfully continue to

84

EHREN-WALIA 003593

maintain such Eurodollar Rate Loans and (B) if such notice asserts the illegality of such Lender determining or charging interest rates based upon the Eurodollar Rate, the Administrative Agent shall during the period of such suspension compute the Base Rate applicable to such Lender without reference to the Eurodollar Rate component thereof until the Administrative Agent is advised in writing by such Lender that it is no longer illegal for such Lender to determine or charge interest rates based upon the Eurodollar Rate.  Upon any such prepayment or conversion, the Borrower shall also pay accrued interest on the amount so prepaid or converted.

Section 3.03    **Inability to Determine Rates.**

(a)    If in connection with any request for a Eurodollar Rate Loan or a conversion to or continuation thereof, (i) the Administrative Agent determines that (A) Dollar deposits are not being offered to banks in the London interbank market for the applicable amount and Interest Period of such Eurodollar Rate Loan, or (B) adequate and reasonable means do not exist for determining the Eurodollar Rate for any requested Interest Period with respect to a proposed Eurodollar Rate Loan or in connection with an existing or proposed Base Rate Loan (in each case with respect to <u>clause (i)</u>, "<u>Impacted Loans</u>"), or (ii) the Administrative Agent or the Appropriate Lenders determine that for any reason the Eurodollar Rate for any requested Interest Period with respect to a proposed Eurodollar Rate Loan does not adequately and fairly reflect the cost to such Lenders of funding such Loan, the Administrative Agent will promptly so notify the Borrower and each Lender. Thereafter, (x) the obligation of the Lenders to make or maintain Eurodollar Rate Loans shall be suspended (to the extent of the affected Eurodollar Rate Loans or Interest Periods), and (y) in the event of a determination described in the preceding sentence with respect to the Eurodollar Rate component of the Base Rate, the utilization of the Eurodollar Rate component in determining the Base Rate shall be suspended, in each case until the Administrative Agent (upon the instruction of the Appropriate Lenders) revokes such notice.  Upon receipt of such notice, the Borrower may revoke any pending request for a Borrowing of, conversion to or continuation of Eurodollar Rate Loans (to the extent of the affected Eurodollar Rate Loans or Interest Periods) or, failing that, will be deemed to have converted such request into a request for a Borrowing of Base Rate Loans in the amount specified therein.

(b)    Notwithstanding the foregoing, if the Administrative Agent has made the determination described in <u>clause (a)(i)</u> of this <u>Section 3.03</u>, the Administrative Agent in consultation with the Borrower and the Appropriate Lenders, may establish an alternative interest rate for the Impacted Loans, in which case, such alternative rate of interest shall apply with respect to the Impacted Loans until (i) the Administrative Agent revokes the notice delivered with respect to the Impacted Loans under <u>clause (a)(i)</u> of this <u>Section 3.03</u>, (ii) the Administrative Agent or the Appropriate Lenders notify the Administrative Agent and the Borrower that such alternative interest rate does not adequately and fairly reflect the cost to such Lenders of funding the Impacted Loans, or (iii) any Lender determines that any Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for such Lender or its applicable Lending Office to make, maintain or fund Loans whose interest is determined by reference to such alternative rate of interest or to determine or charge interest rates based upon such rate or any Governmental Authority has imposed material restrictions on the authority of such Lender to do any of the foregoing and provides the Administrative Agent and the Borrower written notice thereof.

CHAR1\1498335v12

EHREN-WALIA 003594

823

Section 3.04    **Increased Costs; Reserves on Eurodollar Rate Loans.**

    (a)    <u>Increased Costs Generally</u>.  If any Change in Law shall:

        (i)    impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender (except any reserve requirement contemplated by <u>Section 3.04(d)</u>) or the L/C Issuer;

        (ii)    subject any Recipient to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in <u>clauses (b)</u> through <u>(d)</u> of the definition of Excluded Taxes and (C) Connection Income Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

        (iii)    impose on any Lender or the L/C Issuer or the London interbank market any other condition, cost or expense affecting this Agreement or Eurodollar Rate Loans made by such Lender or any Letter of Credit or participation therein;

and the result of any of the foregoing shall be to increase the cost to such Lender of making, converting to, continuing or maintaining any Loan (or of maintaining its obligation to make any such Loan), or to increase the cost to such Lender or the L/C Issuer of participating in, issuing or maintaining any Letter of Credit (or of maintaining its obligation to participate in or to issue any Letter of Credit), or to reduce the amount of any sum received or receivable by such Lender or the L/C Issuer hereunder (whether of principal, interest or any other amount) then, upon request of such Lender or the L/C Issuer, the Borrower will pay to such Lender or the L/C Issuer, as the case may be, such additional amount or amounts as will compensate such Lender or the L/C Issuer, as the case may be, for such additional costs incurred or reduction suffered.

    (b)    <u>Capital Requirements</u>.  If any Lender or the L/C Issuer determines that any Change in Law affecting such Lender or the L/C Issuer or any Lending Office of such Lender or such Lender's or the L/C Issuer's holding company, if any, regarding capital or liquidity requirements has or would have the effect of reducing the rate of return on such Lender's or the L/C Issuer's capital or on the capital of such Lender's or the L/C Issuer's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans made by, or participations in Letters of Credit or Swingline Loans held by, such Lender, or the Letters of Credit issued by the L/C Issuer, to a level below that which such Lender or the L/C Issuer or such Lender's or the L/C Issuer's holding company could have achieved but for such Change in Law (taking into consideration such Lender's or the L/C Issuer's policies and the policies of such Lender's or the L/C Issuer's holding company with respect to capital adequacy), then from time to time the Borrower will pay to such Lender or the L/C Issuer, as the case may be, such additional amount or amounts as will compensate such Lender or the L/C Issuer or such Lender's or the L/C Issuer's holding company for any such reduction suffered.

