1  judgement record.  So Orion was insolvent on May 25, 2017.

2         The fair consideration under Section 272 of DCL,

3  the Court has also found a question of fact as to whether or

4  not the consideration -- whether consideration was provided

5  and whether that consideration was fair for 272 purposes.

6  The Court has also found a question of fact as to whether or

7  not the defendants were operating in good faith at the time

8  that the transfer was made.  See Sardis v. Frankel, 113

9  A.D.3d 135, 141-142.

10        So for all of those reasons, both motions for

11 summary judgement have been denied.  And again, the motion

12 to strike as to the evidence, the Court has already ruled on

13 that.

14        The Court has also noted in the pleadings that the

15 parties have a serious disagreement about the impact of

16 Section 550 of the Bankruptcy Code.  550 is only triggered

17 once a transfer has been avoided.  I won't spend any time

18 talking about 550 because to this point no transfer has been

19 avoided so there is no reason to talk about who might

20 ultimately have liability for the transfer if it were set

21 aside.

22        I'm going to set a trial on the claim in the

23 adversary proceeding.  As I said, for Rule 56(g) purposes,

24 the facts that I've identified as undisputed are undisputed

25 for trial purposes.  The trial will be limited to the

1    matters on which the Court stated there to be genuine issues

2    of material fact.  The Court's intention is to set the

3    matter for trial on July 24th of this year so that the

4    matter can be tried this summer.  The Court will issue a

5    trial scheduling order consistent therewith.

6            Mr. Nolan, I'm going to ask you and Mr. Giuliano

7    to work on a short form of order denying both summary

8    judgment motions.  You don't need to repeat all of the

9    evidentiary rulings that I've made on the record, but they

10   will -- as I said, those evidentiary rulings will stand

11   should the same declarations and affidavits be submitted at

12   the time of trial, which I suspect they might well be.

13           All right?

14           MR. NOLAN:  Yes, Your Honor.  Thank you.

15           MR. GIULIANO:  Thank you, Your Honor.

16           THE COURT:  Thank you both.

17           THE COURT:  All right.  I'm going to turn now back

18   to 20-08049, Trustee v. Walia.  This too is an adversary

19   proceeding seeking recovery of certain transfers.  The

20   causes of action set out in the adversary proceeding are

21   core proceedings, which this Court may hear and determine

22   under Title 28, Section 157(b)(2) and the orders of

23   reference in effect in the Eastern District of New York and

24   is proper before this Court.

25           As with the prior adversary proceeding, these

# EXHIBIT B

Page 1

```
 1    UNITED STATES BANKRUPTCY COURT

 2    EASTERN DISTRICT OF NEW YORK

 3    Case No. 18-71748-ast

 4    Adv. Case No. 20-08042-ast

 5    - - - - - - - - - - - - - - - - - - - - - - - - - x

 6    In the Matter of:

 7

 8    ORION HEALTHCORP, INC.,

 9

10          Debtor.

11    - - - - - - - - - - - - - - - - - - - - - - - - - x

12    HOWARD M. EHRENBERG, IN HIS CAPACITY AS LIQUIDATING TRUSTEE

13    OF ORION HEALTHCORP, INC., et al.,

14                Plaintiffs,

15          v.

16    HOWARD SCHOOR,

17                Defendants.

18    - - - - - - - - - - - - - - - - - - - - - - - - - x

19

20

21

22

23

24

25
```

1843

Page 2

1                    United States Bankruptcy Court

2                    290 Federal Plaza

3                    Central Islip, New York 11722

4

5                    June 3, 2021

6                    10:11 AM

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21    B E F O R E :

22    HON ALAN S. TRUST

23    U.S. BANKRUPTCY JUDGE

24

25    ECRO:    UNKNOWN

1    HEARING re 43 Amended Notice of Motion/Presentment Filed by

2    Plaintiff Howard M Ehrenberg);

3

4    HEARING re 27 Motion for Summary Judgment Filed by Plaintiff

5    Howard M Ehrenberg)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde

Page 4

1    A P P E A R A N C E S :

2

3    PACHULSKI STANG ZIEHL & JONES LLP

4        Attorneys for the Trustee

5        780 Third Avenue, 34th Floor

6        New York, NY 10017

7

8    BY:  JEFF NOLAN

9        ILAN SCHART

10

11   PARLATORE LAW GROUP

12       Attorneys for 2 River Terrace

13       One World Trade Center, Suite 8500

14       New York, NY 10007

15

16   BY:  MARYANN HADDEN

17

18   ROSEBURG & PITTINSKY, LLP

19       Attorneys for Residential Board of Managers of

20       Riverhouse One Rockefeller Park Condominium

21       232 Madison Avenue, Suite 906

22       New York, NY 10016

23

24   BY:  LAWRENCE PIITTINSKY

25

Page 5

1    GIORDANO HALLERAN & CIESLA, P.C.

2         Attorneys for Howard Schoor

3         125 Half Mile Road, Suite 300

4         Red Bank, NJ 07701

5

6    BY:  DONALD CAMPBELL

7

8    ROSEN & ASSOCIATES, LLP

9         Attorneys for Arvind Walia

10        747 Third avenue, 20th Floor

11        New York, NY 10017

12

13   BY:  SANFORD ROSEN

14        PARIS GYPARAKIS

15

16   ALSO PRESENT TELEPHONICALLY:

17

18   JOSEPH ORBACH

19

20

21

22

23

24

25

Page 6

1                    P R O C E E D I N G S

2          CLERK:  Good morning.  I am Amy Tenorello, the

3    courtroom deputy for the Honorable Chief Judge Alan S.

4    Trust.  This hearing is being recorded.

5          THE COURT:  All right.  We'll take up.  Ms.

6    Tenorello, if you want to call the first two matters?

7          CLERK:  Oh, I'm sorry, Judge.  The first matter is

8    18-71748 Orion Healthcorp, Inc.

9          THE COURT:  I'm going to take appearances in the

10   main case on the sale motion as well as in adversary

11   proceeding 20-8051 which is on for status today, Ehrenburg

12   v. Sartison, et al., so who's appearing on those matters?

13         MR. SCHARF:  Sorry, I was on mute.  Good morning,

14   Your Honor.  It's Ilan Scharf and Jeff Nolan of Pachulski

15   Stang Ziehl and Jones on behalf of the Trustee.

16         MR. PITTINSKY:  Good morning, Judge.  Lawrence D.

17   Pattinsky, Roseburg and Pittinsky on behalf of non-party

18   board of managers of the Riverhouse Condominium.

19         MS. HADDEN:  Good morning, Your Honor.  Maryam

20   Hadden from Parlatore Law Group on behalf of 2 River Terrace

21   Apartment 12J LLC, one of the defendants in the adversary

22   and an interested party in the main case.

23         MR. LEV:  Good morning, Your Honor.  Daniel Lev,

24   Sulmeyer Kupetz.  I am general bankruptcy counsel for Howard

25   Ehrenburg, a liquidating trustee.  I will just be monitoring

Page 7

1   today and Mr. Nolan and Mr. Scharf will be handling the

2   hearing.

3           THE COURT: All right. Very well. Anyone else?

4   All right. So, before I take your arguments or positions on

5   the motion, let me outline some of the questions that the

6   Court has for the parties based upon the pleadings, based

7   upon some prior hearings on this matter.

8           My first question is always the optimistic

9   question, which is have you all reached either an overall

10  settlement of the adversary or at least a protocol

11  concerning the sale of the 2 River Terrace apartment?

12          MR. SCHARF: No, Your Honor.

13          THE COURT: Ms. Hadden?

14          MS. HADDEN: We have not, Your Honor. We are

15  still working on getting all of the personal property of the

16  manager of the LLC out of the apartment and we're in the

17  midst of selecting a second date for that.

18          But in terms of the sale of the apartment, no,

19  we're still on opposing ends.

20          THE COURT: All right. And so then, here are the

21  questions that the Court has, the other questions I suppose.

22          First, it does appear as raised by the 2 River

23  Terrace party in interest that as of right now there is a

24  non-final judgment that was entered in the adversary

25  proceeding which is now subject to what might be an

Page 8

1   interlocutory appeal to the district court.  It appears that

2   whoever has indicated that it has sought a stay pending

3   appeal but I don't see that on the CMECF docket.

4           So, let me first raise this to Mr. Scharf or Mr.

5   Nolan.  What is the Trustee's position on whether or not the

6   Court's order and judgment from back in March is

7   interlocutory?

8           MR. SCHARF:  Our position, Your Honor, is that the

9   judgment is interlocutory.  We'll brief that in full in

10  front of the district court within the next 12 days or so.

11          THE COURT:  All right.  And so, from this Court's

12  understanding, the purpose of seeking to determine a

13  judgment on appeal to be interlocutory is to have the appeal

14  dismissed.

15          And so, if the appeal is dismissed, where does

16  that then leave 2 River Terrace on attempting to challenge

17  whether or not the property, which is currently subject of

18  an interlocutory partial judgment, should be sold or not

19  before there's at least a final judgment or a final

20  appealable judgment?

21          MR. SCHARF:  Your Honor, I -- well, if there's no

22  appeal -- if the appeal is mooted out, I think they would

23  have to come back before Your Honor and seek some further

24  injunctive relief that Your Honor may or may not grant based

25  on whatever facts they can adduce to prevent the sale of the

Page 9

1    property.

2            THE COURT:  Wouldn't that then speak in favor of

3    not going forward and allowing the trustee -- the

4    liquidating trustee to sell the property now?

5            MR. SCHARF:  Well, we don't think that that would

6    have any chance of -- a reasonable likelihood or chance of

7    success, Your Honor.  And in addition any relief granted to

8    Mr. Parmar, either with respect to a stay pending appeal or

9    future injunctive relief should absolutely be conditioned on

10   his first posting a bond in the -- in the full amount and

11   value of this property, and second paying the arrears and

12   ongoing expenses that are due to the condo board that caused

13   this to become essentially a wasting asset which is I know

14   unusual for real estate, but given the arrears and ongoing

15   losses and expenses associated with this apartment, it's

16   only appropriate that any relief granted to Mr. Parmar be

17   conditioned on at least -- at the very least a bond and

18   payment of the arrears.

19           THE COURT:  All right.  Thank you, Ms. Hadden,

20   what is 2 River Terrace's position on those issues?

21           MS. HADDEN:  Addressing first the question of

22   whether the judgment is interlocutory and what the effect of

23   that would be if the appeal is dismissed for that reason,

24   and it's in fact for that reason that we initially did not

25   file for stay under Rule 8007.

Page 10

1          We were aware of the Trustee's position that the

2    order -- that the Court's order granting -- or transferring

3    ownership of the apartment to the Trustee was an

4    interlocutory order.

5          Based on that, it was our position that it was

6    untimely for the Trustee to be attempting to sell it.  If

7    the Trustee doesn't finally, for lack of a better term, own

8    the apartment, the sale of the apartment would be

9    injudicious to say the least, and it certainly puts Mr.

10   Parmar and more essentially the LLC in a position where if

11   the apartment is sold, at that point obviously, as the Court

12   is well aware under the Bankruptcy Code, there would be no

13   possibility of appeal at that particular sale.  Once the

14   asset -- once the real estate is sold, the real estate is

15   gone.  There's no appellate remedy.

16          So, we're in a situation where we have appealed

17   what we believed to be a final order, the Trustee believed

18   not to be a final order and it to be a interlocutory order,

19   and I think at this point it's premature to attempt to sell

20   the apartment when that issue is still outstanding.

21          If the order is final, then it is appealable and

22   at that point the appeal can go forward and either we

23   prevail or we don't.  If it's not final, then we're in a

24   scenario where we would be asking for some form of stay or

25   relief to protect the asset, because it is, as the Court is

Page 11

1    aware, a unique piece of property.

2           Every piece of property is unique, and you know,

3    finding another apartment or another premises that meets

4    these same specifications is not something that's either

5    easily done or even possibly done under the law.

6           So, in that scenario, I'm, you know, not taking a

7    position one way or the other as to the Trustee's

8    application that Mr. Parmar set forth a bond.  I honestly

9    don't know what his financial ability to do that is or what

10   the bond amount that the Court would set would be, but that

11   certainly is something that we would endeavor to do if the

12   Court were to require it of us.

13          And in that case, presuming that we were able to

14   do it, we would be doing it to attempt to protect the LLC's

15   sole asset from what at this point is at least arguably not

16   a final determination.

17          THE COURT:  And what about the issue that, one, it

18   is in a sense a wasting asset, more because there are costs

19   and expenses of upkeep, maintenance, board fees, etcetera,

20   being incurred that no one is paying, which Mr. Pittinsky

21   has been both quite vocal and quite temperate about on

22   behalf of his client in these proceedings, and it appears

23   that since an agreement was reached to move out the personal

24   property, nobody is living there?

25          MS. HADDEN:  It's correct that nobody is living

Page 12

1    there, and in fact no one has been able to live there over

2    the last couple of years because -- and Mr. Pittinsky and I

3    are on opposite sides about this issue as well, but it has

4    been our client's position and experience that whenever he

5    would attempt to go to the building, he was refused access

6    to the building.

7              Obviously at this point I'm speaking before the

8    Court's transfer of ownership to the Trustee.  For that

9    reason -- and I see Mr. Pittinsky shaking his head, I'm well

10   aware and I will certainly put on the record that he has

11   informed me that that is not the case.

12             Again, it's yet another thing that we can work oit

13   in mitigation I suppose.  But Mr. Parmar has, because of the

14   denial of access, been unable to use the apartment himself

15   over the last couple of years, since 2018, and it was for

16   that reason that the charges were not being paid initially.

17             It has been his position, and it was the position

18   of a case that we filed in state court and have suspended

19   while all of these other proceedings are being worked out,

20   that the denial of access by the board was depriving him of

21   his real property, and it was his position that the amount

22   of deprivation, the cost of that deprivation, actually

23   outweighed the cost of the fees and charges owed to the

24   board and he was seeking an offset in that state court

25   proceeding.

Page 13

1       Again, that proceeding has been completely put on

2  hold while all of these other matters are ongoing.

3       THE COURT:  And on the subject of things that are

4  on hold, and again this has been discussed at several

5  hearings, all other things be equal, the condo board has had

6  a judgment that they've been very politely holding off on

7  executing on which where they -- did they go forward on that

8  sale, then that property is going to be lost to the estate.

9       I don't think that issue has been lost on any of -

10  - any of the parties.  I doubt that 2 River Terrace's

11  position is that execution on the state court judgment and

12  whatever value that would bring would be higher or better

13  than at least the current $4.8 million offer in front of

14  this Court.

15       MS. HADDEN:  No, that's certainly not anything

16  that I think anybody could contend.  Although the judgment

17  on behalf of the board is substantial, it's certainly

18  significantly less than the 4.8 million.

19       THE COURT:  So, putting procedure aside for a

20  moment, I'm not shelving it because it is one of the things

21  that we do as trial court judges, but putting procedure

22  aside for the moment, has 2 River Terrace made a decision as

23  to whether or not monetizing these assets and paying the

24  judgment that exists and avoiding continued accrual of costs

25  and expenses of maintenance and upkeep, etcetera, is just

1    better than continuing to fight about maintaining the

2    property as opposed to monetizing it and fighting over who

3    gets the money.

4           MS. HADDEN:  At this point, my client's -- I

5    apologize -- my client's manager is still seeking to

6    preserve the asset itself as opposed to monetizing the

7    asset.

8           Can I say that that will always be the case?  No,

9    I can't, but that's still his current position.

10          THE COURT:  All right.  Mr. Pittinsky, I know

11   you're here because you're here and don't necessarily have a

12   direct dog in the hut, but do you want to weigh in on either

13   the sale issue -- well, on the main case sale issue or

14   anything about the adversary on status?

15          MR. PITTINSKY:  Your Honor, not too much to say

16   other than, yes, the board is now getting extremely antsy as

17   the arrears continue to build.  We do have the sheriff on

18   hold.

19          We obviously deny any claim of lack of access to

20   the LLC.  I just want to point out to the Court and Ms.

21   Hadden whatever Mr. Parmar may think, this unit is owned by

22   a limited liability company.  Nobody from that company has

23   been denied access.  No one who was authorized on behalf of

24   that company has ever been denied access, and she can speak

25   to her partner about that.

Case 8-20-08042-ast   Doc 13-16   Filed 05/02/25   Entered 05/02/25 16:58:35
Case 8-20-08042-ast   Doc 48-1   Filed 06/17/21   Entered 06/17/21 19:50:10

Page 15

1       We support monetizing this, sell it, fight about

2   the money, pay us, we get a new owner in so we have our

3   common charges being paid going forward.  They defaulted

4   after knowing about the supreme court action.  This is all

5   after-the-fact arguments on the apartment.

6       We strongly request the Court permit the sale to

7   go forward, and yes, I could say that if it was sold at the

8   sheriff's sale, the sale price is going to be substantially

9   less.  Even if it's bid over the judgment amount, it's not

10  going to reach the amount that the Trustee has been able to

11  secure on a private sale.

12      THE COURT:  Thank you.

13      MR. SCHARF:  Your Honor, if I may respond to a

14  couple of the points here?

15      THE COURT:  Sure.

16      MR. SCHARF:  The notion that mister -- that the

17  defendant -- that the LLC did not seek a stay pending appeal

18  because the appeal might be interlocutory based on our

19  contention is frankly absurd.

20      They knew this apartment was going to be sold

21  weeks ago.  It's self-evident that a Trustee who's charged

22  with selling an apart -- with liquidating an estate is not

23  going to let an apartment lie fallow, and we filed the sale

24  motion well before there was a request for a stay.

25      I would have expected a request for a stay pending

Page 16

1    appeal on the judgment, not the underlying sale but on the

2    judgment being enforced to be filed within -- at the same

3    time the appeal was filed or before the appeal was filed and

4    certainly to see one filed if that was their position as of

5    the -- as of the filing of the sale motion.

6            I expect, and this is my conjecture, that they

7    didn't do so because the conditions that would be associated

8    with such a stay would be something like posting a bond or -

9    - and paying arrears so that there is no further

10   depreciation to the asset.

11           I'll also note, Your Honor, when we do talk about

12   depreciation -- or sorry the losses incurred in the asset on

13   the ongoing arrears, the Trustee is making current payments

14   of the ongoing charges.  So, there is that loss.  It's a

15   direct expense being covered by the Trustee since the

16   Trustee took possession of the apartment.

17           And in addition, Your Honor, we have risk here.

18   It's an unoccupied apartment.  There was some minor damage,

19   scratches, holes, things like that, missing knobs from -- or

20   handles from a refrigerator, minor damage.

21           There's a risk there could be further damage.  We

22   could have a flood in that apartment.  We could all be

23   talking about an insurance claim (indiscernible) somebody

24   liable for fixing an apartment rather than monetizing an

25   apartment down the road.

Page 17

```
 1              So, it's not just the risk of ongoing expenses.
 2    There's a risk of something catastrophic happening, and
 3    frankly that's all on the Trustee given where we sit with
 4    the judgment, Your Honor.
 5              THE COURT:  All right.  Thank you.  The sale
 6    motion itself, the -- I want to know who the witnesses would
 7    be because the Court's -- what the Court's contemplating is
 8    I -- I hate to put the practical ahead of the metaphysical
 9    but it would seem from a practical standpoint that it would
10    be in everybody's best interest to monetize the asset and
11    fight over the proceeds; 2 River Terrace disagrees, and
12    that's fine.  They're certainly entitled to do so.
13              If I held an evidentiary hearing on the sale
14    motion, I presume the Trustee's witnesses would be Mr.
15    Stanton, the broker who's provided a declaration, and Mr.
16    Ehrenburg, the Trustee?
17              MR. SCHARF:  I believe that would be correct, Your
18    Honor.
19              THE COURT:  All right.  Ms. Hadden, I didn't
20    notice --
21              MR. SCHARF:  And Your Honor, potentially Mr.
22    Pittinsky's client on the losses and ongoing expenses in the
23    apartment, and any issues raised by Ms. Hadden.  I'm not
24    putting your client on the spot, Mr. Pittinsky, but those
25    were issues that were raised.
```

Page 18

1  THE COURT:  Ms. Hadden, I didn't notice any

2  affirmative witness declarations in the opposition.  Is 2

3  River Terrace contemplating putting on any witnesses in an

4  evidentiary hearing on a sale?

5  MS. HADDEN:  In the event of an evidentiary

6  hearing, Your Honor, I'd have to discuss it with my co-

7  counsel on the criminal matter, but I would anticipate at

8  least the possibility of calling Mr. Parmar for at least

9  limited testimonial purposes.

10  THE COURT:  What about on the not enough money

11  aspect?  What I'm also trying to figure out is, is 2 River

12  Terrace contending that the purchase price is not fair

13  consideration?

14  MS. HADDEN:  Yes.

15  THE COURT:  All right.  Do you all have an expert

16  lined up to testify about the value of the unit or to

17  challenge whether or not the sale and marketing process was

18  adequate?

19  MS. HADDEN:  I do not, but we would retain one.

20  THE COURT:  All right.  Mr. Pittinsky, this is the

21  part where you again get to talk on behalf of your own

22  client.  Do you -- would the board contemplate putting on

23  evidence at a hearing on whether or not the sale

24  consideration is adequate and the process and procedures

25  that the Trustee -- liquidating Trustee went through were

Page 19

1    appropriate for a sale of this type?

2              MR. PITTINSKY:  Your Honor, we would not really

3    take a position, I believe.  I would have to double check

4    with the board itself.  I don't have a client; I have a

5    board.

6              From my point of view, the price is not something

7    we would object to and the procedure is not something the

8    condominium board would object to.  If we were to do

9    objections, we would've put in papers on the motion itself.

10             THE COURT:  All right.  I'm not sure that whether

11   or not some person was told you can't go in there two years

12   ago or 17 months ago is really probative on whether or not -

13   - what the Court would be looking at, which is whether or

14   not the process the Trustee -- liquidating Trustee has gone

15   through in setting up a private sale process, whether or not

16   the property's been adequately marketed, your typical 363

17   type of issues.

18             Again, if 2 River Terrace wants to bring those in,

19   I take evidentiary objections as the question is asked

20   before the answer is given, but I don't really know that

21   that -- who shot John is particularly probative for me at

22   this -- at this stage.  From the Court's vantage point it's

23   really more of was the sale process -- was the sale process

24   appropriate and is the amount obtained as a result a fair

25   sales price.

1          On the procedural side of it, it seems to the

2     Court in managing my docket that the best way to go about

3     this is if -- if the liquidating Trustee wants the partial

4     judgment to be rendered a final judgement under Rule 54,

5     then the trustee can file papers and ask the Court to do

6     that.

7          That takes this dance over whether it's an

8     interlocutory appeal out if the Court were to grant it.  It

9     would again seem -- I'm not ruling on a motion that's not in

10    front of me, but since 2 River Terrace would like the

11    opportunity to challenge this Court's ruling on appeal, and

12    they're more than welcome to do so, it would seem

13    procedurally the only way to actually do that is to render

14    that judgment final, which I can do under Rule 54 but won't

15    do until somebody actually asks me to do so.

16         If 2 River Terrace wants a stay pending appeal,

17    which they're certainly entitled to ask for, that should be

18    before me and then as you all know the trial court makes the

19    first determination on whether and under what circumstances

20    to grant a stay pending appeal, and then that can be taken

21    to the district court.  There's a certain synchronicity

22    between the two of those as they then tie into whether or

23    not the Court would approve the sale and approve the sale at

24    the price which has been advanced by the Trustee.  I don't

25    see that -- I'm not a wine connoisseur, but like -- but what

Page 21

1    I'm told about bottles of wine is some get better with age,

2    but litigation generally does not.

3           I don't -- I don't see that there is a need --

4    because these issues have been percolating for some time, I

5    don't see the reason to put any significant delay on these

6    issues, because I think the parties are fairly well-informed

7    and advised of what the disputes will be.

8           I'm prepared to give you all both an evidentiary

9    hearing on the sale motion as well as procedural hearings on

10   a 54B motion as well as a stay pending appeal motion on June

11   14th.  That's about 10 days from now.  And again, the issues

12   have been fairly well known and laid out.  I don't see a

13   reason to further delay this, and I have a standing protocol

14   and -- both a virtual platform standing protocol for how I

15   take witness testimony and the who can be in the room when

16   it happens kind of things.

17          As I think you all know from other practice before

18   me, I take all of my direct testimony from party-controlled

19   witnesses by affidavits exchanged in advance and then the

20   parties present here virtually for cross-examination.

21          That's how I'll run this trial.  I typically

22   require those affidavits to be exchanged seven days in

23   advance and then the supporting exhibits provided to the

24   Court in a format that my order will set out.

25          I would anticipate following essentially that

Page 22

1    program.  I'll probably give you a little flex on the

2    affidavits seven days ahead of time, because there is no --

3    the only affidavit that I think the Court has is Mr.

4    Stanton's.

5           But then have you all, you know, ready to try

6    these issues or argue these issues on June 14th at 2:00

7    Eastern Standard Time.  Mr. Scharf, will the Trustee be

8    ready?

9           MR. SCHARF:  The Trustee can be ready.  He is not

10   in the courtroom right now.  Mr. Lev may know his schedule

11   better.

12          MR. LEV:  Your Honor, I've been texting Mr.

13   Ehrenburg, who unfortunately has another conflict and he

14   said he is available on June 14th.

15          THE COURT:  All right.  Ms. Hadden, will 2 River

16   Terrace be ready?

17          MR. LEV:  Ms. Hadden's on mute.

18          THE COURT:  Oh, Ms. Hadden.

19          MS. HADDEN:  Sorry about that.  I actually have a

20   conflict the afternoon of the 14th.  Is it possible to do

21   the 15th or the 16th?  Almost any other day that week I can

22   do.  Just the 14th I'm already in another courtroom at that

23   time.

24          THE COURT:  Mr. Lev, will you check with Mr.

25   Ehrenburg on June 16th?

Page 23

1              MR. LEV:  What time, Your Honor?

2              THE COURT:  2:00 Eastern.

3              MS. HADDEN:  Thank you, Your Honor.

4              THE COURT:  All right.  Ms. Hadden, was -- didn't

5    2 River file a stay pending appeal with the district court?

6              MS. HADDEN:  No, Your Honor.  I had actually filed

7    somewhat informally in the course of my opposition to the

8    motion to sell.  I had added an application for a stay

9    within there, but I do need to file a separate application

10   for a stay to fully meet the Court's procedures.

11             THE COURT:  All right.

12             MS. HADDEN:  And obviously, I will file that

13   before Your Honor rather than in the district court.  I'm

14   aware it needs to be in the bankruptcy court first.

15             THE COURT:  All right.  Mr. Scharf, does the

16   liquidating trustee want to ask to sever the judgment -- the

17   partial judgement and render it final for appeal purposes?

18             MR. SCHARF:  I think I'm going to have to have a

19   substantive conversation with the Trustee about that but I

20   suspect we can -- I believe we can get an answer to that

21   tonight or tomorrow morning.

22             THE COURT:  All right.

23             MR. LEV:  Your Honor, Mr. Ehrenburg is available

24   June 16th, 2 p.m. Eastern time.

25             THE COURT:  Great.  So, we'll proceed --

Page 24

1        MR. PITTINSKY:  Your Honor, part of the -- one --

2   some of the factors for a stay pending appeal include

3   showings of hardship.  We would ask that Mr. Parmar be

4   present to be cross-examined or to be examined by us on

5   those factors at the hearing rather than, you know, rather

6   than skate around whether or not he's relying on comments

7   made by counsel who's not put in an affidavit in connection

8   with that.

9        And or -- or Your Honor can direct if he does not

10   put an affidavit in that there's no -- that he doesn't get

11   another chance for an evidentiary hearing (indiscernible).

12        THE COURT:  Well, I'm going to go with the I'll

13   know what you all are asking me to do when I see it

14   approach.  So, rather than contemplate what's going to come

15   in, I'll decide based on what's actually in front of me.

16        I'll set the June 9th for -- to file whatever --

17   to file the motion seeking whatever relief the parties are

18   going to ask the Court to determine on June 16th at 2:00.

19   Those should be filed in the adversary proceeding.

20        Again, if it's a Rule 54B motion, if it's a stay

21   pending appeal, whatever it's going to be, file those by 5

22   p.m. on June the 9th and then any responses will be due by

23   noon on June the 14th.

24        I don't need replies on those types of issues.

25   There's -- I don't think there's going to be any Supreme

Page 25

1   Court setting presidential issues for me to decide on those

2   types of issues.  So, June 9th at 5 p.m. for the motions,

3   June 14th at noon, and I'll know what you all are asking me

4   to do once it's been filed.

5        On the evidentiary portion of the hearing, I'm not

6   precluding taking evidence on a motion for a stay pending

7   appeal.  I don't know that I typically do, but whatever you

8   all are going to ask me to do, the standing rule still

9   remains, if there are -- if there are specific facts that

10  are in controversy the parties want me to consider, then I

11  need to have a sponsoring witness who would testify to those

12  facts.  That's the general rule for the motion practice as

13  well.

14       Any affidavits that the parties want the Court to

15  consider at the evidentiary hearing on the sale motions,

16  those affidavits also need to be filed and exchanged by June

17  9th at 5 p.m.

18       Mr. Stanton's is already there.  It doesn't need

19  to be refiled, but any other testifying witness whether for

20  the liquidating Trustee or for 2 River Terrace or should the

21  board decide to weigh in from an evidentiary standpoint,

22  those witness affidavits have to be filed and exchanged by

23  June 9th at 5 p.m. along with any exhibits, documents --

24  documentary evidence that the parties wish to rely on.  And

25  then objections to the affidavits and the documents also due

Page 26

1     by June 14th at noon.

2           So, we'll have our full package from the court's

3     standpoint by June 14th at noon so that we can then do our

4     prep for the June 16 at 2:00 evidentiary hearing.  Again,

5     the witness affidavits constitute the direct testimony of

6     the witnesses and then I take live cross-examination of them

7     at the evidentiary.

8           In the event that there are evidentiary objections

9     to portions of the affidavits, I rule on those at the

10     beginning of that witness's testimony.  I don't expect any

11     motions in limine, but again, if you're going to object to

12     the other party's witness testimony or the other party's

13     exhibits, those will be due June 14th at noon.

14           This will all be laid out in the control order

15     that the Court will be issuing, but because the timeline is

16     a little bit tight, I wanted you to know today what those

17     issues are because it could be Monday before that order is

18     entered.

19           And then there'll be the protocol for how you

20     deliver the exhibits to each other and to the Court, and

21     again a -- I need to know who's in the room, anybody with

22     the witness, and from where the witness is testifying.  And

23     again, I have a protocol laid out for that that you'll see

24     in the order.

25           Anything else that you all want to address today

Page 27

1   on the sale motion or the status in the Ehrenberg v.

2   Sartison adversary?

3          All right.

4          MR. NOLAN:  Your Honor?

5          THE COURT:  Yes.

6          MR. NOLAN:  Jeff Nolan on behalf of the plaintiff.

7   To the extent at the -- that a party submits an affidavit

8   and it is not objected to, would -- does the Court need to

9   have that witness present or is the affidavit sufficient for

10  the hearing?