    (c)    <u>Certificates for Reimbursement</u>.  A certificate of a Lender or the L/C Issuer setting forth the amount or amounts necessary to compensate such Lender or the L/C Issuer or its holding company, as the case may be, as specified in <u>subsection (a)</u> or <u>(b)</u> of this <u>Section 3.04</u> and delivered to the Borrower shall be conclusive absent manifest error.  The Borrower shall pay such Lender or the L/C Issuer, as the case may be, the amount shown as due on any such certificate within ten (10) days after receipt thereof.

CHAR1\1498335v12

EHREN-WALIA 003595

(d)     <u>Reserves on Eurodollar Rate Loans</u>.  The Borrower shall pay to each Lender, (i) as long as such Lender shall be required to maintain reserves with respect to liabilities or assets consisting of or including eurocurrency funds or deposits, additional interest on the unpaid principal amount of each Eurodollar Rate Loan equal to the actual costs of such reserves allocated to such Loan by such Lender (as determined by such Lender in good faith, which determination shall be conclusive), and (ii) as long as such Lender shall be required to comply with any reserve ratio requirement or analogous requirement of any central banking or financial regulatory authority imposed in respect of the maintenance of the Commitments or the funding of the Loans, such additional costs (expressed as a percentage per annum and rounded upwards, if necessary, to the nearest five decimal places) equal to the actual costs allocated to such Commitment or Loan by such Lender (as determined by such Lender in good faith, which determination shall be conclusive), which in each case shall be due and payable on each date on which interest is payable on such Loan; <u>provided</u>, <u>that</u>, the Borrower shall have received at least ten (10) days' prior notice (with a copy to the Administrative Agent) of such additional interest or costs from such Lender.  If a Lender fails to give notice ten (10) days prior to the relevant Interest Payment Date, such additional interest shall be due and payable ten (10) days from receipt of such notice.

(e)     <u>Delay in Requests</u>.  Failure or delay on the part of any Lender or the L/C Issuer to demand compensation pursuant to the foregoing provisions of this <u>Section 3.04</u> shall not constitute a waiver of such Lender's or the L/C Issuer's right to demand such compensation; <u>provided</u>, <u>that</u>, the Borrower shall not be required to compensate a Lender or the L/C Issuer pursuant to the foregoing provisions of this <u>Section 3.04</u> for any increased costs incurred or reductions suffered more than nine (9) months prior to the date that such Lender or the L/C Issuer, as the case may be, notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's or the L/C Issuer's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine (9) month period referred to above shall be extended to include the period of retroactive effect thereof).

Section 3.05     <u>Compensation for Losses.</u>

Upon demand of any Lender (with a copy to the Administrative Agent) from time to time, the Borrower shall promptly compensate such Lender for and hold such Lender harmless from any loss, cost or expense incurred by it as a result of:

(a)     any continuation, conversion, payment or prepayment of any Loan other than a Base Rate Loan on a day other than the last day of the Interest Period for such Loan (whether voluntary, mandatory, automatic, by reason of acceleration, or otherwise);

(b)     any failure by the Borrower (for a reason other than the failure of such Lender to make a Loan) to prepay, borrow, continue or convert any Loan other than a Base Rate Loan on the date or in the amount notified by the Borrower; or

(c)     any assignment of a Eurodollar Rate Loan on a day other than the last day of the Interest Period therefor as a result of a request by the Borrower pursuant to <u>Section 11.13</u>;

including any loss of anticipated profits and any loss or expense arising from the liquidation or reemployment of funds obtained by it to maintain such Loan or from fees payable to terminate the deposits from which such funds were obtained.  The Borrower shall also pay customary administrative fees charged by such Lender in connection with the foregoing.

CHAR1\1498335v12

EHREN-WALIA 003596

825

For purposes of calculating amounts payable by the Borrower to the Lenders under this <u>Section 3.05</u>, each Lender shall be deemed to have funded each Eurodollar Rate Loan made by it at the Eurodollar Rate for such Loan by a matching deposit or other borrowing in the London interbank market for a comparable amount and for a comparable period, whether or not such Eurodollar Rate Loan was in fact so funded.

Section 3.06    <u>**Mitigation Obligations; Replacement of Lenders.**</u>

(a)    <u>Designation of a Different Lending Office</u>.  If any Lender requests compensation under <u>Section 3.04</u>, or requires the Borrower to pay any Indemnified Taxes or additional amounts to any Lender, the L/C Issuer, or any Governmental Authority for the account of any Lender or the L/C Issuer pursuant to <u>Section 3.01</u>, or if any Lender gives a notice pursuant to <u>Section 3.02</u>, then at the request of the Borrower, such Lender or the L/C Issuer shall, as applicable, use reasonable efforts to designate a different Lending Office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender or the L/C Issuer, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to <u>Section 3.01</u> or <u>Section 3.04</u>, as the case may be, in the future, or eliminate the need for the notice pursuant to <u>Section 3.02</u>, as applicable, and (ii) in each case, would not subject such Lender or the L/C Issuer, as the case may be, to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender or the L/C Issuer, as the case may be.  The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender or the L/C Issuer in connection with any such designation or assignment.

(b)    <u>Replacement of Lenders</u>.  If any Lender requests compensation under <u>Section 3.04</u>, or if the Borrower is required to pay any Indemnified Taxes or additional amounts to any Lender or any Governmental Authority for the account of any Lender pursuant to <u>Section 3.01</u> and, in each case, such Lender has declined or is unable to designate a different lending office in accordance with <u>Section 3.06(a)</u>, the Borrower may replace such Lender in accordance with <u>Section 11.13</u>.

Section 3.07    <u>**Survival.**</u>

All of the Borrower's obligations under this <u>Article III</u> shall survive termination of the Aggregate Commitments, repayment of all other Obligations hereunder, resignation of the Administrative Agent and the Facility Termination Date.

**ARTICLE IV**

**CONDITIONS PRECEDENT TO CREDIT EXTENSIONS**

Section 4.01    <u>**Conditions of Initial Credit Extension.**</u>

The effectiveness of this Agreement and the obligation of the L/C Issuer and each Lender to make its initial Credit Extension hereunder is subject to satisfaction of the following conditions precedent:

(a)    <u>Execution of Loan Documents</u>.  The Administrative Agent shall have received counterparts of this Agreement and the other Loan Documents, each properly executed by a Responsible Officer of the signing Loan Party and, in the case of this Agreement, by each Lender.