11         THE COURT:  The affidavit is the direct testimony,

12  so the affiant is still subject to cross-examination.  If

13  you all work out an agreement that I'm not going to

14  challenge the affidavit of X and I waive cross-examination,

15  then I'll take the affidavit at face value, but the

16  affidavit is only the direct testimony.  It doesn't waive

17  the other side's right to cross-examine.

18         MR. NOLAN:  All right.  Thank you, Your Honor.

19         MS. HADDEN:  Thank you, Your Honor.

20         THE COURT:  All right.  So, then those of you who

21  are logged in for the sale motion or the Sartison adversary,

22  if you all -- you're all welcome to stay but you're also

23  free to go before we go to our other matter.

24         MS. HADDEN:  Thank you, Your Honor.

25         CLERK:  The next matter on the calendar is case

Page 28

1    number -- adversary case number 20-8042, Howard Ehrenberg v.

2    Howard Schoor.

3         THE COURT:  All right.  And so, who is appearing

4    in that adversary proceeding?

5         MR. NOLAN:  Jeff Nolan appearing on behalf of the

6    plaintiff liquidating Trustee.

7         MR. CAMPBELL:  Good morning, Your Honor.  Don

8    Campbell from the law firm of Giordano Halleran & Ciesla on

9    behalf of Howard Schoor.

10        THE COURT:  All right.  Anyone else?

11        All right.  Bear with me, then, for one minute.

12   Have you all settled?

13        MR. CAMPBELL:  Unfortunately, no, Your Honor.

14        THE COURT:  All right.  So, then the Court has on

15   for today the ruling conference on the liquidating Trustee's

16   motion for summary judgment.  The Court will now render its

17   ruling.

18        The procedural history is as follows.  In this

19   adversary proceeding, 20-8042, the Trustee, Mr. Ehrenberg,

20   filed a complaint in March of 2020.  That complaint

21   essentially seeks to recover $160,000 that was paid to the

22   defendant, Mr. Schoor, in January of 2017.

23        The Trustee then moved for summary judgment on the

24   causes of actions set forth in the complaint and supported

25   that summary judgment motion with affidavits from Mr. Nolan

Page 29

1   and Ms. Edith Wong, which are at docket items 29 and 30

2   along with numerous exhibits.

3           The parties under the Court's instructions had

4   also prepared and filed a joint statement of stipulated

5   facts as well as additional facts upon which the Trustee

6   relies.  That document is at docket 28.  The defendant, Mr.

7   Schoor, filed an objection to the summary judgment motion at

8   docket 33 but did not provide any summary judgment evidence

9   of his own.

10          The Court held a hearing on March 16th of this

11  year on the motion for summary judgment, which I'll just

12  refer to as the motion or the MSJ.  The Court allowed the

13  defendant additional time to seek and submit evidence in

14  opposition to the summary judgment and specifically allowed

15  the defendant to submit affidavits from either Mr. Parmar or

16  Mr. Zaharis, who we'll talk further about.

17          The Court did subsequently receive an affidavit of

18  the defendant, Mr. Schoor, at docket 41, that affidavit

19  details a conversation that Mr. Schoor says he had with Mr.

20  Parmar in April of 2021, but the defendant did not provide

21  any direct affidavit from Mr. Parmar, Mr. Zaharis, or any

22  person who worked for any of the Debtors with knowledge of

23  the facts relevant to the pending motion.

24          The Trustee then moved to strike the predominant

25  portions of the Schoor affidavit that are the objection and

Page 30

1    the motion to strike is at docket 42.  The Court had set

2    today for a ruling conference, and for the reasons to

3    follow, the summary judgment motion will be granted.

4            The Court will detail now on the record a number

5    of facts relevant to the Court's determination.  There are

6    no genuine -- there is no genuine dispute as to any of these

7    facts.  In fact, the predominance of these facts have been

8    stipulated to by the parties.  Other of these facts are

9    drawn from the defendant's own deposition made a part of the

10   summary judgment record as well as the uncontroverted

11   evidence before the Court.

12           Starting back to 2001, between the years 2001 and

13   2006, Mr. Schoor was a neighbor and at least social

14   acquaintance or friend of Paul Parmar.  In June of 2009, at

15   Mr. Parmar's request, Mr. Schoor loaned him $600,000.  That

16   loan is evidenced by a promissory note executed by Mr.

17   Parmar in favor of Mr. Schoor.

18           At that time in 2009 Mr. Parmar was a

19   businessperson interested in a variety of ventures, but

20   relevant here he later became a principal of one or more of

21   the entities that are now Debtors before this Court or were

22   acquired by or merged into one or more of the Debtors before

23   this Court.  That list of Debtors is detailed in the

24   complaint and the summary judgment motion is uncontroverted.

25           In August of 2009, on August 31st, Mr. Schoor sent

Page 31

1    a letter to Mr. Parmar advising that the repayment of the

2    $600,000 loan was late, and Mr. Schoor stated, quote, "You

3    clearly indicated your need was for a few weeks of payroll

4    while you resolved an IRS lien placed on multiple accounts

5    and freed up other assets.  Your request and my reply was

6    based on," quote, "'our friendship,'" close quote, "and not

7    a business deal."  That's stipulation 7 at docket 28.

8          In August of 2010, Mr. Schoor sent a follow-up e-

9    mail stating, "I would greatly appreciate payment on the

10   balance of your personal loan.  Again, I repeat, this loan

11   was done on the basis of our friendship, not as a business

12   investment."

13         Fast forwarding several years now to 2017, Mr.

14   Parmar on January 4, 2017 directed an e-mail to Mr. Zaharis

15   who at that time was a high-ranking officer of one or more

16   of the Debtors.  Mr. Parmar directed that the balance of his

17   loan owed to Mr. Schoor be repaid and be paid with money of

18   one or more of the Debtors.

19         The next day, on January 5, 2017, one or more of

20   the Debtors transferred $100,000 to Mr. Schoor to a Debtor

21   bank account.  The next day, January 6th, Mr. Schoor was

22   sent another $60,000 from a bank account owned by one or

23   more of the Debtors.  Those two payments, the $100,000 and

24   the $60,000, are the transfers at issue in this adversary

25   proceeding.

1          Questions were then raised internally at the

2     Debtors' specifically by an accounting manager as to why

3     these payments were made to Mr. Schoor from the Debtors.  In

4     response on May 20, 2017, Mr. Zaharis e-mailed Mr. Parmar

5     stating, "We need to come up with an invoice for a reason

6     for the payments made to Mr. Schoor."  That e-mail is part

7     of the summary judgment record attached to the affidavit of

8     Ms. Wong.

9          The next day on a Sunday, May 21, Mr. Zaharis

10    prepared a service and retainer agreement which identified

11    Mr. Schoor as a consultant of the Debtor and then told Mr.

12    Parmar that he, quote, "needed to beef up the deliverables

13    for the Howard Schoor agreement."  That e-mail is also

14    before the Court.

15         The next morning on May 22, 2017, Mr. Zaharis

16    forwarded a consulting agreement to Mr. Schoor.  That

17    consulting agreement was backdated to August 1, 2016 and

18    identified Mr. Schoor as a consultant for the Debtor.  That

19    e-mail is also before the Court as well as the document.

20    That document was never signed or authorized by Mr. Schoor.

21         It's undisputed that Mr. Schoor was never a vendor

22    of any of the Debtors.  He never sold product to Debtors.

23    He never performed services for any of the Debtors.  He

24    simply made a personal loan to Mr. Parmar in 2019.  When

25    that personal loan had been repaid in partial payments prior

Page 33

1    to 2017, Mr. Schoor was paid personally by Mr. Parmar.

2            In December of 2019, the liquidated Trustee, Mr.

3    Ehrenberg, sent a letter to Mr. Schoor asking that he return

4    the $160,000.  Shortly thereafter in February of 2020, Mr.

5    Schoor e-mailed Mr. Parmar advising him of the Trustee's

6    demand letter and requested that Mr. Parmar, quote, "review

7    and advise of your thoughts about my/our defense," close

8    quote.

9            In addition, Mr. Schoor asked Mr. Parmar to

10   provide any details as to what companies or what operations

11   he had used the loan proceeds for back in 2009.  Mr. Parmar

12   never responded.

13           From this Court's review of the uncontroverted

14   evidence, there is no genuine issue of material fact as to

15   any of the allegations raised by the Trustee which are

16   necessary for the Court to determine in order to grant

17   summary judgment and therefore the Trustee is entitled to

18   judgment as a matter of law.

19           The competent summary judgment before the Court

20   demonstrates that the two payments made in January of 2017

21   were made with actual fraudulent intent by the Debtors.  The

22   standard is not what intent did Mr. Schoor have when he

23   received the payments.  The standard is what was the intent

24   -- what was the reason behind the Debtors, one or more of

25   the Debtors, making the payments at the time they were made.

Page 34

1          The Court -- because the Court has concluded that

2     they were -- there is adequate evidence for the Court to

3     determine that they were made with actual fraudulent intent,

4     both transfers may be avoided under the Bankruptcy Code

5     under Section 548(a)(1)(A) and under New York Debtor &

6     Creditor Law, Section 276.

7          In reaching these determinations, the Court is

8     relying only on the competent summary judgment effort --

9     evidence in the record.  As has been long clear, and this

10    was noted by the 2nd Circuit almost 50 years ago in Dressler

11    v. MV Sandpiper, 331 F.2d 130 (2d Cir. 1964), it is

12    necessary that the Court only rely on competent evidence to

13    reach its determinations because only in this way may the

14    underlying objective of the summary judgment procedure to

15    determine whether one side has no real support for its

16    versions of the facts can be satisfied.

17         Here, the plaintiff has well documented the

18    evidence in support of his motion through the affidavits and

19    the declarations and the exhibits provided, particularly

20    those of Mr. Nolan and its attachments and Ms. Wong and hers

21    as well as the stipulated facts submitted by the parties.

22         When a party such as the defendant offers facts to

23    support his contention that there are genuine issues of

24    material fact, it must company with Rule 56C which requires

25    that an affidavit or a declaration be used to oppose a

1  summary judgment motion as well as to support such a motion

2  be made on personal knowledge and set out facts that would

3  be admissible in evidence and show that the declarant is

4  competent to testify on the matters stated.

5        The only evidence submitted by the defendant, his

6  affidavit relating a conversation that he says he had with

7  Mr. Parmar in April of 2021, is classic hearsay.  Mr. Schoor

8  is attempting to provide testimony not based on what he

9  knows or could prove at trial but what -- but on what he

10  says Mr. Parmar would say if called to testify at trial.

11        That affidavit attempts to prove that the original

12  loan he made in 2009 was to be used to pay certain business

13  debts, but again, it's a hearsay statement and it fails to

14  provide any specificity as to what purported business debts

15  it would have been paying and is also in opposition to the

16  history of the e-mails and communications between Mr. Schoor

17  and Mr. Parmar.

18        For those reasons, the statements contained within

19  paragraph 7 through 14 of the -- of the Schoor affidavit are

20  stricken as not in compliance with Rule 56 and are

21  inadmissible.

22        Turning then specifically to Section 548(a)(1)(A)

23  of the Bankruptcy Code, in order to prevail on such a

24  fraudulent transfer claim, three elements must be

25  established.  The property at issue must have been property

1    in which the Debtor had an interest at the time transferred.

2    There's no controversy on that issue.

3            The transfer must have occurred within two years

4    prior to the petition date.  There's no controversy on that

5    issue, either.  And the third element that the transfer must

6    have been made with actual intent to hinder, delay, or

7    defraud a creditor.  See In Re: Bruno MacHinery Corp., 435

8    B.R. 819 (N.D.N.Y. 2010) and In Re: Bayou Group, 396 B.R.

9    810 (S.D.N.Y. Bankr. 2008).

10           Here, it's clear from the uncontroverted evidence

11   before the Court that Mr. Parmar and Mr. Zaharis attempted

12   to create a sham to disguise the reason why the Debtors made

13   the payments to Mr. Schoor on Mr. Parmar's personal debt.

14           This includes the e-mail string that the Court has

15   already referred to including specifically the May 20, 2017

16   statement of Mr. Zaharis to Mr. Parmar, "We need to come up

17   with an invoice for a reason to pay Schoor," and then the

18   creation of the back-dated consulting agreement, which

19   there's no evidence in the record to support there was any

20   business reason nor any evidence that it actually existed at

21   any time on or near 2016.

22           The fact that Mr. Zaharis and Mr. Parmar went to

23   lengths to fabricate a reason why the Debtors paid Mr.

24   Schoor is clear, convincing, and uncontroverted evidence

25   that the payments themselves were made with intent to

1  defraud creditors, one or more.

2        It's also uncontroverted that plaintiff has

3  provided evidence that there were creditors who existed in

4  January of 2017 when the payments were made who remained

5  unpaid at the time of the bankruptcy case and still remain

6  unpaid.

7        The Court has before it a judgment that was

8  entered in the Southern District of Texas for obligations

9  owing to Jack McBride and Alan Knottingham.  Those two

10  gentlemen also filed a claim in the case.  They claimed

11  10,000 and won.  That judgment and those -- that claim

12  remain unpaid.

13        The Court has determined that the liquidating

14  Trustee has also met his burden of proof under New York

15  Debtor & Creditor Law Section 276, which provides that every

16  conveyance made and every obligation incurred with actual

17  intent to hinder, delay, or defraud either present or future

18  creditors is fraudulent both as to present and future

19  creditors.  See In Re: MarketXT Holdings, 376 B.R. 390

20  (Bankr. S.D.N.Y.) as well as (indiscernible) Distributors.

21        The evidence again that this Court is relying on

22  are the fake consulting agreement which was attempted to be

23  backdated to create a business justification for one or more

24  of the Debtors having paid Mr. Parmar's personal obligation.

25  That document and the contemporaneous e-mails concerning the

1   creation of that document and the fact that that document or

2   those e-mails were wrote after an internal accounting

3   manager of one or more of the Debtors questioned the

4   payments to Mr. Schoor constitute clear and convincing

5   evidence of an actual fraudulent intent to pay Mr. Schoor

6   and thereby place those funds beyond the reach of legitimate

7   creditors of the Debtors.

8           This Court has also reviewed the badges of fraud

9   that many courts often look at to determine whether or not

10  an actual fraud or fraudulent transfer can be found, and in

11  those badges of fraud, as an alternative basis, the Court

12  could find a violation of Section 276.

13          I'll briefly discuss each of the six badges of

14  fraud typically cited.  First is gross inadequacy of

15  consideration.  Again, here the Debtors didn't owe any Mr.

16  Schoor any money yet the Debtors made the payments.  That

17  evidence is grossly inadequate consideration.

18          As far as a close relationship between the

19  transferor and transferee, certainly Mr. Schoor and Mr.

20  Parmar were neighbors and friends, at least in 2016 -- 2009

21  when the loan was made and apparently had an adequate

22  relationship in 2017 that Mr. Parmar set upon a course to

23  have one or more of the Debtors repay the balance of their

24  loan which was a personal loan and never a business loan.

25          As far as the third badge in solvency, the

Page 39

1    evidence is not as strong on whether or not the Debtors were

2    or were rendered insolvent at the time of the transfers.

3    There's evidence before the Court that in January just

4    before the payments were made in 2017 the Debtors were

5    juggling their financial commitments and funds available and

6    had to, quote, "short pay" certain other creditors in order

7    to pay Mr. Schoor.  Specifically, it was asked if the

8    Debtors can short pay India and use the $160,000 to pay Mr.

9    Schoor and then pay the India obligation later.

10            It's not clear from the summary judgment record,

11   though, whether or not the juggled payments due to the India

12   vendor were ultimately paid or not, but again, insolvency is

13   not necessary to be established in an actual

14   fraud/fraudulent transfer.

15            With respect to the badge of whether or not the

16   transfer was in the ordinary course of business, this was

17   clearly -- these were clearly payments made outside the

18   ordinary course of the business of the Debtors.

19            As far as the fifth and sixth badges, the secrecy

20   of the transfer, the transfers were not kept secret.  In

21   fact, they were discovered and questioned by an internal

22   accounting manager.  Then finally as far as retention of

23   control over the property that does not appear to be an

24   issue here.

25            On balance, the Court would find there was

Page 40

1    adequate evidence under the badges of fraud to conclude as a

2    matter of law that these transfers were actual fraudulent

3    transfers.

4            Finally, as I've partly noted, in an actual fraud

5    transfer under the New York DCL, it is not necessary to

6    prove insolvency or even prove unfair consideration.  As the

7    first appellate department noted in Wallstreet Associates v.

8    Brodsky, DCL 276, until Sections 273 and 275, concerns

9    actual fraud as opposed to constructive fraud and does not

10   require proof of unfair consideration or insolvency, 257

11   A.D.2d 526 (1st Dept 1999.)  See also Korea Deposit

12   Insurance Corp. v. Young, 59 (indiscernible) 442, Superior

13   Court New York County -- Supreme Court New York County 2017.

14           Under DCL 276, a transfer made with actual intent

15   to hinder, delay, or defraud present or future creditors is

16   fraudulent (indiscernible) such creditors whether or not the

17   Debtor receives fair consideration.  See United States v.

18   McCombs, 30 F.3d 310 (2d Cir. 1994.)

19           Finally, the Court notes that Mr. Schoor attempted

20   to allege that the funds that he advanced Mr. Parmar were

21   somehow used on expenses of one or more businesses.  There's

22   simply no evidence in the record, no competent evidence in

23   the record, to support that.

24           For the reasons stated on the record, summary

25   judgment is granted in favor of the liquidating Trustee for

Page 41

1      recovery of the $160,000 plus post-judgment interest

2      thereon.

3              The Trustee in the motion had made a request but

4      did not brief or provide invoices on attorney's fees

5      incurred in connection with this litigation.  The Court will

6      use the following protocol to determine whether or not to

7      grant attorney's fees to the Trustee and if so in what

8      amount.

9              The Trustee has 14 days from today, so that's June

10     17th, to submit any invoices which can be redacted for

11     privilege or work product but should be submitted with a

12     summary attached concerning any legal fees or out-of-pocket

13     expenses incurred in connection with this litigation as well

14     as any case law or argument in support of the grant of

15     attorney's fees.

16             Mr. Schoor will then have 14 days thereafter to

17     file any response.  Again, on an issue of attorney's fees I

18     don't need a reply.  Because of the July 4th holiday, that

19     response will be due on January -- excuse me -- on July 7.

20             So, June 17 for any attorney's fee invoices and

21     summary as well as argument and support and then July 7 for

22     any response.  The Court is also awarding costs incurred in

23     connection with the litigation as provided under the rules.

24             Mr. Nolan, I'm going to -- I'm going to have your

25     office submit a form of judgment, but because I've taken the

Page 42

1    attorney's fees portion on submission on this protocol, I'm

2    simply going to wait and enter one final judgment at the

3    end.   There's nothing else in the litigation to be resolved

4    other than whether or not to award attorney's fees unless

5    there's something that we haven't addressed today.

6                  MR. NOLAN:   That's correct, Your Honor.   This is

7    just the -- just the two parties to the litigation, to the

8    dispute, and I believe I submitted a proposed order to the

9    motion.   I'll look to make sure that that was in fact the

10   case and that's acceptable to the Trustee.

11                 THE COURT:   All right.   So, again, I'll be

12   entering one order.   My protocol, as well as many other

13   trial courts, I'll enter one order granting the motion and

14   then one judgment in the amounts that the Court has

15   determined, but I'm not going to enter a partial judgment

16   now and then a final judgment after I resolve attorney's

17   fees.   I'm just going to enter one order and one judgment at

18   the end.

19                 MR. NOLAN:   That's -- understood, Your Honor.

20                 THE COURT:   All right.   All right.   Mr. Campbell?

21                 MR. CAMPBELL:   Yes, Your Honor.

22                 THE COURT:   I -- anything that you want to address

23   or any questions about the timing mechanics?

24                 MR. CAMPBELL:   Not at this time, Your Honor.

25   Thank you, Your Honor.

Page 43

1           THE COURT:  All right.  All right, very well.  So,

2    then we'll be adjourned on 20-8042.  I'm not going to set a

3    further hearing because what remains to be resolved in the

4    adversary proceeding will be on submission as of July 7th.

5           MR. NOLAN:  Understood.

6           THE COURT:  All right.  Very well.

7           MR. CAMPBELL:  Thank you, Your Honor.

8           THE COURT:  Thank you both.

9           MR. NOLAN:  Thank you, Your Honor.

10           THE COURT:  So, that will conclude then the

11    Court's calendar for the morning of July the 3rd.  The Court

12    will be in recess and we'll go off the record.

13           (Whereupon these proceedings were concluded)