(b)    <u>Organization Documents, Resolutions, Etc.</u>  The Administrative Agent shall have received the following, each of which shall be originals or facsimiles (followed promptly by

88

EHREN-WALIA 003597

826

originals), in form and substance reasonably satisfactory to the Administrative Agent and its legal counsel:

(i)       copies of the Organization Documents of each Loan Party certified to be true and complete as of a recent date by the appropriate Governmental Authority of the jurisdiction of its organization or incorporation, where applicable, and certified by a Responsible Officer of such Loan Party to be true and correct as of the Closing Date;

(ii)      such certificates of resolutions or other action, incumbency certificates and/or other certificates of Responsible Officers of each Loan Party as the Administrative Agent may require evidencing the identity, authority and capacity of each Responsible Officer thereof authorized to act as a Responsible Officer in connection with this Agreement and the other Loan Documents to which such Loan Party is a party; and

(iii)     such documents and certifications as the Administrative Agent may require to evidence that each Loan Party is duly organized or formed, and is validly existing, in good standing and qualified to engage in business in its jurisdiction of organization or incorporation.

(c)      <u>Legal Opinions of Counsel</u>.  The Administrative Agent shall have received an opinion or opinions of counsel for the Loan Parties, dated the Closing Date and addressed to the Administrative Agent and the Lenders, in form and substance reasonably acceptable to the Administrative Agent.

(d)      <u>Financial Statements</u>.  The Administrative Agent and the Arrangers shall have received (i) the Audited Financial Statements; (ii) unaudited consolidated financial statements of Holdings and its Subsidiaries for the fiscal quarters ended March 31, 2016, June 30, 2016 and September 30, 2016, including balance sheets and statements of income or operations, shareholders' equity and cash flows (the "<u>Interim Financial Statements</u>"); (iii) forecasts prepared by management of the Borrower, for the Borrower and its Subsidiaries on an annual basis for each of the five (5) full fiscal years of the Borrower ending after the Closing Date; and (iv) a *pro forma* Consolidated balance sheet and related statements of income and cash flows of the Borrower and its Subsidiaries as of and for the twelve (12) month period ending on the last day of the most recently completed Measurement Period ended prior to the Closing Date, prepared after giving effect to the Transaction as if the Transaction had occurred at the beginning of such period (the "<u>Pro Forma Financial Statements</u>").

(e)      <u>No Company Material Adverse Change</u>.  There shall not have occurred since November 24, 2016 any event or condition that has had or could be reasonably expected, either individually or in the aggregate, to have a Company Material Adverse Effect.

(f)      <u>Collateral Deliverables</u>.  The Administrative Agent shall have received, in form and substance reasonably satisfactory to the Administrative Agent:

(i)       (A) searches of UCC filings in the jurisdiction of incorporation or formation, as applicable, of each Loan Party and each jurisdiction where any Collateral is located or where a filing would need to be made in order to perfect the Administrative Agent's security interest in the Collateral, copies of the financing statements on file in such jurisdictions and evidence that no Liens exist other than Permitted Liens and (B) tax lien, judgment and bankruptcy searches;

89

EHREN-WALIA 003598

(ii)       searches of ownership of Intellectual Property in the appropriate governmental offices and duly executed notices of grant of security interest in the form required by the Collateral Documents as are necessary, in the Administrative Agent's sole discretion, to perfect the Administrative Agent's security interest in the Intellectual Property;

(iii)       completed UCC financing statements for each appropriate jurisdiction as is necessary, in the Administrative Agent's sole discretion, to perfect the Administrative Agent's security interest in the Collateral;

(iv)       to the extent required to be delivered pursuant to the terms of the Collateral Documents, stock or membership certificates evidencing Equity Interests pledged pursuant to the terms of the Collateral Documents, together with undated stock or transfer powers duly executed in blank;

(v)       to the extent required to be delivered pursuant to the terms of the Collateral Documents, all instruments, documents and chattel paper in the possession of any of the Loan Parties, together with allonges or assignments as may be necessary or appropriate to perfect the Administrative Agent's security interest in the Collateral; and

(vi)       copies of insurance policies, declaration pages, and certificates of insurance or insurance binders evidencing liability, casualty, property, terrorism and business interruption insurance meeting the requirements set forth herein or in the Collateral Documents or as required by the Administrative Agent;

provided, that, to the extent any security interest in any Collateral is or cannot be provided and/or perfected on the Closing Date (other than (x) the pledge and perfection of the security interests in equity securities of Holdings' Wholly Owned Subsidiaries that are Domestic Subsidiaries, and (y) assets with respect to which a Lien may be perfected by the filing of a UCC financing statement or the filing of a notices of grant of security interest in Intellectual Property with the United States Patent and Trademark Office or the United States Copyright Office) after the Loan Parties' use of commercially reasonable efforts to do so (but without undue burden or expense), then the provision and/or perfection of a security interest in such Collateral shall not constitute a condition precedent to the availability of the Credit Extensions under this Agreement on the Closing Date but instead shall be required to be delivered after the Closing Date pursuant to arrangements and timing to be mutually agreed by the Administrative Agent and the Borrower acting reasonably, but in any event not less than sixty (60) days after the Closing Date.

(g)       Officer's Certificate.  The Administrative Agent shall have received a certificate signed by a Responsible Officer of the Borrower certifying that (i) the conditions specified in Section 4.01(e), (i), (j), (k) and (l) have been satisfied, (ii) availability under the Revolving Facility, after giving effect to any Credit Extensions to be made on the Closing Date, shall be no less than $15,000,000, (iii) attached thereto are true and complete copies of the Seller Notes Documents, and (iv) attached thereto is a true and complete copy of the organizational structure of Holdings and its Subsidiaries on the Closing Date after giving effect to the Transaction.