14

15

16

17

18

19

20

21

22

23

24

25



Page 44

```
 1                         I N D E X

 2

 3                         RULINGS

 4                                        Page      Line

 5

 6    Motion Granted                       14        32

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 45

1                    C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:   June 14, 2021

**[& - added]**                                                                Page 1

| & | | 3 | 7 |
|---|---|---|---|
| **&** 4:3,18 5:1,8 28:8 34:5 37:15 | 18:2,11 19:18 20:10,16 22:15 23:5,24 25:20 | **3** 2:5 | **7** 31:7 35:19 41:19 41:21 |
| **0** | **20** 32:4 36:15 | **30** 29:1 40:18 | **747** 5:10 |
| **07701** 5:4 | **20-08042** 1:4 | **300** 5:3 45:22 | **780** 4:5 |
| **1** | **20-8042** 28:1,19 43:2 | **310** 40:18 | **7th** 43:4 |
| **1** 32:17 34:5 35:22 | **20-8051** 6:11 | **31st** 30:25 | **8** |
| **10** 21:11 | **2001** 30:12,12 | **32** 44:6 | **8007** 9:25 |
| **10,000** 37:11 | **2006** 30:13 | **33** 29:8 | **810** 36:9 |
| **100,000** 31:20,23 | **2008** 36:9 | **330** 45:21 | **819** 36:8 |
| **10007** 4:14 | **2009** 30:14,18,25 33:11 35:12 38:20 | **331** 34:11 | **8500** 4:13 |
| **10016** 4:22 | **2010** 31:8 36:8 | **34th** 4:5 | **9** |
| **10017** 4:6 5:11 | **2016** 32:17 36:21 38:20 | **363** 19:16 | **906** 4:21 |
| **10:11** 2:6 | **2017** 28:22 31:13 31:14,19 32:4,15 33:1,20 36:15 37:4 38:22 39:4 40:13 | **376** 37:19 | **9th** 24:16,22 25:2 25:17,23 |
| **11501** 45:23 | | **390** 37:19 | **a** |
| **11722** 2:3 | | **396** 36:8 | **a.d.2d** 40:11 |
| **12** 8:10 | | **3rd** 43:11 | **ability** 11:9 |
| **125** 5:3 | **2018** 12:15 | **4** | **able** 11:13 12:1 15:10 |
| **12j** 6:21 | **2019** 32:24 33:2 | **4** 31:14 | **absolutely** 9:9 |
| **130** 34:11 | **2020** 28:20 33:4 | **4.8** 13:13,18 | **absurd** 15:19 |
| **14** 35:19 41:9,16 44:6 45:25 | **2021** 2:5 29:20 35:7 45:25 | **41** 29:18 | **acceptable** 42:10 |
| **14th** 21:11 22:6 22:14,20,22 24:23 25:3 26:1,3,13 | **20th** 5:10 | **42** 30:1 | **access** 12:5,14,20 14:19,23,24 |
| | **21** 32:9 | **43** 3:1 | **account** 31:21,22 |
| **15th** 22:21 | **22** 32:15 | **435** 36:7 | **accounting** 32:2 38:2 39:22 |
| **16** 26:4 | **232** 4:21 | **442** 40:12 | **accounts** 31:4 |
| **160,000** 28:21 33:4 39:8 41:1 | **257** 40:10 | **4th** 41:18 | **accrual** 13:24 |
| **16th** 22:21,25 23:24 24:18 29:10 | **27** 3:4 | **5** | **accurate** 45:4 |
| | **273** 40:8 | **5** 24:21 25:2,17,23 31:19 | **acquaintance** 30:14 |
| **17** 19:12 41:20 | **275** 40:8 | **50** 34:10 | **acquired** 30:22 |
| **17th** 41:10 | **276** 34:6 37:15 38:12 40:8,14 | **526** 40:11 | **action** 15:4 |
| **18-71748** 1:3 6:8 | **28** 29:6 31:7 | **54** 20:4,14 | **actions** 28:24 |
| **1964** 34:11 | **29** 29:1 | **548** 34:5 35:22 | **actual** 33:21 34:3 36:6 37:16 38:5 38:10 39:13 40:2 40:4,9,14 |
| **1994** 40:18 | **290** 2:2 | **54b** 21:10 24:20 | |
| **1999** 40:11 | **2d** 34:11 40:18 | **56** 35:20 | |
| **1st** 40:11 | **2nd** 34:10 | **56c** 34:24 | |
| **2** | | **59** 40:12 | |
| **2** 4:12 6:20 7:11 7:22 8:16 9:20 13:10,22 17:11 | | **6** | |
| | | **60,000** 31:22,24 | |
| | | **600,000** 30:15 31:2 | |
| | | **6th** 31:21 | **added** 23:8 |

Case 8-20-08042-ast Doc 13-16 Filed 05/02/25 Entered 05/02/25 13:05:55
Case 8-20-08042-ast Doc 48-1 Filed 06/17/21 Entered 06/17/21 19:50:10

[addition - balance]                                                    Page 2

addition 9:7 16:17
33:9
additional 29:5,13
address 26:25
42:22
addressed 42:5
addressing 9:21
adduce 8:25
adequate 18:18
18:24 34:2 38:21
40:1
adequately 19:16
adjourned 43:2
admissible 35:3
adv 1:4
advance 21:19,23
advanced 20:24
40:20
adversary 6:10,21
7:10,24 14:14
24:19 27:2,21
28:1,4,19 31:24
43:4
advise 33:7
advised 21:7
advising 31:1 33:5
affiant 27:12
affidavit 22:3
24:7,10 27:7,9,11
27:14,15,16 29:17
29:18,21,25 32:7
34:25 35:6,11,19
affidavits 21:19
21:22 22:2 25:14
25:16,22,25 26:5
26:9 28:25 29:15
34:18
affirmative 18:2
afternoon 22:20
age 21:1
ago 15:21 19:12
19:12 34:10

agreement 11:23
27:13 32:10,13,16
32:17 36:18 37:22
ahead 17:8 22:2
al 1:13 6:12
alan 2:22 6:3 37:9
allegations 33:15
allege 40:20
allowed 29:12,14
allowing 9:3
alternative 38:11
amended 3:1
amount 9:10
11:10 12:21 15:9
15:10 19:24 41:8
amounts 42:14
amy 6:2
answer 19:20
23:20
anticipate 18:7
21:25
antsy 14:16
anybody 13:16
26:21
apart 15:22
apartment 6:21
7:11,16,18 9:15
10:3,8,8,11,20
11:3 12:14 15:5
15:20,23 16:16,18
16:22,24,25 17:23
apologize 14:5
apparently 38:21
appeal 8:1,3,13,13
8:15,22,22 9:8,23
10:13,22 15:17,18
16:1,3,3 20:8,11
20:16,20 21:19
23:5,17 24:2,21
25:7
appealable 8:20
10:21

appealed 10:16
appear 7:22 39:23
appearances 6:9
appearing 6:12
28:3,5
appears 8:1 11:22
appellate 10:15
40:7
application 11:8
23:8,9
appreciate 31:9
approach 24:14
appropriate 9:16
19:1,24
approve 20:23,23
april 29:20 35:7
arguably 11:15
argue 22:6
argument 41:14
41:21
arguments 7:4
15:5
arrears 9:11,14
9:18 14:17 16:9
16:13
arvind 5:9
aside 13:19,22
asked 19:19 33:9
39:7
asking 10:24
24:13 25:3 33:3
asks 20:15
aspect 18:11
asset 9:13 10:14
10:25 11:15,18
14:6,7 16:10,12
17:10
assets 13:23 31:5
associated 9:15
16:7
associates 5:8
40:7

ast 1:3,4
attached 32:7
41:12
attachments
34:20
attempt 10:19
11:14 12:5
attempted 36:11
37:22 40:19
attempting 8:16
10:6 35:8
attempts 35:11
attorneys 4:4,12
4:19 5:2,9
attorney's 41:4,7
41:15,17,20 42:1
42:4,16
august 30:25,25
31:8 32:17
authorized 14:23
32:20
available 22:14
23:23 39:5
avenue 4:5,21
5:10
avoided 34:4
avoiding 13:24
award 42:4
awarding 41:22
aware 10:1,12
11:1 12:10 23:14

**b**

b 2:21
b.r. 36:8,8 37:19
back 8:6,23 30:12
33:11 36:18
backdated 32:17
37:23
badge 38:25 39:15
badges 38:8,11,13
39:19 40:1
balance 31:10,16
38:23 39:25

[bank - contending]

Page 3

bank 5:4 31:21,22
bankr 36:9 37:20
bankruptcy 1:1
  2:1,23 6:24 10:12
  23:14 34:4 35:23
  37:5
based 7:6,6 8:24
  10:5 15:18 24:15
  31:6 35:8
basis 31:11 38:11
bayou 36:8
bear 28:11
beef 32:12
beginning 26:10
behalf 6:15,17,20
  11:22 13:17 14:23
  18:21 27:6 28:5,9
believe 17:17 19:3
  23:20 42:8
believed 10:17,17
best 17:10 20:2
better 10:7 13:12
  14:1 21:1 22:11
beyond 38:6
bid 15:9
bit 26:16
board 4:19 6:18
  9:12 11:19 12:20
  12:24 13:5,17
  14:16 18:22 19:4
  19:5,8 25:21
bond 9:10,17 11:8
  11:10 16:8
bottles 21:1
brief 8:9 41:4
briefly 38:13
bring 13:12 19:18
brodsky 40:8
broker 17:15
bruno 36:7
build 14:17
building 12:5,6

burden 37:14
business 31:7,11
  35:12,14 36:20
  37:23 38:24 39:16
  39:18
businesses 40:21
businessperson
  30:19

c

c 4:1 6:1 45:1,1
calendar 27:25
  43:11
call 6:6
called 35:10
calling 18:8
campbell 5:6 28:7
  28:8,13 42:20,21
  42:24 43:7
capacity 1:12
case 1:3,4 6:10,22
  11:13 12:11,18
  14:8,13 27:25
  28:1 37:5,10
  41:14 42:10
catastrophic 17:2
caused 9:12
causes 28:24
center 4:13
central 2:3
certain 20:21
  35:12 39:6
certainly 10:9
  11:11 12:10 13:15
  13:17 16:4 17:12
  20:17 38:19
certified 45:3
challenge 8:16
  18:17 20:11 27:14
chance 9:6,6
  24:11
charged 15:21
charges 12:16,23
  15:3 16:14

check 19:3 22:24
chief 6:3
ciesla 5:1 28:8
cir 34:11 40:18
circuit 34:10
circumstances
  20:19
cited 38:14
claim 14:19 16:23
  35:24 37:10,11
claimed 37:10
classic 35:7
clear 34:9 36:10
  36:24 38:4 39:10
clearly 31:3 39:17
  39:17
clerk 6:2,7 27:25
client 11:22 17:22
  17:24 18:22 19:4
client's 12:4 14:4
  14:5
close 31:6 33:7
  33:18
cmecf 8:3
code 10:12 34:4
  35:23
come 8:23 24:14
  32:5 36:16
comments 24:6
commitments
  39:5
common 15:3
communications
  35:16
companies 33:10
company 14:22
  14:22,24 34:24
competent 33:19
  34:8,12 35:4
  40:22
complaint 28:20
  28:20,24 30:24

completely 13:1
compliance 35:20
concerning 7:11
  37:25 41:12
concerns 40:8
conclude 40:1
  43:10
concluded 34:1
  43:13
conditioned 9:9
  9:17
conditions 16:7
condo 9:12 13:5
condominium
  4:20 6:18 19:8
conference 28:15
  30:2
conflict 22:13,20
conjecture 16:6
connection 24:7
  41:5,13,23
connoisseur 20:25
consider 25:10,15
consideration
  18:13,24 38:15,17
  40:6,10,17
constitute 26:5
  38:4
constructive 40:9
consultant 32:11
  32:18
consulting 32:16
  32:17 36:18 37:22
contained 35:18
contemplate
  18:22 24:14
contemplating
  17:7 18:3
contemporaneous
  37:25
contend 13:16
contending 18:12

[contention - direct]

contention 15:19
34:23
continue 14:17
continued 13:24
continuing 14:1
control 26:14
39:23
controlled 21:18
controversy 25:10
36:2,4
conversation
23:19 29:19 35:6
conveyance 37:16
convincing 36:24
38:4
corp 36:7 40:12
correct 11:25
17:17 42:6
cost 12:22,23
costs 11:18 13:24
41:22
counsel 6:24 18:7
24:7
country 45:21
county 40:13,13
couple 12:2,15
15:14
course 23:7 38:22
39:16,18
court 1:1 2:1 6:5,9
7:3,6,13,20,21 8:1
8:10,11 9:2,19
10:11,25 11:10,12
11:17 12:18,24
13:3,11,14,19,21
14:10,20 15:4,6
15:12,15 17:5,19
18:1,10,15,20
19:10,13 20:2,5,8
20:18,21,23 21:24
22:3,15,18,24
23:2,4,5,11,13,14
23:15,22,25 24:12

24:18 25:1,14
26:15,20 27:5,8
27:11,20 28:3,10
28:14,14,16 29:10
29:12,17 30:1,4
30:11,21,23 32:14
32:19 33:16,19
34:1,1,2,7,12
36:11,14 37:7,13
37:21 38:8,11
39:3,25 40:13,13
40:19 41:5,22
42:11,14,20,22
43:1,6,8,10,11
court's 8:6,11
10:2 12:8 17:7,7
19:22 20:11 23:10
courtroom 6:3
22:10,22
courts 38:9 42:13
court's 26:2 29:3
30:5 33:13 43:11
covered 16:15
create 36:12
37:23
creation 36:18
38:1
creditor 34:6 36:7
37:15
creditors 37:1,3
37:18,19 38:7
39:6 40:15,16
criminal 18:7
cross 21:20 24:4
26:6 27:12,14,17
current 13:13
14:9 16:13
currently 8:17

**d**

d 6:1,16 44:1
damage 16:18,20
16:21

dance 20:7
daniel 6:23
date 7:17 36:4
45:25
dated 36:18
day 22:21 31:19
31:21 32:9
days 8:10 21:11
21:22 22:2 41:9
41:16
dcl 40:5,8,14
deal 31:7
debt 36:13
debtor 1:10 31:20
32:11,18 34:5
36:1 37:15 40:17
debtors 29:22
30:21,22,23 31:16
31:18,20,23 32:3
32:22,22,23 33:21
33:24,25 36:12,23
37:24 38:3,7,15
38:16,23 39:1,4,8
39:18
debtors' 32:2
debts 35:13,14
december 33:2
decide 24:15 25:1
25:21
decision 13:22
declarant 35:3
declaration 17:15
34:25
declarations 18:2
34:19
defaulted 15:3
defendant 15:17
28:22 29:6,13,15
29:18,20 34:22
35:5
defendants 1:17
6:21

defendant's 30:9
defense 33:7
defraud 36:7 37:1
37:17 40:15
delay 21:5,13 36:6
37:17 40:15
deliver 26:20
deliverables
32:12
demand 33:6
demonstrates
33:20
denial 12:14,20
denied 14:23,24
deny 14:19
department 40:7
deposit 40:11
deposition 30:9
depreciation
16:10,12
deprivation 12:22
12:22
depriving 12:20
dept 40:11
deputy 6:3
detail 30:4
detailed 30:23
details 29:19
33:10
determination
11:16 20:19 30:5
determinations
34:7,13
determine 8:12
24:18 33:16 34:3
34:15 38:9 41:6
determined 37:13
42:15
didn't 17:19 23:4
38:15
direct 14:12 16:15
21:18 24:9 26:5
27:11,16 29:21

[directed - file]

| | | | |
|---|---|---|---|
| **directed** 31:14,16 | **e** | **et** 1:13 6:12 | **expert** 18:15 |
| **disagrees** 17:11 | | **etcetera** 11:19 | **extent** 27:7 |
| **discovered** 39:21 | **e** 2:21,21 4:1,1 6:1 | 13:25 | **extremely** 14:16 |
| **discuss** 18:6 38:13 | 6:1 31:8,14 32:4,6 | **event** 18:5 26:8 | **f** |
| **discussed** 13:4 | 32:13,19 33:5 | **everybody's** | |
| **disguise** 36:12 | 35:16 36:14 37:25 | 17:10 | **f** 2:21 45:1 |
| **dismissed** 8:14,15 | 38:2 44:1 45:1 | **evidence** 18:23 | **f.2d** 34:11 |
| 9:23 | **easily** 11:5 | 25:6,24 29:8,13 | **f.3d** 40:18 |
| **dispute** 30:6 42:8 | **eastern** 1:2 22:7 | 30:11 33:14 34:2 | **fabricate** 36:23 |
| **disputes** 21:7 | 23:2,24 | 34:9,12,18 35:3,5 | **face** 27:15 |
| **distributors** 37:20 | **ecro** 2:25 | 36:10,19,20,24 | **fact** 9:24 12:1 |
| **district** 1:2 8:1,10 | **edith** 29:1 | 37:3,21 38:5,17 | 15:5 30:7 33:14 |
| 20:21 23:5,13 | **effect** 9:22 | 39:1,3 40:1,22,22 | 34:24 36:22 38:1 |
| 37:8 | **effort** 34:8 | **evidenced** 30:16 | 39:21 42:9 |
| **docket** 8:3 20:2 | **ehrenberg** 1:12 | **evident** 15:21 | **factors** 24:2,5 |
| 29:1,6,8,18 30:1 | 3:2,5 27:1 28:1,19 | **evidentiary** 17:13 | **facts** 8:25 25:9,12 |
| 31:7 | 33:3 | 18:4,5 19:19 21:8 | 29:5,5,23 30:5,7,7 |
| **document** 29:6 | **ehrenburg** 6:11 | 24:11 25:5,15,21 | 30:8 34:16,21,22 |
| 32:19,20 37:25 | 6:25 17:16 22:13 | 26:4,7,8 | 35:2 |
| 38:1,1 | 22:25 23:23 | **examination** | **fails** 35:13 |
| **documentary** | **either** 7:9 9:8 | 21:20 26:6 27:12 | **fair** 18:12 19:24 |
| 25:24 | 10:22 11:4 14:12 | 27:14 | 40:17 |
| **documented** | 29:15 36:5 37:17 | **examine** 27:17 | **fairly** 21:6,12 |
| 34:17 | **element** 36:5 | **examined** 24:4,4 | **fake** 37:22 |
| **documents** 25:23 | **elements** 35:24 | **exchanged** 21:19 | **fallow** 15:23 |
| 25:25 | **endeavor** 11:11 | 21:22 25:16,22 | **far** 38:18,25 39:19 |
| **doesn't** 27:16 | **ends** 7:19 | **excuse** 41:19 | 39:22 |
| **dog** 14:12 | **enforced** 16:2 | **executed** 30:16 | **fast** 31:13 |
| **doing** 11:14 | **enter** 42:2,13,15 | **executing** 13:7 | **favor** 9:2 30:17 |
| **don** 28:7 | 42:17 | **execution** 13:11 | 40:25 |
| **donald** 5:6 | **entered** 7:24 | **exhibits** 21:23 | **february** 33:4 |
| **don't** 21:3 26:10 | 26:18 37:8 | 25:23 26:13,20 | **federal** 2:2 |
| 41:18 | **entering** 42:12 | 29:2 34:19 | **fee** 41:20 |
| **double** 19:3 | **entities** 30:21 | **existed** 36:20 37:3 | **fees** 11:19 12:23 |
| **doubt** 13:10 | **entitled** 17:12 | **exists** 13:24 | 41:4,7,12,15,17 |
| **drawn** 30:9 | 20:17 33:17 | **expect** 16:6 26:10 | 42:1,4,17 |
| **dressler** 34:10 | **equal** 13:5 | **expected** 15:25 | **fifth** 39:19 |
| **due** 9:12 24:22 | **essentially** 9:13 | **expense** 16:15 | **fight** 14:1 15:1 |
| 25:25 26:13 39:11 | 10:10 21:25 28:21 | **expenses** 9:12,15 | 17:11 |
| 41:19 | **established** 35:25 | 11:19 13:25 17:1 | **fighting** 14:2 |
| | 39:13 | 17:22 40:21 41:13 | **figure** 18:11 |
| | **estate** 9:14 10:14 | **experience** 12:4 | **file** 9:25 20:5 23:5 |
| | 10:14 13:8 15:22 | | 23:9,12 24:16,17 |
| | | | 24:21 41:17 |

**[filed - ilan]**

filed 3:1,4 12:18 15:23 16:2,3,3,4 23:6 24:19 25:4 25:16,22 28:20 29:4,7 37:10
filing 16:5
final 7:24 8:19,19 10:17,18,21,23 11:16 20:4,14 23:17 42:2,16
finally 10:7 39:22 40:4,19
financial 11:9 39:5
find 38:12 39:25
finding 11:3
fine 17:12
firm 28:8
first 6:6,7 7:8,22 8:4 9:10,21 20:19 23:14 38:14 40:7
fixing 16:24
flex 22:1
flood 16:22
floor 4:5 5:10
follow 30:3 31:8
following 21:25 41:6
follows 28:18
foregoing 45:3
form 10:24 41:25
format 21:24
forth 11:8 28:24
forward 9:3 10:22 13:7 15:3,7
forwarded 32:16
forwarding 31:13
found 38:10
frankly 15:19 17:3
fraud 38:8,10,11 38:14 39:14 40:1 40:4,9,9

fraudulent 33:21 34:3 35:24 37:18 38:5,10 39:14 40:2,16
free 27:23
freed 31:5
friend 30:14
friends 38:20
friendship 31:6 31:11
front 8:10 13:13 20:10 24:15
full 8:9 9:10 26:2
fully 23:10
funds 38:6 39:5 40:20
further 8:23 16:9 16:21 21:13 29:16 43:3
future 9:9 37:17 37:18 40:15

**g**

g 6:1
general 6:24 25:12
generally 21:2
gentlemen 37:10
genuine 30:6,6 33:14 34:23
getting 7:15 14:16
giordano 5:1 28:8
give 21:8 22:1
given 9:14 17:3 19:20
go 10:22 12:5 13:7 15:7 19:11 20:2 24:12 27:23,23 43:12
going 6:9 9:3 13:8 15:3,8,10,20,23 23:18 24:12,14,18 24:21,25 25:8 26:11 27:13 41:24

41:24 42:2,15,17 43:2
good 6:2,13,16,19 6:23 28:7
grant 8:24 20:8 20:20 33:16 41:7 41:14
granted 9:7,16 30:3 40:25 44:6
granting 10:2 42:13
great 23:25
greatly 31:9
gross 38:14
grossly 38:17
group 4:11 6:20 36:8
gyparakis 5:14

**h**

hadden 4:16 6:19 6:20 7:13,14 9:19 9:21 11:25 13:15 14:4,21 17:19,23 18:1,5,14,19 22:15,18,19 23:3 23:4,6,12 27:19 27:24
hadden's 22:17
half 5:3
halleran 5:1 28:8
handles 16:20
handling 7:1
happening 17:2
happens 21:16
hardship 24:3
hate 17:8
haven't 42:5
head 12:9
healthcorp 1:8,13 6:8
hearing 3:1,4 6:4 7:2 17:13 18:4,6 18:23 21:9 24:5

24:11 25:5,15 26:4 27:10 29:10 43:3
hearings 7:7 13:5 21:9
hearsay 35:7,13
held 17:13 29:10
he's 24:6
high 31:15
higher 13:12
hinder 36:6 37:17 40:15
history 28:18 35:16
hold 13:2,4 14:18
holding 13:6
holdings 37:19
holes 16:19
holiday 41:18
hon 2:22
honestly 11:8
honor 6:14,19,23 7:12,14 8:8,21,23 8:24 9:7 14:15 15:13 16:11,17 17:4,18,21 18:6 19:2 22:12 23:1,3 23:6,13,23 24:1,9 27:4,18,19,24 28:7,13 42:6,19 42:21,24,25 43:7 43:9
honorable 6:3
howard 1:12,16 3:2,5 5:2 6:24 28:1,2,9 32:13
hut 14:12
hyde 3:25 45:3,8

**i**

identified 32:10 32:18
ilan 4:9 6:14

inadequacy 38:14
inadequate 38:17
inadmissible
  35:21
include 24:2
includes 36:14
including 36:15
incurred 11:20
  16:12 37:16 41:5
  41:13,22
india 39:8,9,11
indicated 8:2 31:3
indiscernible
  16:23 24:11 37:20
  40:12,16
informally 23:7
informed 12:11
  21:6
initially 9:24
  12:16
injudicious 10:9
injunctive 8:24
  9:9
insolvency 39:12
  40:6,10
insolvent 39:2
instructions 29:3
insurance 16:23
  40:12
intent 33:21,22,23
  34:3 36:6,25
  37:17 38:5 40:14
interest 7:23
  17:10 36:1 41:1
interested 6:22
  30:19
interlocutory 8:1
  8:7,9,13,18 9:22
  10:4,18 15:18
  20:8
internal 38:2
  39:21

internally 32:1
investment 31:12
invoice 32:5 36:17
invoices 41:4,10
  41:20
irs 31:4
islip 2:3
issue 10:20 11:17
  12:3 13:9 14:13
  14:13 31:24 33:14
  35:25 36:2,5
  39:24 41:17
issues 9:20 17:23
  17:25 19:17 21:4
  21:6,11 22:6,6
  24:24 25:1,2
  26:17 34:23
issuing 26:15
items 29:1
it's 9:24 35:13
  36:10 37:2
i'll 27:15 29:11
  38:13 42:9,11,13
i'm 27:13 41:24
  41:24 42:1,15,17
  43:2
i've 40:4 41:25

judges 13:21
judgment 3:4
  7:24 8:6,9,13,18
  8:19,20 9:22 13:6
  13:11,16,24 15:9
  16:1,2 17:4 20:4
  20:14 23:16 28:16
  28:23,25 29:7,8
  29:11,14 30:3,10
  30:24 32:7 33:17
  33:18,19 34:8,14
  35:1 37:7,11
  39:10 40:25 41:1
  41:25 42:2,14,15
  42:16,17
juggled 39:11
juggling 39:5
july 41:18,19,21
  43:4,11
june 2:5 21:10
  22:6,14,25 23:24
  24:16,18,22,23
  25:2,3,16,23 26:1
  26:3,4,13 30:14
  41:9,20 45:25
justification
  37:23

knows 35:9
korea 40:11
kupetz 6:24

**l**

lack 10:7 14:19
laid 21:12 26:14
  26:23
late 31:2
law 4:11 6:20 11:5
  28:8 33:18 34:6
  37:15 40:2 41:14
lawrence 4:24
  6:16
leave 8:16
ledanski 3:25 45:3
  45:8
legal 41:12 45:20
legitimate 38:6
lengths 36:23
letter 31:1 33:3,6
lev 6:23,23 22:10
  22:12,17,24 23:1
  23:23
liability 14:22
liable 16:24
lie 15:23
lien 31:4
likelihood 9:6
limine 26:11
limited 14:22 18:9
line 44:4
lined 18:16
liquidated 33:2
liquidating 1:12
  6:25 9:4 15:22
  18:25 19:14 20:3
  23:16 25:20 28:6
  28:15 37:13 40:25
list 30:23
litigation 21:2
  41:5,13,23 42:3,7
little 22:1 26:16

**j**

jack 37:9
january 28:22
  31:14,19,21 33:20
  37:4 39:3 41:19
jeff 4:8 6:14 27:6
  28:5
john 19:21
joint 29:4
jones 4:3 6:15
joseph 5:18
judge 2:23 6:3,7
  6:16
judgement 20:4
  23:17

**k**

kept 39:20
kind 21:16
knew 15:20
knobs 16:19
knottingham 37:9
know 9:13 11:2,6
  11:9 14:10 17:6
  19:20 20:18 21:17
  22:5,10 24:5,13
  25:3,7 26:16,21
knowing 15:4
knowledge 29:22
  35:2
known 21:12

Case 8-20-08042-ast Doc 13-16 Filed 05/02/25 Entered 05/02/25 16:58:65
Case 8-20-08042-ast Doc 48-1 Filed 06/17/21 Entered 06/17/21 19:50:10

[live - oh] Page 8

| | | | |
|---|---|---|---|
| **live** 12:1 26:6 | **marketed** 19:16 | **motion** 3:1,4 6:10 | **nolan** 4:8 6:14 7:1 |
| **living** 11:24,25 | **marketing** 18:17 | 7:5 15:24 16:5 | 8:5 27:4,6,6,18 |
| **llc** 6:21 7:16 10:10 | **marketxt** 37:19 | 17:6,14 19:9 20:9 | 28:5,5,25 34:20 |
| 14:20 15:17 | **maryam** 6:19 | 21:9,10,10 23:8 | 41:24 42:6,19 |
| **llc's** 11:14 | **maryann** 4:16 | 24:17,20 25:6,12 | 43:5,9 |
| **llp** 4:3,18 5:8 | **material** 33:14 | 27:1,21 28:16,25 | **non** 6:17 7:24 |
| **loan** 30:16 31:2 | 34:24 | 29:7,11,12,23 | **noon** 24:23 25:3 |
| 31:10,10,17 32:24 | **matter** 1:6 6:7 7:7 | 30:1,3,24 34:18 | 26:1,3,13 |
| 32:25 33:11 35:12 | 18:7 27:23,25 | 35:1,1 41:3 42:9 | **note** 16:11 30:16 |
| 38:21,24,24,24 | 33:18 40:2 | 42:13 44:6 | **noted** 34:10 40:4 |
| **loaned** 30:15 | **matters** 6:6,12 | **motions** 25:2,15 | 40:7 |
| **logged** 27:21 | 13:2 35:4 | 26:11 | **notes** 40:19 |
| **long** 34:9 | **mcbride** 37:9 | **move** 11:23 | **notice** 3:1 17:20 |
| **look** 38:9 42:9 | **mccombs** 40:18 | **moved** 28:23 | 18:1 |
| **looking** 19:13 | **mechanics** 42:23 | 29:24 | **notion** 15:16 |
| **loss** 16:14 | **meet** 23:10 | **msj** 29:12 | **number** 28:1,1 |
| **losses** 9:15 16:12 | **meets** 11:3 | **multiple** 31:4 | 30:4 |
| 17:22 | **merged** 30:22 | **mute** 6:13 22:17 | **numerous** 29:2 |
| **lost** 13:8,9 | **met** 37:14 | **mv** 34:11 | **ny** 4:6,14,22 5:11 |
| | **metaphysical** | | 45:23 |
| **m** | 17:8 | **n** | |
| **m** 1:12 3:2,5 | **midst** 7:17 | **n** 4:1 6:1 44:1 | **o** |
| **machinery** 36:7 | **mile** 5:3 | 45:1 | **o** 2:21 6:1 45:1 |
| **madison** 4:21 | **million** 13:13,18 | **n.d.n.y.** 36:8 | **object** 19:7,8 |
| **mail** 31:9,14 32:6 | **mineola** 45:23 | **near** 36:21 | 26:11 |
| 32:13,19 36:14 | **minor** 16:18,20 | **necessarily** 14:11 | **objected** 27:8 |
| **mailed** 32:4 33:5 | **minute** 28:11 | **necessary** 33:16 | **objection** 29:7,25 |
| **mails** 35:16 37:25 | **missing** 16:19 | 34:12 39:13 40:5 | **objections** 19:9,19 |
| 38:2 | **mister** 15:16 | **need** 21:3 23:9 | 25:25 26:8 |
| **main** 6:10,22 | **mitigation** 12:13 | 24:24 25:11,16,18 | **objective** 34:14 |
| 14:13 | **moment** 13:20,22 | 26:21 27:8 31:3 | **obligation** 37:16 |
| **maintaining** 14:1 | **monday** 26:17 | 32:5 36:16 41:18 | 37:24 39:9 |
| **maintenance** | **monetize** 17:10 | **needed** 32:12 | **obligations** 37:8 |
| 11:19 13:25 | **monetizing** 13:23 | **needs** 23:14 | **obtained** 19:24 |
| **making** 16:13 | 14:2,6 15:1 16:24 | **neighbor** 30:13 | **obviously** 10:11 |
| 33:25 | **money** 14:3 15:2 | **neighbors** 38:20 | 12:7 14:19 23:12 |
| **manager** 7:16 | 18:10 31:17 38:16 | **never** 32:20,21,22 | **occurred** 36:3 |
| 14:5 32:2 38:3 | **monitoring** 6:25 | 32:23 33:12 38:24 | **offer** 13:13 |
| 39:22 | **months** 19:12 | **new** 1:2 2:3 4:6,14 | **offers** 34:22 |
| **managers** 4:19 | **mooted** 8:22 | 4:22 5:11 15:2 | **office** 41:25 |
| 6:18 | **morning** 6:2,13 | 34:5 37:14 40:5 | **officer** 31:15 |
| **managing** 20:2 | 6:16,19,23 23:21 | 40:13,13 | **offset** 12:24 |
| **march** 8:6 28:20 | 28:7 32:15 43:11 | **nj** 5:4 | **oh** 6:7 22:18 |
| 29:10 | | | |

oit 12:12
old 45:21
once 10:13,14
25:4
ongoing 9:12,14
13:2 16:13,14
17:1,22
operations 33:10
opportunity
20:11
oppose 34:25
opposed 14:2,6
40:9
opposing 7:19
opposite 12:3
opposition 18:2
23:7 29:14 35:15
optimistic 7:8
orbach 5:18
order 8:6 10:2,2,4
10:17,18,18,21
21:24 26:14,17,24
33:16 35:23 39:6
42:8,12,13,17
ordinary 39:16,18
original 35:11
orion 1:8,13 6:8
outline 7:5
outside 39:17
outstanding 10:20
outweighed 12:23
overall 7:9
owe 38:15
owed 12:23 31:17
owing 37:9
owned 14:21
31:22
owner 15:2
ownership 10:3
12:8

**p**

p 4:1,1 6:1
p.c. 5:1
p.m. 23:24 24:22
25:2,17,23
pachulski 4:3
6:14
package 26:2
page 44:4
paid 12:16 15:3
28:21 31:17 33:1
36:23 37:24 39:12
papers 19:9 20:5
paragraph 35:19
paris 5:14
park 4:20
parlatore 4:11
6:20
parmar 9:8,16
10:10 11:8 12:13
14:21 18:8 24:3
29:15,20,21 30:14
30:17,18 31:1,14
31:16 32:4,12,24
33:1,5,6,9,11 35:7
35:10,17 36:11,16
36:22 38:20,22
40:20
parmar's 30:15
36:13 37:24
part 18:21 24:1
30:9 32:6
partial 8:18 20:3
23:17 32:25 42:15
particular 10:13
particularly
19:21 34:19
parties 7:6 13:10
21:6,20 24:17
25:10,14,24 29:3
30:8 34:21 42:7
partly 40:4

partner 14:25
party 6:17,22
7:23 21:18 27:7
34:22
party's 26:12,12
pattinsky 6:17
paul 30:14
pay 15:2 35:12
36:17 38:5 39:6,7
39:8,8,9
paying 9:11 11:20
13:23 16:9 35:15
payment 9:18
31:9
payments 16:13
31:23 32:3,6,25
33:20,23,25 36:13
36:25 37:4 38:4
38:16 39:4,11,17
payroll 31:3
pending 8:2 9:8
15:17,25 20:16,20
21:10 23:5 24:2
24:21 25:6 29:23
percolating 21:4
performed 32:23
permit 15:6
person 19:11
29:22
personal 7:15
11:23 31:10 32:24
32:25 35:2 36:13
37:24 38:24
personally 33:1
petition 36:4
piece 11:1,2
piittinsky 4:24
pittinsky 4:18
6:16,17 11:20
12:2,9 14:10,15
17:24 18:20 19:2
24:1

pittinsky's 17:22
place 38:6
placed 31:4
plaintiff 3:2,4
27:6 28:6 34:17
37:2
plaintiffs 1:14
platform 21:14
plaza 2:2
pleadings 7:6
plus 41:1
pocket 41:12
point 10:11,19,22
11:15 12:7 14:4
14:20 19:6,22
points 15:14
politely 13:6
portion 25:5 42:1
portions 26:9
29:25
position 8:5,8
9:20 10:1,5,10
11:7 12:4,17,17
12:21 13:11 14:9
16:4 19:3
positions 7:4
possession 16:16
possibility 10:13
18:8
possible 22:20
possibly 11:5
post 41:1
posting 9:10 16:8
potentially 17:21
practical 17:8,9
practice 21:17
25:12
precluding 25:6
predominance
30:7
predominant
29:24

| | | | |
|---|---|---|---|
| **premature** 10:19 | **proceeds** 17:11 | **q** | **recover** 28:21 |
| **premises** 11:3 | 33:11 | **question** 7:8,9 | **recovery** 41:1 |
| **prep** 26:4 | **process** 18:17,24 | 9:21 19:19 | **red** 5:4 |
| **prepared** 21:8 | 19:14,15,23,23 | **questioned** 38:3 | **redacted** 41:10 |
| 29:4 32:10 | **product** 32:22 | 39:21 | **refer** 29:12 |
| **present** 5:16 | 41:11 | **questions** 7:5,21 | **referred** 36:15 |
| 21:20 24:4 27:9 | **program** 22:1 | 7:21 32:1 42:23 | **refiled** 25:19 |
| 37:17,18 40:15 | **promissory** 30:16 | **quite** 11:21,21 | **refrigerator** |
| **presentment** 3:1 | **proof** 37:14 40:10 | **quote** 31:2,6,6 | 16:20 |
| **preserve** 14:6 | **property** 7:15 | 32:12 33:6,8 39:6 | **refused** 12:5 |
| **presidential** 25:1 | 8:17 9:1,4,11 11:1 | **r** | **relating** 35:6 |
| **presume** 17:14 | 11:2,24 12:21 | **r** 2:21 4:1 6:1 45:1 | **relationship** |
| **presuming** 11:13 | 13:8 14:2 35:25 | **raise** 8:4 | 38:18,22 |
| **prevail** 10:23 | 35:25 39:23 | **raised** 7:22 17:23 | **relevant** 29:23 |
| 35:23 | **property's** 19:16 | 17:25 32:1 33:15 | 30:5,20 |
| **prevent** 8:25 | **proposed** 42:8 | **ranking** 31:15 | **relief** 8:24 9:7,9 |
| **price** 15:8 18:12 | **protect** 10:25 | **reach** 15:10 34:13 | 9:16 10:25 24:17 |
| 19:6,25 20:24 | 11:14 | 38:6 | **relies** 29:6 |
| **principal** 30:20 | **protocol** 7:10 | **reached** 7:9 11:23 | **rely** 25:24 34:12 |
| **prior** 7:7 32:25 | 21:13,14 26:19,23 | **reaching** 34:7 | **relying** 24:6 34:8 |
| 36:4 | 41:6 42:1,12 | **ready** 22:5,8,9,16 | 37:21 |
| **private** 15:11 | **prove** 35:9,11 | **real** 9:14 10:14,14 | **remain** 37:5,12 |
| 19:15 | 40:6,6 | 12:21 34:15 | **remained** 37:4 |
| **privilege** 41:11 | **provide** 29:8,20 | **really** 19:2,12,20 | **remains** 25:9 43:3 |
| **probably** 22:1 | 33:10 35:8,14 | 19:23 | **remedy** 10:15 |
| **probative** 19:12 | 41:4 | **reason** 9:23,24 | **render** 20:13 |
| 19:21 | **provided** 17:15 | 12:9,16 21:5,13 | 23:17 28:16 |
| **procedural** 20:1 | 21:23 34:19 37:3 | 32:5 33:24 36:12 | **rendered** 20:4 |
| 21:9 28:18 | 41:23 | 36:17,20,23 | 39:2 |
| **procedurally** | **provides** 37:15 | **reasonable** 9:6 | **repaid** 31:17 |
| 20:13 | **purchase** 18:12 | **reasons** 30:2 | 32:25 |
| **procedure** 13:19 | **purported** 35:14 | 35:18 40:24 | **repay** 38:23 |
| 13:21 19:7 34:14 | **purpose** 8:12 | **receive** 29:17 | **repayment** 31:1 |
| **procedures** 18:24 | **purposes** 18:9 | **received** 33:23 | **repeat** 31:10 |
| 23:10 | 23:17 | **receives** 40:17 | **replies** 24:24 |
| **proceed** 23:25 | **put** 12:10 13:1 | **recess** 43:12 | **reply** 31:5 41:18 |
| **proceeding** 6:11 | 17:8 19:9 21:5 | **record** 12:10 30:4 | **request** 15:6,24 |
| 7:25 12:25 13:1 | 24:7,10 | 30:10 32:7 34:9 | 15:25 30:15 31:5 |
| 24:19 28:4,19 | **puts** 10:9 | 36:19 39:10 40:22 | 41:3 |
| 31:25 43:4 | **putting** 13:19,21 | 40:23,24 43:12 | **requested** 33:6 |
| **proceedings** | 17:24 18:3,22 | 45:4 | **require** 11:12 |
| 11:22 12:19 43:13 | | **recorded** 6:4 | 21:22 40:10 |
| 45:4 | | | |

Case 8-20-08042-ast Doc 13-16 Filed 05/02/25 Entered 05/02/25 13:58:35
Case 8-20-08042-ast Doc 48-1 Filed 06/17/21 Entered 06/17/21 19:50:10

[requires - specifically]                                                                 Page 11

**requires** 34:24
**residential** 4:19
**resolve** 42:16
**resolved** 31:4 42:3
43:3
**respect** 9:8 39:15
**respond** 15:13
**responded** 33:12
**response** 32:4
41:17,19,22
**responses** 24:22
**result** 19:24
**retain** 18:19
**retainer** 32:10
**retention** 39:22
**return** 33:3
**review** 33:6,13
**reviewed** 38:8
**right** 6:5 7:3,4,20
7:23 8:11 9:19
14:10 17:5,19
18:15,20 19:10
22:10,15 23:4,11
23:15,22 27:3,17
27:18,20 28:3,10
28:11,14 42:11,20
42:20 43:1,1,6
**risk** 16:17,21 17:1
17:2
**river** 4:12 6:20
7:11,22 8:16 9:20
13:10,22 17:11
18:3,11 19:18
20:10,16 22:15
23:5 25:20
**riverhouse** 4:20
6:18
**road** 5:3 16:25
45:21
**rockefeller** 4:20
**room** 21:15 26:21
**roseburg** 4:18
6:17

**rosen** 5:8,13
**rule** 9:25 20:4,14
20:24 25:8,12
26:9 34:24 35:20
**rules** 41:23
**ruling** 20:9,11
28:15,17 30:2
**rulings** 44:3
**run** 21:21

**s**

**s** 2:22 4:1 6:1,3
**s.d.n.y.** 36:9 37:20
**sale** 6:10 7:11,18
8:25 10:8,13 13:8
14:13,13 15:6,8,8
15:11,23 16:1,5
17:5,13 18:4,17
18:23 19:1,15,23
19:23 20:23,23
21:9 25:15 27:1
27:21
**sales** 19:25
**sandpiper** 34:11
**sanford** 5:13
**sartison** 6:12 27:2
27:21
**satisfied** 34:16
**says** 29:19 35:6,10
**scenario** 10:24
11:6
**scharf** 6:13,14 7:1
7:12 8:4,8,21 9:5
15:13,16 17:17,21
22:7,9 23:15,18
**schart** 4:9
**schedule** 22:10
**schoor** 1:16 5:2
28:2,9,22 29:7,18
29:19,25 30:13,15
30:17,25 31:2,8
31:17,20,21 32:3
32:6,11,13,16,18
32:20,21 33:1,3,5

33:9,22 35:7,16
35:19 36:13,17,24
38:4,5,16,19 39:7
39:9 40:19 41:16
**scratches** 16:19
**second** 7:17 9:11
**secrecy** 39:19
**secret** 39:20
**section** 34:5,6
35:22 37:15 38:12
**sections** 40:8
**secure** 15:11
**see** 8:3 12:9 16:4
20:25 21:3,5,12
24:13 26:23 36:7
37:19 40:11,17
**seek** 8:23 15:17
29:13
**seeking** 8:12
12:24 14:5 24:17
**seeks** 28:21
**selecting** 7:17
**self** 15:21
**sell** 9:4 10:6,19
15:1 23:8
**selling** 15:22
**sense** 11:18
**sent** 30:25 31:8,22
33:3
**separate** 23:9
**service** 32:10
**services** 32:23
**set** 11:8,10 21:24
24:16 28:24 30:1
35:2 38:22 43:2
**setting** 19:15 25:1
**settled** 28:12
**settlement** 7:10
**seven** 21:22 22:2
**sever** 23:16
**shaking** 12:9
**sham** 36:12

**shelving** 13:20
**sheriff** 14:17
**sheriff's** 15:8
**short** 39:6,8
**shortly** 33:4
**shot** 19:21
**show** 35:3
**showings** 24:3
**side** 20:1 34:15
**sides** 12:3
**side's** 27:17
**signed** 32:20
**significant** 21:5
**significantly**
13:18
**simply** 32:24
40:22 42:2
**sit** 17:3
**situation** 10:16
**six** 38:13
**sixth** 39:19
**skate** 24:6
**social** 30:13
**sold** 8:18 10:11,14
15:7,20 32:22
**sole** 11:15
**solutions** 45:20
**solvency** 38:25
**somebody** 16:23
20:15
**somewhat** 23:7
**sonya** 3:25 45:3,8
**sorry** 6:7,13 16:12
22:19
**sought** 8:2
**southern** 37:8
**speak** 9:2 14:24
**speaking** 12:7
**specific** 25:9
**specifically** 29:14
32:2 35:22 36:15
39:7

[specifications - transferred]                                    Page 12

| | | | |
|---|---|---|---|
| **specifications** 11:4 | **strongly** 15:6 | **suspended** 12:18 | **thereon** 41:2 |