(h)       Solvency Certificate.  The Administrative Agent shall have received a Solvency Certificate signed by the chief financial officer of the Borrower certifying that the Borrower and its Subsidiaries, on a Consolidated basis after giving effect to the Transaction, are Solvent.

EHREN-WALIA 003599

(i)    Conversion of Equity.  The Administrative Agent shall have received satisfactory evidence that substantially concurrently with the initial funding of the Credit Extensions under this Agreement on the Closing Date, the full amount outstanding under that certain Loan Agreement, dated as of August 30, 2016, among First United Health, LLC, a Delaware limited liability company, Paul Parmar, as individual as administrative agent, and Holdings has been exchanged for Equity Interests in Holdings or a Parent.

(j)    Representations and Warranties.  The representations and warranties of the Borrower and each other Loan Party contained in this Agreement or any other Loan Document, or which are contained in any document furnished at any time under or in connection herewith or therewith, shall be made on the Closing Date.  The Specified Acquisition Agreement Representations and the Specified Representations shall, in each case, be true and correct in all material respects (and in all respects if any such representation or warranty is already qualified by materiality or reference to material adverse effect) as of the Closing Date, both before and after giving effect to the Transaction.

(k)    Closing Date Equity Contribution.  The Closing Date Equity Contribution shall have been made prior to, or shall be made substantially concurrently with, the initial funding of the Credit Extensions under this Agreement on the Closing Date and shall be in an aggregate amount not less than forty-nine percent (49%) of the total funds necessary to consummate the Transaction; provided, that, after giving effect to the Transaction, the Sponsor shall own and control, directly or indirectly, at least fifty five percent (55%) of the outstanding Voting Stock of the Borrower.

(l)    Acquisition Agreement; Closing Date Acquisition.  The Acquisition Agreement (including, but not limited to, all schedules and exhibits thereto) shall be in full force and effect and shall not have been altered, amended or otherwise changed or supplemented or any condition therein waived in any manner that would be materially adverse to the Lenders without the prior written consent of the Arrangers (which consent shall not be unreasonably withheld or delayed); provided, that, it is understood and agreed that (i) the granting of any consent under the Acquisition Agreement that is not materially adverse to the interests of the Lenders will not otherwise constitute an amendment, modification or waiver; (ii)(A) any increase in the purchase price of the Closing Date Acquisition will be deemed not to be materially adverse to the Lenders so long as such increase is funded solely by an increase in the Closing Date Equity Contribution, and (B) any reduction in the purchase price of the Closing Date Acquisition shall not be deemed to be materially adverse to the interests of the Lenders so long as such reduction (1) does not exceed ten percent (10%) of the aggregate purchase price, and (2) is applied to reduce the Closing Date Equity Contribution and the Commitments on a *pro rata* basis such that the pro forma capitalization of the Transaction remains forty-nine percent (49%) equity and fifty-one percent (51%) debt; provided, further, that, after giving effect to any increase or reduction of the Closing Date Equity Contribution, the Sponsor shall own and control, directly or indirectly, at least fifty five percent (55%) of the Voting Stock of the Borrower; and (iii) any change to the definition of "Company Material Adverse Effect" in the Acquisition Agreement shall be deemed materially adverse to the Lenders.  The Closing Date Acquisition shall have been consummated in accordance with the Acquisition Agreement substantially concurrently with the initial funding of the Credit Extensions under this Agreement on the Closing Date.

(m)    Loan Notices.  The Administrative Agent shall have received Loan Notices with respect to the Loans to be made on the Closing Date and, to the extent any Eurodollar Rate Loans are to be made on the Closing Date, a Funding Indemnity Letter in connection with such Loan Notices.

91

EHREN-WALIA 003600

829

(n)      Due Diligence; PATRIOT Act.  So long as requested at least three (3) days prior to the Closing Date, the Administrative Agent and the Lenders shall have received all documentation and other information with respect to the Loan Parties that the Administrative Agent or such Lender reasonably determines is required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the PATRIOT Act.

(o)      Fees.  All fees and expenses earned, due and payable to the Arrangers, the Administrative Agent and the Lenders required to be paid on the Closing Date shall have been paid, and all expenses to be paid or reimbursed to the Administrative Agent and the Arrangers that have been invoiced at least two (2) Business Days in advance of the Closing Date shall have been paid (provided, that, such invoicing shall not thereafter preclude a final settling of accounts between the Borrower and the Administrative Agent).

Without limiting the generality of the provisions of the last paragraph of Section 9.03, for purposes of determining compliance with the conditions specified in this Section 4.01, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received notice from such Lender prior to the proposed Closing Date specifying its objection thereto.

The parties hereto acknowledge that (a) the proceeds of the initial Loans will be made available to Mergersub and used by Mergersub to pay a portion of the cash consideration required to consummate the Closing Date Acquisition by Mergersub and (b) upon consummation of the Closing Date Acquisition by Mergersub, Mergersub will cause Orion to (i) assume the obligations of Mergersub as Borrower in respect of this Agreement and the other Loan Documents pursuant to the Borrower Assignment, Assumption and Release and (ii) to execute and deliver an appropriate Note to each applicable Lender, whereupon Mergersub will be released by the Administrative Agent on behalf of the Lenders from its obligations as Borrower pursuant to the Borrower Assignment, Assumption and Release.  For purposes of satisfaction of the conditions precedent set forth in this Section 4.01 relating to Orion, Mergersub hereby agrees, upon consummation of the Closing Date Acquisition by Mergersub, Mergersub will cause Orion to deliver all documents and other matters required pursuant to this Section 4.01, and each of the Administrative Agent and Lenders agrees that as a result of such undertaking by Mergersub  the conditions precedent set forth in this Section 4.01 relating to Orion shall be deemed to have been satisfied.