| **specificity** 35:14 | **subject** 7:25 8:17 13:3 27:12 | **synchronicity** 20:21 | **there'll** 26:19 |
| **sponsoring** 25:11 | **submission** 42:1 43:4 | **t** | **there's** 24:25 36:2 36:4,19 39:3 40:21 42:3,5 |
| **spot** 17:24 | | **t** 45:1,1 | **thing** 12:12 |
| **stage** 19:22 | **submit** 29:13,15 41:10,25 | **take** 6:5,9 7:4 19:3,19 21:15,18 26:6 27:15 | **things** 13:3,5,20 16:19 21:16 |
| **standard** 22:7 33:22,23 | **submits** 27:7 | | **think** 8:22 9:5 10:19 13:9,16 14:21 21:6,17 22:3 23:18 24:25 |
| **standing** 21:13,14 25:8 | **submitted** 34:21 35:5 41:11 42:8 | **taken** 20:20 41:25 | |
| | **subsequently** 29:17 | **takes** 20:7 | |
| **standpoint** 17:9 25:21 26:3 | | **talk** 16:11 18:21 29:16 | **third** 4:5 5:10 36:5 38:25 |
| **stang** 4:3 6:15 | **substantial** 13:17 | **talking** 16:23 | **thoughts** 33:7 |
| **stanton** 17:15 | **substantially** 15:8 | **telephonically** 5:16 | **three** 35:24 |
| **stanton's** 22:4 25:18 | **substantive** 23:19 | **temperate** 11:21 | **tie** 20:22 |
| | **success** 9:7 | **tenorello** 6:2,6 | **tight** 26:16 |
| **starting** 30:12 | **sufficient** 27:9 | **term** 10:7 | **time** 16:3 21:4 22:2,7,23 23:1,24 29:13 30:18 31:15 33:25 36:1,21 37:5 39:2 42:24 |
| **state** 12:18,24 13:11 | **suite** 4:13,21 5:3 45:22 | **terms** 7:18 | |
| **stated** 31:2 35:4 40:24 | **sulmeyer** 6:24 | **terrace** 4:12 6:20 7:11,23 8:16 13:22 17:11 18:3 18:12 19:18 20:10 20:16 22:16 25:20 | |
| **statement** 29:4 35:13 36:16 | **summary** 3:4 28:16,23,25 29:7 29:8,11,14 30:3 30:10,24 32:7 33:17,19 34:8,14 35:1 39:10 40:24 41:12,21 | | **timeline** 26:15 |
| | | | **timing** 42:23 |
| **statements** 35:18 | | **terrace's** 9:20 13:10 | **today** 6:11 7:1 26:16,25 28:15 30:2 41:9 42:5 |
| **states** 1:1 2:1 40:17 | | **testify** 18:16 25:11 35:4,10 | |
| **stating** 31:9 32:5 | **sunday** 32:9 | **testifying** 25:19 26:22 | **told** 19:11 21:1 32:11 |
| **status** 6:11 14:14 27:1 | **superior** 40:12 | | **tomorrow** 23:21 |
| **stay** 8:2 9:8,25 10:24 15:17,24,25 16:8 20:16,20 21:10 23:5,8,10 24:2,20 25:6 27:22 | **support** 15:1 34:15,18,23 35:1 36:19 40:23 41:14 41:21 | **testimonial** 18:9 | **tonight** 23:21 |
| | | **testimony** 21:15 21:18 26:5,10,12 27:11,16 35:8 | **trade** 4:13 |
| | **supported** 28:24 | | **transcribed** 3:25 |
| | **supporting** 21:23 | **texas** 37:8 | **transcript** 45:4 |
| | **suppose** 7:21 12:13 | **texting** 22:12 | **transfer** 12:8 35:24 36:3,5 38:10 39:14,16,20 40:5,14 |
| **stipulated** 29:4 30:8 34:21 | | **thank** 9:19 15:12 17:5 23:3 27:18 27:19,24 42:25 43:7,8,9 | |
| **stipulation** 31:7 | **supreme** 15:4 24:25 40:13 | | |
| **stricken** 35:20 | **sure** 15:15 19:10 42:9 | **that's** 11:4 14:9 31:7 41:9 42:6,10 42:19 | **transferee** 38:19 |
| **strike** 29:24 30:1 | | | **transferor** 38:19 |
| **string** 36:14 | **suspect** 23:20 | | **transferred** 31:20 36:1 |
| **strong** 39:1 | | | |

| | | w | would've 19:9 |
|---|---|---|---|
| transferring 10:2 | underlying 16:1 | | wrote 38:2 |
| transfers 31:24 | 34:14 | wait 42:2 | **x** |
| 34:4 39:2,20 40:2 | understanding | waive 27:14,16 | x 1:5,11,18 27:14 |
| 40:3 | 8:12 | walia 5:9 | 44:1 |
| trial 13:21 20:18 | understood 42:19 | wallstreet 40:7 | **y** |
| 21:21 35:9,10 | 43:5 | want 6:6 14:12,20 | |
| 42:13 | undisputed 32:21 | 17:6 23:16 25:10 | year 29:11 |
| true 45:4 | unfair 40:6,10 | 25:14 26:25 42:22 | years 12:2,15 |
| trust 2:22 6:4 | unfortunately | wanted 26:16 | 19:11 30:12 31:13 |
| trustee 1:12 4:4 | 22:13 28:13 | wants 19:18 20:3 | 34:10 36:3 |
| 6:15,25 9:3,4 10:3 | unique 11:1,2 | 20:16 | york 1:2 2:3 4:6 |
| 10:6,7,17 12:8 | unit 14:21 18:16 | wasting 9:13 | 4:14,22 5:11 34:5 |
| 15:10,21 16:13,15 | united 1:1 2:1 | 11:18 | 37:14 40:5,13,13 |
| 16:16 17:3,16 | 40:17 | way 11:7 20:2,13 | young 40:12 |
| 18:25,25 19:14,14 | unknown 2:25 | 34:13 | you'll 26:23 |
| 20:3,5,24 22:7,9 | unoccupied 16:18 | week 22:21 | you're 26:11 |
| 23:16,19 25:20 | unpaid 37:5,6,12 | weeks 15:21 31:3 | 27:22,22 |
| 28:6,19,23 29:5 | untimely 10:6 | weigh 14:12 25:21 | **z** |
| 29:24 33:2,15,17 | unusual 9:14 | welcome 20:12 | |
| 37:14 40:25 41:3 | upkeep 11:19 | 27:22 | zaharis 29:16,21 |
| 41:7,9 42:10 | 13:25 | went 18:25 36:22 | 31:14 32:4,9,15 |
| trustee's 8:5 10:1 | use 12:14 39:8 | we'll 26:2 29:16 | 36:11,16,22 |
| 11:7 17:14 | 41:6 | 43:2,12 | ziehl 4:3 6:15 |
| trustee's 28:15 | **v** | who's 26:21 | **'** |
| 33:5 | | wine 20:25 21:1 | |
| try 22:5 | v 1:15 6:12 27:1 | wish 25:24 | ' 31:6 |
| trying 18:11 | 28:1 34:11 40:7 | witness 18:2 | 'our 31:6 |
| turning 35:22 | 40:12,17 | 21:15 25:11,19,22 | |
| two 6:6 19:11 | value 9:11 13:12 | 26:5,12,22,22 | |
| 20:22 31:23 33:20 | 18:16 27:15 | 27:9 | |
| 36:3 37:9 42:7 | vantage 19:22 | witnesses 17:6,14 | |
| type 19:1,17 | variety 30:19 | 18:3 21:19 26:6 | |
| types 24:24 25:2 | vendor 32:21 | witness's 26:10 | |
| typical 19:16 | 39:12 | won 37:11 | |
| typically 21:21 | ventures 30:19 | wong 29:1 32:8 | |
| 25:7 38:14 | veritext 45:20 | 34:20 | |
| **u** | versions 34:16 | work 12:12 27:13 | |
| | view 19:6 | 41:11 | |
| u.s. 2:23 | violation 38:12 | worked 12:19 | |
| ultimately 39:12 | virtual 21:14 | 29:22 | |
| unable 12:14 | virtually 21:20 | working 7:15 | |
| uncontroverted | vocal 11:21 | world 4:13 | |
| 30:10,24 33:13 | | | |
| 36:10,24 37:2 | | | |

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : |  |
| ORION HEALTHCORP, INC.[1] | : | Case No. 18-71748 (AST) |
|  | : |  |
| Debtors. | : | (Jointly Administered) |
| ------------------------------------ | : |  |
| HOWARD M. EHRENBERG IN HIS CAPACITY | : |  |
| AS LIQUIDATING TRUSTEE OF ORION | : | Adv. Pro. No. 20-08049 (AST) |
| HEALTHCORP, INC., ET AL., | : |  |
|  | : |  |
| Plaintiff, | : |  |
|  | : |  |
| v. | : |  |
|  | : |  |
| ARVIND WALIA, NIKNIM MANAGEMENT, | : |  |
| INC., | : |  |
|  | : |  |
| Defendants. | : |  |
|  | : |  |
| ------------------------------------ | : |  |

## TRIAL AFFIDAVIT OF CRAIG JACOBSON, EXPERT

STATE OF NEW YORK

COUNTY OF WESTCHESTER

Craig Jacobson, being duly sworn, deposes and says:

1.     I am a Managing Director at GlassRatner Advisory Capital Group, LLC

d/b/a B/Riley Advisory Services ("B. Riley Advisory"), and a resident of the New York office.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Orion Healthcorp, Inc. (7246); Constellation Healthcare Technologies, Inc. (0135); NEMS Acquisition, LLC (7378); Northeast Medical Solutions, LLC (2703); NEMS West Virginia, LLC (unknown); Physicians Practice Plus Holdings, LLC (6100); Physicians Practice Plus, LLC (4122); Medical Billing Services, Inc. (2971); Rand Medical Billing, Inc. (7887); RMI Physician Services Corporation (7239); Western Skies Practice Management, Inc. (1904); Integrated Physician Solutions, Inc. (0543); NYNM Acquisition, LLC (unknown) Northstar FHA, LLC (unknown); Northstar First Health, LLC (unknown); Vachette Business Services, Ltd. (4672); Phoenix Health, LLC (0856); MDRX Medical Billing, LLC (5410); VEGA Medical Professionals, LLC (1055); Allegiance Consulting Associates, LLC (7291); Allegiance Billing & Consulting, LLC (7141); New York Network Management, LLC (7168). The corporate headquarters and the mailing address for the Debtors listed above is 1715 Route 35 North, Suite 303, Middletown, NJ 07748.

4867-2158-7400.5 65004.003

The facts stated herein are of my own personal knowledge. If called upon as a witness to any facts set forth herein, I could and would competently testify thereto.

2. With respect to the issues of insolvency and business valuation, I was retained to review, issue a report and testify if necessary. I have testified in numerous courts on the specific topic and believe my experience and background demonstrate I am qualified to state my opinions on insolvency in this matter. My opinions are based on my experience, training and proficiency as an expert specializing in performing numerous preference and fraudulent transfer analysis as well as analyzing solvency in a variety of bankruptcy cases.

3. I have rendered testimony in which my expert credentials were recognized and my testimony admitted on the issue of valuation and solvency in the following courts within the past five (5) years:

(a) **June 2024**: U.S. District Court, Southern District of New York; Linkable Networks, Inc. v. Mastercard International Inc.

(b) **December 2023**: U.S. Bankruptcy Court, Northern District of California; In re: San Benito Healthcare Care District.

(c) **August 2023**: U.S. Bankruptcy Court, Southern District of California; In re: Rialto Bioenergy Facility, LLC, Debtors.

(c) **March 2020**: District Court, Denver County, Colorado; Robert Zubrin, *et al*. v. Eyal Aronoff.

(d) **October 2019**: U.S. Bankruptcy Court, Southern District of Texas; In re: Bristow Group, Inc. Debtors.

(e) **May 2019**: U.S. Bankruptcy Court, District of Connecticut; In re: Sean Dunne, Debtor.

A further description of my testimony in those matters is set forth in the attached **Exhibit A**.

4867-2158-7400.5 65004.003

4.      I have also testified in arbitration hearings and in deposition on the specific issue of valuation and solvency in numerous matters pending in Federal Court in the Southern and Eastern Districts of New York.  (See **Exhibit A)**  I have written articles on valuation and the various facets involved in it quite extensively.  I hold a B.S. in Economics and Computer Science from the State University of New York in Albany, and an MBA in Finance from the New York University Stern School of Business.  I have been in private practice for the past 30 years working with C.P.A., banking, and merger and acquisition firms where I regularly performed valuation services for transactional, corporate and later associated with litigation services.  As such, I feel I have practical working knowledge of companies, their balance sheets, projections and such benchmarks to gauge their profit, loss or creditworthiness. However, I also have forensic litigation experience and I am familiar with the legal tests for insolvency.

5.      On December 18, 2020, B. Riley Advisory Services was retained to provide business valuation and litigation support services regarding an analysis of the Debtors, Orion HealthCorp Inc., et al. I was the individual from B. Riley Advisory professionals (the "B. Riley Advisory Professionals") who conducted an investigation of the financial condition and business operations of the Debtor.  While I was assisted by B. Riley Advisory Professionals in connection with the investigation, they assisted me, acted under my direction, and at all times worked with me to review significant volumes of business documents including, bank statements, accounts payable, accounts receivables, vendor files, customer files, financial systems and email communications of the Debtors' employees.  I have spent just over 150 hours reviewing documents and preparing the solvency analysis with respect to the present matter. B. Riley Advisory Professionals have spent just over 190 hours reviewing various financial documents in support of our work.  B. Riley Advisory Professionals were retained to look at a

3

number of transfers in different adversaries that occurred at different time frames during the

business cycle of the Debtors. As such, I am personally familiar with various entities of the

Debtors, their book and records, financial records, and data. In addition, I talked with

individuals who were familiar with the business of the Debtors in an effort to get an accurate

understanding of the history of Orion, its group of companies, as well as the role of the holding

company commonly referred to as "CHT", Constellation Healthcare Technologies, Inc. As I

elaborated on in my expert report attached hereto as **Exhibit B**, CHT was a holding company.

CHT's only operating asset was Orion.

6. Paul Parmjit Parmar, aka Paul Parmar, was the Chief Executive Officer

of the Debtor, Constellation Healthcare Technologies, Inc., a consolidated enterprise which

operated in the healthcare sector primarily in revenue and practice management for physician

practices. I identified the operating segments of the Debtor as of the time of the Transfers in

question. I identify those operations in particular in my expert report, **Exhibit B**, at Section IV.

I also determined in my interview with Frank Lazzara, formerly of FTI, as well as from various

Affidavits and declarations lodged in the bankruptcy case, various considerations to account for

in the Debtor's income, its overseas operations, and actions taken by members of the executive

team including Parmar, Sam Zaharis and Ravi Chivukula.

7. In order to determine a company's solvency, I examined the company's

financial statements and performed a Balance Sheet Test, a Cash Flow Test, and a Capital

Adequacy Test. I valued the Debtors as going concern business entity. In examining the fair

market value of the Debtor, I looked to the value of the business enterprise and considered the

three traditional valuation approaches employed by experts in the field to determine the value of

the business: the Asset Approach, the Income Approach and the Market Approach. (See

4

Expert Report, pg. 21-23, **Exhibit B**.)  Since the adversary involves allegations of fraud and diversion of funds to non-debtors, I paid particular attention to locating reliable financial statements and also examined intercompany loans.  In all cases, the most reliable financial statement information was set forth in consolidated form as with respect to financial statements or in Federal and State income tax returns.  I paid special attention to determining which was the operating business entity of the Debtors which was primarily Orion, though other subsidiaries had operations and accounts.

8.      The Expert Report  focused and analyzed the history of the business, a financial analysis of Orion including CHT, the industry and the economy as of the various measurement dates, the value of the business enterprise which was used to perform a balance sheet test, a forecast of the company's operations and debt obligations to perform a cash flow test, and an analysis of the company and other industry companies to perform a capital adequacy test, an analysis of the company's contingent liability, and examined other evidence of insolvency.

9.      I did note the various bank accounts maintained by the executives related to the Debtor CHT, the use of an IOLTA Account, and the significant exposure in the form of liabilities from alleged sham transactions perpetrated from the Orion and CHT accounts.  While I did not accept these occurrences or dismiss them, I was persuaded that these transactions were an additional factor to consider since (a) the Debtors amended or restated their federal tax returns (Expert Report, **Exhibit B,** §114), (b) the restatement materially reduced the net revenue, and (c) the sham transactions resulted in contingent liabilities and funds/equity of the Debtors disappearing from the balance sheet.  (See Expert Report at *Section X. Contingent Liabilities*, pg. 33)

5

10.     It should be noted than in reviewing the financial documents that appear to be reliable reflection of the Debtor, Orion and subsidiaries operations, I also took CHT and the reported revenue reflected in its financial documents and noted that they were identical to those of Orion. (See Expert Report at pg. 39-39, Table 9 & 10).  The documents confirmed that CHT did not have any business operations other than Orion.

11.     The entities Orion and CHT failed the Balance Sheet Test, the Cash Flow Test, and the Capital Adequacy Test.  To summarize, as of the measure dates of April 15, 2016, June 23, 2017 and June 28, 2017, Constellation Healthcare Technologies, Inc. ("CHT"), the parent company of Orion, and Orion were INSOLVENT.  Income from operations as set forth in Table 9, at page 38 decreased from 2014 to 2017 and the entities had Net Income losses of (-$11,917,826) for 2015, (-$46,742,748) for 2016, and (-$20,492,716) for 2017.  At the same time, millions of dollars of assets identified on the balance sheet were not credible, i.e., were not supportable, and the company had nothing close to sufficient income to correct the situation. Rather, it was incurring greater and greater long term debt. (See Table 8, Expert Report, pg. 28)

12.     All of the valuation analyses and methodologies applied herein are fully consistent with the generally accepted body of knowledge in the area of business valuation.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 8 day of July, 2024, at Scarsdale, NY.

Caryn R. Stafford
Notary Public, State of New York
No. : 02ST4952147
Qualified in Westchester County
Commission Expires June 10, 2027

CRAIG JACOBSON

6

4867-2158-7400.5 65004.003

# EXHIBIT A



299 Park Avenue, 21st Floor
New York, NY 10171
Tel: (212) 457-3304
www.brileyfin.com

## CRAIG JACOBSON
## TESTIMONY EXPERIENCE

**Law Firm**: Constantine Cannon LLP
**Name of Proceeding**: Linkable Networks, Inc. v. Mastercard Incorporated and Mastercard International Incorporated
**Type of Claim**: valuation related destruction of business claim
**Type of Court**: United States District Court, Southern District of New York
**Type of Testimony**: deposition (June 14, 2023) and trial (June 7, 2024)

**Law Firm**: Frost Brown Todd LLP
**Name of Proceeding**: In re Maple Heights Investments, LLC; Daniel J. Sherman v. T&T Realty Corp., Louis Lebowitz, Donald Silverman, et al.
**Type of Claim**: reasonably equivalent value and unreasonably small capital
**Type of Court**: In the United States Bankruptcy Court, Northern District of Texas, Dallas Division
**Type of Testimony**: deposition (May 16, 2024)

**Law Firm**: Constantine Cannon LLP
**Name of Proceeding**: Nicklaus Companies, LLC v. GBI Investors, Inc. and Jack W. Nicklaus
**Type of Claim**: breach of contract damages
**Type of Court**: Supreme Court of the State of New York, County of New York
**Type of Testimony**: deposition (April 26, 2024)

**Law Firm**: Figari & Davenport LLP
**Name of Proceeding**: EBG, LLC v. Meyer Capital, Ltd. And Jerry Meyer v. EBG Growth Corporation, et al.
**Type of Claim**: shareholder dispute damages
**Type of Court**: American Arbitration Association
**Type of Testimony**: deposition (April 18, 2024)

**Law Firm**: Smith Gambrell Russell, LLP
**Name of Proceeding**: In Hopedale Mining LLC, et al, Debtors. GlassRatner Advisory & Capital Group, LLC d/b/a B. Riley Advisory Services v. Weston Energy, LLC
**Type of Matter**: liquidation trustee
**Type of Court**: United States Bankruptcy Court, Southern District of Ohio, Cincinnati Division
**Type of Testimony**: deposition (April 16, 2024)

**Law Firm**: Golenbock Eiseman Assor Bell & Peskoe LLP
**Name of Proceeding**: Ashley Hensarling and Sandra Hensarling v. Tonya Crooks, Arches & Halos, LLC, Beauty Partners, LLC, et al.
**Type of Claim**: breach of fiduciary duty damages
**Type of Court**: Superior Court of the State of California For the County of Los Angeles – Central District
**Type of Testimony**: deposition (April 8, 2024)

**Law Firm**: Winget, Spadafora & Schwartzberg, LLP
**Name of Proceeding**: William O'Connell v. Unicom Engineering, Inc.
**Type of Claim**: employment contract damages
**Type of Court**: Commonwealth of Massachusetts, Worcester, Superior Court Department of the Trial Court
**Type of Testimony**: deposition (January 25, 2024)

**Law Firm**: Fox Rothschild LLP
**Name of Proceeding**: In re: San Benito Health Care District dba Hazel Hawkins Memorial Hospital, Debtors
**Type of Claim**: solvency analysis of debtor
**Type of Court**: United States Bankruptcy Court, Northern District of California, San Jose Division
**Type of Testimony**: deposition (November 6, 2023) and trial (December 6, 2023)

1908

**B | RILEY** *Advisory Services*

**Law Firm**: Smith Gambrell Russell, LLP
**Name of Proceeding**: Perry Ellis International, Inc. and PEI Licensing, LLC v. ULC IP Holdings, L.L.C.
**Type of Claim**: valuation of trade name
**Type of Court**: In the Circuit of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida, Complex Business Division
**Type of Testimony**: deposition (November 21, 2023)

**Law Firm**: Yadegar, Minoofar & Soleymani LLP
**Name of Proceeding**: Karina Berlin v Tesla, Inc.
**Type of Claim**: valuation of restricted stock units
**Type of Court**: JAMS Arbitration
**Type of Testimony**: deposition (November 9, 2023)

**Law Firm**: Levene, Neale, Bender, Yoo & Golubchik L.L.P.
**Name of Proceeding**: In re: Rialto Bioenergy Facility, LLC, Debtors.
**Type of Claim**: valuation of debtor assets
**Type of Court**: United States Bankruptcy Court for the Southern District of California
**Type of Testimony**: deposition (August 2, 2023) and trial (August 23, 2023)

**Law Firm**: AMS Advocaten N.V.
**Name of Proceeding**: SDK Schutzgemeinschaft der Kapitalanleger e.V. at Steinhoff International Holdings N.V.
**Type of Claim**: valuation related to proposed restructuring
**Type of Court**: District Court of Amsterdam, the Netherlands
**Type of Testimony**: court testimony (remote) (June 14, 2023)

**Law Firm**: Lovell Stewart Halebian Jacobson LLP
**Name of Proceeding**: Kevin P. Clune, as Executor of the Estate of Barbara B. Clune, and James E. Fisher, Individually and on Behalf of All Others Similar Situated, v. Desmond T. Barry, Jr., George J. Gillespie, III, Winged Foot Golf Club, Inc., and John Do Nos. 1-10
**Type of Claim**: valuation related to alleged breach of fiduciary duty
**Type of Court**: United States District Court, Southern District of New York
**Type of Testimony**: deposition (March 23, 2023)

**Law Firm**: Barnes & Thornburg LLP
**Name of Proceeding**: Niram, Inc. v. Sterling National Bank
**Type of Claim**: lost profits
**Type of Court**: United States District Court, Southern District of New York
**Type of Testimony**: deposition (December 7, 2022)

**Law Firm**: Golenbock Eiseman Assor Bell & Peskoe LLP
**Name of Proceeding**: Cambridge Capital LLC v. Ruby Has LLC; Ruby Has LLC v. Cambridge Capital LLC, Benjamin Gordon and Matthew Smalley
**Type of Claim**: valuation related to expectation damages, lost asset value
**Type of Court**: United States District Court, Southern District of New York
**Type of Testimony**: deposition (November 2, 2022)

**Law Firm**: Holland & Knight LLP
**Name of Proceeding**: U.S. Small Business Administration as Receiver of Elk Associates Funding Corp. v. Michael Feinsod, Silvia Mullens, Richard Feinstein, Gary Granoff, Steven Etra, John Laird, Ivan J. Wolpert, Howard Sommer, Murray Indic, Elliott Singer, and Peter Boockvar
**Type of Claim**: solvency opinion
**Type of Court**: United States District Court, Eastern District of New York
**Type of Testimony**: deposition (February 10, 2022)

**B|RILEY** *Advisory Services*

**Law Firm**: Rooney Nimmo PC
**Name of Proceeding**: Brands Within Reach, LLC v. Belvoir Fruit Farms Ltd.
**Type of Claim**: solvency opinion
**Type of Court**: United States District Court, Southern District of New York
**Type of Testimony**: deposition (May 5, 2021)

**Law Firm**: Robins Kaplan LLP
**Name of Proceeding**: Kimberly Renk v. Linda Renk, et al.
**Type of Claim**: valuation related to shareholder dispute and economic damages
**Type of Court**: Supreme Court of the State of New York
**Type of Testimony**: deposition (November 11, 2020)

**Law Firm**: Lewis Brisbois Bisgaard & Smith LLP
**Name of Proceeding**: University Ventures Funds Management, LLC, et al. v. Gregg Rosenthal
**Type of Court**: American Arbitration Association
**Type of Claim**: valuation of private equity fund components
**Type of Testimony**: deposition (September 30, 2020) and arbitration (November 24-25, 2020).

**Law Firm**: Winget, Spadafora & Schwartzberg, LLP
**Name of Proceeding**: Robert Zubrin, et al. v. Eyal Aronoff, et al.
**Type of Claim**: valuation – dilution related to funding round
**Type of Court**: District Court, Denver County, State of Colorado
**Type of Testimony**: trial (March 17, 2020).

**Law Firm**: Levene, Neale, Bender, Yoo & Brill L.L.P.
**Name of Proceeding**: In re: Bristow Group, Inc., Debtors.
**Type of Claim**: valuation of equity
**Type of Court**: United States Bankruptcy Court for the Southern District of Texas Houston Division
**Type of Testimony**: deposition (September 27, 2019) and trial (October 4, 2019).

**Law Firm**: Winget, Spadafora & Schwartzberg, LLP
**Name of Proceeding**: Freedom Mortgage Corporation v. Guild Mortgage Corporation, et al.
**Type of Claim**: Breach of contract, breach of duty of loyalty, tortious interference, violation of Florida Uniform Trade Secrets Act, violation of Defend Trade Secrets Act, civil conspiracy.
**Type of Court**: Supreme Court of the State of New York
**Type of Testimony**: deposition (September 11, 2019).

**Law Firm**: Lovell Stewart Halebian Jacobson LLP
**Name of Proceeding**: James Tufenkian v. Sylvia Tirakian
**Type of Claim**: Breach of contract, breach of fiduciary duty, fraud, and unjust enrichment.
**Type of Court**: Supreme Court of the State of New York
**Type of Testimony**: deposition (August 29, 2019).

**Law Firm**: Carmody Torrance Sandak & Hennessey LLP
**Name of Proceeding**: In re: Sean Dunne, Debtor. Richard M. Cohan, Trustee of the Bankruptcy Estate of Sean Dunne, v. Gayle Killilea, John Dunne, Mountbrook USA, LLC, Molly Blossom LLC, Barclay Beattie & Brown, LLC, Wahl, LLC, SRQ, LLC, TJD21, LLC, 151 Milbank, LLC, Thomas J. Heagney, Esq., John F. Slane, Jr., Esq., and Heagney, Lennon & Slane.
**Type of Claim**: solvency opinion related to alleged fraudulent transfer.
**Type of Court**: United States Bankruptcy Court, District of Connecticut, New Haven Division
**Type of Testimony**: deposition (March 7, 2019), trial (May 23 & 24, 2019.

**Law Firm**: Lovell Stewart Halebian Jacobson LLP
**Name of Proceeding**: Eugene L. Busher v. Desmond T. Barry, Jr., Thomas T. Egan, John P. Heanue, William M. Kelly, Francis P. Barron, and Winged Foot Golf Club, Inc.
**Type of Claim**: valuation related to alleged breach of fiduciary duty.
**Type of Court**: United States District Court, Southern District of New York
**Type of Testimony**: deposition (March 31, 2017).

---

**B|RILEY** *Advisory Services*

**Law Firm**: Gorrissen Federspiel
**Name of Proceeding**: Milestone Systems A/S v. On-Net Surveillance Systems Inc.
**Type of Claim**: economic damages.
**Type of Court**: The Danish Institute of Arbitration
**Type of Testimony**: arbitration (February 23, 2017).

**Law Firm**: Griffin Hamersky LLP
**Name of Proceeding**: In re Corporate Resources Services, In c., et al., Debtors. James S. Feltman v. Noor Staffing Group, LLC and Noor Associates, Inc.
**Type of Claim**: valuation and economic damages.
**Type of Court**: United States Bankruptcy Court, Southern District of New York.
**Type of Testimony**: deposition (December 7, 2016).

**Law Firm**: Husch Blackwell
**Name of Proceeding**: Landaas & Company v. Paul G. Coldagelli
**Type of Claim**: breach of contract and trade secret infringement damages.
**Type of Court**: FINRA Arbitration
**Type of Testimony**: arbitration (November 16, 2016).

**Law Firm**: Bond, Schoeneck & King PLLC
**Name of Proceeding**: National Waste Associates, LLC v. Danielle Scharf, Carl Slusarczyk, Omega Waste Management, Inc. and Waste Harmonics, LLC
**Type of Claim**: trade secret infringement damages.
**Type of Court**: Supreme Court of the State of New York
**Type of Testimony**: deposition (January 29 & February 4, 2016).

**Law Firm**: Quinn Emanuel Urquart & Sullivan, LLP
**Name of Proceeding**: GSP Finance LLP v. KPMG LLP
**Type of Claim**: economic damages
**Type of Court**: Supreme Court of the State of New York
**Type of Testimony**: deposition (March 27 & 28, 2014) and trial (October 15, 2015).

**Law Firm**: Lucas Bagnell Varga LLC
**Name of Proceeding**: Dennis L. Winger, et al. v. Life Technologies Corporation
**Type of Claim**: economic damages
**Type of Court**: American Arbitration Association
**Type of Testimony**: deposition (November 21, 2011) and arbitration (April 2-4, 2012).

**Client**: Wedbush Securities Inc. (internal counsel)
**Name of Proceeding**: Mary Tiscornia, et al. v. Wedbush Securities Inc., et al.
**Type of Claim**: business valuation
**Type of Court**: FINRA Arbitration
**Type of Testimony**: arbitration testimony (July 17, 2015).

**Law Firm**: Carlton Fields Jorden Burt, LLP
**Name of Proceeding**: Caledonian Bank and Trust, Limited v. Fifth Third Bank
**Type of Claim**: business valuation/economic damages
**Type of Court**: United States District Court, Middle District of Florida
**Type of Testimony**: deposition (June 25, 2015) and court (July 1, 2015).

**Law Firm**: Biller, Sachs, Raio & Zito
**Name of Proceeding**: BThrifty LLC v. Comcast Spotlight, LLC, et al.
**Type of Claim**: economic damages
**Type of Court**: State of Connecticut Superior Court
**Type of Testimony**: deposition (October 6, 2014).

---

1911

**B | RILEY** *Advisory Services*

**Law Firm**: Lucas Bagnell Varga LLC
**Name of Proceeding**: Leeland F. Gray, Jr., et al. v. Town of Easton, et al.
**Type of Claim**: economic damages
**Type of Court**: United States District Court
**Type of Testimony**: deposition (May 28, 2013).

**Law Firm**: Cohen Goldstein Silpe LLP
**Name of Proceeding**: Markowitz v. Markowitz
**Type of Claim**: business valuation
**Type of Court**: New York State Supreme Court
**Type of Testimony**: trial (September 16 & 19, 2011).

**Law Firm**: Berger & Montague, P.C.
**Name of Proceeding**: In re Inergy, L.P.Unitholder Litigation
**Type of Claim**: economic damages.
**Type of Court**: Delaware Chancery Court
**Type of Testimony**: deposition (August 3, 2011).

**Law Firm**: Chase Kurshan Herzfeld & Rubin, LLC (now Herzfeld & Rubin, P.C.).
**Name of Proceeding**: Vitarroz Corp. against G. Willi Food International Ltd., et al.
**Type of Claim**: economic damages
**Type of Court**: Arbitration
**Type of Testimony**: deposition (April 16, 2008) and arbitration testimony (May 6, 2008).

**Law Firm**: Hogan & Hartson.
**Name of Proceeding**: Ezra Billy Hidary v. Abraham J. Hidary, et al.
**Type of Claim**: equitable remedy
**Type of Court**: JAMS Arbitration
**Type of Testimony**: Arbitration testimony (June 27, 2007 and August 2, 2007).

Testified before Kenneth R. Feinberg, Esq. via teleconference in connection with the September 11th Victim Compensation Fund.
**Type of Claim**: business valuation


# PUBLICATIONS

"Price Versus Value: A Transaction and Litigation Perspective." Business Valuation Update, March 2021.