Section 4.02      **Conditions to all Credit Extensions after the Initial Credit Extensions on the Closing Date.**

The obligation of each Lender and the L/C Issuer to honor any Request for Credit Extension after the initial Credit Extensions on the Closing Date is subject to the following conditions precedent:

(a)      Representations and Warranties.  The representations and warranties of the Borrower and each other Loan Party contained in this Agreement or any other Loan Document, or which are contained in any document furnished at any time under or in connection herewith or therewith, shall be true and correct in all material respects (and in all respects if any such representation or warranty is already qualified by materiality or reference to Material Adverse Effect) on and as of the date of such Credit Extension, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct in all material respects (and in all respects if any such representation or warranty is already qualified by materiality or reference to Material Adverse Effect) as of such earlier date, and except that for purposes of this Section 4.02, the representations and warranties contained in Sections 5.05(a), (b) and (d)(ii) shall be deemed to refer to the most recent statements furnished pursuant to Section

92

EHREN-WALIA 003601

6.01(a), Section 6.01(b) or Section 6.01(c) (and, with respect to Sections 5.05(a) and (b), to the statements of the Borrower rather than Holdings).

(b)    Default. No Default or Event of Default shall exist, or would result from such proposed Credit Extension or from the application of the proceeds thereof.

(c)    Request for Credit Extension. The Administrative Agent and, if applicable, the L/C Issuer or the Swingline Lender, shall have received a Request for Credit Extension in accordance with the requirements hereof.

Each Request for Credit Extension submitted by the Borrower shall be deemed to be a representation and warranty that the conditions specified in Sections 4.02(a) and (b) have been satisfied on and as of the date of the applicable Credit Extension.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES

Each Loan Party represents and warrants to the Administrative Agent and the Lenders, as of the date made or deemed made, that:

Section 5.01    Existence, Qualification and Power.

Each Loan Party and each of its Restricted Subsidiaries (a) is duly organized or formed, validly existing and, as applicable, in good standing under the Laws of the jurisdiction of its incorporation or organization, (b) has all requisite power and authority and all requisite governmental licenses, authorizations, consents and approvals to (i) own or lease its assets and carry on its business and (ii) execute, deliver and perform its obligations under the Loan Documents to which it is a party, and (c) is duly qualified and is licensed and, as applicable, in good standing under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license; except in each case referred to in clause (b)(i) or (c), to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect.

Section 5.02    Authorization; No Contravention.

The execution, delivery and performance by each Loan Party of each Loan Document to which such Person is or is to be a party have been duly authorized by all necessary corporate or other organizational action, and do not and will not (a) contravene the terms of any of such Person's Organization Documents, (b) conflict with or result in any breach or contravention of, or the creation of any Lien under, or require any payment to be made under (i) any Contractual Obligation to which such Person is a party or affecting such Person or the properties of such Person or any of its Restricted Subsidiaries or (ii) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Person or its property is subject, or (c) violate any Law, except in each case referred to in clause (b) or (c), to the extent such failure to do so could not reasonably be expected to have a Material Adverse Effect.

Section 5.03    Governmental Authorization; Other Consents.

No approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with (a) the execution, delivery or performance by, or enforcement against, any Loan Party of this Agreement or any other Loan Document, (b) the grant by any Loan Party of the Liens granted by it pursuant to the Collateral Documents,

CHAR1\1498335\12

EHREN-WALIA 003602

(c) the perfection or maintenance of the Liens created under the Collateral Documents (including the first priority nature thereof) or (d) the exercise by the Administrative Agent or any Lender of its rights under the Loan Documents or the remedies in respect of the Collateral pursuant to the Collateral Documents, other than (i) authorizations, approvals, actions, notices and filings which have been duly obtained, (ii) filings to perfect the Liens created by the Collateral Documents and (iii) those which if not obtained could not reasonably be expected to have a Material Adverse Effect.

Section 5.04    **Binding Effect.**

Each Loan Document has been duly executed and delivered by each Loan Party that is party thereto. Each Loan Document constitutes a legal, valid and binding obligation of each Loan Party that is party thereto, enforceable against each such Loan Party in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, fraudulent conveyance, moratorium, reorganization or similar laws and by equitable principles of general application.

Section 5.05    **Financial Statements; No Material Adverse Effect.**

(a)    Audited Financial Statements. The Audited Financial Statements (i) were prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein, (ii) fairly present the financial condition of Holdings and its Subsidiaries as of the date thereof and their results of operations, cash flows and changes in shareholder's equity for the period covered thereby in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein, and (iii) show all material indebtedness and other liabilities, direct or contingent, of Holdings and its Subsidiaries as of the date thereof, including liabilities for taxes, material commitments and Indebtedness.

(b)    Quarterly Financial Statements. The Interim Financial Statements (i) were prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein, and (ii) fairly present the financial condition of Holdings and its Subsidiaries as of the date thereof and their results of operations, cash flows and changes in shareholders' equity for the period covered thereby, subject, in the case of clauses (i) and (ii), to the absence of footnotes and to normal year-end audit adjustments.

(c)    Material Adverse Effect. Since November 24, 2016, there has been no event or circumstance, either individually or in the aggregate, that has had or could reasonably be expected to have a Material Adverse Effect.

(d)    Annual Business Plan and Budget.

(i)    The budget of the Borrower and its Subsidiaries delivered pursuant to Section 4.01(d)(iv) was prepared in good faith on the basis of the assumptions stated therein, which assumptions were believed by management of the Borrower to be reasonable in light of the conditions existing at the time of delivery of such budget, and represented, at the time of delivery, the Borrower's best estimate of its future financial condition and performance.

(ii)    The annual business plan and budget of the Borrower and its Subsidiaries delivered pursuant to Section 6.01(c) was prepared in good faith on the basis of the assumptions stated therein, which assumptions were believed by management of the Borrower to be reasonable in light of the conditions existing at the time of delivery of such

EHREN-WALIA 003603

annual business plan and budget, and represented, at the time of delivery, the Borrower's best estimate of its future financial condition and performance.

(e)     Pro Forma Financial Statements.  The Pro Forma Financial Statements present a good faith estimate of the financial position of the Borrower and its Subsidiaries on a Pro Forma Basis after giving effect to the Transaction.