"The Valuation Paradigm of COVID-19: Using the Discounted Cash Flow Method after an Economic Crisis." Business Valuation Update, May 2020.

"The Use of Financial Projections in Solvency Opinions." Business Valuation Update, June 2018.

"Value of Trademarks Takes on Increased Importance." New York Law Journal, May 16, 2016.

"Economic Benefits of IP Licenses Increasingly Impact Value." New York Law Journal May 18, 2015.

"Trade Secret Valuation and Infringement Damages." New York Law Journal, May 19, 2014.

"The Backsolve Method to Value Common and Preferred Stock." The Legal Intelligencer, August 26, 2013.

"Identify and Valuate Intangible Assets and Intellectual Property." New York Law Journal, May 20, 2013.

1912

# B | RILEY *Advisory Services*

"Putting a Value on Goodwill." New York Law Journal, April 9, 2012.

"Know and Protect Intellectual Property's Worth." New York Law Journal, April 11, 2011.

"Pitfalls to Avoid when Performing a Fairness Opinion." Business Valuation Update, October 2010.

"Factors to Consider in Performing a Valuation Analysis for a Fairness Opinion." Reprinted from Willamette Management Associates Insights, Winter 2009, issue and appearing in the January 2010 and April 2010 editions of Business Valuation Alert.

"Factors to Consider in Performing a Valuation Analysis for a Fairness Opinion." Willamette Management Associates Insights, Winter 2009.

"The Valuation of Stock Options for Equitable Distribution Purposes." Willamette Management Associates Insights, Special Issue 2008.

"Unit Valuation Discount and Premium Adjustments." Willamette Management Associates Insights, Summer 2008.

"Tax Court Rules that Transactions in the Stock of Privately Held Company Can Be Considered as Arm's-Length Transactions." Willamette Management Associates Insights, Autumn 2007.

"Estimating the Cost of Capital: An Update from the Private Equity Perspective." Willamette Management Associates Insights, Summer 2007.

"The Employee Stock Option Backdating Kerfuffle: A Valuation Perspective." Willamette Management Associates Insights, Summer 2007.

"Fairness Opinions, Valuations, and the Related Controversy." Reprinted from Willamette Management Associates Insights, Summer 2006, issue and appearing on www.BankingCrossing.com.

"Estimating Discount Rates in Damages Analysis: Solving the Analyst's Dilemma." Business Valuation Update, November 2006.

"The Use of Empirical Data to Estimate Discount Rates for Business Valuation and/or Economic Damages Analysis." Willamette Management Associates Insights, Autumn 2006.

"Current Controversies Related to Fairness Opinions and "Independent" Financial Advisory Firms." Willamette Management Associates Insights, Summer 2006.

"Estimating Economic Damages in a Patent Infringement Analysis." Willamette Management Associates Insights, Summer 2006.

Fairness Opinions—A Hot Issue Gets Hotter in Recent NYSE Merger." Business Valuation Update, April 2006. "Fairness Opinions—Revisited For The Bankruptcy Professional." American Bankruptcy Institute Advisors Committee Newsletter, March 2006.

"Estate Tax and Estate Planning Valuation Guidance from Internal Revenue Service Publications." Willamette Management Associates Insights, Special Issue 2006.

"Revenue Ruling 2004-4 Provides Guidelines to Classify Certain SESOP Transactions as 'Listed Tax Shelters'." Willamette Management Associates Insights, Winter 2005.

---

**B | RILEY** *Advisory Services*

"Valuation of Improperly Priced Securities and Shareholder Damages." Willamette Management Associates Insights, Summer 2004.

1914

# EXHIBIT B



299 Park Avenue, 21st Floor
New York, NY 10171
Tel: (212) 457-3304
www.brileyfin.com

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------

In re:                          :     Chapter 11

ORION HEALTHCORP, INC.          :     Case No. 18-71748 (AST)
                                     :     (Jointly Administered)
                      Debtors.         :

------------------------------------------------------------------

HOWARD M. EHRENBERG IN HIS CAPACITY AS    :
LIQUIDATING TRUSTEE OF ORION HEALTHCORP, INC.   :    Adv. Pro. No. 20-8049 (AST)
ET AL.,                                   :

                      Plaintiff,       :

v.                                       :

ARVIND WALIA; NIKNIM MANAGEMENT INC.      :

                     Defendants.      :

------------------------------------------------------------------

### EXPERT REPORT OF CRAIG JACOBSON
### JANUARY 10, 2022

A division of B. Riley Financial | www.brileyfin.com | NASDAQ: RILY

**B | RILEY** *Advisory Services*

# Table of Contents

I. Introduction & Summary Conclusions .......................................................................... 1
    A.    Introduction ................................................................................................. 1
    B.    Conclusion ................................................................................................. 2

II. Scope of Review ........................................................................................................ 2

III. About the Litigation .................................................................................................... 2

IV. Orion Description and Relevant History ..................................................................... 3

V. Financial Analysis of Orion ........................................................................................ 8
    A.    Balance Sheet ............................................................................................ 8
    B.    Income Statement .................................................................................... 11
    C.    Working Capital ........................................................................................ 13
    D.    Normalizing Adjustments .......................................................................... 14

VI. Solvency Opinion Overview ..................................................................................... 21
    A.    Solvency Definition ................................................................................... 21
    B.    The Three Solvency Tests ....................................................................... 21
    C.    Solvency Opinion Conclusions ................................................................ 22

VII. Balance Sheet Test (First Solvency Test) ............................................................... 23
    A.    Valuation Parameters .............................................................................. 23
    B.    Valuation Approaches .............................................................................. 23
    C.    Application of the Income Approach ......................................................... 26
    D.    Valuation Synthesis and Conclusion ....................................................... 27

VIII. Capital Adequacy Test (Second Solvency Test) ..................................................... 29

IX. Cash Flow Test (Third Solvency Test) ..................................................................... 32

X. Orion Contingent Liability ........................................................................................ 33

XI. Other Evidence of Insolvency ................................................................................. 34

XII. Solvency of CHT ..................................................................................................... 38

XIII. Summary and Conclusion ....................................................................................... 39

Appendix A ....................................................................................................................... 41

Appendix B ....................................................................................................................... 42

Appendix C ....................................................................................................................... 43

**B ∣ R I L E Y** *Advisory Services*

### I. Introduction & Summary Conclusions

#### A. Introduction

1. GlassRatner Advisory & Capital Group, LLC d/b/a B. Riley Advisory Services ("**B. Riley Advisory**")[1] was retained on December 18, 2020 by Pachulski Stang Ziehl & Jones, LLP ("**Counsel**") on behalf of Howard M. Ehrenberg in his capacity as liquidating trustee of Orion Healthcorp, Inc, et al. ("**Orion**" or "**Debtors**").[2] B. Riley Advisory was retained to provide business valuation and litigation support services. Specifically, we have been asked to: (a) review various financial and other business records associated with Orion and (b) perform a solvency analysis of Orion at certain dates as described in this report.

2. In order to perform this engagement, I relied on other B. Riley Advisory professionals with extensive experience in financial analysis, forensic accounting, business valuation and corporate finance, all of whom worked under my direct supervision and control. I have relied on the work of these B. Riley Advisory professionals to support my review of information related to this matter, and any references to "our" and "we" recognize this reliance.

3. Any minor differences in the amounts calculated or referenced in supporting documentation or schedules to this report are due to rounding.

4. I reserve the right to revise and supplement my analyses, opinions and report to the extent additional relevant information becomes available.

5. The opinions presented in this report are based on my review of the documents, the financial and valuation analyses referred to in this report and contained in the attached schedules, independent research and my past experience, education, training and professional judgment, all of which are regularly relied upon by Courts and other triers of fact in matters such as this.

---

[1] As of September 14, 2020, GlassRatner is known as B. Riley Advisory Services.
[2] The term Debtors includes several other entities as set forth on the title page of the Complaint (defined in paragraph 9 below).

---

1918

### B. Conclusion

6.  Based on the analyses we performed, it is my opinion that:

    a.  As of the Measurement Dates of April 15, 2016, June 23, 2017, and June 28, 2017 (described below), Orion was INSOLVENT.[3]

    b.  Constellation Healthcare Technologies, Inc. ("**CHT**"), the parent company of Orion, was INSOLVENT as of the Measurement Dates.

## II.    Scope of Review

7.  My review was based on documents and information referred to in **Appendix B** of this report.

8.  Part of my review included the preparation of various valuation analyses and calculations. All of the valuation work performed in this engagement has been prepared in accordance with the business valuation standards of the American Institute of Certified Public Accountants Statement of Standards for Valuation Services. Furthermore, all of the valuation analyses and methodologies applied herein are fully consistent with the generally accepted body of knowledge in the area of business valuation.

## III.   About the Litigation

9.  This report has been prepared in connection with the Complaint filed in the United States Bankruptcy Court, Eastern District of New York captioned as *In re: Orion Healthcorp, Inc., Debtors* (Case No. 18-71748); *Howard H. Ehrenberg in his Capacity as Liquidating Trustee of Orion Healthcorp, Inc., et al. v. Arvind Walia; Niknim Management Inc.* (Case No. 20-08049) (the "**Complaint**").

***Overview of the General Allegations***

10.  Plaintiff alleges that on April 15, 2016 (the "**2016 Transfer**"), as well as June 23, 2017 and June 28, 2017 (the "**2017 Transfers**") (collectively the "**Measurement Dates**"), Orion made the following payments to the Defendants (the "**Transfers**") totaling $4,020,000:[4]

---

[3]

[4] Complaint, Exhibit A.

1919

**B∣RILEY** *Advisory Services*

   a.   April 15, 2016 - **$2,500,000**

   b.   June 23, 2017 - **$1,500,000**

   c.   June 28, 2017 - **$20,000**

11.   Plaintiff further alleges the following regarding the Transfers:

   a.   Orion was insolvent on the Measurement Dates.[5]

   b.   Orion did not receive reasonably equivalent value in exchange for the Transfers.[6]

   c.   The Transfers should be avoided as an intentionally and constructively fraudulent transfer pursuant to 11 U.S.C. § 548(a)(1)(A) and NY Debt & Cred L § 276.[7]

   d.   The Transfers were avoidable pursuant to 11 U.S.C. § 548(a)(1)(B) and NY Debt & Cred L § 273-275.[8]

   e.   The 2017 Transfers were avoidable preferences pursuant to 11 U.S.C. § 547(b).

   f.   The Plaintiff is entitled to avoid the Transfers pursuant to 11 U.S.C. §§ 542, 547 and 548.

**IV.   Orion Description and Relevant History**

   *Business Segments*

12.   Orion is a group of companies that provide outsourced business services to physicians. Orion was formed through a series of acquisitions. Orion was held by a holding company, CHT. As a holding company, CHT's only operating asset was Orion.

13.   As of the Measurement Dates, Orion operated in the following business segments:

   a.   <u>Revenue Cycle Management ("**RCM**")</u>. Orion operated a revenue cycle management business that provided hospital-based and office-based physicians with medical billing and services, allowing physicians to focus more time on patient care. RCM services included coding, reimbursement services, charge entry, claims

---

[5] Complaint at 31.
[6] Complaint at 32.
[7] Complaint at 29.
[8] Complaint at 33 and heading for Second Claim for Relief.

**B | RILEY** *Advisory Services*

submission, collections, and financial reporting services. The goal of Orion's RCM services was to increase client cash flows by reducing administrative costs.[9]

b. <u>Physician Practice Management ("**PPM**")</u>. Orion's PPM business provided business and practice management services to certain primary care and subspecialty pediatric practices. These services included accounting and bookkeeping, human resource management, group purchasing, accounts receivable management, quality assurance services, physician credentialing, fee schedule review, training and education, and billing and reimbursement analysis for physician practices.[10]

c. <u>Group Purchasing Organization ("**GPO**")</u>. Orion's GPO services allowed eligible physicians to participate in discounts for vaccines and flu shots offered by certain pharmaceutical companies.[11]

d. <u>Independent Practice Association ("**IPA**")</u>. Orion's IPA business was organized and directed by physicians in private practice to negotiate contracts with insurance companies on their behalf while physicians remain independent, and which also provided other services to physician practices.[12]

14. Orion's RCM business historically utilized third party vendors for back-office services such as claims and payment processing services. According to our interview with Frank Lazzara, formerly of FTI Consulting, Inc.("**FTI**"), Orion used GS Infotech for such services through late 2014. In connection with its March 2015 acquisition of Physicians Practice Plus Holdings LLC, Orion subsequently switched third party providers to Porteck India Infoservices Private Limited ("**Porteck**"). The migration process from GS Infotech to Porteck was costly and will be referenced for consideration of income statement adjustments discussed below.

15. From 2015 through the Measurement Dates, Orion's senior officers were:

---

[9] Declaration of Timothy J. Dragelin in Support of Chapter 11 Petitions and First Day Motions filed March 16, 2018 (the "**Dragelin Declaration**") at 41.
[10] Dragelin Declaration at 47.
[11] Dragelin Declaration at 50.
[12] Dragelin Declaration at 51.

---

    a. <u>Parmjit Parmar</u>, a/k/a Paul Parmer, was the Chief Executive Officer of the Debtor and Constellation Healthcare Technologies, Inc. the parent company of the Debtor.[13]

    b. <u>Sotiros Zaharis</u>, a/k/a Sam Zaharis, was CHT's Chief Financial Officer.

    c. <u>Ravi Chivukula</u>, was CHT's Controller and Secretary.

### *Relevant Dates to this Matter*

16.    During the two-year period prior to the commencement of the bankruptcy cases, the Debtors transferred property to or for the benefit of Defendants in the following amounts:[14]

    i.    April 15, 2016 - **$2,500,000**

    ii.    June 23, 2017 - **$1,500,000**

    iii.    June 28, 2017 - **$20,000**

17.    The Complaint alleged the Debtor's Transfers were made with actual intent to hinder or delay or defraud creditors and were made for the personal benefit of Parmar, his friends and associates.[15]

18.    The Plaintiff claims the Transfers should be avoided as an intentionally or constructively fraudulent transfer pursuant to § 548(a)(1)(A) and NY Debt & Cred L § 276, et al.[16]

### *Other Relevant Dates*

19.    On December 8, 2014, CHT issued a public offering of its common stock on the London Stock Exchange's Alternative Investment Market ("**AIM**").[17]

20.    On March 17, 2015, CHT acquired Physicians Practice Plus, LLC ("**Physicians Practice Plus**") for consideration of up to $20 million in the form of earn-outs. However, a portion of the purchase price was contingent upon Physician Practice Plus meeting certain revenue and earnings targets before interest, taxes, depreciation, and amortization

---

[13] Mr. Parmar was also the CEO of the Debtor's parent company, Constellation Healthcare Technologies, Inc.
[14] Complaint at 22 and Exhibit A.
[15] Complaint at 27.
[16] Complaint at 29.
[17] Dragelin Declaration at 19-20.

**B | RILEY** *Advisory Services*

("**EBITDA**") targets over a 24-month period. Orion became the holding company for the operating subsidiaries of this business.[18]

21. In March 2015, pursuant to an Asset Purchase Agreement by and among Physicians Practice Plus LLC, Porteck Corporation, and the Shareholders of Porteck Corporation (the "**APA**"), Physician's Practice Plus purchased the assets of Porteck Corporation for the sum of $12.8 million (APA § 1.6). According to a letter from the broker on this transaction, the purchase price was only $7.8 million[19] rather than $12.8 million as stated in the APA.

22. In May 2015, CHT raised approximately $20 million in a secondary offering for the stated purposes of allowing for certain acquisitions discussed below.[20]

23. On September 16, 2015, CHT acquired NorthStar First Health, LLC ("**NorthStar**") for a maximum consideration of $18.0 million. The purchase consideration was 64% cash and 36% in shares of CHT common stock. According to the Dragelin Declaration, the actual purchase price was for a maximum consideration of approximately $2.8 million, of which only approximately $2.3 million was actually paid.[21]

24. On September 18, 2015, CHT acquired Phoenix Health LLC ("**Phoenix**") for a maximum consideration of $14.0 million. The purchase price consideration was 75% in cash and 25% in CHT common stock. According to the Dragelin Declaration, Phoenix was an entity created by Mr. Parmar that had no assets and no business operations.[22]

25. On December 11, 2015, CHT announced a secondary offering that resulted in gross proceeds of approximately $45.0 million and net proceeds of approximately $42.2 million.[23]

26. On December 23, 2015, Mr. Parmar instructed Mr. Zaharis to transfer $545,000 by wire transfer from Orion's M&T Bank account to the account of Lustrin Tetelman, LLP,

---

[18] Dragelin Declaration at 21.
[19] EHREN-WALIA 005141.
[20] Dragelin Declaration at 22.
[21] Dragelin Declaration at 23.
[22] Dragelin Declaration at 24.
[23] Dragelin Declaration at 25.

**B | RILEY** *Advisory Services*

attorneys for Clodagh Bowyer Greene and Elliott Greene, the sellers (the "**Sellers**") of a condominium located at Two River Terrace in New York City (the "**Condominium**").[24]

27. On February 10, 2016, CHT acquired MDRX Billing LLC ("**MDRX**") for $28.0 million with a further $2.0 million in cash due upon meeting certain targets. According to the Dragelin Declaration, MDRX had no assets and no business operations.[25]

28. On February 19, 2016, the remaining balance for the purchase of the Condominium and closing costs in the amount of $5,058,408.81 was wired out of Orion's M&T Bank account to Robinson Brog Leinwand Greene LLP ("**Robinson Brog**").[26]

29. On September 23, 2016, CHT acquired Vega Medical Professionals LLC ("**Vega**") for a maximum consideration of $24.0 million including certain considerations in the form of earn-outs. The purchase consideration was 78% cash and 22% in shares of CHT common stock. According to the Dragelin Declaration, the purchase price was significantly overstated by Debtor's management, which was $4.68 million and not $24.0 million.[27]

30. At this point CHT was the holding company of Orion, which owned eighteen subsidiaries.[28]

31. On November 24, 2016, CHT Holdco, LLC ("**CHT Holdco**") entered into an agreement to acquire CHT's common stock for $3.36 per share payable in cash and promissory notes.[29]

32. On January 18, 2017, CHT's shareholders approved the merger agreement between CHT Holdco and CHT.[30] Shortly thereafter, on February 3, 2017, $46 million was transferred to an account at Robinson Brog. Within one week, approximately $17 million was transferred out of this account. On March 15, 2017, the FBI seized $20 million.[31]

33. In October 2017, Timothy J. Dragelin of FTI was appointed as Orion's Chief Executive Officer and Chief Restructuring Officer.[32]

---

[24] Daniel Jones Affidavit at 4.
[25] Dragelin Declaration at 26.
[26] Daniel Jones Affidavit at 5. The firm is currently named Robinson Brog Leinwand Greene Genovese & Gluck PC.
[27] Dragelin Declaration at 27 and footnote 11 (note that "Medial" appears to be a typo of "Medical").
[28] Dragelin Declaration at 28 (note that "eight" on line 3 of this paragraph appears to be a typo of "eighteen").
[29] Dragelin Declaration at 29.
[30] Dragelin Declaration at 30.
[31] Robinson Brog IOLA Quick Report.
[32] Dragelin Declaration at 1.

1924

**B | RILEY** *Advisory Services*

34. On March 16, 2018, the Debtors (with the exception of New York Network Management) filed for chapter 11 bankruptcy.[33]

35. In 2018, Mr. Parmer, Mr. Zaharis and Mr. Chivukuola were indicted for creating fictitious business entities, balance sheets, doctored bank statements, fabricating customers and making sham acquisitions for the purpose of misappropriating the Debtor's assets (the "**Allegations**").[34]

36. In 2018, MTBC, Inc. ("**MTBC**") acquired the assets of Orion Healthcorp, Inc. and thirteen of its subsidiaries for $12.6 million in cash.[35]

## V.    Financial Analysis of Orion

37. The review of any business includes performing a detailed financial analysis of the subject company. Financial analysis is the process of summarizing, synthesizing, comparing, and interpreting financial data and other relevant information in order to assess a company's present performance and future prospects.

38. This section of the report discusses our analysis of Orion's consolidated 2015 and 2016 financial statements. Since I was not provided with audited financial statements for Orion, I relied on the Company's tax returns and other internal financial reports.[36]

### A.  Balance Sheet

39. We reviewed the amended 2015 tax return and the 2016 tax return to assess the balance sheet activity of Orion on a consolidated basis. This analysis can be found in detail on **Schedule 7.2**. **Table 1**Table 1 below summarizes the consolidated balance sheet activity of Orion at December 31, 2015 and December 31, 2016.

---

[33] Complaint at 5.
[34] Complaint at 16.
[35] MTBC Form 10-K as of December 31, 2018, p. 3.
[36] I relied upon the Company's amended 2015 income tax return that was filed after the Company entered bankruptcy protection.

---

**B|RILEY** *Advisory Services*

Table 1

| Description | Amended Orion Healthcorp Inc. & Subs FYE 12/3115[1] | | Consolidated Orion Healthcorp, Inc. FYE 12/31/16[2] | |
|---|---|---|---|---|
| **Consolidated Historical Balance Sheet** | | | | |
| **Assets** | | | | |
| Cash | $ 2,409,919 | 2.6% | $ 1,044,359 | 0.8% |
| Trade Notes and A/R | 15,541,299 | 17.1% | 8,143,392 | 6.1% |
| Less: allowances for Bad Debt | (1,578,617) | -1.7% | (1,154,715) | -0.9% |
| Inventory | 249,430 | 0.3% | 300,809 | 0.2% |
| US Gov. Obligations | - | 0.0% | - | 0.0% |
| Tax-Exempt Securities | - | 0.0% | - | 0.0% |
| Other Current Assets | 395,191 | 0.4% | 2,734,803 | 2.0% |
| Loans to Stockholders | - | 0.0% | - | 0.0% |
| Mtge and Real Estate Loans | - | 0.0% | - | 0.0% |
| Other Investments | - | 0.0% | - | 0.0% |
| Buildings and Other Depr. Assets | 17,668,323 | 19.4% | 14,405,426 | 10.8% |
| Less. Accum. Depreciation | (8,444,040) | -9.3% | (4,872,353) | -3.6% |
| Depletable Assets | - | 0.0% | - | 0.0% |
| Land, net | - | 0.0% | - | 0.0% |
| Intangible Assets | 38,288,546 | 42.1% | 98,336,909 | 73.4% |
| Less. Accum. Amortization | (6,694,009) | -7.4% | (7,520,913) | -5.6% |
| Other Assets | 33,173,528 | 36.5% | 22,472,146 | 16.8% |
| **Total Assets** | **$ 91,009,570** | 100.0% | **$ 133,889,863** | 100.0% |
| | | | | |
| **Liabilities & Equity** | | | | |
| Accounts Payable | $ 3,910,933 | 4.3% | $ 10,303,874 | 7.7% |
| Current Interest Bearing Debt | 4,631,771 | 5.1% | 208,569 | 0.2% |
| Other Current Liabilities | 9,338,271 | 10.3% | 109,790,852 | 82.0% |
| Loans from Stockholders | 1,628,998 | 1.8% | 884,833 | 0.7% |
| Long-term Debt | 10,290,577 | 11.3% | 12,381,666 | 9.2% |
| Other Liabilities | 17,911,073 | 19.7% | 18,231,992 | 13.6% |
| **Total Liabilities** | **$ 47,711,623** | 52.4% | **$ 151,801,786** | 113.4% |
| | | | | |
| Capital Stock - Preferred | $ - | 0.0% | $ - | 0.0% |
| Capital Stock - Common | 6,500 | 0.0% | 8,583 | 0.0% |
| Additional Paid-in Capital | 137,426,624 | 151.0% | 94,984,935 | 70.9% |
| Retained earnings-appropriated | - | 0.0% | - | 0.0% |
| Retained earnings-unappropriated | (94,135,177) | -103.4% | (112,905,441) | -84.3% |
| Adjustments to Shareholder's Equity | - | 0.0% | - | 0.0% |
| Less cost of Treasury Stock | - | 0.0% | - | 0.0% |
| **Total Equity** | **$ 43,297,947** | 47.6% | **$ (17,911,923)** | -13.4% |
| **Total Liabilities & Equity** | **$ 91,009,570** | 100.0% | **$ 133,889,863** | 100.0% |

40.  Our review and analysis of the Company's December 31, 2015, and December 31, 2016, balance sheets revealed the following observations:

1926

**B | RILEY** *Advisory Services*

a. Orion's gross accounts receivable balance decreased 47.6% from $15,541,299 at December 31, 2015 to $8,143,392 at December 31, 2016.

b. Orion's other current assets increased from $395,191 at December 31, 2015 to $2,734,803 at December 31, 2016, an increase of 592.0%.

c. Orion's gross intangible assets increased 156.8% from $38,288,546 at December 31, 2015 to $98,336,909 at December 31, 2016. Most of this increase was in the form of intangible assets, related to acquisitions discussed in this report.

d. Orion's other long-term assets decreased 32.3% from $33,173,528 at December 31, 2015 to $22,472,146 at December 31, 2016.

e. The Company's total assets increased 47.1% from $91,009,570 at December 31, 2015 to $133,889,863 at December 31, 2016.

f. Orion's accounts payable increased 163.5% from $3,919,933 at December 31, 2015 to $10,303,874 at December 31, 2016.

g. Orion's current portion of interest-bearing debt decreased 95.5% from $4,631,771 at December 31, 2015 to $208,569 at December 31, 2016.

h. Orion's other current liabilities increased 1,075.7% from $9,338,271 at December 31, 2015 to $109,790,852 at December 31, 2016. See paragraph 61a for further discussion of this anomaly.

i. Orion' long-term debt increased 20.3% from $10,290,577 at December 31, 2015 to $12,381,666 at December 31, 2016.

j. Orion's other long-term liabilities increased 1.8% from $17,911,073 at December 31, 2015 to $18,231,992 at December 31, 2016.

k. Orion's total liabilities increased 218.2% from $47,711,623 at December 31, 2015 to $151,801,786 at December 31, 2016.

l. Orion's total shareholder equity decreased 141.4% from $43,297,947 at December 31, 2015 to a deficit of $17,911,923 at December 31, 2016.

41. Overall, Orion's balance sheet experienced a material deterioration from December 2015 to December 2016. The Company's current assets declined as accounts receivable were collected or written off at a faster pace than new customer receivables were created. This meant Orion's liquidity weakened during the 12-month period. The Company's intangible

1927

**B | RILEY** *Advisory Services*

assets, primarily Goodwill, increased by a significant amount, which was primarily due to accounting for the numerous acquisitions made by Orion during 2016. However, these Goodwill assets had little or no meaningful value due to the alleged sham nature of several transactions.

42. To better understand the Company's worsening financial distress, we also analyzed Orion's capital structure. During the twelve months ended December 31, 2016, the Company's current liabilities increased approximately $102 million as reported. Current liabilities are defined as liabilities to be paid within the next twelve months. Since the Company's current assets declined during the same period, this meant Orion's ability to meet its ongoing obligations was significantly impaired.

43. Finally, due to the Company's operating losses incurred through 2016, Orion's shareholder capital was completely eliminated to the point where it had a negative $17.9 million book value of equity by December 31, 2016. This represented a decrease of $61.2 million from $43.3 million one year earlier.

## B. Income Statement

44. When analyzing the financial performance of Orion, we reviewed the income statements provided in the 2015 amended tax return and the 2016 tax return. Additionally, we were also provided with adjusted profit and loss statements for the years ending December 31, 2015, and December 31, 2016 that were prepared by FTI. The FTI adjusted financial statements provided greater level of detail than the tax returns and were therefore the focus of our profit and loss analysis.

45. **Table 2**Table 2 below summarizes the income statement for Orion for the twelve-month periods ending December 31, 2015, and December 31, 2016.

1928

B | RILEY *Advisory Services*

**Table 2**

| Description | Adj. Consolidated Orion Healthcorp, Inc. Profit and Loss Statement FYE 12/31/2015[1] | | Adj. Consolidated Orion Healthcorp, Inc. Profit and Loss Statement FYE 12/31/2016[2] | |