Section 5.06     Litigation.

There are no actions, suits, proceedings, claims or disputes pending or, to the knowledge of the Loan Parties, threatened or contemplated, at law, in equity, in arbitration or before any Governmental Authority, by or against any Loan Party or any Restricted Subsidiary or against any of their properties or revenues that (a) purport to affect or pertain to this Agreement or any other Loan Document or any of the transactions contemplated hereby, or (b) either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

Section 5.07     No Default.

Neither any Loan Party nor any Restricted Subsidiary thereof is in default under or with respect to, or a party to, any Contractual Obligation that could, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.  No Default has occurred and is continuing or would result from the consummation of the transactions contemplated by this Agreement or any other Loan Document.

Section 5.08     Ownership of Property.

Each Loan Party and each of its Restricted Subsidiaries has good record and marketable title in fee simple to, or valid leasehold interests in, all real property necessary or used in the ordinary conduct of its business, except for such defects in title as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

Section 5.09     Environmental Compliance.

Except with respect to matters arising under Environmental Laws that would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect:

(a)     None of the properties currently or formerly owned or operated by any Loan Party or any of its Restricted Subsidiaries is listed or proposed for listing on the NPL or on the CERCLIS or any analogous foreign, state or local list or is adjacent to any such property.  Neither any Loan Party or any of its Restricted Subsidiaries, nor, to the knowledge of the Loan Parties, any other person, has operated any underground or above-ground storage tanks or any surface impoundments, septic tanks, pits, sumps or lagoons in which Hazardous Materials are being or have been treated, stored or disposed on any property currently owned or operated by any Loan Party or any of its Restricted Subsidiaries or on any property formerly owned or operated by any Loan Party or any of its Restricted Subsidiaries during the periods of such former ownership or operation,  (ii) to the knowledge of the Loan Parties, there is no asbestos or asbestos-containing material on any property currently owned or operated by any Loan Party or any of its Restricted Subsidiaries, and (iii) neither any Loan Party or any of its Restricted Subsidiaries, nor, to the knowledge of the Loan Parties, any other person, has released, discharged or disposed of any Hazardous Materials on any property currently or formerly owned or operated by any Loan Party or any of its Restricted Subsidiaries; and

95

EHREN-WALIA 003604

833

(b)      Neither any Loan Party nor any of its Restricted Subsidiaries is undertaking, and has not completed, either individually or together with other potentially responsible parties, any investigation or assessment or remedial or response action relating to any actual or threatened release, discharge or disposal of Hazardous Materials at any site, location or operation, either voluntarily or pursuant to the order of any Governmental Authority or the requirements of any Environmental Law.   Neither the Loan Parties or their Restricted Subsidiaries, nor, to the knowledge of the Loan Parties, any other Person, has generated, used, treated, handled or stored any Hazardous Materials at, or transported Hazardous Materials to or from, any property currently or formerly owned or operated by any Loan Party or any of its Restricted Subsidiaries except where such Hazardous Materials have been disposed of in a manner not reasonably expected to result in material liability to any Loan Party or any of its Restricted Subsidiaries.

Notwithstanding any other provision herein to the contrary, this Section 5.09 represents all of the Loan Parties' representations and warranties for matters arising under Environmental Laws.

Section 5.10     **Insurance.**

The properties of the Loan Parties and their respective Restricted Subsidiaries are insured with financially sound and reputable insurance companies not Affiliates of such Persons, in such amounts, with such deductibles and covering such risks as are customarily carried by companies engaged in similar businesses and owning similar properties in localities where the applicable Loan Party or the applicable Restricted Subsidiary operates.   The general liability, casualty, property, terrorism and business interruption insurance coverage of the Loan Parties as in effect on the Closing Date is outlined as to carrier, policy number, expiration date, type, amount and deductibles on Schedule 5.10 and such insurance coverage complies with the requirements set forth in this Agreement and the other Loan Documents.

Section 5.11     **Taxes.**

Each Loan Party and its Restricted Subsidiaries have filed all federal and all material state and local income tax returns and all other material tax returns and reports required to be filed, and have paid all federal, state and local income taxes and all other material taxes, assessments, fees and other governmental charges levied or imposed upon them or their properties, income or assets otherwise due and payable, except those which are being contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves have been provided in accordance with GAAP.   There is no proposed tax assessment against any Loan Party or any Restricted Subsidiary that would, if made, have a Material Adverse Effect, nor is there any tax sharing agreement applicable to any Loan Party or any Restricted Subsidiary.

Section 5.12     **ERISA Compliance.**

(a)      Except for any event, action or condition that has not had or could not be reasonably expected, either individually or in the aggregate, to have, a Material Adverse Effect, each Plan is in compliance with the applicable provisions of ERISA, the Code and other federal or state laws.   Each Pension Plan that is intended to be a qualified plan under Section 401(a) of the Code has received a favorable determination letter or is subject to a favorable opinion letter from the IRS to the effect that the form of such Plan is qualified under Section 401(a) of the Code and the trust related thereto has been determined by the IRS to be exempt from federal income tax under Section 501(a) of the Code, or an application for such a letter is currently being processed by the IRS.   To the knowledge of the Loan Parties, nothing has occurred that would prevent or cause the loss of such tax-qualified status.

CHAR1\1498335\12

EHREN-WALIA 003605

834

(b)    There are no pending or, to the knowledge of the Loan Parties, threatened claims, actions or lawsuits, or action by any Governmental Authority, with respect to any Plan that could reasonably be expected to have a Material Adverse Effect. There has been no prohibited transaction or violation of the fiduciary responsibility rules with respect to any Plan that has resulted or could reasonably be expected to result in a Material Adverse Effect.