|---|---|---|---|---|
| | $ | % | $ | % |
| **Adj. Consolidated Orion Healthcorp, Inc. Profit and Loss Statement** | | | | |
| Revenue | $ 55,490,216 | 100.0% | $ 53,936,035 | 100.0% |
| **Total Revenue** | $ 55,490,216 | 100.0% | $ 53,936,035 | 100.0% |
| | | | | |
| **Operating Expenses:** | | | | |
| Salaries and Benefits | $ 18,576,559 | 33.5% | $ 22,434,628 | 41.6% |
| Facility Rent and Related Costs | 3,099,693 | 5.6% | 2,880,672 | 5.3% |
| Depreciation | 1,284,608 | 2.3% | 2,582,067 | 4.8% |
| Amortization | 3,201,757 | 5.8% | 9,217,893 | 17.1% |
| Professional and Consulting Fees | 17,107,944 | 30.8% | 15,561,441 | 28.9% |
| Management Fees Inter Company | - | 0.0% | - | 0.0% |
| Insurance | 435,427 | 0.8% | 583,882 | 1.1% |
| Provision for Doubtful Accounts | 733,764 | 1.3% | 2,239,825 | 4.2% |
| Vaccines and Medical Supplies | 4,417,260 | 8.0% | 4,796,524 | 8.9% |
| Office and Computer Supplies | 226,948 | 0.4% | 299,649 | 0.6% |
| Postage and Courier | 1,830,631 | 3.3% | 1,963,024 | 3.6% |
| Other | 4,317,315 | 7.8% | 4,793,491 | 8.9% |
| **Total operating expenses** | $ 55,231,907 | 99.5% | $ 67,353,097 | 124.9% |
| | | | | |
| **Income From Operations** | $ 258,309 | 0.5% | $ (13,417,061) | -24.9% |
| | | | | |
| **Other income (expenses):** | | | | |
| Interest Expense | (2,579,398) | -4.6% | (1,656,908) | -3.1% |
| Change in Fair Value of Contingent Consideration | (537,199) | -1.0% | (4,173,331) | -7.7% |
| Early Extinguishment of Debt | - | 0.0% | (6,410,566) | -11.9% |
| Other Expense, Net | (4,691,539) | -8.5% | (22,734,144) | -42.2% |
| **Total Other Income (Expenses), Net** | $ (7,808,136) | -14.1% | $ (34,974,948) | -64.8% |
| | | | | |
| **Income Before Provision For Income Taxes** | $ (7,549,827) | -13.6% | $ (48,392,010) | -89.7% |
| | | | | |
| Provision for Income Taxes | 4,367,999 | 7.9% | (1,649,262) | -3.1% |
| **Net income** | $ (11,917,826) | -21.5% | $ (46,742,748) | -86.7% |
| | | | | |
| Other Comprehensive Loss | - | 0.0% | 659 | 0.0% |
| | | | | |
| **Comprehensive Income** | $ (11,917,826) | -21.5% | $ (46,743,407) | -86.7% |

46.     Our analysis of Orion's 2015 and 2016 income statements revealed the following observations about the Company's operating performance:

a.   Orion's revenue declined 2.8% from $55,490,216 in 2015 to $53,936,035 in 2016.

b.   Orion's operating expenses increased 22.0% from $55,231,907 in 2015 to $67,353,097 in 2016.

    c. Orion's "other" expenses increased 347.9% from $7,808,136 in 2015 to $34,974,948 in 2016.

    d. Orion's net earnings decreased 292.2% from negative $11,917,826 in 2015 to negative $46,742,748 in 2016.

47. Orion's operating performance in 2016 showed a significant decline. Despite a modest revenue decline of approximately $1.6 million during 2016, the Company's total expenses increased by approximately $39.3 million during the same period, resulting in a significant decrease in profitability.

48. Despite making a number of acquisitions during 2016, the Company was unable to generate any additional revenues from these acquisitions; in fact, Orion actually generated less revenue than in 2015. At the very least, this fact illustrated the fictitious nature of Orion's acquisitions during 2016.

### C. Working Capital

49. Working capital is defined as current assets less current liabilities and is a fundamental measurement of a company's financial health and short-term liquidity.

50. While some industries can operate with minimal, and in some cases negative working capital, they are typically businesses with cash sales that rapidly turnover their inventory and have no accounts receivable. However, consulting and service firms like Orion required certain amounts of working capital to fund their daily operations.

51. According to industry data, consulting services companies required working capital levels approaching 18.0% of annual revenue.[37] However, as shown below in **Table 3**, the Company's working capital was clearly deficient relative to its industry peers. The working capital deficit further illustrated the Company's financial distress in 2015 and 2016.

---

[37] Per Integra Five-year Industry Report for SIC 8742 - Management Consulting Services working capital to Sales is approximately 18%.

**B | RILEY** *Advisory Services*

Table 3

| Orion Healthcorp, Inc. Net Working Capital Analysis | | |
|---|---|---|
| Description | FYE 12/31/15 | FYE 12/31/16 |
| Net Revenue[1] | $ 55,490,216 | $ 53,936,035 |
| Adj. Current Assets[2] | | |
| Cash | $ 2,409,919 | $ 1,044,359 |
| Net Accounts Receivable | 13,962,682 | 6,988,677 |
| Inventory | 249,430 | 300,809 |
| Other Current Assets | 395,191 | 2,734,803 |
| Total Adj. Current Assets | $ 17,017,222 | $ 11,068,648 |
| Adj. Current Liabilities[2] | | |
| Accounts Payable | $ 3,910,933 | $ 10,303,874 |
| Current Interest Bearing Debt | 4,631,771 | 208,569 |
| Other Current Liabilities | 9,338,271 | 10,715,352 |
| Adj. Total Current Liabilities | $ 17,880,975 | $ 21,227,795 |
| **Net Working Capital ("NWC")** | $ (863,753) | $ (10,159,147) |
| *NWC as a % of Revenue* | -1.56% | -18.84% |
| Selected Normalized NWC as a % of Revenue[3] | | *18.0%* |
| Normalized Working Capital | $ 9,988,239 | $ 9,708,486 |
| **Implied Working Capital Surplus (Deficit)** | $ (10,851,992) | $ (19,867,633) |
| Notes: | | |
| [1] See Schedule 7.0. | | |
| [2] See Schedules 5.2 and 5.3. | | |
| [3] Per Integra Five-year Industry Report for SIC 8742 - Management Consulting Services working capital to Sales is approximately 18%. | | |

52. **Table** above demonstrates that Orion had negative working capital of $863,753 at December 31, 2015 and negative working capital of $10,159,147 at December 31, 2016 (after consideration of the normalization adjustments described in the following section). This working capital deficit helps illustrate how much the financial health of Orion deteriorated from 2015 to 2016. This demonstrates that Orion did not have sufficient capital to fund short term operations or investments and needed additional funding to achieve the required level of working capital.

## D. Normalizing Adjustments

53. A key concept in valuation is the normalization of a company's financial statements. Normalizing the financial statement is typically a recasting of the subject company's

financial statements with the exclusion or addition of certain items. Typically, there are two types of adjustments:[38]

    a. Normalization Adjustments – "changes made to a private company's earnings to translate to a 'reasonably well run, public company equivalent basis.'"

    b. Control Adjustments – changes made for "'i) the economies and efficiencies of the typical financial buyer and ii) the synergies or strategies of [a] particular buyer.'"

54. Normalization adjustments are used to exclude unusual, extraordinary or non-recurring items from a company's financial statements. Control adjustments are typically made when assessing the value of having a controlling ownership interest in a company. These adjustments result in an indication of earnings and cash flow attributable to the ownership of the subject company.

55. Our analysis of Orion's financial statements indicated a need for certain normalization adjustments as described below.

---

[38] Willamette Management Associates' Valuation Practices and Procedures Insights: Implementing Normalization Adjustments.

**B│RILEY** *Advisory Services*

Table 4

| Orion Healthcorp, Inc. Normalized Income Statement | | | | |
|---|---|---|---|---|
| Description | FYE 12/31/15[1] | | FYE 12/31/16[1] | |
| Net Revenue | $ 55,490,216 | 100.0% | $ 53,936,035 | 100.0% |
| COGS | - | 0.0% | - | 0.0% |
| Gross Profit | $ 55,490,216 | 100.0% | $ 53,936,035 | 100.0% |
| | | | | |
| General & Administrative Expenses | $ 55,231,907 | 99.5% | $ 67,353,097 | 124.9% |
| Net Operating Income | $ 258,309 | 0.5% | $ (13,417,061) | -24.9% |
| | | | | |
| Plus Other Income (Expenses) | $ (7,808,136) | -14.1% | $ (34,974,948) | -64.8% |
| Income Before Provision for Income Taxes | $ (7,549,827) | -13.6% | $ (48,392,010) | -89.7% |
| | | | | |
| Less: Income Tax Provision | $ 4,367,999 | 7.9% | $ (1,649,262) | -3.1% |
| Less: Other Comprehensive Loss | - | 0.0% | 659 | 0.0% |
| Comprehensive Net Income | $ (11,917,826) | -21.5% | $ (46,743,407) | -86.7% |
| | | | | |
| Add Back: | | | | |
| Plus: Interest | $ 2,579,398 | 4.6% | $ 1,656,908 | 3.1% |
| Federal Tax expense | 1,645,978 | 3.0% | 3,283,866 | 6.1% |
| State and Local Tax | 960,090 | 1.7% | 700,000 | 1.3% |
| Deferred Tax Expense | 1,841,425 | 3.3% | - | 0.0% |
| Deferred Tax Benefit | (79,494) | -0.1% | (5,633,128) | -10.4% |
| Plus: Depreciation | 1,284,608 | 2.3% | 2,582,067 | 4.8% |
| Plus: Amortization | 3,201,757 | 5.8% | 9,217,893 | 17.1% |
| EBITDA | $ (484,064) | -0.9% | $ (34,935,801) | -64.8% |
| | | | | |
| Normalizing Adjustments | | | | |
| Add Back: | | | | |
| Consulting Fees | $ 1,123,116 | 2.0% | $ 865,893 | 1.6% |
| Professional Fees | 3,246,391 | 5.9% | 6,111,720 | 11.3% |
| Purchased Services | 1,480,059 | 2.7% | - | 0.0% |
| Normalized Executive Compensation | (475,907) | -0.9% | (487,805) | -0.9% |
| Contract Labor | 3,461,669 | 6.2% | 343,441 | 0.6% |
| Bad Debt Expense | 733,764 | 1.3% | 2,239,825 | 4.2% |
| Normalized Bad Debt Expense | (221,961) | 0.4% | (215,744) | 0.4% |
| Early Extinguishment of Debt | - | 0.0% | 6,265,566 | 11.6% |
| Debt Fees | - | 0.0% | 145,000 | 0.3% |
| Other Expense | 2,831,539 | 5.1% | 361,927 | 0.7% |
| Acquisition Fees | 1,860,000 | 3.4% | 22,372,216 | 41.5% |
| Total Adjustments | $ 14,038,670 | 25.3% | $ 38,002,039 | 70.5% |
| Normalized EBITDA | $ 13,554,606 | 24.4% | $ 3,066,238 | 5.7% |

56.  In **Table 4**Table  above, we adjusted the following items:

a.  <u>Consulting Fees</u>. We added back consulting fees, which represented discretionary fees to management, based on our interview with Mr. Lazzarra.

1933

b. <u>Professional Fees</u>. We added back professional fees, which represented discretionary fees paid to management, based on our interview with Mr. Lazzarra.

c. <u>Purchased Services</u>. We added back purchased services based upon our interview with Mr. Lazzara. Since these expenses only occurred in 2015, it is likely they are related to the Porteck migration, and therefore represent a non-recurring expense (see paragraph 14 above).

d. <u>Contract Labor</u>. We added back contract labor because these were non-recurring fees that we understand from our interview with Mr. Lazzarra were related to the Porteck migration.

e. <u>Executive Compensation</u>. After adding back consulting and professional fees, we deducted a normalized level of expenditure related to executive compensation. We assumed that Paul Parmar's 2017 contract contained a normalized compensation level and deflated this amount back to 2015 and 2016 levels for those years.[39]

f. <u>Bad Debt Expense</u>. Orion had unusually high bad debt expense compared to industry metrics. Therefore, we normalized the bad debt expense by adding back the reported expense and subtracting normalized bad debt expense of 0.4% based on industry data.[40] I note that this is a conservative adjustment from the point of view that a poorly run company such as Orion might be expected to have above-average levels of bad debt expense.

g. <u>Early Extinguishment of Debt</u>. We added back the early extinguishment of debt because it was a non-recurring expense.

h. <u>Debt Fees</u>. The debt fees are related to the early extinguishment of debt and were added back as a non-recurring expense.

i. <u>Other Expense</u>. We added back the other expense account because it was grouped in the "Other Expense" category of the income statement after operating income. Therefore, we concluded that these expenses were not related to the operations of the company and should be normalized.

j. <u>Acquisition Fees</u>. We added back acquisition fees because these were non-recurring expenses.

---

[39] Paul Parmar's Employment Agreement Dated November 24, 2016.
[40] Integra Five-year Industry Report for SIC 8742 - Management Consulting Services.

**B | RILEY** *Advisory Services*

k. <u>Federal Tax Expense</u>. We added back federal tax expense because in the adjusted financial statements, Orion had negative net income and would not incur federal tax expenses.

l. <u>State and Local Tax</u>. Similarly, we added back state and local tax expenses because Orion's adjusted financial statements resulted in negative net income and Orion would not have incurred incur state and local tax expense.

m. <u>Deferred Tax Expense</u>. We added back the deferred tax expense as a non-recurring expense for Orion.

n. <u>Deferred Tax Benefit</u>. We added back the deferred tax benefit as a non-recurring benefit for Orion.

57. After normalizing the historical operations of Orion, Orion earned EBITDA of approximately $13,554,606 the fiscal year ended December 31, 2015 and $3,066,238 for the fiscal year ended December 31, 2016.

58. **Table 5** and **Table 6** below summarize our adjustments to Orion's balance sheet at December 31, 2015 and December 31, 2016.

1935

# B|RILEY Advisory Services

**Table 5**

| | Orion Healthcorp, Inc. Normalized Balance Sheet | | |
|---|---|---|---|
| Description | Reported Balance Sheet as of 12/31/2015 | Adjustments | Adjusted Balance Sheet as of 12/31/2015 |
| **Assets** | | | |
| Cash | $ 2,409,919 | $ - | $ 2,409,919 |
| Trade Notes and A/R | 15,541,299 | - | 15,541,299 |
| Less: allowances for Bad Debt | (1,578,617) | - | (1,578,617) |
| Inventory | 249,430 | - | 249,430 |
| US Gov. Obligations | - | | - |
| Tax-Exempt Securities | - | | - |
| Other Current Assets | 395,191 | - | 395,191 |
| Loans to Stockholders | - | | - |
| Mtge and Real Estate Loans | - | - | - |
| Other Investments | - | - | - |
| Buildings and Other Depr. Assets | 17,668,323 | - | 17,668,323 |
| Less. Accum. Depreciation | (8,444,040) | - | (8,444,040) |
| Depletable Assets | - | - | - |
| Land, net | - | - | - |
| Intangible Assets | 38,288,546 | - | 38,288,546 |
| Less. Accum. Amortization | (6,694,009) | - | (6,694,009) |
| Other Assets | 33,173,528 | - | 33,173,528 |
| **Total Assets** | $ 91,009,570 | $ - | $ 91,009,570 |
| | | | |
| **Liabilities & Equity** | | | |
| Accounts Payable | $ 3,910,933 | $ - | $ 3,910,933 |
| Current Interest Bearing Debt | 4,631,771 | - | 4,631,771 |
| Other Current Liabilities | 9,338,271 | - | 9,338,271 |
| Loans from Stockholders | 1,628,998 | (1,628,998) | - |
| Long-term Debt | 10,290,577 | - | 10,290,577 |
| Other Liabilities | 17,911,073 | - | 17,911,073 |
| **Total Liabilities** | $ 47,711,623 | $ (1,628,998) | $ 46,082,625 |
| | | | |
| Capital Stock - Preferred | - | - | - |
| Capital Stock - Common | 6,500 | - | 6,500 |
| Additional Paid-in Capital | 137,426,624 | - | 137,426,624 |
| Retained earnings-appropriated | - | - | - |
| Retained earnings-unappropriated | (94,135,177) | - | (94,135,177) |
| Adjustments to Shareholder's Equity | - | - | - |
| Less cost of Treasury Stock | - | - | - |
| Loans from Stockholders | - | 1,628,998 | 1,628,998 |
| **Total Equity** | $ 43,297,947 | $ 1,628,998 | $ 44,926,945 |
| **Total Liabilities & Equity** | $ 91,009,570 | $ - | $ 91,009,570 |

59.  In **Table** above, we adjusted Loans from Stockholders and assumed these funds would otherwise be financed by a third-party lender.

1936

**B|RILEY** *Advisory Services*

60. **Table** below summarizes the normalizing adjustments we made to Orion's balance sheet as of December 31, 2016.

### Table 6

| Description | Reported Balance Sheet as of 12/31/2016 | Adjustments | Adjusted Balance Sheet as of 12/31/2016 |
|---|---|---|---|
| **Orion Healthcorp, Inc. Normalized Balance Sheet** | | | |
| **Assets** | | | |
| Cash | $ 1,044,359 | $ - | $ 1,044,359 |
| Trade Notes and A/R | 8,143,392 | - | 8,143,392 |
| Less: allowances for Bad Debt | (1,154,715) | - | (1,154,715) |
| Inventory | 300,809 | - | 300,809 |
| US Gov. Obligations | - | | - |
| Tax-Exempt Securities | - | | - |
| Other Current Assets | 2,734,803 | - | 2,734,803 |
| Loans to Stockholders | - | - | - |
| Mtge and Real Estate Loans | - | - | - |
| Other Investments | - | - | - |
| Buildings and Other Depr. Assets | 14,405,426 | - | 14,405,426 |
| Less. Accum. Depreciation | (4,872,353) | - | (4,872,353) |
| Depletable Assets | - | - | - |
| Land, net | - | - | - |
| Intangible Assets | 98,336,909 | - | 98,336,909 |
| Less. Accum. Amortization | (7,520,913) | - | (7,520,913) |
| Other Assets | 22,472,146 | - | 22,472,146 |
| **Total Assets** | **$ 133,889,863** | **$ -** | **$ 133,889,863** |
| | | | |
| **Liabilities & Equity** | | | |
| Accounts Payable | $ 10,303,874 | $ - | $ 10,303,874 |
| Current Interest Bearing Debt | 208,569 | - | 208,569 |
| Other Current Liabilities | 109,790,852 | (99,075,500) | 10,715,352 |
| Loans from Stockholders | 884,833 | (884,833) | - |
| Long-term Debt | 12,381,666 | 99,075,500 | 111,457,166 |
| Other Liabilities | 18,231,992 | - | 18,231,992 |
| **Total Liabilities** | **$ 151,801,786** | **$ (884,833)** | **$ 150,916,953** |
| | | | |
| Capital Stock - Preferred | - | - | - |
| Capital Stock - Common | 8,583 | - | 8,583 |
| Additional Paid-in Capital | 94,984,935 | - | 94,984,935 |
| Retained earnings-appropriated | - | - | - |
| Retained earnings-unappropriated | (112,905,441) | - | (112,905,441) |
| Adjustments to Shareholder's Equity | - | - | - |
| Less cost of Treasury Stock | - | - | - |
| Loans from Stockholders | - | 884,833 | 884,833 |
| **Total Equity** | **$ (17,911,923)** | **$ 884,833** | **$ (17,027,090)** |
| **Total Liabilities & Equity** | **$ 133,889,863** | **$ -** | **$ 133,889,863** |

61. In **Table** above, we adjusted the following for the December 31, 2016 balance sheet:

1937

**B | RILEY** *Advisory Services*

a. <u>Other Current Liabilities</u>. We adjusted $99,075,500 of current liabilities and moved them to long-term liabilities. We assume this account was related to intercompany loans that would otherwise be financed by a third-party lender.[41]

b. <u>Loans from Stockholders.</u> We normalized Loans from Stockholders and assumed these funds should be classified as equity. This reflects that these loans were not being repaid over time and had no formal loan agreements.

62. These liabilities were moved to long-term debt and ultimately decreased current liabilities by $99,075,500 and normalized Orion's long-term debt to a total of $111,457,166. These adjustments impact Orion's normalized working capital position in addition to Orion's interest expense, which are discussed later in this report.

## VI. Solvency Opinion Overview

### A. Solvency Definition

63. In connection with the claims in this matter, I was asked to perform a solvency opinion in order to determine whether Orion was solvent at the time of the Transfers. A solvency opinion is the opinion of a financial advisor as to whether a company is solvent under certain specified conditions.

64. Solvency opinions are frequently sought by parties such as company management, boards of directors, professional advisors, and other fiduciaries in order to demonstrate that they acted prudently in implementing the subject transaction.

65. In performing my assignment, I was asked to provide a solvency opinion of Orion after the Transfers were made.

### B. The Three Solvency Tests

66. In order to assess the solvency of Orion, I performed three tests: The Balance Sheet Test, the Capital Adequacy Test, and the Cash Flow Test.

---

[41] Orion Healthcorp, Inc. 2016 Tax Return. The tax showed on the Company's entities had a combined intercompany loan amount of $45,661,290. However, the consolidation of the entities also included Other Current Liabilities adjustment of $53,414,210. Since this adjustment had no detail, we assumed it was related to the intercompany loans, the single largest item in Other Current Liabilities.

1938

**B|RILEY** *Advisory Services*

67. Solvency is a company's ability to meet its long-term financial obligations. In order to evaluate a company's solvency, it must pass three tests:

    a. The <u>Balance Sheet Test</u>, pursuant to which a debtor is insolvent when the sum of its debts is greater than all of its property at a "fair valuation." Although the term fair valuation is not defined in the Bankruptcy Code, when employing the Balance Sheet Test of insolvency, it is generally accepted that fair valuation is represented by Fair Market Value as further defined in Section VII.A below.

    b. The <u>Cash Flow Test</u>, which assess whether the Company can meet its normalized operating and debt services needs as they fall due; and

    c. The <u>Capital Adequacy Test</u>, which assess the financial health and solvency of the Company by comparing the Company's financial performance to industry norms.

68. New York Consolidated Laws, Debtor and Creditor Law defines insolvency as follows:[42]

    a. A person is insolvent when the present fair salable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured.

    b. In determining whether a partnership is insolvent there shall be added to the partnership property the present fair salable value of the separate assets of each general partner in excess of the amount probably sufficient to meet the claims of his separate creditors, and also the amount of any unpaid subscription to the partnership of each limited partner, provided the present fair salable value of the assets of such limited partner is probably sufficient to pay his debts, including such unpaid subscription.

69. The three solvency tests described above consider similar factors to the New York law definition. If a company fails any one of the three solvency tests, the company is considered to be insolvent.

### C. Solvency Opinion Conclusions

70. The result of my solvency analyses is that Orion was INSOLVENT after the payment of each of the Transfers.

---

[42] New York Consolidated Laws, Debtor and Creditor Law - DCD § 271.

1939

**B | RILEY** *Advisory Services*

## VII. Balance Sheet Test (First Solvency Test)

71. In order to complete the Balance Sheet Test, we must first assess the Fair Market Value of the Company's assets.

### A. Valuation Parameters

72. The standard of value typically applied in a Solvency Analysis is "Fair Market Value," which is defined as:

> *The price, expressed in terms of cash equivalents, at which the property would change hands between a hypothetical willing and able buyer and a hypothetical willing and able seller, acting at arm's length in an open and unrestricted market, when neither is under compulsion to buy or sell and when both have reasonable knowledge of the relevant facts.*[43]

73. The premise of value is the overall assumption regarding the most likely future business circumstances for the company being valued; for example, going concern or liquidation. We have performed our valuation analysis based on the general assumption that the underlying business activities of Orion as a going concern. As shown in **Schedule 3.3**, we also considered a liquidation analysis of Orion's assets.

### B. Valuation Approaches

74. There are numerous techniques and approaches to determine the value of an ongoing business enterprise. Generally, there are three traditional approaches to value a business interest or asset:

    a. The Asset Approach;

    b. The Income Approach; and

    c. The Market Approach.

75. Within these valuation approaches, valuation analysts will use one or more methods when valuing a business and/or its ownership interests. The objective of using more than one approach or method (if applicable) allows the appraiser to view the target company from different perspectives to form an opinion as to the value conclusion. The method or

---

[43] *ASA Business Valuation Standards* published by the American Society of Appraisers.

methods selected for each valuation will depend upon the appraiser's judgment and experience with similar valuations and upon the quantity and quality of available financial, operational and industry data.

76. The generally accepted business valuation approaches and accompanying methodologies we considered are briefly discussed below.

### The Asset Approach

77. The underlying Asset or Cost Approach establishes value by netting the Fair Market Value of assets and liabilities to determine the net asset value or net worth of the business. The value of all of the target company's assets are discretely determined and accumulated. Therefore, this valuation approach requires a discrete valuation of all of the assets of a company, where the appraiser examines the current cost to purchase or replace each asset.

78. This valuation approach is typically applied for asset heavy or capital-intensive businesses, real estate, or security holding companies. Asset value also constitutes the price determinant of corporate worth where operations have historically been unprofitable, unstable, or earnings are marginal in relation to invested capital. In the case of a company that does not possess sufficient earnings potential or cash flow to warrant treatment as a going concern, assets can be stated at their liquidation values less a provision for disposal costs and taxes that might arise from their liquidation. On the other hand, in situations where there are earnings or potential earnings, the business should be considered a going concern and its value should be calculated with reference to its earnings or earnings potential as opposed to the value of the assets.

79. Since I valued Orion as a going concern, I did not use the cost approach.

80. It should be noted, however, that in 2018 after Orion had filed for Chapter 11 Bankruptcy protection, Orion and several of its subsidiaries were sold for approximately $12.6 million by MTBC, a publicly traded management services company. This value could be used as a proxy for "floor" value when considering the liquidation value of Orion and its subsidiaries which is summarized in **Schedule 3.3**.

**B|RILEY** *Advisory Services*

### The Income Approach

81. The application of the Income Approach establishes value by means that capitalize or discount future anticipated benefits, such as cash flows or earnings, by a discount or capitalization rate.[44] Capitalization and discount rates are developed to reflect market rate of return expectations, as well as the relative risk of the investment. This approach is often used to determine the value of a going-concern business whose value is aligned with its ability to generate future earnings and/or cash flows. Valuations under this approach are typically performed through either the use of either:

   a. The Discounted Cash Flow ("**DCF**") Method, which is often used when reliable projections as of the Measurement Dates are available; or

   b. The Capitalization of Earnings ("**CoE**") Method, which utilizes the calculation of normalized after-tax cash flow to represent expected future earnings and divides the normalized cash flow by a capitalization rate in order to arrive at a value indication.

82. Because I was not provided with any contemporaneous projections for Orion, I utilized the Capitalization of Earnings Method in applying the Income Approach to valuing Orion.

### The Market Approach

83. The Market Approach is a relative valuation approach that assesses a company's value by comparing the company being valued to the market price of similar companies at the Measurement Dates or the historical sales price of similar companies that have been sold. There are two primary methods to apply the Market Approach:

   a. The "**Guideline Public Company Method**" where the value of a business enterprise is determined by comparing the target company to publicly-traded guideline companies in the same or similar lines of business. The guideline firms are also referred to as "Peers" or "Peer Companies."

---

[44] Typically, a capitalization rate is a rate of return used to convert a single period income into a value, and a discount rate is a rate applied to a series of future income amounts to convert them into one value. The inverse of the capitalization rate is a multiple of cash flow. Capitalization is most appropriate for mature businesses with level income streams versus the discounting which is more appropriate for businesses with varying levels of income in the future.

---

**B** | **RILEY** *Advisory Services*

    b.  The "**Guideline Transaction Method**" where the value of a business is determined by comparing the target company to actual M&A sales transactions involving both publicly-traded and privately-held companies in the same industry sector as that target company.

84.  The conditions and prospects of companies in similar lines of business depend on common factors such as overall demand for their products and services. Therefore, an analysis of market multiples of companies engaged in similar lines of business can yield insight into investor perceptions, and accordingly, the value of a target company.

85.  I considered the Market Approach to be relevant to the valuation of Orion and identified potentially comparable public companies under the Guideline Public Company Method and comparable transaction under the Guideline Transactions Method. However, after further analysis of Orion's financial position and understanding the allegedly fraudulent activities that were present within the Company in fiscal year 2016, I determined the Market approach was not applicable because the comparable transactions and guideline public company multiples are not tainted with allegedly fraudulent activity.

86.  The multiples tied to the identified comparable public companies and transactions are derived from companies that are not subject to allegations of fraud and which have not had material restatements of their tax returns. Therefore, it is my opinion that the Market Approach is not relevant to the Balance Sheet Test of Orion.

*Valuation Summary*

87.  We therefore relied entirely on the Income Approach as shown in the Balance Sheet Test Summary set out in **Schedule 1** (the "**Valuation Summary**").

## C.  Application of the Income Approach

88.  As previously stated above, the Capitalized Earnings Method derives value by capitalizing a single period of earnings by a capitalization rate.

89.  We developed a capitalization rate based on the industry standard build-up approach. This approach is detailed in **Schedule 2.0**. For the period ending December 31, 2016, we concluded a capitalization rate of 22.5%.

---