(c)    Except for any event, action or condition that has not resulted in, or could not reasonably be expected, either individually or in the aggregate, to result in, material liability to the Borrower and its Subsidiaries, (i) no ERISA Event has occurred, and no Loan Party nor any ERISA Affiliate is aware of any fact, event or circumstance that could reasonably be expected to constitute or result in an ERISA Event with respect to any Pension Plan or Multiemployer Plan, (ii) as of the most recent valuation date for any Pension Plan, the funding target attainment percentage (as defined in Section 430(d)(2) of the Code) is sixty percent (60%) or higher and no Loan Party nor any ERISA Affiliate knows of any facts or circumstances that could reasonably be expected to cause the funding target attainment percentage for any such plan to drop below sixty percent (60%) as of the most recent valuation date, (iii) no Loan Party nor any ERISA Affiliate has incurred any liability to the PBGC other than for the payment of premiums, and there are no premium payments which have become due that are unpaid, (iv) neither the Borrower nor any ERISA Affiliate has engaged in a transaction that could be subject to Section 4069 or Section 4212(c) of ERISA, and (v) no Pension Plan has been terminated by the plan administrator thereof nor by the PBGC, and no event or circumstance has occurred or exists that could reasonably be expected to cause the PBGC to institute proceedings under Title IV of ERISA to terminate any Pension Plan.

Section 5.13    **Margin Regulations; Investment Company Act.**

(a)    Margin Regulations. The Borrower is not engaged, nor will it engage, principally or as one of its important activities, in the business of purchasing or carrying margin stock (within the meaning of Regulation U issued by the FRB), or extending credit for the purpose of purchasing or carrying margin stock. Following the application of the proceeds of each Borrowing or drawing under each Letter of Credit, not more than twenty-five percent (25%) of the value of the assets (either of the Borrower only or of the Borrower and its Restricted Subsidiaries on a Consolidated basis) subject to the provisions of Section 7.01 or Section 7.05 or subject to any restriction contained in any agreement or instrument between the Borrower and any Lender or any Affiliate of any Lender relating to Indebtedness and within the scope of Section 8.01(e) will be margin stock.

(b)    Investment Company Act. No Loan Party, Person Controlling any Loan Party, nor Subsidiary is or is required to be registered as an "investment company" under the Investment Company Act of 1940.

Section 5.14    **Disclosure.**

The Borrower has disclosed to the Administrative Agent and the Lenders all agreements, instruments and corporate or other restrictions to which it or any of its Restricted Subsidiaries or any other Loan Party is subject, and all other matters known to it, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect. No report, financial statement, certificate or other information furnished by or on behalf of any Loan Party to the Administrative Agent or any Lender in connection with the transactions contemplated hereby and the negotiation of this Agreement or delivered hereunder or under any other Loan Document (in each case as modified or supplemented by other information so furnished) contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading; provided, that, with respect to projected financial information and other forward-looking

EHREN-WALIA 003606

information, each Loan Party represents only that such information was prepared in good faith based upon assumptions believed by it to be reasonable at the time furnished (it being understood that such information is not to be viewed as fact, is subject to significant uncertainties and contingencies, many of which are beyond the control of the Loan Parties, and that no assurance can be given that any such projections will be realized, and that actual results may differ and that such differences may be material).

Section 5.15    **Compliance with Laws.**

Except with respect to Environmental Laws, which are governed exclusively in <u>Section 5.09</u>, each Loan Party and each Restricted Subsidiary thereof is in compliance with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its properties, except in such instances in which (a) such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted or (b) the failure to comply therewith, either individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.

Section 5.16    **Solvency.**

The Loan Parties are, on a consolidated basis, Solvent.  The Borrower and its Restricted Subsidiaries are, on a Consolidated basis, Solvent.

Section 5.17    **Sanctions Concerns; Anti-Corruption Laws; PATRIOT Act.**

(a)    <u>Sanctions Concerns</u>. No Loan Party, nor any Subsidiary, nor, to the knowledge of the Loan Parties and their Subsidiaries, any director, officer, employee, agent, affiliate or representative thereof, is an individual or entity that is, or is owned or controlled by any individual or entity that is (i) currently the subject or target of any Sanctions, (ii) included on OFAC's List of Specially Designated Nationals, HMT's Consolidated List of Financial Sanctions Targets and the Investment Ban List, or any similar list enforced by any other relevant sanctions authority or (iii) located, organized or resident in a Designated Jurisdiction.

(b)    <u>Anti-Corruption Laws</u>. The Loan Parties and their Subsidiaries have conducted their business in compliance in all material respects with the United States Foreign Corrupt Practices Act of 1977, the UK Bribery Act 2010 and other similar anti-corruption laws in other jurisdictions, and have instituted and maintained policies and procedures designed to promote and achieve compliance with such laws.

(c)    <u>PATRIOT Act</u>. Each Loan Party and each Subsidiary is in compliance in all material respects with (i) the Trading with the Enemy Act, as amended, and each of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) and any other enabling legislation or executive order relating thereto and (ii) the PATRIOT Act.

Section 5.18    **Subsidiaries; Equity Interests; Loan Parties.**

(a)    Set forth on <u>Schedule 5.18(a)</u>, is complete and accurate list as of the Closing Date: (i) all Subsidiaries, joint ventures and partnerships and other equity investments of the Loan Parties, (ii) the number of shares of each class of Equity Interests in each Subsidiary outstanding, (iii) the number and percentage of outstanding shares of each class of Equity Interests owned by the Loan Parties and their Subsidiaries, (iv) the class or nature of such Equity Interests (i.e. voting, non-voting, preferred, etc.), and (v) an indication as to whether such Subsidiary is an Excluded Subsidiary (and, if so, the type (i.e. an Immaterial Subsidiary) of such Excluded Subsidiary). The

98

EHREN-WALIA 003607

outstanding Equity Interests in all Restricted Subsidiaries are validly issued, fully paid and non-assessable and are owned free and clear of all Liens, except for Liens created under the Collateral Documents. There are no outstanding subscriptions, options, warrants, calls, rights or other agreements or commitments (other than stock options granted to employees or directors and directors' qualifying shares) of any nature relating to the Equity Interests of any Loan Party or any Restricted Subsidiary thereof, except as contemplated in connection with the Loan Documents. As of the Closing Date, there are no Unrestricted Subsidiaries.