**B｜RILEY** *Advisory Services*

90.  In our analysis we relied on the Company's adjusted historical financial statement information prepared by FTI. A summary of FTI's adjusted historical financials are summarize in **Table 2** above. We then normalized the income statement for certain line items in **Table 4**. This analysis was used to develop the Capitalized Earnings Method analysis summarized below in **Table 7**.

### Table 7

| Description | FYE 12/31/2015 | | FYE 12/31/2016 | | |
|---|---|---|---|---|---|
| Orion Healthcorp, Inc. Income Approach - Capitalized Earnings Method | | | | | |
| Net Revenue[1] | $ 55,490,216 | 100.0% | $ 53,936,035 | 100.0% | |
| | | | | | |
| Adj. EBITDA[1] | $ 13,554,606 | 24.4% | $ 3,066,238 | 5.7% | |
| Less: Normalized Depreciation[2] | 3,930,611 | 7.1% | 3,820,521 | 7.1% | |
| Less: Amortization[3] | - | 0.0% | - | 0.0% | |
| Operating Income | $ 9,623,995 | 17.3% | $ (754,283) | -1.4% | A |
| Tax Rate[4] | 35.0% | | 35.0% | | Tr |
| Less: Income Tax Provision | $ 3,368,398 | 6.1% | $ - | 0.0% | T = A * Tr |
| Net Operating Profit After Tax | $ 6,255,597 | 11.3% | $ (754,283) | -1.4% | B = A - T |
| Plus: Normalized Depreciation[2] | 3,930,611 | 7.1% | 3,820,521 | 7.1% | C |
| Plus: Amortization[3] | - | 0.0% | - | 0.0% | D |
| Less: Capital Expenditures[5] | 4,230,258 | 7.6% | 4,111,776 | 7.6% | CA |
| Less: Changes in Working Capital[6] | 249,706 | 0.4% | 242,712 | 0.4% | ΔWC |
| Free Cash Flow | $ 5,706,243 | 10.3% | $ (1,288,250) | -2.4% | FCF = B + C +D - CA - ΔWC |
| | | | | | |
| Estimated Long-term Growth Rate[4] | 1.025x | | 1.025x | | Gr |
| | $ 5,848,900 | 10.5% | $ (1,320,457) | -2.4% | E = FCF * Gr |
| | | | | | |
| Capitalization Rate[4] | 24.50% | | 22.50% | | CAP |
| | | | | | |
| Market Value of Invested Capital | $ 23,873,059 | | $ - | | MVIC = E / CAP |
| Rounded | $ 23,870,000 | 43.0% | $ - | 0.0% | |

91.  Using the capitalization rate and the normalized financial statements of Orion, we developed a Capitalized Earnings Model that measured the market value of invested capital ("**MVIC**") for Orion as of December 31, 2016. This analysis can be found on **Schedule 3.0** of this report and in **Table** above. We concluded that Orion had an MVIC of **$23.9 million** at December 31, 2015 and **zero**[45] at December 31, 2016.

### D.  Valuation Synthesis and Conclusion

92.  Our MVIC valuation conclusion is based on the income approach since we did not apply the market approach or the cost approach.

---

[45] Capital cannot have a negative value.

---

1944

**B | RILEY** *Advisory Services*

93. We also identified Orion had a material asset from the tax benefits from Orion's amortization expense resulting from the acquisition of several real and fake organizations. Since this expense is not perpetual, we removed it from Orion's income statement. To determine the value of the amortization tax-shield, we calculated the estimated future amortization expense tax benefit and discounted these amounts back to their present value as of the Measurement Dates.

94. We understand that some of the amortization benefits may be related to allegedly sham acquisitions. We conservatively assumed all of the amortization expenses were applicable. Our analysis is presented in **Schedule 3.5**. We concluded the value of the amortization tax savings was $3,525,650 at December 31, 2016. We did not value the amortization benefit at December 31, 2015 since Orion passed the balance sheet that Measurement Date without consideration of that asset.

95. We then used the MVIC value calculated in **Schedule 3.0** and added the Company's tax-shield benefit from amortizable acquired assets, subtracted Orion's normalized interest-bearing debt, and subtracted Orion's estimated working capital deficit. The results of this analysis are summarized in **Schedule 1.0** and **Table 8**Table below.

### Table 8

| Orion Healthcorp, Inc. Balance Sheet Test | | | |
|---|---|---|---|
| | As of 12/31/2015 | As of 12/31/2016 | *Source* |
| Market Value of Invested Capital Income Approach | $ 23,870,000 | $ - | *Schedule 3.0* |
| Market Value of Invested Capital | $ 23,870,000 | $ - | |
| | | | |
| Plus: Amortization Tax-shield Benefit | $ - | $ 3,525,650 | *Schedule 3.5* |
| Less: Short-term Debt | | 208,569 | *Schedule 5.3* |
| Less: Long-term Debt | 10,290,577 | 111,457,166 | *Schedule 5.3* |
| Less: Working Capital Deficit (Surplus) | 10,851,992 | 19,867,633 | *Schedule 4.0* |
| **Residual Invested Capital** | $ 2,727,431 | $ (128,007,718) | |
| | | | |
| **Balance Sheet Test Result** | **PASS** | **FAIL** | |
| | | | |
| **Interpolated Residual Invested Capital 4/15/2016** | | $ (35,135,754) | |
| | | | |
| **Balance Sheet Test Result 4/15/2016** | | **FAIL** | |
| | | | |
| **Balance Sheet Test Result 6/23/2017** | | **FAIL** | |
| | | | |
| **Balance Sheet Test Result 6/28/2017** | | **FAIL** | |

1945

96. As shown in **Table** above, compared to 2016, Orion's 2015 balance sheet had relatively low debt. Combined with positive free cash flow under the Income Approach, the Company passed the balance sheet test at December 31, 2015.[46] One year later, at December 31, 2016, the Company's assets had lost any value and debt had increased significantly, so the Company failed the balance sheet test at December 31, 2016.

97. We did not observe any evidence that indicated that the decrease in the result of the balance sheet test between December 31, 2015 and December 31, 2016 was anything but gradual. We therefore estimated the Residual Invested Capital at April 15, 2016 by assuming that this metric declined the same dollar amount each of the 366 days in 2016. This analysis indicated that the residual invested capital at April 15, 2016 was negative $35.1 million (see **Table** ).

98. Therefore, in my opinion, Orion FAILED the Balance Sheet Test at each of the Measurement Dates.

## VIII. Capital Adequacy Test (Second Solvency Test)

99. The Capital Adequacy Test assesses the financial health of a company by comparing the subject company's financial ratios to industry norms. We therefore compared certain financial metrics related to the adequacy of Orion's capital to those of (a) six public companies that we deemed relevant benchmarks for Orion and (b) Orion's industry based on data published in an industry report.

100. The following companies we selected as a basis of comparison are:

a. NextGen Healthcare, Inc. (NasdaqGS: NXGN, "**NextGen**"). Nextgen provides ambulatory-focused software and services solutions, including electronic health record, practice management solutions and revenue cycle management.[47]

b. MTBC, Inc. ("**MTBC**"). MTBC is a healthcare information technology company that provides an integrated suite of Web-based solutions and related business services

---

[46] Although Orion passed the balance sheet test at December 31, 2015, the Company failed the capital adequacy test and cash flow test. As a result of failing two of three solvency tests, in my opinion Orion was insolvent at December 31, 2015. These two tests are discussed in more detail in the next two sections of this Report.

[47] Source: S&P Capital IQ.

to healthcare providers. MTBC operates through two segments, healthcare IT and practice management.[48]

c.  <u>Allscripts Healthcare Solutions (Nasdaq: MDRX)</u>. Allscripts Healthcare solutions provides information technology solutions and services to healthcare organization in the United States and internationally. Allscripts Healthcare solutions offers electronic health records (EHR), information connectivity, private cloud hosting, outsourcing, analytics, patient access, financial management and population health management solutions.[49]

d.  <u>Cerner Corporation (Nasdaq: CERN)</u>. Cerner Corporation, together with its subsidiaries, provides health care technology information solutions and tech-enables services in the United States and internationally. Cerner offers a person-centric computing framework, which includes clinical, financial, and management information systems that allow providers to access an individual's electronic health record (EHR) at the point of care, and organizes and delivers information for physicians, nurses, laboratory technicians, pharmacists, front- and back-office professionals, and consumers.[50]

e.  <u>Evolent Health, Inc (NYSE: EVH)</u>. Evolent Health, Inc. and its subsidiaries provide health care delivery and payment solutions in the United States. Evolent Health, Inc. uses a proprietary technology system that aggregates and analyzes data, manages care workflows and engages patients; population health performance that delivers patient-centric cost-effective care; delivery network alignments; and integrated cost and revenue management solutions.[51]

f.  <u>Computer Programs and Systems, Inc. (NasdaqGS: CPSI)</u>. Computer Programs and Systems, Inc. provides healthcare information technology solutions and service in the United States and St. Maarten.[52] Some of their services include post-acute care support and maintenance services; revenue cycle management products and services, consulting and business management services, and managed information technology services; patient engagement and empowerment technology solutions; and system implementation and training services.

---

[48] *Ibid.*
[49] *Ibid.*
[50] *Ibid.*
[51] *Ibid.*
[52] *Ibid.*

**B | RILEY** *Advisory Services*

101. I analyzed the following financial ratios related to the capital adequacy[53] of Orion as of December 31, 2015 (the "**2015 Date**") and December 31, 2016 (the "**2016 Date**"). This analysis is presented in **Schedule 6.0 and Schedule 6.1**:

    a. Total Debt[54] ÷ Market Value of Invested Capital ("**Debt-to-MVIC**"). This ratio compares each company's debt as a percent of the market value of all equity and debt in the company at market value as calculated by B. Riley Advisory, including cash. If debt is too high compared to Enterprise Value, this indicates inadequate capital.

    b. Total Debt ÷ Market Value of Equity ("**Debt-to-Equity**"). This ratio compares each company's debt as a percent of the market value of the company's equity, showing the direct relationship between these factors. If debt is too high compared to the market value of equity, this indicates inadequate capital. Orion had a negative market value of equity at both dates, indicating inadequate capital.

    c. Total Debt ÷ EBITDA ("**Debt-to-EBITDA**"). This ratio compares each company's debt to its EBITDA, which represents a measure of cash flow generated by operations before debt service obligations. This indicates the relationship between debt level and the cash flow generated to cover the debt. As of the 2015 Date, Orion's ratio was 1.10x, higher than the guideline data but in line with the industry averages. As of the 2016 Date, Orion had negative EBITDA, so this ratio could not be calculated. These ratios indicate inadequate capital.

    d. Earnings Before Interest & Taxes ("**EBIT**") ÷ Interest Expense (also referred to as "Interest coverage" ratio). This ratio compares each company's EBIT, which represents a measure of operating income before interest expense, to interest expense itself. This ratio indicates how much "headroom" a company has in order to meet its debt service obligations. Orion had negative EBIT at both dates, indicating inadequate capital.

    e. (EBITDA − CapEx) ÷ Interest Expense. This ratio compares each company's EBITDA less CapEx, which represents a measure of operating income before interest expense but after capital expenditures necessary to continue the

---

[53] Performing ratio analysis with ratios such as these is an established methodology of testing capital adequacy, as described in Willamette Management Associates' Bankruptcy Valuation and Solvency Insights: Due Diligence and Analytical Procedures for Fraudulent Conveyance Opinions, Winter 2014 (www.willamette.com).
[54] Total Debt includes all interest-bearing debt, both the current and long-term portions, including capital leases.

1948

**B ∣ R I L E Y** *Advisory Services*

operations of the company at projected levels of revenue, income and cash flow. This ratio is another indication of how much "headroom" a company has in order to meet its debt service obligations. Orion's ratio of 4.52x as of the 2015 Date is significantly below the comparable data, and Orion had negative EBITDA les CapEx at the 2016 Date, indicating inadequate capital.

    f.   <u>Solvency Ratio: (After tax net profits + Depreciation)/Total Liabilities.</u>[55] This ratio measures a company's ability to meet its ongoing obligations. Moreover, the solvency ratio quantifies the size of a company's after-tax income, not counting non-cash depreciation expenses, as contrasted to the total debt obligations of the firm.[56] This ratio could not be calculated for Orion at either date, indicating inadequate capital.

102. Based on the analysis presented above, Orion failed the Capital Adequacy Test at both the 2015 Date and the 2016 Date. Therefore, Orion FAILED the Capital Adequacy Test at all three Measurement Dates.

## IX.   Cash Flow Test (Third Solvency Test)

103. The Cash Flow Test assesses whether a company can meet its operating and debt service obligations as they come due. Sources of cash include (a) cash flow generated by operations, (b) excess cash, if any, and (c) additional borrowing capacity, if any. In addition to operating expenses, cash needs include (a) capital expenditures required for the future operations of the business, (b) incremental working capital, (c) interest on outstanding debt, and (d) repayment of debt principal. The Cash Flow Test should also consider whether the subject company will be able to repay or refinance existing debt upon maturity.

104. When a company prepares projections of future revenue, earnings and cash flow in the normal course of business, the Cash Flow Test typically utilizes the projections to determine whether the subject company can meet its debt service obligations based on projected earnings and borrowing capacity. To our knowledge there are no contemporaneous projections for Orion as of the Measurement Dates. We therefore used normalized 2015 and 2016 financial statement information to perform the cash flow test

---

[55] Ian Ratner, Grant T. Stein and John C. Weitnauer "Business Valuation and Bankruptcy", 2009 ed. p. 154.
[56] Solvency Ratio definition: <https://www.readyratios.com/reference/analysis/solvency_ratio.html>.

**B | RILEY** *Advisory Services*

under the assumption that these results were the best indication of Orion's future performance as of the Measurement Dates.

105. The threshold question in the case of the Cash Flow Test for Orion is whether the Company's operations are expected to generate sufficient operating income to cover its debt service obligations. Using adjusted EBITDA as a starting point, we then adjust for other cash obligations of the Company. These adjustments include:

    a.  Income tax expense;

    b.  Capital expenditures, representing investments in the Company's fixed assets; and

    c.  Incremental working capital, representing a portion of income that the Company needs to retain to finance the growth of short-term assets.

106. After adjusting for cash flow and tax components, Orion had negative $1.8 million at December 31, 2015 and negative $21.2 million, cash flow available to service normalized interest expenses at December 31, 2016 (see **Schedule 5**).[57]

107. We also considered qualitative factors in determining the proper measure of earnings and cash flow to use in the Cash Flow Test. I interviewed J.T. Tomkins of FTI, who informed me that when Orion contracted with Porteck to perform certain "back office" tasks for Orion's RCM operations in early 2015, Porteck performed its services so poorly that the RCM business immediately began to lose most of its customers. This decline continued through 2016, and as of the Measurement Dates, the RCM business was still declining.

108. Since Orion had negative cash flow even before consideration of debt service in both 2015 and 2016, this indicates that Orion did not have the ability to meet its debt service obligations as of the Measurement Dates. Therefore, Orion FAILED the Cash Flow Test as of the Measurement Dates.

## X.   Orion Contingent Liability

109. An additional factor to consider in the context of the three solvency tests presented above is that as of the Measurement Dates, Orion held a significant exposure related to the

---

[57] See **Schedule 5.0**.

1950

**B|RILEY** *Advisory Services*

alleged sham transactions described in this report, including but not limited to the secondary offerings in NorthStar, Phoenix and MDRX transactions (see paragraphs 23 to 28 above). While the nature of these transactions and the resultant significant restatements to Orion's tax returns were not yet known, the basic fact is that the Company likely would have faced one or more lawsuits related to these items.

110. These lawsuits would have involved at least two components of significant expense to the Company. First, the Company would have incurred legal fees defending the lawsuits. Second, they would have faced possible payment of a significant monetary award or settlement.

111. In addition, these lawsuits would have represented a significant drain on Orion management time and attention, which represents an additional risk factor to the Company.

112. I have not received sufficient information necessary to quantify this exposure, which represents a contingent liability to Orion. This factor further negatively impacted Orion's insolvency.

## XI.  Other Evidence of Insolvency

113. The three solvency tests presented above represent a quantitative assessment of solvency. In the case of Orion, there are several qualitative factors that should also be considered in assessing the solvency of the Company.

### *Restated Financial Statements*

114. Orion filed an amendment to its 2015 tax return that showed significant changes from the original tax return filed for that year. **Schedule 7.1** presents the income statements for 2015 and 2016, including both the original and revised data for 2015. Highlights of the revisions include:

   a.  Revenue was revised to $54.7 million, a decrease of 28.7% from the originally reported revenue of $78.7 million.

   b.  Taxable income decreased from <u>positive</u> $5.1 million to <u>negative</u> $11.4 million, a decrease of 325.2%.

---

**B | RILEY** *Advisory Services*

115. Restatements of this magnitude call into question the reliability of any of Orion's reported financial statement information. While this is not an indication of insolvency as a standalone issue, the magnitude of this restatement certainly casts doubt on the legitimacy of Orion's operations and its ability to meet its debt obligations.

**Sham Acquisitions**

116. Another qualitative factor to consider is the allegations that certain acquisitions made by Orion in 2015 and 2016 were either (a) significantly overstated as to the price paid by Orion or/or (b) acquisitions of companies that didn't actually exist.

*NorthStar Acquisition*

117. For example, on September 16, 2015, Orion[58] acquired NorthStar for a total consideration of $17.39 million (the "**NorthStar Acquisition**"). The NorthStar Acquisition appears to fall under both of these categories (i.e., the price paid was significantly overstated, and the company acquired didn't really exist).

118. The allocation of the purchase price to assets acquired and liabilities assumed indicated that (a) $6.4 million of the purchase price represented intangible assets and (b) $10.8 million was excess purchase price allocated to goodwill.[59] Therefore, 99.0%, or almost all of the $17.39 million purchase price, was intangible assets. The goodwill alone was 62.1% of the purchase price. Since goodwill in this context represents an amount above which any portion of the price can be allocated to assets acquired, tangible or intangible, this percentage suggests a significant overpayment.

119. NorthStar, in fact, was a holding company that had recently purchased a company called Vachette Business Services, Ltd. ("**Vachette**"). In addition, an investigation performed by FTI identified journal entries in Orion parent company CHT's general ledger that misrepresented what was actually acquired and created the impression of a significantly larger acquisition. However, approximately two weeks before the NorthStar Acquisition,

---

[58] The buyer in these acquisitions was often CHT and not Orion itself; CHT typically then transferred the acquisitions to Orion. See, for example, description of MDRX Transaction in CHT Audited Financial Statements for the Years Ended December 31, 2016 and 2015, p. 20.

[59] Constellation Healthcare Technologies, Inc. and Subsidiaries Financial Statements for Years Ended December 31, 2016 and 2015, p. 18.

1952

**B│RILEY** *Advisory Services*

NorthStar had purchased Vachette for $2.79 million, as compared to the $17.4 million paid for NorthStar (which had no other business activities).[60]

*Phoenix Acquisition*

120. On September 18, 2015, Orion acquired Phoenix Health for an announced price of $13.66 million (the "**Phoenix Acquisition**"). However, FTI's investigation revealed that a bank account and employee identification number (EIN) were not obtained for Phoenix until after the Phoenix Acquisition. In other words, there basically was no company at the acquisition date. FTI's investigation further revealed that the payments purportedly made for the Phoenix Acquisition were in fact made to Sage Group Consulting Inc., a consulting firm owned by Salil Sharma.[61]

*MDRX Acquisition*

121. In March 2016, Orion acquired MDRX for a total consideration of $48.2 million (the "**MDRX Acquisition**"). The recording of this transaction was that $75,000 out of the $48.2 million purchase price was for property and equipment. Of the balance $19.2 million was for a customer relationship intangible asset with the $28.9 million difference recorded as goodwill.[62] According to the Dragelin Declaration, MDRX was an entity created by certain members of Orion's former management that conducted no business and had no assets.[63] FTI's investigation of the M&T Checking Account statement indicates that the purported payments were transferred to various recipients over the next six months, none of which correlated to the entry in Orion's general ledger indicating that the funds were used as payment for the acquisition of the fictitious MDRX. $4.0 million of these funds was used to create fictitious customer revenue.[64]

*ACA and ABC Acquisitions*

122. On September 1, 2016, CHT acquired Vega, which was a holding company for both Allegiance Consulting Associates LLC ("**ACA**") and Allegiance Billing & Consulting LLC

---

[60] Dragelin Declaration at 92-93.
[61] Dragelin Declaration at 94-96.
[62] CHT Audited Financial Statements for the Years Ended December 31, 2016 and 2015, p. 20.
[63] Dragelin Declaration at 26.
[64] Dragelin Declaration at 98.

("**ABC**") for a total price of $4.68 million. CHT subsequently reported that it acquired Vega for $24.0 million.[65]

*Summary – Other Evidence of Insolvency*

123. The unreliable financial statements and sham transactions described in this section are not as stand-alone factors evidence of insolvency as measured by the three solvency tests, which are quantitative analyses. However, it seems reasonable that in order to determine that a company is solvent, one would also expect the company to have reliable financial statements and to not engage in fraudulent transactions. In my opinion, the regular occurrences of unreliable financial statements and sham transactions lends further strength to my opinion that Orion was insolvent as of the Measurement Dates.

**2017 Financial Results**

124. Two of the Measurement Dates in this report of June 23, 2017 and June 28, 2017 take place almost six months following the end of 2016, the date of the most recent financial information as of these Measurement Dates. We also examined full-year operating results for Orion to determine whether it was possible there was an improvement in the Company's solvency during the first half of 2017. Table **Table 9** below presents summary income statement information for Orion from 2014 through 2017:

---

[65] Dragelin Declaration at 99.

**B | RILEY** *Advisory Services*

Table 9

| | Orion Healthcare, Inc. | | | |
|---|---|---|---|---|
| | Summary Profit and Loss Information | | | |
| | For Fiscal Years Ended December 31, | | | |
| | 2014 | 2015 | 2016 | 2017 |
| **Revenue:** | | | | |
| Management Fee Revenues | $  1,285,295 | - | - | - |
| GPO Revenues | 1,150,022 | 1,198,613 | 1,168,980 | 1,205,397 |
| Fee for Service Revenues | 9,534,508 | 54,291,603 | 52,767,056 | 54,506,216 |
| **Total Revenue** | $ 11,969,825 | $ 55,490,216 | $ 53,936,036 | $ 55,711,613 |
| **Total Operating Expenses** | 52,909 | 55,231,907 | 67,353,097 | 62,008,959 |
| **Income from Operations** | 11,916,915 | 258,309 | (13,417,061) | (6,297,346) |
| **Total Other Income (Expenses), Net** | (8,311,778) | (7,808,136) | (34,974,948) | (13,997,976) |
| **Income Before Provision for Income Taxes** | 3,605,137 | (7,549,827) | (48,392,010) | (20,295,323) |
| Provision for Income Taxes | 888,071 | 4,367,999 | (1,649,262) | 197,394 |
| **Net Income** | $  2,717,066 | (11,917,826) | (46,742,748) | (20,492,716) |

125. As **Table** shows, Orion continued to post significant losses in 2017. There is no evidence that measures of Orion's solvency could have improved sufficiently at any point in 2017 to result in a finding of solvency as of the 2017 Measurement Dates. Therefore, our analyses showing that Orion was insolvent as of December 31, 2016 also indicate insolvency as of the Measurement Dates of June 23, 2017 and June 28, 2017.

## XII.    Solvency of CHT

126. As previously mentioned, CHT is a holding company whose sole operating asset is Orion.

127. We compared the historical unadjusted revenue of Orion (based on an analysis performed by FTI) to CHT's reported revenue from its audited financial statements as presented in **Table 10** below.

**B | RILEY** *Advisory Services*

Table 10

| Historical Unadjusted Revenue Comparison | | |
|---|---|---|
| Description | Unadjusted Constellation Healthcare Technologies Inc. [1] | Unadjusted Orion Healthcorp Inc. & Subs [2][3] |
| Revenue FYE 12/31/15 | $ 76,735,069 | $ 76,735,069 |
| Revenue FYE 12/31/16 | $ 136,219,672 | $ 136,219,672 |

Notes:
[1] Constellation Healthcare Technologies, Inc. 2016 Tax Return.
[2] FTI 2015 P&L by Legal Entity - Tax.xls.
[3] FTI 2016 P&L by Legal Entity - Tax.xls.

128. This shows that CHT did not have any business operations other than those of Orion.

129. We also relied on our interview with Frank Lazzara, formerly of FTI. Based on an investigation performed by Mr. Lazzara, there were no significant non-operating assets held by CHT (i.e., assets other than Orion) that would impact the solvency of CHT as compared to the solvency of Orion.

130. Therefore, it is my opinion that CHT was also **INSOLVENT** as of the Measurement Dates.

### XIII.     Summary and Conclusion

131. **Table 3** (reproduced below) summarizes the results from each solvency test at the Measurement Date.

Table 3

| Orion Healthcorp, Inc. Solvency Opinion Summary | | | | |
|---|---|---|---|---|
| Description | 4/15/2016 | 6/23/2017 | 6/28/2017 | Source |
| Balance Sheet Test Result | FAIL | FAIL | FAIL | Schedule 1.0 |
| Cash Flow Test Result | FAIL | FAIL | FAIL | Schedule 5.0 |
| Capital Adequacy Test Result | FAIL | FAIL | FAIL | Schedule 6.0 and Schedule 6.1 |
| Solvency Opinion | INSOLVENT | INSOLVENT | INSOLVENT | |

**B | RILEY** *Advisory Services*

132. Based on the analyses we performed, it is my opinion that:

    a.   As of the Measurement Dates of April 15, 2016, June 23, 2017, and June 28, 2017 (described below), Orion was INSOLVENT.[66]

    b.   CHT, the parent company of Orion, was INSOLVENT as of the Measurement Dates.

Respectfully submitted,

*[signature]*

Craig Jacobson

---

66

---

**B | RILEY** *Advisory Services*

**Appendix A**

**Craig Jacobson CV**

1958

# CRAIG JACOBSON
## MANAGING DIRECTOR

cjacobson@brileyfin.com
(212) 457-3315
vCard



**Prominent Matters**

- Damages/expert witness in GSP Finance LLC v. KPMG
- Damages/expert witness in re Inergy Unitholder Litigation
- Valuation expert before Kenneth Feinberg of the September 11th Victim Compensation Fund

**Specialties:**
Damages & Expert Witness
Services
Fairness Opinions
Intellectual Property
Litigation Support
Lost Profit Analysis
M&A
Purchase Price Allocation
Solvency Opinions
Valuation

**Industries:**
Energy
Healthcare
Pharmaceutical
Medical Devices
Technology

Craig Jacobson has 30 years of experience in valuation, litigation support services, and transactions consulting. Prior to joining GlassRatner (now doing business as B. Riley Advisory Services) in 2014, Craig was a principal at a regional CPA firm providing valuation and litigation support services. Prior to that, Craig held a senior position with Willamette Management Associates. Craig began his career at a boutique investment banking and consulting firm, where he provided valuations, mergers and acquisitions, and litigation support services.

Craig's experience includes performing valuations for litigation, transaction and corporate planning purposes; fairness opinions, solvency opinions, mergers and acquisitions consulting; pre-Initial Public Offering services, including valuations and assistance in the preparation of SEC filings; calculating economic damages, including lost profits and lost enterprise value; dissenting shareholder litigation and transactions; intellectual property valuation and damages calculations, including irreparable harm calculations; change-in-control disputes; and failed mergers and acquisitions litigation.

Craig has worked in a large number of industries, including energy, healthcare, retail, pharmaceutical, medical devices, financial services, and professional and other services. Craig has worked on many international engagements, including companies in Japan, China, Russia, Denmark, Greece, Italy, the Caribbean, Cyprus, and Indonesia.

Craig's clients include law firms, corporations, partnerships and wealthy individuals. He has acted as an expert witness on several occasions.

Craig has authored many articles and given many presentations on a variety of topics, including commercial damages, intellectual property valuation and damages, fairness opinions, solvency opinions.