(b)     Set forth on <u>Schedule 5.18(b)</u> is a complete and accurate list as of the Closing Date of each Loan Party's: (i) exact legal name, (ii) former legal names in the four (4) months prior to the Closing Date, if any, (iii) jurisdiction of its incorporation or organization, as applicable, (iv) type of organization, (v) jurisdictions in which such Loan Party is qualified to do business, (vi) chief executive office address, (vii) principal place of business address, (viii) U.S. federal taxpayer identification number, and (ix) organization identification number.

Section 5.19     <u>Collateral Representations.</u>

(a)     <u>Collateral Documents</u>. The provisions of the Collateral Documents are effective to create in favor of the Administrative Agent, for the benefit of the Secured Parties, a legal, valid and enforceable Lien on all right, title and interest of the respective Loan Parties in the Collateral described therein. Except for filings completed prior to the Closing Date and as contemplated hereby or by the Collateral Documents, no filing or other action will be necessary to perfect or protect such Liens.

(b)     <u>Intellectual Property</u>. Set forth on <u>Schedule 5.19(b)</u>, as of the Closing Date, is a list of all Intellectual Property registered or pending registration with the United States Copyright Office or the United States Patent and Trademark Office and owned by each Loan Party as of the Closing Date. Except for such claims and infringements that could not reasonably be expected to have a Material Adverse Effect, no claim has been asserted and is pending by any Person challenging or questioning the use of any Intellectual Property or the validity or effectiveness of any Intellectual Property, nor does any Loan Party know of any such claim, and, to the knowledge of the Loan Parties, the use of any Intellectual Property by any Loan Party or any of its Restricted Subsidiaries or the granting of a right or a license in respect of any Intellectual Property from any Loan Party or any of its Restricted Subsidiaries does not infringe on the rights of any Person. As of the Closing Date, none of the Intellectual Property owned by any of the Loan Parties or any of its Restricted Subsidiaries is subject to any licensing agreement or similar arrangement (other than non-exclusive outbound licenses entered into in the ordinary course of business) except as set forth on <u>Schedule 5.19(b)</u>.

(c)     <u>Properties</u>. Set forth on <u>Schedule 5.19(c)</u>, as of the Closing Date, is a list of all real property located in the United States that is owned or leased by any Loan Party (in each case, including (i) the name of the Loan Party owning (or leasing) such property, (ii) the number of buildings located on such property, (iii) the property address, (iv) the city, county, state and zip code which such property is located, and (v) a designation as to whether such real property is Mortgaged Property or Excluded Property).

Section 5.20     <u>Regulation H.</u>

No Mortgaged Property is a Flood Hazard Property unless the Administrative Agent shall have received the following: (a) the applicable Loan Party's written acknowledgment of receipt of written notification from the Administrative Agent (i) as to the fact that such Mortgaged Property is a Flood Hazard

EHREN-WALIA 003608

Property, and (ii) as to whether the community in which each such Flood Hazard Property is located is participating in the National Flood Insurance Program, (b) such other flood hazard determination forms, notices and confirmations thereof as reasonably requested by the Administrative Agent, and (c) copies of insurance policies or certificates of insurance of the applicable Loan Party evidencing flood insurance reasonably satisfactory to the Administrative Agent and naming the Administrative Agent as loss payee on behalf of the Lenders. All flood hazard insurance policies required hereunder have been obtained and remain in full force and effect, and the premiums thereon have been paid in full.

Section 5.21   **Compliance with Health Care Laws.**

With respect to all activities of the Loan Parties, including the services that each Loan Party provides:

(a)     Each Loan Party is in compliance with the all applicable Health Care Laws, except in such instances in which (i) the failure to comply is being contested in good faith by appropriate proceedings diligently conducted or (ii) the failure to comply therewith would not reasonably be expected to have a Material Adverse Effect.

(b)     Each Loan Party has all required material licenses, permits, certifications, authorizations and approvals of each Governmental Authority necessary to the conduct of its business, including without limitation any required under applicable Health Care Laws (collectively, "Health Care Permits").

(c)     No Loan Party, nor to the knowledge of such Loan Party, any employee, officer or director of such Loan Party, has received from any Governmental Authority notices of violations, warning letters, criminal proceeding notices or other enforcement actions, or investigations under any Health Care Laws, or other similar communication from any Governmental Authority alleging or asserting noncompliance in any material respect with any Health Care Laws.

(d)     No Loan Party, nor any officer, director, manager, employee or any other personnel of such Loan Party, (i) has now or, or, to the knowledge of any Loan Party, in the past, been subject to a corporate integrity agreement with the United States Department of Health and Human Services Office of the Inspector General or a similar agreement (e.g., deferred prosecution agreement) with any other Governmental Authority; or (ii) has been convicted of, or to the knowledge of any Loan Party, charged with, or investigated, for any violation of Health Care Laws or any requirements of Law, fraud, theft, embezzlement, breach of fiduciary responsibility, financial misconduct, or obstruction of an investigation, including without limitation any that might reasonably be expected to result in exclusion, suspension or debarment from Medicare or Medicaid. No Loan Party and no officer, director, manager, employee or other personnel of such Loan Party is excluded, suspended or debarred from participation, or is otherwise ineligible to participate, in any state or federal healthcare programs, including without limitation Medicare or Medicaid.

(e)     No Loan Party has, and to such Loan Party's knowledge, no officer, director, manager, employee or any other personnel of such Loan Party has, directly or indirectly, in violation of any Health Care Laws, made, agreed to make, received or agreed to receive, any contribution, gift, bribe, rebate, payoff, influence payment, kickback or other payment to any Person, regardless of form, whether in money, property or services, with the specific purpose of (i) obtaining favorable treatment in securing business for or in respect of such Loan Party in violation of Health Care Laws; (ii) paying for favorable treatment for business secured for or in respect of such Loan Party in violation of Health Care Laws; or (iii) inducing a referral of an individual to such Loan Party.

100

EHREN-WALIA 003609