Representative assignments on which Craig has worked include:

- Providing valuation and consulting services related to large corporate transactions related to fairness opinion and solvency opinion issues
- Estimating Lost Profits, Economic Damages, and Lost Business Value on behalf of Plaintiffs and Defendants
- Estimating damages related to the infringement of Patents, Copyrights, Trademarks and Trade Names, and Trade Secrets
- Performing valuation and corporate finance advisory work for companies headed for initial public offerings or other exit transactions
- Valuation of intellectual property and intangible assets for financial reporting, tax, and transactional purposes

Craig holds a BS in Economics and Computer Science from the State University of New York at Albany and an MBA in Finance from New York University's Stern School of Business.

**B | RILEY** *Advisory Services*
a B. Riley Financial company



299 Park Avenue, 21st Floor
New York, NY 10171
Tel: (212) 457-3304
www.brileyfin.com

**CRAIG JACOBSON**
**TESTIMONY EXPERIENCE**

**Law Firm**: Rooney Nimmo PC
**Name of Proceeding:** Brands Within Reach, LLC v. Belvoir Fruit Farms Ltd.
**Type of Proceeding:** Trial.
**Type of Court:** United States District Court, Southern District of New York
**Type of Testimony:** deposition (May 5, 2021)

**Law firm:** Lewis Brisbois Bisgaard & Smith LLP
**Name of proceeding:** University Ventures Funds Management, LLC, et al. v. Gregg Rosenthal
**Type of Proceeding:** Arbitration.
**Type of Court:** American Arbitration Association
**Type of Testimony:** deposition (September 30, 2020) and arbitration (November 24-25, 2020).

**Law firm:** Robins Kaplan LLP
**Name of proceeding:** Kimberly Renk v. Linda Renk, et al.
**Type of Proceeding:** Trial.
**Type of Court:** Supreme Court of the State of New York
**Type of Testimony:** deposition (November 11, 2020).

**Law Firm:** Winget, Spadafora & Schwartzberg, LLP
**Name of Proceeding:** Robert Zubrin, et al. v. Eyal Aronoff, et al.
**Type of Proceeding:** Trial.
**Type of Court:** District Court, Denver County, State of Colorado
**Type of Testimony:** trial (March 17, 2020).

**Law Firm:** Levene, Neale, Bender, Yoo & Brill L.L.P.
**Name of Proceeding:** In re: Bristow Group, Inc., Debtors.
**Type of Proceeding:** Bankruptcy trial.
**Type of Court:** United States Bankruptcy Court for the Southern District of Texas Houston Division
**Type of Testimony:** deposition (September 27, 2019) and trial (October 4, 2019).

**Law Firm:** Winget, Spadafora & Schwartzberg, LLP
**Name of Proceeding:** Freedom Mortgage Corporation v. Guild Mortgage Corporation, et al.
**Type of Claim:** Breach of contract, breach of duty of loyalty, tortious interference, violation of Florida Uniform Trade Secrets Act, violation of Defend Trade Secrets Act, civil conspiracy.
**Type of Court:** Supreme Court of the State of New York
**Type of Testimony:** deposition (September 11, 2019).

**Law Firm:** Lovell Stewart Halebian Jacobson LLP
**Name of Proceeding:** James Tufenkian v. Sylvia Tirakian
**Type of Claim:** Breach of contract, breach of fiduciary duty, fraud, and unjust enrichment.
**Type of Court:** Supreme Court of the State of New York
**Type of Testimony:** deposition (August 29, 2019).

**Law Firm:** Carmody Torrance Sandak & Hennessey LLP
**Name of Proceeding:** In re: Sean Dunne, Debtor. Richard M. Cohan, Trustee of the Bankruptcy Estate of Sean Dunne, v. Gayle Killilea, et al.
**Type of Claim:** solvency opinion related to alleged fraudulent transfer.

**B | RILEY** *Advisory Services*

**Type of Court:** United States Bankruptcy Court, District of Connecticut, New Haven Division
**Type of Testimony:** deposition (March 7, 2019), trial (May 23-24, 2019).

**Law Firm:** Lovell Stewart Halebian Jacobson LLP
**Name of Proceeding:** Eugene L. Busher v. Desmond T. Barry, Jr., Thomas T. Egan, John P. Heanue, William M. Kelly, Francis P. Barron, and Winged Foot Golf Club, Inc.
**Type of Claim:** valuation related to alleged breach of fiduciary duty.
**Type of Court:** United States District Court, Southern District of New York
**Type of Testimony:** deposition (March 31, 2017).

**Law Firm:** Gorrissen Federspiel
**Name of Proceeding:** Milestone Systems A/S v. On-Net Surveillance Systems Inc.
**Type of Claim:** economic damages.
**Type of Court:** The Danish Institute of Arbitration
**Type of Testimony:** arbitration (February 23, 2017).

**Law Firm:** Griffin Hamersky LLP
**Name of Proceeding:** In re Corporate Resources Services, In c., et al., Debtors. James S. Feltman v. Noor Staffing Group, LLC and Noor Associates, Inc.
**Type of Claim:** valuation and economic damages.
**Type of Court:** United States Bankruptcy Court, Southern District of New York
**Type of Testimony:** deposition (December 7, 2016).

**Law Firm:** Husch Blackwell
**Name of Proceeding:** Landaas & Company v. Paul G. Coldagelli
**Type of Claim:** breach of contract and trade secret infringement damages.
**Type of Court:** FINRA Arbitration
**Type of Testimony:** arbitration (November 16, 2016).

## PUBLICATIONS

"Price Versus Value: A Transaction and Litigation Perspective " Business Valuation Update, March 2021.

"The Valuation Paradigm of COVID-19: Using the Discounted Cash Flow Method after an Economic Crisis." Business Valuation Update, May 2020.

"The Use of Financial Projections in Solvency Opinions." Business Valuation Update, June 2018.

"Value of Trademarks Takes on Increased Importance." New York Law Journal, May 16, 2016.

"Economic Benefits of IP Licenses Increasingly Impact Value." New York Law Journal May 18, 2015.

"Trade Secret Valuation and Infringement Damages." New York Law Journal, May 19, 2014.

"The Backsolve Method to Value Common and Preferred Stock." The Legal Intelligencer, August 26, 2013.

"Identify and Valuate Intangible Assets and Intellectual Property." New York Law Journal, May 20, 2013.

"Putting a Value on Goodwill." New York Law Journal, April 9, 2012.

**B | RILEY** *Advisory Services*

"Know and Protect Intellectual Property's Worth." New York Law Journal, April 11, 2011.

"Pitfalls to Avoid when Performing a Fairness Opinion." Business Valuation Update, October 2010.

1962

**B | RILEY** *Advisory Services*

**Appendix B**

**Documents Considered**

1963

**Orion Healthcorp, Inc.**
Documents Considered

| # | Descriptions | Document Date if Applicable | Exhibit Number If Applicable | Bates Reference If Applicable |
|---|---|---|---|---|
| | **Orion Healthcorp, Inc. Documents Considered** | | | |
| | **Legal Documents** | | | |
| 1 | First Amended Complaint For Avoidance And Recovery Of: (1) Fraudulent Transfers; (2) Preferential Transfers; (3) Recovery Of Avoided Transfers; (4) Objection To Claim No. 10067; Pursuant To 11 U.S.C. §§ 502, 544, 547, 548 And 550 | 5/28/2021 | | |
| 2 | Answer to First Amended Complaint and Affirmative Defenses | 6/9/2021 | | |
| 3 | Complaint for Avoidance and Recovery of (1) Fraudulent Transfers; and (2) Recovery of Avoided Transfers and Objection to Claim Nos. 10063 & 10064 | 3/14/2020 | | |
| 4 | Complaint for Avoidance and Recovery of: (1) Fraudulent Transfers; and (2) Recovery of (2) Avoided Transfers Pursuant to 11 U.S.C. §§544, 548 & 550 | 3/12/2020 | | |
| 5 | John G. "Jack McBride and Alan Nottingham v. Orion Healthcorp, Inc. et. Al, Final | 12/16/2015 | | |
| 6 | Executed Consulting Agreement - Alpha Cepheus, LLC | 11/24/2016 | | RRBB0057558 - 802 |
| 7 | Paul Parmar Executed Employment Agreement | 11/24/2016 | | |
| 8 | Declaration of Timothy J. Dragelin | 3/16/2018 | | |
| 9 | Declaration of Frank A. Lazzara | 6/4/2018 | | |
| 10 | Affidavit of Daniel Jones | 12/1/2020 | | |
| | **Financial Documents** | | | |
| 11 | CHG 2015 Audited Financial Statements | | | |
| 12 | CHG 2016 Audited Financial Statements | | | |
| 13 | Constellation Healthcare Technologies, Inc. 2014 Audited Financial Statements | 3/9/2015 | | |
| 14 | Constellation Healthcare Technologies, Inc. 2015 Audited Financial Statements | 3/21/2016 | | |
| 15 | Constellation Healthcare Technologies, Inc. 2016 Audited Financial Statements | 5/25/2017 | | |
| 16 | Orion Healthcorp, Inc. Amended 2015 Tax Return | | | |
| 17 | Orion Healthcorp, Inc. 2016 Tax Return | | | |
| 18 | Orion Healthcorp, Inc. 2017 Tax Return | | | |
| 19 | Orion Healthcorp, Inc. 2015 Original 2015 Tax Return | 9/8/2016 | | |
| 20 | 2015 P&L by Legal Entity - Tax.xls | | | |
| 21 | 2016 P&L by Legal Entity - Tax.xls | | | |
| 22 | Combined 2014-2017 P&L by Legal Entity - Tax.xls | | | |
| 23 | Constellation 2015 M-1 M-3 analysis.xls | | | |
| | **Other Documents** | | | |
| 24 | BriefHistory.ppt | | | |
| 25 | Certificate of Formation of Lexington Landmark Services, LLC | | | |
| 26 | Privatization Letters | | | |
| 27 | Bank of America Credit Agreement dated January 30, 2017 | 11/17/2016 | | EHREN-ABRUZZ000001 - 9 |
| 28 | Memo to Bank of America dated January 30, 2017 | 1/25/2016 | | EHREN-ABRUZZ000332 - 62 |
| 29 | Asset Purchase Agreement as of March 2015 | 1/30/2017 | | EHREN-ABRUZZ000684 - 852 |
| 30 | Memo re: Sale of Poreck Corporation | 1/30/2017 | | EHREN-ABRUZZ000674 - 682 |
| 31 | Robinson Brog IOLA Quick Report (Exported May 30, 2018) | 2/20/2015 | WAL 0009 | EHREN-WALIA000002 - 76 |
| | | | | EHREN-WALIA005141 |
| | **Research** | | | |
| 32 | MTBC 2018 Form 8-K | 7/2/2018 | | |
| 33 | MTBC Successfully Closes Orion, Largest Acquisition to Date | 7/2/2018 | | |
| 34 | MTBC 2018 Form 10-K | 3/20/2019 | | |
| 35 | IBISWorld Industry Report 54161 Management Consulting in the US (December 2016) | December 2016 | | |
| 36 | Integra Five-Year Industry Report - SIC 8742 Management Consulting Services | 1/6/2021 | | |
| 37 | Willamette Management Associates' Valuation Practices and Procedures Insights: Implementing Normalization Adjustments | Spring 2017 | | |
| 38 | Willamette Management Associates' Bankruptcy Valuation and Solvency Insights: Due Diligence and Analytical Procedures for Fraudulent Conveyance Opinions | Winter 2014 | | |
| 39 | Ian Ratner, Grant T. Stein and John C. Weitnauer "Business Valuation and Bankruptcy" | 2009 | | |
| 40 | https://www.readyratios.com/reference/analysis/solvency_ratio.html | | | |
| 41 | BVR Economic Outlook Update 4Q 2016 published by Business Valuation Resources | Q4 2016 | | |

**B | RILEY** *Advisory Services*

## Appendix C

## The Industry and Economy

133. A key component of a valuation is an analysis of the economy and the company's industry as of the Measurement Date. A company does not operate in a vacuum, and an analysis of the industry and economy provides important information related to the value of the Company.

### *Industry Overview*

134. Management consultants provide advisory services to businesses, nonprofits, and public sector agencies to assist in organizational design, corporate strategy, information technology (IT) strategy, marketing and sales, and logistics.

135. During the past five years, the Management Consulting industry has been booming as more robust corporate profitability and increasing business expenditure resulted in higher demand for advisory services. The industry is estimated to grow at an annualized rate of 5.8% to $229.9 billion over the five different sectors and services.

136. During the next five years, the industry is expected to grow with the US economy. IT will continue to be a key growth area, while other sectors, such as healthcare, also provide new business opportunities. Consolidation from the largest industry players is projected to continue; however, the overall industry structure will continue to be dominated by small, non-employing operators. These businesses focus on servicing local or niche markets and, therefore, control a small proportion of total industry revenue. Overall, industry revenue is expected to increase 2.4% to $258.5 billion during the next five years to 2021.

### *Industry Outlook*

137. Business conditions remain healthy within the industry. During the next five years, strong macroeconomic conditions are expected to drive growth in the Management Consulting industry. Rising corporate profit will increase business budgets and, therefore, increase spending on consulting services.

138. Additionally, businesses are expected to increase workforce size and expand investment in new facilities and operations. Investment in new capabilities will boost demand for

1965

**B** | **RILEY** *Advisory Services*

process and operations management consulting, corporate strategy, and organizational design. Furthermore, rapid IT developments will continue to be instrumental in developing new strategies, designs, and understanding an evolving US market. Moreover, major investment in life sciences and healthcare over the next five years will drive growth for merger and acquisition consultants. Consequently, the Management Consulting industry is projected to grow at an annualized rate of 2.4% to $258.5 billion during the next five years to 2021.

139. Non-employer revenue is expected to decline slightly, further increasing market share concentration. The number of enterprises is projected to grow at an annualized rate of 3.4% to 845,984 during the next five years. Larger and more profitable firms will experience the majority of employment growth, which is expected to increase at an annualized rate of 2.8% to 1.7 million people over the next five years to 2021.

**Economic Overview** [67]

140. The U.S. economy—as indicated by GDP—grew at an annual rate of 1.9% in the fourth quarter of 2016, which is slower than the 3.5% reported in the third quarter. The slowing trend is due to a decline in exports and federal government spending. GDP increased 1.6% during 2016 compared with 2.6% in 2015.

141. Consumer spending increased by 2.5% in the fourth quarter of 2016, suggesting that the economy is growing steadily. Spending on durable goods leaped nearly 11.0% during the fourth quarter.

142. Employment rose by 156,000, which is lower than the 170,000 initially projected. Job growth has averaged 165,000 jobs per month during the past three months, well above the 80,000-jobs-a-month mark the White House Council of Economic Advisers believes is needed to maintain a stable unemployment rate.

143. The unemployment rate increased 0.1% to 4.7% in December, while the labor-force participation rate remained unchanged at 62.7%.

144. The Consumer Confidence Index improved 6.6 points to 113.7, reaching its highest level since August 2001. The post-election surge in the index reflects consumers' optimism in

---

[67] BVR Economic Outlook Update 4Q 2016 published by Business Valuation Resources.

**B** | **RILEY** *Advisory Services*

the economy. The Consumer Sentiment Index rose 4.4 points to 98.2 in December, reaching its highest since 2004. The median projection in a Bloomberg survey called for a reading of 98.0.

145. The 4Q 2016 Wells Fargo/Gallup Small Business Index, reported in August, surged 12.0 points, to a reading of 80.0. This represents the highest optimism reading since January 2008 and the largest quarterly increase in a year. The report highlighted small-business owners are more optimistic about the operating environment in 2017.

146. The RSM U.S. Middle Market Business Index (MMBI) jumped 4.5 points in the fourth quarter of 2016, climbing to a reading of 120.1. The MMBI reading indicated that overall growth in the U.S. middle market is likely to slow during the final quarter of the year. However, the information was gathered before the results of the presidential election.

147. Services sector growth was unchanged in December and remained at the strong growth level established in November. The Non-Manufacturing Index (NMI) remained at 57.2%, which is a 12-month high. The December reading marked the 89th consecutive month of growth for the services sector. The majority of respondents' comments were positive regarding the business conditions and overall economy.

148. The major stock indexes recorded gains during the fourth quarter of 2016. The Dow Jones climbed 7.9% in the quarter and finished the year with a 13.4% gain. The Nasdaq Composite Index increased by 2.5% in the quarter and finished at 87% for the year. The Russell 2000 Index posted an 8.4% quarterly increase and finished the year up 19.5%, while the S&P 500 Index achieved a total return of 3.3% in the fourth quarter and recorded gains of 9.5% for the year.

***Economic Outlook***

149. Consensus Economics Inc., publisher of Consensus Forecasts—USA, reports that the consensus of U.S. forecasters believe that real GDP will increase at a seasonally adjusted annual rate of 2.1% in the first quarter of 2017 and 2.2% in the second quarter of 2017.

150. Consumer spending is projected to increase by 2.3% in the first quarter of 2017 and 2.3% in the second quarter. The forecasters projected consumer spending to increase by 2.5% in 2017.

151. Unemployment is expected to average 4.7% in the first quarter of 2017 and 4.7% in the second quarter. The forecasters predicted unemployment to average 4.9% in 2016 and 4.6% in 2017.

152. The three-month Treasury bill is expected to be 0.6% at the end of the first quarter and 0.8% at the end of the second quarter of 2017. The forecasters believe the three-month Treasury bill rate will rise to 1.2% at the end of 2017. The 10-year Treasury bond yield is projected to be 2.3% at the end of the first quarter of 2017 and 2.5% at the end of the second quarter. 10-year Treasury bond yield is expected to increase to 2.7% at the end of 2017.

153. Consumer prices are expected to rise by 2.1% in the first quarter and 2.4% in the second quarter of 2017. They expect consumer prices to increase by 1.2% in 2016 before rising to 2.3% in 2017.

154. Producer prices are expected to increase by 1.7% during the first quarter of 2017 and 2.1% in the second quarter of 2017. The forecasters anticipate producer prices will fall 0.9% in 2016 before rising 2.0% in 2017.

155. Real disposable personal income is expected to rise 2.3% in the first quarter of 2017 and 2.4% in the second quarter of 2017. The forecasters believe real disposable personal income will increase by 2.7% in 2016 and 2.5% in 2017.

156. Consumer price inflation (CPI) is expected to be 1.3% in 2016 and 2.4% in 2017. The Survey expects CPI to average 2.3% over the next 10 years. The Survey also expects producer price inflation (PPI) to be -1.0% in 2016 and 2.7% in 2017.

The forecasters have increased their previous projections for future S&P 500 index values. S&P 500 index is expected to sit at 2,200 by the end of December 2016 and 2,255 at the end of June 2017.

## Orion Healthcorp, Inc.
### Balance Sheet Test

Schedule 1.0

| Orion Healthcorp, Inc. Balance Sheet Test | | | |
|---|---|---|---|
| | As of 12/31/2015 | As of 12/31/2016 | Source |
| Market Value of Invested Capital | | | |
| Income Approach | $ 23,870,000 | $ - | Schedule 3.0 |
| Market Value of Invested Capital | $ 23,870,000 | $ - | |
| | | | |
| Plus: Amortization Tax-shield Benefit | $ - | $ 3,525,650 | Schedule 3.5 |
| Less: Short-term Debt | | 208,569 | Schedule 5.3 |
| Less: Long-term Debt | 10,290,577 | 111,457,166 | Schedule 5.3 |
| Less: Working Capital Deficit (Surplus) | 10,851,992 | 19,867,633 | Schedule 4.0 |
| Residual Invested Capital | $ 2,727,431 | $ (128,007,718) | |
| | | | |
| Balance Sheet Test Result | PASS | FAIL | |
| | | | |
| Interpolated Residual Invested Capital 4/15/2016 | | $ (35,135,754) | |
| | | | |
| Balance Sheet Test Result 4/15/2016 | | FAIL | |
| | | | |
| Balance Sheet Test Result 6/23/2017 | | FAIL | |
| | | | |
| Balance Sheet Test Result 6/28/2017 | | FAIL | |

Page 1 of 22

B. Riley Advisory Services

## Orion Healthcorp, Inc.
### Weighted Average Cost of Capital ("WACC") - Build Up

| Orion Healthcorp, Inc. Weighted Average Cost of Capital - Build Up | | |
|---|---|---|
| | Discount Rate As of 12/31/2016 | |

**1. Cost of Equity - Build-Up Method:**

| | | |
|---|---|---|
| Risk-free Rate | 2.88% | [1] |
| Equity Risk Premium | 6.03% | [2] |
| Industry Risk Premium | -0.71% | [3] |
| Small Stock Premium | 5.60% | [4] |
| Company-Specific Risk Premium | 15.00% | [5] |
| Levered Cost of Equity: | 28.60% | |

**2. After Tax Cost of Debt:**

| | | |
|---|---|---|
| Borrowing Rate | 7.20% | [6] |
| Tax Rate | 35.00% | [7] |
| Estimated Cost of Debt: | 4.68% | |

**3. Weighted Average Cost of Capital (WACC)**

| | Industry Capital Structure | Weighted Cost | |
|---|---|---|---|
| Debt | 18.00% | 0.84% | [8] |
| Equity | 82.00% | 23.45% | |
| | | 24.29% | |

| | | |
|---|---|---|
| WACC or Discount Rate (rounded) | 25.00% | |

| | | |
|---|---|---|
| Long-Term Growth Rate | 2.50% | [9] |
| Capitalization Rate | 22.50% | [10] |

**Notes:**
[1] Source: Duff & Phelps 2016 US Guide to Cost of Capital Long-term (20-year) US Treasury Coupon Bond Yield.
[2] Source: Duff & Phelps 2016 US Guide to Cost of Capital Long-horizon equity risk premium (supply-side).
[3] Source: Duff & Phelps 2016 US Guide to Cost of Capital Industry Risk Premium for SIC 8742 Management Consulting Services.
[4] Source: Duff & Phelps 2016 US Guide to Cost of Capital CRSP Decile Size Premium Decile 10-smallest.
[5] Due to qualitative factors of the company such as loss of key customer and the fraud.
[6] Source: Duff & Phelps 2016 US Guide to Cost of Capital - Industry SIC Composite SIC 8742 Management Consulting Services.
[7] Assumed corporate income tax rate of 35%.
[8] Source: Duff & Phelps 2016 US Guide to Cost of Capital - Industry SIC Composite SIC 8742 Management Consulting Services.
[9] Source: BVR 2016 Q4 Economic Outlook Update p. 7 Exhibit 3. The long-term growth rate of Real GDP in the U.S. is forecast to be approximately 2.2%, therefore we assume date long-term growth rate for the Company would be approximately 2.5%.
[10] WACC less Long-Term Growth Rate.

# Orion Healthcorp, Inc.
## Weighted Average Cost of Capital ("WACC") – Build Up

| Orion Healthcorp, Inc. Weighted Average Cost of Capital – Build Up | | | |
|---|---|---|---|
| | Discount Rate As of 12/31/2015 | | |

**1. Cost of Equity – Build-Up Method:**

| | | |
|---|---|---|
| Risk-free Rate | 2.40% | [1] |
| Equity Risk Premium | 6.21% | [2] |
| Industry Risk Premium | -0.71% | [3] |
| Small Stock Premium | 5.78% | [4] |
| Company-Specific Risk Premium | 15.00% | [5] |
| **Levered Cost of Equity:** | **28.68%** | |

**2. After Tax Cost of Debt:**

| | | |
|---|---|---|
| Borrowing Rate | 6.60% | [6] |
| Tax Rate | 35.00% | [7] |
| **Estimated Cost of Debt:** | **4.29%** | |

**3. Weighted Average Cost of Capital (WACC)**

| | Industry Capital Structure | Weighted Cost | |
|---|---|---|---|
| Debt | 10.00% | 0.43% | |
| Equity | 90.00% | 25.81% | |
| | | **26.24%** | [8] |

| | | |
|---|---|---|
| **WACC or Discount Rate (rounded)** | **27.00%** | |
| Long-Term Growth Rate | 2.50% | [9] |
| Capitalization Rate | 24.50% | [10] |

**Notes:**

[1] Source: Duff & Phelps 2015 US Guide to Cost of Capital Long-term (20-year) US Treasury Coupon Bond Yield.
[2] Source: Duff & Phelps 2015 US Guide to Cost of Capital Long-horizon equity risk premium (supply-side).
[3] Source: Duff & Phelps 2015 US Guide to Cost of Capital Industry Risk Premium for SIC 8742 Management Consulting Services.
[4] Source: Duff & Phelps 2015 US Guide to Cost of Capital CRSP Decile Size Premium Decile 10-smallest.
[5] Due to qualitative factors of the company such as fees of key customer and the fraud.
[6] Source: Duff & Phelps 2015 US Guide to Cost of Capital – Industry SIC Composite SIC 8742 Management Consulting Services.
[7] Assumed corporate income tax rate of 35%.
[8] Source: Duff & Phelps 2015 US Guide to Cost of Capital – Industry SIC Composite SIC 8742 Management Consulting Services.
[9] BVR 2015 Q4 Economic Outlook Update p. 4 Exhibit 2A The long-term growth rate of Real GDP in the U.S. is forecast to be approximately 2.5%.
[10] WACC-less Long-Term Growth Rate.

1971

# Orion Healthcorp, Inc.
## Income Capitalization Analysis

**Orion Healthcorp, Inc. Income Approach - Capitalized Earnings Method**

| Description | FYE 12/31/2015 | | FYE 12/31/2016 | | |
|---|---|---|---|---|---|
| Net Revenue [1] | $ 55,490,216 | 100.0% | $ 53,936,035 | 100.0% | |
| | | | | | |
| Adj. EBITDA [1] | $ 13,554,606 | 24.4% | $ 3,066,238 | 5.7% | |
| Less: Normalized Depreciation [2] | 3,930,611 | 7.1% | 3,820,521 | 7.1% | |
| Less: Amortization [3] | - | 0.0% | - | 0.0% | |
| Operating Income | $ 9,623,995 | 17.3% | $ (754,283) | -1.4% | A |
| Tax Rate [4] | 35.0% | | 35.0% | | Tr |
| Less: Income Tax Provision | $ 3,368,398 | 6.1% | $ (754,283) | 0.0% | T = A * Tr |
| Net Operating Profit After Tax | $ 6,255,597 | 11.3% | $ (754,283) | -1.4% | B = A - T |
| Plus: Normalized Depreciation [2] | 3,930,611 | 7.1% | 3,820,521 | 7.1% | C |
| Plus: Amortization [3] | - | 0.0% | - | 0.0% | D |
| Less: Capital Expenditures [5] | 4,230,258 | 7.6% | 4,111,776 | 7.6% | CA |
| Less: Changes in Working Capital [6] | 249,706 | 0.4% | 242,712 | 0.4% | ΔWC |
| Free Cash Flow | $ 5,706,243 | 10.3% | $ (1,288,250) | -2.4% | FCF = B + C + D - CA - ΔWC |
| | | | | | |
| Estimated Long-term Growth Rate [4] | 1.025x | 10.5% | 1.025x | -2.4% | Gr |
| | $ 5,848,900 | | $ (1,320,457) | | E = FCF * Gr |
| | | | | | |
| Capitalization Rate [4] | 24.50% | 43.0% | 22.50% | | CAP |
| | | | | | |
| Market Value of Invested Capital | $ 23,873,059 | | $ - | | MVIC = E / CAP |
| Rounded | $ 23,870,000 | | $ - | 0.0% | |

**Notes:**

[1] See Schedule 3.1.

[2] Normalized Depreciation is calculated as: Normalized Capex / (1−.076).

[3] The amortization of the Company stems from non-recurring amortization of acquired assets. Therefore, we assume a go-forward amortization of $0. The tax shield benefit of the amortization of these assets however is calculated in Schedule 3.4.

[4] See Schedule 2.0.

[5] Based on our review of Orion's 2015 Tax Return, we assumed an expected useful life of amortizable assets to be 5 years. We then performed the calculation below to determine Orion's normalized CAPEX to sales ratio. In addition, the Integra Five-year Industry Report for SIC 8742 - Management Consulting Services CAPEX to Sales is approximately 7.4%.

**Assumptions**

| | |
|---|---|
| Growth rate | 2.5% |
| # years life | 5 |
| Capex(t+1) / Depreciation(t) ratio | 7.6% |

[6] See Schedule 3.2.

# Orion Healthcorp, Inc.
## Normalized Income Statement

### Orion Healthcorp, Inc. Normalized Income Statement

| Description | FYE 12/31/15[1] | | FYE 12/31/16[1] | |
|---|---|---|---|---|
| Net Revenue | $ 55,490,216 | 100.0% | $ 53,936,035 | 100.0% |
| COGS | - | 0.0% | - | 0.0% |
| Gross Profit | $ 55,490,216 | 100.0% | $ 53,936,035 | 100.0% |
| | | | | |
| General & Administrative Expenses | $ 55,231,907 | 99.5% | $ 67,353,097 | 124.9% |
| Net Operating Income | $ 258,309 | 0.5% | $ (13,417,061) | -24.9% |
| | | | | |
| Plus Other Income (Expenses) | $ (7,808,136) | -14.1% | $ (34,974,948) | -64.8% |
| Income Before Provision for Income Taxes | $ (7,549,827) | -13.6% | $ (48,392,010) | -89.7% |
| | | | | |
| Less: Income Tax Provision | $ 4,367,999 | 7.9% | $ (1,649,262) | -3.1% |
| Less: Other Comprehensive Loss | - | 0.0% | 659 | 0.0% |
| Comprehensive Net Income | $ (11,917,826) | -21.5% | $ (46,743,407) | -86.7% |
| | | | | |
| Add Back: | | | | |
| Plus Interest | $ 2,579,398 | 4.6% | $ 1,656,908 | 3.1% |
| Federal Tax expense | 1,645,978 | 3.0% | 3,283,866 | 6.1% |
| State and Local Tax | 960,090 | 1.7% | 700,000 | 1.3% |
| Deferred Tax Expense | 1,841,425 | 3.3% | - | 0.0% |
| Deferred Tax Benefit | (79,494) | -0.1% | (5,633,128) | -10.4% |
| Plus Depreciation | 1,284,608 | 2.3% | 2,582,067 | 4.8% |
| Plus Amortization | 3,201,757 | 5.8% | 9,217,893 | 17.1% |
| EBITDA | $ (484,064) | -0.9% | $ (34,935,801) | -64.8% |
| | | | | |
| Normalizing Adjustments | | | | |
| Add Back: | | | | |
| Consulting Fees | $ 1,123,116 | 2.0% | $ 865,893 | 1.6% |
| Professional Fees | 3,246,391 | 5.9% | 6,111,720 | 11.3% |
| Purchased Services | 1,480,059 | 2.7% | - | 0.0% |
| Normalized Executive Compensation | (475,907) | -0.9% | (487,805) | -0.9% |
| Contract Labor | 3,461,669 | 6.2% | 343,441 | 0.6% |
| Bad Debt Expense | 733,764 | 1.3% | 2,239,825 | 4.2% |
| Normalized Bad Debt Expense | (221,961) | 0.4% | (215,744) | 0.4% |
| Early Extinguishment of Debt | - | 0.0% | 6,265,566 | 11.6% |
| Debt Fees | - | 0.0% | 145,000 | 0.3% |
| Other Expense | 2,831,539 | 5.1% | 361,927 | 0.7% |
| Acquisition Fees | 1,860,000 | 3.4% | 22,372,216 | 41.5% |
| Total Adjustments | $ 14,038,670 | 25.3% | $ 38,002,039 | 70.5% |
| Normalized EBITDA | $ 13,554,606 | 24.4% | $ 3,066,238 | 5.7% |

Notes:
[1] See Schedule 7.0.

1973

**Orion Healthcorp, Inc.**
Normalized Change in Working Capital Analysis

### Orion Healthcorp, Inc. Normalized Change in Working Capital Analysis

| Description | FYE 12/31/15 | Year t+1 | FYE 12/31/16 | Year t+1 |
|---|---|---|---|---|
| Net Revenue[1] | $ 55,490,216 | $ 56,877,471 | $ 53,936,035 | $ 55,284,436 |
| Normalized Net Working Capital % of Revenue[1] | | 18.00% | | 18.00% |
| Normalized Working Capital | | $ 10,237,945 | | $ 9,951,199 |
| Net Working Capital - Year 1 | | $ 10,237,945 | | $ 9,951,199 |
| Long Term Growth Rate[2] | | 2.50% | | 2.50% |
| Net Working Capital - Perpetuity Assuming 2.5% Long Term Growth Rate | | $ 10,493,893 | | $ 10,199,978 |
| Change in Net Working Capital | | $ 255,949 | | $ 248,780 |
| Divided by: Deflation Factor (1 + Long Term Growth Rate) | | 1.025x | | 1.025x |
| Implied Change in NWC (Deflated) | | $ 249,706 | | $ 242,712 |

**Notes:**
[1] See Schedule 4.0.
[2] See Schedule 2.0.

# Orion Healthcorp, Inc.
## Balance Sheet Test Addendum - Liquidation Analysis

| Balance Sheet Test Addendum - Liquidation Analysis | As of 12/31/2015 | As of 12/31/2016 |
|---|---|---|
| Purchase Price of Orion Healthcorp, Inc.[1] | $ 12,600,000 | $ 12,600,000 |
| Plus: Amortization Tax-shield Benefit[2] | | $ 3,525,650 |
| Less: Short-term Debt | | 208,569 |
| Less: Long-term Debt[3] | $ 10,290,577 | 111,457,166 |
| Less: Working Capital Deficit (Surplus)[4] | 10,851,992 | 19,867,633 |
| Residual Value | $ (8,542,569) | $ (115,407,718) |
| Pass / Fail | FAIL | FAIL |

**Notes:**

[1] In July 2018 Orion Healthcorp, and 13 of its affiliates were acquired by MTBC for $12.6 million. We have used this value as a proxy for the liquidation value of the company and what the residual value would be if some of its affiliates were sold. This represents the floor value of Orion Healthcorp, Inc. and it affiliates. MTBC 2018 10-K p.3.

[2] See Schedule 3.4.
[3] See Schedule 5.3.
[4] See Schedule 4.0.